Dr. Isaacs
3553 West Chester Pike Unit #177
Newtown Square, PA 19073
Telephone: (212) 257-0737
Email: jdi@alum.dartmouth.org

U.S. DISTRICT COURT
DISTRICT OF N.H.
FILED

2012 FEB -3 P 1:31

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| DR J.D. ISAACS | **VERIFIED COMPLAINT** |
| Plaintiff, *pro se*, | Case No. CV12-cv-40- *PB* |
| -V- | |
| DARTMOUTH HITCHCOCK MEDICAL CENTER; MARY HITCHCOCK MEMORIAL HOSPITAL; TRUSTEES OF DARTMOUTH COLLEGE; and JOHN DOE, | **COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF** |
| Defendants. | |
| | **DEMAND FOR JURY TRIAL** |

## I. STATEMENT OF THE CLAIM

This Complaint for Damages, Injunctive, and Declaratory Relief describes an unethical scenario, devised by Dartmouth College Department of Psychiatry professors, to coerce Plaintiff's resignation from Dartmouth-Hitchcock Medical Center. Most egregiously, the evidence will show that the Defendants taunted and manipulated a victim of injury-induced neuropsychiatric illness. The Defendants, leaders in academic psychiatry, and aware of Plaintiff's deficits, became vengeful after he requested, on multiple occasions, legal protection under the Rehabilitation Act of 1973. Plaintiff seeks redress from this court that shall enjoin and restrain the Defendants from interfering with Plaintiff's work as a resident physician. The evidence will demonstrate that the Defendants' pathological scheme persisted over three to six months, and ultimately left Plaintiff in a state of mental shock.

## II. JURISDICTION AND VENUE

1. Jurisdiction is invoked pursuant to 28 U.S.C. § 1332. Furthermore, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 authorizes this action.

2. Venue is proper in the District of New Hampshire according to 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to this complaint occurred in New Hampshire. For those events that occurred in Vermont, California, or Arizona, this district is proper venue as per 28 U.S.C. § 1391(e)(2).

## III. THE PARTIES

### A. Plaintiff

3. Plaintiff DR J.D. ISAACS is a resident of Vermont. In June 2011, Plaintiff commenced a four-year graduate medical education program (the "Program," or "residency," or "internship") at Dartmouth. He also serves as a co-founder of an eponymous sustainable investment corporation. Plaintiff previously attended Vanderbilt Law School, and later obtained his medical degree in 2010. Plaintiff completed undergraduate studies at Dartmouth College. As a result of the actions described in the Complaint, he has relocated to Pennsylvania for medical treatment.

**B.      Defendants**

4.      Defendant DARTMOUTH HITCHCOCK MEDICAL CENTER ("DHMC") is, and at all times mentioned herein was, an academic medical center located at One Medical Center Drive, Lebanon NH. Likewise, MARY HITCHCOCK MEMORIAL HOSPITAL is the teaching hospital located at the same address. In addition to receiving substantial NIH funds, this year Defendants were specifically reimbursed approximately $100,000 in Medicare funds to train the Plaintiff to practice medicine.

5.      The TRUSTEES OF DARTMOUTH COLLEGE are located at Dartmouth College, Hanover, NH.

## IV.     FACTS APPLICABLE TO ALL CAUSES OF ACTION

6.      Plaintiff commenced postgraduate medical studies in June 2011 at Dartmouth. His curriculum for the PGY-1 intern year began with internal medicine, and would later focus on psychiatry. Also in June 2011, Plaintiff passed the United States Medical Licensing Exam Step 3; he completed the USMLE six months earlier than is typical for an intern. His performance for psychiatry was on the upper end of the USMLE scoring spectrum. The Dartmouth-Hitchcock Psychiatry residency program has a greater than average failure rate on USMLE Step 3.

7.      During his first week at DHMC, Plaintiff was required to work 18-hour shifts and a nearly 90-hour week, exceeding the duty hour regulations set by the ACGME (Accreditation Committee for Graduate Medical Education.) Plaintiff was told that he was "slow." He complained to his Program Director in writing.

8.      Plaintiff worked on the DHMC inpatient psychiatry unit for six months, beginning in July 2011. His monthly rotation evaluations submitted by Department of Psychiatry professors, representing roughly 80% of his work at DHMC, remarked that he achieved either "superior" or "satisfactory" performance in all criteria.

9.      Despite receiving positive evaluations from these Dartmouth College professors, the administrative Program Director, also an Associate Professor of Psychiatry, would meet with the

Plaintiff on almost a weekly basis to critique his skills. Plaintiff, not realizing the hour-long critical meetings he found himself subjected to were not the norm for an intern, initially believed the criticisms and attempted to improve. Over time, inconsistencies developed that concerned Plaintiff.

10. Plaintiff met with a leading researcher at DHMC to participate in exciting research; the researcher, initially receptive, several days later told the Plaintiff that he must "ask the Program Director" for permission, who denied it. Another discrepancy occurred when Plaintiff asked to transfer from the Psychiatry program to the Preventative Medicine program at Dartmouth; his Program administrators stated that he "wasn't competitive" enough and subsequently would not receive their recommendation. The Preventative Medicine program has a 100% acceptance rate, and is widely known to be open to all DHMC residents whom express interest. Yet another example, on the Plaintiff's days off, he would receive hostile emails from Program faculty, including a blatant example on Christmas Day with false allegations intended to upset the Plaintiff on Christmas.

11. In October, all resident physicians take an in-service training standardized exam (the "PRITE.") Plaintiff ranked above nearly half of his class (both at Dartmouth and nationwide) on the PRITE.

12. Plaintiff grew increasingly concerned when he realized that other residents, who scored lower than him on the PRITE, were not receiving the scrutiny he faced. For example, one intern administered three potentially teratogenic psychiatric drugs to a pregnant patient, but was never reprimanded. Another resident accidentally overdosed a patient on Abilify, ordering an accidental dose ten times the recommended dosage. On the other hand, the Plaintiff would be called into hour-long meetings under false pretenses regarding relatively minor issues.

13. Plaintiff has well documented previous neuropsychiatric diagnoses that developed after an injury he suffered in 1997.

14. In early September, Plaintiff met with his Program Director to request a medical leave of absence, due to the stress from relentless criticism. At this point, the Program Director refused the request, and downplayed the criticism, stating: "oh, I wasn't thinking anything like that [serious enough to warrant a medical leave.]" For about a month, the criticism subsided, before resuming in mid-October.

15. In November, an informant told the Plaintiff "I don't know what you did to warrant such intense scrutiny. I'm not sure I could make it [as a resident] if I were subjected to it." Informant later added "you're right, it's the [Program administrators] orchestrating this with a group of [Dartmouth College Department of Psychiatry] attendings."

16. The Dartmouth College Department of Psychiatry also diagnosed Plaintiff with a new neuropsychiatric disorder in October 2011. Initially they rated the severity as moderate-severe, then reduced it to moderate.

17. During an overnight Thanksgiving shift, Plaintiff requested immediate medical leave to a supervising Fellow. Inappropriate comments from Program faculty that evening, and concern over his new neuropsychiatric diagnosis, prompted this request. In front of multiple witnesses, and a deteriorating overdose patient, he demanded that an attending physician be called in from home, as the situation was becoming unsafe in his opinion.

18. Several days later, Plaintiff requested medical leave during a meeting with his Program Director, who denied his request. He had been reprimanded for the sick day he took following the Thanksgiving shift. He asked for disability accommodations during this meeting and during multiple additional meetings. At one point, the Program Director stated "accommodations are difficult to arrange for an intern." Another time, the Program Director stated "you're just a neurotic," and denied the necessity of any accommodation.

19. On November 30th, Plaintiff left voicemail regarding the Thanksgiving shift for the supervising Fellow from that evening. In the voicemail, he explained that the issues with his Program Director had not been resolved, and that a lawsuit was possibly the only recourse remaining.

20. Throughout December, patient was subject to subtle rude stares and other abnormal behavior from a group of Dartmouth College Professors of Psychiatry. Another informant suggested that the Plaintiff look for "another career."

21. On Friday, January 13 2012, at approximately 9:15AM, Plaintiff was accused and threatened while in a closed meeting with two senior Program faculty. One of the purported allegations was application fraud, namely, that Plaintiff had omitted a six-week Arizona employment internship on his job application to Dartmouth. The two individuals asked the Plaintiff to resign, to

1  avoid the ramifications of further investigations. They told Plaintiff that, over the weekend, they
2  would consider what processes to pursue during an Administrative Leave.
3      22.    Plaintiff knew, and possesses incontrovertible proof, that in April 2011, he disclosed
4  the Arizona internship on three separate applications sent to Dartmouth HR. Plaintiff suddenly
5  realized that, for much of the time he worked at DHMC, the Defendants had been looking for
6  pretextual reasons to terminate his employment.
7      23.    On Friday, January 13 2012 at approximately 10:15AM, and after being subjected to
8  behavior that he believes constitutes blackmail, Plaintiff developed wheezing and an acute-on-
9  chronic stress reaction ("mental shock"). He was admitted to the DHMC ED at 10:30AM.
10     24.    At around 7:30PM, a White River Junction, Vermont Veteran's Administration (VA)
11 hospital employee emailed Plaintiff. The email evidences that news of Plaintiff's medical condition
12 had crossed state lines, without his consent. Such action, not only a violation of HIPAA, evidences
13 the fact that chatter about the Plaintiff within the Department of Psychiatry had grown substantially.
14     25.    Plaintiff was discharged from the DHMC ED at 9PM. His treating physician noted
15 that in a discussion with a "high quality" source of collateral information, he was told that Plaintiff
16 had been subjected to "cruel and unusual" treatment by the Department of Psychiatry.
17     26.    Plaintiff is currently pursuing the medical care recommended by the DHMC ED.
18     27.    Plaintiff never received written declaration from the Defendants notifying him of
19 change in his employment status, such as medical leave, administrative leave, or otherwise. Despite
20 this fact, his DHMC email account (containing evidence critical to this complaint) has been
21 terminated.

## V. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### SECTION 504 OF THE REHABILITATION ACT OF 1973 (29 U.S.C. § 794)

28. Plaintiff realleges and incorporates by reference the allegations of the paragraphs 1 through 27 of this complaint as though fully set forth herein.

29. Plaintiff has well documented neuropsychiatric disability stemming from a 1997 injury, as well as a more recent diagnosis determined by the Defendants.

30. Defendants denied Plaintiff any reasonable accommodation for his disability, including but not limited to a medical leave of absence and/or schedule adjustments to compensate for neuropsychiatric limitations.

31. The conduct set forth above denied Plaintiff his deserved participation in and the benefits of the Medicare funded graduate medical program operated by the Defendants.

32. The foregoing conduct did, in fact, cause Plaintiff to suffer losses. As a proximate result of said conduct, Plaintiff suffered loss of career opportunity, physical illness, and emotional distress.

## SECOND CAUSE OF ACTION

## RETALIATION (29 U.S.C. § 794 AND CIVIL LAW

33. Plaintiff realleges and incorporates by reference the allegations of the paragraphs 1 through 27 of this complaint as though fully set forth herein.

34. Plaintiff engaged in protected activity on multiple occasions. He asked his Program Director for accommodation, as well as medical leave as early as September 2011. He also left a voicemail threatening a lawsuit to a supervising Fellow.

35. Defendants retaliated by using false pretense to create a hostile environment and to coerce Plaintiff to resign his position, which he refused to do.

36. Causality is established by the peculiar timeline of the Defendants actions; in January 2012, Defendants threatened Plaintiff concerning a disclosure he made to them in April, 2011.

37. As a proximate result of said conduct, Plaintiff required immediate medical treatment in the Defendants' Emergency Department (ED).

## THIRD CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

38. Plaintiff realleges and incorporates by reference the allegations of the paragraphs 1 through 27 of this complaint as though fully set forth herein.

39. The conduct set forth above was extreme and outrageous and an abuse of the position of Defendants. Said conduct was intended to cause severe emotional distress, or was done in conscious disregard of the probability of causing such distress.

40. The foregoing conduct did, in fact, cause Plaintiff to suffer extreme emotional distress. As a proximate result of said conduct, Plaintiff suffered an acute-on-chronic stress reaction and other emotional distress.

## FOURTH CAUSE OF ACTION
### NEGLIGENCE

41. Plaintiff realleges and incorporates by reference paragraphs 1 through 27 of this complaint as though fully set forth herein.

42. Defendants, as required by the Health Insurance Portability Act of 1996, had a duty to maintain the confidentiality of the Plaintiff's protected health information (PHI).

43. On January 13th 2012, Defendants breached this duty of care. To support his claim, pursuant to the American Recovery and Reinvestment Act of 2009, Division A, Title XIII, Subtitle D, Section 13405(c), Plaintiff requested a facsimile of his DHMC eD-H EPIC Electronic Medical Record (EMR) audit trail from Defendants.

44. As a result of their breach of duty, the Plaintiff suffered damage to his professional reputation, as well as his inherent sense of and right to privacy.

## FIFTH CAUSE OF ACTION
### BREACH OF CONTRACT

45. Plaintiff realleges and incorporates by reference paragraphs 1 through 27 of this complaint as though fully set forth herein.

46. Plaintiff and Defendants entered into numerous contracts in April 2011. Plaintiff signed and accepted an Agreement of Appointment, along with approximately eight additional forms, applications, and agreements sent to him by DHMC human resources (the "new hire packet.") He also signed a HIPAA patient rights declaration as a DHMC ED patient on January 13, 2012.

47. Within the new hire packet that the Plaintiff returned to DHMC GME HR, Plaintiff fully disclosed his voluntary resignation from the six-week Arizona internship. Plaintiff also alleges that, in fact, Defendants either 1) negligently failed to read Plaintiff's returned new hire packet, or 2) read it in April 2011.

48. The Plaintiff and the Defendants initiated full performance of and reliance upon these aforementioned contracts no later than June 26th, 2011 (Plaintiff's employment start date at DHMC).

49. On January 13th 2012, Defendants (the Program Directors) verbally informed Plaintiff that he was being placed immediately on Administrative Leave; they stated that, purportedly, Plaintiff withheld disclosure of his Arizona employment.

50. Furthermore, the Program Directors referenced the 'after-acquired evidence' principle to Plaintiff; they posited that because the Plaintiff failed to disclose material facts to DHMC, the employer would be immune to disability accommodation requests and emotional distress claims resulting from his employment.

51. Defendants also purported that Plaintiff violated the Medicare False Claims Act. They suggested Administrative Leave might address this allegation, as well as any additional information provided by Defendant John Doe.

52. Defendants breached the aforementioned contracts no later than January 13th, by coercing Plaintiff to resign without affording him due process. Specifically, DHMC regulations required the Defendants' Program Directors to provide written declaration of all accusations that warrant initiation of the Administrative Leave process. Instead, Plaintiff was threatened with false accusations, in exchange for not pursuing formal Administrative Leave.

## SIXTH CAUSE OF ACTION
## FRAUD

53. Plaintiff realleges and incorporates by reference the allegations of the paragraphs 1 through 27 of this complaint as though fully set forth herein.

54. Defendants, on numerous occasions, knowingly misrepresented Plaintiff's performance as a resident physician. Such misrepresentations had a cumulative effect within the organization, in that they lead innocent physicians to doubt Plaintiff, further spiraling his deterioration.

55. The evidence, including objective standardized exams and witness testimony, will show that the Defendants' representations were false and retaliatory in nature.

56. Defendants acted in such fashion to achieve a desired benefit of material value, namely, the Plaintiff's resignation. Moreover, a voluntary resignation would render moot most, if not all, of the Plaintiff's legal claims against the Defendants. Furthermore, the Defendants were able to collect nearly $100,000 in Medicare funds by staffing the Plaintiff during the drawn-out retaliatory phase, rather than simply dismissing him. The Program was plagued by an atypically high attrition rate, suffering three unexpected vacancies in 2011 and possibly a resultant $300,000 in lost Medicare funding. The Program was perpetually concerned that the DHMC administration would move ahead with a proposal to convert the DHMC inpatient psychiatry unit into a DHMC surgical ward, due to funding deficits.

57. But for *bona fide* suspicion, Plaintiff was unaware of the extent of Defendants' fraudulent actions until January 13th. (See Declaration of Plaintiff)

58. Plaintiff, trusting the more senior Dartmouth Professors of Psychiatry, relied on these fraudulent statements and documents to conduct his work as a resident physician. For example, he believed the Program director's assessment that he was not competitive for the LPMR Preventative Medicine program; he believed their recommendation that he should not participate in research with the renowned DHMC neuroscience researcher; he believed their vicious criticism by email on Christmas day.

59. As a resident physician in a Medicare funded training program, Plaintiff had every right and expectation to trust that his Program Directors' statements and evaluations were accurate, true, and fair.

60. As a result of the dishonest actions committed by the Defendants, Plaintiff worked under false pretenses for months. Upon discovering the fraud on January 13th, Plaintiff entered an acute stress condition, shocked that he was lied to for months by DHMC psychiatrists. He suffered substantial career and emotional losses as a direct and reasonably foreseeable result of their behavior.

## SEVENTH CAUSE OF ACTION
## FOR INJUNCTIVE RELIEF

61. Plaintiff realleges and incorporates by reference paragraphs 1 through 27 of this complaint as though fully set forth herein.

62. Defendants' wrongful conduct, unless and until enjoined and restrained by order of this court, will cause great and irreparable injury to Plaintiff's medical career.

63. Plaintiff is therefore entitled to a preliminary and permanent injunction ordering Defendants to cease interference with Plaintiff's residency at Dartmouth-Hitchcock.

64. Plaintiff has no plain, speedy or adequate remedy at law other then injunctive relief so as to prevent further damage to Plaintiff's medical career and his psychological well-being.

## VI. STATEMENT OF DAMAGES

65. As a direct and proximate result of the wrongful acts and/or omissions of the Defendants, as set forth above, Plaintiff has sustained the following injuries and damages:

    a. Severe stress reaction and other emotional distress;

    b. Loss of career opportunity; and

    c. Past and future medical expenses;

WHEREFORE, the Plaintiff prays for damages as follows:

1. a. That this Court declare the rights of all parties;
2. b. Compensatory damages, including, but not limited to general and special damages, amounting to $529,000;
3. c. Exemplary and punitive damages;
4. d. Costs of suit incurred herein;
5. e. That this Court issue a permanent injunction, all enjoining and restraining Defendants, and each of them, from restricting Plaintiff's ability to pursue his Medicare-funded graduate medical education at DHMC; and
6. f. All other compensatory, equitable and declaratory relief as this Court deems just.

Respectfully submitted, this 3rd day of February, 2012.

*[signature]*

J. D. ISAACS

Plaintiff, *pro se*

# DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial of this action.

*[signature: J D Isaacs]*

DATED: February 3, 2012.

                J. D. ISAACS

                Plaintiff, *pro se*

# VERIFICATION

I, J.D. Isaacs, do declare as follows:

That I am the Plaintiff in the above-entitled action. I have read the foregoing Complaint for Damages, Declaratory and Injunctive Relief; Demand for Jury Trial, and I know its contents.

I declare, therefore, that the matters stated in the foregoing document are true of my own knowledge, except as to matters which are stated on information and belief, and as to those matters, I believe them to be true. Those matters I aver are what I know to be true.

I declare under penalty of perjury under the law of the United States that the foregoing is true and correct.

Executed on this 3rd day of February, 2012.

_____

J. D. ISAACS

Plaintiff, *pro se*