Dr. Isaacs
3553 West Chester Pike Unit #177
Newtown Square, PA 19073
Telephone: (212) 257-0737
Email: jdi@bakerisaacs.com

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| DOCTOR J. D. ISAACS | **VERIFIED COMPLAINT** |
| Plaintiff, *pro se*, | Case No. CV-12-40-JL |
| -V- | |
| DOCTOR CHRISTINE T. FINN; | **AMENDED COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF** |
| DOCTOR JIM YONG KIM; | |
| DOCTOR DOUGLAS NOORDSY; | |
| DARTMOUTH HITCHCOCK MEDICAL CENTER; | |
| MARY HITCHCOCK MEMORIAL HOSPITAL; | |
| TRUSTEES OF DARTMOUTH COLLEGE; | |
| and JOHN DOE, | |
| Defendants. | |
| | **DEMAND FOR JURY TRIAL** |

## I.  STATEMENT OF THE CLAIM

This Amended Complaint for Damages, Injunctive, and Declaratory Relief describes an unethical scenario, devised by Dartmouth College Department of Psychiatry professors, to coerce Plaintiff's resignation from Dartmouth-Hitchcock Medical Center. Over eight months of employment, the Defendants constantly developed and revised immaterial and false allegations against the Plaintiff, in hopes he would vacate his position. Ultimately, the Defendants affirmed knowledge of previous litigation relating to injury-induced neuropsychiatric illness. Most egregiously, the evidence will show that the Defendants' taunting and manipulative behavior, if they indeed possessed knowledge of Plaintiff's previous litigation, would amount to unauthorized experimentation pursuant to the Nuremburg Code.

A separate lawsuit underway since 2010 in the United States District Court for Vermont alleges that many of the same Dartmouth Department of Psychiatry professors conducted inappropriate "fitness for duty" tests on another resident physician before terminating her employment. The Defendants, leaders in academic psychiatry, and aware of Plaintiff's deficits, became increasingly vengeful after Plaintiff exercised rights to obtain legal protection under the Rehabilitation Act of 1973 and other law.

The evidence in this case will demonstrate that the Defendants' pathological scheme persisted over six to eight months, and ultimately left Plaintiff in a state of mental shock. Plaintiff seeks redress from this Honorable Court that shall enjoin and restrain the Defendants from interfering with Plaintiff's career work in international medicine and development.

## II.  JURISDICTION AND VENUE

1.    Jurisdiction is invoked pursuant to 28 U.S.C. § 1332. Furthermore, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 authorizes this action.

2.    Venue is proper in the District of New Hampshire according to 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to this complaint occurred in New Hampshire. For those events that occurred in Vermont, California, or Arizona, this district is proper venue as per 28 U.S.C. § 1391(e)(2).

### III.  THE PARTIES

**A.    Plaintiff**

3.    Plaintiff DOCTOR J. D. ISAACS is a resident of Pennsylvania. In June 2011, Plaintiff commenced a graduate medical education program (the "Program," or "residency," or "internship") at Dartmouth. He also serves as a co-founder of an eponymous sustainable investment corporation. Plaintiff previously attended Vanderbilt Law School, and later obtained his medical degree in 2010. He holds an MBA from the Insead-Wharton program. Plaintiff completed undergraduate studies at Dartmouth College. As a result of the actions described in the Amended Complaint, he relocated residency from Vermont to Pennsylvania for medical treatment.

**B.    Defendants**

4.    Defendant DARTMOUTH HITCHCOCK MEDICAL CENTER ("DHMC") is, and at all times mentioned herein was, an academic medical center located at One Medical Center Drive, Lebanon NH. Likewise, MARY HITCHCOCK MEMORIAL HOSPITAL is the teaching hospital located at the same address. In addition to receiving substantial NIH funds, this year Defendants were specifically reimbursed approximately $100,000 in Medicare funds to train the Plaintiff to practice medicine.

5.    Defendants DOCTOR CHRISTINE T. FINN, DOCTOR JIM YONG KIM, DOCTOR DOUGLAS NOORDSY and the TRUSTEES OF DARTMOUTH COLLEGE are employed by and or located at Dartmouth College, Hanover, NH.

### IV.    FACTS APPLICABLE TO ALL CAUSES OF ACTION

6.    In February 2011, Defendant Finn sent a recruitment letter to the Plaintiff, claiming a strong "connection" with Partners in Health, an organization founded by Defendant Kim. The letter advertised opportunities to conduct medical training with the renowned international aid group. Plaintiff accepted the recruitment offer, and commenced postgraduate medical studies in June 2011 at Dartmouth.

7.    During his first week at DHMC, Plaintiff was required to work eighteen-hour shifts and almost a ninety hour week, exceeding the duty hour regulations set by the ACGME (Accreditation Committee for Graduate Medical Education.)  He complained to his Program Director, Defendant Finn, in writing.

8.    Plaintiff worked on the DHMC inpatient psychiatry unit for six months, beginning in July 2011. His monthly rotation evaluations submitted by Department of Psychiatry professors, representing roughly 80% of his work at DHMC, remarked that he achieved either "superior" or "satisfactory" performance in all criteria.

9.    Despite receiving positive evaluations from these Dartmouth College professors, Defendant Finn, also an Associate Professor of Psychiatry, would meet with the Plaintiff on a biweekly basis to critique his skills. Plaintiff, not realizing the hour-long critical meetings he found himself subjected to were not the norm for an intern, initially believed the criticisms and attempted to improve. Over time, inconsistencies developed that concerned Plaintiff (See Ethics Complaint).

10.    Plaintiff met with a leading researcher at DHMC to participate in exciting research; the researcher, initially receptive, several days later told the Plaintiff that he must obtain Defendant Finn's permission, which she denied. Likewise, Plaintiff asked to participate in the Preventative Medicine program at Dartmouth, but Defendant Finn stated that he "wasn't competitive" enough and subsequently would not receive a recommendation necessary to apply. The Preventative Medicine program has a 100% acceptance rate, and is widely known to be open to all DHMC residents whom express interest.

11.    Plaintiff scored a 241/99 on the United States Medical Licensing Exam 1, roughly higher than 90% of the Department of Psychiatry. Plaintiff ranked above nearly half of his class on the nationwide standardized in-service training exam (the "PRITE."). Likewise, Plaintiff passed the USMLE Step 3 six months earlier than is typical for an intern, with subject performance for psychiatry on the upper end of the USMLE scoring spectrum. The Dartmouth-Hitchcock Psychiatry residency program has a greater than average failure rate on USMLE Step 3.

12.    Plaintiff grew increasingly concerned when he realized that other residents, who scored lower than him on these exams, were not subjected to the scrutiny he faced. For example, one

intern administered three potentially teratogenic psychiatric drugs to a pregnant patient. Another resident accidentally overdosed a patient on Abilify, ordering an accidental dose ten times the recommended dosage. These residents seemed to be left alone, but on the other hand, the Plaintiff would be called into hour-long meetings under false pretenses regarding relatively minor issues.

13.    Plaintiff has well documented previous neuropsychiatric diagnoses that developed after a brain injury he suffered in 1997.

14.    In early September, Plaintiff met with his Program Director to request a medical leave of absence, due to the stress from relentless criticism. At this point, the Program Director refused the request, and stated that Plaintiff's performance was satisfactory.

15.    In November, an informant told the Plaintiff "I don't know what you did to warrant such intense scrutiny. I'm not sure I could make it [as a resident] if I were subjected to it." Informant later added "you're right, it's the [Program administrators] orchestrating this with a group of [Dartmouth College Department of Psychiatry] attendings."

16.    The Dartmouth College Department of Psychiatry diagnosed Plaintiff with a new neuropsychiatric disorder in October 2011. Initially Plaintiff's treating physician described the condition as moderate-severe, then re-documented the diagnosis severity to mild-moderate.

17.    During an overnight Thanksgiving shift, and in the presence of multiple witnesses, Plaintiff urged that an attending physician be called in from home to treat a deteriorating overdose patient. Plaintiff believed that the safety of a queue of patients was becoming endangered due to unnecessary delays. Cumulative frivolous criticism created substantial delay in Plaintiff's ability to authorize the urgent admission of an overdose patient. In light of his own diagnosis and worsening ability to perform his duties, Plaintiff stated to a supervisor that he felt he required medical leave.

18.    Several days later, Plaintiff requested medical leave during a meeting with his Defendant Finn, who denied his request. He had been reprimanded for the sick day he took following the Thanksgiving shift. Plaintiff asked for disability accommodations during this meeting and during multiple additional meetings. At one point, the Program Director stated "accommodations are difficult to arrange for an intern." Another time, the Program Director stated "you're just a neurotic," and denied the necessity of any accommodation.

19.    On November 30th, Plaintiff left voicemail regarding the Thanksgiving shift for the supervisor from that evening. In the voicemail, he explained that the issues with the Defendants had not been resolved, and that a lawsuit might warrant consideration.

20.    Throughout December, patient was subject to rude stares and other abnormal behavior from a small group of Dartmouth College Professors of Psychiatry. Another informant suggested that the Plaintiff look for "another career."

21.    On Friday, January 13 2012, at approximately 9:15AM, Plaintiff was accused and threatened while in a closed meeting with Defendant Finn and another senior professor. The two individuals asked the Plaintiff to resign, to avoid the ramifications of further investigations. They stated they would consider what processes to pursue, including Administrative Leave. However, no such process was formally initiated.

22.    Plaintiff suddenly realized that, for much of the time he worked at DHMC, the Defendants had been looking for pretextual reasons to terminate his employment. The attached "Statement of Plaintiff" is hereby incorporated fully within this Amended Complaint.

23.    On Friday, January 13 2012 at approximately 10:15AM, after being subjected to behavior that he believes constitutes blackmail, coercion and fraud, Plaintiff developed wheezing and an acute-on-chronic stress reaction ("mental shock"). He was admitted to the DHMC ED at 10:30AM.

24.    While Plaintiff was in the DHMC ED, a White River Junction, Vermont Veteran's Administration (VA) hospital employee emailed Plaintiff. The email evidences that news of Plaintiff's hospitalization had crossed state lines, without his consent. Likewise, another DHMC employee sent a message of sympathy to Plaintiff's pager. Such actions, carried out by well-intending individuals who shall deserve protection under appropriate whistle-blower laws, evidences gross violation of HIPAA.  Inappropriate discourse about the Plaintiff within the Department of Psychiatry appeared widespread. (Exhibit B).

25.    In his DHMC patient chart, the ED treating physician noted that in a discussion with a "high quality" source of collateral information, he was told that Plaintiff had been subjected to "cruel and unusual" treatment by the Department of Psychiatry.

26.    Plaintiff moved to Pennsylvania to pursue the medical care recommended by the DHMC ED. He assumed that he was on Dartmouth's "unlimited sick day" policy, since no other procedure had been properly initiated at DHMC.

27.    For ten weeks, because Plaintiff had never received written declaration from the Defendants notifying him of any change in his employment status, he implored Defendant Kim and Dartmouth Counsel to enforce and to grant him due process. Multiple requests (Exhibit C) were simply ignored.

28.    Around January 17th, Defendant Finn instructed Christine Fitts to disable and or delete his DHMC computer accounts. Plaintiff notified Defendant Kim that these computer accounts contained evidence critical to his ethics complaint, his defense against any DHMC administrative actions, his United States District Court lawsuit, and his Office of Civil Rights HIPAA complaint. Defendant Kim seemingly ignored Plaintiff's request. (Exhibit C)

29.    On January 17th, Plaintiff filed a HIPAA complaint against the Dartmouth Department of Psychiatry with the Office of Civil Rights in Boston.

30.    On January 15th and February 6th, Plaintiff notified Defendant Kim of alleged violations of Dartmouth's Business Ethics guidelines.

31.    Upon assuming office in 2009, Kim actually enacted the enforcement of these guidelines. Plaintiff requested meetings on several occasions, and again, was ignored.

32.    On January 23rd, Plaintiff emailed Counsel Edward Kaplan requesting to know if Defendant Kim would respond to his request; in the alternative, Plaintiff requested that Kaplan liase his request to the Trustees. Kaplan ignored Plaintiff's requests.

33.    The ethics investigation request alleged 1) statements of bias against mental illness 2) deception, coercion, and fraud 3) knowingly worsening a medical illness 4) subjecting patients to improper detainment, and 5) possible unauthorized medical experimentation pursuant to the Nuremberg Code & Helsinki Protocol. Plaintiff's ethics complaint contains forty-eight "discrepancies" alleging bizarre and/or ethically questionable behavior. (Exhibit D)

34.    On March 13th, Plaintiff emailed Dartmouth GME and Defendant Kim requesting an inter-departmental transfer. Plaintiff also complained about Defendants inaction on his ethics

investigation request. Plaintiff alleges that a conflict of interest existed between Partners-in-Health and the Psychiatry leadership which explains Defendant Kim's inaction on Plaintiff's Business Ethics complaint. Ironically, Defendant Kim issued the enforcement code of Dartmouth's Business Ethics policy. Moreover, to the best of Plaintiff's knowledge, Kim outright ignored claims of evidence withholding and or destruction. He also ignored Plaintiff's requests for how own medical records, pursuant to the American Recovery and Reinvestment Act.

35.    On March 16th, the Office of Civil Rights notified Defendants of a pending HIPAA investigation concerning Plaintiff's January 18th complaint.

36.    On March 19th, Defendants terminated Plaintiff's employment. The termination letter falsely purports that Plaintiff had been on formal Administrative Leave.  Defendants terminated Plaintiff's employment before allowing him any opportunity to defend the allegations.

37.    In this notice of termination, it is alleged that the Defendants issued false and scandalous statements regarding a matter of previous litigation. In a settlement agreement ordered years ago by a United States District Judge, Plaintiff had been acquitted of certain allegations and controversies. Defendant Finn's statements, but for serving as embarrassing blackmail/coercion material, is false, scandalous, and immaterial to Plaintiff's employment at DHMC.

## V.  CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### UNCONSTITUTIONAL RETALIATION

38.    Plaintiff realleges and incorporates by reference the allegations of the paragraphs 1 through 37 of this complaint as though fully set forth herein.

39.    During his residency training, Plaintiff engaged in multiple legally protected acts, including filing a HIPAA complaint with the OCR, submitting requests for medical accommodation and leave, notifying an ethics violation to Defendant Kim, and complaining about patient endangerment to Defendant Finn.

40.    Plaintiff alleges previous litigation played a role in angering the Defendants.

41.    Defendants abused, harassed and humiliated Plaintiff.

42.    Defendants' conduct created a hostile working environment for Plaintiff.

43.    Defendants' termination of Plaintiff from the residency program, and from his employment, constituted retaliation against him for these complaints.

44.    As a direct and proximate result of defendants' actions, Plaintiff suffered irreparable injuries, including but not limited to loss of career opportunities, compensation and benefits as well as other economic losses, emotional pain and suffering, mental anguish, humiliation, embarrassment, personal indignity and other intangible injuries for all of which seeks compensation

## SECOND CAUSE OF ACTION

### SECTION 504 OF THE REHABILITATION ACT OF 1973 (29 U.S.C. § 794)

45.    Plaintiff realleges and incorporates by reference the allegations of the paragraphs 1 through 37 of this complaint as though fully set forth herein.

46.    Plaintiff has well documented neuropsychiatric disability stemming from a 1997 injury, as well as a more recent diagnosis determined by the Defendants.

47.    Defendants denied Plaintiff any reasonable accommodation for his disability, including but not limited to a medical leave of absence and/or schedule adjustments to compensate for neuropsychiatric limitations.

48.    The conduct set forth above denied Plaintiff his deserved participation in and the benefits of the Medicare funded graduate medical program operated by the Defendants.

49.    The foregoing conduct did, in fact, cause Plaintiff to suffer losses.  As a proximate result of said conduct, Plaintiff suffered loss of career opportunity, physical illness, and emotional distress.

## THIRD CAUSE OF ACTION

### BREACH OF CONTRACT

### (INCLUDING NUREMBERG CODE VIOLATIONS)

50.  Plaintiff realleges and incorporates by reference the allegations of the paragraphs 1 through 37 of this complaint as though fully set forth herein.

51.  Plaintiff held the residency position under express and/or implied promises, including compliance with the Nuremberg Code as applicable to human medical test subjects. Such promises are located within the DHMC Code of Ethics, IRB policies, and the Dartmouth College Business Ethics guidelines. Additional contract claims violated pertain to job security, adequate educational and training experiences, appropriate supervision and counseling, reasonable accommodations for medical disability, as well as a work environment conducive to performing as a resident physician, all of which were memorialized in Defendants' written policies and agreements and discussions between the parties. Defendants' policies warranted a safe, accommodating work environment free from harassment and unfair treatment, including violating the Nuremberg Code.

52.  Plaintiff informed Defendants of a prior head trauma by filling out his 'new hire packet.' It is also alleged that once Defendants' knew about Plaintiff's prior litigation, they possessed more detailed medical history.

53.  It is alleged that Defendants ignored Plaintiff's Constitutional due process rights and disability rights, and created a hostile environment, in breach of these contractual obligations.

54.  Furthermore, it is alleged that, as leaders in academic psychiatry, Defendants took personal curiosity in the complexity of Plaintiff's neuropsychiatric diagnosis, subjected him to informal tests/challenges, provoked symptoms, and refined their tests/challenges over the course of several months.

55.  It is alleged Defendants' acted so unethically because they believed they had immunity to legal claims, based upon Plaintiff's purported failure to disclose information on an ERAS application.

56.  As a direct and proximate result of defendants' actions, Plaintiff suffered irreparable injuries, including but not limited to loss of career opportunities, compensation and benefits as well as other economic losses, emotional pain and suffering, mental anguish, humiliation, embarrassment, personal indignity and other intangible injuries for all of which seeks compensation

1
2
3
**FOURTH CAUSE OF ACTION**
4
**AMERICANS WITH DISABLITIES ACT VIOLATIONS**
5
6      57.   Plaintiff realleges and incorporates by reference the allegations of the paragraphs 1
7   through 37 of this complaint as though fully set forth herein.
8      58.   Plaintiff engaged in protected activity on multiple occasions. He asked his Program
9   Director for accommodation, as well as medical leave as early as September 2011. He also left a
10  voicemail threatening a lawsuit to a supervising Fellow.
11     59.   Defendants retaliated by using further false pretenses to create more hostile
12  environment and to coerce Plaintiff to resign his position, which he refused to do.
13     60.   Causality is established by the peculiar timeline of the Defendants actions; in January
14  2012, Defendants threatened Plaintiff concerning a disclosure he made to them in April, 2011.
15     61.   As a proximate result of said conduct, Plaintiff required immediate medical treatment
16  in the Defendants' Emergency Department (ED).
17
18
**FIFTH CAUSE OF ACTION**
19
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
20
21     62.   Plaintiff realleges and incorporates by reference the allegations of the paragraphs 1
22  through 37 of this complaint as though fully set forth herein.
23     63.   The conduct set forth above was extreme and outrageous and an abuse of the position
24  of Defendants.  Said conduct was intended to cause severe emotional distress, or was done in
25  conscious disregard of the probability of causing such distress.
26     64.   The foregoing conduct did, in fact, cause Plaintiff to suffer extreme emotional distress.
27  As a proximate result of said conduct, Plaintiff suffered an acute-on-chronic stress reaction and other
28  emotional distress.

## SIXTH CAUSE OF ACTION

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

65.   Plaintiff realleges and incorporates by reference the allegations of the paragraphs 1 through 37 of this complaint as though fully set forth herein.

66.   To the extent that some Defendants may have had more limited knowledge of Plaintiff's medical condition and history, their generally negligent and inconsiderate behavior worsened his condition, worsened the effects of other Defendants' intentional actions, and prolonged his ability to obtain due process.

67.   Defendants had a duty to maintain HIPAA laws, enforce the DHMC Code of Ethics and Dartmouth Business Ethics policy, and other aforementioned contractual duties as stated in this Amended Complaint.

68.   By ignoring Plaintiff's requests for help, and ignoring his worsening distress that should have been obvious to leaders in academic medicine, Defendants breached these duties.

69.   The foregoing conduct did, in fact, cause Plaintiff to suffer extreme emotional distress. As a proximate result of said conduct, Plaintiff suffered an acute-on-chronic stress reaction and other emotional distress.

## SEVENTH CAUSE OF ACTION

## NEGLIGENCE (INCLUDING HIPAA / ARRA)

70.   Plaintiff realleges and incorporates by reference paragraphs 1 through 37 of this complaint as though fully set forth herein.

71.   Defendants, as required by the Health Insurance Portability Act of 1996, had a duty to maintain the confidentiality of the Plaintiff's protected health information (PHI).

72.   On January 13th 2012, Defendants breached this duty of care. To support his claim, pursuant to the American Recovery and Reinvestment Act of 2009, Division A, Title XIII, Subtitle D, Section 13405(c), Plaintiff requested a facsimile of his DHMC eD-H EPIC Electronic Medical Record (EMR) audit trail from Defendants.

73.   As a result of their breach of duty, the Plaintiff suffered damage to his professional reputation, as well as his inherent sense of and right to privacy. He also could suffered delays in defending his Constitutional right to due process as a result of ARRA violations.

## EIGHTH CAUSE OF ACTION
### FRAUD

74.   Plaintiff realleges and incorporates by reference the allegations of the paragraphs 1 through 37 of this complaint as though fully set forth herein.

75.   Defendants, on numerous occasions, knowingly misrepresented Plaintiff's performance as a resident physician. Such misrepresentations had a cumulative effect within the organization, in that they lead innocent physicians to doubt Plaintiff, further spiraling his deterioration.

76.   The evidence, including objective standardized exams and witness testimony, will show that the Defendants' representations were false and retaliatory in nature.

77.   Defendants acted in such fashion to achieve a desired benefit of material value, namely, the Plaintiff's resignation. Moreover, a voluntary resignation would render moot most, if not all, of the Plaintiff's legal claims against the Defendants. Furthermore, the Defendants were able to collect nearly $100,000 in Medicare funds by staffing the Plaintiff during the drawn-out retaliatory phase, rather than simply dismissing him. The Program was plagued by an atypically high attrition rate, suffering three unexpected vacancies in 2011 and possibly a resultant $300,000 in lost Medicare funding. The Program was perpetually concerned that the DHMC administration would move ahead with a proposal to convert the DHMC inpatient psychiatry unit into a DHMC surgical ward, due to funding deficits.

78.   But for *bona fide* suspicion, Plaintiff was unaware of the extent of Defendants' fraudulent actions until January 13th. (See Statement of Plaintiff)

79.   Plaintiff, trusting the more senior Dartmouth Professors of Psychiatry, relied on these fraudulent statements and documents to conduct his work as a resident physician. For example, he

believed the Program director's assessment that he was not competitive for the LPMR Preventative

Medicine program; he believed their recommendation that he should not participate in research with

the renowned DHMC neuroscience researcher; he believed their vicious criticism by email on

Christmas day.

80.    As a resident physician in a Medicare funded training program, Plaintiff had every

right and expectation to trust that his Program Directors' statements and evaluations were accurate,

true, and fair.

81.    As a result of the dishonest actions committed by the Defendants, Plaintiff worked

under false pretenses for months. Upon discovering the fraud on January 13th, Plaintiff entered an

acute stress condition, shocked that he was lied to for months by DHMC psychiatrists. He suffered

substantial career and emotional losses as a direct and reasonably foreseeable result of their behavior.

## NINTH CAUSE OF ACTION

## BREACH OF COVENENT OF GOOD FAITH AND FAIR DEALING

82.    Plaintiff realleges and incorporates by reference the allegations of the paragraphs 1

through 37 of this complaint as though fully set forth herein.

83.    Every contract carries with it an implied obligation of good faith and fair dealing,

whether the contract is express or implied.

84.    The obligation of good faith performance requires the contract parties to act

consistent with common standards of decency, fairness and reasonableness and with the parties

agreed-upon common purposes and justified expectations.

85.    In addition to the foregoing illegal and improper treatment of Plaintiff, Defendants

also falsely accused him of conduct that endangered patient care, unfairly loaded extra and failing to

properly fulfill his work obligations.

86.    Defendants accused plaintiff of misconduct and incompetence based on events that

did not occur as Defendant portrayed them. Defendants accusations against plaintiff were false.

87.    Defendants failed and/or refused to act according to the obligation and the covenant.

88.    Defendants' conduct, as described, breached the obligation and the covenant.

## TENTH CAUSE OF ACTION
### FOR INJUNCTIVE RELIEF

89.    Plaintiff realleges and incorporates by reference paragraphs 1 through 37 of this complaint as though fully set forth herein.

90.    Defendants' wrongful conduct, unless and until enjoined and restrained by order of this court, will cause great and irreparable injury to Plaintiff's medical career and associated career endeavors.

91.    Plaintiff is therefore entitled to a preliminary and permanent injunction ordering Defendants to maintain Plaitiff's employment/educational training Dartmouth-Hitchcock.

92.    Plaintiff has no plain, speedy or adequate remedy at law other then injunctive relief so as to prevent further damage to Plaintiff's medical career and his psychological well-being.

## VI.  STATEMENT OF DAMAGES

93.    As a direct and proximate result of the wrongful acts and/or omissions of the Defendants, as set forth above, Plaintiff has sustained the following injuries and damages:

a.    Severe stress reaction and other emotional distress;

b.    Loss of career opportunity; and

c.    Past and future medical expenses;

WHEREFORE, the Plaintiff prays for damages as follows:

a.    That this Court declare the rights of all parties;

b.    Compensatory damages, including, but not limited to general and special damages, amounting to $6,529,000;

c.    Exemplary and punitive damages;

d.    Costs of suit incurred herein;

e.      That this Court issue a permanent injunction, all enjoining and restraining Defendants, and each of them, from restricting Plaintiff's ability to return to his Medicare-funded graduate medical education employment at DHMC; and

f.      All other compensatory, equitable and declaratory relief as this Court deems just.

Respectfully submitted, this 25th day of March, 2012.

/s/   J. D. Isaacs

J. D. ISAACS

Plaintiff, *pro se*

1

**DEMAND FOR JURY TRIAL**

2

3        Plaintiff hereby demands a jury trial of this action.

4

5                                      /s/   J. D. Isaacs

6

7    DATED: March 25, 2012.

8                                      J. D. ISAACS

9                                      Plaintiff, *pro se*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2

3      Plaintiff served this Amended Complaint on existing Defendants via ECF. Proof of service for

4  Individual Defendants shall be filed separately.

5

6                                           /s/  J. D. Isaacs

7

8  DATED: March 25, 2012.

9                                          J. D. ISAACS

10                                          Plaintiff, *pro se*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VERIFICATION**

I, J.D. Isaacs, do declare as follows:

That I am the Plaintiff in the above-entitled action.  I have read the foregoing Amended Complaint for Damages, Declaratory and Injunctive Relief; Demand for Jury Trial, and I know its contents.

I declare, therefore, that the matters stated in the foregoing document are true of my own knowledge, except as to matters which are stated on information and belief, and as to those matters, I believe them to be true.  Those matters I aver are what I know to be true.

I declare under penalty of perjury under the law of the United States that the foregoing is true and correct.

Executed on this 25th day of March, 2012.

/s/   J. D. Isaacs

J. D. ISAACS

Plaintiff, *pro se*