# Statement of Plaintiff

Dartmouth psychiatry recruited me with promises of participating in groundbreaking neuroscience research and working for Defendant Kim's renowned Partners-in-Health organization. With a background in international medicine and finance, Dartmouth's offer fit my long-term goals of effecting meaningful change in international health. I had fond memories of Dartmouth as an undergraduate; my business partner and good friend from college co-founded Baker Isaacs Capital Group in 2010 to focus on our goals of global sustainability and health care development projects.

When I arrived at Dartmouth in June 2011, the tone had drastically changed from the recruitment letters. It was odd. They started me on M2, the hardest rotation in the curriculum, and relentlessly criticized me from day one. There were other strange things, like unquestionably bizarre eye contact during an orientation speech. I didn't know what to make of it.

The Defendants quickly started to deny me participation in the research and preventative medicine programs they had promised during recruiting. In hour-long biweekly meetings with Defendant Finn, under the premise that she was trying to "help me succeed," she blocked my participation in research activities because they might 'distract' me.

They first advanced the rationale that I purportedly lacked fundamental knowledge. I probably scored higher than 90% of the Psychiatry department on my USMLE Step 1 exam (I achieved a 241/99); my original goal was to be a neurosurgeon, which generally requires a more competitive score than psychiatry. In November, I surpassed about half the other residents on the nationwide in-service exam. The Defendants quickly changed their criticisms to purported performance issues.

During about five of these biweekly review meetings, I was distraught and asked for medical leave; I stated that I was already performing to the best of my ability, and if deficiencies existed, I'd need a leave of absence to figure out what was wrong. The program directors always replied that my performance was still within the satisfactory range, and that a leave of absence wasn't necessary. Defendant Finn, and several other faculty members, would ask me all about what symptoms I had, if I took prescription or recreational drugs (I do not), etc. I would discuss detailed aspects of my medical history, and particularly, what the triggers were to my symptoms that began after a traumatic brain injury in 1997. Dartmouth faculty witnessed and even documented these symptoms, e.g. an M2 evaluation cited "incapacitating anxiety."

I complained to senior faculty that patient care was being compromised as a result of the Department's criticisms, which were becoming widely known and also

affecting my ability to focus. In particular, I was concerned about two patients that I felt had been improperly committed to New Hampshire Hospital.

As the year progressed, I progressively felt on the verge of collapse at work. I arranged an appointment with the sleep medicine center at Dartmouth, a division of the Dartmouth College Department of Psychiatry. The center diagnosed me with a severe neurological disorder initially. My program director told me not to worry about it; regarding accommodations, she said they were almost impossible for an intern. A few weeks later, my treating doctor lowered and revised my condition to 'moderate' severity, and told me not to worry about it as far as work is concerned.

Meanwhile, performance criticisms would continue to come at odd-hours, on Thanksgiving Day, after Christmas Day, or after I was sleep deprived from overnight sleep studies. The inappropriate criticism was almost always issued by Defendant Noordsy or a few other friends and colleagues of Defendant Finn.

As the situation worsened, I received looks of disgust and disdain from certain faculty. They interviewed another candidate for my position in October, who was a transfer from the Internal Medicine department. Defendant Finn actually emailed me to evaluate her; at the time, I didn't know she would be my replacement. The candidate told me that I was "an enigma; both introverted and extroverted." I don't know if she knew she was replacing me, but was told that rumors circulated. Furthermore, my colleagues started to act different around me; several quietly expressed concern to me that the program would fire me in January, on the challenging M2 rotation. It seemed they wanted another department to fire me, but at the time I didn't know why.

On Friday, January 13th, after three days on the M2 rotation, I was told to meet with Defendant Finn. She suggested that I could resign for omitting potentially embarrassing items on my residency application. It was a rather vague meeting; the Defendants never issued any written allegations, as required under DHMC policy. After realizing that I had no intention to resign, they finally decided to raise issues I suspect they knew about for almost a year. First, they accused me of omitting a previous voluntary resignation. After I reminded them that I disclosed the six-week Arizona internship to them back in April 2011, they brought up what was possibly the real issue all along – previous litigation revolving around a brain-injury related condition.

Around 10:15 on Friday, January 13th, I left the meeting and began to think about all of the previous meetings with the Defendants. I remembered Defendant Finn telling me how she feigned accolade towards an "unlikeable" patient with narcissistic personality disorder throughout her therapy sessions, and doing so made her sick to her stomach. I remembered all her attempts to "help" me, where she actually took adverse actions against me. I started to think that, in fact, the Defendants never wanted to help me. Could they have lied to me throughout our meetings, the same way they lied over years to the patient with narcissistic personality disorder? If they

learned about my Arizona internship back in April 2011, or previous litigation during their pre-employment background checks, maybe they had been holding these issues against me for six months. I recalled an occasion in November where I mentioned my Arizona internship to Defendant Finn - she quickly changed the subject. Yes, they knew and planned to dismiss me for months. Nearly certain that I had been subjected to a sham, namely months of psychological manipulation by leaders in academic psychiatry, I went into mental shock.

I had been hoping Defendant Kim would mobilize the correct resources at Dartmouth to investigate, but he never did to my knowledge. I also felt that evidence was being withheld illegally, and asked Defendant Kim's help. Despite never being formally placed on administrative leave, my DHMC accounts containing vital evidence were either deleted or disabled. A week after I criticized Defendant Kim for ignoring me, I was fired. My benefits and employment were terminated before I could defend myself at DHMC, which defies that whole concept of administrative leave. In the words of a friend, "you're not getting any due process at Dartmouth."

It seems the Defendants ignored due process in order to discredit me, and moreover, discredit me quickly. I find the timing rather suspicious. Nobody from Dartmouth communicated my employment status to me for two months since January 13th. The Defendants are fighting vigorously in Court to delay proceedings until late April.

In March 2011, I possessed enthusiasm to train with Defendant Kim's Partners-in-Health. One year later, ten days after accusing Defendant Kim of negligent inaction, three days before Defendant Kim received the nomination to lead the World Bank, my employment and my aspirations were terminated.


To the best of my knowledge, the aforementioned statements and beliefs are true and correct.


*Jeffrey D. Isaacs*

Doctor J. D. Isaacs                           March 25, 2012