Dr. Isaacs
3553 West Chester Pike Unit #177
Newtown Square, PA 19073
Telephone: (212) 257-0737
Email: jdi@bakerisaacs.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| DOCTOR J. D. ISAACS ) | |
| ) | |
| Plaintiff, *pro se*, ) | Case No. CV-12-40-JL |
| ) | |
| -V- ) | |
| ) | **PLAINTIFF'S OPPOSITION** |
| DOCTOR CHRISTINE T. FINN; ) | **TO DEFENDANTS' "MOTION** |
| DOCTOR JIM YONG KIM; ) | **TO DISMISS" PURSUANT TO** |
| DOCTOR DOUGLAS NOORDSY; ) | **F.R.C.P. 12(b)(6)** |
| DARTMOUTH HITCHCOCK MEDICAL CENTER; ) | |
| MARY HITCHCOCK MEMORIAL HOSPITAL; ) | |
| TRUSTEES OF DARTMOUTH COLLEGE; ) | |
| and JOHN DOE, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |

## I. INTRODUCTION

In their motion pursuant to FRCP 12(b)(6), the moving party pieces together select portions of Plaintiff's amended complaint to construct a straw-man argument. Generally, the Amended Complaint argues that the Defendants became aware of prior time Plaintiff spent in Arizona and California, and then subjected him to a six-month sham to coerce his resignation. Despite opposing counsel's argument that Plaintiff never pleaded anything "extreme and outrageous," Plaintiff submits that the evidence supporting his claims and testimony will indeed lead a jury to conclude that six months of exposure to mind-games executed by Harvard-trained psychiatrists is both extreme and outrageous. Their actions are documented as "cruel and unusual punishment" by a witness statement in a DHMC ER medical record. Indeed, if one were to imagine how Ivy League psychiatry experts would commit the tortuous act of IIED, it would in the subtle and well orchestrated form suggested throughout Plaintiff's complaint. Furthermore, should Plaintiff's claims of evidence destruction and apparent perjury prevail, the egregiousness of Defendants acts must be determined to be significant enough to warrant such obstruction.

In Dartmouth's Answer filed by Attorney Peahl, it is claimed that Defendant Finn learned of "certain information" [a vague reference to California/Arizona presumably to avoid perjuring herself] in January 2012. In other words, Dartmouth's Answer relies upon convincing the Court that Dartmouth never learned about Plaintiff's prior experience in Arizona and California until January 2012, despite 1) Plaintiff's own declaration to Dartmouth HR in April 2011, 2) transmission of credentials in May 2011 from the Arizona Board of Medicine to NH Board of Medicine 3) extensive background checks ordered in April 2011 by an Ivy League teaching hospital (DHMC), and 4) Plaintiff's direct mention of Arizona to Defendant Finn in October 2011 (she quickly changed the subject). In short, there are determinations of fact that must proceed beyond a 12(b)(6) motion.

The Motion to Dismiss also argues that Dartmouth College had neither implied nor express contractual relationships with the Plaintiff. The Defendants incorrectly declare that Mary Hitchcock Memorial Hospital is the sole entity affiliated with the Dartmouth Psychiatry program. Each year, resident physicians "match" to train with "Dartmouth." Colloquially speaking, no resident at Dartmouth, if asked where they train, would reply "Mary Hitchcock Memorial Hospital." This is

JDI v. Dartmouth et al
Case No. CV12- 40-JL                                                                                     2

because, more formally, the Dartmouth College Department of Psychiatry coordinates training of its resident physicians at a multitude of locations, including the New Hampshire Hospital, the Dartmouth College Undergraduate Infirmary, the White River Junction VA, and Mary Hitchcock Memorial Hospital (Exhibit - "Message of Chairman Green"). There are complex reimbursements between the facilities, managed via a detailed time & location accounting website. Day-to-day decisions regarding employment and training are conducted by the Dartmouth College professors. Evaluations are written by Dartmouth College professors. Courses are taught on Dartmouth facilities. Patients are treated on Dartmouth College facilities (the "Dick's House" infirmary). In this case, beyond enrolling in a graduate medical curriculum with Dartmouth Psychiatry, Plaintiff was given a Dartmouth College "Post-Doc employee" ID card in June 2011. He was also issued a Dartmouth College laptop and computer account in June 2011 (which is now the subject of an evidence destruction claim). He was refused research participation with a Dartmouth College research expert in magnetic transcranial stimulation. Likewise, he was refused a required endorsement to the Dartmouth M.P.H. degree-granting program.

    It might also be noted that in the two years that a similar lawsuit filed by another terminated Dartmouth psychiatry resident (*Connors v Dartmouth*) has been underway in the Vermont USDC, Dartmouth College has never used the tenuous argument now put forth by Attorney Peahl, intending that a *pro se* litigant won't be heard.

## II. STATEMENT OF FACTS

1. See Plaintiff's Amended Complaint, as a whole; the standard applicable to dismissal of this case requires interpreting each reasonable inference of the Amended Complaint in a light most favorable to the Plaintiff.

## III. ARGUMENT

**A.    Unconstitutional Retaliation relates to Plaintiff's other statutory and common law claims and is not a stand-alone claim (Plaintiff hereby waives this claim as a specific cause of action)**

1. Plaintiff agrees with Defendants' argument that Dartmouth and its employees were not acting under the color of constitutional law. This claim is intended to clarify ADA and Rehabilitation Act retaliation claims.

### B.    Rehabilitation Act claims shall not be dismissed against Dartmouth College

1. A primary activity of Dartmouth College's Department of Psychiatry is conducting federally-funded research and education, with particular research strengths in head injury and PTSD. The Dartmouth Faculty appoint their trainee residents to various resources and regional training opportunities at WRJ VA, New Hampshire Hospital, DHMC/Mary Hitchcock, and Dartmouth College. (Exhibit – "Training Sites") Plaintiff joined a training program operated and administered by Dartmouth College. He was denied participation in research programs (e.g. NIH grants to Dartmouth Ph.D's having no affiliation with Mary Hitchcock), as well as an MPH degree program at The Dartmouth Institute.

2. In *Freed v. Consolidated Rail Corp.*, 201 F.3d 188 (3d Cir. 2000), the court, and every court of appeals to have addressed this question, held that plaintiffs suing private recipients of federal funds under section 504 do not need to exhaust Title VI administrative remedies. See, e.g., Brennan v. King, 139 F.3d 258, 268 n.12 (1st Cir. 1998); Tuck v. HCA Health Serv. of Tennessee, Inc., 7 F.3d 465, 470-71 (6th Cir. 1993); Smith v. Barton, 914 F.2d 1330, 1338 (9th Cir. 1990); Miener v. State of Missouri, 673 F.2d 969, 978 (8th Cir. 1982); Pushkin v. Regents of the Univ. of Colo., 658 F.2d 1372, 1382 (10th Cir. 1981); Lloyd v. Regional Transp. Auth., 548 F.2d 1277, 1287 (7th Cir. 1977). These holdings reflect the fact that "the applicable remedies [under Title VI] provide no individual relief, including no damage orders against an employer." Tuck, 7 F.3d at 471.

3. Regarding Individual Liability, Plaintiff acknowledges that many jurisdictions do not allow such an action. Indeed, Plaintiff learned this in prior litigation – which the Defendants' seem to be using as a playbook - from their treatment of Plaintiff at DHMC, to delays regarding the summons, to this actual motion to dismiss.

### C.    Breach of Contract and Fair Covenant are valid claims against Dartmouth

1. Plaintiff entered into express and implied agreements when he accepted an offer to train with the Dartmouth College Department of Psychiatry. The attached exhibits from Dartmouth's website may serve as judicial notice regarding the training opportunities advertised at Dartmouth College Department of Psychiatry. The exhibits clearly refer to the psychiatry department being a "component" of Dartmouth Medical School (and hence, Dartmouth College), and refer to the numerous opportunities for residents within Dartmouth College/Dartmouth Medical School. Plaintiff submits that expert witnesses will support his argument that as a medical resident, he was the beneficiary of numerous educational opportunities at Dartmouth College. Hence, an early Motion to Dismiss is inappropriate, pending expert testimony regarding the exact nature of resident training and the structure of the Dartmouth College Department of Psychiatry.

2. Furthermore, Dartmouth's Business Ethics code (Exhibit) creates an additional explicit contract between Dartmouth and interested community parties including the Plaintiff. It states that Dartmouth not only abides by applicable law, but that Dartmouth conducts itself with the "highest ethical standards." Dartmouth did not adhere to this contract, when its professors hid the truth for months, and moreover, when it failed to investigate Plaintiff's complaints. To date, Dartmouth still has not listened to Plaintiff's ethics complaint; merely its attorneys have forwarded portions of the complaint to the Trustees, never affording Plaintiff a full opportunity to register his ethics grievance.

### D. ADA claims shall not be dismissed against Dartmouth College

Plaintiff was engaged in federally funded educational activities with Dartmouth College, and hence the EEOC administrative requirements do not apply to Dartmouth College[1]. Nonetheless, Plaintiff is in the process of filing an EEOC complaint against DHMC.

---

[1] In *Mayo Foundation v United States* (2011) the Supreme Court held that, for IRS purposes, a medical resident may be considered an employee rather than a student. However, the High Court's opinion took notion of the medical profession's historical view of residents as students: " We do not doubt that Mayo's residents are engaged in a valuable educational pursuit or that they are students of their craft. The question whether they are "students" for purposes of §3121, however, is a different matter." As such, Plaintiff's attempted education within Dartmouth College's Department of Psychiatry deserves protection under the ADA & Rehabilitation Act.

### E. Plaintiff states a valid claim for IIED

1. Plaintiff argues that the Defendants had knowledge of Plaintiff's prior litigation against an influential professor from Harvard Medical School and NIH director. While Plaintiff has not pleaded any conspiracy[2] between the prior defendants and the current defendants, he does plead that "Defendants were angered by prior litigation." The Individual Defendants, with their own Harvard Medical School tenure, have professional overlap with certain Defendants in Plaintiff's prior lawsuit. When Dartmouth (i.e. the Individual Defendants) learned about this prior litigation, not only were they angered, but they also learned extensive details about Plaintiff's psychiatric history. Plaintiff need not document all these facts in his initial complaint, as they shall be described throughout depositions, interrogatories, and other document production. But put simply, the Defendants' knowledge of Plaintiff's reaction to past false-accusations put them in a position to repeat the trauma. Plaintiff argues it is precisely this –subjecting him to a repeat trauma - that they have done. Plaintiff's claims of medical experimentation center around this point – the Defendants became curious about his "complicated"(words used in DHMC records) psychiatric history, and it seems, wanted to learn about his condition over six-months; they even hired his replacement in September 2011, with no intent to train him or maintain his employment.

2. At one time, the Defendants had Plaintiff "mock interview" a psychiatry patient named "Jeffrey" who was also a Dartmouth alumnus, who suffered from a head injury, had a similar religious background, and a similar medical diagnosis to the Plaintiff. After the exam, a Dartmouth College professor laughed "He's you! I don't believe you could have failed the interview?" Indeed, testimony throughout this case will show bizarre subtle (and, in retrospect, not so subtle) references that took Plaintiff six months to piece together—and hopefully will allow a jury to piece together the truth in six days.

3. Defendants also argue that Plaintiff has no disability and that he failed to disclose any disability on his application. Plaintiff disclosed his head injury on his application to Dartmouth.

---

[2] Plaintiff avoided including any such speculative claim of conspiracy in his complaint. However, his attorney from a prior legal settlement has stated that there appears to have been a breach of confidentiality (Attached Affidavit of Michael Payne).

1  Furthermore, he spoke about the head injury during his interview in January 2011 with a global
2  expert on head injury, Dartmouth College Professor Thomas McAllister (Attached exhibits by
3  McAllister regarding the difficulty in prognosticating and describing head injury sequelae.) Plaintiff
4  agrees that on his HR application he stated he did not require accommodation for any disability, but
5  the fact is Plaintiff disclosed a head injury to Dartmouth both verbally and in writing. Aware of his
6  prior post-concussive and PTSD diagnoses (and a "severe" sleep related diagnosed by Dartmouth
7  Psychiatry in November 2011), the Defendants -experts in academic psychiatry- caused emotional
8  distress to plaintiff that goes beyond mere negligence.

9     4.   The Amended Complaint pleads that a witness statement documented in medical notes
10 referred to Dartmouth Psychiatry actions as "cruel and unusual punishment." As such, there is a clear
11 claim of IIED that may not be dismissed in a 12(b)(6) motion. Even without including witness
12 statements, Plaintiff's own allegations are sufficient to withstand 12(b)(6) by invoking the "Twelve
13 Bishop Rule." Indeed, Plaintiff has been wrongly discredited by almost as many Harvard-trained
14 medical professors.

15    5.   Defendant Kim was notified in January 2012 of unethical and illegal behavior by his
16 subordinates, the directors of the Psychiatry Department at Dartmouth College and their legal
17 counsel. Despite having authored the ethics complaint enforcement policy, Kim intentionally ignored
18 Plaintiff's complaint. Kim was notified that the current issues dated back to prior litigation. Kim
19 presumably had been briefed on the matter and *acquiesced* – accepting the opinion of three Harvard-
20 trained physicians (like himself) at Dartmouth, and potentially, a prior defendant, who like Kim, was
21 a leader in international health with a twenty-year tenure at Harvard Medical School.

22    6.   Immediately after telephoning Defendant Kim, Plaintiff was connected to Dartmouth
23 General Counsel O'Leary in early February. O'Leary had obvious knowledge of the situation from
24 Kim's perspective. In response to Plaintiff's request for informal mediation in lieu of a lawsuit,
25 O'Leary stated to Plaintiff "I'm sure you do wish you knew what happened. It's impractical to
26 convene everyone  - including your John Doe defendant - to discuss it." He elaborated "You can't sue
27 us – you sue everybody!" To be clear, Plaintiff doesn't allege a conspiracy involving Kim, but does
28

allege that regardless of the order events occurred, they resulted in intentional infliction of emotional distress.

### F. Plaintiff states a valid claim for NIED

1. In the event that some Defendants had more limited knowledge of Plaintiff's past medical and legal history, they still were negligent in their actions, which included issuing false criticisms and violating HIPAA. There can be no doubt that the Defendants were aware of Plaintiff's deteriorating condition in connection with his employment (see next paragraph).

2. In July 2011, an email was transmitted by a DHMC physician documenting Plaintiff's "incapacitating anxiety." This email, and other evidence, was either withheld or deleted. Plaintiff submits that, until such evidence is produced in discovery, dismissal of this negligence claim is unwarranted.

### G. Plaintiff's Negligence claim does not apply to the moving Defendants; states a HIPAA private right-of-action against DHMC

1. This claim pertains solely to Plaintiff's experience as a patient at the DHMC ED; as such, it was not intended to apply to Dartmouth College or its employees.

### H. Plaintiff's Fraud claim does not apply to Defendant Kim; Plaintiff states a valid claim against the remaining Defendants

1. Plaintiff did detrimentally rely upon the false statements issued by Defendants Finn and Noordsy. Plaintiff worked each day, and wasted career time in his life (potentially a year, assuming Defendants learned in April 2011 about Arizona/California), believing that the Defendants were actually trying to teach him and promote him to be a senior resident. In fact, they had hired his replacement in September, and were merely subjecting him to mind-games for the remainder of time.

### I. Plaintiff's Fraud claim does not apply to Defendant Kim

Defendant Kim never issued any written or verbal statements to Plaintiff's attention, so he is not a subject of the Fraud claim.

## IV. CONCLUSION

Plaintiff pleads valid claims with sufficient specificity to allow this case to move forward to the discovery process. In his opposition to the MTD, Plaintiff has clarified that "Count 1

1  Unconstitutional Retaliation" is not a formal cause of action; "Count 7 Negligence" only applies to
2  HIPAA claims with DHMC; and "Count 8 Fraud" does not apply to Defendant Kim.  As suggested
3  by DHMC's Answer, an additional dispositive motion is pending by Defendant Mary Hitchcock
4  Memorial Hospital. Once both of the pending motions are adjudicated, if necessary, Plaintiff requests
5  leave to amend any deficiencies that the Court determines to exist.

7  Respectfully submitted, this 1st  day of May, 2012.

11                                              /s/   J. D. Isaacs

13                                              J. D. ISAACS
14                                              Plaintiff

**CERTIFICATE OF SERVICE**

Plaintiff served this Opposition to Motion to Dismiss on all Defendants via ECF.

/s/   J. D. Isaacs

DATED: May 1, 2012.

J. D. ISAACS

Plaintiff, *pro se*