**Universal** Background Screening

**Request for Background Check**

Account #003047

**Social Security Number**

REDACTED

**Date of Birth** - used for identification purposes only

MONTH — DATE — YEAR

| First Name | Middle Name | Last Name |
|---|---|---|
| Jeffrey | David | Isaacs |

**Other Names Used** (maiden name, AKA names, etc.)

**Current Residential Address**

| City | State | Zip Code |
|---|---|---|
| Berwyn | PA | 19312 |

List each **CITY**, **STATE** and **ZIP CODE** (if known) where you have lived during the past seven years:

| City | State | Zip Code | From Date | To Date | |
|---|---|---|---|---|---|
| Berwyn | PA | 19312 | 8/2010 | Present | [ ] |
| Tucson | AZ | 85701 | 7/2010 | 8/2010 | [ ] |
| West Palm Beach | FL | 33412 | 7/2009 | 7/2010 | [ ] |
| New York<br>Epsom, Surrey CTY ENGLAND | NY<br>UK | 10010 | 2/2009<br>10/2008 | 7/2009<br>2/2009 | [ ] |
| Maho    St-Maarten | | | 8/2006 | 10/2008 | [ ] |

| Driver's License Number | State of Issue |
|---|---|
| REDACTED | |

NHES TRIBUNAL EXHIBIT Number: 2 OMB No. 2900-0205
Estimated Burden: 30 minutes

# Department of Veterans Affairs

# APPLICATION FOR HEALTH PROFESSIONS TRAINEES

**SEE LAST PAGE FOR PAPERWORK REDUCTION ACT, PRIVACY ACT AND INFORMATION ABOUT DISCLOSURE OF YOUR SOCIAL SECURITY NUMBER**

**INSTRUCTIONS:** Please submit this application furnishing all information in sufficient detail to enable the Department of Veterans Affairs (VA) to determine your eligibility for appointment in Veterans Health Administration. Type, or print in ink. If additional space is required, please attach a separate sheet and refer to items being answered by number. Residency, fellowship and internship announcements for clinical training programs may require additional information. All applications must include the information required by the training program to which you are applying as well as information requested on all application forms.

**VA must protect the safety of our patients.** Therefore, at some point in the appointment process, you will be asked questions on your physical and mental health. This includes such questions as to whether you received tuberculin testing, hepatitis B vaccination or any other vaccinations.

| 1A. NAME (Last, First, Middle) | 1B. OTHER NAMES USED (For example: maiden name, nickname, etc.) |
|---|---|
| ISAACS, Jeffrey David | |

| 2. PRESENT ADDRESS (Include ZIP Code) | 3A. DAY TELEPHONE (include area code) |
|---|---|
| Lane Berwyn, PA 19312 | |
| | 3B. EVENING TELEPHONE (include area code) |
| | (610) 202-1460 |

| 4. SOCIAL SECURITY NUMBER | 5. PREFERRED EMAIL ADDRESS | 6. DATE OF BIRTH (mm/dd/yyyy) | 7. PLACE OF BIRTH (City, State, and Country (if not U.S.A.)) |
|---|---|---|---|
| 66- | jeffreydi@gmail.com | | , PA |

| 8A. PROGRAM/DISCIPLINE OF STUDY | 8F. CURRENT COLLEGE/UNIVERSITY/SCHOOL: INCLUDE CITY AND STATE (Do not abbreviate) |
|---|---|
| Allopathic Medicine/Psychiatry | Dartmouth-Hitchcock |

**8B. ARE YOU APPLYING FOR A VA ADVANCED FELLOWSHIP PROGRAM FOR PHYSICIAN RESIDENTS?** ☐ YES ☒ NO

**8C. ENTER YOUR NATIONAL PROVIDER IDENTIFIER (NPI)**

**8G. TARGET DEGREE LEVEL OF YOUR CURRENT TRAINING PROGRAM**
☐ Certificate/Diploma  ☐ Master's  ☐ Post-doctoral (other than residents)
☐ Associate  ☐ Post-master's fellowship
☐ Baccalaureate  ☐ Doctoral  ☒ Residency/Fellowship

| 8D. START DATE OF YOUR DEGREE PROGRAM OF STUDY (mm/yyyy) | 8E. EXPECTED END DATE OF YOUR DEGREE PROGRAM OF STUDY (mm/yyyy) |
|---|---|
| 06/2011 | 06/2015 |

| 9A. VA TRAINING FACILITY (City, State) | 10. CHECK APPROPRIATE BOXES IF YOU ARE ENROLLED IN A COLLEGE/UNIVERSITY THAT IS CLASSIFIED AS: |
|---|---|
| White River Junction, VT | ☐ Tribal College or University (TCU) |

| 9B. VA TRAINING START DATE (mm/yyyy) | 9C. VA TRAINING END DATE (mm/yyyy) |
|---|---|
| ☐ UNKNOWN  06/2011 | ☒ UNKNOWN |

☐ Historical Black College and University (HBCU)
☐ Hispanic Serving Institution (HSI)

## II - FOR APPLICANTS CURRENTLY ON ACTIVE DUTY IN U.S. MILITARY DUTY

| 11A. ARE YOU NOW IN U.S. MILITARY? | 11B. SERIAL OR SERVICE NO. | 11C. BRANCH OF SERVICE |
|---|---|---|
| ☐ YES (If YES, complete 11b, 11c) ☒ NO | | |

## III - CITIZENSHIP

**12A. CITIZENSHIP**
☒ U.S. CITIZEN BY BIRTH  ☐ NATURALIZED U.S. CITIZEN  ☐ NOT A U.S. CITIZEN (Complete item 12B)

**12B. COUNTRY OF CITIZENSHIP**

**NOTE: Complete items 13A, 13B, 13C, or 13D ONLY if you are not a U.S. citizen.**

| 13A. IMMIGRANT | 13B. EXCHANGE VISITOR | | 13C. OTHER NON-IMMIGRANT | | 13D. FORM DS2019 |
|---|---|---|---|---|---|
| "A" NUMBER | VISA TYPE | VISA NUMBER | VISA TYPE | VISA NUMBER | DO YOU HAVE A VALID DS2019? ☐ YES ☐ NO |
| DATE | ISSUE DATE | EXPIRATION DATE | ISSUE DATE | EXPIRATION DATE | DATE OF LAST VALIDATION (mm/dd/yyyy) |

## IV - THIS SECTION TO BE COMPLETED BY DESIGNATED EDUCATION OFFICER (DEO) OR DESIGNEE

| | | |
|---|---|---|
| 14A. The trainee has met all of the criteria of the Trainee Qualifications & Credentials Verification Letter (TQCVL). | ☐ YES | ☐ NO |
| 14B. Incomplete items on the TQCVL have been addressed and resolved. | ☐ YES | ☐ NO |

14C. Special attention has been given to the following items from the application forms.

14D. Comments:

| 14E. This applicant has been approved for appointment. | ☐ YES | ☐ NO |
|---|---|---|

14F. Comments:

| 15A. SIGNATURE OF FACILITY DESIGNATED EDUCATION OFFICER OR DESIGNEE | 15B. TITLE | 15C. DATE |
|---|---|---|

| LAST NAME, FIRST NAME, MIDDLE NAME | NHES TRIBUNAL EXHIBIT 2025 | SOCIAL SECURITY NUMBER |
|---|---|---|
| ISAACS, Jeffrey David | | 66- |

## V- LICENSE, CERTIFICATION, OR REGISTRATION IN CURRENT CLINICAL PROFESSION

| 16A. LIST ALL LICENSES, CERTIFICATIONS, AND REGISTRATIONS, INCLUDING THE DRUG ENFORCEMENT AGENCY (DEA), THAT YOU HAVE NOW OR HAVE HAD AS A HEALTH PROFESSIONAL, I.E. MEDICAL, NURSING, PHARMACY, ETC. | 16B. LICENSE, CERTIFICATION OR REGISTRATION BODY | 16C. STATE ISSUING LICENSE | 16D. LICENSE, CERTIFICATION OR REGISTRATION NUMBER | 16E. IS THE LICENSE, REGISTRATION, OR CERTIFICATION CURRENT? IF NO, EXPLAIN IN PART XI. | 16F. EXPIRATION DATE |
|---|---|---|---|---|---|
| | | | | ☐ YES  ☐ NO  ☐ NOT REQUIRED | |
| | | | | ☐ YES  ☐ NO  ☐ NOT REQUIRED | |
| | | | | ☐ YES  ☐ NO  ☐ NOT REQUIRED | |
| | | | | ☐ YES  ☐ NO  ☐ NOT REQUIRED | |

## VI- LICENSE, CERTIFICATION, OR REGISTRATION IN OTHER/PREVIOUS CLINICAL PROFESSION(S)

| 17A. LIST ALL LICENSES, CERTIFICATIONS, AND REGISTRATIONS, INCLUDING DEA, THAT YOU HAVE EVER HAD AS A HEALTH PROFESSIONAL, I.E. MEDICAL, NURSING, PHARMACY, ETC. | 17B. LICENSE, CERTIFICATION OR REGISTRATION BODY | 17C. STATE ISSUING LICENSE | 17D. LICENSE, CERTIFICATION OR REGISTRATION NUMBER | 17E. IS THE LICENSE, REGISTRATION, OR CERTIFICATION CURRENT? IF NO, EXPLAIN IN PART XI. | 17F. EXPIRATION DATE |
|---|---|---|---|---|---|
| | | | | ☐ YES  ☐ NO  ☐ NOT REQUIRED | |
| | | | | ☐ YES  ☐ NO  ☐ NOT REQUIRED | |
| | | | | ☐ YES  ☐ NO  ☐ NOT REQUIRED | |
| | | | | ☐ YES  ☐ NO  ☐ NOT REQUIRED | |

**The following two questions apply to both your current health profession and any prior health profession.**

18. DO YOU HAVE PENDING OR HAVE YOU EVER HAD ANY LICENSE, CERTIFICATION, OR REGISTRATION TO PRACTICE (including DEA Certificate) REVOKED, SUSPENDED, DENIED, RESTRICTED, LIMITED, OR ISSUED/PLACED ON A PROBATIONAL STATUS OR VOLUNTARILY RELINQUISHED?  ☐ YES - EXPLAIN IN PART XI  ☒ NO

19. DO YOU HAVE PENDING OR HAVE YOU EVER HAD CLINICAL PRIVILEGES AT ANY HEALTH CARE INSTITUTION OR AGENCY REVOKED, SUSPENDED, DENIED,RESTRICTED, LIMITED, OR ISSUED/PLACED ON A PROBATIONARY STATUS OR VOLUNTARILY RELINQUISHED?  ☐ YES - EXPLAIN IN PART XI  ☒ NO

## VII - EDUCATION AND TRAINING AFTER HIGH SCHOOL THROUGH GRADUATE / PROFESSIONAL SCHOOL (Continue in Part XI if necessary)

| 20A. NAME OF SCHOOL | 20B. ADDRESS (City, State, and Zip Code) | 20C. START DATE (mm/yy) | 20D. DATE COMPLETED (mm/yy) | 20E. DIPLOMA/DEGREE/ CERTIFICATE OR QUALIFICATIONS RECEIVED | 20F. MAJOR FIELD OF STUDY |
|---|---|---|---|---|---|
| American University of the Caribbean | 901 Ponce de Leon Blvd Coral Gables FL | 08/06 | 05/10 | M.D. | Medicine |
| Wharton-Insead | Philadelphia, PA & Singapore | 08/02 | 01/04 | M.B.A. | Business |
| Dartmouth College | Wheelock St, Hanover NH 03755 | 08/96 | 06/99 | A.B. | Computer Science |
| | | | | | |

## VIII - GRADUATES OF AN INTERNATIONAL MEDICAL SCHOOL

| 21A. ARE YOU A GRADUATE OF AN INTERNATIONAL MEDICAL SCHOOL?  ☒ YES  ☐ NO | 21B. EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES (ECFMG) CERTIFICATE NUMBER  5-188-988-9 | 21C. ECFMG CERTIFICATE DATE 05/10/2010 |
|---|---|---|

## IX- INTERNSHIP, RESIDENCY AND FELLOWSHIP TRAINING

| 22A. NAME OF HOSPITAL OR INSTITUTION | 22B. ADDRESS (City, State and ZIP Code) | 22C. SPECIALTY | 22D. COMPLETED (mm/yy) | 22E. AMOUNT OF TIME APPROVED BY SPECIALTY BOARD |
|---|---|---|---|---|
| University of Arizona | 1501 . Campbell Ave Tucson, AZ 85724 | Surgery | 08/10 | 0 |
| | | | | |
| | | | | |
| | | | | |

| LAST NAME, FIRST NAME, MIDDLE NAME | SOCIAL SECURITY NUMBER |
|---|---|
| ISAACS, Jeffrey David | ███ 66-████ |

## X - ADDITIONAL QUESTIONS

| ITEM | PLACE AN 'x' IN APPROPRIATE SPACE. IF YES, EXPLAIN DETAILS IN PART XI. | YES | NO |
|---|---|---|---|
| 23 | If you have ever participated in the Medicare/Medicaid Program, were you convicted of and or investigated for making and/or using false, fictitious, or fraudulent statements, representations, writings or documents, regarding a material fact in connection with the delivery of or payment for health care benefits, items or services that would be in violation of the Criminal False Claims Act? | ☐ | ☒ |
| 24 | ARE YOU NOW, OR HAVE YOU EVER BEEN, INVOLVED IN ADMINISTRATIVE, PROFESSIONAL OR JUDICIAL PROCEEDINGS IN WHICH MALPRACTICE ON YOUR PART IS OR WAS ALLEGED? If YES, give details in Part XI, including name of action or proceedings, date filed, court or reviewing agency, and the status or disposition of case concerning allegations, together with your explanation of the circumstances involved.<br><br>As a provider of health care services, the VA has an obligation to exercise reasonable care in determining that applicants are properly qualified. It is recognized that many allegations of professional malpractice are proven groundless. Any conclusion concerning your answer as it relates to professional qualifications will be made only after a full evaluation of the circumstances involved. | ☐ | ☒ |
| 25 | Do you need accommodations to perform the procedures and essential functions of the training position for which you have applied? | ☐ | ☒ |

| ITEM NO. | XI - REMARKS<br>(Include additional information requested in items above. Be sure to indicate Item number on Form to which the comment refers.) |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

## XII - CERTIFICATION

**I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE AND BELIEF, ALL OF MY STATEMENTS ARE TRUE, CORRECT, COMPLETE, AND MADE IN GOOD FAITH.**
NOTE: A false statement on any part of your application may be grounds for not hiring you, or for terminating you after you begin work. Also, you may be punished by fine or imprisonment (U.S. Code, Title 18, Section 1001).

| 26A. SIGNATURE OF APPLICANT (sign in dark ink) | 26B. DATE (month, day, year) |
|---|---|
|  |  |

| LAST NAME, FIRST NAME, MIDDLE NAME | SOCIAL SECURITY NUMBER |
|---|---|
| ISAACS, Jeffrey David | ▀▀66-▀ |

## AUTHORIZATION FOR RELEASE OF INFORMATION

In order for the Department of Veterans Affairs (VA) to assess and verify my educational background, professional qualifications and suitability for employment, I:

[X] Authorize the VA to make inquiries concerning such information about me to my previous employer(s), current employer, educational institutions, State licensing boards, professional liability insurance carriers, other professional organizations and/or persons, agencies, organizations or institutions listed by me as references, and to any other appropriate sources to whom the VA may be referred by those contacted or deemed appropriate;

[X] Authorize release of such information and copies of related records and/or documents to VA officials;

[X] Release from liability all those who provide information to the VA in good faith and without malice in response to such inquiries; and

[X] Authorize the VA to disclose to such persons, employers, institutions, boards or agencies identifying and other information about me to enable the VA to make such inquiries.

[X] Authorize VA to share any information about me with the affiliated institution and /or training program official.

| SIGNATURE OF APPLICANT | DATE |
|---|---|
|  |  |

## PAPERWORK REDUCTION ACT AND PRIVACY ACT NOTICE

Public reporting burden for this collection of information is estimated to average 30 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering data and completing and reviewing the information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to VA Clearance Officer (005R1B), 810 Vermont Avenue NW, Washington, DC 20420. Do not send applications to this address.

AUTHORITY: The information requested on the attached application form and Authorization for Release of Information is solicited under Title 38, United States Code, Chapters 73 and 74.

PURPOSES AND USES: The information requested on the application is collected primarily to determine your qualifications and suitability for appointment to a residency, advanced fellowship, fellowship, internship or other type of clinical training appointment. If you are appointed by the VA, the information will be used to make pay and benefit determinations and, as necessary, in personnel administration processes carried out in accordance with established regulations and published notices of systems of records.

ROUTINE USES: Information on the form or the form itself may be released without your prior consent outside the VA to another Federal, State or local agency. It may be used to check the National Practitioner Health Integrity and Protection Data Bank(HIPDB) or the List of Exclusions is maintained by Health and Human Services (HHS) Office of Inspector General (OIG) on the List of Excluded Individuals and Entities (LEIE), to State licensing boards, and/or appropriate professional organizations or agencies to assist the VA in determining your suitability for a clinical training appointment. This information may also be used to periodically verify, evaluate and update your clinical privileges, credentials and licensure status, to report apparent or potential violations of law, to provide statistical data upon proper request, or to provide information to a Congressional office in response to an inquiry made at your request. Such information may be released without your prior consent to Federal agencies, State licensing boards, or similar boards or entities, in connection with the VA's reporting of information concerning your separation or resignation as a professional staff member under circumstances which raise serious concerns about your professional competence. Information concerning payments related to malpractice claims and adverse actions which affect clinical privileges also may be released to State licensing boards and the National Practitioner Data Bank. The information you supply will be stored in a confidential and secure VA database for purposes of processing your application and may be verified through a computer matching program at any time. The information from this form may also be used to survey you regarding employment opportunities in VA and solicit you perceptions regarding your clinical training experience at VA and non-VA facilities.

EFFECTS OF NON-DISCLOSURE: See statement below concerning disclosure of your social security number. Your obligation to respond is mandatory and failure to provide this information may delay or make impossible the proper application of Civil Service rules and regulations and VA personnel policies and thus may prevent you from obtaining employment, employees benefits, or other entitlements.

## INFORMATION REGARDING DISCLOSURE OF YOUR SOCIAL SECURITY NUMBER UNDER PUBLIC LAW 93-579 SECTION 7(b)

Disclosure of your SSN (social security number) is mandatory to obtain the employment and related benefits that you are seeking. Solicitation of the SSN is authorized under the provisions of Executive Order 9397, dated November 22, 1943. The SSN is used as an identifier throughout your Federal career from the time of application through retirement. It will be used primarily to identify your records. The SSN also will be used by Federal agencies in connection with lawful requests for information about you from your former employers, educational institutions, and financial or other organizations. The information gathered through the use of the number will be used only as necessary in personnel administration processes carried out in accordance with established regulations and published notices of systems of records, "Applicants for Employment" under Title 38, U.S.C.-VA" (02VA135), in the 2003 Compilation of Privacy Act Issuances. The SSN will also be used for the selection of persons to be included in statistical studies of personnel management matters. The use of the SSN is made necessary because of the large number of present and former Federal employees and applicants who have identical names and birth dates, and whose identities can only be distinguished by the SSN.

NHES TRIBUNAL EXHIBIT PAGE 6

**Have you ever resigned from a medical education program or  medical practice position?**

I was employed as a preliminary surgery resident at the University of Arizona for approximately six weeks, between July - August 2010. I resigned, in good standing, from the program, and with permission from the program director. At the time, the program was under ACGME probation and I felt that the program was not a good fit with my overall career plans.  I planned to reapply to categorical programs in 2011 that would allow me to pursue my interest in the neurosciences, and succeeded in finding such a program at DHMC.

NHES TRIBUNAL EXHIBIT PAGE 7

**SUPPLEMENT TO APPLICATION FOR**
**TRAINING LICENSE AS RESIDENT/FELLOW**

YOU ARE REQUIRED TO COMPLETE THE QUESTIONS BELOW:

|  | YES | NO |
|---|---|---|

1. Have you ever resigned from a medical education program or medical practice position?  **YES** _____

2. Do you now or have you ever held a license in another state?  If so, please complete the following:  **YES** _____

    STATE            TYPE (Training, Full, Temporary)

    **Arizona**             **Training**

    _____          _____

    **Original verification of all prior licenses is required**
    **(whether the license is a full, training or**
    **temporary license).**

3. Have you ever been reprimanded, sanctioned, restricted or disciplined in any activities involving medical education or practice?  _____ **NO**

4. Have you ever been convicted of a felony?  _____ **NO**

5. Are you now, or have you been in the past, dependent on alcohol or drugs?  _____ **NO**

If you answered yes to any of the above questions, please provide a complete description on the reverse side.  You may attach additional sheets as necessary.

I hereby certify, under penalty of perjury, that all of the information provided in this application is complete and accurate.

NAME:    **Jeffrey David Isaacs, M.D.**

SIGNATURE: _____  DATE: _____

NHES TRIBUNAL EXHIBIT PAGE 8

**Mary Hitchcock Memorial Hospital – Matched Applicant Disclaimer**

Please answer all of the following questions.  If instructed, please explain any "YES" answers in the space provided.  If necessary, provide attachment.

1.  Are you legally eligible for employment in the United States?  ☒ Yes ☐ No
    (All employees, within three days of employment, are required to furnish documents in original form which prove identity and the legal right to work in the U.S.)

2.  Do you require sponsorship for employment visa status (e.g. J-1, H-1B transfer)  ☐ Yes ☒ No

3.  Have you ever been excluded, suspended, debarred or otherwise ineligible to participate  ☐ Yes ☒ No
    in federal health care programs?

    a.  If yes, have you been reinstated?  ☐ Yes ☐ No

4.  Have you voluntarily resigned or withdrawn from any hospital or licensed facility due to  ☐ Yes ☒ No
    professional misconduct, incompetence or negligence?

5.  Has any hospital or licensed facility restricted or terminated your professional training,  ☐ Yes ☒ No
    employment or privileges?

6.  Have you ever been the subject of professional misconduct proceedings or received  ☐ Yes ☒ No
    notice of any impending actions?

7.  Have you ever been convicted of a criminal offense, either misdemeanor or felony other  ☐ Yes ☒ No
    than minor traffic violations? If you answered yes, give dates and explain.
        Date of conviction(s) _____
        Explanation: _____
    (Note to Applicant: A conviction record will not necessarily bar you from employment.
    We will consider factors such as age when the offense occurred, the recentness of the
    offense, the seriousness and nature of the violation, the nature of the position applied for
    and any rehabilitation undergone.)

8.  Are you presently charged with (pending charges but not convicted) any misdemeanor  ☐ Yes ☒ No
    or felony violations of law other than minor traffic violations? If you answered yes,
    please provide details.
        Details of pending charges: _____

NHES TRIBUNAL EXHIBIT PAGE 9

I, as a Resident or Fellow candidate who has accepted a training position at Mary Hitchcock Memorial Hospital (collectively "DHMC"), understand and agree to all of the following items as a condition of accepting a position with MHMH.

(1) Misrepresentation or omission of material information from my employment application, my C.V., or other documents related to my application, may result in rejection of my application or, if I am hired, termination of my employment.

(2) By submitting this disclaimer, I affirm that I am (or will be) legally authorized to work in the United States no later than my date of hire.  As provided by law, all persons hired will be required to provide, within three days of commencing work, documents verifying identity and legal right to work in the United States.

(3) Effective July 1, 2008, DHMC is a Tobacco Free workplace.  It is a violation of DHMC policy to use tobacco products on DHMC properties, whether leased or owned.

(4) MHMH is an equal employment opportunity employer.  It is the policy of MHMH to provide equal opportunity to all qualified persons without regard to citizenship, race, color, creed, religion, sex, age, sexual orientation, national origin, disability, handicap, veteran or other legally protected status.

(5) In submitting my application, I am consenting to MHMH obtaining and considering background information concerning me, including but not limited to verification of my identity, a criminal background check, verification of my employment history, and contacting personal and professional references.

(6) MHMH will require job applicants to take a test for drug and alcohol screening as part of the selection process. Additionally, pursuant to DHMC policy, employees may be subject to drug testing at any time, with or without cause or notice.

(7) All offers of employment are contingent upon DHMC's review of information obtained from background checks and tests.  DHMC reserves the right to withdraw an offer of employment, or terminate employment, based on such background information.


_____          March 28, 2011
Candidate's Signature                       _____
                                            Date

NHES TRIBUNAL EXHIBIT PAGE 10



LEBANON | CONCORD | KEENE | MANCHESTER/BEDFORD | NASHUA | CHILDREN'S HOSPITAL AT DARTMOUTH (CHAD) | NORRIS COTTON CANCER CENTER |

| PATIENTS & VISITORS | HEALTH CARE PROFESSIONALS | **RESIDENTS & FELLOWS** | DONORS & VOLUNTEERS | CAREERS | EMPLOYEES |

# Policies & Procedures

Home › Residents & Fellows › Policies & Procedures › Policies and Procedures Manual › GME Policies › Grievance Policy › Procedures

## Procedures

1. **Academic Deficiency**

   **Definition**: Academic deficiency shall include, but not be limited to: a) insufficient fund of medical knowledge, (b) inability to use knowledge effectively, and/or (c) behavior detrimental to the educational process or the care of patients.

   **Length and Goals of Remediation:** A Resident whose academic performance does not meet departmental standards may be entitled to a defined period of remedial training in order to allow the Resident to improve academically and remain in the program.

2. **Non-academic Deficiency**

   **Definition:** Medical and surgical disciplines require unique abilities and talents which are unrelated to intellect, motivation or other academic qualities common to the physician. When a Resident's non-academic abilities and talents are judged insufficient by the Program Director, notification should be offered at an early stage, when a change in career direction will be least disruptive to the Resident.

   **Length and Goal of Remediation:** A Resident whose non-academic performance does not meet department standards may be offered a defined period of remedial training in order to allow the Resident to improve and remain in the program. If correction is not deemed feasible by the Program Director, the Resident's exploration of career alternatives and Program Director's assistance in finding a position more in keeping with the Resident's abilities and talents will take place.

3. **Behavior Incompatible with the Role of the Physician**

   **Definition:** Some behavior may be judged by the Program Director to be illegal, immoral, unethical or so objectionable as to be incompatible with the role of the physician. When such behavior on the part of a Resident has been alleged and not refuted to the Program Director's satisfaction, the Program Director, after discussion with the Director of GME, may recommend the Resident's dismissal without an intervening probationary period.

   **Length and Goal of Remediation:** There is no right to remediation under these circumstances.

4. **Procedure for Notification of Non-renewal, Dismissal or Other Concerns**

   1. The Resident shall be informed in writing of the documented deficiencies or allegations and of the recommendation for non-renewal, dismissal or remedial training in a private meeting with the Program Director or a duly appointed representative. At this meeting or as soon thereafter as possible, the Resident shall be provided with a copy of this policy.

   2. The Program Director shall submit written notification of the deficiencies, allegations and recommendation for non-renewal or dismissal to the Resident, the Director of Graduate Medical Education, the Chief of Staff of the Veterans Affairs Medical Center (White River Junction, Vermont) and the GMEC where appropriate.

   3. The Resident shall have five days, or within a mutually agreed upon time, from the date of this written notification to either (a) agree to the remedial plan (b) submit a resignation effective at a mutually acceptable date within the context of these guidelines, or (c) request a review of the case from the Director of Graduate Medical Education.

   4. If the Resident does not reach resolution after meeting with the Director of GME and attempted mediation, the Resident may request a review in a written request for the Fair Hearing Process, as described below, to be followed.

Copyright © 2012 Dartmouth-Hitchcock. All Rights Reserved.

About This Site | Notice of Privacy Practices | Website Privacy Policy | Feedback

NHES TRIBUNAL EXHIBIT PAGE 11





LEBANON | CONCORD | KEENE | MANCHESTER/BEDFORD | NASHUA | CHILDREN'S HOSPITAL AT DARTMOUTH (CHAD) | NORRIS COTTON CANCER CENTER

PATIENTS & VISITORS | HEALTH CARE PROFESSIONALS | **RESIDENTS & FELLOWS** | DONORS & VOLUNTEERS | CAREERS | EMPLOYEES

# Policies & Procedures

Home › Residents & Fellows › Policies & Procedures › Policies and Procedures Manual › GME Policies › Grievance Policy › Grievance Process

### Grievance Process

At any time during this process, the Resident may resign. Once a written resignation has been delivered to the Program Director, however, the Resident shall be deemed to have waived all rights to a hearing or to a continuance of their appointment.

### Hearing Procedure

1. Upon notification by the Resident that a review is requested, the Director of Graduate Medical Education or his designee shall form a committee consisting of the Director of Graduate Medical Education or his designee, a Hospital administrator, a house officer and two program directors or one program director and one physician faculty member selected by the Director of Graduate Medical Education or his designee (hereafter called the Committee.) The Director shall not select any person having a direct working relationship with the Resident. The Director of Graduate Medical Education or his designee shall chair the Committee.

2. The Committee shall schedule a hearing to occur within 14 days, or within a reasonable period of time based upon availability of the Resident, Program Director and Committee, but not less than seven days from the date of the Resident's request for review. In the interim, the GME Office shall obtain all relevant evaluation and academic records.

3. All evidence available to the Committee shall be provided to the Resident and Program Director at least three *working* days prior to the hearing. The specification of reasons for non-renewal or dismissal or other factors in the original written notice shall not prevent the Committee from relying on other reasons which are presented at the hearing; provided that the Committee may, at the request of the Resident and without special notice, recess the hearing and reconvene later in order to allow the Resident adequate opportunity to address reasons not included in the notice. The Committee may also, at its sole discretion and without special notice, recess the hearing and reconvene later in order to study new evidence presented by the Resident at the hearing.

4. The Resident shall be present and prepared to proceed at the scheduled hearing or shall be deemed to have waived all rights to a hearing and to have accepted any adverse recommendation or decision made by the Committee. Another hearing may be scheduled at the Committee's sole discretion if the Resident presents good cause for failing to appear or proceed. Hearings scheduled under these Guidelines shall be postponed only for good cause and at the sole discretion of the Committee.

5. The Resident and the Program Director may invite up to five witnesses each to present before the Committee. The Resident and Program Director may also ask others not invited to speak to submit written statements which will be collected for the GME Office at least five days prior to the hearing date.

6. The GME Director may appoint a separate hearing officer or designate a member of the Committee to preside over the hearing, to determine the order of procedure, to assure that all participants have a reasonable opportunity to present relevant oral and documentary evidence, to maintain decorum and to make any necessary procedural rulings.

7. The hearing need not be conducted strictly according to the rules of law relating to the examination of witnesses or the presentation of evidence. Any relevant matter upon which responsible persons customarily rely in the conduct of serious affairs shall be considered.

8. The Resident shall be entitled to submit, either prior to or during the hearing, memoranda concerning any issue of procedure or fact and such memoranda shall become part of the hearing record.

9. The order of presentation shall be determined by the Chair of the Committee. The Program Director shall be responsible for presenting appropriate evidence in support of the decision being questioned by the Resident. The Resident shall be responsible for presenting evidence which contradicts the Program Director's evidence or indicates that the Program Director's decision was arbitrary, unreasonable or capricious.

10. The Resident, the Program Director and the Committee may be entitled to consult with legal counsel in preparation for the hearing or with regard to other related matters.

11. Neither the Resident nor the Program Director shall be represented at the hearing by an attorney.

12. The Resident or Program Director may utilize a DHMC physician or staff member as an advisor during the Fair Hearing Process. This advisor may be present throughout the hearing.

13. The Committee may, without special notice, recess the hearing and reconvene the same for the convenience of the participants or for the purpose of obtaining new or additional evidence or consultation. Upon conclusion of the presentation of oral and written evidence, the hearing shall be closed.

14. The hearing may not be tape-recorded.

### Post-Hearing Procedure

1. The Committee shall conduct its deliberations in closed sessions. Only Committee members will be permitted to observe or participate in the deliberations.

2. Within 14 days, or a reasonable period of time after the conclusion of the hearing, the Committee shall make its final decision and shall deliver written notice thereof to the Program Director and the Resident. The notice shall indicate the reasons relied upon by the Committee in reaching its decision.

3. In the event the Committee should not concur with the Program Director's recommendation for non-renewal or dismissal or other issues regarding the Resident, the Program Director may be asked to accept the Resident in the departmental program for an additional period of specified duration during which remedial efforts may be continued on the Resident's behalf. The Resident's appointment shall be continued under such conditions as shall be defined in writing by the Program Director to the Resident and to the Director of Graduate Medical Education.

Case 1:12-cv-00040-LM     Document 40-1     Filed 06/30/12     Page 12 of 49
NHES TRIBUNAL EXHIBIT PAGE 12



**Jeffrey Isaacs <jeffreydi@gmail.com>**

## RE: Question about ACGME investigation
1 message

**Marsha Miller** <mmiller@acgme.org>                          Fri, May 4, 2012 at 1:24 PM
To: "Jeffrey D. Isaacs" <jeffrey.isaacs.wg03@wharton.upenn.edu>

The applicable ACGME requirement is:

II.D.4.e) Grievance procedures and due process: The Sponsoring
Institution must provide residents with fair, reasonable, and readily
available written institutional policies and procedures for grievance
and due process. These policies and procedures must minimize
conflict of interest by adjudicating parties in addressing:

II.D.4.e).(1) Academic or other disciplinary actions taken against
residents that could result in dismissal, non-renewal of a
resident's agreement, non-promotion of a resident to the
next level of training, or other actions that could
significantly threaten a resident's intended career
development; and,

II.D.4.e).(2) Adjudication of resident complaints and grievances related
to the work environment or issues related to the program
or faculty.

-----Original Message-----
From: jeffreydi@gmail.com [mailto:jeffreydi@gmail.com] On Behalf Of Jeffrey D. Isaacs
Sent: Friday, May 04, 2012 12:04 PM
To: Marsha Miller
Subject: Re: Question about ACGME investigation

Is it then correct to say, so as to not violate ACGME Institutional Requirement II.D.4.e, the institution needs to actually
follow its due process and grievance policies?

I am preparing a motion for a court injunction and this is the reason I am trying to be certain of ACGME's stance.

Jeffrey

On Fri, May 4, 2012 at 12:37 PM, Marsha Miller <mmiller@acgme.org> wrote:
> Dear Dr. Isaacs,
>
> The ACGME has no policy.  It would be up to the institution's due process and grievance policy and human
resources.
>
> Marsha

NHES TRIBUNAL EXHIBIT PAGE 25

GEORGE D. GOLDMAN, PH.D.
305 EAST 86TH STREET, PHA-W
NEW YORK, NY 10028-4702
TEL: 212.722.6515
FAX: 212.722.0565
DRGDGOLDMAN@AOL.COM

AMERICAN BOARD OF
PROFESSIONAL PSYCHOLOGY

CERTIFIED IN
PSYCHOANALYSIS AND
CLINICAL PSYCHOLOGY

January 25, 2002

To Whom It May Concern:

I am George D. Goldman, Ph.D., a New York State Licensed Psychologist, a Fellow of
the American Psychological Association, Board Certified in Clinical Psychology and
Psychoanalysis, in private practice for 50 years.

I have been seeing Jeffrey Isaacs in psychotherapy weekly and eventually twice weekly
since August 8, 2001. It is my diagnostic opinion that Mr. Isaacs suffers from Post
Traumatic Stress Disorder brought on by the devastating repeated humiliations and
degradations at the hands of fellow workers and management at _____ where Mr.
Issacs worked until July 23, 2001 and while on medical leave.

Let me amplify and explain the diagnosis and Mr. Isaacs' present condition. Sometimes
traumas such as those experienced by Mr. Isaacs at the hands of _____
can shatter a person's life. When these feelings of helplessness, humiliation, degradation,
and horror didn't go away and interfered monumentally with his life I gave him the
diagnosis of Post Traumatic Stress Disorder. The symptoms that Mr. Isaacs, and others
with this disease suffer fall into the subgroups: a) reliving the experience, b) staying away
from reminders of the trauma, and c) feeling on edge or on guard. Mr. Isaacs has severe
depressive symptoms, that is a persistent feeling of sadness and loss of enjoyment that
interferes with his living his life normally.

This disease can last an indeterminate amount of time and can be very disabling. War
veterans with this disease have had symptoms for all the years since World War II for
example. Therefore I can make no prediction as to when Mr. Isaacs will recover from his
disorder.

Yours Truly,

George Goldman

NHES TRIBUNAL EXHIBIT PAGE 26

**GEORGE D. GOLDMAN, PH.D.**
305 EAST 86TH STREET, PHA-W
NEW YORK, NY 10028-4702
TEL: 212.722.6515
FAX: 212.722.0565
DRGOGOLDMAN@AOL.COM

AMERICAN BOARD OF
PROFESSIONAL PSYCHOLOGY

CERTIFIED IN
PSYCHOANALYSIS AND
CLINICAL PSYCHOLOGY

Debbie O'Connor



August 13, 2001

Dear Ms. O'Connor

  I am a New York State licensed Psychologist, a fellow of the American Psychological Association, and a Diplomate in Clinical Psychology and Psychoanalysis, with over fifty years of experience, and I am seeing Jeffrey Isaacs in psychotherapy.

  It is my diagnostic impression that Mr. Isaacs is suffering from a Post Traumatic Stress Disorder (309.81) which so incapacitates him that he is unable, at this time to return to work since the illness is so work related.

  The psychological traumas that precipitated his mental illness were both his being tricked by his fellow group members through false e-mail messages and being teased and ridiculed by fellow employees about his ▮▮▮▮▮▮

  At this time I cannot give an exact approximation of when he will be able to return to work.

Sincerely Yours,

*George D. Goldman Ph.D.*

George D. Goldman, PH.D.
Psychologist

NHES TRIBUNAL EXHIBIT PAGE 31

Isaacs, Jeffrey D ███████████████

**ED Provider Notes signed by James B Ebert Jr., MD at 01/13/12 2134**

| | | | | |
|---|---|---|---|---|
| Author: | James B Ebert Jr., MD | Service: | (none) | Author Type: Physician |
| Filed: | 01/13/12 2134 | Note Time: | 01/13/12 1104 | |
| Related Notes: | Original Note by: James B Ebert Jr., MD filed at 01/13/12 2008 | | | |

Chief Complaint
Patient presents with

- Panic Attack

The history is provided by the patient.
34-year-old white male presents with complaints of panic attack and cough. The patient was exposed to an extended family member with pneumonia over Christmas. Following the exposure the patient developed a heavy cough. He has experienced persistent cough with yellow gray sputum and an expiratory wheeze. There is no history of previous pneumonia, bronchitis or asthma. He is without chest or abdominal pain. There is no history of fever, shaking chills, sweats or diaphoresis. The patient does complaint of some fatigue. The patient's secondary complaint is a panic attack. He met with his supervisor in the past hour which he states did not go well. He then lodged a complaint with the office of GME and feels he has been wronged. It is unclear what the content of the conflict is. The patient states he has PTSD and feels this is being exacerbated by the conflict today. There is no history of suicidal or homicidal ideation. He denies hallucinations.

With additional discussion the patient states "I may be delusional". "I have been experiencing feelings of persecution for approximately 6 months which are coming to a head."

Additionally, the patient has been started on CPAP in the past week

Past medical history: Anxiety with panic attacks, PTSD associated with work, decompensation approximately 10 years ago with question of bipolar , Sleep apnea.
SHX: Married and employed as a first year psychiatry resident.
Habits: None
FHX: Non-contributory

No Known Allergies

Review of Systems
Respiratory: Positive for cough, shortness of breath and wheezing.
Psychiatric/Behavioral: Positive for sleep disturbance and dysphoric mood. The patient is nervous/anxious.
All other systems reviewed and are negative.

Physical Exam
Nursing note and vitals reviewed.
Constitutional: He is oriented to person, place, and time. He appears well-developed and well-nourished. He appears distressed.
HENT:

NHES TRIBUNAL EXHIBIT PAGE 32

Isaacs, Jeffrey D [REDACTED]
Head: Normocephalic and atraumatic.
Right Ear: External ear normal.
Eyes: Conjunctivae and EOM are normal. Pupils are equal, round, and reactive to light.
Neck: Normal range of motion. Neck supple.
Pulmonary/Chest: Effort normal. He has ~~wheezes~~.
    **Left posterior and inferior thorax with rhonchi at the base.**
Abdominal: Soft. Bowel sounds are normal.
Musculoskeletal: Normal range of motion.
Neurological: He is alert and oriented to person, place, and time.
Skin: Skin is warm and dry.
Psychiatric: His behavior is normal. Judgment and thought content normal.
    **Dysphoric mood, very anxious and tearful**


Procedures

**MDM**
Number of Diagnoses or Management Options

Amount and/or Complexity of Data Reviewed
Tests in the radiology section of CPT®: ordered and reviewed

Risk of Complications, Morbidity, and/or Mortality
Presenting problems: low
Diagnostic procedures: low
Management options: low


ED Course:  Patient became increasingly anxious. He did ultimately ask for a urine drug test because he states there was a concern he might be using medications. He is aware that this is not a compliant collection consistent with normal for cause testing.

Chest x-ray: Negative

Re-evaluation at 16:45 without evidence of tachypnea, tachycardia, hypoxia or HTN.

Case discussed with Risk Management (Pamela Driscoll, Art Higgins) and Psychiatry (Will Torrey, Ben Nordstrom) in extensive detail.

Psychiatry Evaluation with plan for outpatient management.

Strept test ordered at patient's request.

Upon discharge the patient demands a CBC and blood culture. After extensive discussion on 3 separate occasions reviewing the medical indications for these tests, the patient originally understood the treatment plan and was in agreement. The patient then expectorated in a cup and demanded the sputum be tested for tuberculosis.

Reviewed the patient's behavior from a psychiatric standpoint with Dr. Nordstrom from psychiatry. His most recent evaluation does not support IEA.

Patient refused to sign discharge documents.  Paged Jim Gregoire with Risk Management, but did not receive call.  Discussed with Dr. Torrey as well.

Isaacs, Jeffrey 

A/P: Bronchitis with panic attack, adjustment disorder. No evidence of pneumonia. Mild bronchospasm. Patient is discharged with prescriptions for Zithromax, albuterol and Xanax. He has been instructed to followup with his PCP within 24 hours.

IF THIS PATIENT RETURNS TO THE ED, CONTACT DR. WILL TORREY FIRST.


James B Ebert Jr., MD
01/13/12 1201


James B Ebert Jr., MD
01/13/12 2008

James B Ebert Jr., MD
01/13/12 2134

 

**DEPARTMENT OF PSYCHIATRY**          DARTMOUTH-HITCHCOCK
PSYCHIATRIC ASSOCIATES

# Dartmouth-Hitchcock
## MEDICAL CENTER

February 1, 2011

Jeffrey D. Isaacs

Dear Jeff,

I wanted to write and let you know that we have completed our review of January applicants and everyone was impressed by your background and thought you would be a great fit for our program. I think that your interests in neuroimaging and genetics are in line with much of what is currently going on in the department and that it would be easy for you to be matched up with mentors who would further your work in these areas.

Since our meeting, I've had the opportunity to speak to the Director of Mental Health for Partners in Health, an international aid organization. He let me know that a fellowship in international mental health will soon be available, and that Dartmouth residents will be seen as priority applicants given Dartmouth's connection to the organization. Opportunities for resident electives are also expected to develop shortly.  Given you interests in international health prior to this point, I wanted you to know this updated information.

Please be in touch with me or our program coordinator, Jennifer O'Keeffe (Jennifer.M.O'Keeffe@Hitchcock.ORG) if you have any additional questions, or if you would like to schedule a second look day. We do not have specific dates set aside for second visits, but rather try to customize a day that would work well for your interests and questions.

Let me close by saying how much we would enjoy having you join us at Dartmouth. I think that this program would be a good fit for you interests and you would find it fun to be back in Hanover again. Best of luck with the remainder of your residency interviews.

Sincerely,

Christine T. Finn, MD

Christine T. Finn, MD
Department of Psychiatry
Director, Psychiatry Residency Training Program
Director, Crises and Consult Service
Tel: (603)650-4529
Fax: (603)650-9442
christine.t.finn@hitchcock.org

NHES TRIBUNAL EXHIBIT PAGE 35

<u>Affidavit of Michael H. Payne, Esquire</u>

I, Michael H. Payne, Esquire, being duly sworn, hereby depose and say:

1.  I am an attorney-at-law and I am duly licensed to practice law in the Commonwealth of Pennsylvania.   Currently, I am a partner at Cohen Seglias Pallas Greenhall & Furman, PC, a law firm in Philadelphia, Pennsylvania.

2.  Previously, and during the time period from May 2005 to April 2009, I was a partner in the law firm of Payne Hackenbracht & Sullivan, located in Fort Washington, Pennsylvania.

3.  During that time period I represented Jeffrey Isaacs with regard to certain matters involving the University of Southern California ("USC").

4.  I have been informed, by Dr. Isaacs, that he has received notice of an investigation of his ERAS 2012 application, and that there is a question about whether Dr. Isaacs omitted information on his application regarding his alleged attendance at USC's Keck School of Medicine from August 2005 to June 2006.

5.  Dr. Isaacs is in a difficult position regard to his ability to answer questions regarding the Keck School because he became involved in a dispute with the University that is the subject of a confidentiality agreement.

6.  Although it is true the Dr. Isaacs was admitted to the School, his enrollment was terminated during the first semester, without any subsequent finding of fault by either party, and his dispute with the University was resolved by agreement of the parties.

7.  I represented Dr. Isaacs with regard to the negotiation of a settlement agreement which both parties agreed was to remain confidential.

8. In view of the settlement, Dr. Isaacs correctly determined that his attendance at the Keck School was a nullity and that he not was not required to list the Keck School on any application that required a listing of prior educational institutions he attended and that, in fact, he would be in violation of the terms of the confidentiality agreement if he listed the Keck School on any future application or similar document.

9. In my opinion, the purported "omission" by Dr. Isaacs of any reference to the Keck School was not intended to mislead or deceive the AAMC, but was simply something that he was required to do by virtue of a confidentiality agreement. In fact, it appears that a violation of the confidentiality agreement by another party may have resulted in the improper disclosure of information to the AAMC.

10. It is my further opinion, as the attorney who represented Dr. Isaacs during the settlement negotiations, that he acted properly in treating any matters associated with the Keck School as a nullity. In my view, he should not be penalized for abiding by the terms of a confidentiality agreement.

I declare that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: 4-30-12

Michael H. Payne, Esq.

Sworn to and subscribed before me this 30th day of April , 2012.

Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Melinda T. Norcross, Notary Public
City of Philadelphia, Philadelphia County
My Commission Expires March 1, 2015
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

NHES TRIBUNAL EXHIBIT PAGE 37

Dear AAMC,                                                                May 2, 2012

In response to your Preliminary Determination, I hereby object to and deny the first allegation. I hereby acknowledge the second allegation and admit to inadvertent omission of six weeks spent at U. Arizona. My statement follows:

*First allegation (2006 experience at a US Medical School)* – Please incorporate the attached Affidavit of Michael Payne as my response to this allegation. Additionally, so as to not to render worthless a confidentiality agreement I fought two years to obtain, I respectfully request that you redact any mention of this inquiry in your publications.

*Second allegation (U. Arizona 2010)* –I resigned from Arizona after six weeks, and didn't view it as a significant career experience to warrant listing on ERAS. At the time of certifying the ERAS application, I was busy working as an intern at Dartmouth; Arizona was something I had put behind me and I didn't think about it. I disclosed Arizona to my most recent employer, Dartmouth Psychiatry, in April 2011, and also to the New Hampshire Board of Medicine. I was asked about Arizona in numerous interviews. It easily showed up on Program Directors' databases, despite my ERAS omission; I never took any active steps to conceal Arizona.

I never matched into a field of my choice, which I believe is the consequence of an improper dismissal from a US medical school in 2006. When I arrived at Arizona, I realized it was not the right program for me. As a foreign-trained graduate, I didn't fully understand what the Preliminary Surgery curriculum entailed when I ranked it on NRMP, and ultimately determined it was not part of my career plan.

At the time of my resignation, I suspected Arizona was holding a prior civil lawsuit against me from the day I started, but I had no tangible evidence to support this belief. When I certified my ERAS application in October 2011, I once again started to feel that my employer – Dartmouth psychiatry – was holding my past against me.  This time, direct evidence became available in January 2012 to confirm my belief.  The matter is now the subject of United States District Court Lawsuit CV-NH-12-40.  I have been fighting in Court for seven years to become a doctor. Let me be clear that, in an instant, I would have foregone either lawsuit for if allowed to complete my medical training.

I have been under significant distress since my quest to be a doctor was de-railed in 2006. I was diagnosed with Post-Concussive and PTSD in 1998 and 2001, respectively.  My determination to pursue my calling as a physician persisted despite the aforementioned trauma in 2006 that might have deterred another person from continuing medical studies. As such, and in conclusion, I submit that my inadvertent omission might reflect a desire to avoid thinking about the distress I have endured while pursuing my goal to contribute to the medical field, i.e., become a doctor.

Sincerely,
Jeffrey Isaacs

NHES TRIBUNAL EXHIBIT PAGE 38

# RE: ERAS INVESTIGATION NOTIFICATION-JEFFREY DAVID ISAACS AAMC ID

Inbox ×    Wharton ×

**ERASInvestigations** via wharton.upenn.edu

to Jeffrey

May 3

Thank you for your response. Your request is reasonable, and as such, we will honor your request to keep the Keck information off of the report. This will require that you submit a new statement that does not mention the Keck school and we will provide a new draft preliminary report that only mentions your time at Arizona.

Best Regards -

Statement Of William L. Isaacs, D.M.D.

May 1, 2012

To whom it may concern:

My name is Dr. William Isaacs and I am writing this letter to help validate some of
the claims Jeffrey Isaacs has made. My credentials are as follows; I am his father, I
have been active as either an attending or the head of a hospital residency program
for over thirty years, and Jeffrey consulted me on a routine basis with many
questions regarding his tenure and treatment while a resident at Dartmouth. Now
that I am retired I still give a yearly lecture to the residents on ethics and I feel that
this case is all about ethics and thus my observations should carry equal weight
when compared to the statements from the psych department.

From the first week of Jeff's employment I received calls and e-mails from him
recounting incidents that seemed to me that they were designed to criticize him
unfairly while other residents were given a free pass oftentimes for more egregious
or dangerous actions. Examples were as minor as being one minute late while
another resident was several minutes later or as major as a resident suggesting
treatment that would have been wrong or dangerous and not being criticized as
much as Jeff was for simple clerical mistakes. Jeff was told almost from day one that
he was not up to their expectations when everyone who teaches in a residency
program knows that the majority of residents have no experience and are there to
learn. If they had all the answers in June there would be no need for an intern year!
In fact, Jeff scored higher than the majority of residents in the national standardized
tests.

Another incident occurred which I have direct knowledge of which shows the level
of untruth which has taken place. On September 16 2011 I spoke with Jeff and he
informed me that he had a meeting set with his supervisor to ask for a leave of
absence as he felt he could not handle the pressure. I was not happy to hear this but
felt relieved several hours later when he informed me that she said it was not
necessary to take a leave. My son has never lied to me and I believe this meeting did
take place as I remember the details he described clearly. I understand his
supervisor denies this meeting took place.

I understand that Jeff's e-mail account was closed and possibly deleted. Why was
this necessary if all was on the up and up? I also understand that Jeff was accused of
falsifying his application but never given a forum to explain his actions. I do know
that Dartmouth was aware of his stay at USC which was a case settled in Federal
court and required a confidentiality agreement from both parties. Jeff's omission of
USC was his following the Federal Court mandate; obviously someone on the other
end was not as honest.

William L. Isaacs, DMD

NHES TRIBUNAL EXHIBIT PAGE 40

16th of May 2012

To Whom It May Concern,

I would like to please ask for a moment of your time to at least read this letter of support for a great friend of mine: Jeffrey Isaacs '99. I have known Jeff for 15 years from our first year at Dartmouth and have closely followed his personal and professional endeavors ever since. He has been a great friend and is one of the most selfless individuals I know. I was saddened to hear of his dismissal from Dartmouth's Department of Psychiatry where he was 4 months away from finishing his 8-year quest of becoming a doctor.

Before I continue I just want to say: Both Dartmouth and my friends who went there will always remain dear to me. I urged Jeff to exercise considerable restraint before filing the lawsuit. He was trying to finish the year and leave, once he realized things weren't going well. Jeff filed a lawsuit as a last resort, and would have dropped it if he were permitted to complete his residency. I am at a loss understand why a good person is being prevented from finishing his medical studies and contributing all his learned knowledge to the benefit of society. I feel that these days, more and more people are judged summarily in such short time based on a few documents, rather than with real knowledge of an individual's true character.

Jeff is one of the most conscientious individuals and I have never witnessed him being untruthful. Last week, the American Academy of Medical Colleges determined that Jeff's application correctly obeyed a confidentiality agreement ordered by a United States District Judge. Likewise, he disclosed Arizona on an application he filed with Dartmouth three months before starting work. As I see it, Jeff's actions were truthful and as forthcoming as reasonably could be given the circumstances.

Regarding our business, I emailed Jeff in September 2010 asking him to consider starting a new business with me, and suggested the name Baker Isaacs Capital Group. We incorporated it in December 2010. Jeff is a talented individual, who normally would have been able to help develop our business even while managing the responsibilities of being a medical intern. Unfortunately, Jeff was not the same since he began work in July 2011. When I phoned him a week after starting work in Hanover, he sounded distracted and quite nervous.

To conclude, the point I'm trying to convey in this letter is that Jeff has great intentions and was constantly trying to improve himself from past difficulty that damaged his career seven years ago. To me there is no question that Jeff will uplift himself and prove his exceptional qualities if he had a chance to return to finish his goal of becoming a doctor. Jeff is most happy when he is helping other people. At our request, he provided helpful medical advice to my wife and it made him proud and happy that he helped someone. The same goes with just this past month when Jeff successfully advised me through difficult negotiations over a shared asset in a

NHES TRIBUNAL EXHIBIT PAGE 41

company; again, he felt much better that he helped someone and was able to advocate on someone else's behalf. I feel these actions and feelings will just get better if he were allowed to return or at least be vindicated from the allegations.

As you make your own decisions, please let me remind you that you are holding Jeff's career in your hands. Even in the age of the Internet and thousands of electronic applications, sometimes it takes more than documents to know the true qualities of an individual.

My very best to you,

George F. Baker IV '00

# Dartmouth-Hitchcock
## Internal Medicine

| | | | |
|---|---|---|---|
| Evaluator: | Brian Kenwitt – Assist. Professor | Subject: | Jeffrey Innnes – PGY1 |
| Activity: | M2 Team B - PGY1 | Site: | Mary Hitchcock Memorial Hospit- |
| Evaluation Type: | Resident | Completion Date: | 08/16/2011 |
| Request Date: | 07/08/2011 | | |
| Period: | Block 3 2011-12 | Dates of Activity: | 06/26/2011 To 07/31/2011 |
| Subject Participation Dates: | 06/26/2011 To 07/31/2011 | | |

The Internal Medicine Residency Program is incorporating the ABIM milestones into our resident ev lu ions to ensure that residents are acquiring the necessary knowledge, skills, and attitudes for advancing in their training and entering th next phase of their internal medicine careers. Thank you for completing this evaluation in a timely manner.

**Competency: Medical Knowledge**

Knowledge of core content - (Milestone #29)

*(Question 1 of 13 - Mandatory)*

Understands the relevant pathophysiology and basic science for common medical conditions

| Cannot evaluate | Behind expected performance | Improving with assistance | Sometimes | Usually | Almost always |
|---|---|---|---|---|---|
| 0 | >> 1 << | 2 | 3 | 4 | 5 |

**Competency: Patient Care**

Patient Management - (Milestone #17)

*(Question 2 of 13 - Mandatory)*

Recognizes when to seek additional guidance

| Cannot evaluate | Behind expected performance | Improving with assistance | Sometimes | Usually | Almost always |
|---|---|---|---|---|---|
| 0 | >> 1 << | 2 | 3 | 4 | 5 |

**Competency: Patient Care**

Historical data gathering - (Milestone #1)

*(Question 3 of 13 - Mandatory)*

Acquires accurate and relevant history from the patient in an efficiently customized, prioritized, and hypothesis driven ,

| Cannot evaluate | Behind expected performance | Improving with assistance | Sometimes | Usually | Almost always |
|---|---|---|---|---|---|
| 0 | >> 1 << | 2 | 3 | 4 | 5 |

**Competency: Pactice-Based Learning and Improvement**

Acquires the best evidence - (Milestone #49)

*(Question 4 of 13 - Mandatory)*

Accesses medical information resources to answer clinical questions and library resources to support decision making.

| Cannot evaluate | Behind expected performance | Improving with assistance | Sometimes | Usually | Almost always |
|---|---|---|---|---|---|
| 0 | >> 1 << | 2 | 3 | 4 | 5 |

**Competency: Interpersonal and Communication Skills**

Interprofessional team - (Milestone #63)

*(Question 5 of 13 - Mandatory)*

Delivers appropriate, succinct, hypothesis-driven oral presentations

| Cannot evaluate | Behind expected performance | Improving with assistance | Sometimes | Usually | Almost always |
|---|---|---|---|---|---|
| 0 | >> 1 << | 2 | 3 | 4 | 5 |

---

**Competency: Sytems-Based Practice**

Works effectively within an interprofessional team - (Milestone #127)

(Question 6 of 13 - Mandatory)

Works effectively as a member within the interprofessional team to ensure safe patient care.

| Cannot evaluate | Behind expected performance | Improving with assistance | Sometimes | Usually | Almost always |
|---|---|---|---|---|---|
| 0 | >> 1 << | 2 | 3 | 4 | 5 |

---

**Competency: Systems-Based Practice**

Works effectively within an interprofessional team - (Milestone #126)

(Question 7 of 13 - Mandatory)

Appreciates roles of a variety of health care providers, including, but not limited to, consultants, therapists, nurses, home care workers, pharmacists, and social workers.

| Cannot evaluate | Behind expected performance | Improving with assistance | Sometimes | Usually | Almost always |
|---|---|---|---|---|---|
| 0 | >> 1 << | 2 | 3 | 4 | 5 |

---

**Competency: Professionalism**

Adhere to basic ethical principles - (Milestone #93)

(Question 8 of 13 - Mandatory)

Demonstrates empathy and compassion to all patients.

| Cannot evaluate | Behind expected performance | Improving with assistance | Sometimes | Usually | Almost always |
|---|---|---|---|---|---|
| 0 | 1 | 2 | 3 | 4 | >> 5 << |

---

**Competency: Professionalism**

Demonstrate compassion and respect to patients - (Milestone #96)

(Question 9 of 13 - Mandatory)

Demonstrates a commitment to relieve pain and suffering.

| Cannot evaluate | Behind expected performance | Improving with assistance | Sometimes | Usually | Almost always |
|---|---|---|---|---|---|
| 0 | 1 | 2 | 3 | 4 | >> 5 << |

---

**Resident Strengths**    (Question 10 of 13)

For comments to be effective as feedback, please be direct and constructive.  Global adjectives or remarks such as "good resident" do not provide meaningful feedback to the resident.

Unfortunately, Jeff was not able to make the leap into intern year and struggled with anxiety to degree of inability to complete his job on any functional level, he was removed from the rotation for further assistance.

---

**Suggested Areas for Improvement**    (Question 11 of 13)

For any component that needs attention or was rated 2 or less, please provide specific comments and recommendations.  Be as specific as possible, including reports of critical incidents.  Global adjectives or remarks, such as "bad resident" do not provide meaningful feedback to the resident.

NHES TRIBUNAL EXHIBIT PAGE 44

Face to Face Evaluation    *(Question 12 of 13 - Mandatory)*

Face to face evaluation was presented to intern/resident for this rotation.

| Selection | Option |
|-----------|--------|
| X | Yes |
| | No |

Excellence In Teaching Award    *(Question 13 of 13)*

If you would like to nominate this person for an Excellence in Teaching Award, please list a minimum of 3 detailed r as ns for your nomination. These will be included in a PowerPoint slide that will be shown at a future M&M conference in which the award will be presented.

**Dartmouth-Hitchcock**
**Internal Medicine**

| Evaluator: | Dawn Brooks - PGY2 | Subject: | Jeffrey Issacs - PGY1 |
|---|---|---|---|
| Activity: | M2 Team B - PGY1 | Site: | Mary Hitchcock Memorial Hospital |
| Evaluation Type: | Training Colleague | Completion Date: | 08/02/2011 |
| Request Date: | 07/08/2011 | | |
| Period: | Block 1 2011-12 | Dates of Activity: | 06/26/2011 To 07/31/2011 |
| Subject Participation Dates: | 06/26/2011 To 07/31/2011 | | |

---

**Respect**    *(Question 1 of 11 - Mandatory)*

Shows inadequate personal commitment to honoring the choices and rights of other persons.

Always shows exceptional personal commitment to honoring the choices and rights of other persons.

| Cannot Evaluate | : 1 to 2 =Unsatisfactory | : 3 = Average for level | : 4 to 5 = Exemplary |
|---|---|---|---|
| 0 | 1    2 | >> 3 << | 4    5 |

---

**Medical Knowledge (Peer Perspective)**    *(Question 2 of 11 - Mandatory)*

Limited and fragmented

Extensive and well-integrated

| Cannot Evaluate | : 1 to 2 =Unsatisfactory | : 3 = Average for level | : 4 to 5 = Exemplary |
|---|---|---|---|
| 0 | >> 1 <<    2 | 3 | 4    5 |

---

**Compassion**    *(Question 3 of 11 - Mandatory)*

Shows inadequate appreciation of patients' and families' needs, or develops inappropriate emotional involvement.

Always appreciates patients' and families' needs, but avoids inappropriate emotional involvement.

| Cannot Evaluate | : 1 to 2 =Unsatisfactory | : 3 = Average for level | : 4 to 5 = Exemplary |
|---|---|---|---|
| 0 | 1    2 | >> 3 << | 4    5 |

---

**Responsibility**    *(Question 4 of 11 - Mandatory)*

Does not accept responsibility for own actions and decisions; blames patients or other professionals.

Fully accepts responsibility for own actions and decisions.

| Cannot Evaluate | : 1 to 2 =Unsatisfactory | : 3 = Average for level | : 4 to 5 = Exemplary |
|---|---|---|---|
| 0 | >> 1 << | 3 | 4    5 |

---

**Overall Clinical Skills**    *(Question 5 of 11 - Mandatory)*

Overall clinical skills.

| Cannot Evaluate | : 1 to 2 =Unsatisfactory | : 3 = Average for level | : 4 to 5 = Exemplary |
|---|---|---|---|
| 0 | >> 1 << | 2    3 | 4    5 |

---

**Documentation**    *(Question 6 of 11 - Mandatory)*

Documents bare minimum, with little attention to detail or assessment.

Clear, concise, and complete documentation with full assessment.

| Cannot Evaluate | : 1 to 2 =Unsatisfactory | : 3 = Average for level | : 4 to 5 = Exemplary |
|---|---|---|---|
| >> 0 << | 1 | 2    3    4 | 5 |

---

**Data Acquisition**    *(Question 7 of 11 - Mandatory)*

NHES TRIBUNAL EXHIBIT PAGE 46

Unable to do adequate history and exam, does cursory chart review.

Does excellent history and exam, an complete chart review

| Cannot Evaluate | : 1 to 2 =Unsatisfactory | : 3 = Average for level | : 4 to 5 = Exemplary |
|---|---|---|---|
| >> 0 << | 1 | 2    3    4 | 5 |

## Data Management    (Question 8 of 11 - Mandatory)

Unable to synthesize data from different sources to formulate a plan.

Synthesizes data from different so. re- and formulates a cohesive and will thought out plan

| Cannot Evaluate | : 1 to 2 =Unsatisfactory | : 3 = Average for level | : 4 to 5 = Exemplary |
|---|---|---|---|
| 0 | >> 1 << | 2    3    4 | 5 |

## Prioritizing    (Question 9 of 11 - Mandatory)

Unable to assess importance of each task, and proceeds without regard to level of urgency.

Accurately assesses importance of · ich ask, and plans day accordingly.

| Cannot Evaluate | : 1 to 2 =Unsatisfactory | : 3 = Average for level | : 4 to 5 = Exemplary |
|---|---|---|---|
| >> 0 << | 1 | 2    3    4 | 5 |

## Seeking Help    (Question 10 of 11 - Mandatory)

Always seeks help either without assessing the situation or after it is "too late".

Always seeks help at appropriate lev l, i ter good initial evaluation, but before it is "too late"

| Cannot Evaluate | : 1 to 2 =Unsatisfactory | : 3 = Average for level | : 4 to 5 = Exemplary |
|---|---|---|---|
| 0 | >> 1 << | 2    3    4 | 5 |

## General Comments    (Question 11 of 11)

Please provide any additional comments or suggestions which you feel may be helpful. Positive feedback also enco: ag d.

NHES TRIBUNAL EXHIBIT PAGE 47

**Dartmouth-Hitchcock**
**Internal Medicine**

| | | | |
|---|---|---|---|
| **Evaluator:** | Emergency Department Faculty - Attending Physician | **Subject:** | Jeffrey Isaacs - PGY1 |
| **Activity:** | ED - PGY1 | **Site:** | Mary Hitchcock Memorial Hospital |
| **Evaluation Type:** | Resident | **Completion Date:** | 01/17/2012 |
| **Request Date:** | 12/16/2011 | | |
| **Period:** | Block 6 2011-12 | **Dates of Activity:** | 11/14/2011 **To** 12/18/2011 |
| **Subject Participation Dates:** | 11/14/2011 **To** 12/18/2011 | | |

The Internal Medicine Residency Program is incorporating the ABIM milestones into our resident evaluations to ensure that residents are acquiring the necessary knowledge, skills, and attitudes for advancing in their training and entering the next phase of their internal medicine careers.  Thank you for completing this evaluation in a timely manner.

**Competency: Patient Care Performing a physical exam - (Milestone #5)**  *(Question 1 of 12 - Mandatory)*

Performs an accurate physical examination that is appropriately targeted to the patient's complaints and medical condition.  Identify pertinent abnormalities using common maneuvers.

| Cannot evaluate | Has serious deficits or problems | Occasional problems | Adequate | Doing well | Exceptionally good in this area |
|---|---|---|---|---|---|
| 0 | 1 | 2 | >> 3 << | 4 | 5 |

**Competency: Patient Care Patient management - (Milestone #17)**  *(Question 2 of 12 - Mandatory)*

Recognizes when to seek additional guidance.

| Cannot evaluate | Has serious deficits or problems | Occasional problems | Adequate | Doing well | Exceptionally good in this area |
|---|---|---|---|---|---|
| 0 | 1 | 2 | 3 | >> 4 << | 5 |

**Competency: Medical Knowledge Knowledge of core content - (Milestone #29)**  *(Question 3 of 12 - Mandatory)*

Understands the relevant pathophysiology and basic science for common medical conditions.

| Cannot evaluate | Has serious deficits or problems | Occasional problems | Adequate | Doing well | Exceptionally good in this area |
|---|---|---|---|---|---|
| 0 | 1 | 2 | >> 3 << | 4 | 5 |

**Competency:  Practice-Based Learning and Improvement Improves via feedback - (Milestone #61)**  *(Question 4 of 12 - Mandatory)*

Responds welcomingly and productively to feedback from all members of the health care team including faculty, peer residents, students, nurses, allied health workers, patients and their advocates.

| Cannot evaluate | Has serious deficits or problems | Occasional problems | Adequate | Doing well | Exceptionally good in this area |
|---|---|---|---|---|---|
| 0 | 1 | 2 | 3 | >> 4 << | 5 |

**Competency:  Interpersonal and Communication Skills Interprofessional team - (Milestone #83)**  *(Question 5 of 12 - Mandatory)*

Delivers appropriate, succinct, hypothesis-driven oral presentations.

| Cannot evaluate | Has serious deficits or problems | Occasional problems | Adequate | Doing well | Exceptionally good in this area | |
|---|---|---|---|---|---|---|
| 0 | 1 | 2 | 3 | >> 4 << | 5 | |

---

**Competency:  Professionalism Practice individual patient advocacy - (Milestone #113)**  *(Question 6 of 12 - Mandatory)*

Recognizes when it is necessary to advocate for individual patient needs.

| Cannot evaluate | Has serious deficits or problems | Occasional problems | Adequate | Doing well | Exceptionally good in this area |
|---|---|---|---|---|---|
| 0 | 1 | 2 | >> 3 << | 4 | 5 |

---

**Competency:  Professionalism Maintain accessibility - (Milestone #102)**  *(Question 7 of 12 - Mandatory)*

Carries out timely interactions with colleagues, patients and their designated caregivers.

| Cannot evaluate | Has serious deficits or problems | Occasional problems | Adequate | Doing well | Exceptionally good in this area |
|---|---|---|---|---|---|
| 0 | 1 | 2 | >> 3 << | 4 | 5 |

---

**Competency:  Systems-Based Practice**  *(Question 8 of 12 - Mandatory)*

Understand unique roles and services provided by the ED and understands how the ED interfaces with other departments within the hospital.

| Cannot evaluate | Has serious deficits or problems | Occasional problems | Adequate | Doing well | Exceptionally good in this area |
|---|---|---|---|---|---|
| 0 | 1 | 2 | >> 3 << | 4 | 5 |

---

**Resident Strengths**  *(Question 9 of 12)*

For comments to be effective as feedback, please be direct and constructive.  Global adjectives or remarks, such as "good resident" do not provide meaningful feedback to the resident.

No problem areas identified. Performed well during his time in the ED. Functions well as part of the team. Keep up the good work.

---

**Suggested Areas for Improvement**  *(Question 10 of 12)*

For any component that needs attention or was rated 2 or less, please provide specific comments and recommendations.  Be as specific as possible, including reports of critical incidents.  Global adjectives or remarks, such as "bad resident" do not provide meaningful feedback to the resident.

---

**Face to Face Evaluation**  *(Question 11 of 12 - Mandatory)*

Face to face evaluation was presented to intern/resident for this rotation.

| Selection | Option |
|---|---|
| | Yes |
| X | No |

---

**Excellence in Teaching Award**  *(Question 12 of 12)*

If you would like to nominate this person for an Excellence in Teaching Award, please list a minimum of 3 detailed reasons for your nomination.  These will be included in a PowerPoint slide that will be shown at a future M&M conference in which the award will be presented.

NHES TRIBUNAL EXHIBIT PAGE 49



Jeffrey Isaacs <jeffreydi@gmail.com>

---

## Re: From OccMed - DHMC

1 message

---

**JDI** <jeffreydi@gmail.com>                                                    Fri, May 20, 2011 at 10:22 AM
To: "Erin A. Cartier" <Erin.A.Cartier@hitchcock.org>

Hi Erin,

I've almost certain I've had rubella titers drawn, I'll check to see if I can locate the documentation. I'll be arriving in New Hampshire around June 16 - can I get the PPD and Tdap (and rubella titer if necessary) then?

The depression issue was in 2005-6, and I received counseling for a total of approximately six months from a physician. It was related to a career transition and some family issues. I am not currently taking any medications, prescription or OTC, nor have I since 2006.

Thank you,
Jeffrey

On Fri, May 20, 2011 at 5:06 PM, Erin A. Cartier <Erin.A.Cartier@hitchcock.org> wrote:

> ## Hi Jeffrey,
>
> ## In reviewing your health questionnaire and immunizations, it appears we need a few items. Since some fo the titers are not in English, I am un able to see that a Rubella (German Measles) was drawn. You also need a Tdap and current PPD.
>
> ## Can you also explain about the depression issue. Was it a situation issue? Are you on medication or counseling? Please explain further.
>
> ## This information and immunizations are needed prior to attending orientation in June. If you are in the area, please call us and we can take care of your immunization issues.
>
> Erin A. Cartier, RN
>
> Occupational Medicine

---

NHES TRIBUNAL EXHIBIT PAGE 50

Dartmouth Hitchcock Medical Center

One Medical Center Drive

Lebanon, NH 03756

Erin.A.Cartier@Hitchcock.org

603-653-3850

fax 603-650-0928

www.dhmc.org/goto/occmed



----------------------------------------------------------------------------------

**IMPORTANT NOTICE REGARDING THIS ELECTRONIC MESSAGE** This message is intended for the use of the person to whom it is addressed and may contain information that is privileged, confidential, and protected from disclosure under applicable law.  If you are not the intended recipient, your use of this message for any purpose is strictly prohibited.  If you have received this communication in error, please delete the message and notify the sender so that we may correct our records.

----------------------------------------------------------------------------------

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

IMPORTANT NOTICE REGARDING THIS ELECTRONIC MESSAGE:

This message is intended for the use of the person to whom it is addressed and may contain information that is privileged, confidential, and protected from disclosure under applicable law. If you are not the intended recipient, your use of this message for any purpose is strictly prohibited. If you have received this communication in error, please delete the message and notify the sender so that we may correct our records.

NHES TRIBUNAL EXHIBIT PAGE 51



**Jeffrey Isaacs <jeffreydi@gmail.com>**

---

## Re: Rain here all day
1 message

---

**Jeffrey D. Isaacs** <jeffrey.isaacs.wg03@wharton.upenn.edu>            Sun, Jul 3, 2011 at 8:58 AM
To: William Isaacs <wlisaacs@aol.com>, "Salvo, Lynn R" <salvol@email.chop.edu>

> From: Jeffrey D. Isaacs
> Sent: Sunday, July 03, 2011 8:51 AM
> To: Harley P. Friedman
> Cc: Christine T. Finn
> Subject: RE: Summary of meeting
>
>
> Dear Dr. Friedman,
>
> I understand from our meeting today that a decision was made yesterday
> to remove me from the M2 service. This was one day after our
> discussion on the responsibilities of an intern.
>
> To note, on Friday I filed my progress notes around 11am, five hours
> earlier than previously. I worked an 18 hour shift on Friday. When I
> asked to go home at 16 hours, I was told "duty hours don't matter."
>
> Likewise on Monday, I was told to work a 19 hour shift and I had to
> tell the resident that I was physically unable to work/concentrate, as
> the first two days had been an incredibly stressful adjustment for me.
> So I went home after about 16.5-17.5 hours (I don't remember the exact
> time, I logged 16 hours) on tuesday.
>
> Around noon yesterday, I received a phone call from my good friend
> George Baker. He asked me why I sounded short of breath. After the
> phone call I noted my breathing rate was around 40/minute. I was
> exhausted from this last week, where I worked approximately 90 hours,
> to the point of dyspnea. I did my laundry and grocery shopping and
> fell back asleep. Today I felt physically rested and more assured, and
> was guardedly optimistic on a much better week.
>
> As I said to you today, I don't think the decision you made last night
> was just. It suprises ne that it was made just one 18-hour shift after
> our discussion. I am asking to remain on the M2 service for at least
> another week to see how things go with Dr. Solberg. I think you must
> understand that pulling me from the service might only increase my
> anxiety as an intern, as it will be widely known.
>
> Even being exhaused from the 18 hour shift and approx 90 hour week,
> Friday evening I handled a cardiology situation more calmly than the
> resident, in my opinion. Our patient ████d became hypotensive
> (75/55) after receiving a relatively large dose of trazodone on Friday
> night. Dawn phoned the cardiology fellow at home (Alex?) and requested
> that he come in from home to perform cardioversion. When he arrived,
> he asked my opinion on the next course of action. I replied that
> monitoring would be more appropriate than aggressive cardioversion,
> and he agreed. We actually all had a laugh when the patient reminded

NHES TRIBUNAL EXHIBIT PAGE 52

us of his metoprolol dosing. Alex said "this guy is telling US his
cardiac medication schedule, and she wants to cardiovert him??"

You stated that you spoke with all my supervisors from friday and "the
decision was clear." Interestingly, I know that I filed my notes early
that day and handled a deteriorating cardiology situation rather
appropriately. I am somewhat mystified, to be honest, at your
decision.

Regards,
Jeffrey Isaacs


On Sun, Jul 3, 2011 at 8:48 AM, William Isaacs <wlisaacs@aol.com> wrote:
> Stay up there till meeting on Tuesday  get applications in if you see any programs to your liking. Apply to some
lower tier programs if you really want medicine as they may be happy to get you   If they move you to psych take it but
look for an escape to something else. Keep me posted
>
> Sent from my iPhone

Case 1:12-cv-00040-LM    Document 40-1    Filed 06/30/12    Page 37 of 49

NHES TRIBUNAL EXHIBIT PAGE 53



**Jeffrey Isaacs <jeffreydi@gmail.com>**

## Re Isaacs v DHMC et al
1 message

**Jeffrey D. Isaacs** <jeffrey.isaacs.wg03@wharton.upenn.edu>          Mon, Jan 23, 2012 at 11:21 AM
To: ekaplan@sulloway.com

Dear Mr Kaplan:

I have received your letter from this morning.

Please consider the following requests:

1) Last week, I requested an EPIC audit trail, as I am concerned about a HIPAA violation that may have occurred during my ED hospitalization. Please advise of the status of this request.

2) Last week, I requested medical leave (retroactively from November 27th) in a conversation with Sonyal Kumar. Please advise of the status of this request.

3) Likewise, please provide written declaration of my current employment/administrative status at DHMC.

4) Last week, I requested a meeting with President Kim. Please advise of the status of this request. If this request has been refused, and to mitigate damages, please arrange for transmission of my written, immediate appeal to the Board of Trustees of Dartmouth College.

5) Please provide me an electronic copy of my entire DHMC Microsoft Outlook email history, as well as my EPIC Inbox.


Regards,
Jeffrey Isaacs

NHES TRIBUNAL EXHIBIT PAGE 54



**Jeffrey Isaacs <jeffreydi@gmail.com>**

---

## DHMC requests
1 message

---

**Jeffrey D. Isaacs** <jeffrey.isaacs.wg03@wharton.upenn.edu>          Mon, Jun 11, 2012 at 1:13 PM
To: Edward Kaplan <ekaplan@sulloway.com>

Attorney Kaplan-

I haven't heard back from you regarding countless requests for your
client. Please advise the status of those requests (ie medical records
request especially).

An additional request - please provide the coverage information for
the Hartford disability plan that was in effect for me until
termination.

Jeffrey Isaacs

NHES TRIBUNAL EXHIBIT PAGE 55



Jeffrey Isaacs <jeffreydi@gmail.com>

---

## Re: ADA application
1 message

---

Jeffrey Isaacs <jdi@bakerisaacs.com>                               Wed, Jun 20, 2012 at 12:53 AM
To: "Miranda K. Pizinger" <Miranda.K.Pizinger@hitchcock.org>

Miranda,
After 5 months I have not heard back regarding my request for medical disability leave. Please notify me immediately
the status of this request.
I have filed a complaint regarding non-compliance with the United States Department of Labor.
Jeffrey Isaacs


On Thu, Jan 19, 2012 at 1:16 PM, Jeffrey Isaacs <jdi@bakerisaacs.com> wrote:
    Thank you Miranda. I will await their call.

    I would also like to formally request medical leave, effective retroactively from November 27th 2011. On this evening
    , I informed my supervisor (adamantly & in the presence of 4 nurses) that I no longer felt safe working on patients
    because of a hostile environment that had taken its toll on my mental health. He pressured me to stay , which I
    succumbed to. The following weekday my program director told me "it's difficult to make ADA accommodations for
    interns." She made false accusations as well - to which I responded by leaving voicemails for a supervisor  in which
    I threatened a lawsuit.


    Regards
    Jeffrey


    On Wed, Jan 18, 2012 at 4:41 PM, Miranda K. Pizinger <Miranda.K.Pizinger@hitchcock.org> wrote:

        Good Afternoon,


        Thank you for calling this afternoon, I have reached out to Employee Relations and they will be in touch with you
        tomorrow regarding your complaint. I have attached the application to this email for you and your provider to
        complete and return to my office. If you have any questions please let me know.


        **Miranda Pizinger**

        Supervisor, Benefits Operations

        Human Resources |Benefits Administration

        Colburn Hill |One Medical Center Drive|Lebanon, NH 03756

        v: 603.653.1433|e- fax: 603.727.7973

        www.dhmc.org


        cid:image003.jpg@01CA530A.32546310

---

**NHES TRIBUNAL EXHIBIT PAGE 56**

CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information.  Any unauthorized review, use, disclosure or distribution is prohibited.  If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

IMPORTANT NOTICE REGARDING THIS ELECTRONIC MESSAGE:

This message is intended for the use of the person to whom it is addressed and may contain information that is privileged, confidential, and protected from disclosure under applicable law. If you are not the intended recipient, your use of this message for any purpose is strictly prohibited. If you have received this communication in error, please delete the message and notify the sender so that we may correct our records.

---

 **RequestForAssistance.pdf**
8K

NHES TRIBUNAL EXHIBIT PAGE 57



**Jeffrey Isaacs <jeffreydi@gmail.com>**

## Re: USDC PA

**Jeffrey D. Isaacs** <jeffrey.isaacs.wg03@wharton.upenn.edu>        Mon, Jun 18, 2012 at 1:48 PM
To: Kathleen Peahl <KPeahl@wadleighlaw.com>

Thank you. There are two further urgent issues I am requesting your
client respond to:



2) As far as the Eastern PA complaint, I would like to notify you that
I will waive my right to name Jim Yong Kim in that lawsuit if you can
provide the following affidavit: Dr Kim had no prior or current
personal or professional relationship with the Defendants from
Keck/NIH lawsuit(Henderson/Baughman). Furthermore, Dr Kim never
communicated, directly nor through a third party, with Henderson or
Baughman. Again, if these statements are true, then Kim would not be a
relevant Defendant for discovery in the matter pending  in
Pennsylvania. I anticipate Filing on Thursday--absent a response on
this issues, I'll assume the proposed affidavit is not possible/true.

Regards
Jeffrey Isaacs

On Mon, Jun 18, 2012 at 11:08 AM, Kathleen Peahl <KPeahl@wadleighlaw.com> wrote:
> Dr. Isaacs,
>
> I am authorized to accept service on behalf of those defendants that I currently represent in the pending action in
NH USDC.
>
> Kathleen Peahl
> Wadleigh, Starr & Peters, PLLC
> 95 Market Street
> Manchester NH 03101
> (603)206-7229 (direct dial)

NHES TRIBUNAL EXHIBIT PAGE 58

>
>
>
>
>
> **** CONFIDENTIALITY NOTE ****
> The content of this e-mail contains information from the law firm of Wadleigh, Starr & Peters, P.L.L.C., which is
confidential or privileged. If you are not the intended recipient, be aware that any disclosure, copying, distribution or
use of the contents of this e-mail is prohibited. If you have received this e-mail in error, please notify us immediately.
Thank you.
>
> -----Original Message-----
> From: jeffreydi@gmail.com [mailto:jeffreydi@gmail.com] On Behalf Of Jeffrey D. Isaacs
> Sent: Friday, June 15, 2012 2:56 PM
> To: Kathleen Peahl
> Subject: USDC PA
>
> Attorney Peahl:
>
> Please indicate if you are authorized to represent & accept service for Dartmouth College, with regards to a civil
complaint currently being filed in USDC Eastern Pennsylvania.
>
> Jeffrey Isaacs



REPLY TO: CAPITAL OFFICE
Fax number: (603) 223-2963
ekaplan@sulloway.com

January 23, 2012

FRANK J. SULLOWAY
(1883-1981)
FRANKLIN HOLLIS
(1904-1980)

SENIOR COUNSEL:
CHARLES F. SHERIDAN, JR.
MARTIN L. GROSS
ROBERT M. LARSEN
FRED L. POTTER

MICHAEL M. LONERGAN
EDWARD M. KAPLAN
IRVIN D. GORDON
MICHAEL P. LEIHMAN
MICHEL A. LAFOND
PETER F. IMSE
R. CARL ANDERSON
DOUGLAS R. CHAMBERLAIN
MARGARET H. NELSON
JAMES O. BARNEY
JAMES E. OWERS
ROBERT J. LANNEY
PETER A. MEYER
JOHN R. HARRINGTON
RONNA F. WISE
WILLIAM D. PANDOLPH
JEANINE L. POOLE
W. KIRK ABBOTT, JR.
ELISE H. SALEK
MARTIN P. HONIGBERG
SARAH S. MURDOUGH
PATRICK J. SHEEHAN
DEREK D. LICK
MELISSA M. HANLON
CHRISTOPHER J. PYLES
KEVIN M. O'SHEA
BETH G. CATENZA
JAY SURDUKOWSKI
NICOLE J. SCHULTZ-PRICE
KATHERINE DEFOREST
MATTHEW J. SNYDER
HEATHER L. DEVINE
ROSEMARY B. GUILTINAN

ALL ATTORNEYS ADMITTED
IN NEW HAMPSHIRE

INDIVIDUAL ATTORNEYS
ADMITTED IN:
MAINE, VERMONT, FLORIDA
MASSACHUSETTS, NEW YORK,
AND OTHER STATES

*VIA E-MAIL & U.S. MAIL*
Jeffrey David Isaacs, M.D.
Baker Isaacs Capital Group
477 Madison Avenue, Suite 1600
New York, NY 10022

Re:   Isaacs v. DHMC, et al.

Dear Dr. Isaacs:

Please be advised that I represent the Dartmouth Hitchcock Medical Center and the various entities that you have named as defendants in your January 15, 2012 "notice" of intention to seek some type of relief from the United States District Court. Please direct any further communication regarding the issues raised in your "notice" to me rather than any other individuals who may be at the institutions you name in your "notice."

Please direct any further requests for information to me as well and I will respond to your requests in a timely manner.

Very truly yours,

Edward M. Kaplan

EMK/jrw

cc:   Jeanine Arden-Ornt

CAPITAL OFFICE
9 Capitol Street
P.O. Box 1256
Concord, NH 03302
Tel: 603-224-2341

PORTLAND OFFICE
477 Congress Street
5th Floor
Portland, ME 04101
Tel: 207-253-5141

GORHAM OFFICE
30 Exchange Street
P.O. Box 335
Gorham, NH 03581
Tel: 603-466-5946

{C0909492.1 }   *Celebrating More Than 150 Years of Service to Clients and Community*

NHES TRIBUNAL EXHIBIT PAGE 60



**Jeffrey Isaacs <jeffreydi@gmail.com>**

# Re: Service of Process Request
1 message

---

**Seldon Nason** <nasoninvestigations@tds.net>                    Tue, Feb 7, 2012 at 1:52 PM
To: Jeffrey Isaacs <jdi@bakerisaacs.com>

Hi Jeff

Served in hand at 1:32 pm. The attorney wouldn't take at first and I showed him his letter to you and mentioned it was a complaint and summons in federal district court. He said he wasn't authorized to took it but took it anyways.

I will mail it out to you later today.

Don

On Feb 7, 2012 12:03 PM, "Seldon Nason" <nasoninvestigations@tds.net> wrote:

Ok..Heading there now.

On Feb 7, 2012 12:02 PM, "Jeffrey Isaacs" <jdi@bakerisaacs.com> wrote:
yes , that is fine,the summons/complaint is the important item for now

thanks

On Tue, Feb 7, 2012 at 11:28 AM, Seldon Nason
<nasoninvestigations@tds.net> wrote:
> Hi Jeff,
>
> Question before I serve this---the Pro Se Motion has no names on it, just
> your copied signature.  Am I to fill it out or do you want to just mail it
> to the attorney after the other paperwork is served (Summons/Complaint).
>
> Don
>
> On Mon, Feb 6, 2012 at 6:30 PM, Jeffrey Isaacs <jdi@bakerisaacs.com> wrote:
>>
>> Hello Mr. Nason,
>>
>> As per our telephone conversation, I am requesting your assistance for
>> service of process. Attached is the USDC, Complaint, and a Motion,
>> which should all be delivered to attorney Ed Kaplan in Concord. Please
>> don't hesitate to contact me if you have any questions.
>>
>> Regards,
>> Jeff
>
>

NHES TRIBUNAL EXHIBIT PAGE 61

# Statement of Plaintiff

Dartmouth psychiatry recruited me with promises of participating in groundbreaking neuroscience research and working for Defendant Kim's renowned Partners-in-Health organization. With a background in international medicine and finance, Dartmouth's offer fit my long-term goals of effecting meaningful change in international health. I had fond memories of Dartmouth as an undergraduate; my business partner and good friend from college co-founded Baker Isaacs Capital Group in 2010 to focus on our goals of global sustainability and health care development projects.

When I arrived at Dartmouth in June 2011, the tone had drastically changed from the recruitment letters. It was odd. They started me on M2, the hardest rotation in the curriculum, and relentlessly criticized me from day one. There were other strange things, like unquestionably bizarre eye contact during an orientation speech. I didn't know what to make of it.

The Defendants quickly started to deny me participation in the research and preventative medicine programs they had promised during recruiting. In hour-long biweekly meetings with Defendant Finn, under the premise that she was trying to "help me succeed," she blocked my participation in research activities because they might 'distract' me.

They first advanced the rationale that I purportedly lacked fundamental knowledge. I probably scored higher than 90% of the Psychiatry department on my USMLE Step 1 exam (I achieved a 241/99); my original goal was to be a neurosurgeon, which generally requires a more competitive score than psychiatry. In November, I surpassed about half the other residents on the nationwide in-service exam. The Defendants quickly changed their criticisms to purported performance issues.

During about five of these biweekly review meetings, I was distraught and asked for medical leave; I stated that I was already performing to the best of my ability, and if deficiencies existed, I'd need a leave of absence to figure out what was wrong. The program directors always replied that my performance was still within the satisfactory range, and that a leave of absence wasn't necessary. Defendant Finn, and several other faculty members, would ask me all about what symptoms I had, if I took prescription or recreational drugs (I do not), etc. I would discuss detailed aspects of my medical history, and particularly, what the triggers were to my symptoms that began after a traumatic brain injury in 1997. Dartmouth faculty witnessed and even documented these symptoms, e.g. an M2 evaluation cited "incapacitating anxiety."

I complained to senior faculty that patient care was being compromised as a result of the Department's criticisms, which were becoming widely known and also

affecting my ability to focus. In particular, I was concerned about two patients that I felt had been improperly committed to New Hampshire Hospital.

As the year progressed, I progressively felt on the verge of collapse at work. I arranged an appointment with the sleep medicine center at Dartmouth, a division of the Dartmouth College Department of Psychiatry. The center diagnosed me with a severe neurological disorder initially. My program director told me not to worry about it; regarding accommodations, she said they were almost impossible for an intern. A few weeks later, my treating doctor lowered and revised my condition to 'moderate' severity, and told me not to worry about it as far as work is concerned.

Meanwhile, performance criticisms would continue to come at odd-hours, on Thanksgiving Day, after Christmas Day, or after I was sleep deprived from overnight sleep studies. The inappropriate criticism was almost always issued by Defendant Noordsy or a few other friends and colleagues of Defendant Finn.

As the situation worsened, I received looks of disgust and disdain from certain faculty. They interviewed another candidate for my position in October, who was a transfer from the Internal Medicine department.  Defendant Finn actually emailed me to evaluate her; at the time, I didn't know she would be my replacement. The candidate told me that I was "an enigma; both introverted and extroverted." I don't know if she knew she was replacing me, but was told that rumors circulated. Furthermore, my colleagues started to act different around me; several quietly expressed concern to me that the program would fire me in January, on the challenging M2 rotation. It seemed they wanted another department to fire me, but at the time I didn't know why.

On Friday, January 13th, after three days on the M2 rotation, I was told to meet with Defendant Finn. She suggested that I could resign for omitting potentially embarrassing items on my residency application. It was a rather vague meeting; the Defendants never issued any written allegations, as required under DHMC policy. After realizing that I had no intention to resign, they finally decided to raise issues I suspect they knew about for almost a year. First, they accused me of omitting a previous voluntary resignation. After I reminded them that I disclosed the six-week Arizona internship to them back in April 2011, they brought up what was possibly the real issue all along – previous litigation revolving around a brain-injury related condition.

Around 10:15 on Friday, January 13th, I left the meeting and began to think about all of the previous meetings with the Defendants. I remembered Defendant Finn telling me how she feigned accolade towards an "unlikeable" patient with narcissistic personality disorder throughout her therapy sessions, and doing so made her sick to her stomach. I remembered all her attempts to "help" me, where she actually took adverse actions against me. I started to think that, in fact, the Defendants never wanted to help me. Could they have lied to me throughout our meetings, the same way they lied over years to the patient with narcissistic personality disorder? If they

NHES TRIBUNAL EXHIBIT PAGE 63

learned about my Arizona internship back in April 2011, or previous litigation during their pre-employment background checks, maybe they had been holding these issues against me for six months. I recalled an occasion in November where I mentioned my Arizona internship to Defendant Finn - she quickly changed the subject. Yes, they knew and planned to dismiss me for months. Nearly certain that I had been subjected to a sham, namely months of psychological manipulation by leaders in academic psychiatry, I went into mental shock.

I had been hoping Defendant Kim would mobilize the correct resources at Dartmouth to investigate, but he never did to my knowledge. I also felt that evidence was being withheld illegally, and asked Defendant Kim's help. Despite never being formally placed on administrative leave, my DHMC accounts containing vital evidence were either deleted or disabled. A week after I criticized Defendant Kim for ignoring me, I was fired. My benefits and employment were terminated before I could defend myself at DHMC, which defies that whole concept of administrative leave. In the words of a friend, "you're not getting any due process at Dartmouth."

It seems the Defendants ignored due process in order to discredit me, and moreover, discredit me quickly. I find the timing rather suspicious. Nobody from Dartmouth communicated my employment status to me for two months since January 13th. The Defendants are fighting vigorously in Court to delay proceedings until late April.

In March 2011, I possessed enthusiasm to train with Defendant Kim's Partners-in-Health. One year later, ten days after accusing Defendant Kim of negligent inaction, three days before Defendant Kim received the nomination to lead the World Bank, my employment and my aspirations were terminated.

To the best of my knowledge, the aforementioned statements and beliefs are true and correct.

Doctor J. D. Isaacs                    March 25, 2012

NHES TRIBUNAL EXHIBIT PAGE 64

<u>Complaint against Dartmouth Department of Psychiatry</u>
<u>for Ethical and Criminal Violations</u>

This complaint documents my knowledge of the morally reprehensible, criminal activity that Dartmouth Psychiatry subjected me to as a resident physician. During my tenure at Dartmouth, I was singled-out, manipulated, and eventually, broken down. Throughout this, senior physicians told me to understand that "residency is hard," and that they were only "trying to help me." I would learn, slowly and painfully, that I was a victim of cruelty that goes far beyond any normal residency experience. Nobody in the senior leadership at Dartmouth was trying to help me; they were waiting for my replacement to be hired in January. In the meantime, they collected approximately $100,000 in Medicaid funds for purportedly training me. In trying to explain what I lived through to others, the best analogy I can offer is some unpleasant hybrid of "One Flew Over the Cuckoo's Nest" and "Full Metal Jacket." Like the military, residency training is notoriously difficult. In the wrong hands, torture could take place under the veil of rigorous training.  Something akin to this occurred, to the best of my understanding. I seek prosecution of the responsible individuals for criminal assault, harassment, bias crimes, Nuremberg code violations, and patient endangerment. I tried to report these crimes when I was hospitalized at Dartmouth on Friday January 13, 2012. Nobody would listen.

My reaction to the abuse that began in June 2011 had direct physical repercussions. At the suggestion of a fellow colleague who witnessed my impairment, I scheduled a consultation with the Dartmouth Psychiatry sleep laboratory. When I explained my worsening concentration and alertness to the laboratory doctors, they initially suspected narcolepsy. After only two or three hours of rounds in the morning, I would retreat to the resident break room and pass out for thirty minutes. Never, prior to starting at Dartmouth, was I so disabled as to pass out every three hours. Even during the difficult six week Arizona surgery internship I worked in 2010, I made it through the day without incident. The director of the sleep lab conducted an 8-hour overnight brain wave EEG study. He told me the results were "severely abnormal" and pointed to brain wave spikes that occurred approximately every 14 seconds. My brain, in his words, couldn't sleep for more than 14 seconds without arousing.  Several weeks later, I was told "not to worry" about the abnormalities, and to continue working as usual with the assistance of a breathing device. When I asked my Program Director for accommodations, she told me "accommodations are difficult to arrange for interns." In January, I requested my medical records from Dartmouth, both the medical chart as well as the 'audit trails' of who looked at my chart, but this evidence has been withheld and or destroyed.

In addition to the documented EEG disturbance, after only one week at Dartmouth, a senior resident named Nick asked me if I "was on the verge of a nervous breakdown." Several days later, Dr Brian Justin Krawitt filed an evaluation stating that I had to be removed from his M2 rotation due to "incapacitating anxiety." This evaluation, likewise, has been withheld despite numerous requests I have made to Dartmouth's attorneys. On September 17th 2011, after informing my family of my

NHES TRIBUNAL EXHIBIT PAGE 65

intent, I asked my program director for medical leave. She told me it was not necessary.

The actions that lead to my decline were calculated and subtle. Most of the perpetrators were Harvard-trained leaders in academic psychiatry. I was systematically pulled into meetings, stared down like a criminal, broken down into tears, and then told they'd help me improve. I was blamed for other residents' mistakes. I was run in circles with for the amusement of a few psychiatry professors. These were masters of human psychology, enacting a form of learned hopelessness on an intern they regretted hiring, because of an issue they would reveal to me on Friday January 13, 2012.

On orientation day in June 2011, Chairman Alan Green stared at me for approximately twenty-five minutes during an orientation speech. It took me six months to understand why. In January 2012, still trying to piece together all that happened, I wrote a list of fifty discrepancies that I believe, collectively, represent evidence of the perpetrators' intent to inflict harm. I complained about some of these discrepancies to Program Director Finn, who either never responded or offered implausible excuses. Likewise, Finn denied multiple requests I made for medical leave, assuring me that I was doing well enough not to warrant leave, and that they were helping improve. In fact, I was deteriorating, and Dartmouth Psychiatry leadership knew it.

I will elaborate on several representative examples from the list I made in January. In July 2011 Professor Douglas Noordsy emailed me that a typo I made "would shame my Dartmouth English professor." Unfortunately, small typographical or grammatical errors are typical for resident hospital notes. Indeed, the Dartmouth Psychiatry Resident Manual emphasized not to spend time 'perfecting patient notes to Shakespearian prose.' What I would later learn is that Noordsy actually meant my Dartmouth economics professor would be shamed to have recommended me for the position at Dartmouth Psychiatry, for the reasons that would be explined to me on January 13th.

On Christmas 2011, Noordsy emailed me stating "Sometimes good enough, just isn't good enough" while he proceeded to blame me for the mistake of *another* resident. I received similar attacks via email on Thanksgiving, New Year's Day, education leaves, and my vacation. These emails were all deleted and withheld from me on January 17th 2012, two months before I was terminated.

Patients were ultimately endangered. Noordsy restrained a patient of mine in four-point physical and chemical restraints, against my will and her will. The patient, excited to go home to her daughter's birthday, had left the unit in socks, without shoes. I was the only witness to the entire event, and told Noordsy that under New Hampshire law it was illegal to threaten the restraint of a patient merely for not wearing sneakers. Almost to spite me, it seemed, he exercised his authority and ordered restraints. The following morning, Dr Holtzheimer, who had no knowledge