NHES TRIBUNAL EXHIBIT PAGE 66

of my situation, rhetorically asked me "is there any reason why this patient can't go home to her daughter's birthday?" and encouraged me to discharge her, as the patient was obviously fine.

My suspicion of Dartmouth Psychiatry escalated by November. Four Jewish residents (out of twenty-three total residents) had administrative problems. I was told Dr. Traum was terminated, shortly after Finn emailed the entire department about her medical problems. Dr Nunberg resigned because, in her words, "they didn't teach her." Dr. Schindler, a career Navy fighter pilot, told me "they [senior psychiatrists] abuse you, but that's how they teach here." Schindler had been placed on temporary leave by an outside agency in August 2011, but I personally witnessed Dr. Villari and Dr. Finn suggest he was unwelcome to return to Dartmouth once cleared by the agency. When I sought advice from former Program Director Ronald Green, he carefully told me to consider another career. Furthermore, Green stated that despite my abilities, he "didn't know if he himself" could change the momentum to fire me. He concluded our meeting by stating that "it isn't [his] castle anymore."

On Friday, January 13th, Program Director Finn arranged to meet with me, and again, I was stared down like a criminal with no rights. Dartmouth Psychiatry had just hired a new resident, my replacement, earlier in the week. After six months of abuse, I was in poor condition. In addition to severe EEG abnormalities, I had wheezing and bronchitis, documented in my DHMC ED chart, that caused one medical student to step back three feet from me in an effort to avoid contamination. It took until April 2012 for the bronchitis (which I had never had before) to clear. The meeting with Finn began with the apparent revelation that I had forgotten to document a patient's anxiety about an abdominal exam. Finn accused me of Medicare fraud, even though this minor mistake was inadvertent and made while I was physically ill. Furthermore, this type of mistake is common among residents, and there exists no material or pecuniary benefit for a resident to commit the type of Medicare fraud she accused me of.

After ten minutes of discussing Medicare fraud, Finn changed the subject and revealed the true reason for the six months of abuse. Finn suggested I immediately resign for failing to disclose prior training with Arizona and USC on my CV. It became clear to me, suddenly, that Finn, Noordsy, and Green had been holding Arizona and USC against me since July. They were blackmailing me to resign, by threatening to make public, once again, events that had lead to my six week psychiatric hospitalization in 2006.

Despite a confidentiality agreement, it would be rather easy for Dartmouth to have obtained court records about my time at USC. They also would have learned that I spent six weeks in a psychiatric hospital, and that I had past diagnoses of PTSD, post-concussion syndrome, bipolar 2, and psychosis NOS. To me, possessing clear memories of every statement made to me over six months, there is no question that Dartmouth Psychiatry knew about my psychiatric history, subjected me to intentional abuse, and informally experimented for their own curiosity or pleasure. I

saw the enjoyment they took out of joking about their own patients, even restraining them inappropriately; unbeknownst to me, I was just another unlikeable patient in their eyes.

I suspect that some of the senior leadership at Dartmouth knew Defendants in my prior lawsuit against USC and the National Institutes of Health. If this is true, it seems their actions to break me down were in revenge for the lawsuit. Indeed, two years after graduating from medical school with national exam scores at the highest possible 99 level, I have been unable to advance my career at either Arizona or Dartmouth. It is now clear that that prior federal litigation has been illegally used against me to ruin my career nationwide.

Dartmouth's illegal treatment persisted well beyond January 13th. I have suffered nightmares and other symptoms every day since. Dartmouth College Attorney O'Leary joked to me "I'm sure you do wish you knew what happened!" Attorney Kaplan told me "If you haven't been already, you're being fired for failure to disclose your time spent at USC." The Dartmouth Alumni office added USC to my public alumni record, despite it being a sealed nullity. The American Academy of Medical Colleges validated my belief that USC is a nullity that need not be disclosed, as it was subject to a confidentiality agreement ordered in a United States federal court. Dartmouth is *still* trying to break me down illegally because of USC. They refuse to grant due process, they refuse to properly accept civil court summonses, they refuse to produce evidence, and they argue in Court that I don't even have a right to state a claim against Dartmouth.

I never filed a crime report against an individual in my life. I would only do so if I had compelling reason to believe that someone was consciously and maliciously trying to harm my wellbeing. I requested an Ethics Investigation from President Jim Yong Kim, confident that an Ivy League university would at least investigate a claim filed by one of their resident physicians. I filed a civil suit, confident that discovery conferences with Dartmouth's attorneys would quickly reveal the extent of any crime that occurred. The case discovery has not moved forward in six months. Not only did Dartmouth and their attorneys fail to investigate, they fired me without ever granting me due process. I was never placed on probation. I was never given a fair hearing. I was fired days after I accused Jim Yong Kim of negligence for failing to investigate this complaint, and days before President Barack Obama nominated Jim Yong Kim to the World Bank Presidency. When a process server attempted to serve a summons upon Jim Yong Kim, the process server wrote that who appears to be a federal judge's relative told him Kim was not home, when the process server felt he was. Despite my efforts to persevere from a trauma involving federal litigation seven years ago, I am not being allowed to pursue a medical career, I am not being afforded due process by Dartmouth, and I am being treated like a criminal with no rights.

*Jeffrey D. Isaacs*                                                             May 28, 2012

<u>Discrepancy List for Ethics Complaint – January 2012</u>
1. Chairman Alan Green stared at me for 25 minutes on orientation day speech.
2. Christine Finn assigns me the most difficult rotation, M2, and exclaims "Intense! Jeff, you up for it?"
3. Comment by Chief Resident of looming "nervous breakdown"
4. Criticized from first day for not being proficient in matters I couldn't have reasonably learned in medical school – e.g. the name of local SNF rehabilitation facilities
5. Five psychiatrists sitting on roundtable after Thanksgiving call, looking at me like a criminal and telling me I should have done notes that were, in fact , the responsibility of other residents.
6. Noordsy stating that "Engish professor would be shamed"
7. Noordsy involuntarily restrains patient for wearing socks
8. Nurses exclamation at Noordsy's ridiculing patient being IEAd "How can he do that?"
9. Shift with Natalie Riblet, where I made hours of phone calls to family members for collateral patient information, criticized for being unmotivated
10. Program Director Finn laughing in November "We'll sign off on you for the year, you don't want to do intern year again, right?"
11. Finn stating that Julie Frew and Jeff Simon "only trying to help me"
12. Green mentioning in October about his son's stock analyst job in Australia
13. Green stating "If I'm ever admitted to the psychiatry hospital.."
14. Green calls before brown oral boards. Says don't be late. I was in hallway with other examinees. Brown interviewer tells me I failed. Green then calls me, tells me congrats on passing. Asks why I was late. Tells me pt I interviewed "He's you![referring to Dartmouth alum/tbi/bipolar"
15. Green reprimanding for being late for Brown Mock Boards, when I was in fact 10 minutes early.
16. Similarly, During ECT rounds, Green tells me "if they yell at you about being late today, tell them I delayed you."
17. Finn's ridiculing on Narcissistic Personlity Disorder Patient
18. Green has tremulous hands, spills coffee twice in meetings with me.
19. Green stating first week "I like working with you, lets hope it stays that way."
20. 1 hour sleep after sleep study , noordsy criticized poor notes
21. Da███████████████ts
22. Complained to Finn about Ravi's comments, no response
23. Donald West – asked if I take any medicine for anxiety
24. Sonia joy – nervous—sits in interview, commends me for interview "the rest you can learn" coaches me on M2 several times.
25. ███ Bae ridiculing R████████████████████████████████████ more intelligent than he is"

26. Sometime in October brought up Arizona/surgery subject with Finn. She started to say "but how", then motioned it will be addressed later.
27. JJ Chen – "I don't know if you need a good eval, but I'll put one in for you." Never did.
28. Believing up until last minute they'd "help me," move me to easier rotation. I was supposed to think they were helping me all along
29. Schindler – maybe eat protein meals to relieve your sleep/EEG problems
30. Ethan Karsen- sick day– "partied with rock stars in Montreal." Friends with "Arcade Fire." No reprimand. I am reprimanded when I was actually sick. Karsen in fact a solid resident, but example shows I was singled out.
31. Rubber room- one flew over cuckoos nest poster, "you don't need to be crazy to work here, we train you"
32. Always told "not to argue back," "we're trying to help you"
33. Nervous breakdown comment. Was short of breath next day on phone with Baker.
34. Sympathy email from Ryan Smith day of hospitalization
35. Sympathy pager msg from Sonia Joy day of hospitalization
36. Internal medicine director Harley staring at me like criminal when I was simply walking with lemonade from outdoor walkway in December 2011
37. Harley walking past my ER pod on January 13, looking nervously out of corner of his eyes
38. Other residents overdose patient, teratogenic drugs during pregnancy, nowhere near level of criticism I received
39. Jeff Simon stating "I don't know what you did to warrant it, but I don't know if I could do residency under such intense scrutiny."
40. Hiring my replacement, Dr Frances Shin, in October 2011
41. Noordsy mentioning Arizona VA in July 2011
42. Frances Shin interview, her mentioning "Finn is an enigma, like you"
43. Told I was not competitive for LPMR program with 100% acceptance rate
44. September 17 request for medical leave, determined "unnecessary" by Finn
45. Schindler stating "they abuse you here"
46. Dave Ravi constantly laughing how "easy M2 was" "why'd you have trouble?"
47. Dave Ravi stating "They *hate* you over on M2, any idea why?" Likewise "you're getting us all in trouble with Finn, she's cracking down on the rules"

Case 1:12-cv-00040-LM   Document 40-2   Filed 06/30/12   Page 5 of 12



**NHES TRIBUNAL EXHIBIT PAGE 93**



**Jeffrey Isaacs <jeffreydi@gmail.com>**

## Re: george
1 message

**George Baker** <cavu96@gmail.com>        Sun, Jun 3, 2012 at 7:39 AM
To: JDI <jeffreydi@gmail.com>

Jeff,

Very well written. I think everything is in there. Maybe you should mention the name of the guy at NIH who might be behind the scenes in all of this. Don't know how you can prove it though.

Feel better,

George

Sent from my iPad

On Jun 2, 2012, at 10:32 PM, JDI <jeffreydi@gmail.com> wrote:

> please let me know if you have any comments on this, if you'd like
>
> jeff
> <JDIcrimalreport.pdf>

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
## INTAKE QUESTIONNAIRE

Please immediately complete this entire form and return it to the U.S. Equal Employment Opportunity Commission ("EEOC"). **REMEMBER**, a charge of employment discrimination must be filed within the time limits imposed by law, within 180 days or in some places within 300 days of the alleged discrimination. When we receive this form, we will review it to determine EEOC coverage. **Answer all questions completely, and attach additional pages if needed to complete your responses. If you do not know the answer to a question, answer by stating "not known." If a question is not applicable, write "N/A." (PLEASE PRINT)**

**1. Personal Information**

Last Name: Isaacs    First Name: Jeffrey    MI: D
Street or Mailing Address: [redacted]    Apt or Unit #: 
City: Ft Washington    County: Montgomery    State: PA    Zip: 19034
Phone Numbers: Home: [redacted]    Work: (212) 257-0737
Cell: [redacted]    Email Address: jdi@bakerisaacs.com
Date of Birth: [redacted]    Sex: ☒ Male ☐ Female    Do You Have a Disability? ☒ Yes ☐ No

**Please answer each of the next three questions.**   i. Are you Hispanic or Latino? ☐ Yes ☒ No

ii. What is your Race? Please choose all that apply.  ☐ American Indian or Alaskan Native   ☐ Asian   ☒ White
☐ Black or African American   ☐ Native Hawaiian or Other Pacific Islander

iii. What is your National Origin (country of origin or ancestry)? Jewish, American

**Please Provide The Name Of A Person We Can Contact If We Are Unable To Reach You:**

Name: William Isaacs    Relationship: Father
Address: [redacted]    City: Ft Washington    State: PA    Zip Code: 19034
Home Phone: [redacted]    Other Phone: (  )

**2. I believe that I was discriminated against by the following organization(s):** (Check those that apply)

☒ Employer   ☐ Union   ☐ Employment Agency   ☒ Other (Please Specify) Dartmouth College Dept Psych

**Organization Contact Information** (If the organization is an employer, provide the address where you actually worked. If you work from home, check here ☐ and provide the address of the office to which you reported.) **If more than one employer is involved, attach additional sheets.**

Organization Name: Dartmouth-Hitchcock Medical Center
Address: 1 Medical Ctr Dr    County: Grantham
City: Lebanon    State: NH    Zip: 03756    Phone: (603) 650-2000
Type of Business: Medical ctr    Job Location if different from Org. Address: 
Human Resources Director or Owner Name: Marc Bertrand    Phone: (603) 650-5000

**Number of Employees in the Organization at All Locations**: Please Check (✓) One
☐ Fewer Than 15    ☐ 15 – 100    ☐ 101 – 200    ☐ 201 – 500    ☒ More than 500

**3. Your Employment Data** (Complete as many items as you are able.) **Are you a federal employee?** ☐ Yes ☒ No

Date Hired: 6/23/2011    Job Title At Hire: Resident physician
Pay Rate When Hired: $48500 per annum    Last or Current Pay Rate: same
Job Title at Time of Alleged Discrimination: Resident Physician    Date Quit/Discharged: 3/19/2012
Name and Title of Immediate Supervisor: Christine Finn

**If Job Applicant,** Date You Applied for Job _____    Job Title Applied For _____

1

**4. What is the reason (basis) for your claim of employment discrimination?**

*FOR EXAMPLE, if you feel that you were treated worse than someone else because of race, you should check the box next to* Race. *If you feel you were treated worse for several reasons, such as your sex, religion and national origin, you should check all that apply. If you complained about discrimination, participated in someone else's complaint, or filed a charge of discrimination, and a negative action was threatened or taken, you should check the box next to* Retaliation.

☐ Race  ☐ Sex  ☐ Age  ☒ Disability  ☐ National Origin  ☐ Religion  ☒ Retaliation  ☐ Pregnancy  ☐ Color (typically a difference in skin shade within the same race)  ☐ Genetic Information; circle which type(s) of genetic information is involved: i. genetic testing   ii. family medical history   iii. genetic services (genetic services means counseling, education or testing)

If you checked color, religion or national origin, please specify:_____

If you checked genetic information, how did the employer obtain the genetic information?_____

_____

Other reason (basis) for discrimination (Explain): Filed HIPAA complaint; filed federal lawsuit

**5. What happened to you that you believe was discriminatory?** Include the date(s) of harm, the action(s), and the name(s) and title(s) of the person(s) who you believe discriminated against you.  **Please attach additional pages if needed.**
*(Example: 10/02/06 – Discharged by Mr. John Soto, Production Supervisor)*

**A. Date**: 1/13/2012   **Action**: Coerced to resign  with threats of embarrassing previous litigation  . See attached current United States District Court suit

**Name and Title of Person(s) Responsible**: Christine Finn

**B. Date**: 3/19/2012   **Action**: Terminated before 'fair hearing' ; due process and evidence withheld

**Name and Title of Person(s) Responsible** Christine Finn/Marc Bertrand

**6. Why do you believe these actions were discriminatory? Please attach additional pages if needed**.
I filed a federal discrimination lawsuit in 2006; I believe Dartmouth held this against me and even experimented with me to determine extent of my disability.

**7. What reason(s) were given to you for the acts you consider discriminatory?  By whom?  His or Her Job Title?**
They allege I omitted information on an ERAS application, even though I corrected the application, or the information was immaterial.

**8. Describe who was in the same or similar situation as you and how they were treated.**  For example, who else applied for the same job you did, who else had the same attendance record, or who else had the same performance?  Provide the race, sex, age, national origin, religion, or disability of these individuals, if known, and if it relates to your claim of discrimination.  For example, if your complaint alleges race discrimination, provide the race of each person; if it alleges sex discrimination, provide the sex of each person; and so on.  Use additional sheets if needed.

**Of the persons in the same or similar situation as you, who was treated *better* than you?**

| Full Name | Race, Sex, Age, National Origin, Religion or Disability | Job Title | Description of Treatment |

**A.** Generally, the others employees at Dartmouth-Hitchcock.

**B.**

2

**Of the persons in the same or similar situation as you, who was treated *worse* than you?**

| Full Name | Race, Sex, Age, National Origin, Religion or Disability | Job Title | Description of Treatment |

A. TO the best of my knowledge, nobody.

B. 

**Of the persons in the same or similar situation as you, who was treated the *same* as you?**

| Full Name | Race, Sex, Age, National Origin, Religion or Disability | Job Title | Description of Treatment |

A. Jennifer Connors -- pending lawsuit in Vermont United States District Court

B. Four jewish individuals (Shindler, Traub, Nunberg, Isaacs) were terminated, resigned for grievances, or placed on leave during the six months I was there.

**Answer questions 9-12 only if you are claiming discrimination based on disability. If not, skip to question 13. Please tell us if you have more than one disability. Please add additional pages if needed.**

**9. Please check all that apply:**
- [x] Yes, I have a disability
- [ ] I do not have a disability now but I did have one
- [ ] No disability but the organization treats me as if I am disabled

**10. What is the disability that you believe is the reason for the adverse action taken against you? Does this disability prevent or limit you from doing anything?** (e.g., lifting, sleeping, breathing, walking, caring for yourself, working, etc.).

Post-concussive syndrome/PTSD secondary to head trauma; sleep disorder

**11. Do you use medications, medical equipment or anything else to lessen or eliminate the symptoms of your disability?**
[x] Yes  [ ] No
If "Yes," what medication, medical equipment or other assistance do you use?
Sleep apnea device

**12. Did you ask your employer for any changes or assistance to do your job because of your disability?**
[x] Yes  [ ] No
If "Yes," when did you ask? September 2011   How did you ask (verbally or in writing)? verbally and written
Who did you ask? (Provide full name and job title of person)
Christine Finn
Describe the changes or assistance that you asked for: Medical leave or schedule accommodation

How did your employer respond to your request? Refused it and ignored later.

3

**13. Are there any witnesses to the alleged discriminatory incidents? If yes, please identify them below and tell us what they will say. (Please attach additional pages if needed to complete your response)**

| Full Name | Job Title | Address & Phone Number | What do you believe this person will tell us? |

A. ~~Not known fully. Generally, I believe most members of the Department of Psychiatry were aware of my difficulties and were aware of the stress the administrators subjected me to. However, I believe these other employees were lied to about my performance so as to not raise suspicion of the true retaliatory nature of their actions.~~

B.

**14. Have you filed a charge previously on this matter with the EEOC or another agency?** ☐ Yes ☒ No

**15. If you filed a complaint with another agency, provide the name of agency and the date of filing:** _____

_____

**16. Have you sought help about this situation from a union, an attorney, or any other source?** ☒ Yes ☐ No
Provide name of organization, name of person you spoke with and date of contact. Results, if any?
Attached federal court process.   Attached criminal/ethics complaint.

_____

**Please check one of the boxes below to tell us what you would like us to do with the information you are providing on this questionnaire.** If you would like to file a charge of job discrimination, you must do so either within 180 days from the day you knew about the discrimination, or within 300 days from the day you knew about the discrimination if the employer is located in a place where a state or local government agency enforces laws similar to the EEOC's laws. **If you do not file a charge of discrimination within the time limits, you will lose your rights.** If you would like more information before filing a charge or you have concerns about EEOC's notifying the employer, union, or employment agency about your charge, you may wish to check Box 1. If you want to file a charge, you should check Box 2.

**BOX 1** ☐ I want to talk to an EEOC employee before deciding whether to file a charge. I understand that by checking this box, I have not filed a charge with the EEOC. **I also understand that I could lose my rights if I do not file a charge in time**.

**BOX 2** ☒ I want to file a charge of discrimination, and I authorize the EEOC to look into the discrimination I described above. I understand that **the EEOC must give the employer, union, or employment agency that I accuse of discrimination information about the charge, including my name.** I also understand that the EEOC can only accept charges of job discrimination based on race, color, religion, sex, national origin, disability, age, genetic information, or retaliation for opposing discrimination.

_Jeffrey D. Isaacs_                                   May 31, 2012
**Signature**                                              **Today's Date**

**PRIVACY ACT STATEMENT:** This form is covered by the Privacy Act of 1974: Public Law 93-579. Authority for requesting personal data and the uses thereof are:
1) **FORM NUMBER/TITLE/DATE.** EEOC Intake Questionnaire (9/20/08). **2) AUTHORITY.** 42 U.S.C. § 2000e-5(b), 29 U.S.C. § 211, 29 U.S.C. § 626. 42 U.S.C. 12117(a)
3) **PRINCIPAL PURPOSE.** The purpose of this questionnaire is to solicit information about claims of employment discrimination, determine whether the EEOC has jurisdiction over those claims, and provide charge filing counseling, as appropriate. Consistent with 29 CFR 1601.12(b) and 29 CFR 1626.8(c), this questionnaire may serve as a charge if it meets the elements of a charge.  4) **ROUTINE USES.**  EEOC may disclose information from this form to other state, local and federal agencies as appropriate or necessary to carry out the Commission's functions, or if EEOC becomes aware of a civil or criminal law violation. EEOC may also disclose information to respondents in litigation, to congressional offices in response to inquiries from parties to the charge, to disciplinary committees investigating complaints against attorneys representing the parties to the charge, or to federal agencies inquiring about hiring or security clearance matters.
5) **WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR NOT PROVIDING INFORMATION.** Providing this information is voluntary but the failure to do so may hamper the Commission's investigation of a charge. It is not mandatory that this form be used to provide the requested information.

November 2009

NHES TRIBUNAL EXHIBIT PAGE 98



U. S. Department of Labor
Employee Benefits Security Administration
Washington, DC 20210

Request for Assistance Form

General Information: The Employee Retirement Income Security Act of 1974 (ERISA) is a federal law that sets minimum standards for retirement and health benefit plans in private industry. ERISA does not require any employer to establish a plan. It only requires that those who establish plans must meet certain minimum standards. ERISA covers retirement, health and other welfare benefit plans (such as life, disability and apprenticeship plans). Among other things, ERISA provides that those individuals who manage plans (and other fiduciaries) must meet certain standards of conduct. ERISA does not cover plans sponsored by the Federal government, or plans sponsored by a State or local governmental plan (such as a public school, a public college or university or a police or fire department). Additionally, Title I of ERISA generally does not cover church plans.

Requests for Assistance or Complaints involving alleged violations of Title I of ERISA are handled by Benefit Advisors in our national and field offices. Those who file complaints with us can expect a prompt and courteous response from our staff. Every complaint received will be pursued and, if determined to be valid, resolution will be sought through informal dispute resolution. You can expect to receive a status report from the assigned benefits advisor every 30 days. If your valid complaint cannot be resolved informally, it may be referred for further review by our enforcement staff. While we cannot ensure that every complaint will result in an investigation, at the conclusion of enforcement activity, if requested, we will furnish an understandable explanation of the outcome of our review and investigation.

NHES TRIBUNAL EXHIBIT PAGE 99

## Applicant Information

| | |
|---|---|
| Confirmation #: | ▮▮▮▮▮▮▮▮19 |
| Name: | Jeffrey Isaacs |
| Street Address: | 8 Chase Circle |
| City: | Fort Washington    State: Pennsylvania    Zip Code: 19034 |
| Phone: | (▮▮▮) ▮▮▮-▮▮55 |
| Alt. Phone: | () |
| Email: | |
| Type: | Participant/Beneficiary (such as Employee/Dependent) |
| Comments: | |

## Plan Types

1. Other Welfare Plan (such as long term/short term disability, severance, life insurance, etc.)

## Requested Assistance With

1. Locating or contacting your plan
2. Getting documents or statements from your plan
3. Plan is not complying with legal requirements (such as ERISA, COBRA, HIPAA, the Affordable Care Act)
4. Other - describe in other information and comments below

## Plan Contact Information

| | |
|---|---|
| Type: | Employer |
| Name: | Dartmouth-Hitchcock |
| Contact Name: | Marc Bertrand |
| Street Address: | 1 Medical Center Drive |
| City: | Lebanon    State: New Hampshire    Zip Code: 03755 |
| Phone: | (603) 650 5000 Ext: |
| Alt. Phone: | () Ext: |
| Email: | marc.bertrand@hitchcock.org |
| Website: | |

## Other Information:

I requested medical leave from my employer, Dartmouth Psychiatry, on September 17th 2011. I was told it was not necessary. After sleep studies in November confirmed a severe sleep disorder, I was told "accommodations are difficult" to make for an intern like myself. I was threatened to resign on January 13th, and then made written request for medical/short term disability leave. Multiple written and verbal requests were made. Two weeks ago, I emailed Dartmouth's attorney asking for my disablity plan information, and have been ignored. Dartmouth terminated me on march 19th, and notified me that my disability insurance was cancelled. I have been trying to file a claim for nearly nine months, and have been ignored.

**Jeffrey D. Isaacs**  **Page 1**
**Statement of Facts**
**Addendum to ACGME Complaint Regarding the University of Arizona Surgery Program**

On July 1st, 2010, I started work as a PGY 1 resident with the University of Arizona Surgery Residency Program.

On the July 4th weekend, I participated in my first "attending rounds" with Dr. Levine. Dr. Levine singled me out, for thirty minutes, and repeatedly criticized my "pattern" of presenting a surgical patient. He asked me "What do I want to be when I grow up? A doctor? A surgeon?" This was all because I wasn't sure whether or not to remove a wound dressing on one of his patients. Hospital and attending dressing removal preferences vary; I found it unusual, on my first day with this attending, to be criticized for so long. He stated that it would take "much time" to change "developed patterns" regarding my inspection and presentation ability. He claimed, at least three times, that "his partner would have had me in tears for such a presentation." He was referring to Dr. Robert Krouse, who reportedly was reprimanded for bringing medical students to tears in the past. He is proud, in fact, that he was ordered to participate in behavior modification courses.

On July 5th, I received a phone call from fellow intern Dr. Angela Echeverria. She complained of receiving inappropriate comments from Dr. Krouse: "Do you know what you are? An intern. I would be happiest if I never heard from you for the rest of the year." In response, I told her about my experience with Dr. Levine. I asked her if she knew anything else about the Program's probation status for intimidation of residents. Regarding the behaviors, she stated that "it was unnecessary and did not foster learning."

On July 5th, Dr. Krouse telephoned me in the resident call room. He angrily asked if I "knew where I was on the hierarchy of medicine?" I replied, "at the bottom, sir." He scolded me for not knowing that I was to have written notes for his July 2nd clinic. I informed him that I was not ever asked to write notes for his clinic. He accused me of dishonesty; he alleged that "it is suspect" that I didn't know he wanted me to write his clinic notes. I replied that the clinic was on my second day of work, and that I had no idea whatsoever that I was to chart his patient notes. Nonetheless, I apologized and promised that in future clinics I would promptly write progress notes, which I always did.

On July 6th, the Program Director's administrative assistant sent me the following email, with no explanation of the subject matter:

> *Jeffrey,*
>
> *I am sending this email to schedule a meeting between you and Dr. Waer and Dr. Wynne tomorrow, Wednesday July 7th at 11:30 AM. You will be meeting with them in room 4333 which is Dr. Waer's office within the General Surgery Residency Office. Please confirm receipt of this email.*