Dr. Isaacs
3553 West Chester Pike Unit #177
Newtown Square, PA 19073
Telephone: (212) 257-0737
Email: jdi@alum.dartmouth.org

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| DOCTOR J. D. ISAACS | ) |
| | ) |
| Plaintiff, *pro se*, | ) Case No. CV-12-40-JL |
| | ) |
| -V- | ) |
| | ) **MOTION FOR SANCTIONS &** |
| DARTMOUTH HITCHCOCK MEDICAL CENTER; | ) **PROPOSED INJUNCTIVE ORDER** |
| DOCTOR CHRISTINE FINN; | ) |
| MARY HITCHCOCK MEMORIAL HOSPITAL; | ) |
| TRUSTEES OF DARTMOUTH COLLEGE; | ) |
| | ) |
| | ) |
| and JOHN DOE, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |

**MOTION FOR SANCTIONS &**
**PROPOSED INJUNCTIVE ORDER**

I. General Background

In 2005, the Plaintiff sent roughly one paragraph of mobile phone SMS messages to a classmate, the child of a prominent National Institutes of Health (NIH) executive director. The classmate, scorned, invoked the father's communication with the Dean of the medical school. The Plaintiff inadvertently obtained evidence of the NIH communication with the Dean using "ReadNotify" email tracking software, which lead to an unintentional legal threat against the Dean. As a result, despite achieving US Medical Board scores higher than the average neurosurgeon, the Plaintiff has been vilified as a 'dangerous litigant' and effectively barred from U.S. medical training for the past decade. In particular, the Plaintiff has been deprived matriculation in a federally funded M.D. program, a federally-funded surgical residency in Arizona, and in this case, deprived of a federally-funded psychiatry residency and M.P.H. degree program at Dartmouth College.

II. Specific Factual Background for this Motion

Following the initial NIH-related litigation in 2006, Plaintiff completed medical studies outside the United States, and graduated in 2010 without incident. Plaintiff returned to the United States in July 2010 to begin a surgical residency at the University of Arizona. After only six weeks, Plaintiff executed a "resignation under duress" to Arizona, and issued notice of intent to sue in the United States District Court, for what he believed to be unspoken dissent towards him for his previous litigation. Absent compelling proof, and reluctant to be involved in a second instance of federal litigation, the Plaintiff never moved forward with the suit he noticed against Arizona.

Plaintiff attempted a second residency training program at Dartmouth Psychiatry. During his first week at Dartmouth, both patients and attending physicians commented in writing about Plaintiff's "incapacitating anxiety" and "nervous breakdown." Every action the

Plaintiff took was criticized, to the point he developed speech impediments. In an all-department orientation day meeting, Plaintiff was stared down for twenty minutes by Dr Alan Green, Chair, Dartmouth Psychiatry. The Plaintiff was asked to perform one or two unnecessary prostate exams, including one on a 90 year old patient with metastatic terminal cancer, during his first three days at Dartmouth. Such a rate would amount to twenty prostate exams per month, had he continued on the M2 internal medicine rotation he was removed from after only four days. The absurd rate and lack of medical indication is the subject of pending discovery requests.

Six months following the M2 discrepancies that started his residency at Dartmouth, Defendant Finn accused the Plaintiff of concealing his Arizona resignation – a matter he had already disclosed eight months earlier, in March 2011, to Dartmouth. Plaintiff suffered a mental breakdown in the DHMC Emergency Room in the minutes following Finn's questioning. As Plaintiff pleaded in the original Complaint, he had been subject to a "three to six month sham." Knowing that he had disclosed Arizona in March 2011, and was questioned about it only in January 2012, Plaintiff felt a crime had occurred; though he couldn't pinpoint the exact individuals or timeline, he placed a written criminal complaint in his DHMC ER patient chart (Exhibit 1). Five days later, never formally noticed of any administrative leave, Trustees of Dartmouth College agent Christine Fitts ordered Plaintiff's DHMC email account deleted (Exhibit 2).

Plaintiff noticed this lawsuit on January 16th and filed in early February 2012. He made at least three pleas to Dartmouth President Dr Jim Yong Kim in January, February, and March 2012, to investigate his criminal and ethics charges. In one instance in February, Kim forwarded Plaintiff's call to his lawyer, who said "you can't sue us, you sue everybody." In March, Plaintiff criticized Kim's inaction. A week later, Dartmouth Associate Dean Bertrand and Defendant Finn issued Plaintiff's termination letter, falsely purporting that Bertrand and Finn had recently learned of the Arizona surgery resignation.

Plaintiff believes he was the first Dartmouth resident ever terminated without a "Fair Hearing," and this was done, at least in part, to discredit his legal and criminal claims – two days prior to Kim's nomination to the World Bank.

In late July 2013, Plaintiff learned that both Defendant Finn and Dartmouth's Dean Bertrand validated, by signature, his NH Board Application, which had an entire page describing Isaacs' grievance and resignation with Arizona. Moreover, Defendants' initial disclosures show that the page describing Arizona disappeared from Isaacs' residency file (Exhibit 3), despite the fact it is on file at the NH Board (Exhibit 4), who received it from Dartmouth! While Finn had initially told Isaacs that she failed to see the Arizona matter until January 2012, it is now asserted that the termination letter issued by Finn/Bertrand is materially false, misleading, and fraudulent. After realizing Bertrand signed off on the Arizona resignation statement, Plaintiff performed a Google search and learned that Bertrand trained for five years at the University of Arizona's surgical department (Exhibit 5). *As a matter of law, Bertrand verified his notice of Arizona, eight months earlier than he claims. Beyond the technical matter of legal notice, there exists probable cause and motive evidencing Dean Bertrand's false statement.* That both Finn and Bertrand failed to notice two pages about Arizona is not plausible, especially considering Bertrand verified, by signature, disparaging remarks about his *alma mater.* While the Plaintiff originally pleaded a "three to six month sham," he now asserts with reasonable specificity that his entire employment at Dartmouth was under false pretenses. Bertrand, in efforts to protect his former colleagues and/or Dartmouth itself, initiated a nightmare M2 experience for Isaacs that would build a paper-trail of incompetence. *Disconcerting as it may be to him, the Plaintiff now affirms that since 2010, his entire residency experience formed within an ironic stance, where everybody knew about his past, but nobody said so.*

Neuropsychiatric evaluation by an expert member of the University of Pennsylvania's Tumor Board, and a second opinion from the director of a Philadelphia Neuropsychiatric

organization, reveal that Plaintiff now suffers frontal brain impairment, where the front of his brain is effectively shut down or dysfunctional. Such frontal brain impairment appears to stem from Asperger's, traumatic brain injury, and/or hypoxic injury related to the stress reaction Plaintiff developed from mental abuse at Dartmouth. In assessing injuries, damages, and prognosis, Plaintiff and his physicians require further knowledge of, basically, what exactly happened during his residency training from 2010-2012. This motion pertains to evidence destruction and willful resistance to Rule 37 discovery orders, as Dartmouth attempts to cover up the fraud, crimes, and abuse that occurred over six months of Plaintiff's training.

III. Defendants Have Intentionally Spoliated Critical Evidence

**a. Loss of Medical Chart Records**

Plaintiff's severe symptoms lead Dartmouth Psychiatry to prescribe an "actigraph" device study, which became the subject of great interest and even ridicule as Plaintiff was required to wear a large medical diagnostic device on his wrist for two weeks in October 2011. In January 2012, two weeks after Plaintiff noticed this lawsuit, Dr Glen Greenough wrote in Plaintiff's DHMC Patient Chart that the actigraph suffered "device failure" and data was irretrievably lost – three months after the study. The actigraph device has light and motion sensors, and would have provided forensic level evidence that Plaintiff retreated to a dark room for up to two hours a day while working at Dartmouth psychiatry. Likewise, the motion detectors would indicate his excessive fatigue and sleep abnormalities from alleged abuse.

Dartmouth Psychiatry noted the failure three months after the study, but never notified the Plaintiff. Instead, they abandoned Plaintiff as a patient once he asked them to complete disability paperwork. In a case where Dartmouth has pleaded, for two years, that Plaintiff has no disability, such loss of medical records is being brought to the attention of the

Court to highlight a pattern of disappearing evidence and verified employment applications purportedly never read.

**b. Loss of Plaintiff's entire DHMC email account**

Central to this motion is the question, why did Defendants feel a need to delete the Plaintiff's email account two months prior to his termination? Plaintiff noticed a criminal complaint on January 13th 2012, and this lawsuit in January 16th 2012. By January 18th, Defendant Trustees of Dartmouth College, through their agent Christine Fitts, ordered Plaintiff's DHMC email account deleted – despite the fact Plaintiff was never formally placed on administrative leave.

Plaintiff propounded a discovery request in May 2013 for his entire Dartmouth email account. Defendant DHMC responded that, due to "failure of a litigation hold," his emails were irretrievably lost. They alleged to be "working" to retrieve portions of the emails – but as of filing, just two months before fact discovery expires, they have failed to produce a single email. The loss of an entire hospital-based email account is outrageous in the year 2013.   Defendant DHMC has not responded to Plaintiff's inquiries whether or not backup archives existed.

To make matters worse, in January 2012 Plaintiff notified the Defendants, and Jim Yong Kim, that his email account was inaccessible and scheduled for deletion, and that he urgently needed the emails to defend himself. Plaintiff, never having been given written notice of administrative leave, attempted unsuccessfully to login to his email account on January 17 2012. He telephoned DHMC IT support, and the helpful IT representative explained to Plaintiff that his account, peculiarly, had been scheduled for deletion in thirty days. Plaintiff had noticed litigation and criminal complaints, and Defendants had a clear legal duty to preserve his emails. Moreover, there was no good reason to delete his email account TWO MONTHS prior to his illegal termination. Defendants cannot even begin to

claim negligence, as Plaintiff relayed DHMC's IT department concern that the account was scheduled for deletion. In short, deletion of this account demonstrates probable evidence of criminal activity and Dartmouth's criminal intent to shield and cover up Plaintiff's criminal and civil allegations.

The deletion of Plaintiff's email account raises serious concern about evidence spoliation for other key witnesses, who no longer work at Dartmouth. Peggy Meunier was Dean Bertrand's assistant at the time of Plaintiff's application to Dartmouth. She is likely the person who coordinated Bertrand and Finn's signature of Plaintiff's Arizona surgery disclosure. Moreover, she is likely the individual who photocopied the documents and would have knowledge whether or not the Arizona disclosure was intentionally removed from Plaintiff's file. Dr Simon Khagi no longer works at Dartmouth, but was the individual who instructed Plaintiff on his first few days of M2 to conduct prostate exams at the rate of twenty per month. Reviewing Khagi's email accounts could be critical to proving Plaintiff's claims, and moreover, establishing a *mens rea* of the probable crimes that occurred. Likewise, Dr Ghislaine Guez no longer works at Dartmouth, but supervised Isaacs on his final M2 week. Dr Guez had emailed Plaintiff (an email that apparently no longer exists) that the upcoming M2 week would be a "very pleasant" week – more irony, given the fact Plaintiff was slated to be fired that week.

*Zubulake v. UBS Warburg* ("Zubulake V"  S.D.N.Y. July 20, 2004) held that the United States District Court must enact strict sanctions for the willful destruction of emails that are reasonably important to foreseeable litigation. The present case demands even greater sanctions than *Zubulake*, because the evidence that willful destruction occurred greatly exceeds that in *Zubulake*. First, *Zubulake* was limited to ADA claims, whereas Plaintiff's claims allege criminal fraud and abuse. Second, Plaintiff notified the Defendants, on behalf of their own IT department, that the emails were scheduled to be deleted, thirty days prior to deletion. Finally, *Zubulake* was held in 2004 – some ten years later, emails

are even more critical in the workforce, and backup/archival systems are more readily available and vastly reduced in price. There is simply no excuse for Defendants, an Ivy League college and leading academic medical center, not to be sanctioned for willfully allowing deletion of emails pertaining to such serious, grave allegations. Absent immediate, verifiable production of entire email accounts for Isaacs, Meunier, Khagi, and Guez' accounts, the Defendants must be found guilty of willful evidence destruction.

IV. Defendants Have Resisted Critical Evidence Discovery Orders

**a. DHMC Outlook Email search for "Isaacs."**

In May 2013, Plaintiff's former counsel at Skinner Rivard propounded a simple request upon DHMC to produce all emails from 2011-2012 containing the term "Isaacs." (Exhibit 6, the combined RFP discovery orders/responses). It should be noted that Defendants have propounded approximately FIFTY (50) keyword requests upon Isaacs, yet Defendants claim a keyword search for "Isaacs" is overly burdensome and privileged. They maintain they are "working" to look for non-privileged emails, but, some two years into this matter, have failed to produce a single non-privileged email with the term "Isaacs" at time of filing.

While there exists serious concern whether or not critical emails were destroyed (see above), surely Defendants are in possession of emails that are not privileged. Plaintiff hereby moves the Court to compel production of all emails from years inclusive 2011-2012 on Hitchcock.org or Dartmouth.edu email domains, containing the term "Isaacs".

**b. DHMC EPIC Audit Trail**

About a year ago, Plaintiff moved for an injunction to produce his EPIC patient chart audit trail, pursuant to ARRA, that shows which DHMC physicians viewed his medical chart, and when. Plaintiff alleges that up to thirty individuals at Dartmouth knew about his deteriorating medical situation over the course of his six months of training, and this would be evidenced by an EPIC audit trail. Plaintiff now suffers serious medical

conditions – frontal brain impairment – and it is reasonable to ask for production of his

entire medical audit trail to ascertain potential witnesses to his deterioration and abuse.

Of note, Plaintiff filed a HIPAA complaint with the Boston OCR office, concerned

that his EPIC chart had been viewed inappropriately. The OCR office deferred to

DHMC's own internal investigation, which found that all individuals who viewed the

Plaintiff's medical chart did so for "work-flow scheduling purposes." The OCR did find

that two individuals violated HIPAA – Plaintiff believes the number to be much higher.  It

appears DHMC responds to federal agencies investigating these matters the same way

they do to Plaintiff – with every imaginable privilege assertion to prevent arriving at the

merits of a complaint. Plaintiff hereby motions the Court to immediately compel

production of the Plaintiff's EPIC audit trail, pursuant to ARRA, so that discovery may

proceed to determine whether or not Plaintiff's personal health information was truly used

merely for "work-flow scheduling," or if other witnesses exist to Plaintiff's abuse.

c. **Additional pending matters**

The above items (a) and (b) are not an exhaustive list of active efforts by

Defendants to resist discovery. Defendant Trustees of Dartmouth College is currently

resisting a deposition and request for admissions on Marc Bertrand (Exhibit 6), arguing

that even though he is an officer and Associate Dean of Dartmouth Medical School, they

do not control him, because his salary (which stems mostly from his clinical

anesthesiology work) is paid by DHMC. It should be noted these discovery requests are

outstanding, and Plaintiff believes his request for admissions shall be deemed admitted if

Bertrand fails to answer them. As such, this motion in no way waives or delays or moves

to compel currently outstanding discovery requests. In short, Plaintiff is concerned that

Dartmouth is using organizational structure to bury claims. For example, if Bertrand

communicated with Arizona using his Dartmouth.edu email domain, they now attempt to

claim that Bertrand only acted at DHMC, to avert discovery of his actions within the

Dartmouth infrastructure (including discussions with Jim Yong Kim). Likewise,

Dartmouth argues that Plaintiff was not a student of the Trustees – even though Bertrand

was the Dean of GME students such as Isaacs. Plaintiff has invoked *Mayo Foundation v United States (562 U.S. 2011)* in discussions with opposing counsel, pointing out that while the Supreme Court held that residents may be taxed for "working wages," they are historically students of their trade. As such, the Supreme Court appears to have intentionally avoided declaring residents to be solely "employees," rather than students. In fact, they are both, which is why Dartmouth's Trustees have appointed an Associate Dean of GME such as Bertrand.

Furthermore, it should be noted that in this lawsuit, Dartmouth has alleged privileges and immunity on the basis of Plaintiff purportedly not being a student of theirs. Interestingly, in a related lawsuit in USDC VT (*Connors vs Dartmouth*), Dartmouth simultaneously argued that Connors was a student, rather than an employee. In short, there exist multiple questions about the integrity of Dartmouth's litigation processes, from destroying evidence, to resisting discovery, to retaliating, to making contradictory claims in bad-faith.

V.  The ReadNotify Discrepancy

Interestingly, Defendant DHMC propounded a request upon the Plaintiff to produce any "ReadNotify" records he possesses evidencing communications at Dartmouth. Plaintiff immediately emailed his former counsel, Skinner Rivard, and suggested they file a Rule 37 violation. Plaintiff asserts *the only* possible reason for asking for "ReadNotify" information would be for Dartmouth/DHMC to assess their risk of committing perjury, evidence destruction, or obstruction of justice in the discovery process.

Quite simply, DHMC was asking Isaacs for any proof he had of communications between Dartmouth/Arizona/DHMC/USC, before they would answer Plaintiff's discovery requests. Such is not in the spirit of FRCP 37 – "*show us evidence, or we won't produce what we have.*"

Plaintiff is not aware of any good reason to ask for this information, other than to assess the risk of obstructing this judicial process. Indeed, Plaintiff has been viewed as a 'dangerous litigant' since use of ReadNotify in 2005 (see introduction), and it appears Dartmouth simply wants to know if Isaacs has proof of inappropriate communications, as he did in 2005. For instance, if Isaacs' had ReadNotify data representing communications between Defendants and Arizona or USC, it could construct a timeline to prove that the Defendants have perjured themselves.

A failed actigraph device, the deleted email account despite Plaintiff's/IT warning, Finn & Bertrand's purported failure to read Isaacs' Arizona disclosure, and now, the discovery request for "ReadNotify" solidifies a *mens rea* of attempted evidence destruction.

VI. Standards of Law for Proposed Injunctive Relief

Under Rule 37, the Court has vast powers to issues sanctions and enforce discovery compliance with specific orders for actions / injunctive relief. *Zubulake v. UBS Warburg* is a well-known case particularly relevant to Plaintiff's claims. Plaintiff asserts that *Zubulake v. UBS Warburg*, and a host of other cases, clearly establish that the Court has the authority to issue the proposed injunction. In short, Plaintiff is asking the Defendants to, at their own expense, pay a professional audit firm to review and produce its remaining electronic evidence. In fact, the Court has substantially greater powers than Plaintiff motions for: given reasonable belief evidence was destroyed to obstruct an active federal civil process, the Court has authority to order, *sua sponte*, immediate production to the U.S. Marshal of all electronic archival data at Dartmouth.

Upon determination that records were deleted, *Zubulake v. UBS Warburg* and similar cases also demonstrate that the Court may make determinations, as a matter of law, that evidence was destroyed willfully and therefore evidence guilt.

As with any injunction, the Court must balance the risk of harm to the Plaintiff versus the weight of its orders. Plaintiff has serious medical conditions, including frontal brain impairment, and possibly, poor prognosis ventricular tachycardia arrhythmias, that were exacerbated or caused by alleged abuse. The risk of ongoing harm to Plaintiff is severe, given that two years into this lawsuit, very little evidence even exists anymore, apparently. Moreover, given recently acquired information, it appears, as a matter of law, that Bertrand/Finn's termination letter was false and materially misleading. The Court may reasonably conclude Plaintiff has a high likelihood to prevail on his claims – it appears that at least some of Plaintiff's claims could succeed on a motion for summary judgment at this point.

No later than *Brown v Board of Education*, the federal courts have exercised their right to uphold equity and justice by enjoining illegal actions that prevent matriculation of a student. Despite the fact that Plaintiff's termination already occurred, the Court may hold that the termination letter issued by Bertrand was materially misleading and or fraudulent, and order it annulled. At this point in time, there is little doubt that prior to Plaintiff's residency start at Dartmouth, Bertrand had knowledge of Plaintiff's prior federal claims against Arizona and USC, and used these against him for six months. Likewise, *Brown v Board of Education* would permit the court to order matriculation to the LPMR MPH degree program, because Plaintiff was prevented from applying to the program (with its 100% acceptance rate) under false pretenses now established as a matter of law (Bertrand's false termination letter; destruction of evidence which supports Plaintiff's assertions that Bertrand and Finn knew for six months and abused him).

VII. Generally Deteriorated Discovery Suggestive of Harassment of Plaintiff

In deciding this motion, the Court may request production for *sua sponte* review of all discovery correspondence between the parties. Plaintiff has been inundated with hundreds

of privilege objections, bizarre waiver requests, fishing expeditions, and constant 1-3 week 'running out the clock' delays for basic requests. Even though Plaintiff was a student nearly his entire life and never made much income at all, Defendants are vigorously pushing for his tax returns – a fishing expedition they hope will reveal tax fraud. Lengthy five page "hush" orders have been demanded to release Plaintiff's employee chart.  Counsel requested medical records waivers that would grant them full access to every - nearly fifty - of Plaintiff's health providers for the past 15 years, and even provide for broad disclosure to unrelated third parties of things such as Plaintiff's STD history (Plaintiff never had an STD, but the fishing expedition never relents). Opposing Counsel recently alleged that Plaintiff's frustration –reasonable emails addressing the status of over twenty outstanding discovery orders – constitute harassment. In short, it appears the Court will need to intervene at some point soon.

Relevant to this motion, Plaintiff believes he is being ridiculed by the Defendants during litigation. On January 15, 2012 the Plaintiff notified Defendants, and Jim Yong Kim, of a Rule 34 request to preserve evidence (Exhibit 7). Several days later, the email account was scheduled to be deleted, and Plaintiff again notified Defendants of the scheduled deletion (Exhibit 2). Now, Defendant's are purporting a "Litigation Hold failure" (Exhibit 6). Quite frankly, Plaintiff is a ridiculed Asperger's affected adversary, and there are very few reasonable alternative explanations to Defendant's actions, other than complete disregard for the federal judicial process because of their stature and power.

Eight years ago, Plaintiff sued a leading international neuroscience professor from Harvard Medical School. The individual, previously an NIH director, now is vice-CEO of a leading global elite think-tank university in Okinawa, where he works side-by-side with numerous Nobel laureates. His child (see intro) now works at Massachusetts General Hospital. Dartmouth Psychiatry Chair Green, and or Defendant Jim Yong Kim, almost certainly knew this individual professionally during their work at Harvard Medical

School. Bertrand almost certainly had knowledge about Arizona. If they didn't, others at Dartmouth 'gossiped' and Plaintiff's future was sealed. In short, Plaintiff has the burden of trying to discover how gossip amongst some of the most prestigious physicians in the world lead to fraud and abuse against him. Somehow, Plaintiff's history caught up with him at Dartmouth. Plaintiff has been making reasonable attempts, through 30(b)(6) depositions and ESI discovery requests, to learn how this occurred. They are being blocked, and critical ESI was destroyed.

VIII. Conclusion

The integrity of the federal judicial process requires parties to abide by the Federal Rules of Civil Procedure. Plaintiff asserts that illegal retaliation has deprived him, for almost a decade, of federally funded medical education enrollment. In the year 2013, an Ivy League institution, and its partner academic medical center, shall not be permitted to allow flagrant deletion of critical evidence that could prove serious criminal and civil allegations. When Plaintiff consulted in February 2011 with a well-known litigator in the region, Plaintiff was told "Dartmouth is very adept at burying evidence." Plaintiff never imagined that burying evidence would go so far as to deleting an entire hospital physicians' email and backup archives. It appears to be well known that Dartmouth operates under the belief it has a monopoly of power in the region; the Court *must* curtail Dartmouth's complete disregard for modern e-discovery law, both for this case and for future victims.  That Bertrand and Finn failed to read the Plaintiff's NH Board application they verified before his employment, that an actigraph medical device malfunctioned three months after the study, that an entire hospital physician's email account vanished; together, these are not plausible assertions. This Honorable Court, to preserve fairness, equity, and just order, must sanction these activities appropriately.

1
2
3
4
5
6
7
8
9
10

Opposing counsel does not assent to this motion. Plaintiff has made best efforts to cite the most pertinent Federal Rules and case law when appropriate. Plaintiff requests that this Honorable Court consider any additional actions, *sua sponte*, necessary to preserve justice and equity in any matters described herein. Likewise, Plaintiff is in possession of hundreds of correspondence and related discovery documents between himself and Defendants' counsel, and for clarity and brevity, has only included the most substantial documents with this Motion. If the court requires additional evidence, the Plaintiff respectfully requests either Oral Argument for this motion, and/or *sua sponte* directives to appropriate parties to produce relevant evidence / correspondence.

11
Respectfully submitted, this 14th day of August, 2013.

12
13                                          /s/ J. D. Isaacs
14                                          J. D. ISAACS
15                                          3553 West Chester Pike Unit 177
16                                          Newtown Square, PA 19073
17                                          Plaintiff, *pro se*
18
19
20
21
22
23
24
25
26
27
28

1

2

**CERTIFICATE OF SERVICE**

3

    I, J.D. Isaacs, do declare as follows:

4

5

I certify that a copy of the foregoing **MOTION FOR SANCTIONS, PROPOSED INJUNCTIVE ORDER** was delivered electronically to counsel for the Defendants with counsel, and mailed conventionally to those without known counsel.

6

7

    Executed on this 14th day of August, 2013.

8

9

10

11

                   /s/ J.D. Isaacs

12

                   J. D. ISAACS

13

                   Plaintiff, *pro se*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JDIsaacs v. Dartmouth
Case No. 12-CV-40-JL