EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEW HAMPSHIRE

Dr. J.D. Isaacs,                                    §
    Plaintiff                              §
                                                   §
                                                   §
v.                                                 §    Civil No.:  1:12-cv-40-JL
                                                   §
Dartmouth-Hitchcock Medical Center,                §
Mary Hitchcock Memorial Hospital                   §
Dartmouth Medical School and                       §
Doctor Christine T. Finn,                           §
    Defendants                             

**<u>FIRST SET OF INTERROGATORIES PROPOUNDED BY DEFENDANTS
DARTMOUTH HITCHCOCK MEDICAL CENTER AND
MARY HITCHCOCK MEMORIAL HOSPITAL
TO PLAINTIFF DR. J.D. ISAACS</u>**

     Defendants  Dartmouth-Hitchcock Medical Center and Mary Hitchcock Memorial

Hospital, pursuant to Rule 33 of the Federal Rules of Civil Procedure propound the following

interrogatories to be answered separately and fully in writing, under oath, and within thirty (30)

days by the plaintiff, Dr. J.D. Isaacs:

1.    Please state the following:

    a.   your full name, and all other names by which you have been known;

    b.   your date and place of birth;

    c.   your present address; and

    d.   your marital status as of the date of your dismissal from the residency program.  If you were married on that date, please state the name and present address of your spouse.

**<u>ANSWER:</u>**

a.   Jeffrey David Isaacs.

         I.   Jeff Isaacs.

        II.  Geoffroi Isaacs (While resident in France).

        III. J.D. Isaacs.

b.   June 9, 1977 Abington, Pennsylvania.

c.   10312 Orchid Reserve Drive, West Palm Beach, FL 33412.

d.   Married- objection to all other information about spouse as irrelevant.

2. Please describe, in detail, for the period beginning with your graduation from high school through the present, your education including all undergraduate, graduate and/or medical education and/or training which you received at any time or at any location, including in your answer, but not limiting it to:

   a. The name and address of each school, college, educational program or other institution of learning you have attended;

   b. The dates you attended each school, college, educational program or other institution of learning;

   c. The nature of each program or course of studies in which you have enrolled;

   d. Whether there were any interruptions in the completion of each program or course of studies, and, if so, please describe each such interruption in detail;

   e. Whether each program was completed, and if yes, the date of each completion;

   f. The type of each degree, diploma, certificate or designation you received, if any associated with each school, college, educational program or other institution of learning.

**ANSWER:**

   I graduated in June 1995, *cum laude*, from Germantown Academy in Fort Washington Pennsylvania.

   I completed freshman college year at University of Pennsylvania, in Philadelphia, for the 95-96 academic year. I was in the College of Arts & Sciences and Benjamin Franklin Scholar program, reserved for the top 5% of freshman. The program was not completed as, unfortunately, I transferred to Dartmouth College in Hanover, New Hampshire.

   I studied at Dartmouth College from 1996-1999, and graduated with an honors diploma in Computer Science. Whether or not my studies there were interrupted is not a straightforward issue. I spoke with a Dean for Undergraduate Studies in Winter 1998 to get permission to drop my pre-med curriculum after the drop course deadline. I explained to her (as I recall) that I was on medication (fluoxetine) for a head injury I suffered several months earlier, and found it difficult to concentrate on chemistry. I had been assaulted by a fellow Dartmouth College student, who I understand had documented anger management issues. I was never warned by the College of this student's propensity for violent eruptions. I was struck very hard in the head, and spent the next several weeks

acutely believing that I was dying, and that I would never be a computer scientist or doctor. In short, I regret transferring to Dartmouth because a "bad apple" assaulted me there, so I associate the entire experience with this assault. Permission was granted to drop the pre-med track after the deadline.

I studied at the Insead MBA program in France and Singapore in 2002-2003. I had been admitted on a nearly full scholarship to the Vanderbilt MBA/JD program, and attended part of the VLS fall 2003 semester, but took a leave to complete my MBA studies at Wharton (University of Pennsylvania) in Philadelphia, because a last minute opportunity for top students in the Insead program developed at Wharton, necessitating this confusing schedule change. As such, I earned my MBA diploma at the tail end of 2003 and received in in 2004.

I finally finished my pre-med organic chemistry classes at Temple University (Philadelphia), Villanova University (Villanova, PA) and University of Pennsylvania, throughout 2003-2005. I don't have records anymore and don't recall all the exact courses/dates. I also completed the semester I had deferred at Vanderbilt Law School I Nashville TN, in Fall 2004. I studied contract law, torts, and introduction to the legal process there before leaving.

I was admitted to a US medical school in early 2005 (all records from this school have been annulled, and ordered confidential by court as part of a related settlement), and dropped out of Vanderbilt Law School to attend medical school.

In 2006, I enrolled at the American University of Caribbean med school in Cupecoy, St Maarten. I took a leave of absence after one year to attend the Duke-NUS medical school in Singapore, but quickly returned to AUC because of a $1million/9 year bond commitment at Duke-NUS. I completed my MD under AUC with clinical studies at St George's University London, Staten Island University Hospital, Cleveland Clinic, Mt Sinai Medical School, and Mercer University in Georgia.

I completed Commercial pilot training and instrument pilot training from 1997-2004, intermittently, as a hobby. Total hours amounted to about a month of flying, mostly with an instructor.

I was a resident for about six weeks at University of Arizona General Surgery program, Tucson AZ.

Law Offices of
Sulloway & Hollis, P.L.L.C.
Concord, N.H. 03302

-4-

3. Did you include each of the schools, colleges, educational programs or other institutions of learning identified in your answer to the preceding interrogatory on your ERAS Application?    If no, please state why you did not include each institution on your application.

**<u>ANSWER:</u>**

I included each and every materially relevant school, college, or program on ERAS. I did not, for example, disclose Temple, VLS, Villanova, and Penn for pre-med chemistry classes, as these would be viewed as trivial and I believe standard practice for most applicants nationwide is not to include minor/trivial matriculations lasting only a semester. Likewise, any matriculation that was sealed and annulled under federal court order, and ordered confidential by mutual request, under federal court enforced settlement, I did not disclose.

4.  Please describe your medical history in complete detail.  Please include in your answer, but do not limit it to the following:

**ANSWER:**

Objections

1. Plaintiff objects to this request to the extent that it is overbroad, unduly burdensome, or requires unreasonable efforts or expense on behalf of the Plaintiff.
2. Plaintiff objects to this request as requesting confidential documents.
3. Plaintiff objects to this request because the documents requested are not relevant to the lawsuit or likely to yield information pertinent to this case.
4. Plaintiff objects to this request because Plaintiff no longer has access to the information requested.

Subject to and without waiving these Objections, or any other objection or claim of privilege, Plaintiff produces documents and states as follows.

a.  Please state the dates (in chronological order) and describe the nature and treatment of each and every illness, psychological and/or emotional problem, condition, accident, disease, physical examination or operation you have had from 1995 through the present.

Asperger's – neurodevelopmental disorder present at birth

Unknown virus first month after arriving at Dartmouth College – CDC investigated, harmless virus, no treatment necessary.

Plantar fasciitis at Dartmouth – no treatment

Head injury – assault from Dartmouth College student with known anger management /violence issues (see above) in 1997. Told treatment was bed rest and, later, fluoxetine. Lost 20 pounds during bed rest.

Wisdom tooth extraction 1998

PTSD diagnosed in 2001, which I believe is TBI sequelae, and which no doctor has definitively told me is *not* manifestation of my TBI and/or Asperger's. No or few nightmares until Dartmouth psychiatry.

Hypomania 2/2 fluoxetine adverse event – multiple episodes in 2004/2005. Treated with olanzapine (incorrectly diagnosed as psychosis NOS) for adjustment features. Weight gain +35 lbs, never returned to normal.

Whiplash/2nd TBI in 2009 – no treatment, bed rest.

Liver steatosis in 2010. – told to attempt weight reduction

Severe sleep disorder , bradycardia – 2011 – CPAP failure

Bronchitis – 2012 – albuterol, bad reaction, no treatment thereafter

Dysexecutive syndrome/frontal brain impairment – 2012

Asperger's disintegration/PTSD – 2012

Ventricular tachycardia – 2013 – echocardiogram (normal)

b.   Please identify, by name and address, each and every physician or other health care professional who provided treatment for you or with whom you consulted for each illness, psychological and/or emotional problem, condition, accident, disease, physical examination or operation identified in (a) above.

Aspergers – Neuropsych studies by Dr. Fisher, 2nd opinion Dr. Goldberg

Head injury – I do not recall ER doctors or neurologists names from 1997.

Wisdom tooth extraction - Irrelevant

PTSD – George Goldman.

Hypomania 2/2 fluoxetine adverse event – self diagnosis &Wayne Sandler MD

Sleep disorder and cognitive worsening from olanzapine use – self diagnosed

Whiplash/2[nd] TBI in 2009 – self diagnosis, normal A&E checkup in London

Liver steatosis in 2010 – Mayo Clinic Dr Snyder

Severe sleep disorder , bradycardia – DHMC Sleep Center

Bronchitis – DHMC ED

Dysexecutive syndrome/frontal brain impairment – Dr. Fisher

Asperger's disintegration/PTSD – Dr. Fisher (Asperger's)

Ventricular tachycardia – Penn Sleep Medicine finding (DR. R. Schwab)

c.  Please identify, by name and address, each and every physician or other health care provider who you considered your primary health care provider during the period 2009 through the present

Dartmouth Family Medicine (2011-12).

Penn Internal Medicine (2012-present)

d.  Please describe, in detail, the nature, extent and exact location of the injuries and/or illnesses, including emotional injuries, you claim to have suffered as a result of any of the defendants' actions alleged in this action.

My TBI and/or Asperger's have fully disintegrated because of what I went through over the past 3 years. I have nightmares every day; I have become disheveled, fully reclusive, fatigued with substantially worsened sleep disorders. I have a family history of arrhythmias that are associated with stress and I attribute bradycardia and ventricular tachycardia to Dartmouth Psychiatry.

e.  Please identify by name and address each and every physician or other medical care provider who examined or treated you for the ailments described in your answers to (a) through (d) above; and state the date and nature of each consultation, examination and treatment.

DHMC ED, DHMC Sleep Center, Penn Sleep Medicine, Penn Internal Medicine, Richard Cornfield MD, Fisher PsyD, Goldberg PsyD.

f.  Did you receive treatment at a hospital, clinic or health care facility as a result of the any of the ailments described in your answer to the (a) through (d) above?  If yes, please state the name and address of the facility and the date(s) between which you were there for treatment.

Weekly psychiatry appointments. Sleep medicine consults/ PSGs. Many symptoms, as a doctor, I understand are due to abuse and decline further treatment.

g.  If you are now suffering from or have any present injuries as a result of said alleged actions, please describe in detail your present injuries and/or illnesses; and if permanent injuries are claimed, state the nature of each permanent injury and each problem resulting from each permanent injury.

This question shows no concern for medical realities. IN particular, prognoses are particularly difficult for head injury, Asperger's, olanzapine toxicity, sleep disorders, and PTSD.

In short, I am not able to function in most tasks that I was able to do prior to starting at DHMC. I am not able to maintain conversations, I am not able to sleep correctly, I have palpitations, to name a few.

h.  Please sign the enclosed medical records authorizations for release of your medical records for each medical care provider identified in your answers to these interrogatories. Copies of all records gathered with these authorizations will be provided, without cost, to plaintiff.

Law Offices of

Sulloway & Hollis, P.L.L.C.

Concord, N.H. 03302

5.  Please :

    a.  state the date you were first diagnosed with each of the following medical conditions mentioned in plaintiff's complaint;

    b.  identify by  name and address the health care provider who first diagnosed you with each condition; and

    c.  identify by name and address each and every health care provider with whom you have sought treatment for each of the following medical conditions:

        1.  Severe neurological conditions,

        TBI w/ frontal brain impairment is a severe neurological condition – diagnosed 1997, I do not recall Doctor's names.

        2.  Neuropsychiatric disability,

        Asperger's, PTSD, TBI when accompanied by symptoms that impact ability to work efficiently and relate to others, are neuropsychiatric disabilities – diagnosed 1997, 2002 respectively. I do not recall TBI doctors.

        3.  Asperser's syndrome – 2012, Dr. Fisher, Dr. Goldberg

        4.  Head trauma – 1997, 2009  - Don't recall all, Dr. Goldberg

        5.  Sleep disorder – 2011 – DHMC Sleep med, Penn Sleep Ctr.

        6.  Chronic nightmares – 2012 – Self reported symptom NA

        7.  Mental impairments – 1997 TBI

        8.  Wheezing– 2012  DHMC ED, persisted 6 months

        9.  Acute-on-chronic stress reaction. DHMC ED (Adjustment disorder, in light of PTSD/Asperger's disintegrations)

6. Did any of the physicians or medical care providers identified in your answer to the preceding interrogatory ever recommend any type of accommodation for the any of aforementioned conditions? If yes, please describe in detail each and every accommodation any of the physicians or other medical care providers identified in your answer to the preceding interrogatory recommended, and state the date each such recommendation was made.

**<u>ANSWER:</u>**

The only doctors that treated me DURING my employment were the DHMC sleep physicians. I believe they abandoned me as a patient and discarded actigraph evidence, so that they would not have to prescribe accommodations. In fact, I specifically asked Dr. Greenough to fill put my disability forms, and this is when he dropped me as a patient. There can be no doubt he worked with defendants' lawyers and realized that he would either have to commit medical malpractice, testify against DHMC, or abandon me as a patient.

Doctors who treated my TBI in 1997 of course did not know my prognosis, as this is medically impossible to do. Therefore, it is irrelevant to ask about accommodations they suggested 15 years prior.

Doctors who treated me AFTER the DHMC Sleep Center face the compounded problem of trying to figure out my baseline, versus deterioration from the abuse at DHMC. Thus, this question oversimplifies the nature of my injuries. The bottom line is, from 1997 onwards, doctors did not know the extent of my head injury until neuropsych testing 15 years later. As the Defendants are well aware, relatively small concussions can be fatal, but show nothing abnormal on MRI/CT/etc. Only time and trying to persevere would determine the extent of disability. Doctors cannot answer this question definitively. Unfortunately at DHMC I was never given accommodations which would have been helpful in narrowing down the extent of my work impairments. I asked for them, multiple times, but was terminated in a vicious and vindictive fashion.

Despite describing car accidents and falling asleep treating patients, DHMC Sleep Center did not recommend accommodations. Instead, they destroyed evidence (an actigraph watch) and abandoned me as a patient. My neuropsych tests verified what I believed within minutes of my 1997 TBI – that I had a high probability of impaired executive function. There is some belief that Asperger's and olanzapine contributed the executive dysfunction, the stress from abuse at DHMC caused it.

7. Do you allege that any representative of any defendant was informed that you suffered from any of the conditions described in your answer to the preceding Interrogatories? If yes, please identify each representative of the defendant who you allege was so informed, state the date you allege each representative was so informed, and describe the manner in which you allege each representative of the defendant was so informed.

**ANSWER:**

Generally, my symptoms were widely known at DHMC and certainly by Dr. Finn, but my exact diagnosis was and is complicated. Some other interns (Ravi) even joked about how difficult it was to figure out my diagnosis.

In my new hire medical packet, I informed Defendants that I had a prior TBI/concussion. In other words, before June 2011, Dr. Finn should have been aware that I was a prior TBI victim. Certainly this would raise eyebrows to a Harvard trained neuroscientist such as Dr. Finn. Furthermore, in my interview with McAllister in January 2011, I mentioned my head injury. McAllister was one of the few interviewers who supported my candidacy (Others, like Dr. Finn, focused on my awkward tendencies, whereas McAllister focused on my strengths.) Put simply – not even knowing about the frontal brain impairment I always suspected – I went out of my way to convey information of my head injury to the defendants. Interestingly, I was contacted by a HR nurse in May 2011 who had red-flagged some issues in my pre-employment medical forms, but she didn't ask any information about the head injury. Interestingly, she focused on the mood issues I reported around the time of my USC litigation.

By the end of the first week of M2 (July 2011), I know that Dr. Finn, Dr. Khagi, Dr. Friedman, and others were aware of my symptoms. I had emailed Dr. Finn stating that – 12 hours after my shift – I woke up short of breath when I answered a telephone call from Mr. Baker. A chief resident asked me if I was on the "verge of a nervous breakdown." I would break out in sweats in meetings with Finn/Friedman, I would have such nervous exhaustion that numerous (Ravi, Doucette, others) residents I worked with would remark that I "looked tired." By August 2011, I think it was well known to the entire department that I was beginning to retreat – for hours at a time – to the resident sleep room.

In July, August and September I believe I met with Dr. Finn about ten times, or more, and we often discussed my symptoms. She usually described my symptoms in terms of poor work performance. For example, my slow verbal processing she would often remark on. Indeed, during my interview when I met her for 20 minutes, she remarked "Awkward. would have expected better social skills for an MBA." During the first three months, she would chastise me that 'others' felt I was "arrogant" because I didn't fully explain my ideas, but acted like I knew things. She was describing my neuropsych profile – slow frontal verbal synthesis skills, but quite exceptional knowledge base. I can't remember every detail, but I would estimate we met for about 15 hours and discussed things like my "resisantance" to working with others, by "endurance" (sleep problems), and other such euphemisms for my medical limitations. The discussions themselves were wearing me down, as I started to suspect she didn't really want to help. This is when I asked for medical leave. From that point forward, she wrote up a

Law Offices of
Sulloway & Hollis, P.L.L.C.
Concord, N.H. 03302

"Performance Improvement Plan" and told me that my conditions were not bad enough to require medical leave, that they would place me on a "more accommodating" rotating in lieu of M2 (which they never did), and that I was "just neurotic" and shouldn't worry about my medical problems. Meanwhile, I believe rumors were growing at DHMC of my limitations. I directly asked her about this in October – and she replied "Rumors? What rumors?"

I went to Ronald Green after Thanksgiving, when a large number of department members started to treat me incorrectly. I asked Green for advice, and, he suggested I look for another career, but then referred me to Finn. Finn told me not to worry, that she would make sure I pass the intern year if I continued to make the efforts I was making. Two months later, IN January 2012, she would tell me my performance was not acceptable and coerce me to resign. Two months later again, the "performance" reasons were removed from their complaints, and I was terminated for USC litigation. In retrospect, I can only conclude that Finn was dishonest with me from the start, despite witnessing worsening medical impairments.

The sleep center was notified in October 2011 that I was falling asleep in rounds and felt on the verge of a car accident. They attempted a CPAP titration – which only worsened my sleep disorder severity (on their own machines). Despite dangerous symptoms – and inability to treat me – they never made any efforts to help me secure medical leave. Moreover, it appears they destroyed evidence in January 2012 and then abandoned me as a patient.

First request for medical leave from Defendant Finn:

In early September I met with Dr. Finn and requested medical leave, feeling that "something was wrong." This was an emotional request as I had spent my whole life trying to become a doctor, and was so close to doing so, but felt I was about to crack . I had enough symptoms to know something was not normal. Dr. Finn persuaded me not to seek further medical leave.

Dr. Finn wrote it up a few days later as a referral for "counseling" that I did not comply with. I feel this is dishonest. With all due respect to some of the excellent counselors at Dartmouth, I felt my problems stemmed from complex medical causes, namely: history of two MTBIs, olanzapine use (and my fear that the drug caused permanent toxicity to me, as it is known to reduce chimpanzee brain volume permanently by 10%), and possibly, PTSD from all the resultant trauma of these etiologies. This is what I was thinking. Dr. Finn knew that I was bringing up serious matters that would have required lengthy medical leave to evaluate. I was not a normal intern who needed counseling for the normal pressures of internship. Moreover, she knew my main complaint was fatigue and not enough time to do my work and rest. By suggesting counseling that Dr. Finn knew I did not have time to fulfill, she in turn forced me to leave my conditions untreated.

Disclosure to Dr. West that I was unable to write patient notes due to distractibility:

I spoke with Dr. West about my inability to concentrate, which improved when working away from any distraction. This is a common long term effect of head injuries. He made great efforts to provide me with quieter rooms, etc. In December he expressed regret that he had been

so accommodating, as the pressure from the administration was obvious. I remember replying to him with gratitude "No, if it wasn't for your accommodations I wouldn't have had any chance to make it through these six months." Again, in retrospect, Dartmouth and their lawyers were trying to get rid of me, while Dr. West was being a decent doctor – and human- and trying to help me.

Demand from Dr. Simon for Immediate Medical Leave:

      On a Thanksgiving shift, in the presence of about 5 nurses, I asked Dr. Simon to vacate my shift and that he call in the attending as I felt patient safety was being jeopardized. I had just gone to Philadelphia and back for Thanksgiving, and had slept as the passenger for the 14 hour round trip journey, while my wife, who had never been to America before that week, drove my car the 700 mile journey. I recall sleeping with my head covered by my winter jacket.  I had deteriorated so much that I could not even help my newly immigrated wife drive the trip home. This was not normal resident 'burnout' and something was wrong.

      After Dr. Frew chastised me for poor allegedly verbal communication (despite what I believe was my excellent care of the patients in the ED), I realized I was breaking down and demanded leave. Dr. Simon pleaded with me not to go, saying "that will look really bad." I told him at that point I suspected that Dr. Finn was using call shifts to block my promotion to PGY2, with some of her friends colluding such as Dr. Frew. Dr. Simon was on the telephone with Dr. Frew for about an hour. The next week, about 20 psychiatry staff treated me like dirt. Basically, my demands for medical leave were being met by harsh opposition by a LARGE group. For what it is worth, Dr. Simon told me that week "You're right, it's Finn and some of her friends working against you."

Second request to Defendant Finn:

      After being diagnosed in November with moderate-severe sleep disorder, I spoke about this in detail with Dr. Finn. I told her that my sleep problems were pervasive in my life and that I felt a part-time schedule would be necessary for me. She verbally (and in writing) denied this request for schedule accommodation.

      I asked Senior Resident Dan Herrick, who had expertise in sleep medicine, to help me review my polysomnogram. For many years, I was trying to understand the causes of my disabilities, and sought advice from my colleagues and supervisors at DHMC, experts in areas such as PTSD, head injury, and sleep medicine.

8.  Do you allege that you requested any reasonable accommodations from any of the defendants relating to any alleged disability?  If yes, please describe said requests in detail, including in your answer, but not limiting it to:

    a.  The date of each and every occasion wherein you allege plaintiff requested reasonable accommodations;

    b.  The exact accommodation requested on each and every occasion;

    c.  Each specific disability for which each accommodation was requested;

    d.  Whether each request was made orally, in writing, via email or through other means of communication;

    e.  Whether each accommodation requested was recommended by any health care or mental health care provider;

    f.  To whom plaintiff allegedly directed each request for accommodations;

    g.  The response of each defendant, or any of their representatives, to each and every request described in your answer to this interrogatory; and

    h.  Please identify and attach to your answers to these interrogatories each and every document which you allege supports your answer to this interrogatory or to which you referred in preparing your answer.

**ANSWER:**

First request for medical leave from Defendant Finn:

    In early September I met with Dr. Finn and requested medical leave, feeling that "something was wrong." This was an emotional request as I had spent my whole life trying to become a doctor, and was so close to doing so, but felt I was about to crack . I had enough symptoms to know something was not normal. I had mentioned my TBI history , which was mentioned in the New Hire Packet she reviewd. Dr. Finn persuaded me not to seek further medical leave, stating "I wasn't thinking anything that drastic for your problems."

    Dr. Finn wrote it up a few days later as a "Performance Improvement Plan" and referral for "counseling" that I did not comply with. I feel this is dishonest. With all due respect to some of the excellent counselors at Dartmouth, I felt my problems stemmed from complex medical causes, namely: history of two MTBIs, olanzapine use (and my fear that the drug caused permanent toxicity to me, as it is known to reduce chimpanzee brain volume permanently by 10%), and possibly, PTSD from all the resultant trauma of these etiologies. This is what I was thinking. Dr. Finn knew that I was bringing up serious matters that would have required lengthy medical leave to evaluate. I was not a normal intern who needed counseling for the normal pressures of internship. Moreover, she knew my main complaint was fatigue and not enough

time to do my work and rest. By suggesting counseling that Dr. Finn knew I did not have time to fulfill, she in turn forced me to leave my conditions untreated.

Disclosure to Dr. West that I was unable to write patient notes due to distractibility:

I spoke with Dr. West about my inability to concentrate, which improved when working away from any distraction. This is a common long term effect of head injuries. He made great efforts to provide me with quieter rooms, etc. In December he expressed regret that he had been so accommodating, as the pressure from the administration was obvious. I remember replying to him with gratitude "No, if it wasn't for your accommodations I wouldn't have had any chance to make it through these six months." Again, in retrospect, Dartmouth and their lawyers were trying to get rid of me, while Dr. West was being a decent doctor – and human- and trying to help me.

Demand from Dr. Simon for Immediate Medical Leave:

On a Thanksgiving shift, in the presence of about 5 nurses, I asked Dr. Simon to vacate my shift and that he call in the attending as I felt patient safety was being jeopardized. I had just gone to Philadelphia and back for Thanksgiving, and had slept as the passenger for the 14 hour round trip journey, while my wife, who had never been to America before that week, drove my car the 700 mile journey. I recall sleeping with my head covered by my winter jacket.  I had deteriorated so much that I could not even help my newly immigrated wife drive the trip home. This was not normal resident 'burnout' and something was wrong. After Dr. Frew chastised me for poor allegedly verbal communication (despite what I believe was my excellent care of the patients in the ED), I realized I was breaking down and demanded leave. Dr. Simon pleaded with me not to go, saying "that will look really bad." I told him at that point I suspected that Dr Finn was using call shifts to block my promotion to PGY2, with some of her friends colluding such as Dr. Frew. Dr. Simon was on the telephone with Dr. Frew for about an hour. The next week, about 20 psychiatry staff treated me like dirt. Basically, my demands for medical leave were being met by harsh opposition by a LARGE group. For what it is worth, Dr. Simon told me that week "You're right, it's Finn and some of her friends working against you."

Second request to Defendant Finn:

After being diagnosed in November with moderate-severe sleep disorder, I spoke about this in detail with Dr. Finn. I told her that my sleep problems were pervasive in my life and that I felt a part-time schedule would be necessary for me. She verbally (and in writing) denied this request for schedule accommodation.

I asked Senior Resident Dan Herrick, who had expertise in sleep medicine, to help me review my polysomnogram. For many years, I was trying to understand the causes of my disabilities, and sought advice from my colleagues and supervisors at DHMC, experts in areas such as PTSD, head injury, and sleep medicine.

The only document I am aware of which could evidence what I am saying here is a document produced by Defendant Finn at the NHES hearing which showed that she denied hours accommodations. All other possible documents are in the possession of the Defendants.

9. Please describe in detail, each and every act of any of the defendants which you allege was in any way discriminatory toward you.  Please include in your answer, but do not limit it to:

    a. The date(s) each discriminatory act allegedly occurred;

    b. A detailed description of each act which you allege was discriminatory;

    c. The identity of each person involved in each discriminatory act;

    d. The location where each discriminatory act allegedly occurred;

    e. The identity of each and every witness to each and every alleged discriminatory act; and

    f. Please identify and attach to your answers to these interrogatories copies of any and all documents which you allege supports your answer to this interrogatory or to which you referred in preparing your answer.


**<u>ANSWER:</u>**


1. In November 2011 at the DHMC Psychiatry offices, I was steered away from the LPMR program (and prevented from applying) and told I was not qualified. I believe "not qualified" in fact referred to : a) slow performance speed due to head injury/Asperger's, b) poor communication skills due to head injury/Asperger's, c) being an individual with the stigma of prior Tarasoff and psychiatric hospitalization history.

2. I was terminated for a) slow performance speed due to head injury/Asperger's, b) poor communication skills due to head injury, c) an individual labeled with the stigma of prior Tarasoff and psychiatric hospitalization history.

3. Generally, I feel like I was treated like a second-class citizen, mocked, hazed, and ridiculed, and was unable to defend myself due to Asperger's and related disabilities.

4. I was not given accommodations such as schedule changes, and was frequently chastised about my sleep disorder, as mentioned elsewhere in my pleadings and incorporated herein.

5. I was not given a fair-hearing before being terminated, because I was viewed as a second-class citizen.

6. In 2012, I was abandoned as a patient by the Dartmouth Psychiatry sleep center because I was an "undesirable" patient with multiple disabilities.

7. Evidence of my disability was destroyed, including the actigraph watch, which is itself discriminatory.

8.   In November 2011, after the "Brown Mock Oral Boards" Ronald Green mentioned "he's you! how could you fail?" regarding a severely disabled patient of his named "Jeffrey" who had a head injury, who I was assigned to interview.

9.   Between July 2011 and December 2011, numerous individuals warned me I would be fired on "M2" but gave little details beyond general warnings. Mostly, I thought it was just normal "fearmongering" of interns. When I started, and finished on M2, I believe I was hazed and abused in ways that specifically brought out and exacerbated my disability. This is one of the most unethical discriminatory events that occurred to me at DHMC - they forced me out by causing me to "crack" - where even patients were remarking that I appeared on the verge of nervous breakdown. Dr. Finn even emailed me the day before she knew they would terminate me to ask me how M2 was going. She knew I would be afraid to say anything or complain - again knowing my nervousness - and did this to build her case.

10. I incorporate by reference each and every response contained herein. The acts taken by the Defendants that were discriminatory against me are too numerous to list here.

10. Please identify each and every internet domain name you have registered during the period 2000 through the present, including in your answer, but not limiting it to:

    a.   The domain name;

    b.   The date of registration;

    c.   The purpose of the domain registration;

    d.   Whether you have posted any information on each site, and if so, please provide a description of all information posed; and

    e.   Please identify and attach to your answers to these interrogatories all documents which you allege support your answer to this interrogatory, or to which you referred in preparing your answer.

### **ANSWER:**

### Objections

1. Plaintiff objects to this request to the extent that it is overbroad, unduly burdensome, or requires unreasonable efforts or expense on behalf of the Plaintiff.

2. Plaintiff objects to this request because the documents requested are not relevant to the lawsuit or likely to yield information pertinent to this case.

Subject to and without waiving these Objections, or any other objection or claim of privilege, Plaintiff produces documents and states as follows.

      I registered DartmouthPsychiatryLawsuit.com in 2012, and renewed it in 2013. I purchased this to write a blog about the unethical activity I witness as a resident at Dartmouth. I have registered about 100 other domain names, such as getshampoo.com, amazonbirdcages.com, qrlostfound.com, and others(examples given are fully representative as to the categories and types of websites), in an attempt to mitigate damages and begin a new career that I can do in isolation. To date, I have had no profit from these sites, no significant revenue, and qrlostfound.com is now controlled by George Baker and I am not affiliated with it any more. I am working on several websites to keep busy, but may stop soon as one year of efforts has only been frustrating. The names of these websites are irrelevant, other than DartmouthPsychiatryLawsuit.com.

11. During the period beginning when you first started the residency program in June of 2011 through the present, have you utilized any type of email tracking system on emails you exchanged with any representative of any defendant, including counsel?

If yes, please describe the type of tracking system utilized, and please identify and attach to your answers to these interrogatories complete copies of each and every "ReadNotify" or similar email tracking history associated with each email communication with any representative of any defendant you have tracked.

**<u>ANSWER:</u>**

<u>Objections</u>

1. Plaintiff objects to this request to the extent that it is overbroad, unduly burdensome, or requires unreasonable efforts or expense on behalf of the Plaintiff.

2. Plaintiff objects to this request because the documents requested are not relevant to the lawsuit or likely to yield information pertinent to this case.

12. Please state the date you were first notified of your suspension from the residency program.

   **ANSWER:**

   I am not sure that I was ever legally notified of suspension from the residency program. I received a termination letter in March 2012. In a meeting with Dr. Finn and Ronald Green on January 13 2012, I was given many false statements, so I am not sure what to make of them. One was a serious accusation that I had committed Medicare fraud for an auscultation issue, which I later learned was an accusation made by Green to Connors to terminate her. Likewise, Dr. Finn verbally told me she "needed to talk" over the weekend with Dr. Green, but that I should no longer report to work and was "being placed" on administrative leave. Administrative leave requires written notice, and Dr. Finn used vague language and verb tenses – probably because she was beginning an illegal termination of me – so the short answer is, I don't know when, if ever, I was placed on suspension.

13. Do you allege that you were dismissed from the residency program because you performed acts that public policy would encourage or refused to do something that public policy would condemn?

If yes, please describe:

    a. Each and every act you claim to have performed that you allege public policy would encourage;

    b. Each and every act you claim you refused to perform that you allege public policy would condemn;

    c. Each and every activity, other than those described above, which you were engaged in that you claim to be protected by public policy;

    d. Each adverse action you claim was taken because you engaged in each such alleged protected activity; and

    e. Please identify and attach to your answers to these interrogatories copies of any and all documents which you allege support your answer to this interrogatory or to which you referred in preparing your answer.

**<u>ANSWER:</u>**

I filed a lawsuit in 2006 against USC. Defendants used this against me as a reason for termination. I suspect one of the 2006 Defendants may have been a colleague at Harvard Medical School with somebody at Dartmouth who played a role in my termination. A lawsuit is something public policy encourages, if it states non-trivial complaints. My complaint focused on A) I was hypomanic for much of the time at USC, because I was taking fluoxetine to try to improve my concentration, which had never been the same since my TBI. I wrote rambling, hypomanic emails while on fluoxetine. B) My emails were forwarded (tracked with ReadNotify) between the NIH headquarters and the senior Medical School Dean who never met me. They arranged punitive actions and restraining orders against me – even though the classmate involved would laugh at me, walk near me, and violate the restraining order. In short, as an individual with TBI, Asperger's, and drug-induced hypomania, I filed a valid complaint for ADA retaliation, improper influence and harassment against USC and the NIH director. As such, terminating me for suing a US medical school and NIH director, which DHMC clearly did, is a retaliatory action against my valid public policy complaint.

I filed an ACGME complaint against U Arizona and threatened a lawsuit, as I believe they were holding my USC lawsuit against me. Public policy (see above) would encourage filing these complaints.

I complained to Dr. Finn and Dr. Friedman in July 2011 in writing. I complained about an 18 hour shift, which is against ACGME rules. I complained about shortness of breath on the

Law Offices of
Sulloway & Hollis, P.L.L.C.
Concord, N.H. 03302

phone with Mr. Baker, which I suggested was due to mistreatment at work.

I requested medical leave from Dr. Finn in September 2011. I requested reduced work hours in November/December 2011.

I complained to several interns (Ravi, Bae) about Dr. Finn's lack of accommodations for my sleep problems.

On Thanksgiving, I complained to Dr. Simon about Finn and Dr. Frew. I left him voicemail stating that I would file a lawsuit if they didn't stop mistreating me. I demanded medical leave on Thanksgiving and felt that I patient care was being jeopardized as I was no longer able to function. In retrospect, this was a battle for months where I wasn't being allowed medical leave, because they wanted to fire me once a replacement was hired.

On January 13 2012, I filed a "Criminal and Ethics Complaint" in the DHMC ED.

A week later, I emailed Jim Yong Kim requesting an Ethics investigation.

I filed this lawsuit several weeks later.

Since March 2012, I filed complaints with the NH CHR, the Boston OHR, JAHCO, ACGME, Miami/Philadelphia/Boston EEOC, US DOL, NH Board of Medicine, FBI, NH State Police, Lebanon & Hanover Police. I continually update these complaints (the ones that remain open) and am in process of filing additional complaints.

14. Please describe, in detail, your reasoning for failing to invoke and participate in the Fair Hearing Process relating to the decision to dismiss you from the residency program.

**<u>ANSWER:</u>**

I did not fail to invoke, nor did I fail to participate in, the Fair Hearing Process. According the DHMC's Red Book bylaws, a resident must be given a Fair Hearing prior to being terminated. This is the same policy at most leading academic medical centers. The Red Book language supports this assertion when it declares that "at any time during this [Fair Hearing] process, a resident may resign." While other leading academic medical centers use more explicit language, I believe the implicit promise in the Red Book language is sufficiently strong to support my belief that DHMC fired me, in breach of the Red Book contract, before a Fair Hearing.

My medical condition only worsened at the anger of being terminated before a hearing, so I initially requested a delay in the hearing (offered to me after the termination) for this reason. Upon reviewing the matter more, I decided to ask the ACGME to intervene, and asked the USDC for NH to issue an injunction maintaining the *status quo* at the time the lawsuit was filed. In other words, I hoped the appropriate authorities would order my employment at DHMC to stay until a hearing. Unfortunately, the ACGME has been less than helpful, and I have asserted to them that I will take action at the right time to expose their total lack of enforcement.  The USDC did not issue the injunction, in part due to errors I believe I made in requesting it. As I am not an attorney, I have made frequent mistakes in filing pro se, which I believe Defendants have only capitalized on.

Once the ACGME and USDC made their determinations, I promptly informed my attorneys that I believed a Fair Hearing , even after the termination, might be important as the Fair Hearing panel has Investigative Powers, and I hope they will investigate the numerous violations I witnessed as an inter at DHMC.

In summary, without waiving my objection to the fact that the contract was breached, I am, and always have been, willing to invoke and participate the Fair Hearing process. In fact, I await their investigative powers as I believe that DHMC fired the wrong person – and as I have filed to press charges with the FBI and NH Attorney General – believe that other DHMC employees belong in NH and/or Federal prison.

15. Please describe, in complete detail, each and every negligent misrepresentation or fraudulent misrepresentation (indicating which) you allege was made by any representative of defendants Mary Hitchcock Memorial Hospital and Dartmouth Hitchcock Medical Center. Please include in your answer, but do not limit it to:

    a.   The date you allege each and every negligent misrepresentation was made;

    b.   The date you allege each and every fraudulent misrepresentation was made;

    c.   The identity of each and every person who you alleged made each and every misrepresentation;

    d.   The nature and substance of each alleged negligent representation;

    e.   The nature and substance of each alleged fraudulent misrepresentation;

    f.   Whether each alleged representation was made orally, in writing or by some other means of communication; and

    g.   Please identify and attach to your answers to these interrogatories each and every document which you allege supports your answer to this interrogatory or to which you referred in preparing your answer.

**<u>ANSWER:</u>**

1. My Resident Appointment documents/New Hire packets, via the "Red Book" and other documents, had implicit and/or explicit guarantees that my entire residency application file would be reviewed with due diligence prior to employing me. These due diligence guarantees include, but are not limited to, simply reading my application. As such, I justifiably relied upon Dartmouth to have read my disclosure of a short, six week internship at Arizona, from which I resigned. Moreover, I signed a consent form for a "Universal Background Check" which included searches for past civil litigation. As such, I absolutely relied upon this due diligence, which the Defendants purport was not carried out correctly.

2. Generally, Defendant Finn and others held my prior mental health and Tarasoff experience against me, but never told me so, instead acting generally false, cynical, condescending, and fake to me. In other words, I am asserting that the false and fake nature of my supervisors, unsure how to approach an intern's mental health issues, resulted in false or exaggerated criticisms of my work that retrospectively constituted a sham and/or hoax perhaps larger than they initially intended.

3. Defendant Finn issued a termination letter stating cause for termination as being false statements I purportedly made to the NH Board of Medicine and the AAMC/ERAS. Both

of these entities investigated and found Defendant Finn's claims to be false.

4. In general I was stared at with disapproval during almost every patient round in internal medicine, and "left to dry." Basically they subjected me to false expectations (and therefore false criticisms) such as expecting me to know the names of every Skilled Nursing facility in New Hampshire on my first day of work, then looked at me incredulously that I didn't know, provoking my anxiety. While any resident might be subjected to some degree of this, I was effectively tortured nonstop until patients remarked that I appeared on the verge of a nervous breakdown.

5. In October 2011, The Dartmouth Sleep Center ordered a 2-week actigraph study on me, in which I had to wear an actigraph and meticulously record my sleep cycle. This was in October, and received widespread comments from my colleagues. I believe the Sleep Center was pressured to discontinue the study, as it would evidence my disability and/or abuse at DHMC. Three months after the study, Dr Greenough issued a patient note stating that the actigraph had "failed." I do not believe the actigraph failed, and I relied upon proper medical studies and proper medical charts to pursue my rights as a disabled patient.

6. In November 2011, Finn and Green falsely stated that I was not competitive for the LPMR program, and as such they could not recommend me for the program.

7. Defendants state in various pleadings that I do not have a disability. I believe the Defendants witnessed tell-tale signs of neurological and mental impairment, and are issuing false statements in the litigation itself. In other words, the Defendants are using their stature as experts in mental health to falsely evade legal claims of their abuse. For example, Finn witnessed my nervous tremors, tearfulness, illogical/circumferential speech patterns, PTSD symptoms, sweating, hypersomnia, isolative behavior, and other symptoms, and has now caused false statements to be issued from my employment and extending into legal pleadings.

8. DHMC enacted into a contract with me, which provisioned the process for terminating a resident. The process clearly states that at any time up to and including the "Fair Hearing", a resident may resign. Thus, DHMC asserts a (rather poorly drafted) contract which purports to offer the same due process of most other leading academic medical centers. However, in my case, this was false, as I was terminated prior to a Fair Hearing and never afforded the opportunity to defend allegations and resign if I felt unable to, prior to an embarrassing termination.

9. I entered the residency with a fair expectation, and implicit contract, of fair business

dealing and fair educational training. This was false, as I did not receive training that I paid them to undertake.

10. Likewise, each MD in the country is allocated a limited amount of Medicare funding. Dartmouth accepted my allocated Medicare funding quota, but effectively denied me its benefit. In other words, they did not sufficiently train me in light of the money they received. Although I do not have their Medicare contracts, it is reasonably evident they had to falsely sign a statement that I was a student of theirs and would be trained according to the standard of training nationwide.

11. After my October 2011 sleep study, Finn told me "accommodations are difficult to make for an intern" and that "part time schedules are not possible." Such claims were false and/or illegal, but I relied upon them as I continued to work in impaired condition.

12. Dr Khagi instructed me to perform two rectal exams during my first 2-3 days at DHMC. One was on a terminally ill patient and, though I could be mistaken, I do not believe it was medically justified. In other words, I believe I was hazed so much during the first week that, possibly, patients were violated as a result.

13. Dr Noordsy chastised me on Christmas day in a PATIENTS NOTE about an error Dave Ravi made. I believe it is not normal to chastise interns in patient notes, especially when I did not make the error noted. I believe this was one of numerous false criticisms intended to make me uncomfortable at work. I relied on them as, frankly, I believed them more than I should have.

14. DHMC, Dartmouth, and their representatives have made numerous false claims and assertions throughout related processes which are too numerous to list here.

16. Please describe, in full detail, your employment history for the past fifteen (15) years. For each position held, please include in your answer, but do not limit to the following:

    a.   The identity of each employer;

    b.   The inclusive dates of each employment;

    c.   The job title of each position held;

    d.   The job description of each position held;

    e.   The rate of pay for each position;

    f.   Whether the separation and/or termination from each employment position was voluntary; and

    g.   The reason for separation and/or termination from each position.

**ANSWER:**

I worked for Cairnwood Capital International from June 1999-2000 in Paris, France as an Analyst. I was paid approximately $40,000 p.a. The separation was in part because my boss felt I was 'floundering' and needed a more structured environment, and likewise, in part because I was offered a position as an Analyst at Merrill Lynch

I worked for Merrill Lynch as an Analyst in New York from June 2000-May 2002, and was paid about $70,000 p.a. I was initially told I would be terminated for poor performance and poor concentration, but later, a mutually agreeable resignation was reached.

I worked for University of Arizona as a surgery intern from July – September 2010. I suspected Arizona was holding my lawsuit against USC against me, and "resigned under objection/duress."

I then formed Baker Isaacs Capital group in December 2010 and was CEO until resigning and relinquishing any involvement in the company, in both 2012 (reversed decision) and 2013.

17. Have you ever applied for benefits, or made any other claims for monetary damages of any type, against any other person, party or employer alleging any type of claim, including, but not limited to, worker's compensation claims, disability benefits claim, wrongful termination claims, harassment and/or discrimination?  If yes, please state:

    a.  The identity of each person, party or employer against whom you made any such claim;

    b.  The nature of each such claim;

    c.  A complete description of all injuries you claim to have suffered associated with each claim;

    d.  The name and address of each insurer for each claim for disability, worker's compensation and/or other benefit claimed;

    e.  The court or administrative agency, and corresponding claim or docket number, in which each claim and/or lawsuit was filed, and

    f.  The present status of each claim.

**<u>ANSWER:</u>**

1. I filed a complaint with the United States Department of Labor, alleging that DHMC was attempting to deny me of disability benefits. For six months, I had asked DHMC HR for medical leave and disability leave paperwork. They never processed my request. For about two months, the Hartford requested DHMC provide them this policy information directly. I filed a complaint with the US DOL, and within a week, DHMC turned over the policy coverage documents to The Hartford. Of note, I still believe DHMC is attempting to deny me of these benefits. My reason is that DHMC has stated in Federal Court that I do not have a disability. 20 harvard trained physicians at DHMC clearly know I have a disability. Moreover, an actigraph watch, which was apparently destroyed, clearly documented my disability. I will be aggressively pursuing these matters with all appropriate authorities, including the NH Board of Medicine and FBI.

2. I applied for NHES unemployment insurance. I believe Finn perjured herself in the hearing, resulting in me being denied benefits. I filed an appeal with the NHES but they never processed it, in violation of my rights. The entire NHES process was bizarre, nearly all my requests for evidence were denied, and I believe I was blocked from asking relevant questions or providing relevant testimony. IN any event, I notified the NHES that I was fully disabled and no longer would pursue unemployment.

3. I applied for LTD benefits from the Hartford (see above) which were granted after 1) The USDOL intervention, and 2) the Hartford ordered a neuropsychological evaluation substantiating my belief since 1997 of frontal dysfunction.

4. I suspected that the University of Arizona held my prior litigation against USC against me, but was encouraged to resign so quickly that I had no evidence. I informed them I planned to sue them , but decided I did not need another lawsuit in my life and moved on. They were very angry at me and ordered change in door lock codes, and I suspect their anger was 'passed on' to Dartmouth, though I can't be sure.

5. A Harvard attorney who 'wrote the book' on disability law filed a claim on my behalf against a former employer. The matter is resolved and all parties agreed to keep the matter confidential. Of relevance to this case, the nature of the claims were performance & concentration issues, and bullying evidenced by obtained derogatory emails against me, referencing perceived national origin "Frenchie," fatigue from working beyond the "French work week" and other protected classes.

6. I filed a lawsuit in the USDC in 2006 against USC, 2 of its Deans, and an NIH director. Question 13 details the nature of this case, in which a classmate and friends began to bully me and wrote false complaints, with the assistance of the Deans. The lawsuit settled with an annulment of all prior contracts and agreements between the parties, dismissal of all allegations and controversies, as well as the sealing of disputed/voided academic records. The settlement was further ordered in full force by US District Judge Feess.

18. If any of the aforementioned claims have settled or have otherwise resolved, please state:

    a.   The date of the settlement or resolution;

    b.   The terms of the settlement or resolution;

    c.   The parties to the settlement or resolution; and

    d.   Please identify and attach to your answers to these interrogatories copies of any and all documents which confirm the terms of the settlement or resolution, including, but not limited to the settlement release and all documents which you allege support your answer to this interrogatory or to which you referred in preparing your answer.

**ANSWER:**

Answered in question 14 above- prior lawsuits had been settled or expired, USDOL intervention resolved the benefits matter.

19. Do you claim lost earnings and/or loss of earning capacity in this matter? If yes, please specify:

    a.  The total lost wages claimed, including the source of each loss;

    b.  The dates on which you were unable to work and the amount of wages lost as a consequence thereof;

    c.  The amount claimed for loss of earning capacity, including the basis upon which you make any such claim;

    d.  The manner in which the amount of your total lost wages claimed was calculated; and

    e.  Please identify and attach copies of any and all documents which support your answer to this interrogatory or to which you referred in preparing your answer.

**ANSWER:**

I have tried to make rough estimates of lost earnings. In general, for 2-3 years I have had little to no functionality because of what I believe Defendants did. I have had all medical interviews revoked. In short, I probably had an uphill battle to be a doctor, in light of dysexecutive disorders, and Dartmouth ruined whatever chances I did have to work in part-time or research capacity. I have attached three documents which will show an estimation of my lost earning capacity.

20. Did you sustain any other financial loss as a result of the alleged actions of the defendants described in your Amended Complaint?  If yes, please describe the nature and amount of each such loss, including in your answer the method used to calculate each of the financial losses claimed.

**<u>ANSWER:</u>**

See attached documents from question 16 above.

21. Please sign the attached authorizations for release of your medical records for every health care provider identified in these interrogatories, your education records, your employment records for every employer identified in these interrogatories, your disability records, your worker's compensation records and your income tax returns.

**<u>ANSWER:</u>**

<u>Objections</u>

1. Plaintiff objects to this request to the extent that it is overbroad, unduly burdensome, or requires unreasonable efforts or expense on behalf of the Plaintiff.

2. Plaintiff objects to this request as requesting confidential documents.

3. Plaintiff objects to this request because the documents requested are not relevant to the lawsuit or likely to yield information pertinent to this case.

Respectfully submitted,

Dartmouth-Hitchcock Medical Center,
Mary Hitchcock Memorial Hospital,

By Their Attorneys,
SULLOWAY & HOLLIS, P.L.L.C.

DATED:                        By_____

Edward M. Kaplan (NH Bar No. 1307)
9 Capitol Street
P. O. Box 1256
Concord, NH  03301
(603) 224-2341

===============================================================

The foregoing answers to interrogatories are true and complete to the best of my knowledge.

Dated: 7/2/13

_____
Jeffrey David Isaacs

STATE OF Florida
COUNTY OF Palm Beach

Personally appeared before me, on this 2 day of July , 2013, the above-named, Jeffrey David Isaacs, and acknowledged, swore and affirmed, under oath, that the facts herein are true and accurate to the best of her knowledge and belief.

_____
Notary Public/Justice of the Peace

My Commission Expires: 10/27/13

MICHELE BUCOLO
Notary Public - State of Florida
My Comm. Expires Oct 27, 2013
Commission # DD 904038
Bonded Through National Notary Assn.

Law Offices of
Sulloway & Hollis, P.L.L.C.
Concord, N.H. 03302

-35-