JEFFREY DAVID ISAACS
3553 West Chester Pike
PMB #177
Newtown Square, PA 19073
Telephone:    (215) 609-4625
Mobile:       (610) 202-1460
E-Facsimile: (310) 564-0432
Email: jdi@alum.dartmouth.org



IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JEFFREY DAVID ISAACS,

      Plaintiff, *pro se*

  v.

UNIVERSITY OF SOUTHERN CALIFORNIA

      Defendant.

:
:
:
: Case No. CV06-3338-GAF
: DECLARATION OF
: Jeffrey David Isaacs
: IN OPPOSITION TO SUMMARY
: JUDGMENT OR DISMISSAL

1. My name is Jeffrey David Isaacs and I am a United States
   citizen. I am personally familiar with the facts stated
   herein and could testify under oath to verify these
   assertions.

2. Prior to any controversy described herein, my academic
   experiences have been most positive. I am appalled at the
   implications of USC's recent request for Judicial Notice on
   school violence, and I believe that those who know me would
   be likewise appalled. I hold our country's educational
   institutions in high esteem and would never be associated

1

with any such atrocity. I graduated from Germantown Academy
*cum laude* and played on two high school sport teams there.
I then enrolled at the University of Pennsylvania, and
while taking a 'pre-med' curriculum, became a 'Benjamin
Franklin Scholar,' the top 5% of the freshman class.
Thereafter, I transferred to Dartmouth College and
graduated in 1999 *with honors* in Computer Science. Although
I participated in pre-med extracurricular activities such
as the Dartmouth Ski Patrol, I did not finish the entire
'pre-med' curriculum during college; like many in my
graduating class, I pursued several years of employment in
venture capital during the 'internet bubble.' In 2003, I
was accepted on a full scholarship to the Vanderbilt JD/MBA
program. At the time, I did not know if I wanted to commit
to the four-year program, because I was still considering
medical school. I deferred my acceptance to the JD program
at Vanderbilt, and accepted an offer at a one-year global
MBA program with Wharton and Insead. I received my MBA in
2004. Subsequently, I took summer pre-med classes and
studied for the medical college admissions test (MCAT). I
enrolled in my deferred spot at Vanderbilt Law in the fall
of 2004. I enjoyed Vanderbilt Law School and formally
applied to the combined JD/MD program at Vanderbilt.
Contrary to USC Counsel's portrayal, I liked school.
Because I was not timely able to gain acceptance to one of
the rare JD/MD spots offered every few years at Vanderbilt,
in January 2005, I accepted an offer to enroll at the Keck
School of Medicine at USC. I decided to pursue this

2

opportunity and possibly apply to the JD/MD Program at USC
at a later time. Before starting at USC in July 2005, I
spent several months in Sri Lanka doing tsunami
reconstruction aid work.

3. My transcripts from all schools before enrolling at USC are
   unremarkable for any disciplinary history. I was never
   suspended, dismissed, or otherwise subjected to any
   irregular delays or course failures before or during
   college, law school, or business school. Separate and apart
   from my clean prior academic history, I never did anything
   at USC Keck that was violent in nature or intent. I never
   had any form of violent ideation, and, still, I seek
   readmission as a Keck medical student.

4. My USC clinical professors at Cedars-Sinai, Dr Fred Kuyt
   and Dr Mark Vogel, spent significant time observing my
   interactions with patients and peers. I believe that they
   are in a position to correctly attest to my basic
   character. Their assessment (Exhibit A), in stark contrast
   to that of USC Counsel, is consistent with how I think I
   was generally perceived at other schools, and how I
   perceive myself, generally. Moreover, Dr Kuyt was not
   allowed to support me at the USC SPC suspension hearing,
   and his advocating emails have been lost, destroyed, or
   improperly withheld by USC.

5. Dr Stellwegen and Dr White also gave me positive character
   evaluations in our Professionalism Study Group. These
   evaluations were not produced by USC, and have apparently
   been lost, destroyed, or improperly withheld.

6. My clinical peer group gave me overwhelmingly positive
   evaluations (USC Exhibit 595). Moreover, they met with
   former Dean Katsufrakis to express their concern about how
   I was being treated by a fellow student (SAC Email
   Exhibits). Katsufrukis' records of this meeting have either
   been lost, destroyed, or improperly withheld.

7. The student dispute that resulted in my improper dismissal
   initially came to the attention of USC on November 21,
   2005, when Ms Amy Baughman complained of text messages I
   sent that complained about her discussing me with Keck
   classmates, her illegal drug use, and her sarcastic
   comments to vandalize Keck property.

8. On December 4th, 2005, Ms Baughman essentially retracted her
   November 21st complaint. She wrote that "now [she]
   understands … that [I] was out of sorts," and that she had
   no feelings of "animosity." She even went so far as to
   state that her complaint and or her threat of a 50-foot
   stay-away order may have been a "selfish way to handle
   things." Furthermore, and typical of her irritating
   behavior, Ms Baughman apparently wanted me to be baited by
   her promise that "we could be [friends] in the future."
   (USC Exhibit 33)

9. Ms Baughman issued the USC Exhibit 33 email one day after
   she learned extensive details about my best friend's
   family, including that his great-grandfather (George F.
   Baker) founded the Harvard Business School. For reasons
   that I could now only disclose under a Court Seal, Baughman
   and I had a conversation which discussed 1) the Harvard

4

Business School being near her home in Cambridge, 2) her father being a Harvard neuroscience professor before joining the NIH Administration, and 3) the top 10% of the class at Harvard being given the distinction "George F. Baker Scholar."

10.    I believe that Mr Dave Braxton, an ex-boyfriend of Ms Baughman, and Mr Alexander Jack both ridiculed Ms Baughman for 'backing off' her allegations at the point she learned about my relationship with the Baker family. Indeed, Mr. Jack made unethical comments to me that convince me of this fact. Again, I could offer a detailed description under a Court Seal. Likewise, I had heard them ridicule Amy before as "crazy Amy" and "half-Asian Amy." They were, among other things, immature.

11.    After exams in mid-December, Ms Baughman was rather distressed; she had arrived a half-hour late to the exam and appeared disheveled. Afterwards, out of the blue, she yelled at me, then told me to call her over break to resolve things, then emailed me never to speak with her again, all within a span of several hours. Her friend Krishna Ramaswamy motioned with his car that he would run me over (and later falsely accused me of "hanging on" to his car) then punched me in the chest at a post-exam party, saying "No hard feelings?" (Exhibit B). Confused, I sent Ms Baughman a couple emails over break seeking clarification of her recent outburst and mixed messages. Given the mixed messages and the involvement of numerous classmates, I felt that this was reasonable and I did not intend to harass her

5

with these emails or pose any nuisance. Moreover, in her
USC DPS Harassment report filed January 11th 2006, Ms
Baughman denied that I sent her email over break,
apparently wishing to conceal the fact that she had told me
to contact her over break.

12.     In the Declaration filed by Amy Baughman on March 26
2008, Ms Baughman mischaracterizes my written complaints as
stalking. Indeed, she was seemingly annoyed that I wrote
complaints about her inappropriate behavior. For example,
at a January 6 2006 "MedProm" Keck event, Ms Baughman spent
abnormal amounts of time speaking with my Cedars-Sinai
clinical group. These were my six closest peers at Keck,
and the same individuals who gave me positive evaluations
in USC Exhibit 595. With over two hundred persons at the
MedProm, Ms Baughman's decision to socialize with my six-
person clinical group after telling me to stay away from
her was an obvious attempt to ostracize and harass me, in
my opinion. After about half an hour, and waiting to speak
with my friends, I started to walk in their direction. Ms
Baughman abruptly ended her conversation, walked towards
me, and hit me with her purse (USC Exhibit 191 - complaint
of physical contact).

13.     I emailed Ms Baughman following the MedProm (USC
Exhibit 241) that I wanted the "stupidity to end." In USC
Exhibit 191, I stated to Ms Baughman "At the MedProm
itself, you made physical contact with me twice." While my
emails, not my most eloquent due to my deteriorated
condition, attempted to allow everyone to 'save face,' Ms

Baughman clearly realized that I was accusing her of
wrongdoing. The next day she emailed Katsufrakis about her
"creep-o-meter" (USC Exhibit 235) and moved for a
restraining order. Indeed, she was the one surrounding
herself with my friends at parties. In my opinion, this
episode typifies the student conflict, and moreover,
demonstrates the exaggerated retaliatory ways of the
Defense.

14.    Upon thorough review of all current evidence, I
believe that the majority, if not all, of Ms Baughman's
complaints followed hours or days after I made a respective
complaint.

15.    As Dr Sandler has stated and can testify more
precisely, my condition and mood fluctuations spiraled
downhill rapidly with all that was happening at Keck. It
had become impossible for me to focus on my studies,
something that never was a problem in my past. Looking
back, many of my communications at the time were out of
character to varying degrees. At times my communications
contained attempts to placate to Ms Baughman; I had
succumbed to trying to placate someone I believed was
harassing me, so that she would 'walk away saving face' and
would leave me alone. Knowing that her father was in
frequent communication with three senior Deans from NIH
headquarters, I think it is reasonable to say that I made
confessions and professions, at my expense, hoping everyone
could 'save face' and move on. However, I was wrongfully
dismissed.

7

16.     Even after a stay-away order was issued, Ms Baughman
would walk into me and laugh, and commit other similar
nuisances. In my mind, she was abusing the purpose of the
stay away order. I emailed this to Dean Taylor (SAC
Exhibit)

17.     In February 2006, I was required to answer a
deposition to Ms Donna Budar-Turner, an administrator of
the USC Main Campus Student Judiciary Committee. The
deposition transcript is the subject of USC Exhibit 302,
and I have transcribed it in Exhibit B. I re-affirm this
statement of the early and pathetic events that lead to
this lawsuit. For the record, I believe that this student
conflict would have been more appropriately, and normally,
addressed in some sort of student dispute resolution
session such as the Student Judiciary Committee. Instead,
Keck moved to dismiss me and overrode Ms Budar-Turner's
administrative involvement. In my opinion Jim Ball and
former Dean Katsufrakis overrode Ms Budar-Turner because
they knew that normally nothing more than probation would
likely result from the unbiased Student Judiciary Committee
proceeding. I believe this was because of the pressure and
influence of the father of the other student involved, who
lobbied for his daughter from the NIH Executive
Headquarters. These emails have been lost, destroyed, or
improperly withheld.

18.     I believe the Keck faculty did not fully understand
the situation. There is more to this case than a black &

8

white stay-away order breach, however that was the main focus of the Keck hearings. Moreover, I was under duress; I had been *persona non grata* at Keck since the retaliatory events of early January 2006. I believe that the faculty saw a distressed, ostracized student who, at that point, had difficulty following instructions, and summarily dismissed me without understanding the full circumstances. Moreover, the SAC Exhibit M, written by my lawyer Mrs Nina Marino, details the some of the ways in which Dean Katsufrakis mislead the SPC committee which he chaired. I do not believe there was a fair hearing at Keck. I was not in a stable enough position to defend myself, at that point.

19.     Former Dean Katsufrakis told me on February 28, 2006 that I was suspended and that I was going to be dismissed (USC Exhibit 500). I told Katsufrakis that the decision was "not right, not fair." I explained that I had been wrongly portrayed, that although a rational group of people (the SPC) could rationally reach a suspension decision given the facts that were presented, it was a wrong result and I would appeal. I met with Henderson and Ball later in the week; Henderson appeared exceptionally agitated when I accused him of a conflict-of-interest; he rolled his knuckles on the table and, generally, made it clear he didn't want to hear from me.

20.     It was clear to me since early January 2006 that Henderson, Katsufrakis and Baughman wanted me dismissed. I stopped going to many classes as I was ostracized and

distressed. I knew from the email tracking information that
administrators from departments throughout USC were working
on the case against me. Indeed, after discussions with the
Dean of Admissions and another administrator, in USC
Exhibit 543, Katsufrakis denied my request to attend a
meeting in Chile as student officer representative to a
United Nations recognized non-government organization for
medical student humanitarian work (IFMSA). If USC had any
intent for me to stay enrolled, I think they would have
deferred the SPC hearing by a week for this important
cause. Moreover, Katsufrakis and Ball encouraged Mr Dave
Braxton, Mr. Krishna Ramaswamy, and Mr Alexander Jack to
write the SPC complaint against me (USC Exhibit 392).
Interestingly, USC Counsel chose not to include Exhibit 392
in support of their Motion for Summary Judgment.

21.     Exhibit 392 was the sole complaint used to invoke the
SPC procedural hearings against me, which resulted in my
improper dismissal. Considering Exhibit 392 was written as
per the "Personal advice" of Katsufrakis, I believe it is
reasonably evident that the USC Deans wanted me 'out' of
Keck as of mid-January, when the letter was issued. Hence,
in my opinion, claiming that the Tarasoff Warning is
'cause' for my dismissal is blatant pretext. Indeed, the
Tarasoff happened after I was suspended, after a dismissal
hearing was scheduled, and after Katsufrakis maliciously
(but off-the-record) told me I was 'kicked out' of Keck.

22.     I was concerned when UCLA Neuropsychiatric informed me
that they had been required to issue a 'Tarasoff Warning'

10

to USC. I remembered studying the Tarasoff case as a 1L at
Vanderbilt, and could not believe that this was actually
happening. While there is no question that I was angry at
being wrongfully suspended, I am not a violent person by
any definition. At the time, I was focused only on my well-
being and the lawsuit: I had brought to UCLA
Neuropsychiatric a copy of the Complaint that I originally
filed in the Los Angeles Superior Court.  Indeed, I spoke
in depth with UCLA Neuropsychiatric about the lawsuit.
Recognizing that, upon my admission, I was sleep deprived,
delirious, and not my normal self, I even sought their
advice on whether or not my interpretation of the email
tracking evidence between Henderson and Baughman was at all
delusional – UCLA tested me and all tests and diagnoses
were negative for any form of paranoid schizophrenia,
thought disorder, etc.

23.     I promptly spoke with former Dean Katsufrakis from
UCLA NPH in order to assure him that there was no actual
threat. I told him that this was solely a liability
concern, given my unstable condition at the time coupled
with my anger over the situation. Katsufrakis replied that
he never had any concern and that he appreciated my desire
to alleviate any unnecessary worry. Indeed, Katsufrakis
apparently took notes of this phone call, and may have even
recorded it (USC Exhibit 501). In Exhibit 501, he annotated
"JI apologizing, saying Dr Bullock had miscommunication, he
(JI) had no intent to harm." Exhibit 501 also has a
crossed-out annotation "Recorded phone conversation PJK". I

never received any such recordings, which should have
fallen under my discovery document requests. As such, they
may have been lost, destroyed, or improperly withheld.

24.     The Tarasoff warning contained two alleged 'threats.'
One of the statements was incorrectly relayed to UCLA
physicians by my mother, through a social worker. My mother
was also present when I made another statement that was the
additional subject of the Tarasoff warning. She issued an
affidavit (USC Exhibit 467) declaring that there was no
actual threat. To elaborate, upon my arrival at UCLA NPH
intensive care, I told a resident panel that I was angry
and worried about the long term effects a wrongful
dismissal might have on my health. I told them I was so
angry I was worried I would give myself a heart attack or a
stroke. I was in intensive care and was rightfully
concerned about my well-being. Regarding the alleged
statement about a gun, when I was first explaining the
severity of the situation at Keck to my mother, I told her
that a lot of people were legitimately confused about what
was going on, and that some were seemingly worried that I
would come to USC to harm myself. The SAC contains one
email from a worried fellow student, who had met my mother,
who emailed me that I should consult the student SOS mental
health emergency intervention program (SAC Exhibit G). I
explained to my mother that this situation at Keck had a
lot of people worried. My comment, in literal terms, spoke
about *other people's concern*, out of sympathy. There is

12

absolutely no substantiated basis for any other
interpretation of my comment.

25.     I believe that USC is mischaracterizing the Tarasoff
as a cause for dismissal endorsed by UCLA Neuropsychiatric.
Towards the end of my hospitalization, UCLA NPH staff told
my mother and I that they had some regrets about issuing
the Tarasoff, because the more they learned about the case,
the more they realized it might be used against me.
Moreover, UCLA promptly issued a correction to USC; in USC
Exhibit 294, Donna Budar-Turner's notes "Dr Bullock stated
that Mr. Isaacs now denies he is a danger and Mr. Isaacs
says he was referring to his being so upset that he will
have a heart attack."

26.     After a specific search for the most appropriate
physician, UCLA Neuropsychiatric discharged me for
outpatient care to UCLA staff psychiatrist Dr. Wayne
Sandler. Dr. Sandler has earned appointments to UCLA
Geffen's resident and medical student well-being
committees; his selection as my outpatient provider was, if
anything, an endorsement for me to return to studying
medicine.

27.     Dr Sandler testified on my behalf at the Keck
dismissal hearing (USC Exhibit 383). He was not treated
with appropriate respect at USC; Katsufrakis did not even
introduce him by name or describe his credentials. Dr
Sandler stated that he personally would not have issued a
Tarasoff warning; that I was allowed some degree of anger
over the situation and that I had absolutely no plans or

13

ideation to carry out any violence. I believe that he would
testify that the UCLA NPH resident who issued the Tarasoff
warning may have erred in doing so, and even if he didn't,
that the Tarasoff was only a warning at the height of my
hospitalization and not a cause for dismissal. I received
good medical treatment at UCLA NPH. Because I was delirious
upon admission, there was fair confusion and concern; UCLA
promptly updated USC as the situation improved.

28.     Interestingly, Ms Donna Budar–Turner apparently
questioned Keck's reliance on the Tarasoff Warning as
grounds for dismissal. Originally, Ms Budar–Turner's office
at USC Main Campus had been charged with investigating the
Tarasoff Warning. After clear involvement by Mr. Jim Ball,
Keck 'took over' the Tarasoff issue. In USC Exhibit 294,
Ms. Budar Turner writes        "6/12/06 Keck Student
Performance Committee votes to dismiss Jeffrey Isaacs from
Keck School of Medicine. Student has 10 days to appeal. See
email dated June 9th, 2006 [never produced by USC] *Tarasoff
warning only – mentioned at Keck? Talk with Peter
[Katsufrakis] to make sure no double adjudication. How much
did this influence decision? Has it already been
addressed?"*

29.     According to redacted USC Exhibit 313, on 6/13/06 Ms
Budar–Turner spoke with USC Counsel Jim Ball. From that
point forward in her work notes, it appears that Ms Budar–
Turner made no further enquiries about the (im)proper
handling of the Tarasoff.

14

30.     In Defendant's Motion for Summary Judgment, USC claims
that they ordered to obtain a psychiatric consult at UCLA
NPH. This is not true. I admitted myself to UCLA NPH
voluntarily, out of my own concern for my well-being. In
fact, as is clear from SAC Exhibit K, USC *originally*
ordered me to seek psychiatric counseling at USC-LAC, then
modified this *requirement* to a *recommendation.* The only
possible explanation I can imagine for this modification is
that USC wanted to dismiss me, and by requiring me to
undergo a psychiatric evaluation, it would complicate a
dismissal and might have yielded more understanding by the
SPC voting faculty.

31.     As recently as March 27th, 2008 Ms Amy Baughman emailed
my friend George Baker, in violation of a USC stay away
order not to contact each others friends. This was
reasonably disturbing to me and to my friends, who do not
wish to hear from Ms Baughman. The fact is that Ms Baughman
surrounded herself with *my friends* at Keck events, and, two
years later, emailed my best friend. In Reply to Motion to
Enforce Settlement, USC Counsel now offers a most weak
excuse for why Ms Baughman may have emailed Mr. Baker.
Notwithstanding their constantly changing stories, USC's
allegations of stalking are retaliatory sham, in my
opinion. I submit that a true victim of stalking, and Ms
Baughman is not, would never initiate email contact via
Facebook with the best friend of the alleged stalker, two
years after the fact.

15

32.    Between March 20th and March 31st, USC negotiated with
me to settle this case in exchange for being "acquitted"
and incorporating confidentially clauses that I was "not
required to disclose this matter to anyone." As is clear
from Defendant's Reply to Motion to Enforce Settlement,
this was a misleading settlement. In their Reply, USC
Counsel didn't even address the logical inconsistency
between an "acquittal" and being dismissed. It took me a
few days to suspect this and now I know that the settlement
I signed was not what I thought it might be.

33.    There was no meeting of the minds or mutuality of
intent in the supposed formation of the settlement
agreement. USC sees the contract consideration as a
"monetary settlement" (Reply Page 7), whereas I thought I
was being acquitted.

34.    USC obviously wanted me to believe that I was clearing
my record, or they wanted to entice me to lie on future
applications. In Motion to Enforce Settlement Exhibit B
page 26, USC Counsel wrote me that the settlement was
"vague enough that you are free to interpret and apply it
as you like." Hence, USC Counsel's 'selling point' was that
the contract was vague and that the two parties could
interpret it as they like. As such, it seems readily
apparent that there could not have been a meeting of the
minds, nor mutuality of intent.

35.    I believe that the undue influence exerted by USC in
the settlement discussions, and USC's ability to keep me in
economic career duress, is *intertwined with the core of*

*this lawsuit.* Moreover, I believe their misleading

settlement tactics are indicative of their treatment of me

since 2006. Hence, I have no intention to dismiss this case

before pursuing a full discovery production and allowing a

jury to decide the case.

36.     Because USC has not produced important evidence that I

have requested, I intend to supplement this affidavit

should additional evidence become available that

necessitates additional testimony.


I declare under penalty of perjury that the foregoing is

true and correct to the best of my knowledge, information and

belief. Opinions stated herein are made based upon my best

knowledge and understanding of the matter.

Respectfully submitted,


Dated: May 7, 2008              Jeffrey David Isaacs


17

## CERTIFICATE OF SERVICE

I hereby certify that the following document

- DECLARATION OF JEFFREY DAVID ISAACS IN OPPOSITION TO
  SUMMARY JUDGMENT FOR USC OR DISMISSAL

was served upon the represented parties, by CERTIFIED ELECTRONIC
MAIL AS STIPULATED BY THE PARTIES, by e-mail copies thereof to:


Robin D. Dal Soglio
27240 Turnberry Lane, Suite 200
Valencia, California 91355

On this 7th day of May, 2008.


JEFFREY DAVID ISAACS
Plaintiff
3553 West Chester Pike
PMB 177
Newtown Square, PA  19073
Telephone: 215-609-4625

18

**EXHIBIT A**

**Exhibit A**
Plaintiff's Formal Keck First Semester Evaluation [transcribed]
written December 2005 by
Dr Fred Kuyt
Keck Admissions Committee Member and
Keck Clinical Professor,
Staff Surgeon-Physician, Cedars-Sinai and Century City Hospital

USC Keck Student Evaluation of Jeffrey D Isaacs MS1

December, 2005

Jeff is a sensitive, soft-spoken young man who works hard as a
student physician. He thinks logically, has a good fund of
knowledge and embraces constructive comments. His written work
to date is fine and his verbal milestone was very well done and
organized. He is strikingly kind and intelligent and implements
his assets maximally.

[Original Signed by Dr. Fred Kuyt & Dr. Mark Vogel]

20

**EXHIBIT  B**

**Exhibit B**
Plaintiff's Deposition to Ms Donna Budar—Turner
Transcribed short—hand minutes
USC Office of Student Judicial Affairs
February 15, 2006 (USC Exhibit 302)

First year med student. August 8/8/05 orientation camping trip.
Rumors about Amy.
10/7/2005 post mid-terms Las Vegas trip approx 30 students
10/21/2005  mexico trip.
February 27th  2006 hearing re professional behavior SPC
Dean Katsufrakis

Isaacs states DPS Harassment report contains false allegations:
Cover up —  Isaacs was standing next to passenger side not
hanging on to car.
Krishna Ramaswamy was driving, revved engine to intimidate
Isaacs. [Baughman said "don't run him over"]
Krishna Ramaswamy later approached Isaacs and shoved him in the
chest and said "No hard feelings"
Friday after December exams.

Rumor about Amy Baughman had physical relations with someone
first week of orientation [Mr. David Braxton]
Isaacs claims he is "on the verge of a nervous breakdown"
[illegible]
In August Amy Baughman fell asleep on Isaacs' shoulder during a
lecture.
10/7/05 Las Vegas trip: thirty students went to hotel in LV.
Friday in LV Baughman was a bit intoxicated and she told Isaacs
she knew something embarrassing about the person she had a
physical relationship with in August (STD infection?). Isaacs
changed subject because he was a mutual friend.
Baughman asked Isaacs "you're not Christian, are you?"
Spoke 2 hours then she went to her hotel room
There is photo posted on internet of her w half off clothing
She was obviously intoxicated before photo
Next night she could not get into dance club no ID card, so
Isaacs assisted her in with friends.
Isaacs drove Baughman and 2 friends back to hotel  before Isaacs
went back to LA that night.
Women talking about sexual history and how they groom themselves
— sexually provocative.
Baughman asked Isaacs Why are you going back?
Isaacs said not having fun.
Baughman teary eyes, "why don't you stay here with me?"
Isaacs states "its not you, it's me".
Isaacs was tired and drove home.
Baughman looked and acted embarrassed next week at school "are
you going to laugh at me each time you see me for the next four
years?"
Isaacs understood she had a boyfriend at Georgetown medical
school.

11/16 Isaacs asked Baughman to meet because he was very upset
little details built up (general rumors, mixed messages)
Two hour conversation she acted afraid[/concerned]
Said "does it bother you I'm a flirt"
"does it bother you I'm a tease"
Isaacs said "this is your decision but don't do that with me"
She's putting on advances then backing off to humiliate him
Baughman said "I got in here through connections. I'll get my
degree/residency through connections. My father is @ NIH"
She threatened me implicitly
Did you feel threatened?
Yes, according to Isaacs
11/16 Baughman asks Isaacs "So what do you want"
Isaacs replied "You can wave, say hello, but don't invite me to
your apt"
Baughman then replied she'd like to go out to dinner in January,
if he wanted, after exams.
11/16 Baughman text messages Isaacs " are you feeling better?
Goodnight". Isaacs never replied.
11/17 evening Baughman again text messages Isaacs. Isaacs never
replied.
11/17 Isaacs and Baughman exchanges looks [illegible]
11/18 Isaacs told Baughman by library "what are you doing
sending these text messages when I said not to flirt around me"
Baughman started yelling at Isaacs "Stay away from me but do get
better" in a malicious sarcastic tone re his past confiding w
her about pscyh.

Isaacs disputes DPS report January 10 2006 DPS entered MDL, 25
persons in lab. Isaacs' friend called Isaacs that DPS was
looking for him.
Isaacs claims Baughman's reputation is "fixed" and now Isaacs is
being ridiculed.
Baughman created a scene and insulted Isaacs for 30 minutes.
Never to see her again . Car incident.