UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF NEW HAMPSHIRE

\* \* \* \* \* \* \* \* \* \* \* \* \*

J. D. ISAACS,                                    \*

            Plaintiff,    \*

  V.                                             \*   No. 1:12-cv-

DARTMOUTH-HITCHCOCK MEDICAL                      \*     00040-JL

CENTER, et al,                                   \*

           Defendants.   \*

\* \* \* \* \* \* \* \* \* \* \* \* \*


DEPOSITION OF JEFFREY D. ISAACS, M.D.

Deposition taken at the United States District Court, 55 Pleasant Street, Concord, New Hampshire, on Thursday, December 19, 2013, commencing at 9:14 a.m.

1    A.    Yes.

2    Q.    Okay.

3    A.    I was.

4    Q.    And did you observe, that you can recall, whether or not any of the individuals with whom you were with, about six you said, whether or not any of them were drunk, in your view, or intoxicated?

8    A.    It was too long ago to remember that.

9    Q.    Okay.  Let me ask specifically about Mr. Chang.

11   A.    Yeah.

12   Q.    Do you remember what his condition was given his alcohol consumption?

14   A.    I won't speculate.  I would guess he was drunk.

16   Q.    Okay.  Let me move on to another question I just wanted to follow up on.  You told me or you testified that you worked at Merrill Lynch for a while.

20   A.    Right.

21   Q.    Did you ever bring any claims against Merrill Lynch?

23   A.    I think I already exerted a privilege, work

1  product, on attorney/client privilege and on right to
2  privacy.
3     Q.  Good.  My question is did you ever bring any
4  claims against Merrill Lynch?  Are you refusing to
5  answer that question?
6     A.  Did I bring claims against Merrill Lynch?
7  What kind of claims?
8     Q.  Any kind of claims, sir.
9     A.  I think there were claims made.
10 Notwithstanding my objection.
11    Q.  All right. And what were the nature --
12 strike that.  Did you bring those claims?  That's what
13 I'm asking.
14    A.  Well, I had an attorney, but I don't want to
15 go into what he did.  That's the work --
16 attorney/client privilege.
17    Q.  Your conversations with your attorney may be
18 attorney/client privilege.  I'm not asking you about
19 that.  Don't tell me about your conversations with
20 your counsel.
21    A.  Right.
22    Q.  What I'm asking you about are -- is what is
23 the nature of the claims that were brought for you or

1  by you?

2      A.  Well, that would have been his communication.
3  I don't know.  I never sued them in court, if that's
4  what you're asking.

5      Q.  Did you ever see the claims?  Did you ever
6  see in writing what the nature of the claims were?

7      A.  I think I did see them.  I'm not sure how
8  much I studied them at the time, but I did see them.

9      Q.  Tell me what you remember you read or saw.

10     A.  That's -- that's attorney/client privilege.

11     Q.  Sir, you know, I know you're not a lawyer,
12 but I'm telling you right now it's not an
13 attorney/client privilege for me to ask you what the
14 nature of the claims that were asserted by you or on
15 your behalf were.

16     A.  Well, and rights of privacy and work product,
17 I also exert that privilege.

18     Q.  And there is neither a work product nor a
19 privacy here --

20     A.  Merrill Lynch's work product.

21     Q.  But you don't get the right to assert Merrill
22 Lynch's work product.

23     A.  I don't know that.  I'm not an attorney.

1    Q.  Good.

2    A.  But I am actually pro se, and I believe I can

3  object to work product, my work product with them.

4    Q.  Sir, let me get this straight.  You're

5  refusing to answer the question, which is pretty

6  simple and pretty direct.  It is simply the following:

7  Tell me what you know about the claims that were

8  asserted against Merrill Lynch in connection -- on

9  your behalf or by you.  That's it.

10   A.  Attorney Kaplan, I've listed three

11 objections, not being a lawyer, I believe at least one

12 of them are valid, if not all three.  And separately

13 from that I also -- while I understand normally things

14 are relevant in deposition, I think if you start

15 asking about, you know, the color of the socks I wore

16 as a baby, you know, there's limits to it.  So I think

17 bringing up something from 12 years ago that is under

18 the three privileges I stated, I'm not going to

19 proceed with questions there.  I might reconsider at

20 the end of this deposition if you want to bring it up

21 again just for continuity.  But at this point I

22 just -- I don't think I'm allowed to answer that.  I'm

23 not sure if I'm allowed to.  And I'm not sure it's

1   really proper to be questioned about it.

2       Q.  Sir, you refuse to answer at your own peril.
3   We'll deal with it.

4       A.  I understand that.

5       Q.  Let's move on.  We're back in Arizona.

6           Andy, please.

7           (Isaacs Exhibit 7 was

8           marked for identification.)

9       Q.  BY MR. KAPLAN:  We've marked Exhibit 7, it's
10  an October 6, 2010 letter written -- excuse me,
11  written by the University of Arizona.  Have you ever
12  seen this?  It was sent in response to claims you made
13  against them.  Take a look at it and I'll ask you some
14  questions --

15      A.  Yeah, I'm not sure if I actually read this
16  document.  I may have briefly seen it.

17      Q.  Okay.  Do you know if it was sent to you for
18  you to see?

19      A.  I don't know.  It looks like internal ACGME
20  review documents.  I don't think I would have seen
21  them.

22      Q.  I want to ask you about this letter.  And if
23  you look at it, it's written -- excuse me, signed by

1   narrow down your question beyond that answer.

2       Q.  My question was which physicians are
3   currently treating you, currently treating you for
4   anything?  Which physicians?  And I think you've given
5   me a list.

6       A.  I've given you the main ones, but you know
7   what?  There's probably a lot more, you know, I think.

8       Q.  In my interrogatory I asked you to sign
9   authorizations which you have not done.

10      A.  That's right.

11      Q.  Despite the court order that you do so.

12      A.  That's -- I disagree with that.

13      Q.  Well, you haven't signed the authorizations,
14  correct?

15      A.  I have notified you that the authorizations
16  are in violation of the court's protective order.  You
17  asked me to waive my HIPAA rights and allow you to
18  disclose to third parties, my medical knowledge to
19  insurance companies, to institutions, to other third
20  parties.  That is not in the court -- in fact, that's
21  against the court order.  I also told you that if you
22  want to rewrite those -- can I finish my answer?

23      Q.  Yeah.  Yeah.

1    A.  If you want to rewrite those waivers, I'd
2   consider signing them even after these deadlines to
3   not include those breaches of HIPAA.  I think I also
4   offered to write up those waivers myself, ones that
5   would -- you know, I'd feel comfortable with that were
6   in the spirit of the protective order.  And I think I
7   also told you I wouldn't oppose subpoenas, even though
8   I think they are objectionable.  For instance, that
9   you could subpoena UCLA and California, even though
10  California has strict psychotherapy notes that I am
11  almost positive would not be produced by any judge in
12  California.  I think I even said I would waive that if
13  you wanted to subpoena them.  So I think I gave you
14  three options to get my medical records even though I
15  don't think you have a right to them.
16       Q.  You haven't signed the authorizations, right?
17       A.  I believe the authorizations are not in the
18  spirit of the protective order and they would violate
19  my HIPAA rights.
20       Q.  Okay.  Is there something complicated about
21  my question you don't understand?  My question was
22  have you signed the authorizations?
23       A.  Right.  I said I did not because I felt they

Page 276

1   were in violation of the protective order. I gave you
2   three alternatives to get the records you want.
3       Q. When we pursue the court's direction to have
4   you sign the authorizations, frankly, it may be
5   necessary to come back and ask you questions about
6   that, but I'll wait till that happens later.
7       Will you mark this. I think it's my last
8   exhibit.
9       (Isaacs Exhibit 29 was
10      marked for identification.)
11      Q. BY MR. KAPLAN: Do you recognize what I've
12  placed in front of you, sir?
13      A. Yeah, I do.
14      Q. What is it?
15      A. It was a very rough estimate of damages --
16  damage scenarios in this litigation.
17      Q. And who put this damage scenario together?
18      A. I did in conjunction with my three attorneys
19  that I previously retained.
20      Q. When was this put together?
21      A. There's a date on it. It was when I was
22  e-mailing -- it was when it was e-mailed to you.
23      Q. Which physician -- excuse me, which attorneys

1  A. I wasn't -- I didn't have a salary.

2  Q. Let's look at the --

3  A. So I don't know how you fire someone who is
4  not salary.

5  Q. You wrote to yourself that you were fired,
6  correct?

7  A. I did. And I just want to clarify that fired
8  was just a brief word that he asked me to leave. And
9  it was --

10 Q. Fine. It says Merrill, would that be Merrill
11 Lynch, next line?

12 A. Yeah.

13 Q. Made fun of, quote, French workweek, close
14 quote. Concentration difficulties. What is that all
15 about?

16 A. That's the objection I stated earlier. It's
17 been, you know, a resolved issue. I'm just -- you
18 know.

19 Q. What is that all about, sir, about your
20 connection with Merrill and your departure there?

21 A. Well, Merrill made fun of French workweek, so
22 that's a true -- that's a true statement. Again, I
23 did settle. I'm going to give limited answers there.

Page 267

1   And they -- there was discussion of concentration

2   difficulties that I had there.

3       Q.  And ultimately, as I understand it, you filed

4   a claim against Merrill for the -- whatever basis was

5   that you separated?

6       A.  I filed a claim for whatever basis ...

7       Q.  You filed a claim against Merrill that thus

8   far you've been refusing to inform me about, right?

9       A.  Right.

10      Q.  And I'm going to just tell you right now that

11  we'll come back and get those questions answered if

12  the court let's us, but your position --

13      A.  That will be after Dr. Torrey's questions he

14  didn't even know about.  So that'll be a long way from

15  that.

16      Q.  So your position is that you don't need to

17  tell me about how you separated from Merrill Lynch?

18      A.  I mean, it's actually, to my advantage here

19  to disclose what happened in Arizona -- or Merrill,

20  but I signed an agreement, I won, and I believe it's

21  privileged.  Like I said, they raised the possibility

22  of concentration difficulties there.  Which for

23  someone with undiagnosed frontal brain impairment