UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF NEW HAMPSHIRE


\* \* \* \* \* \* \* \* \* \* \* \* \*

J. D. ISAACS,                              \*

                  Plaintiff,   \*

   V.                                      \*   No. 1:12-cv-

DARTMOUTH-HITCHCOCK MEDICAL          \*      00040-JL

CENTER, et al,                          \*

             Defendants.   \*

\* \* \* \* \* \* \* \* \* \* \* \* \*


DEPOSITION OF JEFFREY D. ISAACS, M.D.

Deposition taken at the United States District

Court, 55 Pleasant Street, Concord, New Hampshire,

on Thursday,December 19, 2013, commencing at

9:14 a.m.

1                          I N D E X

2

3  WITNESS:   Jeffrey D. Isaacs, M.D.

4

5

6  EXAMINATION:                              Page

7          By Mr. Kaplan                      6

8          By Ms. Peahl                     281

9          By Mr. Kaplan                    329

10         By Mr. Isaacs                    336

11         By Mr. Kaplan                    345

12         By Mr. Isaacs                    346

13         By Mr. Kaplan                    348

14

15

16  EXHIBITS FOR IDENTIFICATION:

17  Isaacs        Description              Page

18     1      11/4/13 order                 12

19     2      USC case docket summary       48

20     3      USC case defendant motion to

21            enforce settlement            49

22     4      USC case plaintiff opposition

23            to enforce settlement         50

5     USC case order re motion to
      enforce settlement                  51

6     9/1/09 ERAS application             77

7     10/6/10 Dr. Waer letter to
      Ms. Miller                          93

8     7/21/10 Dr. Waer letter to
      Dr. Isaacs                          129

9     8/12/10 meeting documentation 133

10    9/1/10 ERAS application             135

11    Arizona permit registration    140

12    NH application for training
      license                             155

13    Supplement to Exhibit 12        163

14    New House Staff Appointment
      Form                                175

15    GME Confidential Data Form      183

16    5/20/11 e-mail string           185

17    E. Cartier form to P. Meuiner 190

18    3/28/11 Dr. Isaacs documents
      to GME                              194

19    4/15/11 e-mail string           203

20    Resident Agreement of
      Appointment                         210

| 21 | E-mail package | 214 |
| 22 | Dr. Isaacs DHMC QA file | 235 |
| 23 | 12/16/10 Dr. Isaacs e-mail | 246 |
| 24 | Dr. Isaacs e-mail string to | |
|    | B. Boswell | 250 |
| 25 | Dr. Isaacs text string to | |
|    | HD Behrang | 255 |
| 26 | Dr. Isaacs text messages | 262 |
| 27 | Dr. Isaacs notes re | |
|    | concussion | 264 |
| 28 | 1/15/12 Dr. Isaacs notice | 268 |
| 29 | Spreadsheet re losses | 276 |
| 30 | 9/26/11 and 9/21/11 e-mails | 305 |
| 31 | Interrogatories | 321 |
| 32 | 1/25/02 G. Goldman letter | 326 |
| 33 | 4/7/06 Dr. Sandler letter to | |
|    | Ms. Marino with attachments | 326 |
| 34 | Dr. Isaac depo notes and | |
|    | internet search printouts | 351 |

(Original exhibits appended to transcript and copies scanned to counsel.)

```
1   APPEARANCES:

2   For the Plaintiff:    Pro Se

3   For the Hitchcock defendants:
                            SULLOWAY & HOLLIS, PLLC
4                           By: Edward M. Kaplan, Esq.
                                  - and -
5                           Christopher J. Pyles, Esq.
                            9 Capitol Street
6                           P.O. Box 1256
                            Concord, NH 03302-1256
7                           Ekaplan@sulloway.com

8   For the College defendants:
                            WADLEIGH, STARR & PETERS, PLLC
9                           By:  Kathleen C. Peahl, Esq.
                                  - and -
10                          Pierre A. Chabot, Esq.
                            95 Market Street
11                          Manchester, NH 03101
                            kpeahl@wadleighlaw.com
12
    Also present:         Alison Dick
13                        Kevin O'Leary, Esq.
                          David Foster
14
    Court Reporter:       Andrew E. Vangjel, NH LCR 23
15                        andy@braganreporting.com

16                          STIPULATIONS

17          It is agreed that the deposition shall be

18   taken in the first instance in stenotype and when

19   transcribed may be used for all purposes for which

20   depositions are competent under the Federal Rules of

21   Civil Procedure.

22          Notice, filing, caption and all other

23   formalities are waived.  All objections will be made
```

1   at the time of deposition and ruled on at trial.

2          It is further agreed that if the deposition

3   is not signed within thirty (30) days after submission

4   to counsel, the signature of the deponent is waived.

5

6                    JEFFREY D. ISAACS, M.D.

7              having been duly sworn by Mr. Kaplan,

8              was deposed and testified as follows:

9                       EXAMINATION

10  BY MR. KAPLAN:

11     Q.   So before we begin, Dr. Isaacs is not

12  prepared to waive objections during the course of this

13  deposition so any objections anyone wishes to take on

14  any basis will need to be made during the course of

15  the deposition.  Is that what you want, Dr. Isaacs?

16     **A.   Yes, that's correct.**

17     Q.   Okay.  Dr. Isaacs, why don't you tell me your

18  full name.

19     **A.   Before doing so, I just would like everyone**

20  **in the room to identify themselves for the record.  So**

21  **I'm present, I'm the plaintiff, it's captioned Dr.**

22  **J.D. Isaacs.**

23              MR. KAPLAN:  Sure.  Alison is -- Alison Dick

1   is in the room, she's sitting to your right.  She's a

2   representative of the Mary Hitchcock Memorial

3   Hospital, Dartmouth-Hitchcock Medical Center.

4           MR. O'LEARY:  I'm Kevin O'Leary, associate

5   general counsel, Dartmouth College.

6           MR. FOSTER:  I'm Dave Foster, I'm the

7   associate director of risk management at Dartmouth

8   College.

9           MR. CHABOT:  Pierre Chabot from Wadleigh,

10  Starr & Peters here on behalf of the trustees of

11  Dartmouth College.

12          MS. PEAHL:  Kathleen Peahl from Wadleigh,

13  Starr & Peters on behalf of the trustees of Dartmouth

14  College and Christine Finn.

15          MR. PYLES:  Chris Pyles from Sulloway for the

16  Hitchcock, the defendants.

17     **A.    Also, there were I think two objections I**

18  **have to state before your questions begin.  One, I**

19  **object to the duration of this in terms of the**

20  **plaintiff's capacity.  So I'll just leave that as it**

21  **is.**

22          **And I also object, I thought I'd noticed a**

23  **video request for video deposition.  I notice there's**

1    **no video.**

2         Q.   There is no video here.  It was not my

3    responsibility to arrange for a video.  I did not do

4    so.

5         **A.    Okay.**

6         Q.   And just so you're aware, it is not

7    my -- my intent, assuming things go normally, would be

8    that you would be present at trial and your video

9    deposition would not be necessary.  So that's why.

10        **A.    Okay.**

11        Q.   So having said that, why don't you tell us

12   what your name is.

13        **A.    Jeffrey David Isaacs is the name on my birth**

14   **certificate.**

15        Q.   Okay.  Have you ever used or been known by

16   any other names?

17        **A.    I'm not sure what you mean by that question,**

18   **but legally I've never had an alias that I know of.**

19   **Never had a name change that I know of.**

20        Q.   Okay.  What's your current residential

21   address?

22        **A.    I don't know if I really have a residence**

23   **right now.  So I guess that's my answer to the**

1    **question.  I mean, I'm in the Holiday Inn in Concord**

2    **tonight.**

3        Q.   Do you have a place where you have a home or

4    that someplace you go back to when you're done in

5    Concord?

6        **A.    Not -- not specifically.**

7        Q.    All right.  The last time I had an address on

8    you it was somewhere in Pennsylvania.  And I think --

9    I don't remember exactly what city.  Do you maintain

10   any sort of apartment there?

11       **A.    I guess I consider myself a Pennsylvania**

12   **resident.  I've never had an intent to leave**

13   **Pennsylvania at this point in time.**

14       Q.    Are you currently or is anyone currently

15   paying rent on your behalf to any entity?

16       **A.    Not rent per se, no.**

17       Q.    Is anybody paying any sort of financial --

18   any sort of dollars to any entity to maintain a

19   residence that you can go to?

20       **A.    I've stayed at my parents' different**

21   **locations.  They're divorced, so between them there's**

22   **I think three or four different locations that I have**

23   **been temporarily residing at since Dartmouth**

1    terminated me.

2        Q.   What are the addresses of those locations?

3        A.   Oh.   I think my parents' addresses are

4    privileged.   But I can tell you Newtown Square,

5    Pennsylvania, is my official mailing address.   I've

6    lived in Margate City, New Jersey, in West Palm Beach,

7    Florida, in Berwyn, Pennsylvania, in Fort Washington,

8    Pennsylvania.

9        Q.   And if one were to mail a letter to you and

10   expect you to receive it, which address would you use?

11       A.   3553 West Chester Pike, PMB 177, and that's

12   Newtown Square, PA, 19073.

13       Q.   Okay.   And that's a -- is that a condominium?

14       A.   No.   That's a UPS store.

15       Q.   Okay.   And that's the mailing address that

16   you use?

17       A.   That's my most permanent address for the last

18   eight years.

19       Q.   Okay.   Are you married, sir?

20       A.   Yes, I am.

21       Q.   What is your wife's name?

22       A.   I guess notwithstanding objection to

23   relevance, Ianina Petrea.

1       Q.   Okay.  And is -- how do you spell that?

2       **A.   I-a-n-i-n-a is her first name.  P-e-t-r-e-a**

3    **is her last name.**

4       Q.   Okay.  And does Ms. Petrea reside with you

5    anyplace?

6       **A.   She's in Margate City, New Jersey, at the**

7    **address of my parents I mentioned.  Or the residence**

8    **of my parents right now.**

9       Q.   When were you married?

10      **A.   March 4th, 2011.**

11      Q.   Okay.  Is your father William Isaacs?

12      **A.   Yes.**

13      Q.   And your mother Lynn Isaacs-Salvo?

14      **A.   Yeah.  I don't know if her middle name is**

15   **Isaacs.  I think it is.**

16      Q.   Okay.  Lynn Salvo?

17      **A.   Yeah.**

18      Q.   And what is your mother's husband's name?

19      **A.   Anthony C. Salvo.**

20      Q.   Dr. Isaacs, are you currently on any

21   medication that you believe affects your ability to

22   answer questions truthfully?

23      **A.   I'm not currently on any medications nor have**

1     **I really been on any medication consistently in my**

2     **life other than, like, six weeks or 12 weeks in 2006.**

3          Q.   In answer to my question, you're not --

4          **A.   Well, no, this isn't 2006, so no.**

5          Q.   You took no medications in the last two days

6     that would impact your ability to answer questions

7     truthfully?

8          **A.   No medications, no chemicals, no supplements,**

9     **no -- nothing.**

10         Q.   Okay.  And similarly, you took no medications

11    that would impact your ability to understand questions

12    that are asked of you and to decide whether or not you

13    understand them; is that correct, sir?

14         **A.   I do have to object to my medical history**

15    **being brought in.  That's not really relevant, but I**

16    **will answer the question that no, I'm not on any**

17    **medications.  So the answer is no.**

18              MR. KAPLAN:  Okay.  Andy, would you mark

19    this, please.

20              (Isaacs Exhibit 1 was

21              marked for identification.)

22         Q.   BY MR. KAPLAN:  Dr. Isaacs, why don't you

23    take a look at that.  It's the court order that was

1   issued after the hearing we participated in.

2        A.    Okay.

3        Q.    Just go through it and tell me if you can

4   agree that that is the court order and that you're

5   familiar with it.

6        A.    Yeah, it appears to be based on my memory.

7        Q.    Okay.  The -- if you take this and look at it

8   for a moment, I just want to make sure we're in

9   agreement on something.  On page 3, paragraph 4, do

10  you see that the order sets forth the terms under

11  which this deposition can be conducted?

12       A.    (Peruses document.)  Yes.

13       Q.    And those terms are, to summarize, that we're

14  permitted to depose you for six hours, and certainly

15  if you would like a break in between, you're entitled

16  to a break between those three-hour segments, correct?

17       A.    Correct.  Just to clarify, I'm still

18  maintaining an objection on medical grounds that I

19  don't believe the magistrate weighed into this

20  hearing.  So I understand that you're following her

21  rules, but I still have the objection generally.

22       Q.    That's fine.  Well, as you know, as we go

23  through this process, if you need a break, if you need

```
 1   to catch your breath, if you need to take a walk for

 2   five or ten minutes, just let us know, we'll stop the

 3   process and you can do what you need to do, okay?

 4       A.   Okay.

 5       Q.   Are you currently employed, sir?

 6       A.   No, I don't -- no.

 7       Q.   Do you do anything at the current time to

 8   earn income?

 9       A.   I'm going to have to object to that as a

10   right to privacy and a work product objection.  But

11   that answered, I've done what I consider hobbyist work

12   on the Internet for maybe an hour a day on average for

13   the last year or two.

14       Q.   Okay.  As a result of the work you do on the

15   Internet, do you receive any payments from any source

16   whatsoever?

17       A.   Not regularly, but I have received some

18   payments from -- just in the last few months from

19   Google AdMob.

20       Q.   Google, I'm sorry?

21       A.   AdMob, A-d-M-o-b.

22       Q.   And from whom do you receive income or

23   dollars, what's the source of the money that is sent
```

1    to you?

2        A.    From Google.

3        Q.    Okay.  And they come on checks that say

4    Google?

5        A.    I think so.

6        Q.    Okay.  And how long have you been earning any

7    sort of income in this process?

8        A.    Several months, maybe.

9        Q.    Okay.  And what's the amount of income you've

10   earned?

11       A.    Last month it was about $600.  That was

12   about -- about the high from Google AdMob.

13       Q.    Okay.  In the last year, let's see, we're

14   towards the end of 2013, so during the year of 2013

15   what's the total income you earned from any source

16   whatsoever?

17       A.    I don't have that information here.

18       Q.    Give me a ballpark.

19       A.    $600 a month.  Maybe -- I really don't know.

20   But I would say about $5,000.

21       Q.    Okay.  Other than that $5,000, is there any

22   other source of income that is being provided to you

23   by anyone?

1       **A.    My family.**

2       Q.    Okay.

3       **A.    Yeah.**

4       Q.    So is it your family that is providing you

5  with the income you need to live day to day?

6       **A.    Well, no.   The -- oh, that's right.   An**

7  **insurance company as well, so my family and the**

8  **insurance company.**

9       Q.    You're receiving disability payments,

10  correct?

11      **A.    Yeah, yeah.**

12      Q.    From whom are you receiving those payments?

13      **A.    I think it's The Hartford.   Or -- yeah, it's**

14  **The Hartford.**

15      Q.    And what do they pay you?

16      **A.    About $3,000 a month.**

17      Q.    And do they mail those checks, do they mail

18  checks to you, or do you receive that money in some

19  other form?

20      **A.    I think it's an ACH direct deposit.**

21      Q.    So you receive roughly $3,000 a month direct

22  deposit to an account that you maintain?

23      **A.    Yeah.**

1        Q.   And in addition to that, over the course

2   of --

3        **A.   But I actually -- I have to supplement, I**

4   **also object to insurance relationship privilege.   I'm**

5   **not sure exactly what you call that in answering that**

6   **question.**

7        Q.   In addition to that, you've earned roughly

8   $5,000 in the last year?

9        **A.   Not including family loans or assistance,**

10  **yes.**

11       Q.   Okay.  You told me about 600 of that from

12  Google.

13       **A.   Right.**

14       Q.   Where does the other 4,000 or so come from?

15       **A.   No, that was 600 a month from Google.**

16       Q.   Oh, okay.

17       **A.   Yeah.**

18       Q.   And that's the number, roughly $5,000 number?

19       **A.   But I really don't have the number in front**

20  **of me.**

21       Q.   Okay.  Do you have documents if we were to

22  ask for them that would demonstrate these income

23  amounts?

1      A.   Well, yeah, I've sent them to The Hartford so

2  I have them.

3      Q.   Okay.  Dr. Isaacs, I want to talk to you just

4  a little bit about your educational background for a

5  moment.  If I understand correctly, you attended

6  Germantown Academy; is that correct?

7      A.   Yeah.  That's right.  And I do have to object

8  to educational records in general being privileged,

9  but yes.

10     Q.   Okay.  So you attended Germantown Academy and

11  graduated in what year?

12     A.   '95.

13     Q.   You went from Germantown Academy -- from

14  Germantown Academy, did you go to any other

15  educational institution?

16     A.   Before college?

17     Q.   Whatever your next institution was.

18     A.   Well, after Germantown Academy, I went to the

19  University of Pennsylvania.

20     Q.   Okay.  And did you start there in roughly

21  September '95?

22     A.   Yeah.

23     Q.   Okay.  Did you stay at the University -- how

1    long did you stay at the University of Pennsylvania?

2         A.    About a year, freshman year.

3         Q.    Okay.  Why did you leave the University of

4    Pennsylvania?

5         A.    I think -- no idea.  Sorry.  It's hard not

6    to -- not to I guess belittle that question, but I

7    applied to transfer to Dartmouth and Harvard.  And I

8    was in the top of my class at Penn, and I thought I

9    needed a challenge of a better ranking institution I

10   think I was thinking at the time.  At the time

11   Dartmouth was ranked 4th or 6th in U.S. News and Penn

12   was ranked 13th.  I think I was influenced by ranking,

13   which is part of why I left earlier.  No idea why I

14   really weighed that.  Also I liked the idea of going

15   to a nonurban campus, so I think that's one of the

16   reasons I went to Dartmouth.

17        Q.    So you transferred to Dartmouth?

18        A.    Yeah.  And the third reason would be Penn has

19   different engineering schools, and I had an interest

20   in computer science and premed.  I would have had to

21   be an engineer and do premed on top of that, which I

22   thought added complexity; whereas Dartmouth has --

23   although it does have an engineering school, the

1    **computer science program is within the arts -- the**

2    **bachelor of arts program.  So I think I actually may**

3    **have been misinformed on that during transfer, but I**

4    **thought it would resolve some scheduling and**

5    **curriculum matters by transferring.**

6        Q.    You started at Dartmouth when?

7        **A.    September '96.**

8        Q.    And when you started at Dartmouth, did you

9    have a declared major?

10       **A.    No, I did not that I know of.  Unless I wrote**

11   **computer science.**

12       Q.    Did you have -- do you remember your

13   roommates when you started at Dartmouth?

14       **A.    Yeah, sure.  We were in Richardson 202.  And**

15   **Scott Berg and Matthew Cirulnick.**

16       Q.    Did you have any problems with your roommates

17   when you started at Dartmouth?

18       **A.    With a roommate.  Matthew Cirulnick, I think.**

19   **We had multiple meetings with Dean Pelton.**

20       Q.    What were the nature of the problems you were

21   having?

22       **A.    You know, it's hard to remember them.  I**

23   **mean, I certainly remember some of the -- some of the**

1    conversations with the Deans.  It's really hard to

2    remember them.  But I remember at one point someone

3    had drug paraphernalia that they threw across the room

4    and got scattered material through the room and I

5    think an RA, a room advisor, came in and there was

6    noise, and I think that's what started the meetings.

7    And then it -- as it evolved, it turned out, you know,

8    they made -- I think they made some immature comments,

9    Matt Cirulnick and his friend.

10        Q.    Immature comments to whom?

11        A.    To me.

12        Q.    Concerning what?

13        A.    I don't -- I mean, this is, like, 15 years

14   ago.

15        Q.    If you don't remember, just tell me you don't

16   remember.

17        A.    I mean, I don't -- I don't really remember.

18   I think you produced one or -- or Dartmouth has

19   produced some of the documents, so for the most part I

20   think they're accurate.

21        Q.    Your answer leads me to ask you a question I

22   forgot, which was what, if anything, have you looked

23   at specifically to prepare for today's deposition?

1      **A.    Probably -- well, I guess I have to object to**
2  **form there.**

3      Q.    Fine.    Now why don't you answer the question.

4      **A.    Do you mean by yesterday I didn't look at**
5  **anything.    I drove up yesterday.    I was in the car.**
6  **Other than I printed out a few privileged lists.**

7      Q.    Did you review any documents or any materials
8  that are in any way connected to this litigation in
9  order to prepare for this deposition?

10     **A.    I didn't specifically prepare for this**
11 **deposition.    Other than these two pages from the first**
12 **page of Google.**

13     Q.    During the tenure, your tenure at Dartmouth,
14 did you ever file any claims or lawsuits against
15 Dartmouth or any of its related entities?

16     **A.    During my enrollment there as an undergrad?**

17     Q.    Yes.

18     **A.    I don't think so.**

19     Q.    How about after?    Excluding this case.

20     **A.    I don't think so.**

21     Q.    Okay.    You've alleged that at some point
22 during your Dartmouth experience you had a head
23 injury.

1        A.    Yeah, that's right.

2        Q.    First of all, tell me what year that head

3    injury occurred.

4        A.    '97 or '98.  I think it was November '97 if

5    my memory is correct.

6        Q.    All right.  So that would have been your

7    second year at Dartmouth, correct?

8        A.    It would have been my junior year but my

9    second year at Dartmouth.

10       Q.    Correct.  Junior year in college, second year

11   at Dartmouth?

12       A.    Right.

13       Q.    And it was November '97?

14       A.    That's right.  Or October.  End of October.

15   It was around Halloween.

16       Q.    That's fine.  Do you remember who caused the

17   head injury to you?

18       A.    Sure.  It was another person -- another class

19   of 1999 at Dartmouth named Christopher Chang.

20       Q.    Christopher, I'm sorry?

21       A.    Chang, C-h-a-n-g.

22       Q.    Okay.  What were the circumstances

23   surrounding the injury?

1      A.    I have to object to form there.  I don't know

2   what you mean circumstances around.

3      Q.    Okay.  You don't understand the question?

4      A.    I could go -- I could answer that in a

5   direction, but I really don't know if that's what

6   you're asking for.

7      Q.    The injury -- what time of day did the injury

8   occur?

9      A.    Oh, pretty late at night.  We were out -- we

10  were out in Tampa in a place called Ybor City.

11     Q.    Tampa, Florida?

12     A.    Tampa, Florida.  There was a Dartmouth-

13  arranged internship in Tampa, Florida, that about six

14  people in my class went to for two or three months.  A

15  joint.  Dartmouth has the D plan, so I think we all

16  had an off semester that fall.  So this was a somewhat

17  Dartmouth-endorsed internship.

18     Q.    Okay.

19     A.    In Tampa.

20     Q.    And was Mr. Chang one of the people on that

21  internship program?

22     A.    Yes, he was.

23     Q.    And can you tell me what, if you know, what

 1    gave rise to the circumstances concerning your injury?

 2         A.    Actually, my -- my psychiatrist asked that

 3    question last week.  I think he had asked it before,

 4    but he asked it again.  And what I said to him, which

 5    I'll say now, I can't imagine what would have led to

 6    that in terms of someone giving what could be a lethal

 7    punch.  I had never had a history of violence in my

 8    life.  Whereas I understand Mr. Chang had -- I was

 9    told he had anger management issues and a known

10    history of violence.  So I can't -- I can't even

11    speculate what would cause someone to throw a

12    potentially lethal punch.

13         Q.    So the circumstance surrounding your injury

14    was that you were punched by Mr. Chang; is that

15    correct?

16         A.    If that's what you meant by -- yes.

17         Q.    And do you -- at the time or immediately

18    before you were punched by Mr. Chang, what was going

19    on, if anything, between the two of you?

20         A.    We had been out with a group of friends in

21    Ybor City, and I think they left prematurely.  That's

22    how I saw it.  Again, I don't remember details of

23    that.  But I think that -- I think I returned home

 1   **alone, and I asked him why he left without me in Ybor**

 2   **City.  And I suspect, you know, while I may not have**

 3   **been happy, again, I'm not going to speculate why he**

 4   **took maybe my unhappiness about him leaving me alone**

 5   **to throw a potentially lethal punch.  So that's my**

 6   **speculation.  I don't really want to speculate, but**

 7   **that's the best recollection I have of what happened**

 8   **or what maybe -- I don't want to use the word prompted**

 9   **but maybe what precluded the assault.**

10        Q.   Okay.  Dr. Isaacs, I'm just trying to find

11   out what happened.  That's why I'm asking these

12   questions.

13        **A.   Yeah.**

14        Q.   So let me make sure I understand.

15        **A.   Sure.**

16        Q.   If I understand you correctly, a group of

17   people including yourself were out together someplace.

18        **A.   Right.  Ybor City.**

19        Q.   In Ybor City, Florida, correct?

20        **A.   Yes.**

21        Q.   Some of those people left and apparently you

22   did not; is that correct?

23        **A.   That's correct.**

1     Q.   Left wherever you were and you did not?

2     **A.   Yes.**

3     Q.   Among the people who left was Mr. Chang?

4     **A.   Yes.**

5     Q.   Were you left alone or were others staying

6  with you?

7     **A.   I think I was left alone, right.**

8     Q.   And Mr. Chang and the others left.

9     **A.   Right.**

10     Q.   You then returned to wherever it was that you

11  were residing?

12     **A.   Right.  Which was next door to Mr. Chang.**

13     Q.   Okay.  And when you got back to that

14  residence you saw Mr. Chang in some way?

15     **A.   Yeah.  Actually, I think I remember, but I'm**

16  **not sure, I think a bunch of people were kind of out**

17  **and maybe still playing games there.  I think I**

18  **rejoined the group.  But I really don't remember it.**

19     Q.   And at some point you apparently said

20  something to Mr. Chang?

21     **A.   No, I don't know that I did.  I'm just trying**

22  **to speculate.  I mean, something, not to excuse it,**

23  **but something probably prompted this assault.  So**

1    **I'm -- I'm thinking, but I don't know, I don't have**

2    **any memory, that I was upset that they left me alone**

3    **there.**

4        Q.   And during this issue or during that time Mr.

5    Chang apparently struck you?

6        **A.   Oh, he did -- as best as I can recollect he**

7    **struck me, yes.**

8        Q.   All right.  And where did he strike you?

9        **A.   Right here.  (Indicates.)**

10       Q.   And you're pointing to your right temple?

11       **A.   Yeah, right temple.  Upper ear through the**

12   **right temple.**

13       Q.   How many times did he strike you?

14       **A.   One very hard.**

15       Q.   Okay.  Were you -- as a result -- as a

16   consequence of that, were you knocked unconscious?

17       **A.   I don't know.  Unconsciousness, as you may or**

18   **may not know, you can define Glasgow Coma Scale,**

19   **there's different levels of consciousness.**

20       Q.   Dr. Isaacs, define it any way you want.  Just

21   tell me whether or not in your view you were conscious

22   or unconscious.

23       **A.   I'm somebody who wanted to be a brain**

1    surgeon, so defining consciousness is not a trivial

2    matter.  But let me try to answer your question with

3    as much detail as possible, assuming I know what

4    you're asking.  I do remember being struck

5    immediately.  I do remember my first thought upon

6    being struck was surprise but not -- surprise is the

7    wrong kind of tone.  Almost shock that someone who was

8    basically a colleague, it was a thought why did you

9    hit me so hard to almost kill me?  That's the best way

10   I could try to describe it.  But it was really just

11   this shock of betrayal.  Like someone just took a --

12   you know, an insult or assaults you.  And that's the

13   last thing I remember, actually.  Well, I do remember

14   a sensation that was very odd.  So this odd sensation

15   which may have then prompted this thought why did you,

16   Mr. Chang, why did you hit me like that?  And that's

17   the last thing I remember until being in a phone

18   booth, a security phone booth in this residence we

19   lived in trying to call 9-1-1.

20        Q.   Okay.

21        A.   So I have no memory between that thought and

22   being in that phone booth.  And then I was home where

23   I remember seeing the odd visual halos.  So I don't

1    know the time frame in those three things.  It could

2    be two minutes, it could be two hours.

3         Q.    That's fine.  Thank you.

4         A.    So to answer your question consciousness,

5    again, I'm not an expert in things like Glasgow Coma

6    Scale.  I would guess I had reduced consciousness.

7    Whether I was unconscious or not by the typical term,

8    I don't know.

9         Q.    Were you knocked to the ground?

10        A.    Again, I don't have any recollection of that.

11   I would suspect I was.

12        Q.    Okay.  So if I, again, understand what you

13   said, you met Mr. Chang, something provoked him, he

14   hit you in the head on the right temple, that area,

15   you next -- your next memory is being in a phone booth

16   in the area where you were struck, in the same general

17   residential area, correct?

18        A.    That's right.  And I was told that I was down

19   by sprinklers, you know in Florida they have

20   sprinklers in Tampa, for some time.  I don't know if

21   that's true or not.  Whether it would have been before

22   the phone booth, I don't know.

23        Q.    Did you call 9-1-1?

1        A.    I think I attempted.  I do have these

2   memories of trying to call 9-1-1 from various

3   locations.  I think I even had trouble putting through

4   a call to 9-1-1.  To answer your question, I don't

5   know that I actually transmitted a phone call to

6   9-1-1.

7        Q.    Did you end up receiving any medical

8   treatment that night -- excuse me, did this happen in

9   the evening?

10        A.    It actually happened early morning.

11        Q.    Okay.

12        A.    I believe that day I did -- it was after --

13        Q.    Let me ask the question more clearly.  Did

14   any emergency medical people come to the residential

15   area where you were to provide you with any care?

16        A.    No one notified them, no.

17        Q.    So the answer is you did not receive any

18   emergency care that -- when the incident occurred?

19        A.    I believe I received emergency care about 12

20   hours later.

21        Q.    Okay.  So at some point in the next day did

22   you seek some medical care?

23        A.    Yeah, I think I woke up and felt something

1   was not right and then sought emergency care.

2       Q.    Where did you -- where -- and how did you

3   seek that care?

4       A.    I don't remember.  It was in an emergency

5   room.

6       Q.    Did you drive to the emergency room?

7       A.    I don't know if I drove or if my friend drove

8   me.  I don't know.

9       Q.    But you were treated in an emergency room?

10      A.    I don't know if you'd call it treat.  I think

11  that initial doctor didn't do anything other than

12  examine my pupils.

13      Q.    You went to an emergency room?

14      A.    Yeah.

15      Q.    Do you remember what emergency room you went

16  to?

17      A.    I don't remember the name of the hospital

18  there.  I really don't.

19      Q.    But was it a hospital in the same city in

20  which you were residing?

21      A.    Yeah, it would have been one of the main

22  hospitals.  I seem to remember it had a Catholic name

23  like saint, saint something.

1     Q.   All right.  Were you admitted to the

2   hospital?

3     **A.   No.  No.**

4     Q.   Do you recall any diagnosis or comments by

5   the physician concerning what he or she thought had

6   occurred or what the consequences were?

7     **A.   Well, later physicians, yes.**

8     Q.   How about the emergency room doc?

9     **A.   I mean, he was trying to assess, you know,**

10  **whether there was something, you know, life-**

11  **threatening emergency he could do something about.  So**

12  **I don't think he made any assessment as to that.**

13    Q.   Did you make any claims of any sort against

14  Mr. Chang?

15    **A.   No.  I mean, verbally I probably said some**

16  **things about him that he assaulted me.**

17    Q.   Okay.  But did you make any formal claims

18  to -- first of all to any court system?

19    **A.   No.**

20    Q.   Did you report the incident to anyone at

21  Dartmouth?

22    **A.   I think I mentioned it to the Deans.**

23    Q.   Okay.  Do you remember which Deans you may

1  have mentioned it to?

2      A.   Just going off the names I read from recent

3  documents in the lawsuit, Dean Cruz and Dean Pelton

4  were aware of it.

5      Q.   Cruz and Pelton?

6      A.   Yeah.

7      Q.   And is that because you reported it?

8      A.   Apparently a chemistry professor reported it.

9      Q.   Do you remember anything being done at

10  Dartmouth as a consequence of Mr. Chang striking you,

11  or by Dartmouth?

12      A.   No, I don't think I did.  I've asked for his

13  records in this lawsuit because I understood he had

14  this history of violence and anger management, so I

15  have to wonder if some of this was preventable

16  negligence on Dartmouth's part.  But that's -- I'm

17  just going on what someone told that me he had a

18  history of violence, so I don't know.  I don't know

19  anything about Mr. Chang's student record at

20  Dartmouth.

21      Q.   Do you know where Mr. Chang is now?

22      A.   Funny, someone last week told me that he's

23  working for a company called Smashburger as CFO.

1      Q.   Okay.  But if I understand correctly, you

2   made no claims against Mr. Chang as a result of this?

3      **A.   That's right.**

4      Q.   Okay.  When did you graduate from Dartmouth?

5      **A.   June of '99.**

6      Q.   With what degree?

7      **A.   I don't know the -- if they have the Latin.**

8   **An AB.**

9      Q.   Fine.  In June of '99 after graduating from

10  Dartmouth what -- what did you do either in terms of

11  work, employment or education?

12     **A.   I -- again, I don't know if you'd call it**

13  **employment because -- or versus projects that I worked**

14  **on.  But I worked with at the time I was calling it**

15  **venture capital.  In retrospect, I'm not sure -- I'm**

16  **not sure if it technically qualifies as venture**

17  **capital or what it falls under.**

18     Q.   Were you employed by an entity that paid you

19  income for what you were doing?

20     **A.   I don't -- I don't remember.  I know I had an**

21  **apartment paid for in Paris.  And some other expenses.**

22  **And some -- I don't know if it was salary or stipend**

23  **for about a year.**

1        Q.    What was the name -- for about a year?

2        A.    Yeah.

3        Q.    What was the name of the entity?

4        A.    It was called Cairnwood, C-a-i-r-n-w-o-o-d,

5    Capital International.

6        Q.    All right.  So you were doing something for

7    Carinoid Capital for about a year?

8        A.    Cairnwood Capital.

9        Q.    Cairnwood Capital.  For about a year?

10       A.    Exactly a year, yeah.

11       Q.    And you were living at an apartment in Paris?

12       A.    Right.  This was -- he was an American, and I

13   think the company was structured in America and

14   offshore.  I don't even know the structure of the

15   company to be honest.

16       Q.    Do you know where it was based?

17       A.    It was complicated.  I don't really know.  I

18   know that I had an apartment paid for in Paris.

19       Q.    You may have had an apartment in Paris.

20       A.    I'm not sure I can --

21       Q.    What I'm asking is do you know where the

22   company was based, where its home office, if you will,

23   was located?

1      A.   No.   This really is very complicated because

2  there was later litigation, and there are different

3  names I don't even necessarily recognize.   They had

4  possibly ten different companies related to what I

5  thought I was working for.

6      Q.   Did you report to a particular individual?

7      A.   Yeah.

8      Q.   Who did --

9      A.   Lane Pendleton.

10      Q.   Lane Pendleton?

11      A.   Yeah.

12      Q.   And where was that -- is that a Mr. or Ms.?

13      A.   Mr. Lane Pendleton.

14      Q.   And where did Mr. Pendleton -- when you

15  reported to him, where did you report to him?

16      A.   In Paris.

17      Q.   So he was also in Paris?

18      A.   Yeah, yeah.

19      Q.   Okay.   Does this company still exist?

20      A.   I don't know.

21      Q.   Okay.

22      A.   Probably parts of it do.

23      Q.   So -- and so you would --

1      A.   Yeah, actually, parts of it do.  Because

2  parts of it are in the Wharton Global Family Alliance,

3  which I believe still exists, last I checked.

4      Q.   Were you with this company from roughly June

5  of '99 until sometime in early 2000?

6      A.   Yeah.  And I think I had some projects, some

7  Internet start-ups that I still maintained some

8  affiliation with after that.

9      Q.   Okay.  After leaving this company, what did

10  you next do either for education or for work?

11      A.   I went to Merrill Lynch Pierce, Fenner &

12  Smith, which I don't think exists anymore in that

13  form.

14      Q.   And where were you -- when you were at

15  Merrill Lynch, what time period did that involve?

16      A.   I believe about the next two years after I

17  left France.

18      Q.   Okay.  So that would take you from roughly

19  2000 to roughly 2002?

20      A.   Yeah, that's right.

21      Q.   Okay.  In the position --

22      A.   Yeah.

23      Q.   The position you had with -- forgive me if I

1  screw up the name, tell me that company again in

2  Paris?

3      A.    Cairnwood.

4      Q.    Cairnwood.   In the position in Cairnwood,

5  what was it that caused you to leave that?

6      **A.    Mostly I think Mr. Pendleton was moving to**

7  **Singapore.   Again, he had many different entities on**

8  **his plate.   It was never kind of promised as anything**

9  **longer than a one year type of experience.**

10     Q.    Okay.

11     **A.    That's -- he did mention that he thought I**

12 **appeared to be kind of floundering.   So that's the**

13 **only comment I would say, insight I have in his**

14 **knowledge.   Other than the fact he didn't expressly**

15 **indicate a position that was a long-term one, and he**

16 **was moving to Singapore.**

17     Q.    What did you do for Merrill Lynch?

18     **A.    I was an analyst in their technology group.**

19     Q.    Where were you based?

20     **A.    250 Veazey Street in New York.**

21     Q.    Where did you live?

22     **A.    Not far from there.   A few miles from there.**

23     Q.    Okay.   Did your position stay the same during

1   your full tenure there?

2        A.    Yeah.

3        Q.    What caused you to leave?

4        A.    **Well, that's -- it's a two-year analyst**

5   **program, so I believe I was paid through -- through**

6   **those two years, or almost those two years.  I'm not**

7   **sure.**

8        Q.    So when you began at Merrill Lynch, did you

9   understand that it was a two-year position?

10       A.    **Yeah.  That would be a typical understanding.**

11       Q.    It may be a typical understanding.  Was it

12   your understanding?

13       A.    **Yeah.**

14       Q.    Okay.  And was the position that you were

15   hired for specifically a two-year position?

16       A.    **Could be extended to a third year, it could**

17   **be promoted beyond that.  But typically it's two**

18   **years.**

19       Q.    Okay.  And you left after two years?

20       A.    **About two years.**

21       Q.    Where did you go from there?

22       A.    **I actually left -- I wasn't present in New**

23   **York all those two years.  After 9/11 I moved to**

1    **Nashville and applied to -- I was accepted to a JD MBA**

2    **program on a full scholarship at Vanderbilt Law.  But**

3    **I deferred that enrollment because I was accepted to**

4    **an MBA program at INSEAD, which is a French --**

5    **I-N-S-E-A-D, a French MBA program, and then Wharton it**

6    **turns out through an affiliation with them.**

7        Q.    So when you left Merrill Lynch, did you begin

8    the INSEAD MBA program?

9        **A.    Yeah.  Yeah.**

10       Q.    And where was that program located?

11       **A.    Actually, I went to Singapore.  That's where**

12   **I -- I think -- the next official place I was in for**

13   **Merrill Lynch was in Singapore.**

14       Q.    So when you were working for Merrill Lynch

15   you were transferred to Singapore?

16       **A.    No, no.  INSEAD had -- has a campus in**

17   **Singapore.**

18       Q.    So when you began working at -- when you

19   began that degree program, and is it appropriate to

20   call it a degree program?

21       **A.    Sure.**

22       Q.    When you began that MBA program, if I

23   understand correctly, you began it in Singapore?

1       A.      That's right.

2       Q.      And how long did you remain in Singapore?

3       A.      Maybe eight months.

4       Q.      Where did you go from there?

5       A.      To France to continue with that program.

6       Q.      And how long did you then remain in France?

7       A.      Maybe four months.

8       Q.      And where did you go from there?

9       A.      To Wharton in Philadelphia.  There was delays

10  in that, though.  I think I actually started at

11  Vanderbilt Law before I went to Wharton.  Because it

12  was a new affiliation with Wharton that wasn't all set

13  in stone.

14      Q.      Okay.

15      A.      So they took the top of my class from the MBA

16  program, the ones who wanted to go to Wharton, and let

17  them -- or worked that out for late 2003, I believe.

18  So I think actually before that in August 2003 I was a

19  student at Vanderbilt Law.

20      Q.      Okay.  So when did you begin Vanderbilt?

21      A.      August 2003.

22      Q.      And how long did you remain there?

23      A.      Just about a month before I left from

Wharton.

    Q.   Why did you -- so forgive me if I'm confused. Were you still involved in the Wharton -- in the INSEAD Wharton program when you began Vanderbilt?

    A.   Sure, sure.

    Q.   What prompted you to begin the Vanderbilt program while you were still involved in the other?

    A.   Well, I had deferred an enrollment so I was somewhat obliged to go, I mean, assuming I wanted to. And I think Wharton, the scheduling wasn't -- like I said, it wasn't set in stone. So I thought maybe I could defer that to the summer. I don't know what I was thinking exactly at the time, but I think I thought I could maybe get a year of law school done and pick up -- pick up the Wharton at the tail end of it. Or even transfer law credits and skip Wharton. I didn't know.

    Q.   Okay.

    A.   I don't remember.

    Q.   So how long did you stay at Vanderbilt?

    A.   Like I said, just about a month.

    Q.   Did you ever return?

    A.   Yeah, I deferred enrollment again to complete

1    my MBA, which they understood.  I completed my MBA

2    in -- I think the last day of class at Wharton was in

3    December, they sent me my diploma in January from

4    France by DHL, and I think I took maybe some premed

5    courses then.

6        Q.   When did you return, if at all, to

7    Vanderbilt?

8        A.   Well, I'm -- after some more premed courses I

9    think I returned to Vanderbilt in the fall of 2004.

10       Q.   Okay.  And how long did you remain at

11   Vanderbilt?

12       A.   That was longer.  That was -- I consider it

13   almost -- almost the full academic year.  It wasn't.

14   I think I left in February.  But there were a lot of

15   exams, a lot of reading I had already done, so I think

16   I kind of read the first year of law school and then

17   left is my recollection of it.

18       Q.   So if -- what I understood you to tell me,

19   though, that you left, physically left Vanderbilt --

20   strike that, Andy.  Let me ask it differently.

21           Were you attending classes at Vanderbilt in

22   the 2004 academic year?

23       A.   Yeah, yeah.

1        Q.   And did you attend classes throughout that

2    semester?

3        **A.    Yeah.**

4        Q.   And did you continue to attend classes in the

5    semester that would have begun probably in January of

6    2005?

7        **A.    Yeah.   I guess only qualification if you're**

8    **saying attend in terms of working towards a diploma,**

9    **that was always under question what diploma I wanted,**

10   **but I did physically attend.**

11       Q.   Were you physically enrolled --

12       **A.    Yeah, yeah.**

13       Q.   -- through that entire year?

14       **A.    Yeah.**

15       Q.   Okay.  So then --

16       **A.    No, not the entire year.   Through February.**

17       Q.   And what happened after February?

18       **A.    I think I went to do volunteer work.   There**

19   **was a tsunami in Sri Lanka.   I went to do medical**

20   **volunteer work because I was anticipating going to**

21   **medical school at that point.**

22       Q.   And how long did you continue doing that?

23       **A.    Two, three months.**

1      Q.   When you returned -- did you then return to

2  the United States?

3      **A.   Yeah.**

4      Q.   And what did you do when you returned to the

5  United States?

6      **A.   I think I took more premed courses because**

7  **there were, like, three years of them that had**

8  **basically been put on hold since I would date it back**

9  **to the head injury, so I had about three years, six**

10 **semesters of premed to take.**

11     Q.   Where did you take your premed courses when

12 you returned to the United States?

13     **A.   I think four different places.  I think**

14 **Villanova, Temple, Penn.**

15     Q.   Did you register for those courses or did you

16 simply audit them?

17     **A.   Yeah, I got credit for them.**

18     Q.   And then at some point in time you ultimately

19 ended up at the University of Southern California?

20     **A.   I did physically end up at USC, that's**

21 **correct.**

22     Q.   When did you -- well, you applied for and

23 attended medical school at USC; didn't you?

1      A.   Well, I applied for it.  I -- I wouldn't use

2   the word attend.  But that's -- that's -- obviously a

3   lot of people spend a lot of time on that issue.  So I

4   don't -- I don't feel comfortable using the word

5   attend, but I was physically at USC taking classes

6   there.

7      Q.   Well, you enrolled at the University of

8   Southern California Keck School of Medicine; didn't

9   you?

10      A.   I -- I think the area of law you're

11   talking -- I think you're referencing an area of law

12   in terms of, like, facts versus legal -- legal facts

13   versus actual fact.  I don't -- it's a little bit over

14   my head.  But I did -- I did physically sit in Los

15   Angeles and was taught by USC professors.

16      Q.   Are you unable to tell me affirmatively that

17   you enrolled in medical school at the University of

18   Southern California?  Is that something you're unable

19   to confirm?

20      A.   I don't want to testify to that fact.

21      Q.   I don't care what you want to testify to,

22   sir.

23      A.   Not -- actually, want is the wrong word.  I'm

1    not sure how to testify regarding that fact.

2        Q.    All right.  You sued the University of

3    Southern California; didn't you?

4        A.    Well, I believe I'm not supposed to discuss

5    that under settlement terms so I think I'm going to

6    have to object there to attorney/client privilege

7    based on the attorneys I did have there, and right to

8    privacy.

9        Q.    Sure.

10            Mark it, please.

11        A.    I'm just trying to answer these questions the

12    best I can.  I think, as you know, these are

13    complicated issues.

14            (Isaacs Exhibit 2 was

15            marked for identification.)

16        Q.    BY MR. KAPLAN:  I've given you a document,

17    sir, it's titled the United States District Court for

18    the Central District of California.  It's a civil

19    docket.  Do you recognize this document?

20        A.    I object to entering this into the -- this

21    lawsuit because there's no privy to this matter here.

22    And again, just generally I think this is privileged.

23    But I do recognize it.

1    Q.   Okay.  So having recognized it, tell me what

2  it is.

3    **A.   Notwithstanding objections, it's a docket for**

4  **a case 6-CV-338, Gary Feess.**

5    Q.   Okay.  This is a docket of a lawsuit that you

6  filed against the University of Southern California;

7  is that correct, sir?

8    **A.   Yeah.   That's right.**

9    Q.   Okay.  Let me show you another document.

10        Let's mark that.

11        (Isaacs Exhibit 3 was

12        marked for identification.)

13    Q.   BY MR. KAPLAN:  I've handed you another

14  document, and it's Jeffrey David Isaacs versus

15  University of Southern California and a number of

16  other people.  Do you recognize this document?

17    **A.   Vaguely.   There were a lot of documents in**

18  **that docket, as you probably know.**

19    Q.   Okay.  But you do recognize this as being a

20  document from that lawsuit, correct?

21    **A.   It appears to be.**

22        MR. KAPLAN:  Okay.  And then, finally, let's

23  mark this one, too.

1          (Isaacs Exhibit 4 was

2          marked for identification.)

3      Q.    BY MR. KAPLAN:  So now I've shown you another

4  document, and it's a University of Southern California

5  document, again in that lawsuit.  And it's your

6  opposition to the motion to enforce settlement.  Do

7  you recognize that document?

8      **A.    (Peruses document.)  Yeah, I do.  I do**

9  **recognize that.**

10     Q.    Okay.  And without referring to it, although

11  feel free to do so if you want to, do you recall that

12  when you ultimately resolved the matter concerning

13  this lawsuit, or tried to, there was an issue

14  regarding the settlement documents that you signed?

15     **A.    I guess I have to object to the form.  An**

16  **issue, I'm not sure what you mean.**

17     Q.    Did you refuse to go through with the

18  settlement that you had negotiated with the University

19  of Southern California?

20     **A.    I think I -- if not refused I -- I tried to**

21  **have the judge intervene, yes.**

22     Q.    Okay.  And as a result of having the judge,

23  or trying to have the judge intervene, the University

1    of Southern California moved to enforce the

2    settlement; didn't they?

3         **A.    Right.    That's what -- that's Exhibit 3.**

4              MR. KAPLAN:   Okay.   Let's mark one more.

5              (Isaacs Exhibit 5 was

6              marked for identification.)

7         Q.   BY MR. KAPLAN:   And the last exhibit in this

8    group that I've shown you which is now marked Exhibit

9    5 is an order concerning your motion to enforce the

10   settlement.   Excuse me, concerning USC's motion to

11   enforce the settlement.   Have you ever seen that

12   before?

13        **A.    Yes.**

14        Q.   Okay.   The -- I'd like to ask you about this

15   order for a moment.   In the second paragraph of this

16   order what the court says starting with the second

17   sentence of the second paragraph is, "Isaacs sought

18   through his lawsuit to clear his record.   He is now

19   not sure whether the settlement effectuates that

20   goal."   Is it correct, sir, that through your lawsuit

21   with Southern California you attempted to clear your

22   record?

23        **A.    You know, I'm not sure that the judge**

1    actually -- I disagreed, or I believe a lot of the

2    words chosen in this order and others were not based

3    on scrutiny of the documents.  So I don't think

4    cleared is the right word.  The reason I say that is

5    because there were two settlement agreements with USC,

6    and this motion was about the second settlement

7    agreement.  The first settlement sealed my records,

8    which you could also use the word cleared for.  So I

9    think -- not sure where the judge used the word

10   cleared.  I'm sure it related to some of my pleadings,

11   but I'm not sure it accurately related to them.

12       Q.   Do you recall, and feel free to review it if

13   you want to, that your position was that you did not

14   achieve through the settlement terms what you had

15   hoped to achieve?

16       A.   No, I disagree with that characterization.

17       Q.   Okay.  So you disagree with the court's term

18   where it says, "Through this lawsuit he attempted to

19   clear his record"?  You don't think that's correct?

20       A.   Well, the problem is that, you know, to

21   anyone -- a non -- a nonlawyer, which I am, or even a

22   lawyer in this case, you know, there's so many word

23   definitions here that start to overlap, and frankly, I

1    think it's hard to construe logic from some of -- some

2    of the motions in this lawsuit.  This being the

3    California lawsuit.  You know, this -- this went over

4    two years of wrangling, and I do agree with that.

5    Like I said, the first settlement in a lot of ways

6    cleared my record to my satisfaction.  The second one

7    actually -- the second one annulled all prior

8    agreements.  And I was concerned, my biggest concern,

9    you know, in filing lawsuits you don't -- or in filing

10   motions or pleadings you don't necessarily always say

11   what your biggest concern is.  Sometimes it's hidden

12   away or tucked away, not intentionally always, so one

13   of my -- from recollection my biggest concern, or one

14   of them was that the good or the better settlement

15   agreement was annulled by the second agreement.  So

16   like I said, the logic in these motions and the

17   settlements themselves even I wouldn't say is the best

18   logic, best example of law in the world.

19       Q.   Sir, when you filed your lawsuit against USC,

20   were you aware that any future applications you would

21   complete for medical school or anything connected to

22   the medical profession would require that you disclose

23   your attendance at USC?

1      **A.    I missed the beginning of the question.   Did**
2  **you say when I ...**
3           MR. KAPLAN:   Why don't you read it back,
4  Andy.
5           (The pending question was read.)
6      **A.    I think the answer is no because when I filed**
7  **the lawsuit I actually hadn't been expelled from USC.**
8      Q.    BY MR. KAPLAN:   So you deny that you would
9  have -- never mind.
10     **A.    I think the answer to your question is no,**
11 **because at the time I filed it I probably was**
12 **optimistic that I wouldn't have to disclose it in the**
13 **future.   And actually, I hadn't been expelled yet, so**
14 **I don't know what I would have had to disclose.   So**
15 **the timing of your question I think you need to**
16 **rephrase.**
17     Q.    Well, do you recall, for example, asking USC
18 to destroy your medical -- your records of attendance?
19     **A.    I can't discuss confidential settlement**
20 **discussions with you.**
21     Q.    Do you recall asking USC to destroy your
22 records?
23     **A.    I object to privilege of confidential**

 1    settlement agreements.  And attorney/client privilege.

 2         Q.   Who is the attorney that you're --

 3         A.   Michael Payne would have been one, Nina

 4    Marina would be another.

 5         Q.   These were your attorneys --

 6         A.   Yes.

 7         Q.   -- on this action?

 8         A.   Parts of this action.

 9         Q.   Turn to page -- in Exhibit 3 --

10         A.   Again, for all these exhibits I object to

11    them being entered as evidence.

12         Q.   That's fine.  In Exhibit 3, which is the big

13    one right there, turn to page 12.  It's a handwritten

14    page number.

15         A.   Yeah.

16         Q.   Okay.  And you see at the very bottom of the

17    page there's a sentence -- there's an e-mail there

18    from Jeffrey D -- Jeffrey DI at Gmail dot com.  Is

19    that you, sir?

20         A.   Yes.

21         Q.   And you'll see that there's a response to an

22    e-mail from you that says, "USC will not settle for,"

23    and you've blanked out, or somebody has blanked out

1    what that is, "moreover, USC is not going to destroy

2    any records.  If by 'bilateral agreement' you mean a

3    mutual release of claims, that would not be a problem.

4    USC has made no 'empty settlement offers.'"  And

5    there's a full e-mail chain above that.  And I want to

6    ask you again did you demand that USC destroy your

7    records in order to engage -- in order to resolve this

8    matter?

9        A.    Again, she is referencing confidential

10    communications, but that objection notwithstanding, if

11    I erroneously asked them to destroy evidence, that's

12    an error.

13        Q.    Well, whether it was erroneous or not, are

14    you now prepared to agree that you did ask USC to

15    destroy your records or -- in connection with your

16    attendance there?

17        A.    No.  At that time the records were sealed to

18    begin with.  So I don't know what would have been

19    destroyed.  And whether they had a right to keep

20    something that was sealed is beyond my legal

21    knowledge.

22        Q.    Okay.

23        A.    So I don't know what -- my memory, the best

1   of my memory, destroying records -- you know, I think

2   to step back here, you know, I've probably written or

3   been involved in 300 motions in federal court, and I

4   would say the large majority of them have been

5   flagrant with errors.  Many pointed out by you, in

6   fact, Attorney Kaplan.  I think I was studying for

7   exams during most of this lawsuit to get the top one

8   percent board score that I got in med school.  So I

9   don't -- I don't think -- these are not documents

10  signed under penalty of perjury by a notary.  I

11  don't -- I'll be the first to admit some of my

12  pleadings have had errors.  Certainly some of my

13  informal e-mails with lawyers, what I meant by

14  destroyed or what she meant by destroyed eight years

15  ago I simply don't recall.

16      Q.   Sir, there's a document in front of you

17  that's Exhibit 5.  Could you put it up in front of

18  you, please.

19      A.   Okay.

20      Q.   Paragraph C in Exhibit 5 is what I'd like you

21  to look at.  Why don't you read it and then I'll ask

22  you questions.

23      A.   Paragraph ...

1      Q.   C.   It says illegality and impracticality.

2   Which document are you looking at?

3      **A.   5.**

4      Q.   Okay.  Take a look at that and then I want to

5   ask you a question about it.

6      **A.   (Peruses document.)  Again --**

7      Q.   Have you read it?

8      **A.   Yeah.**

9      Q.   All right.  You're aware of the fact that the

10  court in its order found that the confidentiality

11  section of the agreement you entered into did not

12  prohibit disclosures to the extent otherwise required

13  by law?  You --

14     **A.   Well, I object to the characterization of the**

15  **question there in that it seems to be misleading.  And**

16  **actually, I do remember thinking about this back when**

17  **I read it in 2008.  You know, the judge kind of -- to**

18  **my -- my interpretation was the judge kind of glossed**

19  **over the issue and just said hey, everyone has to**

20  **follow the law and didn't really address the -- the**

21  **conflict that I had pointed out.  The conflict I had**

22  **pointed out was on one hand the records were sealed,**

23  **and then the settlement sealing records was annulled.**

1    **And that was conflicting.  And I wanted the judge to**

2    **resolve that.  He did not.  He glossed over it, which**

3    **I think is, you know, -- I think that happens in pro**

4    **se cases in particular.  So the fact that the judge**

5    **said people have to follow the law, I don't know what**

6    **that means, what it refers to.**

7    Q.    First of all, sir, I'm confused about

8    something.  You've now told me you were both

9    represented and you were pro se.  Which one is it?

10    **A.    Well, I was represented for aspects of this**

11    **controversy by two attorneys.  But the federal lawsuit**

12    **itself I did pro se.**

13    Q.    Nobody filed an appearance for you?

14    **A.    Not that I remember, no.**

15    Q.    Okay.  All right.  Now, my question to you is

16    simply this:  As a result of your efforts to void the

17    settlement and the court's order on that issue --

18    **A.    Void which settlement?**

19    Q.    The settlement that we're referring to right

20    here.

21    **A.    Because I never wanted to void the settlement**

22    **that sealed my records.**

23    Q.    Okay.  We're talking about the settlement

1    having -- we're talking about the settlement that did

2    not deal with sealing your records.

3        **A.    Actually, they both did, but ...**

4        Q.    My question is:  Did you understand as a

5    result of the court's order that your records could be

6    and would have to be disclosed --

7        **A.    The court did not order that.**

8        Q.    Let me finish, sir.

9        **A.    Okay.**

10       Q.    -- as a result of an appropriate lawful

11   request?  Did you understand that?

12       **A.    Well, the court simply said that the**

13   **settlement agreement never prevented any -- anyone**

14   **from having to follow the law.  Of course I know that**

15   **you have to follow the law.  So the answer to your**

16   **question -- well, I object to the characterization,**

17   **but yes, I know the judge said here that people have**

18   **to follow the law.**

19       Q.    As a result of the issues -- strike that.

20   Why don't you tell me in your own words what caused

21   you to file -- what caused you to refuse to sign the

22   settlement agreement that you had entered into.  You

23   can use your own words and tell me that.

1      A.    Yeah.   Well, again, my memory of 2008 during

2  exams is not the best.   But the main thing I mentioned

3  to you was I was concerned that an agreement that

4  annulled all prior agreements, annulled a very

5  important settlement, specifically a settlement that

6  sealed my records.   So my recollection that was my

7  main concern.   Like I said, some pleadings -- you

8  know, I list eight concerns.   That was my main one.

9  Some of the others were weaker or stronger arguments

10  than that.   Which I'll go through now.   Lack of

11  consideration.   So I used -- did use the word clear

12  here, that it did not unequivocally clear because it

13  had potentially annulled the sealing.   So it was

14  unequivocal to me.   So that's one.   I do have to

15  answer your question in full.

16          Non est factum -- my memory is going off this

17  document at this point.   Non est factum, signed

18  without full knowledge of its meaning.   I would say

19  that.   I would say that I was in over my head.   Not

20  knowing what acquittal and sealing means.   I think

21  there's not much case law on sealing of educational

22  records, so I think that's difficult for attorneys,

23  let alone a pro se person.   So, you know, I wish the

1    judge had addressed that.  He did not.

2           Illegality, on one hand the plaintiff was

3    acquitted, so here I am saying I believed I was

4    acquitted.  So that would contradict me saying that I

5    didn't have the records cleared.  So, you know, I

6    would say this is rife, all these documents, like I

7    said, are rife with illogical inconsistencies and are

8    not the best example of law.

9       Q.   Okay.

10      A.   I do have to go on because you asked why the

11   duress.  I -- I mean, I -- you know, I was trying to

12   litigate a federal lawsuit and go through med school

13   at the time, and I was doing pretty well in med

14   school.  Like I said, I had a 99 on the boards.  A

15   lawsuit itself is full-time, a full-time job, if not

16   the job of eight attorneys full-time.  So trying to do

17   this, I do believe that California, USC put me in

18   economic and mental duress.  And I basically had no

19   choice to either drop the lawsuit or drop my studies.

20   So I do think there was duress here that the judge

21   didn't look into enough.  I have to answer your

22   question in full.

23          Unclean hands.  You know, I don't know how --

1    I don't know if USC really had -- what they were

2    thinking with that settlement agreement.  Again,

3    that's probably not one of the stronger points I had

4    made in this.

5         Undue influence.  I think that goes back to

6    duress.  So I do think that's what I was thinking.

7    This is all back to what I was thinking.

8         And unconscionability.  Well, I think that's

9    probably the key one.  If you look at where I am now,

10   you know, I think for allegations of controversy that

11   USC that didn't even make misdemeanor level, right?

12   They reported this to LAPD, they reported some of the

13   controversies to LAPD, and the LAPD refused it at not

14   even meeting the criteria for a misdemeanor.  So a

15   typical person for a misdemeanor, I don't know what

16   the punishments are, you know, somewhere from

17   community service to possibly a year in incarceration.

18   I'd say I had eight years of punishment.  Now, I know

19   it can't fall under the cruel and unusual punishment

20   clause because it's not a government action.  But I

21   would say it's unconscionable.  Most people I

22   informally talk to say, you know, it's unconscionable

23   to have eight years of your life taken away from you

1   **over what was a small quibble with a classmate in med**

2   **school.  So I think the unconscionability thing here**

3   **is what I was thinking at the time in addition to the**

4   **other reasons I've listed.  So that is the end of my**

5   **answer to your question.**

6       Q.   Now, in answering the question, you were

7   referring to which exhibit, sir?

8       **A.   That was Exhibit 4, my --**

9       Q.   And Exhibit 4 is a document that you prepared

10  and filed with the federal court, correct?

11      **A.   Under some duress, yes.**

12      Q.   Now, what I wanted to do is ask you a couple

13  of questions about what you said in that exhibit

14  specifically.

15      **A.   Okay.**

16      Q.   Would you turn to page 4 of it for a moment.

17  Actually, let's go right to page 5, it's probably

18  easier.  And at the beginning of the first -- second

19  paragraph there, what you wrote is, "The plaintiff,"

20  that would have been you, correct?

21      **A.   Yeah.**

22      Q.   "The plaintiff is concerned that his intended

23  future career path is likely to require disclosure of

1  academic records."  Did I read correctly what you

2  wrote?

3      **A.    Well, -- yes.**

4      Q.    Did I read correctly what you wrote?

5      **A.    I object to the characterization.  The**

6  **implication there is if the sealing was canceled, then**

7  **there was concern that I'd have to disclose things.**

8      Q.    Are you finished?  Did I read correctly what

9  you wrote?

10     **A.    Can you point out where it is again?  Because**

11 **I actually didn't see.**

12     Q.    Page 5.

13     **A.    Page 5.  I thought you said page 4.**

14     Q.    You're looking at the wrong page.  Page 5,

15 second paragraph, I quote, "The plaintiff is concerned

16 that his intended future career path is likely to

17 require disclosure of academic records" --

18     **A.    Sure.  It says that.**

19     Q.    That's what you wrote, correct?

20     **A.    I wrote that.**

21     Q.    And when you wrote that, you understood that

22 you would likely have to disclose academic records,

23 and the records you were referring to were whose

1  records?

2      A.    No, I disagree with that characterization.

3      Q.    Then let me just ask this:  Whose records

4  were you referring to?  What institution?

5      A.    You know, like I said, in the 10,000 pages of

6  documents I had filed or had been filed about in these

7  two federal lawsuits, some of them were written late

8  at night after studying for medical school.

9      Q.    Dr. Isaacs, whose records were you referring

10  to?  You can tell me or you can tell me you don't

11  know.  But answer the question, please.

12      A.    Well, I have to answer it in full.  I was

13  concerned, and that's the reason I filed this, about

14  USC records.

15      Q.    Okay.

16      A.    But concern is different from knowledge.

17      Q.    Would you turn to page 6 for a moment.  You

18  were just looking at 5.  Go to page 6.  You have a

19  topic there under 3 that is titled illegality and/or

20  impracticality.  You see that?

21      A.    Right.

22      Q.    In that you wrote, "Plaintiff would be unable

23  to answer future job applications or academic

```
 1    admissions applications that require disclosure of

 2    past disciplinary actions."

 3         A.    I object.  Attorney Kaplan, you're taking out

 4    of context arguments that you know are not the most

 5    well-written arguments.  And --

 6         Q.    Did you write what --

 7         A.    I'm answering your question.  What I wrote in

 8    full was obviously referring to would is conditional

 9    verb tense meaning if the sealing was -- you know, and

10    this is something I assume people are thinking on my

11    wavelength a lot of times.  I don't know if that's

12    Asperger's or being smarter or less smart, that's not

13    for me to judge.  But I assume that people are

14    thinking on my wavelength.  I wrote a conditional verb

15    tense there.  This whole thing is assuming that there

16    was some annulment of the prior settlement agreement.

17    So you're trying to take a few words, maybe a poorly

18    written phrase of one of 10,000 pages in these eight

19    years of federal litigation and, frankly, I think

20    that's what happened at Dartmouth for six months.

21    People watched this and knew.  But that's a separate

22    issue I won't testify about right now.  But to answer

23    your question is I used a conditional verb tense.  I'm
```

1    a computer science major.  Conditions in computer

2    science make or break a program.  Conditions in a

3    legal document make or break a legal document.

4        Q.    You wrote what I read; did you not?

5        A.    I wrote the condition you stated.

6        Q.    Now, I wanted to ask you about that because

7    it goes on and it states right after that on the next

8    page, which you're free to look at.

9        A.    Yeah.

10       Q.    "Hence, any answer, short of divulging this

11   entire lawsuit, and even then, it would remain

12   unclear, could be construed as a dishonest response."

13   And using that background, I just want to ask you.  So

14   as a result of that, what you were trying to do was

15   ask the court to issue an order for you, correct?

16   Your goal in this pleading and in avoiding signing the

17   settlement was to have the court issue an order that

18   said you didn't have to sign the settlement; isn't

19   that right, sir?

20       A.    You asked a compound question so I object to

21   the form.  But let me answer both parts of it.  Again,

22   could be construed was conditional saying if one were

23   to waive this in an adverse manner to me, then it

1  could be construed as a dishonest response.  But if

2  you were to interpret it in the way I thought with the

3  prior settlement agreement with the words acquitted

4  and discharged then it would not be a dishonest

5  response.  So again, I used the conditional verb

6  tense, that's the first prong of your question.

7          The second prong, yes, I was hoping the judge

8  would just simplify the whole matter and avoid future

9  eight years of litigation eight years later and

10 declare that my records at the very least were sealed,

11 that that was not annulled.  And it turns out USC

12 actually stipulated that they were not annulled, so

13 the judge didn't have to do that.  And I was hoping he

14 would address the words discharged and acquitted,

15 which he did not do.  So I was hoping for some

16 clarification from the judge, you're correct.

17     Q.   And the judge denied your request and ordered

18 you -- ordered the settlement enforced; didn't he?

19     A.   Well, he didn't deny my hopes of clarifying.

20 He just didn't do that.  He denied my requests to

21 strike the settlement.

22     Q.   Now, so did you ultimately execute the

23 settlement agreement?  Did you actually sign it?

1          A.    Yes.    Yeah, I did.

2          Q.    Okay.   So now, going forward from that point

3     in time, was your understanding -- what was your

4     understanding concerning the period of time you spent

5     at USC and the need to disclose it or not on future

6     applications?

7          A.    Going forward from this point?

8          Q.    Going forward from the court's order that was

9     issued on May 8, 2008, what was your understanding

10     concerning disclosure of your time at USC?

11          A.    Well, I've already said that this is a

12     confusing matter that has caused different attorneys

13     to weigh down differently.  But with regard to my

14     understanding, I was actually the most happy from this

15     was that USC stipulated that the first settlement

16     agreement was never annulled.  So after that I was

17     relieved.  So as this motion was being determined,

18     probably before the judge even issued his order, I had

19     been somewhat relieved from the concerns I had in my

20     pleading.  So I would say I still think the USC

21     settlement agreement -- I mean, I think my points are

22     valid that I filed there.  I think it's still -- you

23     know, just because the judge didn't actually rule on

1    anything about it, I think that could still be brought

2    up in this court case or others.  But it's likely, my

3    best likely understanding is that sealing records made

4    them immaterial and then nondisclosure on immaterial

5    matter is basically, you know, permissible.  That's my

6    best understanding to answer your question.

7        Q.   So your understanding was, if I understand

8    what you just said, that you were -- it was

9    appropriate for you to fail to disclose to any other

10   institutions the fact that you had spent a year or so

11   at USC; is that correct?

12       A.   Well, appropriate, that's a vague word.  I

13   can't really -- I mean, I actually would have liked to

14   have told Christine Finn about these things.  So I

15   don't want to use the word appropriate because that

16   brings up moral issues.  But legally, legally I

17   believe the sealing made the records as if one could

18   deny them.  So then legally I would think it's

19   justifiable not to disclose them.

20       Q.   Okay.  So you're --

21       A.   And that's not mentioning the discharge of

22   the records -- of a contract and agreement of any

23   nature known or unknown whatsoever.  So, you know,

1    **there were protective factors -- or protective clauses**

2    **in the second settlement agreement that even without**

3    **the first settlement agreement I would think it's**

4    **justifiable not to disclose USC.  Again, the case law**

5    **on these matters, I don't think there have been too**

6    **many cases like this.  None that I've found.  But my**

7    **understanding, the American Academy of Medical**

8    **College's understanding and four different attorneys'**

9    **understanding is yes, the answer to your question is**

10   **yes, it is permissible to omit what may or may not**

11   **have been an enrollment at USC.**

12       Q.   Okay.  So you felt that you were honestly

13   replying, or honestly completing your ERAS, E-R-A-S,

14   ERAS application, --

15       **A.   Do you mean at the time I was filling out the**

16   **application what did I think?**

17       Q.   No, let me finish my question, sir.  We'll

18   get to your ERAS applications in a bit, but when you

19   filled out your ERAS application, the first one you

20   filled out in 2010, your understanding was it was

21   permissible for you not to disclose your attendance at

22   USC?

23       **A.    I thought my best understanding of all this**

1    mess, for lack of a better word, was that -- was yes,

2    I could not disclose it.

3         Q.   And did you read the application language

4    before you began to fill it out?

5         A.   Sure.

6         Q.   Did you understand that the failure to

7    disclose if improperly done would be immediate grounds

8    for dismissal?

9         A.   Well, I object to the form of that.  I mean,

10   you've changed the subject.  I've -- I've said that

11   there's no disclosure necessary.  You're talking now

12   about nondisclosure.  So I just won't -- I won't

13   answer that question.

14        Q.   Well, I'm going to ask it again, and what you

15   answer or don't answer you do at your own peril.

16        A.   Okay.

17        Q.   Because I'm going to tell you something, and

18   that is that when I ask you a question, I believe it

19   should be answered or I wouldn't ask it.  And if you

20   don't answer it, we'll end up in front of the court

21   and we'll have the court decide what you have to

22   answer or not.

23        A.   Right.  I read the ERAS application and

1  instructions, and I agree with their instructions.

2      Q.   You understood --

3      A.   I understand their instructions.

4      Q.   So specifically you understood that an answer

5  or a failure to disclose -- excuse me, a failure to

6  disclose an institution improperly that you had

7  attended would be grounds for immediate termination

8  from the program?

9      A.   Improper actions on the application would be

10  grounds fail -- to terminate or whatever.

11      Q.   And you consciously chose -- just with regard

12  to USC, you consciously chose not to disclose USC?

13      A.   No, I consciously believed that USC was no

14  longer a disclosable entity.

15      Q.   And tell me who you reviewed, if anybody, who

16  you reviewed that conclusion with.  Who helped you to

17  gain that understanding?

18      A.   You know, mostly myself.

19      Q.   Okay.

20      A.   But I did review a bit with Michael Payne.

21      Q.   Michael Payne is the guy who filled out a

22  couple of affidavits?

23      A.   Right.

1      Q.   He stopped representing you on February 8th,

2  2008, according to his affidavit.

3      **A.   Well, the general issue was known in 2008.**

4  **Whether or not this was as disclosable entity or not.**

5      Q.   So when Michael Payne filled out an affidavit

6  for you, Michael Payne never said that he directed you

7  not to list USC?

8      **A.   Well, a lawyer can't direct you.  He can only**

9  **give advice.**

10     Q.   He never said he gave you advice not to

11 include USC.  He reviewed it after the fact.  Don't

12 you recall that?

13     **A.   I'm confused on the question there.**

14     Q.   Okay.

15     **A.   And I think --**

16     Q.   Well, your answer to me -- if I understand,

17 you're telling me that before you decided not to

18 include USC, you consulted with Attorney Payne about

19 that specific issue.  Is that what you're testifying

20 to?

21     **A.   No.**

22     Q.   Okay.

23     **A.   No.**

 1        Q.   So then answer the question who did you

 2   consult with concerning your decision not to include

 3   USC on your 2010 ERAS application?

 4        **A.   I think I've answered that.  I based it on my**

 5   **own legal knowledge and discussions with Michael Payne**

 6   **in 2008.**

 7        Q.   In 2008.

 8        **A.   Right.  2009?  2008, yeah.**

 9        Q.   Did Attorney Payne tell you before you

10   completed the 2010 ERAS application that in his

11   opinion you did not have to include USC?

12        **A.   Again, I object to the form there as trying**

13   **to misconstrue.  He gave advice that would have**

14   **pertained to the ERAS three years before ERAS.  So I'm**

15   **not going to speculate as to what Michael Payne**

16   **thought his advice would apply to or not apply to.**

17        Q.   If my question was confusing, I apologize.

18   But I want to try it again because it's an important

19   issue to me anyway.  I asked you who you consulted

20   with, if anybody, specifically on the issue of

21   excluding USC from the ERAS application.

22        **A.   And I've answered this question twice now.**

23   **Michael Payne specifically on the matter raised by**

1    **ERAS.  Course, Michael Payne probably didn't know what**

2    **ERAS was to answer your question.  But the matter**

3    **there he had advised me about.  But again, I said**

4    **primarily I base this on my own knowledge, my own**

5    **legal understanding.**

6        Q.   Let's move from California to Arizona for a

7    minute.

8            (Isaacs Exhibit 6 was

9            marked for identification.)

10       **A.   After Arizona I'd just like to take a break**

11   **to get water.**

12       Q.   BY MR. KAPLAN:  We can take a break right

13   now.

14       **A.   Let's just get through a similar related**

15   **issue.**

16       Q.   All right.  I've handed you an ERAS

17   application.  You see it?

18       **A.   Yes.**

19       Q.   Can you confirm for me that it is an ERAS

20   application that you completed and signed on September

21   1, 2009?

22       **A.   Yes.**

23       Q.   I wanted to ask you a couple things about

1  this and then we can move on to something else.

2  There's a question here on Educational Commission for

3  Foreign Medical Graduated Certification on page 2.

4  You see that?

5       **A.   Yeah.**

6       Q.   Okay.  Now, at that point in time, obviously

7  you had -- you answered correctly that you hadn't been

8  certified.

9       **A.   That's right.**

10      Q.   Because at that point in time had -- strike

11  that.  When was it that you ultimately gained

12  certification?

13      **A.   So certification I believe you can't get**

14  **until you have your medical diploma.  That's what the**

15  **ECFMG is, Educational Commission for Foreign Medical**

16  **Graduates, and their job is basically to verify**

17  **foreign documents that someone has a medical degree.**

18  **So I got my medical degree on May 10th, 2010, and I**

19  **think shortly thereafter that I was certified by**

20  **ECFMG.**

21      Q.   Okay, that's fine.  Now, I wanted you to look

22  down, you disclose here where it says medical

23  education, you disclose the fact that you attended the

1  Duke NUS Graduate Medical School in Singapore?

2       **A.   That's right.**

3       Q.   That isn't disclosed on any of your

4  subsequent ERAS applications.

5       **A.   I guess I don't really remember.**

6       Q.   We'll go through them.  What I'm trying to

7  figure out is what caused you to disclose it here

8  on --

9       **A.   You know, I think this is -- it's a question**

10 **of what's material or not.  I don't disclose my premed**

11 **courses at six different -- you know, Villanova,**

12 **Temple.  So this was a very short time period.  About**

13 **a month.  So I think I wavered on whether or not it**

14 **was material, to be honest.  You know, that's the best**

15 **answer I can give to your question.**

16      Q.   So is it your understanding as you complete

17 an ERAS application that when it says medical

18 education, institution and location, you get the right

19 to think about what's material and what isn't?  Is

20 that your understanding of the ERAS application?

21      **A.   You know, if you were -- let's say I was at**

22 **Villanova for a day and I -- for premed biochem, and**

23 **then I realized that a better schedule was at Temple.**

1    **And I never went to Villanova after the one day there,**

2    **yeah, I do think there's some degree of latitude that**

3    **if something is not material, you know, you don't need**

4    **to waste paper to put it on there.**

5         Q.   So to follow up on that, if you decide that

6    your attendance at an academic institution is not

7    material, do you understand that you have the right to

8    decide not to disclose it on your ERAS application?

9         **A.   I actually want to go back and revise the**

10   **answer a little bit.  With Duke, I think it was**

11   **unclear whether or not I matriculated there.**

12        Q.   Dr. Isaacs, I didn't ask you about Duke.

13   We're finished with Duke.

14        **A.   I'm allowed to on the same testimony change,**

15   **you know, revise an answer.  So I've testified --**

16        Q.   You can revise an answer any time you want,

17   but let me ask a question.

18        **A.   Right.  I did.**

19        Q.   The question is:  Is it your understanding,

20   or was it your understanding as you completed any of

21   your ERAS applications that you had the opportunity to

22   decide what was material for academic institutions and

23   to not disclose it if you thought them not material?

1      A.    I don't know the answer to that.  I want to

2 revise Duke.  I think there's a question of Duke

3 whether I actually matriculated or not.  Because while

4 I believe at one point in time I had matriculated, I

5 think they had sent me a letter saying basically, you

6 know, refunding your tuition and you never

7 matriculated.  I think actually I matriculated maybe

8 and never paid tuition and then they waived it.  It's

9 complicated there.  So I think that's what happened

10 with Duke.  I really don't know whether I matriculated

11 or not there.

12      Q.    Now let's go back to the question --

13      A.    To answer your question, I think you are

14 supposed to list everything, the instructions say list

15 every institution you've been at.  That would not

16 include things -- institutions that enrollment had

17 been annulled at.  Whether people don't maybe put one

18 day of an organic chemistry course that they

19 transferred -- you know, the example I gave, I guess

20 that would be an immaterial infarction, perhaps, but I

21 don't even know the law on it so I'm not entirely

22 sure.

23      Q.    By the way, was your attendance at USC ever

1    annulled, to use your words?

2        A.    I think discharge of a contract is a -- is

3    the synonym for annulled.  But again, the language --

4        Q.    You have a document that's ever been in your

5    hands or provided to you that said your attendance at

6    USC is annulled?

7        A.    You stopped -- I have to finish my answer to

8    the question.  Moreover, moreover, in addition to

9    discharge of a contract being a possible synonym for

10   annulment of the contract, sealing, as I testified I

11   think three times already today, sealing of a

12   document, general understanding is you can act as if

13   it didn't happen or didn't exist.

14       Q.    Really.

15       A.    According to Wikipedia.

16       Q.    That's your --

17       A.    According to most people I spoke to.

18       Q.    Your source on the law then was Wikipedia?

19       A.    Most people I speak to --

20       Q.    Sir, was your source on the law then

21   Wikipedia?

22       A.    No.  Sealing, I tried other sources at that

23   time other than Wikipedia, although I may have used

1    Wikipedia.  I don't remember.

2        Q.   Okay.  So your conclusion then was that

3    although your records weren't annulled, they were

4    sealed, in your view --

5        A.   No, they were both, actually.  I said they

6    were discharged and they were sealed.

7        Q.   And so when USC sealed your records and

8    maintained them, --

9        A.   Right.

10       Q.   -- it's your conclusion that that annulled

11   your participation there for a year.  That's the

12   conclusion --

13       A.   What would have been the consideration for

14   that contract if it wasn't that?  They didn't pay me

15   for that settlement.  There was no --

16       Q.   Thank you.

17       A.   I want to answer that question.  There was no

18   consideration for the -- the contract for USC sealed

19   my academic records.  It had no consideration for me

20   other than the sealing of them.  So I'm not sure what

21   would make that contract legally valid and binding but

22   for consideration that the records were sealed which

23   meant something for me.  What it meant was I could

1  **disavow knowledge in most forums of those records.**

2      Q.   Well, what it meant it meant, and,

3  respectfully, I won't rely on your analysis of what it

4  meant.  Do you agree --

5      **A.   There's no real case law about this, Attorney**

6  **Kaplan, so I'm not sure your analysis is any better**

7  **than mine.**

8      Q.   Do you agree with me that merely and simply

9  sealing the records at your request to resolve the

10  matter would have been sufficient consideration in and

11  of itself?

12      **A.   No.**

13      Q.   Good.  That's all.

14      **A.   No, I'm not sure I understand the question.**

15      Q.   Let's move on.

16      **A.   Well, no, I want the question repeated**

17  **because I think you said -- can you repeat the**

18  **question?  Sorry.**

19      Q.   I asked you simply whether or not offering

20  and agreeing to seal the records on USC's behalf to

21  have been sufficient consideration for a contractual

22  obligation.  Nothing other than sealing.

23      **A.   Oh.  Yes.  The answer is yes.**

1      Q.    Okay.

2      **A.    Because sealing means something, I believe.**

3      Q.    Would you turn to the last page of the

4  exhibit I just put in front of you, the very last

5  page.

6      **A.    Yeah.**

7      Q.    You don't have it in front of you.  There you

8  go.  There's a certification there.

9      **A.    Right.**

10     Q.    And I just want to ask you about that.  It

11 says, "I certify that the information contained within

12 my ERAS application is complete and accurate to the

13 best of my knowledge."

14     **A.    Right.**

15     Q.    And I want to stop there and say do you

16 interpret that to mean complete and accurate to the

17 best of my knowledge insofar as I consider it

18 material?

19     **A.    No.**

20     Q.    It then goes on to say, "I understand that

21 any false or missing information may disqualify me

22 from consideration for a position."  And about that I

23 want to ask you is that missing information which you

 1    consider to be material or is it any missing

 2    information?

 3         **A.    It would be improperly missing information.**

 4         Q.    Okay.  That would require that somebody has

 5    to decide whether it's proper or improper.

 6         **A.    Well, --**

 7         Q.    So I want to go back to what I said before.

 8    Is it information that only you consider material that

 9    would constitute missing information?

10         **A.    No.  I'm using proper and material**

11    **differently.**

12         Q.    Okay.  It goes on, then, to say, "May

13    constitute cause for termination from the program and

14    may result in expulsion from ERAS and investigation by

15    AAMC."  Did you understand signing your ERAS

16    applications and misstating on them could give rise to

17    termination from a program?

18         **A.    Well, I object that you're actually trying to**

19    **testify with your question.  But the answer to the**

20    **question is ERAS investigated this and I was**

21    **exonerated.**

22         Q.    Well, we're going to get to the letter later

23    that you claim exonerates you, but my question is

1     different.  My question is simply did you understand

2     that if you improperly misstated or omitted

3     information from the ERAS application you could be

4     terminated from a program?

5          **A.   Yes.  Of course.**

6          MR. KAPLAN:  Okay.  Why don't you take a

7     break for a minute.  It's quarter to -- 17 minutes to

8     11.  Why don't we take ten minutes and then we'll be

9     back.

10          (Recess taken.)

11          Q.   BY MR. KAPLAN:  Dr. Isaacs, you ready?

12          **A.   Yeah.**

13          Q.   Couple things I wanted to follow up on from

14     the questioning before we broke.  The first thing is

15     in connection with the events involving your being

16     struck by Mr. Chang, contemporaneously with those

17     events and during that evening was there any alcoholic

18     drinking going on?

19          **A.   Yes, there was.  There was the typical binge**

20     **drinking of Dartmouth juniors, which is pretty**

21     **excessive typically from what I observed.  In fact,**

22     **dangerously -- dangerously obsessive I think you could**

23     **call it from what I observed.  I typically observed**

1  **people breaking windows, breaking property, injuring**

2  **themselves, broken bones, pretty severe altercations.**

3  **So yes, it was typical of a Dartmouth junior.**

4      Q.   Okay.  So that evening, if I understand what

5  you're telling me, there was -- strike that, Andy.

6          How many were in the group at the bar?  Were

7  you at a bar?

8      **A.   We were at Ybor City, which is a group of**

9  **establishments.**

10     Q.   Okay.

11     **A.   I don't remember which we were at.**

12     Q.   That's fine.

13     **A.   About six people to answer your question.**

14     Q.   About six people.

15     **A.   Maybe ten.**

16     Q.   And did you observe that evening that there

17 was -- that particular evening do you recall that you

18 observed that there was binge drinking going on?

19     **A.   I think so.  But it's hard to testify to that**

20 **fact, you know, 15 years later.**

21     Q.   Let me just ask was there drinking going on?

22     **A.   Sure.**

23     Q.   Were you drinking?

1      **A.    Yes.**

2      Q.    Okay.

3      **A.    I was.**

4      Q.    And did you observe, that you can recall,

5      whether or not any of the individuals with whom you

6      were with, about six you said, whether or not any of

7      them were drunk, in your view, or intoxicated?

8      **A.    It was too long ago to remember that.**

9      Q.    Okay.  Let me ask specifically about Mr.

10     Chang.

11     **A.    Yeah.**

12     Q.    Do you remember what his condition was given

13     his alcohol consumption?

14     **A.    I won't speculate.  I would guess he was**

15     **drunk.**

16     Q.    Okay.  Let me move on to another question I

17     just wanted to follow up on.  You told me or you

18     testified that you worked at Merrill Lynch for a

19     while.

20     **A.    Right.**

21     Q.    Did you ever bring any claims against Merrill

22     Lynch?

23     **A.    I think I already exerted a privilege, work**

1    **product, on attorney/client privilege and on right to**

2    **privacy.**

3         Q.   Good.  My question is did you ever bring any

4    claims against Merrill Lynch?  Are you refusing to

5    answer that question?

6         **A.    Did I bring claims against Merrill Lynch?**

7    **What kind of claims?**

8         Q.   Any kind of claims, sir.

9         **A.    I think there were claims made.**

10   **Notwithstanding my objection.**

11        Q.   All right.  And what were the nature --

12   strike that.  Did you bring those claims?  That's what

13   I'm asking.

14        **A.    Well, I had an attorney, but I don't want to**

15   **go into what he did.  That's the work --**

16   **attorney/client privilege.**

17        Q.   Your conversations with your attorney may be

18   attorney/client privilege.  I'm not asking you about

19   that.  Don't tell me about your conversations with

20   your counsel.

21        **A.    Right.**

22        Q.   What I'm asking you about are -- is what is

23   the nature of the claims that were brought for you or

1  by you?

2      A.   **Well, that would have been his communication.**

3  **I don't know.   I never sued them in court, if that's**

4  **what you're asking.**

5      Q.   Did you ever see the claims?  Did you ever

6  see in writing what the nature of the claims were?

7      A.   **I think I did see them.  I'm not sure how**

8  **much I studied them at the time, but I did see them.**

9      Q.   Tell me what you remember you read or saw.

10      A.   **That's -- that's attorney/client privilege.**

11      Q.   Sir, you know, I know you're not a lawyer,

12  but I'm telling you right now it's not an

13  attorney/client privilege for me to ask you what the

14  nature of the claims that were asserted by you or on

15  your behalf were.

16      A.   **Well, and rights of privacy and work product,**

17  **I also exert that privilege.**

18      Q.   And there is neither a work product nor a

19  privacy here --

20      A.   **Merrill Lynch's work product.**

21      Q.   But you don't get the right to assert Merrill

22  Lynch's work product.

23      A.   **I don't know that.  I'm not an attorney.**

1      Q.    Good.

2      **A.    But I am actually pro se, and I believe I can**

3  **object to work product, my work product with them.**

4      Q.    Sir, let me get this straight.  You're

5  refusing to answer the question, which is pretty

6  simple and pretty direct.  It is simply the following:

7  Tell me what you know about the claims that were

8  asserted against Merrill Lynch in connection -- on

9  your behalf or by you.  That's it.

10      **A.    Attorney Kaplan, I've listed three**

11  **objections, not being a lawyer, I believe at least one**

12  **of them are valid, if not all three.  And separately**

13  **from that I also -- while I understand normally things**

14  **are relevant in deposition, I think if you start**

15  **asking about, you know, the color of the socks I wore**

16  **as a baby, you know, there's limits to it.  So I think**

17  **bringing up something from 12 years ago that is under**

18  **the three privileges I stated, I'm not going to**

19  **proceed with questions there.  I might reconsider at**

20  **the end of this deposition if you want to bring it up**

21  **again just for continuity.  But at this point I**

22  **just -- I don't think I'm allowed to answer that.  I'm**

23  **not sure if I'm allowed to.  And I'm not sure it's**

1   **really proper to be questioned about it.**

2       Q.   Sir, you refuse to answer at your own peril.

3   We'll deal with it.

4       **A.   I understand that.**

5       Q.   Let's move on.  We're back in Arizona.

6            Andy, please.

7            (Isaacs Exhibit 7 was

8            marked for identification.)

9       Q.   BY MR. KAPLAN:  We've marked Exhibit 7, it's

10  an October 6, 2010 letter written -- excuse me,

11  written by the University of Arizona.  Have you ever

12  seen this?  It was sent in response to claims you made

13  against them.  Take a look at it and I'll ask you some

14  questions --

15      **A.   Yeah, I'm not sure if I actually read this**

16  **document.  I may have briefly seen it.**

17      Q.   Okay.  Do you know if it was sent to you for

18  you to see?

19      **A.   I don't know.  It looks like internal ACGME**

20  **review documents.  I don't think I would have seen**

21  **them.**

22      Q.   I want to ask you about this letter.  And if

23  you look at it, it's written -- excuse me, signed by

1    Amy Waer and Rebecca Potter.  Do you know who Dr. Waer

2    is?  That's W-a-e-r.  Do you know who Dr. Waer is?

3        **A.    Sure.  Yeah, I do.**

4        Q.    You sued her; didn't you?

5        **A.    Not at the time this letter was done.**

6        Q.    But you have sued her.

7        **A.    She has been served, yeah, with -- yes.**

8        Q.    Okay.  And do you know who Rebecca Potter is?

9        **A.    I think so.**

10       Q.    Okay.  Did you have any direct contact with

11   Dr. Waer while you were at the University of Arizona?

12       **A.    Sure.  She was my program director.**

13       Q.    Okay.  And did you work with her during your

14   time there?

15       **A.    I don't know if you really call it work.  I**

16   **mean, she -- she acted kind of strange from day one**

17   **for about 20 days and then I was kind of asked to**

18   **leave.  Or suggested -- kind of subtlety inferred to**

19   **leave, whatever you call it.**

20       Q.    You weren't subtlety requested to leave.  You

21   were told you were incompetent and given a chance to

22   leave or be dismissed; isn't that correct, sir?

23       **A.    That's not my recollection.**

1      Q.   Okay.  We'll go through some documents.

2      **A.   There were -- I think that's an unfair**

3  **summary.**

4      Q.   Okay.  Well, let's look at this letter.  And

5  this letter, if you look at the first paragraph, it

6  says that, "This is in response to your letter dated

7  September 7, 2010 regarding Jeffrey Isaacs, MD, and

8  his complaint alleging violation of ACGME requirements

9  by our general surgery residency program."  Do you

10  recall making a complaint?

11     **A.   Sure.**

12     Q.   All right.  And do you recall that you made

13  that complaint to ACGME?

14     **A.   Yes.**

15     Q.   And do you recall that the complaint had to

16  do with items and elements concerning the surgery

17  program at the University of Arizona?

18     **A.   Well, yes and no.**

19     Q.   Well, which part is yes and which part -- and

20  why is there a no?

21     **A.   Yes, I mean, basically just briefly reading**

22  **this, these were facts I stated.  No in that I kind of**

23  **suspected that Arizona knew about USC and was**

1  terminating me for that.  And I never stated that to

2  the ACGME.  I was I think naively hoping that their

3  investigation would just turn that up.  Which it did

4  not.  So that's why there's a no.

5      Q.    When you say you thought Arizona knew about

6  USC, what is it that you thought they knew about USC?

7      A.    Well, there are about 5,000 pages of

8  documents, some of them pretty embarrassing, so I

9  think that's what they knew.

10     Q.    So you think they knew about -- I don't want

11  to guess what you're telling me, sir.  5,000 pages of

12  documents doesn't help me.  Is there anything

13  particular within the documents that were involved at

14  USC that would motivate Arizona in your view to do

15  something bad to you?

16     A.    I can't speculate what their mentality was.

17  In fact, I think it was probably pretty poor mentality

18  to put a word on it.  But I think the 5,000 pages in

19  the docket is what I was referring to.  Some of which

20  contained unusual or embarrassing information about

21  myself such as a terrorist on hold.  Again, beyond

22  that it would be speculation as to what actually in

23  there prompted their thought processes.

1        Q.   And what is it that leads you to the

2   conclusion that the -- that Arizona was aware of

3   anything connected to USC?

4        **A.   I have trouble believing the first day of**

5   **work there that I was actually performing at the**

6   **levels they were saying and that they could have**

7   **assessed that within a day or two of working.  Also**

8   **that they locked and changed their door code about 20**

9   **days later.  I suspect, you know, there was nothing**

10  **about me that appears, at least everyone whose known**

11  **me my whole life has said that appears to be something**

12  **that warrants locking doors.  But if you read a**

13  **lawsuit that, you know, is spun or charged up by**

14  **attorneys it might make me appear more dangerous than**

15  **I am.  So I think them locking the doors -- that's one**

16  **example.  But I can't really -- I'm not allowed to**

17  **list items for you in a deposition, but those are a**

18  **couple of the types of things that were**

19  **inconsistencies to me.**

20       Q.   Did you ever confirm that anybody at Arizona

21  knew anything at all about USC?

22       **A.   That's what I've spent three years in this**

23  **litigation trying to do.**

1          Q.    Actually, is that what you think you're

2     trying to prove in this litigation?

3          A.    Part of it.  I mean, I understand I have sent

4     a notice of deposition to Dr. Waer for this

5     litigation.  So part of it would be -- I mean, there

6     are a lot of issues in this litigation, but one of

7     them is that.

8          Q.    You haven't sued Dr. Waer or Arizona in the

9     litigation that brings you here today, sir.

10         A.    That doesn't mean that they didn't play a

11    role.

12         Q.    Okay.  So I just -- again, just to make sure

13    I understand this.  Your view or your understanding is

14    that US -- that Arizona in their residency -- surgical

15    residency program knew about USC, and that is what

16    motivated action on their behalf?

17         A.    It's something I'm suspicious of.  I didn't

18    want to put it in writing to ACGME just on a

19    suspicion, so I went on the odd facts I listed in

20    there, which were duty hour violations, odd

21    criticisms, you know, that they're on probation for

22    having -- Arizona was on probation for two years for

23    being too aggressive to its residents.  So that was

1    the nature of my concerns, things that would be more

2    typical.

3         Q.   Did you know Arizona was on probation when

4    you decided to go there?

5         A.   Not for those reasons, no.  I did know they

6    were on probation, but not for -- they did not

7    disclose the reasons they were on probation, which I

8    think is an ACGME complaint.

9         Q.   So just to bring this little aspect of

10   questioning to closure, your understanding, your view

11   is that Arizona was aware -- somehow became aware of

12   USC and that that motivated their actions towards you?

13        A.   It was a suspicion.  I can't testify to that.

14        Q.   And it's still a suspicion?

15        A.   It is.

16        Q.   And have you ever in the course of any -- on

17   any basis at all, what, if any, evidence do you have

18   that sustains or confirms, excuse me, your suspicion?

19        A.   Again, I have to object to form.  I'm not

20   allowed to list items.

21        Q.   I don't know what you mean when you say --

22        A.   Can I finish my statement?

23        Q.   Excuse me, I don't know what you mean when

1  you say you're not entitled to list items.

2       **A.   Well, I'm answering.  So I'm objecting to**

3  **form.**

4       Q.   Right.

5       **A.   I understand that I'm not allowed to be asked**

6  **to list every allegation or -- against any party.  I**

7  **can't be expected to recall that.**

8       Q.   Dr. Isaacs, you are a master of allegation.

9  I'm not asking you about --

10      **A.   I object to that statement.**

11      Q.   I'm not asking you about your allegations.

12      **A.   Okay.**

13      Q.   I'm asking you if you have any facts.  Not

14  allegations.

15      **A.   Right.**

16      Q.   Facts that confirm --

17      **A.   Right.  I object to the form of that.**

18      Q.   Let me finish.  Let me finish.  Do you have

19  any facts to confirm your suspicion that the

20  individuals at the Arizona surgical residency program

21  knew anything at all about the USC incidents, or the

22  USC matter?

23      **A.   So let me answer the question.  If you were**

1    to say to me do I have any facts supporting this

2    lawsuit here against Dartmouth today, that's an

3    improper question, as I understand it, because that

4    could be three days of facts.  I just can't -- no

5    witness could be expected to organize and testify a

6    list of facts.  I think in California that rule, the

7    case law is Kincaid or -- let me -- again, I'm not

8    finished with my answer.  It's Rifkind, R-i-f-k-i-n-d.

9    That's California.  I don't know the federal

10   equivalent of that, but I believe it does exist.

11           Now, the question you're asking me is

12   different because Arizona is not obviously a party to

13   this lawsuit, but I believe the same objection

14   applies.  That said, I will answer two brief examples.

15        Q.    Good.

16        A.    One, it took Dartmouth until February,

17   actually, a phone conversation with you to mention

18   knowledge of California to me.  So I see that as

19   evidence that universities, program directors and

20   their attorneys were uncomfortable mentioning it,

21   California, when they learned about it.  So that what

22   happened to me at Dartmouth I draw a parallel to

23   Arizona.  Again, I mean, you can infer if you want if

1    that's a correct inference, but I do believe that's

2    one example that there was a reluctance to raise USC

3    at Dartmouth, and that's probably what occurred at

4    Arizona.

5            The second example was in a meeting with Dr.

6    Waer, I mean, she was -- she was doubting whether I

7    actually took the USMLE, I think she alleged I maybe

8    cheated on all my tests and all my diplomas and didn't

9    have them.  And those are actually the same type

10   allegations Harley Friedman and Christine Finn started

11   e-mailing my MBA program not believing I had these

12   credentials.  So there were just too many

13   similarities.  And the doors were locked.  Dean

14   Bertrand ordered my access revoked.  So there were

15   just similarities between the two that, as we know,

16   Dartmouth knows about USC, so I kind of inferred that

17   my suspicion with Arizona was probably correct.  They

18   probably did know about USC.  But I can't testify for

19   sure.

20       Q.  Okay.  So that would constitute the facts

21   that you believe confirm your suspicion?

22       A.  No.  I used the California Rifkind objection.

23   I don't know the federal equivalent of that, like I

1    **said.  I can't list every fact, every body language I**

2    **noticed, every document that had a -- you know, an odd**

3    **statement, every criticism made to me.  I'd have to**

4    **sit for weeks, and I've done that, and those have been**

5    **filed in various cases, but, frankly, it's hard to do**

6    **because I believe this is a cover-up from two**

7    **institutions.**

8         Q.   Okay.

9         **A.   So I can't testify for every fact.  I've**

10   **given two or three examples.**

11        Q.   Why don't you look at the exhibit I've placed

12   in front of you, the most recent exhibit, which is No.

13   7.

14        **A.   Yeah.**

15        Q.   And I'd like you to turn to page -- I want to

16   ask you about some of the incidences in this document.

17   And I'm specifically on page 3.  Did you get to page

18   3?

19        **A.   Yeah.  I'm not going to read the whole thing.**

20   **I don't want to --**

21        Q.   I didn't ask you to read it, sir.  I asked

22   you to go to page 3.  I'd like you to look at the July

23   6th, 2010 entry.  And if you don't want to read it

1    I'll read it to you.  It says, "Dr. Waer received an

2    e-mail from Dr. Ira Levine, general surgery faculty

3    member at the VA, stating that Dr. Isaacs failed to do

4    physical examinations of the patients he was assigned

5    to present at rounds and was unable to give a

6    presentation on his patients."  Do you recall such an

7    incident?

8         A.    Well, now not as described, but if you'd like

9    me to describe how I remember this incident I'll do

10   so.

11        Q.    Let me make sure we're talking about the same

12   thing --

13        A.    We're talking about the same paragraph, July

14   6th.

15        Q.    You remember a July 6th incident.  How do you

16   remember it?

17        A.    I remember, like I said, this was like my

18   third day of work there, and hospitals vary on their

19   procedures, attendings vary on their procedures and

20   what they want done.  And this was a wound bandage

21   issue, I believe, which is actually, you know, my

22   first day of work refers to third day of work, same

23   issue raised on my last day of work at Dartmouth.  And

1    **I didn't remove a wound on a patient that I didn't**

2    **believe the wound -- or the bandage, I didn't believe**

3    **the bandage needed to he be removed on.**

4        Q.   Well, the Dartmouth issue is different; isn't

5    it, sir?  It's not a situation where you didn't

6    believe the wound needed to be examined at Dartmouth,

7    was it?

8        **A.   Right.  So I believe they were constructively**

9    **terminating me.  That's my answer.**

10       Q.   Is that correct, sir, that the Dartmouth

11   issue is actually different than this?

12       **A.   Well, that's how constructive termination**

13   **works.  You are criticized for one thing when you just**

14   **want the person to quit for another reason.**

15       Q.   So going back to the July 6th incident that's

16   recorded here.

17       **A.   Right.**

18       Q.   What it says is that you failed to write

19   notes on the two to three patients whom he saw that

20   day.

21       **A.   Right.  I was never asked to write notes.**

22   **Again, --**

23       Q.   So you began a -- let me, again, did you

 1   understand as you began your residency at -- in the

 2   surgery program that upon seeing a patient you needed

 3   to be asked to write notes?

 4       A.   Some attendings do actually prefer to write

 5   their notes.  That's rare.  This was a clinic.  I had

 6   never served in that kind of clinic.  It was a VA

 7   clinic that I had never actually been in that kind of

 8   setting before.  And as soon as he asked me to write

 9   notes, I wrote them.  It was why would I -- why would

10   I -- I can't even imagine if I knew I had to write

11   notes why I would pretend I didn't have to write them.

12   I mean, ...

13       Q.   Why don't you turn to the next page, July 21.

14       A.   Okay.

15       Q.   In here it says that, "Dr. Waer received

16   notice from Felipe," and I'm going to spell the last

17   name so that Andy has it, M-a-e-g-a-w-a, "a PGY 5

18   resident."  That would stand for the fifth year of the

19   residency program, correct?

20       A.   Yeah.

21       Q.   "That Dr. Isaacs did not report to work that

22   day to do rounds on his patients at the VA with the

23   general surgery team."

1      **A.    Right.**

2      Q.    Let's stop right there.  Do you recall that

3   July 21 day when you failed to report?

4      **A.    I'm trying to remember if that was the day I**

5   **had a car accident or a related day.  But I don't**

6   **recall exactly.**

7      Q.    All right.  It goes on to say that you did

8   not answer -- "He did not answer his pager, either,

9   despite multiple attempts to reach him that morning on

10  his pager."  Do you remember being told that you had

11  not been reachable on your pager?

12     **A.    If that was one of the days something**

13  **happened, then I probably wasn't reachable.  I don't**

14  **recall.**

15     Q.    Okay.  If you continue on this, it goes on to

16  say.  "Dr. Waer then tried to reach Dr. Isaacs on both

17  his service pager and his personal pager, but received

18  no response."  So you apparently had two pagers,

19  right?

20     **A.    I don't know.**

21     Q.    Okay.  In the middle of the paragraph, it

22  continues on the next page, it says, and I'm actually

23  looking one, two, three, four, five, six, seven,

1    eight, nine, ten, on the 11th line there's a sentence

2    that begins, "Dr. Isaacs responded that the reason he

3    did not report to work was that he was at home calling

4    his former medical student friends to see how other

5    residency programs compared to the University of

6    Arizona."  And my only question about that is do you

7    recall having a discussion in which you used that as

8    an excuse for not attending -- not being at work?

9        **A.   So I'm actually starting -- you know, like I**

10   **say, I hadn't seen this document before, and I do see**

11   **the next line mentions the car problems and not**

12   **feeling well.  But I do recall, to answer your**

13   **question, I do recall that this is when I started to**

14   **be suspicious that I was being constructively**

15   **terminated, and I started to I guess you could say**

16   **fight back.**

17       Q.   I don't understand.  Let me explore that

18   answer because I don't understand it.  Did you

19   fight -- when you say you were fighting back, how were

20   you fighting back?

21       **A.   I think I was implying to her that something**

22   **was unusual with my experience, the way I was being**

23   **treated, that I spoke with friends, and that none of**

1    them were having the concerns I had.

2         Q.   So it's correct, then, that you failed to

3    report to work on that day when you were scheduled to

4    report to work; is that correct?

5         A.   Well, there was a sickness and/or a car

6    accident involved, yes.  And I did apparently not show

7    up.  I think concurrent with that I think the car

8    accident was due to stress and what was happening, and

9    I kind of took some time to reconsider what was going

10   on.  I think I did make some phone calls, and then I

11   think I showed up three hours later and complained to

12   Dr. Waer.  That is my recollection.

13        Q.   Well, actually, if doesn't say anything about

14   an accident.  It said you were having car problems.

15        A.   What she chose to write.  I mean, the car

16   problem was actually an accident which I can pull up a

17   police report or insurance file for.

18        Q.   What I'm actually trying to figure out,

19   though, is your answer, sir, which was that you were

20   starting to fight back.  Was the method by which you

21   fought back not appearing on a day when you were

22   scheduled to work?

23        A.   No.  That was the method because I started to

 1    become too sick to work and I had a car accident.

 2         Q.   And who did you call --

 3         A.   When I actually met with her I face to face

 4    said, or implied, there's something a little strange

 5    here.

 6         Q.   Who did you call when you realized you

 7    couldn't go to work?

 8         A.   No, I think I just reported to her as soon as

 9    I felt able to.  Maybe I -- you know, I don't sleep

10    when I get stressed out.  It may be that I was just

11    not capable of treating patients.  I may have then

12    fallen asleep for two hours and then shown up and

13    presented in her office.  That's probably what

14    happened.

15         Q.   A lot of things may have happened.  The

16    reference states that you didn't call or report that

17    you were --

18         A.   Well, I was probably asleep.

19         Q.   Okay.

20         A.   I think as soon as I was able to I reported

21    to her and said in my way of doing it something is a

22    little suspicious here.

23         Q.   I want you to look at the next entry on July

1   23 for a minute.  And at the very end of the page

2   there's a sentence or -- that begins Dr. Wayne --

3   Wynne, excuse me, Dr. Wynne.  Do you remember Dr.

4   Wynne?

5       **A.   Yeah, I do.**

6       Q.   Good guy?  Bad guy?  What?  Do you remember?

7       **A.   You know, if I knew who was the good guys and**

8   **who was the bad guys in my life things would be a**

9   **little easier to figure out.**

10      Q.   Ever remember Dr. Wynne doing anything that

11  caused you to have suspicions concerning --

12      **A.   Sure.  Well, she's the one who actually**

13  **implied that I forged diplomas and test scores.  And**

14  **how she did that when everyone who knows me knows I'm**

15  **just an outstanding test taker and have very good**

16  **diplomas.  How she had the nerve to do that is very**

17  **suspicious.  No one ever did that in my life except**

18  **Harley Friedman or Christine Finn.  So when you have a**

19  **lifetime span of 36 years and only two people ever**

20  **made some kind of allegation to you, you tend to think**

21  **that some evidence that they communicated with each**

22  **other.**

23      Q.   Dr. Isaacs, in fairness, there's a whole slew

1    of people on these documents that talk about your

2    level of incompetence, not just three.  Are you aware

3    that many other physicians than the three you have

4    identified have routinely talked about your

5    incompetence as a physician?  Do you know that?

6        **A.    Well, I think a program director can kind of**

7    **pull together criticisms.  But they were weren't**

8    **criticisms at the level of falsifying diplomas and**

9    **exams.**

10        Q.    All right.  I understand that.

11        **A.    I'm answering your question.  Only Dr. Wynne**

12    **and Dr. Friedman made that heightened level of**

13    **allegation.  The others that I left a pager are a**

14    **different level.  Yes, I'm aware there are allegations**

15    **I think are constructive termination coordinated by**

16    **the program -- two program directors, yes.**

17        Q.    You are aware that there are numerous

18    physicians, more than simply Dr. Wynne and Dr.

19    Isaacs -- excuse me, Dr. Bertrand and Dr. Finn who

20    have commented upon your incompetence as a physician?

21        **A.    Well, let me answer --**

22        Q.    Are you aware of that?

23        **A.    I want to answer the question my awareness is**

1    that about six physicians at Arizona built a paper

2    trail against me, and then Friedman and Finn knew

3    about that, and I don't know the count of who they

4    kind of got to jump on the bandwagon at Dartmouth.

5        Q.   So your conclusion is that all of the various

6    physicians who have observed your work either at

7    Arizona or at Mary Hitchcock Memorial Hospital, all of

8    those people are reporting levels, your level of

9    incompetence because they have been told to do so by

10   others?

11       A.   No.   For example, Dr. West, who I spent 90

12   percent of my time with at Dartmouth, gave me pretty

13   much superior evaluations.

14       Q.   You gotta listen to my question, sir.   I'll

15   try it again.

16       A.   Okay.

17       Q.   To the extent there are negative reports

18   about your incompetence --

19       A.   Okay.   But that wasn't your question.

20       Q.   To the extent there are such reports, whether

21   they're at Arizona or at Mary Hitchcock Memorial

22   Hospital, is it your contention those reports are all

23   there because the physicians have been told to do so

1    by program directors?

2        **A.    No.    I did leave a pager on -- probably on**

3    **this occasion that someone noticed.    The question is**

4    **whether I was -- whether they were observing me kind**

5    **of stressed out from the situation and then reporting**

6    **things.    So they were maybe innocent bystanders, some**

7    **of these.**

8        Q.    I'd like you to turn to July 21 through 30 on

9    the next page.    Page 6.    See that?

10       **A.    Yeah.**

11       Q.    And now, this says, "Dr. Isaacs was closely

12   monitored by the VA general surgery faculty and senior

13   residents on the service."    And I want to stop there

14   for a minute and ask if you recall that the level of

15   monitoring of your work was greater than other

16   residents or interns with whom you were working.

17       **A.    Absolutely.**

18       Q.    Okay.    And it says, "He was given minimal

19   patient and operating room assignments because he had

20   demonstrated an inability to adequately maintain

21   patient safety."    Do you recall that your work

22   assignments, the number of patients and so forth that

23   you had to participate with were reduced below those

1  of other interns?

2       A.    I'm not sure.  Probably, yes, but I'm not

3  sure.

4       Q.    Okay.  Were you aware that the number of

5  patients for whom you had responsibility were reduced

6  at Arizona because of concerns regarding your ability

7  to treat them properly?

8       A.    Well, no.  I believe those were generally

9  false concerns.

10      Q.    All right.  Whether or not they were false or

11  not, do you agree that you were informed, whether

12  falsely or not, that the reason your work schedule was

13  being reduced in terms of patients was because of

14  concerns regarding your ability to treat them?

15      A.    Well, I think I'm allowed to answer an

16  example why I believe it's false.

17      Q.    Why don't you answer it first and then you

18  can do anything you want.  Were you told that the

19  reason your work responsibilities were reduced was

20  because of the concerns regarding your ability to

21  provide patient care?  Whether it's true or not, did

22  they tell you that?

23      A.    I don't think they phrased it that way, but I

1    don't remember how they phrased it.

2        Q.    Did you get a message similar to the message

3    in that question?

4        A.    Yeah, probably.

5        Q.    Okay.

6        A.    Yeah.

7        Q.    If you want to continue your answer now, go

8    ahead.

9        A.    Yeah.  I mean, one of the -- you know, I

10    mentioned West's evaluation.  But one of the -- you

11    know, an alternative example of what I believe was a

12    false criticism, for instance, they said my technical

13    skills in surgery were one.  Being, you know, failed.

14    And I was only asked to do one technical procedure in

15    surgery, which was suturing a portacath at Arizona

16    that was a subcuticular suture they asked me to do.  I

17    remember that very well because I remember in the

18    Caribbean first semester seven years back my anatomy

19    lab tutor, it was Dr. Stam now, Dr. Brittany Stam

20    taught me how to do a subcuticular on a cadaver.  I

21    had only done that once.  I practiced it four times in

22    front of her, and that was the last subcuticular I did

23    until being asked to do one in Arizona.  And I

1    **remember being surprised that I remember the procedure**

2    **so well that I actually did a very good subcuticular,**

3    **so how they wrote one on technical, when I**

4    **specifically remember the only thing they ever asked**

5    **me to do there and what I consider to be a sham and**

6    **constructive termination was something I did a very**

7    **good job at.  So to answer your question, I don't**

8    **believe they had a legitimate concern over patient**

9    **safety.**

10        Q.    Okay.  Would you turn to August 10th for a

11    moment.  It's a couple down.

12        **A.    Yeah.**

13        Q.    Now, by August 10 you're apparently having

14    some serious problems at least in the view of the

15    folks at Arizona, and this entry says, "The surgery

16    residency executive committee called an emergency

17    meeting to discuss Dr. Isaacs" -- "Dr. Isaacs'

18    performance because of a number of complaints and

19    negative evaluations.  Dr. Waer had received to

20    date" -- "evaluations Dr. Waer had received to date.

21    His evaluations were reviewed and the committee voted

22    unanimously to place Dr. Isaacs on probation pursuant

23    to the due process guidelines for residents and

1  fellows."  Now, all I want to ask you about that

2  initially is do you recall that you were advised that

3  you were being placed on probation, that a vote had

4  been taken to place you on probation on or around

5  August 10 of 2010?

6      A.    No.  Actually, I do recall some mention of

7  probation, but I was told that if I resigned at the

8  point of the meeting, whenever this meeting was with

9  myself, Dr. Waer and Dr. Wynne, that nothing official,

10  no negative official statements were on my record.

11      Q.    I understand.

12      A.    Which would be different from actually a vote

13  that I was on probation.  So actually, I think I was

14  lied to in the meeting, and I was never told that I'd

15  been voted onto probation.

16      Q.    Whether or not you were told you were voted,

17  to use that word, on probation, were you informed by

18  anybody at Arizona on or about August 10 that you were

19  going to be placed on probation and there might be

20  some other options to avoid that?  You recall that,

21  sir?

22      A.    I was told if I resigned, I had no negative

23  problems in my file.  Which apparently was not true.

1      Q.   Okay.  Do you recall being told the reasons

2   why they were placing you on probation?

3      **A.   Well, they did hand me the -- the**

4   **technical -- one or two evaluations which were only**

5   **one or two pages, you know, circles from one through**

6   **five.  And that's the example I just gave you.  So I**

7   **immediately looked at it and thought technical**

8   **problems?  I did one very good suture here, and that's**

9   **the only technical thing I was asked to do.  And**

10  **that's the point where I actually -- I think I made up**

11  **my mind to resign.  I thought, you know, I'm doing a**

12  **good job on subcuticular sutures and they're circling**

13  **one out of five.  This program, for lack of a better**

14  **word, is BS or they know about USC and they're holding**

15  **that against me, and I think I made my choice to**

16  **resign then.**

17     Q.   Your -- your -- when you filled out

18  your -- the ERAS application next after your

19  attendance in this intern program, and we'll show it

20  to you in a bit.

21     **A.   Mm-hmm.**

22     Q.   You chose not to include the University --

23  your experience as an intern at the University of

1  Arizona.  Correct?  I'm going to show you the

2  application.  Do you agree that you failed to disclose

3  it?

4      **A.   I agree I did not place Arizona on the ERAS**

5  **application, yes.**

6      Q.   Okay.  You knew you had participated in an

7  intern program at Arizona when you completed the ERAS

8  application?

9      **A.   You know, I -- I didn't think it was real**

10 **participation on an informal level.  I guess formally**

11 **I participated to answer your question.  But I do have**

12 **to answer informally I don't think I really**

13 **participated as part of their team.  I don't think**

14 **they really -- I think they knew something on day one.**

15 **So informally if you're talking, like, morally**

16 **answering the question what I really believed,**

17 **participation would be a questionable word.  Legally I**

18 **would say yes, I participated.  I definitely would.**

19     Q.   So -- so you -- for whatever reason, and I'll

20 ask you in a moment about it, did you decide not to

21 include Arizona internship on the ERAS application you

22 filled out subsequent to that experience?

23     **A.   I don't remember deciding.  I was in a**

1    very -- my state when I was filling out that ERAS

2    application to me felt, and I haven't felt that many

3    times in my life, like my stay in the UCLA psych ward

4    that they labeled as psychosis NOS.  So I did have

5    that feeling, whatever.  I think I dispute their

6    characterization of it.  But I did have that feeling

7    after Arizona, that's how much I believed that the USC

8    issue had come back to haunt me.  So I can't recall a

9    firm decision process on that.  If you're asking

10   decisions.

11        Q.    You think you forgot it?

12        A.    It's possible.  The ERAS is actually -- it's

13   similar to patient notes, you can copy them over from

14   the previous year.  And what I think -- what I think

15   happened, if you're asking what I think probably

16   happened, short of really remembering it, I copied

17   over the application from the previous year, and I

18   thought -- I was asking for my job back at Arizona at

19   the time.  So I had sent them a resignation under

20   duress letter I had called it.  And I thought they

21   might take me back, actually, that's honestly what I

22   thought at the time.  So I probably -- again, I don't

23   really remember this, but if I try to think back, I

1    think I may have been thinking I don't want to

2    transmit to the whole country kind of my -- this issue

3    at Arizona when they take me back tomorrow.  So again,

4    I don't remember, but that is my guess that I didn't

5    know how to deal -- how to answer a voluntary

6    resignation under duress.

7         Q.   So you then made a decision not to include

8    it?

9         A.   But I don't -- decision is -- you know, I

10   think you have to remember conscious, you know, train

11   of thought.  I don't remember that.

12        Q.   Do you remember talking to people about

13   whether or not you had to disclose Arizona?

14        A.   No, I don't think I talked to anyone.  I

15   mean, I may have talked to my parents driving home.

16        Q.   Do you remember asking Dr. Waer or Dr. Wynne

17   about it?

18        A.   No.  The only thing -- I don't think we

19   discussed that.  I think we only talked about whether

20   or not I had to disclose any negative things on the

21   record, and they assured me there were no negative

22   things on my record.

23        Q.   Turn to the next page, sir.  In the middle of

1    the paragraph on page 8, I'll read to you, it says,

2    "Dr. Isaacs asked Dr. Wynne and Dr. Waer, quote,

3    if" -- in quotes, by the way, "if I resign can we say

4    I was never here, question mark, close quote."

5         **A.   Mm-hmm.**

6         Q.   "Dr. Waer informed Dr. Isaacs that that would

7    be impermissible but gave Dr. Isaacs the opportunity

8    to consider whether to resign voluntarily from the

9    program or to be placed on probation."  And I want to

10   ask you about that.  First of all, I want to ask you

11   do you recall asking Dr. Wynne and Dr. Waer if you

12   could resign and say that I've never been here?

13        **A.   Obviously I just testified I wouldn't -- I**

14   **wouldn't falsely testify on that if I recalled it.  So**

15   **no, I don't recall it.**

16        Q.   There's a little thing we do sometimes which

17   everybody does, which is that sometimes you look at a

18   document and your recollection is spurred more than it

19   was before.  Having read that, having read that, do

20   you know whether or not you said that to Dr. Waer or

21   doctor -- excuse me, Dr. Waer or Wynne?

22        **A.   I was just trying to figure that out.  It**

23   **does -- the question does seem a bit like my -- my way**

1  of wording things.  But the next sentence actually

2  goes back to what I was saying before how they assured

3  me, you know, they said if I resigned voluntarily or

4  be placed on probation, but there was evidence before

5  I was already voted onto probation.

6      Q.  But you didn't know about that, sir,

7  remember?

8      A.  Which I didn't know that.  So this does seem

9  to be the discussion we had about if I resigned and

10 what the ramifications would be.  There was a

11 discussion about that.  I was assured that there was

12 no negative things on my file if I resigned, and maybe

13 I -- maybe I said after does that mean that this just

14 doesn't -- you know, that this would be something I

15 could wipe off my record?  Maybe I asked that and they

16 said no, I don't remember.

17     Q.  But you did wipe it off your record when you

18 next filled out an application.

19     A.  Well, I didn't wipe it off my record because

20 I put it on my application to Dartmouth before I was

21 employed there.

22     Q.  Well, actually, sir, that's not true, but

23 we'll talk about it in a minute.

1      **A.    Okay.**

2      Q.    Your ERAS application that you completed

3  three or four -- three weeks after you left Arizona --

4      **A.    Right.  Was corrected.**

5      Q.    -- does not include the University of

6  Arizona.

7      **A.    It was corrected later on.**

8      Q.    That application is the one that was -- do

9  you know whether or not that application is the one

10  that was actually reviewed and considered by

11  Dartmouth?

12     **A.    I believe that's -- well, the question is**

13  **vague, but I believe what you're asking is false.  In**

14  **that Dartmouth credentials --**

15     Q.    Well, --

16     **A.    Can I answer your question?  Dartmouth**

17  **credentials all interns with a large number of**

18  **documents, of which those documents included Arizona.**

19     Q.    When you applied to the Medical Center in

20  Hanover, did the ERAS application that you -- that

21  was --

22     **A.    Well, if the Medical Center is in Hanover,**

23  **then that resolves that some of the jurisdictional**

 1    **issues here.**

 2          Q.    Sir, let me -- when you applied to the

 3    Medical Center, or the Medical Center considered your

 4    application, --

 5          **A.    Right.**

 6          Q.    -- are you aware of the fact that it

 7    considered an ERAS application for you as it did for

 8    other individuals?

 9          **A.    It considered that along with every other**

10    **document it considered.**

11          Q.    On the application that you submitted or that

12    was submitted in 2010, did you include the University

13    of Arizona Medical Center?

14          **A.    I consider my application to Dartmouth to**

15    **have included Arizona by the time they were**

16    **considering me for preemployment checks.**

17          Q.    In the application that you completed in

18    September of 2010, which was the application

19    considered by Dartmouth, -- excuse me, by DHMC, did

20    you include the University of Arizona?

21          **A.    I think that's been asked and answered.**

22          Q.    I'm going to ask it again and ask you to

23    answer it, because I don't think it's been answered.

1          **A.    Okay.**

2               MR. KAPLAN:  Why don't you read it back,

3     Andy.

4               (The pending question was read.)

5          **A.    I think ERAS is really an interview**

6     **application, and that interview application did not**

7     **list Arizona, as I've listed before.**

8          Q.    BY MR. KAPLAN:  I think you've -- you've

9     agreed with me that you knew that Arizona was on

10    probation when you applied there and attended there,

11    correct?

12         **A.    Right.  But I didn't know -- they're supposed**

13    **to tell you the reasons for probation, and they failed**

14    **to do so.**

15         Q.    Okay.  Now, you've testified that somebody at

16    the University of Arizona told you you have a positive

17    record there; is that correct?  There was nothing bad

18    in your record?

19         **A.    They said that there was nothing -- I forgot**

20    **their word, I don't think they used negative, but**

21    **there was nothing officially on my record if I**

22    **resigned at that point.**

23         Q.    What did you understand that to mean?

1      A.   That it was a voluntary resignation, that it

2  was not a good fit, the program there.   I mean, they

3  suggested those things in the meeting.   They said

4  maybe this just isn't working.   They even suggested I

5  consider something like radiology, which was odd.   She

6  suggested that right after she accused me of

7  falsifying my board scores.   If you think someone

8  falsified their board scores, you wouldn't typically

9  advise them to be a radiologist.   So it was an odd

10 conversation.   I don't know whether it meets criteria

11 for resignation under duress, a coerced resignation or

12 just a simple voluntarily resignation.

13     Q.   Were you advised, did anybody tell -- strike

14 that.   By the time you had that conversation

15 contemporaneously with your leaving, you came to

16 understand that there were criticisms of your work;

17 didn't you?

18     A.   Well, just, you know, really the first

19 written one I think was the one they handed me, that

20 one out of five for surgical skills.   So I didn't

21 really put much weight in this.   I mean, that and that

22 they thought I didn't write notes intentionally, which

23 I consider absurd.

1          MR. KAPLAN:  Mark that, please.

2          (Isaacs Exhibit 8 was

3          marked for identification.)

4     Q.   BY MR. KAPLAN:  So why don't you take a look

5  at Exhibit 8, Dr. Isaacs.

6     **A.   (Peruses document.)**

7     Q.   You ever seen this before?

8     **A.   I don't remember.  I mean, I -- probably they**

9  **gave it to me.  I just don't remember it.**

10    Q.   Well, this is a letter to you dated July 21,

11 2010, which happens to be the same date on which they

12 reduced your responsibilities.  You remember the last

13 thing we looked at?

14    **A.   Yeah.**

15    Q.   Okay.

16    **A.   Yeah.**

17    Q.   And this is a letter to you that's titled

18 notice of deficiencies.  It goes on to say, Thi's

19 notice of deficiency is based on your, one,

20 demonstrated incompetence in professional activities

21 related to the fulfillment of assigned duties and

22 responsibilities associated with your position; 2,

23 personal conduct that substantially impairs your

```
 1   fulfillment of properly assigned duties and
 2   responsibilities" --
 3       A.   Attorney Kaplan, I have stated that I believe
 4   this was constructive termination because of USC or
 5   some other reason unknown to me.  To go through this
 6   is really badgering me.  Yes, I don't remember most of
 7   these documents.  I've stated examples down to the
 8   surgical wound that I think I did very well.  If you
 9   want to -- I mean, I'll answer a few more critical
10   questions, but if you want to badger and relive
11   Arizona, I don't think this is the venue to do it.
12       Q.   Good.  And I'm going to ask you the questions
13   I choose to ask you because I --
14       A.   Go ahead.  And if you badger me on Arizona
15   when I've said I believe I was constructively
16   terminated and these were false criticisms, I'm
17   allowed to walk and leave, which, frankly, right now I
18   wouldn't mind doing, so ...
19       Q.   The third here says, "Inability or failure to
20   perform the essential functions of the job or tasks
21   assigned."  So my question --
22       A.   BS, for lack of a better word.
23       Q.   So my question to you is on or around July 21
```

1    of 2010, do you recall being alerted to Arizona's

2    sense of your deficiencies?

3       **A.   As I said, these I really have forgotten.**

4    **I'd forgotten about Arizona pretty much the day I got**

5    **to Dartmouth.   I mean, I could try to remember these**

6    **things.   But it's going to come back to the same**

7    **statement.   They made what I call, you know, void**

8    **allegations for the purposes of constructive**

9    **termination.**

10      Q.   So my other question on this is you've

11   testified that somebody told you your record was not a

12   negative record.   And I'm trying to understand if you

13   had received this letter how you could have concluded

14   that.

15      **A.   You know, I also think I testified that I**

16   **think they lied to me.   I think also because I**

17   **threatened litigation they put something in my record**

18   **that maybe at that point they were willing to forego**

19   **putting in my record.   It appears to me -- just**

20   **quickly looking at this, it appears something a little**

21   **improper happened.**

22      Q.   So you threatened to sue Arizona as well?

23      **A.   Well, I object to that "as well" because I'm**

1  **not sure --**

2       Q.   Well, you -- did you threaten to sue Arizona?

3       **A.   Yes.**

4       Q.   For what reason?

5       **A.   Well, I've said I believe they improperly**

6  **constructively terminated me.  I think I wrote it up**

7  **probably as IIED, fraud and ADA, like this -- like**

8  **this case.**

9       Q.   Now, again, you've told us that your

10  resignation -- perhaps I can shorten this.  Do you

11  agree with -- that your designation was submitted to

12  them on the understanding that if you didn't resign

13  you would be terminated from the -- placed on

14  probation and ultimately terminated from the program?

15  Did you know about --

16       **A.   No, I disagree with that.  Because you're not**

17  **allowed to say that you're on probation and going to**

18  **be terminated.  That's not proper procedure.  If they**

19  **knew that, they'd have to terminate you immediately.**

20  **So I disagree with that.  Although I will tell you**

21  **that it seems like someone said something to that**

22  **extent.**

23            MR. KAPLAN:  Okay.  Andy, let's mark this.

1              (Isaacs Exhibit 9 was

2              marked for identification.)

3       Q.   BY MR. KAPLAN:  So I've handed you Exhibit 9.

4  It's a meeting documentation of August 12th, 2010

5  concerning you.  And I just want to ask you.  I can

6  read it to you or you can read it.  But couple of

7  questions.  The second paragraph.  Well, actually at

8  the beginning it says you were asked to meet with Dr.

9  Wynne and Dr. Waer following the resident executive

10 committee that we referenced before.  Do you remember

11 being called upon to participate in a meeting with

12 them?

13      **A.   I've described that meeting.  I've described**

14 **how she alleged I falsified my board scores and my**

15 **diplomas.**

16      Q.   It goes on to say here, that "I," and that

17 would be Amy Waer in this case, "informed Dr. Isaacs

18 of the committee's recommendation to place him on

19 probation."  And I just want to stop there and say you

20 were aware as of that point in time that you were

21 going to be placed on probation; is that correct?

22      **A.   And I don't seem to remember, like I said,**

23 **there's both.  Whether that's my memory or they didn't**

1   mention it, I don't know.  But they did suggest that

2   now would be -- now, being then, would be an opportune

3   time to resign because I'd have a clean record.

4        Q.   Well, it goes on to say, "I informed him that

5   once placed on probation he will have to report this

6   fact from here on out in any application process."  Do

7   you remember being told that?

8        A.   Yeah, I think that's what they were saying

9   that you should resign now if this is a bad fit

10  because we're likely to put you on probation if you

11  don't resign and then you'd have to disclose it.  They

12  never handed me papers.

13       Q.   Right.  So your resignation was a resignation

14  that you -- that you offered in lieu of being placed

15  on probation?

16       A.   Well, it wasn't fully in lieu because it

17  wasn't official.

18       Q.   Okay.

19       A.   Same way Christine Finn never put me on

20  administrative leave with paperwork.  These are kind

21  of, you know, improper meetings, as far as I'm

22  concerned, to constructively terminate someone that --

23  for an improper reason.

1      Q.   Okay.

2      A.   I've said that like, you know, 20 times.  But

3  I also want to state that -- on that same answer I

4  want to clarify that.  This mentions a meeting with

5  Dr. Gruessner the next day, which I did do, and I do

6  remember that meeting.  And Dr. Gruessner considered

7  putting me on a transitional year, which I asked for.

8  So Dr. Gruessner appeared to be considering --

9  reconsidering the whole matter.  So I don't think it

10  was -- and I'm testifying to this, I don't think that

11  there was a firm probation or termination executed in

12  my file.  I think that was probably done post --

13  post -- I'm not sure of the word, but after I

14  threatened a lawsuit or after they locked the doors.

15  Because I had a friendly -- relatively friendly

16  conversation with Dr. Gruessner, who is Dr. Waer's

17  supervisor, who appeared to be rethinking the whole

18  thing.

19      Q.   Okay.

20      A.   So I have to question Dr. Waer and Dr.

21  Wynne's whole issue here.

22              (Isaacs Exhibit 10 was

23              marked for identification.)

1      Q.   BY MR. KAPLAN:  Okay.  Dr. Isaacs, we've

2  spent some time talking about the ERAS application you

3  signed on September 1, 2010.

4      **A.   Right.**

5      Q.   And if you look at the back you'll see that's

6  when you signed it.  And I want to ask you some things

7  about this.  Let's start on page 20.  So this is

8  completed by you on September 10.  Just out of

9  curiosity --

10     **A.   September 1?**

11     Q.   September 1, I'm sorry.  Do you remember when

12  you left the Arizona program?

13     **A.   Whether it was when I left Arizona, the**

14  **program and when I left Tucson.  I left Tucson around**

15  **September 1.**

16     Q.   You submitted your resignation to Arizona on

17  August 13, correct?

18     **A.   Right.  I stayed for tests at the Mayo**

19  **Clinic.**

20     Q.   But you know it was submitted on August 13th?

21     **A.   And there was a period waiting for tests at**

22  **the Mayo Clinic for what was the beginning of a**

23  **worsened disability.**

1      Q.   So on August 13 you submitted your

2   resignation.  On September 1 you completed your next

3   ERAS application?

4      **A.   Yes.**

5      Q.   And why did you complete this application?

6      **A.   To get a job.**

7      Q.   Okay.  And where did you put the application

8   after you completed it?  What happened to it?  As far

9   as you know.

10      **A.   I mean, ERAS would have to answer that**

11   **question.**

12      Q.   But do you have an understanding of how the

13   process works?

14      **A.   Yeah.  I mean, like every medical student I**

15   **do.**

16      Q.   So how does the process work?

17      **A.   You certify the application, which I did on**

18   **September 1st.**

19      Q.   Mm-hmm.

20      **A.   And then you pick programs to transmit to.  I**

21   **don't ...**

22      Q.   So did you pick the programs you wanted it

23   transmitted to?

1          **A.    Right.**

2          Q.    And who did you pick?

3          **A.    Probably a hundred.  I can't remember all of**

4     **them.  But one of them was Dartmouth.**

5          Q.    Okay.  And you understood that this

6     application would then go to Dartmouth as one of the

7     programs you picked.

8          **A.    Mm-hmm.**

9          Q.    And they would then consider you among other

10    applicants they probably had based on the information

11    initially in this application?

12         **A.    Well, they would consider me based upon my**

13    **interview, this application, and my other application**

14    **documents.**

15         Q.    Okay.  But at the point of time that you fill

16    this out, this was the only document that they would

17    have had about you?

18         **A.    This -- ERAS actually calls this a CV.  I**

19    **think of it as a CV.  It's something you send to get**

20    **an interview.  That's how I think of it.**

21         Q.    And you were untruthful on this application;

22    weren't you?

23         **A.    Not sure how to answer that.**

1        Q.   Yes or no would be a good start.

2        **A.   Well, I'm not sure what you're referring to,**

3    **untruthful.  I mean, that's a vague question.**

4        Q.   Okay.  Then let's look at the application in

5    more detail.  Turn to the next page.

6        **A.   Okay.**

7        Q.   It says state medical licenses.  You say

8    none.  Is that true?  Is that true?

9        **A.   I never had a medical license.  I had a**

10   **training license, which is what you're apparently**

11   **referring to.  Most people -- most doctors -- I just**

12   **want to answer this while you asked the question.**

13   **Most doctors, like, for instance, I just -- when I was**

14   **flying back from the deposition in California last**

15   **week, I stopped and visited two friends from the**

16   **Caribbean, and he said I had just got my medical**

17   **license.  Now, he's a PGY 3.  Of course he had a**

18   **training license.  But that's not what he said to me.**

19   **He didn't say I just got my -- he didn't say I just**

20   **got my training license converted to a full license.**

21   **He said hey, I just got my training license.  So the**

22   **answer to your question did I have a training**

23   **license, the answer was -- or did I have a license,**

1    **the answer is no.  Did I have a training license at**

2    **the time?  The answer is yes.**

3        Q.   So why do you think it says type under

4    medical licenses?  Don't you think that's so somebody

5    can write in training, sir?

6        **A.    That's where I think -- I honestly think**

7    **that's from copying over the previous year.  I don't**

8    **think I thought about that much as far as I remember.**

9        Q.   All right.  So did you think that all I have

10   is a training license, I don't have to disclose that?

11       **A.    I don't think that.**

12       Q.   Okay.  So -- but you did have --

13       **A.    It's possible, but I don't think so.**

14           MR. KAPLAN:  Let's mark this.

15           (Isaacs Exhibit 11 was

16           marked for identification.)

17       Q.   BY MR. KAPLAN:  So this -- what we've marked

18   as 11 is your postgraduate -- is your training license

19   for Arizona, right?

20       **A.    Right.**

21       Q.   And that is a license that permits you to

22   practice medicine as a resident or an intern at an

23   institution?

1          **A.     Yeah.**

2          Q.    And you chose not to disclose it in your

3    application?

4          **A.    Well, I disagree with the word chose.    I**

5    **don't think I chose on that.    But I don't remember.**

6          Q.    Okay.    Let's go down to medical education.

7    Did you truthfully answer your medical education

8    question?

9          **A.    So that does not include Arizona, right?**

10         Q.    Well, it doesn't include USC or Arizona, does

11   it?

12         **A.    Right, it doesn't include USC or Arizona.**

13         Q.    Right.    In terms of medical education it does

14   not include USC, correct?

15         **A.    Right.**

16         Q.    And in terms of the question on the bottom

17   there, medical education/training extended or

18   interrupted, you said no.

19         **A.    Right.**

20         Q.    That also is not true, is it?

21         **A.    Again, that depends whether you consider Duke**

22   **to have been a matriculation or not.**

23         Q.    Well, let's talk about Arizona.    Forget about

1  Duke for a moment.  Arizona was supposed to be what

2  length of time -- what was the length of time that you

3  were supposed to participate in the Arizona surgical

4  program?

5      **A.    One year.**

6      Q.    Okay.

7      **A.    Yeah.**

8      Q.    Didn't make it through one year, did you?

9      **A.    I resigned after six weeks.**

10      Q.    Would you agree with me that six weeks is an

11  interruption in a one-year period?

12      **A.    I don't know from looking at this if medical**

13  **education refers to residency or not.**

14      Q.    Sir, it says medical education --

15      **A.    Actually, it does not.  It says current prior**

16  **training is what you should be referring to with your**

17  **questions.**

18      Q.    Go with me, will you please?  We're at the

19  bottom of medical education there's a phrase that says

20  institution and location.

21      **A.    Right.**

22      Q.    You wrote Duke, you wrote American University

23  in the Caribbean, and you left out USC, right?

1      A.    Well, I did not place USC in there.

2      Q.    Okay.

3      A.    Left out implies it should have been there.

4      Q.    Okay.  And then under that it says medical

5  education or -- it doesn't say or.  Medical

6  education/training extended or interrupted.  Now,

7  would you agree with me that a surgical residency is a

8  training program?

9      A.    I don't think I -- at the time I think this

10  was under the box of medical education and a separate

11  box three boxes later was training.  I don't think I

12  made the link.  In fact, I just made it now.  I don't

13  think I made that then.

14      Q.    You just made a big point about how you

15  received just a training license.  Wouldn't you agree

16  that the training license was so you could be part of

17  a training program as a resident or intern?

18      A.    I don't -- again, this was copied over.  I

19  don't think I made the link there or for state medical

20  licenses.

21      Q.    Let's go to the next page.

22      A.    Okay.

23      Q.    Then it says current/prior training.  To the

1   extent it's different you write none.

2        A.   Right.

3        Q.   Not true, is it?

4        A.   I stand by the statement I made to ERAS.

5   They investigated this, and I submit that as testimony

6   here.  So it's already been answered.

7        Q.   My question to you is when you filled out

8   this application, you filled it out before you

9   contacted ERAS with regard to anything concerning ERAS

10  applications?

11       A.   Well, sure, but now --

12       Q.   Let me finish.

13       A.   Okay.

14       Q.   When you filled out this application, you had

15  not been in contact with ERAS?

16       A.   I wasn't insinuating I was.

17       Q.   When you filled out this application, nobody

18  from ERAS told you whether you did or did not have to

19  disclose anything regarding your prior --

20       A.   They don't provide personal advice.

21       Q.   -- regarding your prior medical situations,

22  correct?  Regarding your prior training.

23       A.   They would never give advice.  I guess if you

1    could probably -- if you have questions maybe you

2    could contact them, but ...

3        Q.   So when you completed this application and

4    wrote none, it was before ERAS wrote or told you

5    anything about the application process?

6        A.   That's not been in dispute, right.

7        Q.   And you chose not to mention Arizona?

8        A.   I won't use the word chose.  I say -- you can

9    take my written statement that I submitted with ERAS

10   and apply that for this deposition.  But I want

11   to -- not remembering that, I mean, I do stand by

12   that, but I will answer it again here what I said

13   before, I was driving back in a state that reminded me

14   of the psychosis NOS.  This was copied over from the

15   previous year.  I don't remember a decision process,

16   but I do think, I do seem to remember thinking well,

17   to transmit to 200 programs around the country my

18   allegations against Arizona and the fact that they may

19   take me back to work the next day just seems a little

20   bit strange.

21       Q.   So why didn't you wait a day before you

22   filled out your application?

23       A.   I like to get applications in on the -- the

1    application process opened up on the 1st, and a day is

2    a bit of a -- you know, it might have been a week.

3        Q.   So why didn't you wait a week?

4        A.   Well, there's penalties.  I mean, the longer

5    you wait the less option of getting an interview.  It

6    might have been two, three weeks, right?

7        Q.   I want to make sure I understand.

8        A.   Yeah.

9        Q.   You're telling us in this deposition that you

10   credibly believed that Arizona was going to take you

11   back?

12       A.   I actually did believe that.  I don't have

13   to -- I won't hesitate on that answer.  I won't say I

14   credibly believed in full, like a hundred percent.

15   But I thought there was a real chance.

16       Q.   So you considered that, and the reason you

17   didn't put Arizona on -- let me finish.  What you just

18   said to me was the reason you didn't put Arizona down

19   was because you didn't want to send notice to a

20   hundred institutions that you had attended a program

21   that you might go back to, right?

22       A.   No, I didn't say that.  Because I said --

23   first of all, I did say I was speculating what I

1    probably was thinking.  And it's my best guess what I

2    was thinking on top of whatever poor thinking process

3    I had.  I want to finish the question.

4        Q.   Go ahead.

5        A.   I didn't also want to slander -- I actually

6    liked some of these people at Arizona.  I didn't --

7    you know, even if I sue the institution I don't think

8    that -- you know, 99 percent of the surgeons there are

9    good people, right?  So I didn't want to make an

10   allegation against them, and ERAS is what I'm thinking

11   that I didn't know what was happening.  I thought if

12   this program takes me back tomorrow, you know, I don't

13   want to slander them, slander would be the wrong word

14   but it was correct.  I don't want to raise an issue

15   that's a moot point.  So I was probably thinking that.

16   But I don't remember, actually.

17       Q.   So the other thing I wanted to ask you about

18   based on some of your earlier answers was you

19   considered the ERAS application, if I understand you

20   correctly, to be a request for an interview?

21       A.   They actually call it a CV.  A CV is usually

22   what you hand someone when you're trying to get an

23   interview.  Or mail to them.

1      Q.    Why question is did you consider it a request

2  for an interview?

3      **A.    Well, I'm saying it actually is a CV.    They**

4  **call it a CV.**

5      Q.    Is that a yes to my question that you

6  consider it a request for an interview?

7      **A.    It's two things, I would say.    It's a request**

8  **for an interview, it's kind of a notice of intent that**

9  **you'll be in the match process.    So three things.    And**

10  **it's probably part of your overall application file**

11  **for employment.**

12      Q.    And so in submitting this request for an

13  interview, among other things, you selectively chose

14  to not include either USC or Arizona --

15      **A.    I have to object because that's not the prior**

16  **testimony.    I specifically said all along today I**

17  **won't use the word chose or decision.**

18      Q.    All right.    Then let me restate the question

19  for you.

20      **A.    Okay.**

21      Q.    You didn't include Arizona, USC -- or USC or

22  the fact that you held a license or the fact that you

23  had participated in a training program, and I'm trying

1    to figure out if you thought that would give rise to a

2    truthful interview.

3        **A.    Well, yes is the answer.    Because I don't**

4    **think USC was a -- how did -- what term did I use**

5    **before?  Disclosable entity.  I think a training**

6    **license is not -- not something that -- you know, the**

7    **only issue that I have agreed with, like I stated to**

8    **AAMC, was that Arizona was not disclosed on here.**

9        Q.    Keeping with that page, I think the page is

10   Bates number 21 at the bottom, or stamped 21.  In

11   connection with your Merrill Lynch job, you see that?

12   Merrill Lynch?

13       **A.    Yeah.**

14       Q.    There's a question your reason for leaving.

15   You decided -- or didn't, whether you decided I don't

16   know.  You didn't indicate your reason for leaving.

17   So what was your reason for leaving?

18       **A.    To go to an MBA program.  To go to med**

19   **school.  That I didn't like working in an investment**

20   **bank.  There's a lot of reasons.**

21       Q.    But you chose not to put any one down?

22       **A.    All of them I didn't.  I think that's almost**

23   **an optional question.  I mean, ...**

1          Q.   You think it's optional?  Supposing you left

2     Merrill Lynch because you had fraudulently stolen from

3     them.

4          **A.   Yeah.**

5          Q.   Do you think it would be a question that you

6     could choose to answer or not as you thought?

7          **A.   I think that would be under -- there's a**

8     **question of felony convictions so you'd have to answer**

9     **yes if you stole from Merrill Lynch and then it would**

10    **be on the application.**

11         Q.   Was the reason you left Merrill Lynch

12    summarized in the claim you filed against them?

13         **A.   I don't think so.**

14         Q.   Okay.

15         **A.   I mean, it may be one of several reasons.**

16         Q.   You also indicated -- or didn't indicate your

17    reason for leaving the Cairnwood Group.  I just want

18    to know were these decisions you made for whatever

19    reason not to respond to those parts of the questions?

20         **A.   I think there's a star by required things on**

21    **ERAS, that you're actually bringing back my memory.**

22    **So some items have a star that they're required,**

23    **others don't.  And that's not a required answer.**

1        Q.   When did you secure, if you recall, an

2   interview with Dartmouth -- with the Medical Center as

3   a result of -- the psychiatry program, excuse me, as a

4   result of this ERAS program?

5        **A.   When did I secure my position?**

6        Q.   No.  When were you interviewed?

7        **A.   January.  I think January 2011.**

8        Q.   Mm-hmm.  When you were interviewed in January

9   of 2011, did you inform anybody at the Medical Center

10   that you had participated as a medical student at USC?

11        **A.   Well, I object to participated as a word for**

12   **that.  But the answer is no.**

13        Q.   When you interviewed at DHMC or the Medical

14   Center in January, did you inform anybody that you had

15   attended a residency program, whether you participated

16   or not, whether you attended a residency program at

17   the University of Arizona?

18        **A.   I don't remember disclosing that.**

19        Q.   Okay.  When you secured your -- strike that.

20   Do you remember who you interviewed with?

21        **A.   Christine Finn, Jasper Chen, McAllister, Dr.**

22   **McAllister.  I think Thomas is his first name.**

23        Q.   Mm-hmm.

1        A.    A psychologist, a neuropsychologist whose

2    name may have been Fisher but I'm not sure.  No.  I

3    forget her name.

4        Q.    Okay.  Now, when you interviewed with these

5    people in January, you -- you were -- weren't you

6    aware of the fact that Arizona had decided not to

7    reinstate you?

8        A.    I thought it was under ACGME review, which

9    was until about February, at which point I immediately

10   disclosed it to Dartmouth.  So I kind of thought it

11   was a trial.

12       Q.    How did you disclose it?

13       A.    On three different papers I sent to the HR

14   department that were signed by Finn.

15       Q.    Actually, you disclosed it in connection with

16   completing a medical -- training medical license

17   request?

18       A.    It was part of my application that I sent to

19   HR that Finn and Bertrand both signed.

20       Q.    Actually, you didn't send anything to

21   Bertrand and Finn, did you?

22       A.    Well, it's related to a third party.  It

23   depends whether you consider send direct or indirect.

1          Q.   You didn't send anything to Dr. Bertrand or

2    Dr. Finn; is that true, sir?

3          **A.   I don't know.  I just said I think I put**

4    **something in Fed Ex that ended up in their hands so I**

5    **sent it to them.**

6          Q.   You sent it to the HR department at the

7    Medical Center.

8          **A.   Well, obviously I knew it wasn't going to be**

9    **just --**

10         Q.   Sir, did you send it to the HR at the Medical

11   Center?

12         **A.   Yeah, that's who it was addressed to.**

13         Q.   And how do you know, what facts do you

14   contain, or what makes you think that it went to --

15   either when it was done, and we're talking about

16   April, correct?

17         **A.   Yeah.**

18         Q.   All right.  When it was done in April of

19   2012, how do you know that it was ever reviewed by

20   either Dr. Finn or by Dr. Bertrand?

21         **A.   Oh, well, I do know.**

22         Q.   And how do you know?

23         **A.   Because the application that I have, and I**

1    remember this, I believe at page 2, or page 3, has a

2    box for program director and GME director.  So I knew

3    it would be reviewed by them.

4         Q.   And what is it -- you know all kinds of

5    things, sir.

6         A.   Well, you just asked how I know.  I just

7    answered how I know.

8         Q.   It is correct, is it not, that Dr. Finn signs

9    an attestation of fact that you will be a student in

10   the program, correct?  And we're going to bring this

11   thing up in a minute, but I just want to ask you about

12   this.

13        A.   Yeah.

14        Q.   And Dr. Bertrand signs as well, correct?

15        A.   Well, I think you're mischaracterizing this

16   so I have to object to that.  I think -- you asked how

17   I knew.  And the answer to how I know if it wasn't

18   clear to you, without -- we'll bring it up later as

19   evidence I'm sure, but there's a suggestion or a

20   direct declaration there that Finn and/or Bertrand

21   would be reading the document, reviewing it, attesting

22   to the entire correctness of the entire application

23   and signing.  So it was reasonable for me to infer.  I

1    **guess if you say how do I know, I guess I would say it**

2    **was a reasonable inference that Finn and/or Bertrand**

3    **would read it.  I mean, if I saw this document that I**

4    **wrote Arizona and saw program director and GME**

5    **director, you can be sure I thought my program**

6    **director and the Dean of GME are going to see this.**

7              MR. KAPLAN:  Mark it, Andy, would you.

8              (Isaacs Exhibit 12 was

9              marked for identification.)

10        Q.   BY MR. KAPLAN:  So we're marking an exhibit,

11    and the exhibit is a form you completed to gain a

12    training license, correct?

13        **A.   Yeah.   That's right.**

14        Q.   So when we look at the first page of this

15    agreement, was this completed by you or was it

16    completed by somebody other than you?

17        **A.   Who else would have done it?**

18        Q.   You know what?   That's the reason I ask these

19    questions.   Could be done by anybody.

20        **A.   It's my signature.   I remember filling it**

21    **out.   Actually, this one I do remember the**

22    **deliberation of thought that I did so I can**

23    **definitely tell you not only did this -- did I sign**

1  **this out, but I remember the thought process and I**

2  **remember actually who I spoke to about filling this**

3  **out.**

4  Q.   So my -- so the answer to my question, then,

5  is that when I'm just looking at page 1, it's actually

6  page 2 is the first page.  You see the numbers down at

7  the bottom?

8  **A.   Right.**

9  Q.   Looking at page 2, the information there in

10  typewritten form was done by you?

11  **A.   Yeah, mm-hmm.**

12  Q.   Did you fill in the training date begin and

13  training date end?

14  **A.   Wait.  Let me ...**

15  Q.   Why don't you take a careful look at this

16  before you answer these questions.

17  **A.   No.  Parts of it were pre-filled out probably**

18  **by Finn or Peggy Meuiner.**

19  Q.   So is there any part of this that you are

20  positive, not guessing, not thinking, not maybe, that

21  you are positive you filled out on the first page?

22  **A.   Yeah, I think all the typewritten stuff I**

23  **actually typed on Microsoft Word, because I have a**

1    **Word document on this.  I've gone back and looked at**

2    **it.  So not only do I remember it but I also looked**

3    **back at it recently.**

4        Q.    So your testimony is that you completed this

5    page?

6        **A.    Best as I know.**

7        Q.    Okay.

8        **A.    Short of -- short of the handwritten.**

9        Q.    All right.  Now, when I look at this first

10   page, it does not include under medical schools USC.

11       **A.    Which I don't think it should.**

12       Q.    Okay.  It also does not include

13   participation -- well, just -- right.  It doesn't

14   include USC.  And you consciously, as I get it, since

15   you filled it out, now you're aware of this one, you

16   consciously decided not to put it in there?

17       **A.    Actually, for this one I remember -- I**

18   **remember the deliberation on Arizona because I was**

19   **going to be disclosing that.  I don't think I even**

20   **thought about USC because I was -- it was something**

21   **that was way in the past that I just at that point was**

22   **sure, you know, it didn't even have to be in there.  I**

23   **didn't even think I thought about that.**

1      Q.    Now, on the second page.  Turn the page for a

2   minute.  On the second page you'll see it bears the

3   signatures of Marc Bertrand and Christine Finn, right?

4      **A.    Right.**

5      Q.    Now, what is it that you understand Marc

6   Bertrand and Christine Finn saw -- strike that.

7   Strike that.

8           What is it that you understand that Marc

9   Bertrand was verifying by his signature?

10     **A.    Well, I'm going to give a common sense**

11  **answer.  If you send someone a four-page document and**

12  **they have to sign, they take a look at the whole**

13  **thing.**

14     Q.    Do you know what Marc Bertrand or Christine

15  Finn had in front of them when they actually signed

16  the verification on page 3?

17     **A.    Well, I know --**

18     Q.    Do you know what they had in front of them?

19     **A.    I know what the instructions are.  And the**

20  **instructions are the above-named applicant, so they at**

21  **had the first page.**

22     Q.    Okay.  Now, let's stop right there.  If they

23  had the first page and they reviewed the first

1  page, --

2      **A.    Right.**

3      Q.    -- would they know anything about USC?

4      **A.    Not from the first page.**

5      Q.    If they had the first page and they reviewed

6  the first page, would they know anything about

7  Arizona?

8      **A.    If they reviewed the first page?**

9      Q.    If they had the first page and reviewed the

10  first page, would they know anything about Arizona?

11      **A.    Well, not on the first page, if that's what**

12  **you're asking.**

13      Q.    So the question --

14      **A.    I mean, if you're asking whether I believe**

15  **they didn't see Arizona, the answer is no.**

16      Q.    Sir, in fairness, I really don't care what

17  you believe.  I'm asking a simple question.  If they

18  had only the first page in front of them, is there

19  anything there that would alert them to your

20  attendance at Arizona?

21      **A.    Well, Christine Finn had received the**

22  **personal and professional qualifications, so I believe**

23  **that includes the supplement to the application.  So**

1    **yes for Finn, maybe not for Bertrand.**

2         Q.   Do you know whether or not they had anything

3    in front of them other than the first page of the

4    application?

5         **A.   Well, Finn had a responsibility to review the**

6    **entire thing, so I do reasonably infer, I can't know,**

7    **reasonably infer that at least Finn or probably**

8    **Bertrand saw the second -- or the fourth page.**

9         Q.   Now, let's -- let me keep asking you about

10   some of this.  On page 4, all right, it says, "Have

11   you ever resigned from a medical education program or

12   medical practice position?"  You've now answered that

13   question yes, correct?

14        **A.   Yes.**

15        Q.   And that's the first time you've ever

16   disclosed on a document your attendance at Arizona,

17   right?

18        **A.   Yes.**

19        Q.   Okay.  You disclose it's Arizona, you

20   disclose training.

21        **A.   Mm-hmm.**

22        Q.   It says, "Have you ever been reprimanded,

23   sanctioned, restricted or disciplined in any

1  activities involving medical education or practice?"

2  You see that?

3      **A.   Right.**

4      Q.   You said no.

5      **A.   Right.**

6      Q.   Is that true?

7      **A.   I have to object to form there.  But --**

8      Q.   You're objecting to the form of is that true?

9      **A.   Is what true?**

10     Q.   Is your answer to question 3 true?

11     **A.   To the best of my knowledge, at that time, in**

12  **my understanding of the USC settlement agreement one**

13  **and two, yes, it's true.**

14     Q.   The -- you have testified earlier that you

15  were aware of the fact that your activities at Arizona

16  were restricted.

17     **A.   No.  No.  They told me if I resigned there**

18  **was nothing official.**

19     Q.   I wasn't asking you about your resignation,

20  sir.  I asked you about whether or not earlier you

21  knew that your work was being limited because of your

22  capabilities.

23     **A.   That -- that's a stretch on restricted.  I**

 1    mean, I don't -- that's not official.  If they thought

 2    to give me an easier patient load one week, I don't

 3    consider that restricted.

 4        Q.   Okay.  And you don't believe that what

 5    occurred at Arizona constituted any sort of

 6    discipline?

 7        A.   No.  Because of what I told you Dr. Gruessner

 8    was really -- he seemed honestly considering the idea

 9    to me to just let me stay on and move me to a

10    different program.

11        Q.   Let's go USC.  Do you consider being expelled

12    from their school discipline?

13        A.   It's not in testimony that I've been expelled

14    because I believe that was sealed and annulled and

15    discharged.

16        Q.   So --

17        A.   And acquitted.

18        Q.   So were you expelled from USC?

19        A.   I think I answered this a lot of times today.

20    And again, my explanation for my understanding is any

21    controversy I was acquitted of, any enrollment

22    agreement was discharged, and anything was sealed in

23    terms of disciplinary records to the point that I

1    could disavow their existence.  So my understanding

2    the answer to your question is no, I was not expelled

3    as of today, as of my understanding of those three

4    different clauses of the settlement agreement.

5        Q.   Okay.  Now, I just want to ask again based on

6    what you know, not based on what you think.  Do you

7    know where the supplement to application for training

8    license as a resident fellow that you completed

9    actually goes?  Do you know how it works?

10       A.   I think it's -- I think, I can't know --

11       Q.   Then if you don't know, wouldn't the answer

12   be I don't know?

13       A.   Well, I can reasonably believe that this is

14   only part of it that was signed with my signature, so

15   the whole document went to Finn and Bertrand and then

16   went to the New Hampshire Board.  That's what I

17   reasonably believe.  Common sense.  I don't know.

18       Q.   Okay.  Then your answer is you don't know.

19       A.   Well, my answer is common sense I believe.

20            MR. KAPLAN:  Mark that.

21            (Isaacs Exhibit 13 was

22            marked for identification.)

23       Q.   BY MR. KAPLAN:  I'm handing you what's been

1    marked as Exhibit 13.  Do you recognize this and know

2    what it is?

3         A.    Sure.  Sure.

4         Q.    And tell me what it is.

5         **A.    It's -- I think I had to explain on this**

6    **packet to the New Hampshire Board and Finn and**

7    **Bertrand, it says if you answered yes, please provide**

8    **a complete description on the reverse side.  So I -- I**

9    **typed up a description and attached it to this.**

10   **Again, it's very hard for me to believe that Meuiner,**

11   **Bertrand and Finn didn't see this attached letter.**

12        Q.    So your explanation for your departure from

13   the University of Arizona, do you believe this

14   explanation based on what you've testified to is

15   truthful?

16        **A.    Well, it is -- let me read it.  But I'll read**

17   **it line by line.  I was employed as a surgery**

18   **resident.**

19        Q.    Why don't you read it to yourself.

20        **A.    No, I'm going to answer your question how I**

21   **want to.  The first sentence is true.  I was employed**

22   **there.  I resigned in good standing from the program**

23   **and with permission from the program director.  Well,**

1    that's -- I believe that's true because I had had

2    permission and they had told me that nothing was

3    official if I resigned then, and even Gruessner seemed

4    to be considering keeping in good standing.  So I

5    believe that's true.  I see there's some question as

6    to that, but I believe it's true.  The next sentence,

7    at the time the program was under probation.  I felt

8    the program was not an good fit with my overall career

9    plans.  Well, that's certainly true.  I planned to

10   reapply to categorical problems in 2011 that would

11   allow me to pursue my interest.  Certainly true.

12   That's what I did.  And I did find a program at DHMC,

13   which is true.  So every sentence there is true, and

14   one of them I believe to be true based on Dr.

15   Gruessner's conversation with me.

16        Q.   You say here that the program was not a good

17   fit with my overall career plans.  Your overall career

18   plans at the time you entered Arizona were to become a

19   surgeon; weren't they?

20        A.   No.  So let me explain what.  I'm not sure if

21   you're aware of this, but a preliminary surgery

22   program is considered like the bottom of the barrel.

23   Very undesirable.  After I looked at it, I was told to

```
 1    stay away from it.  It's a one-year program.  So most
 2    people when they graduate medical school they get a
 3    categorical program, which means they get the
 4    specialty they want and they're going to get a medical
 5    license, permanent medical license in that field.
 6    Preliminary surgery, or any preliminary program is not
 7    like that.  It's like almost a year on probation in
 8    and of itself.  It's kind of useless in some ways.
 9    And certainly that was a bad fit just on the fact that
10    it was preliminary.  And then on top of the fact it
11    was preliminary, this is what I really didn't
12    understand when I was there, I was interested in
13    neurosurgery and neurosciences.  Especially with the
14    head injury, it's always been my interest.  And
15    computer science I'd say also neurology.  I thought
16    that that program would count towards a year of
17    neurosurgery.  So neurosurgery is a seven-year
18    residency.  I thought going to Arizona would count as
19    a year.  Turns out it was a GI program where you
20    worked on appendixes and hemorrhoids, things like
21    that, and nothing to do with neurosurgery.  And I
22    thought I could at least do an elective or two in
23    neurosurgery.  That wasn't true.  I asked them.  That
```

1    was part of the discussions that Waer didn't put in

2    all these things.  So they knew from the minute I got

3    there that I was someone who wanted to be a

4    neurosurgeon who was disappointed I was there.  And

5    they didn't -- I think if they weren't holding USC

6    against me, which I think is unlikely, they were

7    certainly holding the fact against me that I had

8    beaten them, most of them by 20 points on the boards

9    and wanted to be a brain surgeon and thought that

10   general surgery was not my cup of tea.  They didn't

11   like that.

12        Q.   You were smarter than all of them?

13        A.   No, I didn't say that.  But I beat -- I think

14   on average I beat them by 20 points on the boards.  I

15   mean, in fact, ironically, right, they may have beat

16   me on the neuropsych test by four standard deviations

17   in some areas.  So that's an interesting question you

18   raise.

19        Q.   When is the first time you can recall that

20   the issue of your attendance at Arizona came up for

21   any level of discussion with anybody from the Medical

22   Center?

23        A.   Well, a lot of people asked it during the

1    **interview process.  But you mean Dartmouth?  I mean, I**

2    **mentioned Arizona to a lot of people when I was**

3    **interviewing.**

4        Q.   You mentioned Arizona -- when was the first

5    time you mentioned Arizona?

6        **A.    To Dartmouth?**

7        Q.   Yeah.

8        **A.    In this exhibit here, 12 and 13.**

9        Q.   That's your written description.

10       **A.    I consider mention to included written**

11   **reference.  I'm not sure how you define mentioned.**

12       Q.   If the question wasn't clear I'll ask it

13   again.  You told me that when you interviewed as a

14   result of the ERAS application, the subject of --

15   neither the subject of USC or Arizona was discussed.

16       **A.    Right.**

17       Q.   And you believe that those interviews

18   occurred in January, I believe, of 2011 -- 12.

19       **A.    Yeah.**

20       Q.   Okay.  So my question to you is when is the

21   first time any discussion, those would be records,

22   words, any discussion occurred between you and any --

23   either Marc Bertrand or Chris Finn, let's do that for

1  right now, concerning Arizona?

2       A.    During one of the many conversations where I

3  was pulled into Christine Finn's office, we were

4  talking about upcoming electives -- or upcoming

5  rotations, upcoming responsibilities I'd have.  And we

6  were talking about the possibilities of not coming

7  back to M1 or M2, whatever it was.  And how the VA was

8  a different atmosphere.  And she started to say some

9  people like the VA better, some people don't.  It's

10 kind of a preference.  And I said oh, sure.  I said I

11 actually like -- she says it's a whole different

12 computer system.  I said actually, yeah, I mean, I

13 know I've used -- what's the name of it?  I'm drawing

14 a blank on it now.  But I named the computer system.

15 I said oh, sure, I've used that, I used that in the VA

16 for surgery.  And I liked it.  And I think I was kind

17 of testing her at the time, to be honest, because I

18 was starting to -- I think I was starting to suspect

19 that she was trying to get me to talk about Arizona.

20 So I did that.  I thought I was complying with her

21 wishes.  And she said but how did you -- how did you

22 work at the VA?  And then she changed the subject back

23 to, like, something totally different.  I don't

1    remember.  So she was, like, caught off guard by my

2    question, or my statement about doing surgery at the

3    VA, which would have been at Arizona, back to your

4    question.  So that was around October I mentioned it

5    to Finn.

6              Dr. Noordsy, Dr. Noordsy mentioned he went

7    out to a triathlon in Arizona, and he mentioned that

8    to me in July, my first or second week at DHMC.  And

9    he really made a point of talking about Tucson and the

10   beautiful VA they have out there that looks like the

11   Alamo or something.  It's like this Spanish colonial

12   building that's the most beautiful VA in the country.

13   So I thought does he want me to talk about Arizona VA

14   experience?  Because he's -- it could be a

15   coincidence.  He does a lot of triathlons, he's a very

16   talented athlete.  That's a little weird the second

17   week he's talking about the VA that I worked at and

18   how beautiful it is.

19              I think I called home and said to my parents

20   do they want me to discuss this with them?  I mean, I

21   put it on my application.  So the first instance, I

22   mean, to answer your question, was probably Doug

23   Noordsy in the second week of work, and then next in

1    October -- that could have been a coincidence.  I

2    really don't know.  It doesn't seem like it to me,

3    given -- given all this.  So short of the Arizona VA

4    and specific discussions of where I worked and how

5    beautiful it was, I think Christine Finn, definitely I

6    told her that I was there in October, around October.

7    And she changed the subject blatantly.

8        Q.   So Doug Noordsy in the summer, Christine Finn

9    in October.  Let's talk about Doug Noordsy in the

10   summer.  Did you tell Doug Noordsy you attended a

11   residency program at the University of Arizona?

12       A.   He wouldn't have asked.

13       Q.   Did you tell him --

14       A.   No, no, no, he wouldn't have asked, it

15   wouldn't have been a subject typically.

16       Q.   So the second issue, Christine Finn, did you

17   tell Christine Finn in this conversation that you're

18   alluding to that you attended a residency program at

19   the University of Arizona?

20       A.   I think the answer is yes in that I discussed

21   my responsibilities working in the surgery VA

22   department.  So I don't think I used the word Arizona,

23   but I described work of a surgery intern in a VA.  So

**I think the answer to your question is yes, but it**

**depends on the -- I mean, I could have objected to**

**form there, but yeah.**

Q.    Sir, let me -- did you mention the words that

would include Arizona residency program?

**A.    Well, I've already said I mentioned enough**

**words that would have -- I mean, if you're going to**

**try to spin it, the answer is no there, but --**

Q.    Dr. Isaacs, I'm not trying to spin anything;

I'm just trying to ask you questions.  And my question

is in the conversation you've referred to and that you

believe occurred in October of 2000 and -- what would

that be, '12, '11, October of 2011, right?

**A.    Right.**

Q.    Did you specifically reference a residency

program you attended?

**A.    Yes.  Not only did I specifically reference a**

**residency program with Finn but I believe she was**

**startled by the response and changed the subject.**

Q.    So you think Christine Finn was startled by

your response because you mentioned the VA, correct?

**A.    My work at the VA.**

Q.    Right.  Your work at the VA.  All right.

1      A.    With their computer system, which I've

2   forgotten the name of right now.

3      Q.   When is the first time that you can recall

4   that you actually stated and used words Arizona

5   residency program with anybody at the Medical Center,

6   any -- either Chris Finn, Marc Bertrand or any of the

7   supervising or attending --

8      A.    I don't know if I mentioned Arizona to other

9   people there so I don't -- I don't know the answer to

10   that.

11      Q.   Okay.  All right.  When is the first time you

12   can recall mentioning it to Marc Bertrand or -- to

13   Marc Bertrand?

14      A.    I don't think I ever really spoke with

15   Bertrand much at all verbally.

16      Q.   Okay.  Does that mean you can't remember

17   specifically mentioning it to Marc Bertrand?

18      A.    Well, other than the document I sent him,

19   which I consider a mention, no.

20      Q.   That's a document you sent to HR?

21      A.    That he signed.

22      Q.   Okay.  And how about Chris Finn?  When is the

23   first time you can specifically remember using the

1    term Arizona residency program?

2        A.    My belief is she --

3        Q.    When is the first time you remember using

4    those words, sir?  Not the VA, not computer.

5        A.    I'll be clear, I used the word VA, I didn't

6    use the word Arizona.  So I don't remember.  It was

7    probably when I was in shock that she told me that

8    I -- what I call blackmail, she said you didn't

9    disclose Arizona, you need to resign.  That's probably

10   the first time.  That's the answer to your question.

11       Q.    When did that occur?

12       A.    January 10th about ten a.m.

13       Q.    So your best recollection is the first time

14   Chris Finn or you together used the words Arizona

15   specifically --

16       A.    No.  Just to be clear, I believe that she

17   made a fraudulent blackmail on January 13th and that

18   she knew very well in October that I worked at a VA

19   Hospital in Arizona.

20       Q.    Okay.  Dr. Isaacs, I'm going to be asking you

21   some questions now about DHMC specifically.

22       A.    Am I done with these exhibits?

23       Q.    No, leave them there.  We'll collect them.

1      **A.    It's getting hard to track.**

2      Q.    What I want to know, though, is whether you

3   want to take a break before I do so.

4      **A.    No, I'd rather go to 12 if possible.**

5          (Discussion off the record.)

6          MR. KAPLAN:  Okay.  Let's mark a couple of

7   exhibits.  Or an exhibit here.

8          (Isaacs Exhibit 14 was

9          marked for identification.)

10     Q.    BY MR. KAPLAN:  All right.  Dr. Isaacs, I'm

11  showing you a document that's entitled New House Staff

12  Appointment Form.  And first thing I want to know is

13  first of all, have you ever seen it?

14     **A.    Yeah, I've seen it.**

15     Q.    Do you know, did you prepare this form?

16     **A.    No.**

17     Q.    So you've not -- you saw it.  How did it come

18  about that you saw it?

19     **A.    I think it was in the discovery materials**

20  **somewhere.**

21     Q.    Okay.

22     **A.    Yeah.**

23     Q.    Now, this form is dated March 24, 2011.  Is

1    that when you -- is that around the time you received

2    materials from Dartmouth to sort of begin the process

3    of your residency?

4        **A.    Yeah.**

5        Q.    And is that -- is this something that

6    prompted an e-mail to your dad where you said what am

7    I going to do?  I finally have to disclose Arizona?

8    You remember that?

9        **A.    No, that was the board application.**

10       Q.    Okay.  Wasn't the board application part of

11   the package you received?

12       **A.    Mm-hmm.**

13       Q.    Yes?

14       **A.    Yeah.  Yeah.**

15       Q.    All right.  We'll talk about that in a

16   minute.  Now, this thing says as of March 24, 2011, it

17   says previous residency or fellowship training in

18   another program.  And you say no.  Truthful?

19       **A.    No, I think Finn filled this out, right?**

20       Q.    I don't know.  I'm asking you who filled it

21   out.  Did Finn fill it out?

22       **A.    Well, I think so.  I'm not sure.**

23       Q.    So if Dr. Finn filled it out, or somebody

1  other than you filled it out, as of March 24, 2011,

2  they apparently knew nothing about the University of

3  Arizona?

4      **A.    Let me see the date on the --**

5      Q.    April 11.  On the application?  The last

6  exhibit.

7      **A.    Right.  So I wouldn't have filled this out,**

8  **to my knowledge, because this was a week after the**

9  **match and I was actually out of the country by this**

10 **point.  I wouldn't have received it by e-mail.  I was**

11 **actually I think on my honeymoon at the time this was**

12 **signed.**

13     Q.    So you didn't fill it out?

14     **A.    I'm pretty sure I didn't fill it out.**

15     Q.    So as of this date, though, you're having --

16 well, strike that.  Is this the first time you've ever

17 seen it?

18     **A.    No, just recently in discovery I think I saw**

19 **this.**

20     Q.    All right.  So would you agree with me that

21 at least as of March 24, 2011, whoever filled this out

22 did not believe that there had been any residency you

23 had attended?

1     **A.    Finn -- most program directors saw that I was**

2  **at Arizona on their computer system.  So I don't -- I**

3  **can't testify whether Finn knew that or not at that**

4  **time.**

5     Q.   You filled --

6     **A.   I'm sorry, but that is --**

7     Q.   You filled out your application that we

8  marked as exhibit -- what's the number of the Board of

9  Medicine app?

10          MR. CHABOT:   The Board of Medicine is 12.

11     Q.   12, okay.  You filled out your application to

12  the Board of Medicine which we marked as Exhibit 12

13  and signed it on April 23rd, 2012, okay?

14     **A.   Okay.**

15     Q.   Now, just to be sure, the first time you ever

16  disclosed or wrote Arizona as a prior training process

17  was on this application, correct?

18     **A.   That's right.  But that wasn't your question**

19  **before.**

20     Q.   That is correct, though, what I just said?

21     **A.   What you just said is correct.**

22     Q.   And you never submitted anything to the

23  Medical Center prior to April 23, 2011 that referenced

1    Arizona?

2         **A.    That's right.**

3         Q.    All right.

4         **A.    But your answer -- your question whether Finn**

5    **knew or not on March 24th, I have to say her computer**

6    **screen would show that I was at Arizona at that time.**

7    **And in fact, most people when I applied for residency**

8    **back on September 1st, I got a lot of e-mails back**

9    **saying tell us about Arizona.  And I didn't get many**

10   **interviews.  So it appeared to me the large majority**

11   **of the program directors, like out of 200 maybe 180,**

12   **maybe all 200 saw that I was at Arizona.  So I can't**

13   **testify as to Finn's knowledge on March 24th when most**

14   **residency program directors I did apply to did know at**

15   **that time and date.**

16        Q.    So let me explore that a bit because I'm -- I

17   don't know what you're talking about.

18        **A.    Sure.**

19        Q.    So let me ask you.  So why would the

20   University of Arizona experience show up and where --

21   strike that.

22             Where would the University of Arizona

23   experience show up that a program director, any

1    program director could review?

2        A.    I've never used their computer systems, but I

3    believe there's a screen.

4        Q.    Who is theirs?

5        A.    The program directors that you apply to have

6    a computer screen they log in to.

7        Q.    Right.

8        A.    That I believe shows past training programs.

9    Whether or not you disclosed it or not.  So I believe

10   it was commonly known to most people, I got e-mails, I

11   can show you the e-mails, maybe I already put them in

12   the lawsuit, I don't know if I've disclosed them,

13   e-mails from program directors like a week after I

14   applied saying tell us about Arizona.  So it was well

15   known among the program directors around the time of

16   my application that I had actually been in Arizona.

17   And I didn't get many interviews, which I attribute

18   to -- compared to last year, which I -- you know, the

19   year before I had a lot of neurosurgery interviews.

20   The next year I had very few in psychiatry, which is

21   generally considered the least competitive.  You know,

22   I said prelim surgery is the bottom of the barrel, but

23   psychiatry in terms of competitiveness --

1    competitiveness levels is pretty low.  So I think I

2    only got some undesirable interviews from people that

3    were willing to look past the surgery internship at

4    Arizona that they knew about.

5        Q.   So you're -- you're operating on an

6    assumption that -- if I understand correctly, that

7    there, first of all, was a computer process available

8    for program directors that would have disclosed your

9    prior participation at Arizona?

10       A.   That's my assumption.

11       Q.   And would it disclose your prior

12   participation at USC?

13       A.   I don't think so, but actually, I don't know.

14   Maybe.

15       Q.   And you're assuming, furthermore, that Chris

16   Finn may have looked at that and therefore would have

17   known that you attended the University of University

18   of Arizona program?

19       A.   Well, actually, I want to answer your

20   question.  It's been alleged I went into this shock or

21   adjustment disorder on January 13th, because I started

22   to try to figure out how long did Finn know.  And I

23   traced it back to my conversation with her about the

1  VA, back to Noordsy's conversation, back to my

2  training application documents of her and Bertrand.

3  And then -- and obviously I thought that she was a

4  pretty unethical person at that point.  And it crossed

5  my mind like did she even know before she matched me?

6  You know, did she just not care about it and then turn

7  that around later?  I mean, and I think no human

8  would -- what would be her motive to do that?  So I

9  don't think that's what happened, but I wondered.

10      Q.   Okay.  But you don't know that happened?

11  That's an assumption?

12      A.   I wondered.  I hope that's not true.

13      Q.   And to summarize this area, at least I think

14  we can agree that the first time you actually put

15  anything in writing that would disclose Arizona would

16  be on the application which was April 23rd?

17      A.   That's right.

18      Q.   All right.

19      A.   No.  No.  Was it April 23rd?

20      Q.   April 23rd, 2011, sir.  See?  See your

21  signature?

22      A.   Yeah, okay.  25th.  Is that a three or a

23  five?

1          Q.   I have no idea.

2          **A.   Let me just make sure.**

3          Q.   Doesn't make any difference.

4          **A.   (Peruses document.)  It's the 25th.  That's**

5     **why I was confused by the date.**

6          Q.   All right.  So now I want to show you another

7     document.  This I believe -- wait a minute.  I want to

8     make sure I mark this -- yes.

9               (Isaacs Exhibit 15 was

10              marked for identification.)

11         Q.   BY MR. KAPLAN:  All right.  I'm placing

12    Exhibit 15 in front of you.  Ever seen it before?

13    This is your GME Confidential Data Form.

14         **A.   Lot of forms start to blur together, but --**

15         Q.   You know, sir, if you don't know, just answer

16    you don't know.  It's okay.  Whatever the answer is.

17         **A.   I don't remember if this is part of the new**

18    **hire packet or if this is something I've never seen.**

19         Q.   I think it is part of the new hire packet.

20    Does that help you?

21         **A.   Yeah.  So then I probably saw it before.**

22         Q.   So what I want to focus on here is a couple

23    things.  And it's the Equal Employment Opportunity

1    Commission reporting and the paragraph below there,

2    the question.  You see question number one, it says,

3    "Do you have a handicap or disability?"

4         **A.    Yeah.**

5         Q.    Did I read that correctly?

6         **A.    That's right.**

7         Q.    And you answered you did not?

8         **A.    That's right.**

9         Q.    And then on question number 4, it says,

10   "Please describe any reasonable accommodation that the

11   hospital could consider enabling you to perform your

12   job in a safer or better manner."  And you wrote NA.

13   Can I assume that stands for not applicable?

14        **A.    That's right.**

15        Q.    All right.  So as of this particular date,

16   March 28, 2011, you were reporting the fact that you

17   did not personally believe you had any medical issues

18   that required further discussion for purposes of

19   accommodation.  That's correct; isn't it?

20        **A.    Can you read back the question.**

21             MS. KAPLAN:  Go ahead, Andy.

22             (The pending question was read.)

23        **A.    That's a difficult question for me to answer.**

I was reporting that I did not have a handicap or
disability.

Q.   BY MR. KAPLAN:  Okay.

A.    Whether I was reporting my belief is
difficult because I would say from the head injury in
'97 I was reporting a belief of a disability, and I
was often told that no such disability existed.  So I
think I started to believe what people told me to
believe.

Q.   You answered no, right?

A.    Well, I did say that.  I said I'm reporting
no as to whether I have a disability.  But as to my
beliefs, I think that's a more complicated question.

MR. KAPLAN:  All right.  Mark this for me.

(Isaacs Exhibit 16 was

marked for identification.)

Q.   BY MR. KAPLAN:  Now, take a look at 16.  It's
an e-mail.  And first of all, I want to put this in
context and see if you remember it.  Apparently in the
health questionnaire you prepared, which was looked at
through the people in the medical group at DHMC, a
question arose about whether or not you actually did
need some sort of help.  Do you remember that

1    occurring, and do you remember being asked about that?

2         A.   I think the answer to your question is no.

3    No question arose to me about a disability.

4         Q.   Well, let's look at this e-mail.  On May --

5    on Friday, May 20, at 5:06, Erin Carter, who is in

6    occupational medicine at DHMC?

7         A.   Cartier or Cartier.

8         Q.   Cartier.  I'm not sure.  Did you know her?

9         A.   No.

10        Q.   All right.  She sent an e-mail to you and it

11   said, "Hi, Jeffrey, in reviewing your health

12   questionnaire and immunizations, it appears we need a

13   few items."  And she goes on to talk about measles and

14   vaccinations.  It also states, "Can you also explain

15   about the depression issue.  Was it a situation issue?

16   Are you on medication or counseling?  Please explain

17   further."  All right?  Do you remember receiving that

18   e-mail?

19        A.   Sure.  I remember that e-mail pretty well.

20        Q.   Okay.  You responded hi, Erin.  And you talk

21   in the first paragraph about the fact that you have

22   all the vaccinations that you think you need.

23        A.   I'm sorry, I thought you were clarifying your

1    question from before which was did she ask me about

2    disability, and the answer was no.

3        Q.    I didn't know that I asked you that.

4        A.    Well, we can read it back, but I'm not going

5    to ask him to do that.

6        Q.    Let me -- okay.  You -- do you remember

7    receiving this e-mail?

8        A.    Yes.

9        Q.    And do you remember that the e-mail included

10   a request about information about possible depression?

11       A.    Yeah, which actually I remember being

12   surprised about.  I remember being very surprised by

13   this e-mail.  I was actually in Moldova at the time,

14   or the former Soviet republic of Moldova, and I was

15   really surprised by this e-mail.  In fact, this

16   prompted a few phone calls to a few people because --

17   you haven't -- you haven't admitted it as evidence,

18   but I filled out a health form disclosing a

19   concussion, or TBI, and I listed depression on that

20   form, I believe.

21       Q.    And wouldn't you --

22       A.    And let me finish my answer.

23       Q.    I'm sorry.  I'll let you finish.

1      **A.    I was very surprised that what -- what**

2    **plagued me or concerned or worried me for many years**

3    **was this TBI.  And a TBI is certainly more of a**

4    **concern generally than depression.  I remember**

5    **being -- I think it's a little weird that she's**

6    **writing back about the depression issue and not the**

7    **TBI.  And that made me think she maybe was wondering**

8    **about the USC issue.  But the depression issue, of**

9    **course, related to USC.**

10     Q.   All right.  So you went through that thought

11   process before you responded --

12     **A.    You asked me my thought process.  And when I**

13   **remember it, I do -- you know, obviously I would need**

14   **to tell you my thought process of what I remember.**

15     Q.   So let's look at your answer, all right?  The

16   first paragraph of your answer talks about the fact

17   that you were pretty certain you had the various

18   vaccinations, right?

19     **A.    Yeah.**

20     Q.   And then you go on to say the depression

21   issue was 2005-6.

22     **A.    Right.**

23     Q.   And I received counseling for a total of

1    approximately six months from a physician.  What was

2    going on in 2005-6 that caused you depression?

3        A.   **Well, as I just mentioned, that pertained to**

4    **the USC matter.**

5        Q.   Okay.  And then it goes, you went on to state

6    it was related to a career transition --

7        A.   **That's right.**

8        Q.   -- and some family issues.

9        A.   **That's right.**

10       Q.   It doesn't talk about USC.

11       A.   **Well, that's the career transition, USC.**

12       Q.   Okay.  And it says, "I am not currently

13   taking any medications, prescription or OTC," over --

14   that stands for over-the-counter, right?  OTC?

15       A.   **That's right.**

16       Q.   "Nor have I since 2006."

17       A.   **That's right.**

18       Q.   So did you understand or -- strike that.  Are

19   you telling me based on your earlier answer that you

20   concluded there was something nefarious about this

21   request?  Something inappropriate?

22       A.   **No, I don't think Erin Cartier was some bad**

23   **actor in all this.  But I thought it was odd that she**

1    would send me something not asking about my TBI but

2    asking about depression.  It's like if you disclose,

3    you know, I mean, something serious and then mention

4    you have the flu, and someone said tell me about your

5    flu, that would be a little odd.  So I thought it was

6    odd that she was asking about the depression which

7    centered around obviously a complex legal career

8    transition in my life.  And I thought that was odd.

9    Maybe she's -- maybe that's just what she focused on,

10   so I wrote back and answered her question.

11        Q.   You had yet another opportunity to indicate

12   if you would need any accommodations for anything at

13   DHMC, and let's talk about that for a minute.

14        A.   Okay.

15             (Isaacs Exhibit 17 was

16             marked for identification.)

17        A.   Do you have the TBI disclosure so I can

18   reference that in my discussions?  Do you actually

19   have that with you?

20        Q.   BY MR. KAPLAN:  I don't think I do.  This is

21   an e-mail -- or excuse me, a document.  Have you ever

22   seen this before?

23        A.   Let me take a look at it.

1      Q.    Sure.

2      **A.    (Peruses document.)  I don't think I've seen**

3   **this.  It looks like a urine drug test I took.  Which**

4   **I remember taking.**

5      Q.    And -- but it also indicates restrictions/

6   accommodations, none.  My only question -- this is

7   dated June 20, 2011.

8      **A.    Mm-hmm.**

9      Q.    My question is prior to June 20, had you done

10  anything, talked with anybody at the Medical Center

11  about the need for any kind of accommodation to

12  perform your work as an intern or resident?

13     **A.    Well, I object to the characterization here.**

14  **This is Cartier's summary of my drug screen and the**

15  **previous discussion she had had with me.  So this was**

16  **nothing I voluntarily had any say in except it dates**

17  **back to my disclosure of the TBI and depression.**

18     Q.    That's great, but that's not my question,

19  sir.  My question --

20     **A.    So Cartier never followed up on the TBI.  Had**

21  **she followed up on that I think this would be a**

22  **different discussion.**

23     Q.    Okay.  You had indicated on your earlier

1    documents that we marked that you had no disability

2    nor any reason for accommodation, correct?  That's

3    what you wrote?

4        **A.    Which we've discussed in some detail about my**

5    **beliefs, whether -- but whether I reported that fact,**

6    **I've answered this question.**

7        Q.    Well, you didn't report it.  The form

8    specifically doesn't report it.

9        **A.    Well, I've answered that pretty specifically.**

10       Q.    Give me the document again.  Exhibit 15.

11   Would you put it in front of you?

12       **A.    Right.**

13       Q.    Exhibit 15 says do you have a handicap or

14   disability.  You answered no.

15       **A.    I already answered no.  And I gave a very**

16   **detailed answer that I reported the fact that I**

17   **don't -- didn't have a disability, but whether I --**

18   **whether or not I believed I had a disability is a more**

19   **complicated issue.  And I went into some detail about**

20   **that.**

21       Q.    And you think somebody should know that you

22   are struggling with determining whether or not you

23   have a disability?

1          A.   I don't think Cartier should have read my

2     mind, but it's interesting that -- like I'll give you

3     an example.  She asked about the flu and not the big

4     accident.  She asked about the depression and not the

5     TBI.  If she asked about the TBI, I would have had to

6     disclose different answers.

7          Q.   Well, you were asked about all kinds of

8     things you decided not to disclose, schools, training

9     programs, right?

10         A.   I object to that characterization.

11         Q.   Let's go to question four on this form where

12    you said any reasonable accommodation, and you

13    basically said it wasn't applicable?

14         A.   I did write NA.  I agree to that.

15         Q.   And so my question to you I thought was

16    simple.  Sorry if it gave rise to all of this.  And my

17    question simply was as of June 20, 2011, when there

18    was a conclusion reached that you had no need for any

19    accommodations and that there was no restriction on

20    what you could do, had you provided any information to

21    the Medical Center to the contrary?

22         A.   I disclosed the TBI, but I did not say it

23    rose to the level of disability.

1      Q.    Okay.  Thank you.

2            (Isaacs Exhibit 18 was

3            marked for identification.)

4      Q.    BY MR. KAPLAN:  All right.  I'm showing you

5   Exhibit 18.  First I ask if you recall seeing it

6   before.  It's a fax cover sheet with two pages

7   attached to it.

8      **A.    (Peruses document.)  Yeah, I think this was**

9   **the first document I got after the match.**

10     Q.    And this is part of the -- did you get a

11  series of documents or did they --

12     **A.    Maybe this was in the series of them.**

13     Q.    Didn't you get one package of documents?

14     **A.    I think they were e-mailed by Peggy Meuiner,**

15  **and some of them were in several e-mails.**

16     Q.    That's right, okay.  So on this one here, I

17  want to ask you about questions 4 and 5.

18     **A.    Okay.**

19     Q.    Now, this is dated -- March 29, 2011 is when

20  it's dated on the date on the cover sheet.  It says,

21  "Have you voluntarily resigned or withdrawn from any

22  hospital or licensed facility due to professional

23  misconduct, incompetence or negligence?"  You answered

1  no.

2       **A.    Right.**

3       Q.    You believe that's truthful?

4       **A.    I think at the time -- of course, I didn't**

5  **have the neuropsych studies that I have now.  At the**

6  **time I believed this.  I didn't do any misconduct at**

7  **Arizona.  I -- incompetence or negligence, I thought**

8  **they were giving me a hard time about the pager.  You**

9  **know, dazed, I had a car accident and about USC.  So I**

10 **didn't think it was real negligence.  So I think I**

11 **answered it truthfully.**

12      Q.    Next question is, "Has any hospital or

13 licensed facility restricted or terminated your

14 professional training, employment or privileges?"  You

15 said no.  You think that was truthful, too?

16      **A.    Well, I never proved they constructively**

17 **terminated me so in that case I voluntarily resigned.**

18      Q.    Okay.  Let's go to the next page.  Number 1

19 where it talks about the fact that a,

20 "Misrepresentation or omission of material information

21 from my employment application, my CV or other

22 documents related to my application may result in

23 rejection of my application or, if I am hired,

1    termination of employment."  You see that, right?

2         **A.    Yeah.  I think --**

3         Q.    Let me ask you a question.

4         **A.    Okay.**

5         Q.    My first question was did you see it, my next

6    question was what did you consider to be your

7    employment application?

8         **A.    All the documents that they were sending me.**

9    **And my ERAS.**

10        Q.    And the ERAS application?

11        **A.    Everything including the ERAS.**

12        Q.    Well, what else besides ERAS?

13        **A.    This, about eight documents they sent me.**

14        Q.    Okay.  We'll keep going.  Next document.

15        **A.    Each hospital -- just to continue with that,**

16   **Attorney Kaplan.  Each -- ERAS is one standardized**

17   **form.  Certainly that couldn't cover each hospital's**

18   **HR policies and concerns over HR procedures.  So each**

19   **hospital has their own new hire packet that**

20   **supplements the ERAS to make one binding employment**

21   **application.  So DHMC in this case, I mean, we've seen**

22   **most of their employment application, but collectively**

23   **they form a binding employment application process.**

1      Q.   Before we mark this, let me just ask you.  It

2   was -- as I understand it, and you help me if I'm

3   wrong here, as I understand it, it was your intention

4   not to disclose the University of Arizona?

5      **A.   No, that's not true.**

6      Q.   So you intended to disclose it?

7      **A.   Disclose it once ACGME may have ruled on my**

8   **request for investigation.**

9      Q.   And when do you think you made the request

10  for investigation?

11     **A.   Well, actually, I have to object to your**

12  **form.  I don't know when you're talking about, when I**

13  **believed this.**

14     Q.   That's fair.  Let me change it.

15     **A.   Yeah.**

16     Q.   So do you recall when you made a request of

17  the ERAS group to look into your application

18  situation?  Do you recall when that happened?

19     **A.   You mean ACGME?**

20     Q.   Yeah.  I'm sorry, ACGME.

21     **A.   To look into my situation in Arizona?**

22     Q.   Yes.  Do you recall when that happened?

23     **A.   It was during that time period in August 2010**

1  when I was going to the Mayo Clinic.

2      Q.   Okay.  Do you have a recollection of when

3  anybody actually looked into that and gave you any

4  sort of information?

5      A.   Like I said, they made -- I didn't really

6  hear much from them until -- you know, it was

7  interesting.  There was the shooting in Tucson, and

8  the Arizona surgery department were like national

9  heroes at the time.  They saved quite a few people's

10 lives.  And it was like a week after that the ACGME

11 e-mailed me that Arizona was cleared.  I mean, that's

12 just what I remember.  I didn't hear anything about

13 Tucson, I saw Tucson on the news one day and a week

14 later it was cleared, or two weeks later.  And then at

15 that point I realized I had an obligation to update

16 Dartmouth.  And I did so at the first opportunity.  I

17 think about a -- within a month.

18     Q.   And you're talking about -- you continue to

19 consider that your April 23 was the notice to

20 Dartmouth?

21     A.   Right.  I don't know when --

22     Q.   And you were going to do that voluntarily?

23     A.   Voluntarily once I knew from the ACGME.

1          Q.   But you didn't know from ACGME as of April

2     23, 2011 what action, if any, they were going to take

3     on your complaint, on your Arizona complaint?

4          **A.   I think you've misunderstood the -- something**

5     **didn't fit here with the question you're asking.  I**

6     **voluntarily planned to update Dartmouth once I was**

7     **informed by ACGME that they found no wrongdoing.**

8          Q.   Okay.  And when is it that ACGME found no

9     wrongdoing?

10         **A.   First, Attorney Kaplan, --**

11         Q.   When is it that ACGME found no wrongdoing?

12         **A.   Like I said, it was about a month -- about a**

13    **month -- within a month that I disclosed it to**

14    **Arizona.  I think it was the end of February and then**

15    **I disclosed the end of March.**

16         Q.   So just -- again, these are -- these may not

17    seem important to you, they are to me, so let me be as

18    clear as I can.

19         **A.   Mm-hmm.**

20         Q.   As of April 1, 2011, you're sitting there,

21    you know that you haven't disclosed Arizona, right?  I

22    mean, you're aware that you haven't disclosed it?

23         **A.   Yeah.**

1      Q.   You've made a complaint to ACGME about

2   Arizona, correct?

3      **A.   Right.**

4      Q.   You're waiting for a response from ACGME

5   concerning Arizona?

6      **A.   Yeah, yeah, mm-hmm.**

7      Q.   And you are intending, as soon as that

8   response comes in, assuming it finds no wrongdoing,

9   you're going to go to DHMC where you've had your

10  interview and they've talked to you, and you're going

11  to say look, I didn't tell you about Arizona because

12  of ACGME?

13     **A.   Right.  But I voluntarily resigned, yeah.**

14     Q.   Okay.  Now, when -- what confuses me about

15  that, and let me ask.  I realize you made a complaint

16  to ACGME, and we went through their response,

17  remember?  We went through their response to ACGME?

18     **A.   Whose response?**

19     Q.   Arizona.

20     **A.   Well, there were probably a lot of responses.**

21  **I mean, I never heard anything from ACGME, like I**

22  **said, till, like, two weeks after that Tucson**

23  **shooting, you know, the tragedy with Gabby Gifford.**

1      Q.   Well, remember we marked Exhibit 7, Exhibit 7

2   is dated October 6, 2010, and it's the response of

3   Arizona to your complaint to ACGME?

4      **A.   To ACGME.**

5      Q.   Right.

6      **A.   I didn't know that.**

7      Q.   No, I understand that.

8      **A.   Okay.**

9      Q.   And it responds to the various issues that

10   you raised?  Remember we went through that letter?

11      **A.   Right.**

12      Q.   Okay.  Is that what you were waiting for, you

13   were waiting for the response from ACGME?

14      **A.   No.**

15      Q.   What were you waiting for, then?

16      **A.   I was waiting for their response to me.**

17      Q.   That's what I mean.  You were waiting --

18      **A.   Well, four months after that, so I just want**

19   **to be clear on the time here.**

20      Q.   Did ACGME provide a response to you?

21      **A.   Four months later.**

22      Q.   And what was their response?

23      **A.   That the RRC, or residency review committee,**

1  reviewed everything in their last meeting, which was

2  probably in January of 2011, and that they found no

3  accreditation deficiencies, I think that's the term,

4  but they said they wanted to use caution or make me

5  aware of the fact that they wouldn't investigate

6  personal torts, personal claims.  So I don't know if

7  that's their standard letter or if they were saying

8  this is an accreditation matter but you still may have

9  a claim against them.

10       Q.   So how was it that you reached the conclusion

11  that ACGME's response to your complaint was going to

12  be determinative of whether or not you needed to

13  disclose Arizona on your application?

14       A.   Well, I mean, I could have sued them, right?

15  It wasn't an end all be all to ACGME, if that's what

16  you're asking.

17       Q.   That's not what I'm asking.  What I'm asking

18  is you told me you were waiting for a response from

19  ACGME.

20       A.   Right.

21       Q.   And then you were going to voluntarily

22  disclose your Arizona attendance assuming something

23  about their response.

1        A.   Yeah.

2        Q.   What was it that Arizona -- that you were

3   going to get from ACGME that had anything whatsoever

4   to do with your decision about disclosing Arizona?

5        A.   **Well, I thought there was a chance they'd**

6   **come back and say we found out they did know about**

7   **your attendance at USC, they mistreated you and you**

8   **were never given a real chance there.  And that**

9   **obviously would impact what I would say to Dartmouth.**

10       Q.   Would that have -- was that what you were

11  leaning or waiting for --

12       A.   **Yeah.**

13       Q.   -- to decide whether or not you were going to

14  disclose it?

15       A.   **That may sound ridiculous to you, but I can**

16  **tell you that was my thought process.**

17       Q.   Don't worry about how it sounds, that's okay.

18            All right.  Let's mark -- we didn't mark

19  this, did we?

20            (Isaacs Exhibit 19 was

21            marked for identification.)

22       Q.   BY MR. KAPLAN:  Take a look at --

23       A.   **Actually, I want to add on that, Attorney**

1  Kaplan, I wasn't thinking about Dartmouth on a daily

2  basis and a contingency of this.  I was just waiting

3  to hear back from ACGME.

4       Q.   Take a look at the e-mail.

5       A.   And I feared once they do something I'll make

6  my next determination.

7       Q.   Take a look at the --

8       A.   So to try to remember some thought process,

9  if you're going to try to break the logic there, I

10  just -- you know, I was waiting to hear back from

11  ACGME, and I think -- you know, I thought once I know

12  what this case is or what they find, or if they don't

13  find anything I'm probably not going to sue them, then

14  I'll make a decision on how to go forward from there.

15  That's my best memory.

16       Q.   Would you look at Exhibit 19, please.

17       A.   Okay.

18       Q.   So at the bottom of this exhibit it says,

19  "Good afternoon.  I want to welcome you all to

20  Dartmouth-Hitchcock.  Your new hire packets have been

21  mailed today, April 15th."

22       A.   That's right.

23       Q.   You seemed to remember that they were

 1    e-mailed, but do you remember actually whether they

 2    were mailed or e-mailed?

 3        **A.    I think she used mail, but I think she**

 4    **e-mailed a lot of it.  She could have mailed some.  I**

 5    **don't remember.**

 6        Q.    All right.  Now, within the packet was a

 7    requirement for you to seek a training license,

 8    correct?

 9        **A.    Yeah.**

10        Q.    And --

11        **A.    That's the first item here.**

12        Q.    Right.  New Hampshire training license:

13    "This form needs to be filled out in order for you to

14    obtain a New Hampshire training license.  It is

15    required for all residents."  So you knew you had to

16    fill out, then, a New Hampshire training license?

17        **A.    Sure.**

18        Q.    You probably knew that anyway because you'd

19    filled out one for Arizona, right?

20        **A.    Yeah.  Although I don't know if each state**

21    **has -- but yeah, probably.**

22        Q.    The receipt of this material caused you to

23    e-mail your father, right?

1        **A.    That's right.**

2        Q.    And on -- at 6:14 -- excuse me, at 5:30 you

3    e-mailed your father, and what you said was, "They

4    e-mailed a bunch of stuff today and mailed out the

5    contracts today.  The New Hampshire State training

6    license application asks about prior training licenses

7    in other states so I guess I'll need to write that I

8    left Arizona and request that Arizona Medical Board

9    send my file to New Hampshire."

10        **A.    Mm-hmm.**

11        Q.    "Don't see any way around this."

12        **A.    Mm-hmm.**

13        Q.    "I will just say I joined the program

14    thinking it would help me get neurosurgery and was

15    disappointed."

16        **A.    Mm-hmm.**

17        Q.    "Disappointed in the training experience and

18    realized it would not in any way help me do a

19    neurosurgery residency."  That's what you wrote to

20    your father, right?

21        **A.    That's right.**

22        Q.    So let me ask you about this.  Where you talk

23    about the fact that don't see any way around this.  Do

1   you think that is -- references an individual who was

2   intending to voluntarily disclose the information?

3       **A.    I don't think it -- I don't think it**

4   **references my past thoughts there, no.  I think it**

5   **references that form.  I had to fill out this form.**

6   **There was no way around it.**

7       Q.    And -- but you had told me a few moments ago

8   that you were going to disclose this anyway as soon as

9   you --

10      **A.    Actually, I did state that I was waiting on**

11  **ACGME, and I thought I would do the right thing, but I**

12  **never really thought about the steps.**

13      Q.    That's not what you said to your dad, is it?

14  What you said to your father was now I've gotta

15  disclose it.

16      **A.    No.  I think that's taken out of context.**

17      Q.    Okay.  So you believe that this e-mail that

18  you wrote to your father is indicative of somebody who

19  was planning to disclose this information anyway?

20      **A.    I was planning to comply with all laws at the**

21  **point -- you know, at all points.  That's all I'll**

22  **say.**

23      Q.    You see the part of this e-mail that says, "I

1  don't see any way around this"?

2      A.    Well, that's referencing USC and the bigger

3  issue.   This is, you know, --

4      Q.    Is there any reference to USC in this e-mail,

5  sir?

6      A.    Well, he knew it.

7      Q.    Is there any reference in here?

8      A.    Well, I wouldn't write that to him.   That's

9  just how I write to him.   He knows what it's about.

10     Q.    What this talks about is the fact that you're

11 being asked in the license to disclose prior training?

12     A.    No, see, Attorney Kaplan, this is eight years

13 of, you know, father/son, parent/child trauma,

14 whatever you want to call this nightmare.   He knows

15 about the USC issue onward, issues before that, head

16 injury, whatever.   I don't see any way around this is

17 saying I'm going to have to -- I'm going to have to

18 approach this mess and write something, you know,

19 truthful and all deadlines, like he says.

20     Q.    So again, my only question to you about this

21 e-mail to close out this section is you believe that

22 somebody reading this e-mail could reasonably conclude

23 that you were going to comply with the requirements of

1    the licensing application voluntarily before --

2    before -- and disclose Arizona before you got the

3    request for a license?

4        A.    Can -- can you repeat that?

5        Q.    Sure.  You believe, and you're trying to

6    communicate to me as I see it or hear it, that this

7    e-mail reflects somebody who was going to voluntarily

8    disclose attendance at Arizona prior to the time the

9    New Hampshire licensing board required it?

10        **A.    So in that month between when ACGME made**

11    **their ruling I was probably thinking about suing**

12    **Arizona and making this an issue that was in debate in**

13    **court.**

14        Q.    Good.  Read my question back, please.

15        **A.    So --**

16        Q.    Oh, I'm sorry.

17        **A.    So like I said, I don't remember -- if you**

18    **were trying to ask me before about an exact process of**

19    **when I would disclose to Arizona, I don't remember an**

20    **exact thought process on that.  I do think generally**

21    **after ACGME came up with their ruling, pretty quickly**

22    **thereafter I decided not to sue and pretty quickly**

23    **thereafter I decided that I need to let Dartmouth**

1    know.  And I think that this statement here to my

2    father I don't see any way around this, you know,

3    refers to the whole nightmare, that I'm going to have

4    to bring it up and I'm going to have to bring it up

5    now.  Whether -- I thought I would bring it up at some

6    point, well, now I had to bring it up.  It might be

7    referring to -- you know, these aren't fully thought

8    sentences because, you know, he knew what I was

9    thinking so, you know, these are kind of notes.  And,

10   you know, it could be I don't see any way around that

11   I have to do it today.  It wasn't -- you know, you

12   can't make something -- I don't think you can

13   reconstruct that one-month period any better than what

14   I'm -- what I'm remembering.

15            MR. KAPLAN:  Fine.  Mark the next exhibit,

16   Andy, please.  Next document.

17            (Isaacs Exhibit 20 was

18            marked for identification.)

19       Q.   BY MR. KAPLAN:  This is Exhibit 20.  You

20   recognize it as your resident agreement of

21   appointment?

22       A.   Yeah.

23       Q.   And I just -- all I wanted to ask you about

here is I think we've already confirmed that you

submitted your licensing application on April 23,

right?  Or April 25, I guess, right?

          **A.    Yeah.**

          Q.    And so the earliest -- even under your

impression of what happened, the earliest that you --

the Medical Center would have known about Arizona was

sometime on or after April 25?

          **A.    Well, no, I don't know what Finn knew.  Like**

**every other program director in the country.**

          Q.    Well, the only time there would have been any

written evidence in the file of your attendance at

Arizona would have come from this document?

          **A.    That's not a true statement either.  She**

**could have printed that out.**

          Q.    She could have printed what?

          **A.    My Arizona history and put it in my file.**

          Q.    Let me try again.  The only way they would

have known from anything you did, you personally,

would have been on or after April 23rd?

          **A.    Right.  Yes.  Yes.**

          Q.    Now, when you look at Exhibit 20, tell me

when Jan (sic) Kelliher, who was the administrative

1    director of the office of GME, gave you this contract

2    of employment?  Gave you the agreement of employment.

3    Signed.

4        **A.    That's weird.**

5        Q.    What's weird?

6        **A.    I guess she signed it first on the 14th and**

7    **then sent it to me.**

8        Q.    He, it's John Kelleher, right?  So John

9    Kelleher, who is the administrator at GME, provided to

10    you or forwarded to you your appointment contract

11    prior to the time you made the disclosure that you

12    made to the licensing board with a copy to DHMC HR,

13    correct?

14        **A.    Yeah.**

15        Q.    And can you take a look, I can't read your

16    handwriting as well as you can.  What date did you

17    sign this?

18        **A.    4/25/11.**

19        Q.    Okay.  So you sent this in the same time, or

20    signed this, I don't know what you did with it, the

21    same time that you sent it to the board?

22        **A.    Sure.**

23        Q.    So if you're wrong about people checking

1  computers and finding out all kinds of information

2  about you, you would have signed this agreement, and

3  it would have been offered to you and you would have

4  signed it prior to the time that you personally made

5  any disclosure concerning Arizona, right?

6      **A.    No, because it's the same day.  I mean, I**

7  **sent them back together in one Fed Ex envelope.**

8      Q.    Take a look at the terms of nonrenewal.

9  Well, you don't have to take a look at it.  Let me

10  just ask you.  You knew, did you not, that if you had

11  misstated relevant information that you could be

12  terminated from the program?

13      **A.    Yeah, again, I object.  This was sent in the**

14  **same Fed Ex envelope as the disclosure.  So if you're**

15  **going to say I signed one five minutes before the**

16  **other, that's kind of ridiculous.**

17      Q.    No, actually what I was asking you was

18  whether or not you were offered the position before

19  you made any disclosure.

20      **A.    I was not accepted for the position until I**

21  **made the disclosure.**

22          MR. KAPLAN:  Okay.  I think that if we're

23  going to break, we might as well do it now.

1              (Discussion off the record.)

2              (Lunch recess taken.)

3        Q.   BY MR. KAPLAN:  All set?  You ready?

4        **A.   Ten seconds.**

5        Q.   Sure.

6        **A.   Okay.**

7        Q.   Dr. Isaacs, I just want to remind you you

8   know you're still under oath?

9        **A.   Yeah, that's right.**

10             MR. KAPLAN:  Andy, can we mark this exhibit,

11  please.

12             (Isaacs Exhibit 21 was

13             marked for identification.)

14       **A.   Before we go into testimony, I was**

15  **calculating the time during the break.  We started at**

16  **about 9:15 and left for break about 1:05.  So just ten**

17  **minutes short of three hours, plus a ten-minute break,**

18  **so we're at two hours 40 minutes -- sorry, three hours**

19  **40 minutes out of a total of six hours, so that leaves**

20  **two hours 20 minutes.  I was requesting 15 minutes for**

21  **my cross-examination, so that leaves two hours five**

22  **minutes.  I don't know how much time the defendants**

23  **Dartmouth need, so your questioning would have to stop**

1   **after two fours five minutes, or whatever you agree**

2   **with them.**

3        Q.   BY MR. KAPLAN:  I have no idea whether that's

4   consistent with our calculation.  Was it?

5        MS. PEAHL:  We're off by a few minutes.  We

6   have it that we've been at it for three-and-a-half

7   hours.

8        Q.   Okay.  We're in the same ballpark.  I placed

9   an exhibit in front of you, Dr. Isaacs.  And --

10       **A.   Okay.**

11       Q.   And that's Exhibit No. 21.  See it in front

12   of you?  That's a pile of e-mails.

13       **A.   Yeah.**

14       Q.   And I want to ask you, and just so you're

15   aware of this, what I'm asking you about in this

16   segment of the questioning are issues concerning the

17   fair hearing opportunities that were available to you,

18   okay?

19       **A.   Okay.**

20       Q.   And can we agree that you -- did you know

21   what the fair hearing process was?

22       **A.   It's kind of confusing the way it's written**

23   **up.  I've looked at -- I compared it to about ten**

1    different hospitals, fair hearing processes, and

2    Dartmouth's is by far the worst written, even compared

3    to community hospitals relatively -- you know, well

4    less resources than Dartmouth.  As far as it's written

5    up, I think I understand it.

6         Q.   So you have had -- you did have a chance to

7    look at it and review it?

8         A.   Yeah.

9         Q.   And tell me, what are the hospitals you

10   looked at to compare Dartmouth's?

11        A.   Well, I just mentioned a community hospital.

12   I don't even remember.  It was in Kansas.  I don't

13   remember.

14        Q.   Tell me the names of any hospitals --

15        A.   Harvard, University of Pennsylvania --

16        Q.   Harvard isn't a hospital, sir.  It's a

17   school.

18        A.   Sorry, medical centers' policies for their

19   residents.

20        Q.   Okay.  So --

21        A.   So Mass. General Hospital, University of

22   Pennsylvania Health System.

23        Q.   What else?

1          **A.    UCLA.  I think a few of the UC schools.**

2   **Maybe a couple of community hospitals.**

3          Q.   And you compared them to Dartmouth's fair

4   hearing procedures?

5          **A.    Yeah.  About a year and a half ago.  My**

6   **memory is not that good.  My impression is -- I**

7   **remember my impression that Dartmouth's was almost**

8   **absent of fundamentals.**

9          Q.   Okay.  So let's take a look at some stuff

10  here.  I'd like you to turn, if you would, initially

11  to page 5 of these documents.  You'll see they're

12  marked Bates stamped with MLB and then a number.

13         **A.   Okay.**

14         Q.   And page 5.  And I just want to go through

15  this with you.  This is an e-mail to you dated March

16  20, 2012, and it says -- it's from Dr. Bertrand.  It

17  says, "I've attached a PDF version of a letter

18  addressing your status as a resident at

19  Dartmouth-Hitchcock Medical Center.  Included with

20  this letter is a copy of the GME grievance process and

21  procedures for review."  And it talks about the signed

22  original of the letter will end up at your Newtown

23  Square address.  Do you remember getting this e-mail?

1          A.    Yeah, I did.

2          Q.    And then attached to it, if you turn the next

3    page is your -- is a March 19 letter.

4          A.    I just notice he uses tracking in that so I

5    didn't know that.  I do remember getting the e-mail.

6    I didn't know there was tracking on it.  Whatever.

7          Q.    The March 19, 2012 letter.  You see that?

8          A.    Yeah.

9          Q.    And do you agree that that was your

10   termination letter?

11         A.    I refer to it as a termination letter.

12   Whether or not it properly terminated me I don't agree

13   with.

14         Q.    So let's look at the letter for a minute and

15   then we'll go on.  But it says at the beginning of it,

16   it says, "This letter is to inform you of your

17   dismissal from the adult psychiatry residency

18   program."  You know, and it says effective March 19.

19   The next sentence says, "Given that you have not taken

20   advantage of voluntary resignation options," I just

21   want to stop there and ask.  Were you given the option

22   to voluntarily resign?

23         A.    Well, I was never put on academic leave, so I

1    **don't know why I would have voluntarily resigned.**

2        Q.    That's an interesting answer to a question I

3    didn't ask.  Let me ask you again.  Did you have --

4    strike that.  Were you given an opportunity to resign

5    by the psychiatry program?

6        **A.    Everyone always has an opportunity to**

7    **voluntarily resign.**

8        Q.    Did someone from the program offer you an

9    opportunity to resign?

10       **A.    I characterize it as blackmail from Christine**

11   **Finn.  I don't call it an opportunity to voluntarily**

12   **resign.  That's not how I'd characterize it.**

13       Q.    Did Christine Finn give you an opportunity to

14   resign no matter how you characterize it?

15       **A.    Other than anyone always has an opportunity**

16   **to resign, as I've said.  Other than that, I've**

17   **answered the question.**

18       Q.    You haven't answered the question, Dr.

19   Isaacs.

20       **A.    I don't characterize it as a voluntary**

21   **resignation offer.  I characterize it as blackmail.**

22       Q.    Okay.  Let's go on.  It says the decision to

23   dismiss you is based on, and it goes on to say

1    academic deficiencies as well as behavior incompatible

2    with the role of a physician.  That's one topic.  And

3    then it goes on to say omission of material

4    information from your electronic residency

5    application.  It goes on to say falsification of

6    information provided to the New Hampshire Board of

7    Medicine and the false reporting of patient electronic

8    medical record as well as substantial competency and

9    integrity concerns.  Now, when you got this letter,

10   did you read that paragraph?

11        **A.    Sure.**

12        Q.    You've often characterized your termination

13   as being based solely upon your misstatements or

14   omissions on your ERAS application.  And so I just

15   want to make sure that you understood there were other

16   elements that were being alleged as well?

17        **A.    So I remember those elements and I remember**

18   **thinking Dartmouth's attorneys made an interesting**

19   **choice to kind of throw the book at me.  Because there**

20   **were different strategies you could have taken, and I**

21   **was a little surprised at the one you chose.  So I do**

22   **remember that pretty well.**

23        Q.    So my question to you is simply whether or

1    not you understood upon reading that paragraph that

2    there were allegations concerning your termination

3    beyond your representations on your application.

4         **A.    I felt the book was being thrown at me, so to**

5    **speak.**

6         Q.    All right.  I'll take that as your answer.

7    It goes on to say that you did not disclose the

8    University of California nor your Arizona experience,

9    we've gone over that.  I'm not going to do it again.

10   And this letter you did receive and did have a chance

11   to read, right?

12        **A.    Right.**

13        Q.    Now, one other thing about this that I want

14   to ask you.  Okay.  On the second page of the letter

15   it says, "Included with this notice of termination is

16   a copy of our GME grievance process and procedures.

17   Should you choose to pursue the grievance option

18   described in these attachments, you must notify Dr.

19   Bertrand in the Graduate Medical Education office."

20   Were -- do you agree that you were provided with the

21   fair hearing process despite the way you may

22   characterize it?

23        **A.    Well, considering it was never initiated**

 1    **correctly by administrative leave, I would say no.**

 2         Q.   Did you receive the document attached to

 3    this, sir?

 4         **A.   Attorney Kaplan, my answer is given that it**

 5    **was never initiated correctly, I would say no.**

 6         Q.   Turn the page in the exhibit.

 7         **A.   Okay.  I've seen that.**

 8         Q.   Was the document that you're looking at right

 9    now attached to the letter?

10         **A.   I mean, you could attach a document for**

11    **homicidal -- you know, hearing on homicide.  The**

12    **document was attached.**

13         Q.   Thank you.  The document --

14         **A.   If that's your question.**

15         Q.   The document was attached.  And the document

16    was attached to the letter when you received it,

17    right?

18         **A.   Yes.**

19         Q.   Okay.  Now, let's keep going.  I'd like you

20    to turn to page 18 in the exhibit in front of you.

21    And this is another letter -- e-mail to you from Dr.

22    Bertrand.  You got that 18?  It says, "I have attached

23    a PDF version of my response to your requested GME

1  review of the decision."

2      **A.    I think that's the same one we just read.**

3      Q.    I don't think it is.

4      **A.    Oh, no, okay.**

5      Q.    Okay?  It says, "A signed original has been

6  forwarded to your Newtown Square."  And that was your

7  request for a review, correct?

8      **A.    Yeah, I think I also asked for a medical**

9  **deferral maybe at that time.**

10      Q.    But this particular e-mail addresses the fact

11  that at some point prior to March 27 you requested a

12  GME review of the decision, right?

13      **A.    Notwithstanding objection to it, I think I**

14  **did proceed by asking for the review.**

15      Q.    Okay.  I'd like you next to turn to page 22

16  of the exhibit.  And this is doctor -- let me wait

17  till you get it in front of you.  Okay?  This is

18  another e-mail to you from Dr. Bertrand dated April 3.

19  You remember receiving this?

20      **A.    Sorry, what page?**

21      Q.    22.

22      **A.    No, this is a letter I wrote.**

23      Q.    I'm sorry.  I apologize.  It is a letter you

wrote.  And it was from you to Dr. Bertrand.  And it

talks about it's in regards to the fair hearing

related request; is that correct?

**A.    Yeah, that's right.**

Q.    And then at the end of this letter, you go to

the very end, and it says, "I hereby request a stay on

the fair hearing," correct?

**A.    That's right.**

Q.    And so as of March -- April 3, you were

asking that Dr. Bertrand delay or stay the fair

hearing that you had earlier requested?

**A.    That's right.**

Q.    Okay.  All right.  Let's keep going.  If you

go to page 23, the next page, there's a change in the

process here.  Now we're on to May 7th, okay?  May 7.

And now you say to Dr. Bertrand, "Letter being sent to

you, your attorneys," and actually you send one to me,

"five witnesses," that says, "I wrote to you one month

ago requesting a delay in the fair hearing for good

cause.  I have not received any response since my

letter was sent.  Nonetheless, my request has become

moot in light of material developments over the past

week."

1      **A.    Mm-hmm.**

2      Q.    And then you say, "I hereby request immediate

3    execution of the fair hearing process without delay."

4      **A.    That's right.**

5      Q.    "DHMC shall afford."  Now is it fair for me

6    to assume that what you were asking for there is

7    immediate institution of the fair hearing process?

8    You were lifting your request for stay, correct?

9      **A.    You know, I don't think I was in a very good**

10   **state.**

11     Q.    Well, regardless of what state you were in --

12     **A.    Well, I have to question my capacity in this**

13   **e-mail, but yes, my answer is yes.**

14     Q.    Now, what I was curious about also is it said

15   developments the past week.

16     **A.    Right.**

17     Q.    Do you recall what the developments during

18   that week might have been that caused you to write

19   this?

20     **A.    Yeah.  So what happened with this e-mail, the**

21   **ACGME investigated the USC omission and expunged their**

22   **investigation.  And I thought case closed.  I thought**

23   **this hearing that I really wasn't competent to go to**

1   **at the time, let alone having time to get the evidence**

2   **or research the law.  So multiple reasons I had asked**

3   **for the stay.  I thought that was moot because I**

4   **thought kind of case closed, the ACGME ruled on the**

5   **matter.  So a five-minute hearing I could -- I'd be**

6   **competent to do.  That's what I thought.**

7       Q.   Okay.  So looking next at page 24, it says,

8   "I have received your request to proceed with the fair

9   hearing."  This is from Dr. Bertrand to you?

10      **A.   That's right.**

11      Q.   And based on your April 3 material preserved

12  your right to request a hearing and so forth.  And

13  then he goes on to say, "I'll proceed with the

14  formation of a committee."

15      **A.   That's right.**

16      Q.   Now, and based on that response the day after

17  yours, I assume you felt that was an appropriate

18  response, was that?

19      **A.   Mm-hmm.**

20      Q.   Yes?

21      **A.   Yes.**

22      Q.   So now let's go to page 25.  And, Dr. Isaacs,

23  you're now being informed of the membership, that the

1    membership has been defined and he anticipates that

2    there will be a hearing in the next -- provide a

3    couple of scheduling options, right?

4         A.    Yeah, but he didn't tell me the membership.

5    I believe he should have.

6         Q.    Okay.  But you've got an e-mail here telling

7    you that we're moving forward essentially as you

8    requested?

9         A.    That's right.

10        Q.    All right.  So now let me go to 32 for a

11   minute.  Would you go to page 32.  So on page 32, you

12   get a couple of dates, June 13, June 18 as possible

13   times for your fair hearing, right?

14        A.    That's right.

15        Q.    Again, consistent with your request, right?

16        A.    Yes.

17        Q.    And on page 33, you say the following, this

18   is from you to him, "I consider it unsafe for me to go

19   to DHMC."  Now, this is the day he sends you, as you

20   requested, the hearing information.  "I consider it

21   unsafe for me to go to DHMC.  I'm in the process of

22   filing criminal complaints against you personally and

23   other individuals.  This will not be tolerated.  You

```
 1   e-mail my four e-mails address" -- "you e-mail my four
 2   e-mails addresses and are proceeding with a hearing to
 3   terminate me from the AAMC" -- "when the AAMC has
 4   already ruled I had no obligation to disclose USC.
 5   Apparently you think it is funny to harass me, and I
 6   hope to see you in jail for this."
 7        A.   Yes, that's right.
 8        Q.   You were pretty angry at the time?
 9        A.   Angry?  You know, I think I would
10   characterize it as distressed.
11        Q.   It goes on to say, "Let me know the status of
12   my requests for a videoconference, as well as for my
13   e-mail evidence which I need to prepare for the fair
14   hearing."
15        A.   That's right.
16        Q.   When had you made a request for a
17   videoconference?
18        A.   I'd done so.  I don't remember the date.
19        Q.   Okay.  Do you still feel it unsafe for you to
20   go to DHMC?
21        A.   I don't think it would be the safest
22   situation in the world, no.  I probably was more
23   imminently afraid for my well-being than I am now, but
```

1    I still would -- I have reservations about going

2    there.

3        Q.   Then why did you apply for a residency there,

4    a new residency if you were unsafe?

5        A.   Well, I don't seriously think they were going

6    to accept me.

7        Q.   That's not an answer, sir.  The question is

8    why did you apply for a residency there if you felt it

9    was unsafe?

10       A.   Like I said, the reservation doesn't mean at

11   this point there would be no circumstances where I'd

12   go back.  I think if they were to accept me there --

13   you could imagine scenarios where I might feel safe

14   there.

15       Q.   How would that make you safe?  What would

16   happen?

17       A.   Well, let's say for instance, you know, the

18   residency application takes a long time.  And since

19   you asked the question I need to answer it fully.

20       Q.   Go ahead.

21       A.   When you apply in September you're not

22   matched and accredited until April.  Now, nine months

23   is enough -- you know, I had made a complaint to the

1   **FBI.  If Christine Finn and Marc Bertrand were in jail**

2   **for ten years for federal felonies I think I'd feel a**

3   **lot safer at DHMC.  So nine months is a long time,**

4   **Attorney Kaplan, and there are scenarios to imagine**

5   **where I would be safer there.  I don't think the**

6   **average nurse employee at DHMC wants to do me harm.  I**

7   **do question whether Marc Bertrand, if he had the**

8   **opportunity and if he was under more investigation**

9   **than I think he is, I don't know how he acts.**

10       Q.   Good.  Would you turn to page 35, please.

11   All right.  Now, this is an e-mail from you on May

12   31st to Marc Bertrand.  It says, "This letter serves

13   as notice of DHMC's breach of contract, effective

14   March 19, 2012.  As you know, I was terminated on this

15   date before any hearing."

16       **A.   That's right.**

17       Q.   Okay?  "The purpose of the fair hearing is

18   not to rehire me now, three months later, or to rubber

19   stamp your illegal termination."

20       **A.   That's right.**

21       Q.   "The purpose was to give me a fair hearing on

22   the allegations before terminating me.  You fired me

23   two days before Jim Yong Kim's appointment, and this

1  matter will now be before a jury and/or law

2  enforcement to investigate."

3       **A.    Okay.**

4       Q.    And at the end of this it says, "Please do

5  not ever contact me again, especially by four

6  simultaneous e-mails," right?

7       **A.    A direction to Dr. Bertrand not to contact me**

8  **again.**

9       Q.    It says, "Please do not contact me ever

10  again" --

11      **A.    Dr. Bertrand.**

12      Q.    Dr. Bertrand was writing these e-mails to you

13  as the director of GME?

14      **A.    I was thinking about -- I'm just clarifying,**

15  **I was thinking about Dr. Bertrand there.  I wasn't**

16  **thinking about Peggy Meuiner, for example.  She could**

17  **contact me again.**

18      Q.    The e-mail concerns the concept of fair

19  hearing.  Now, and I --

20      **A.    Well, it concerns a few concepts.**

21      Q.    The purpose --

22      **A.    Jim Yong Kim.  There's a dozen concepts**

23  **scattered in here.**

1      Q.   So my question concerning this e-mail is the

2   following:   The conclusion -- if the conclusion was

3   reached as a result of this e-mail that you were no

4   longer interested to pursue the fair hearing process,

5   if that was the conclusion reached based on this

6   e-mail to Dr. Bertrand, would that be an unreasonable

7   conclusion in your view?

8      **A.   That's not the correct conclusion.  And**

9   **moreover, they breached first.**

10     Q.   So having sent this e-mail on May 31, 2012,

11  was it your sense that they would receive this e-mail

12  or was it your -- was it your desire to have them

13  receive this e-mail and nonetheless continue with the

14  fair hearing process?

15     **A.   Attorney Kaplan, let me answer my thoughts**

16  **about the transmitting of that e-mail to Dr. Bertrand.**

17  **My understanding from law school, from the contract**

18  **class, I forgot the name of the professor, he's a very**

19  **good professor, it was that you need to notify a**

20  **breach if it occurs; otherwise, in a sense you've**

21  **waived the breach.  Well, there may be all kinds of**

22  **exceptions to that, but my first semester of law**

23  **school that's what I was taught.  I felt a duty to**

1    inform that DHMC the breached, and that anything after

2    that really was up in dispute for court.  And any

3    action I do after that would be as a result of the

4    breach I couldn't follow the normal path of actions I

5    would take because they're affected by the breach.

6         Q.   So my question --

7         A.   So -- I'm answering.  So because of that, the

8    primary point of this e-mail is me following what I

9    thought I was taught in the first semester of law

10   school that the contract was breached and basically

11   it's all up in the air now.  That being said, I felt

12   Dr. Bertrand was harassing me.  I didn't want him to

13   ever contact me again.  What someone may have

14   concluded from that erroneously I can't speculate.

15        Q.   My question to you -- thanks for the speech.

16   That wasn't my question.  My question is the

17   following:  Did you intend to continue the fair

18   hearing process after you sent this e-mail?

19        A.   So yes, I lost my train of thought.  The

20   conclusion of that, because you interrupted me a bit.

21   Yes, at that time I probably pictured and hoped that

22   the FBI would charge Bertrand and Finn and then I'd

23   have a hearing and be vindicated and that I might

1    actually be back as a radiologist at Dartmouth.  So I

2    honestly believed that at the time I sent that e-mail.

3    I pictured that scenario in my head.

4        Q.   So your scenario was the FBI would

5    investigate, and after they investigated they would

6    charge Bertrand and Finn and then you would have a

7    fair hearing process?

8        A.   Or -- or the New Hampshire Board or the New

9    Hampshire State Police I might have been thinking in

10   addition -- or in exchange for the FBI.

11       Q.   In fact, the New Hampshire Board is

12   conducting a hearing for your inappropriate

13   conclusion --

14       A.   Well, the New Hampshire Board is a defendant

15   in my lawsuit.  I don't want to speak about that in

16   this lawsuit.

17       Q.   We'll talk about that in a second.

18       A.   Okay.

19       Q.   So -- so my simple question, and I'm still

20   not sure I have the answer.  You sent this letter that

21   says please do not ever contact me again to Marc

22   Bertrand.  Marc Bertrand was the person who was

23   coordinating your fair hearing process, right?

1      A.   Marc Bertrand is a person who defrauded me.

2  That's all I think about Marc Bertrand.

3      Q.   Was Marc --

4      A.   I think he's a liar who colluded with

5  Arizona, defrauded me and ruined my health and

6  well-being, family's well-being.  I hope to see him in

7  jail.  There's a six-year or seven-year statute of

8  limitations on many of his actions, and I will fight

9  probably to my last drop to make -- see that that

10  happens.

11      Q.   Good.  Now let me ask a question.  You

12  understood that Marc Bertrand was the one who was

13  coordinating your fair hearing process?

14      A.   Well, I wouldn't call it coordinating a fair

15  hearing.  I would call it defrauding.

16      Q.   Let's move on.  All right.  We'll move on.

17           (Isaacs Exhibit 22 was

18           marked for identification.)

19      A.   I also just want to point out you asked a

20  question before I wanted to augment.  You asked a

21  question if I had any preparation for this, and I

22  answered no, none whatsoever.  And I've never

23  participated in a mock hearing.  I've never filed a

1  criminal charge against anyone until this happened.

2  And I generally consider myself a pretty poor speaker

3  spontaneously.  So I would say anything I'm saying

4  now, my impression, I hope I'm giving that impression,

5  is really based upon my direct stream of consciousness

6  and not any training.

7      Q.   BY MR. KAPLAN:  Sir, would -- I've handed you

8  a document.  And take a quick look at it.  I'm not

9  sure if you've ever seen it before other than the fact

10  that it's been produced in litigation.  Do you

11  recognize it?

12      **A.   I recognize I think I've seen parts of it.**

13      Q.   Okay.  And you know that this is your quality

14  assurance file from the Medical Center?

15      **A.   If that's how you want to characterize it, I**

16  **agree.**

17      Q.   Okay.  I'm going to ask you some questions

18  about some of the references in here.  Why don't you

19  first turn to page 51.  Why don't you take a look at

20  that.  I want to ask you about it.

21      **A.   Okay.**

22      Q.   Okay.  This is an e-mail having to do with

23  Dr. Friedman's concerns about your work on the medical

1    rotation.  My only question about this is did Dr.

2    Friedman talk to you on or about June 30 concerning

3    some of these issues?

4        **A.    Yes.**

5        Q.    Okay.  Would you turn to page 58.  This is an

6    e-mail that was sent to you by Dr. Friedman on that

7    same date of June 30.  Do you recall receiving it?

8        **A.    Yes.  Actually, it seems correct, but I don't**

9    **remember much of it.**

10       Q.    Okay.  Well, do you remember meeting with Dr.

11   Friedman and having a discussion about your

12   performance issues --

13       **A.    Yeah.**

14       Q.    -- that was then set out in this e-mail?

15       **A.    Yeah.**

16       Q.    And that he was giving you in this e-mail

17   specific direction for how you were expected to do

18   certain things on his medical service?

19       **A.    Yeah.**

20       Q.    Okay.  And as you look at this e-mail, does

21   it appear to you and did it at the time that you were

22   receiving appropriate direction in how to do things

23   you may not have been familiar with?

1        A.    No.    I was actually thinking of resigning at

2    that point.    So June 30th was I think a day into my

3    job, or maybe two days.    To have written these kind of

4    e-mails in 24 or 36 hours to me I certainly thought

5    something was fishy and was actually -- at one point

6    had decided to resign.    At my parents' kind of request

7    I stayed up there.    Which obviously had repercussions.

8        Q.    All right.    So as of June 30, a couple of

9    days into your internship, you're considering

10   resigning?

11       A.    Yeah.    From what I thought was completely

12   foreign and ...

13       Q.    Foreign what?    I'm --

14       A.    Experience.    Just something -- something out

15   of -- out of control.

16       Q.    And did you read this e-mail as being an

17   e-mail trying to assist you in coming to grips with

18   the protocols and procedures at the Medical Center?

19       A.    You know, Harley Friedman's e-mails, I mean,

20   I spent a lot of time looking at them --

21       Q.    Sir, did you read this e-mail, the e-mail in

22   front of yous as an effort by Dr. Friedman to

23   familiarize you with the protocols and procedures that

1  you would have to participate in?

2      A.   No.  I read the statements such as let me be

3  blunt, at this point, your performance is far behind.

4  And my parents, everyone on the phone said, you know,

5  how in 36 hours could your performance be far behind

6  when you were a top-ranked medical student?  And

7  something seemed wrong.

8      Q.   Okay.  Let's move --

9      A.   So I didn't know what to make of it is the

10  answer to your question.

11      Q.   All right.  Let's move on.  Would you -- I

12  jumped to 58.  I'd like to go back to page 53 for a

13  minute.  Would you go to page 53.

14      A.   Yeah.

15      Q.   You got it?

16      A.   Mm-hmm.

17      Q.   This is an e-mail from Justin K-r-a-w-i-t-t.

18  Do you know who Justin Krawitt was?

19      A.   Sure.

20      Q.   Was he somebody who had it in for you, too?

21      A.   Well, I object to the characterization.  I

22  don't know what Dr. Krawitt knew.  He actually seemed

23  like a pretty nice guy to me.

1     Q.   This e-mail says, "Jeff is doing poorly,

2  independent of patient care, struggling with keeping

3  his pager.  Lost his S/O," don't know what S/O stands

4  for, actually, "just before trying to present a

5  patient to me and I thought was about to completely

6  break down."  Do you remember this day, sir?

7     A.   Not specifically, but I remember this time

8  period of being on the verge of breaking down that

9  week.

10     Q.   Okay.  And that was your first week there?

11     A.   First 36 hours, apparently.

12     Q.   Okay.  And by the way, had you talked to your

13  parents at that point in time about the possibility of

14  resigning?

15     A.   Well, I know it was before 4th of July

16  weekend.  I kind of checked in with them.  I don't

17  remember the exact date.

18     Q.   Okay.  Would you turn to page 54, please.

19  Now, this e-mail is an e-mail from Harley Friedman to

20  Chris Finn, and the second line says, "Jeff is a

21  complete disaster and I'm removing him immediately

22  from the IM service," internal medicine service.

23     A.   Mm-hmm.

1      Q.   Do you remember being removed from the

2  service on that day?

3      **A.   Well, sure.   I thought it was inappropriate**

4  **and traumatic.**

5      Q.   There are a number of things here that he

6  references.   Talking about taking forever to get

7  things done.   But he references one specific thing I

8  want to ask you about.   It says you left to, quote, go

9  to your car and get a few things done, close quote.

10  And almost left his pager just sitting there again

11  until he was reminded.

12      **A.   Right.**

13      Q.   Let me finish.   Note that I don't think that,

14  quote, going to get things done in your car, close

15  quote, is a good idea when you're struggling.   Now, I

16  just want to ask you about the pager issue.

17      **A.   Okay.**

18      Q.   Prior to July 2, had you been -- had you left

19  your pager and been instructed not to do so while you

20  are on service?

21      **A.   Attorney Kaplan, I'm going to give the same**

22  **objection I gave with Arizona.   My statement is that**

23  **this is constructive termination.   The details of**

1    where my pager was I'm not going to be able to fully

2    recall.  I can say that these are contradictory

3    statements.  On number 6 he says as far as I can tell,

4    my medical knowledge is zero.  On another e-mail says

5    my problem is not my medical knowledge.  I just

6    think -- I think this is rubbish.  I don't think

7    there's another word.  It's what I think of Arizona.

8    The pager issue happening at both places.  It seems to

9    me they colluded with each other, and it's the same

10   constructive termination.  You can ask the same

11   questions.  You have about an hour and ten minutes

12   left.  And I'm just going to say I don't remember

13   exactly when my pager was lost, if it was lost, but it

14   seems to me that I was under a microscope for

15   constructive termination because of their knowledge of

16   Arizona and California.

17       Q.   Good.  Did you leave your pager and were you

18   cautioned about that while you were at Arizona on any

19   occasion?

20       A.   I don't remember.

21       Q.   Did you lose your pager and were you

22   cautioned about it at Dartmouth-Hitchcock Medical

23   Center on any occasion?

1        A.    You know, I'm someone who is pretty connected

2   to the world with e-mail and pagers, and I don't think

3   I -- I don't think I ever put a patient in harm by not

4   being connected.   That's my knowledge.

5        Q.    My question was did you ever leave your pager

6   unattended while you were on service and expected to

7   have your pager?

8        A.    You know, I started to wonder now if, you

9   know, if -- like Dr. Khagi would order me to go take

10  lunch and I would just go, leave the room.   Because he

11  would need to say you need to get lunch now, you're

12  not thinking right.   And I would start to wonder if --

13  I mean, it sounds paranoid, but I'd start to wonder if

14  it was like they knew when my pager wasn't on me and

15  they'd direct -- tell me -- send me down the hall.

16  That seems farfetched, to be honest, and I'm not

17  alleging that in the lawsuit.   I mean, I have run a

18  lot of scenarios through my head.

19            MR. KAPLAN:   Would you read my question back,

20  please, Andy.

21            (The pending question was read.)

22       A.    So I think I did answer that.   By leave I

23  have to wonder if I was ordered to go do something

1   while my pager wasn't on me.  In which case I didn't

2   really intentionally leave it there.  I didn't have a

3   choice.  I was ordered to go do a task.  So I don't

4   know that I left it.  It's plausible.  I think it's a

5   minor issue.  I think it's -- it's rubbish is the word

6   I used.  I don't remember.  It's possible.

7       Q.   BY MR. KAPLAN:  So as I go through these

8   various criticisms, am I going to hear from you on

9   each of them that this was all developed as a

10  conspiracy to get rid of you from Dartmouth because

11  you were the perfect resident?

12      A.   Well, I think they knew about Arizona at this

13  point, and I felt like maybe I was under a deposition

14  for six months there.  Maybe that's what I would say.

15      Q.   So does knowing about Arizona, even if that's

16  true, justify your poor performance?

17      A.   It explains why I was having the nervous

18  breakdown the first week because I was being just --

19  you know, I felt something, you know, whether I felt

20  that they were judging me or deposing me or whatever,

21  it caused nervousness.  And maybe -- you know, maybe I

22  just -- maybe it was just a sense.  You know when

23  someone is lying to you.  You know when someone is

1    defrauding you.  So I would suspect most of your

2    questions, although if you have one that's different

3    you're allowed to ask it, I would suspect for most of

4    them like the pager I would say they may have known

5    about Arizona, I may have been falling apart because

6    of my sense of their attitude towards me.  And I don't

7    have good memory on where that pager was at that

8    moment.  That's generally what I'll be answering.

9        Q.   And you don't have a recollection that on

10   several occasions, that would be three or more, that

11   you were confronted specifically about your

12   responsibility to maintain your pager with you so that

13   you could be contacted?

14       A.   So I do remember Dr. Finn running down the

15   stairs to the unit with Dr. LaRusso while I was

16   rounding out patients with Dr. West, and I found that

17   I thought it was very inappropriate.  They had said

18   they were paging me, and I -- that time I do remember

19   I did not have my pager that morning on rounds.  I

20   thought there were rules -- there's rules when you're

21   allowed to turn off -- you're supposed to turn off

22   your pager.  For example, if you're in a didactic

23   session, you're supposed to turn off your pager.  So I

1    may have thought rounding takes priorities over the

2    pager, and I may have turned it off at that point.

3    And what was strange to me was how fast Finn and

4    LaRusso ran down and yelled at me about this pager

5    being off when I was doing my job rounding.  And it

6    seemed to me they were -- it seemed like an elementary

7    school playground.  They were playing gotcha.  And now

8    I know they were playing gotcha, right?  They -- she

9    knew -- as a matter of law, she knew about Arizona,

10   and I don't know what she was thinking, whether she

11   intended to fire me the whole time, whether she

12   intended to give me a chance, whether it was something

13   she just thought was funny to talk about with her

14   colleagues to get attention for herself.  I can't

15   speculate on her mentality.  But it appeared to me

16   like a game of gotcha.

17        Q.    Okay.  Dr. Isaacs, let's go on to something

18   else since you've told me what your answers will be to

19   these things.  Here we go.

20             All right, Andy, let's mark some exhibits

21   again.

22             (Isaacs Exhibit 23 was

23             marked for identification.)

1        Q.   BY MR. KAPLAN:  I'm putting an e-mail in

2   front of you.  It's Exhibit 23.

3        **A.   Okay.**

4        Q.   Are you with me?

5        **A.   Just take a break for about a minute.  I'm**

6   **just checking something.**

7             **(Brief pause.)**

8        **A.   Okay.  Just for the record I was taking an**

9   **EKG which showed a sinus tachycardia of 130.  I just**

10  **wanted to check that.**

11       Q.   BY MR. KAPLAN:  Would you look at the

12  exhibit, please.

13       **A.   Okay.**

14       Q.   It's an e-mail.  And I believe you sent this

15  to an individual named Ben Boswell?

16       **A.   Yeah.**

17       Q.   Who is Ben Boswell?

18       **A.   A guy I knew from Philadelphia where I grew**

19  **up.**

20       Q.   Okay.  It says, "I've canceled two psych

21  interviews and won't be going to Hawaii.  I just

22  decided psych is probably not for me."  Now, we're

23  talking about December 16, 2010.  Didn't get any other

1    interviews except a few family med, which I might

2    rank.  This is all kind of a bummer.  But I gotta face

3    the facts of USC/AUC/Arizona/failed step two not

4    helping my medical career."  You see that?

5        **A.    Yeah, sure.**

6        Q.    So what I wanted to ask you about is your

7    reference to USC.  What did you tell Ben Boswell about

8    USC?

9        **A.    Well, Ben knew me before I moved to**

10   **California.**

11       Q.    So my question is what do you tell --

12       **A.    I don't remember.  He knew me as a friend**

13   **before that.  So his recollection, you can't steal his**

14   **recollection, you'd have to ask him what he remembers**

15   **and what he doesn't.**

16       Q.    That's really good but that's not what I

17   asked you, sir.  I asked you what you told him about

18   USC.

19       **A.    What you would normally tell a friend when**

20   **you move to California to study.**

21       Q.    All right.  What did you tell him after you

22   entered into an agreement with USC?

23       **A.    You know, there's an agreement within that**

1   agreement I couldn't talk about it, I -- he knew I was

2   in litigation, I may have said it's over and

3   everything is okay now.  I may have said something

4   like that.

5       Q.   Do you remember what you said?

6       A.   I just said approximately.  It was something

7   like the litigation is over and it's basically -- it's

8   okay, or it's as good as it's going to be now.  I

9   don't remember.  Something like that.  It's okay.

10      Q.   So in this e-mail you're indicating, though,

11  that the facts concerning USC, AUC, which is American

12  University of the Caribbean, right?

13      A.   That's right.

14      Q.   And Arizona and failing step two of a

15  particular -- that was a test; was it not?

16      A.   Yeah.

17      Q.   That those things weren't helping you?

18      A.   Sure.  I don't think there's a disputed fact

19  that those things didn't help my career.

20      Q.   Did you at that point in time undertake the

21  effort of trying to keep those things secret, if you

22  could?

23      A.   Sorry, what do you mean by that?

1          Q.   Did you try and keep those secret so that

2     they wouldn't continue to destroy your career from

3     your point of view?

4          **A.   No, I talked to my friend about it.**

5          Q.   Okay.  Let's look at another one for a

6     minute.

7               (Isaacs Exhibit 24 was

8               marked for identification.)

9          Q.   BY MR. KAPLAN:  What I'm first interested in

10    with regard to 24, Exhibit 24, isn't the e-mail on

11    top.  It's the redactions that you did.  You see

12    those?

13         **A.   I do.**

14         Q.   And I want to ask, first of all, on what

15    basis did you redact information from the e-mails that

16    you produced?

17         **A.   I think that's attorney/client privilege**

18    **because I had attorneys at the time this was made.  So**

19    **I -- and I also don't recall what these are, but I**

20    **generally recall that it's stuff totally unrelated to**

21    **the lawsuit.  So I think irrelevance is probably why**

22    **and also right of privacy of third parties.  I think**

23    **this may have been comments about my wife or**

1    comments -- who knows?  So I think they were honestly

2    just things that were completely unrelated or about a

3    third party.  That's what I think.

4        Q.   You don't know that?

5        A.   I don't recall the attorney/client privilege,

6    and if I did recall they would be privileged.

7        Q.   These were not produced when you were

8    represented, sir.

9        A.   I thought they were.  No?

10        Q.   Well, this -- I don't believe these were.

11        A.   I'm almost positive they were.  I mean, ...

12        Q.   So what you're saying is that your counsel

13    deleted this or you did?

14        A.   Maybe you could help clarify what these were

15    produced for.

16        Q.   They were produced in connection with this

17    litigation.

18        A.   What request?

19        Q.   I don't know, one of the requests.

20        A.   It was a request where I had to retain three

21    attorneys.  That's my memory.

22        Q.   That's fine.  So who made the decision to --

23    all I'm asking, simple question, who made the decision

1  to redact this information?

2       **A.    I guess we both do.  As attorneys I have to**

3  **agree with him.**

4       Q.   Okay.  So you sat with the counsel and the

5  decision was made to react this information?

6       **A.    Well, that's privileged, and it may have been**

7  **a phone call.  But it is privileged.**

8       Q.   Well, I'm -- I'm not asking what was said,

9  what was discussed.  Please listen to my question.

10      **A.    Well, you're asking me the contents.**

11      Q.   I'm asking whether or not the redaction was

12  done, not -- whether or not this redaction was done

13  based on what your counsel decided to do?

14      **A.    I can't -- you know, I think that I've**

15  **answered this.**

16      Q.   All right.  So you're not prepared to answer

17  that question?

18      **A.    No, I am answering all questions that aren't**

19  **privileged, and I believe that's a work --**

20  **attorney/client privilege as to what we were**

21  **discussing as to what could be redacted.**

22      Q.   All right.  Let's keep going.  Look at the

23  top, top e-mail.  Again, it's to your friend Ben

1 | Boswell?

2 | **A.   Okay.**

3 | Q.   It says -- it talks about canceling the psych

4 | interviews again.  Go down to the fourth line.  It

5 | says -- it says, "So I will rank the few psych

6 | programs and family med programs I interviewed at.

7 | Not all that optimistic that I'll actually match.

8 | Seems like Arizona thing is easy for them to find and

9 | hold against me."  See that?

10 | **A.   Yeah.**

11 | Q.   All right.  Now, the Arizona thing you're

12 | referring to obviously is your residency or internship

13 | there, correct?

14 | **A.   Well, what I was referring to was the fact**

15 | **that, like I said, almost every program director**

16 | **e-mailed me about Arizona and apparently didn't like**

17 | **it that I had voluntarily resigned.  So I was saying**

18 | **that it seems like program directors don't like this**

19 | **so it's going to be hard to match.**

20 | Q.   Actually, what you say is, "It seems like

21 | Arizona thing is easy for them to find and hold

22 | against me.

23 | **A.   Yeah, they found it and held it against me,**

1   yes.

2       Q.   What program directors called you and

3   discussed Arizona?

4       A.   I'd have to pull up the e-mails.  You never

5   asked for that.  But there are e-mails from program

6   directors.

7       Q.   Okay.  I assume you wouldn't agree with me

8   that this reflects the fact that you would be hiding

9   Arizona to the extent you could?

10      A.   I mean, I think Arizona was a -- like I say,

11  a nightmare that included USC.  And I surely wouldn't

12  have wanted to raise that in general with people.  So

13  I think that I'd actually disagree with you.  That in

14  general is not something I wanted to talk about.

15      Q.   Well, you didn't want to talk about it,

16  right?

17      A.   Well, like I said, it's a nightmare is the

18  only word I could characterize it.  With that said, I

19  felt that I was in compliance with all disclosure

20  requirements.  And if I hadn't, I immediately

21  corrected that.

22          MR. KAPLAN:  Mark the next one, will you,

23  Andy.

1              (Isaacs Exhibit 25 was

2              marked for identification.)

3         Q.    BY MR. KAPLAN:   This is a series of e-mails

4    that I wanted to ask you about that begin on June 27.

5    And I believe they're written in exchange between you

6    and somebody named HD Behrang; is that correct?

7         **A.    Behrang.**

8         Q.    Behrang HD.   And who is he or she?

9         **A.    He's a friend.**

10        Q.    Okay.   The first e-mail on June 27 says

11   asshole.   Is that your -- the way you refer to Mr.

12   Behrang or is that something else?

13        **A.    No.   No.**

14        Q.    Okay.

15        **A.    That's part of the conversation before.**

16   **Might be Dr. Friedman that I was referring to.**

17        Q.    All right.

18        **A.    Or Dr. Khagi.**

19        Q.    It says, "I have been working nonstop.   This

20   is insane here.   Never seen anything like it.   It's

21   like a fucking TV show nonstop."

22        **A.    Yeah.**

23        Q.    Was that the way -- on June 27th, a couple of

1  days into your internship is the way you felt about

2  the program?

3      A.   You know, looking at that, that's not my

4  typical choice of prose.  And I do know, you know,

5  people regress into more immature prose when they're

6  under stress.  So I would say under stress that is how

7  I felt about it using very crude words.

8      Q.   Okay.  That's fine.  I just was asking how

9  you felt about it.  He wrote back, "Jeez, all IM?"

10 You responded, "Yeah, dude, this was a mistake.  I

11 thought this would be easier than Arizona.  It's

12 impossible."  That's what you wrote, right?

13     A.   Yeah.

14     Q.   So you considered the work you were doing at

15 DHMC more difficult than what you were doing at

16 Arizona?

17     A.   Well, I was surprised because preliminary

18 surgery is known to be one of the harshest

19 residencies, and psychiatry is known to be one of the

20 easiest, so I was surprised what I thought would be

21 easier than a notorious program was actually

22 impossible.

23     Q.   He writes back on the next page, "Jeez."  And

1    you say, "I am getting crushed worse than Arizona."

2        **A.   Again, my surprise that how the psychiatry**

3    **program is harder than surgery.  I was just very**

4    **surprised.  That's basically what I'm communicating to**

5    **Behrang here like I'm in a psych program and it's**

6    **harder than -- it's harder than surgery.**

7        Q.   You go on at the end of this e-mail to say,

8    "I wonder if family med in PA would have been better

9    or if I am just totally incompetent.  Six months

10   IM/neuro."  And -- but I wanted to ask you about the

11   last line here.  It says, "I don't even have three

12   minutes to write on Facebook.  In ED now doing

13   admissions."  Now, when were you writing this?  The

14   things we're reading right now, the exchange that

15   occurred on June 27, when were you writing this?

16       **A.   During the workday at -- on June 27th.**

17       Q.   What were you using to compose these?

18       **A.   On June 27th I may have been using the**

19   **Dartmouth-owned laptop.  But I'm not sure.**

20       Q.   Were you in your car or were you at your work

21   station?  Wherever that might be.

22       **A.   You know, I seem to remember this**

23   **conversation being in the M2 work room.  But I write**

**ED doing admission, I may have been heading over to**

**the ED and kind of just put the two ideas together.**

**Or I may have been in the ED.  I don't remember.**

Q.   All right.  Let's turn the page.  The -- you

talk about the fact that the real shit starts this

Tuesday.  I'm on call on Tuesday.  Do you see that?

**A.   No, I think that's Behrang HD.**

Q.   Is that what he wrote?

**A.   I think so.**

Q.   Was he a resident as well?

**A.   Yeah, he was starting, so he was starting**

**after me, so his internship starts Tuesday.**

Q.   Turn to the last page, will you?

**A.   So we're skipping the part where it says they**

**worked me 18 hours last night?**

Q.   I was.  But that's fine.  It speaks for

itself.  Next last page -- next to last page, I'm

sorry, it says, "I get my step three Wednesday."  Step

three was another test, right?

**A.   US -- test three is United States Medical**

**Licensing Exam.**

Q.   Right.

**A.   USMLE.**

1        Q.    Three?

2        **A.    Three.**

3        Q.    And you needed to pass it?

4        **A.    I didn't need to actually pass it.  I took it**

5    **a year early.**

6        Q.    But you were taking it.  But you say if I

7    fail -- "If I failed I think I'm going to have to

8    leave here."  Is that what you wrote?

9        **A.    That's what I wrote.**

10       Q.    It says, "I met with two program directors

11   this week, they are going to wait till next week to

12   make decisions."  Now, I want to focus on that for a

13   minute.  So as of July 2, what were the decisions that

14   you understood two program directors were going to

15   make?

16       **A.    So I think there was this question of**

17   **incompetence that I even wrote to Behrang, and I guess**

18   **I resort to multiple choice tests or standardized**

19   **tests to help me assess that.  So what I was saying**

20   **here, USMLE three was not required at that point.  I**

21   **took it a year early but I personally my own judgment**

22   **level I thought if I fail it then -- then I would**

23   **start to wonder if I was incompetent.  So to me it was**

1  **a standardized assessment based on what I found to be**

2  **pretty outrageous evaluations by Friedman and Finn and**

3  **Khagi.  So that was my thinking.  It was my own**

4  **thought process of how I standardized evaluations.**

5      Q.   Turn to the past page, if you would.  And

6  this is written later.  March 16.

7      **A.   2012.**

8      Q.   The last page.  March 16.  Maybe three days

9  before you're notified you're about to be terminated

10  from the program, right?

11      **A.   Yeah.**

12      Q.   And you write -- and is this also written to

13  your friend Behrang, whatever?

14      **A.   Yeah, I think it's part of the same.**

15      Q.   "I mean the fact is I didn't do anything

16  really wrong."  And where are you -- what are you

17  referring to there, anything really wrong at DHMC?

18      **A.   Behrang is one of if not my best friend**

19  **definitely at that time.  So I think I was writing to**

20  **him what I would have felt.**

21      Q.   But what I'm asking you about is when you say

22  you didn't do anything really wrong, are you referring

23  to anything really wrong at the Dartmouth-Hitchcock

1    Medical Center as opposed to anyplace else?  I'm just

2    trying to figure out what you meant by that.

3        **A.   Yeah, I think I was talking about DHMC**

4    **probably from the application process to the**

5    **termination process.**

6        Q.   Okay.  It says, "I was basically nice to

7    people, did my work for six months, kept to myself,

8    took some naps at lunch."  That's what you're telling

9    me?

10       **A.   That's true.  I stand by that statement.**

11       Q.   And you say I think this lawsuit --

12       **A.   Well, you have to finish the statement.  You**

13   **have to finish your sentence.**

14       Q.   I said I think they know this lawsuit could

15   drag on for a while.

16       **A.   No.  Maybe it's not clear from this, but the**

17   **whole sentence is --**

18       Q.   "Just because I sent 25 SMS seven years ago

19   doesn't give them a right to fuck with me."

20       **A.   Yeah, that's the whole sentence.**

21       Q.   That's what you wrote?

22       **A.   That's what I wrote.**

23       Q.   And the 25 SMS you're referring to are the

1  e-mails that you sent to a female at USC, correct?

2      **A.   I think -- I'll answer your question, but I**

3  **do have to object to entering the prior lawsuit in.**

4  **But yes, it's a reference to I think a couple**

5  **paragraphs of SMS text messages I'd sent at USC which**

6  **were subjects of allegations.**

7              MR. KAPLAN:  Okay.  Let's mark this, Andy.

8              (Isaacs Exhibit 26 was

9              marked for identification.)

10      Q.   BY MR. KAPLAN:  And I don't want to spend a

11  lot of time on this, but I want to show you this

12  document.  It's Exhibit 26, and I'm going to

13  specifically ask that you look towards the bottom of

14  it on the November 18 date and the numerous e-mails

15  or -- they weren't e-mails, they were texts; weren't

16  they?

17      **A.   So these -- you're asking a question about**

18  **Exhibit 26.  I object to entering evidence from USC**

19  **into the record, prior litigation.**

20      Q.   Now, my question is were they text messages

21  that are being referred to here?

22      **A.   So these were text messages sent from my**

23  **T-Mobile account at the time to her T-Mobile account.**

1          Q.   And if I look at the bottom of the first

2     page, the last time AWB exists, I assume that's the

3     woman to whom you were sending these, correct?

4          **A.   Well, last time AWB exists, you have to look**

5     **at the whole conversation that proceeds from page 9 to**

6     **page 10.  So I'm only going to talk about the whole**

7     **conversation, and I'm going to answer questions about**

8     **the whole conversation.**

9          Q.   You're going to answer questions I ask you or

10    you say you won't answer.

11         **A.   And I'm going to put them in context.**

12         Q.   So my question is is this the conversation,

13    the SMS conversation you were referring to in the last

14    e-mail?

15         **A.   To Behrang?**

16         Q.   Yes.

17         **A.   Yes.**

18         Q.   This is it.  And these are the texts that you

19    sent to a student who was at USC with you?

20         **A.   My belief is that the page that I've**

21    **introduced I believe improperly is the core reason**

22    **that I was terminated from medical school, or the core**

23    **allegation or substance notwithstanding, you know, the**

1   whole story.

2       Q.   Okay.  Good.  I don't need to do anything

3   else with it.  I just wanted to find that out.  Okay.

4   Just a few more and then we'll be done.

5           (Isaacs Exhibit 27 was

6           marked for identification.)

7       Q.   BY MR. KAPLAN:  This is another e-mail.  It's

8   an e-mail to yourself, I think, right?

9       A.   Yeah, I found this -- part of the search that

10  you had requested or Dartmouth defendants requested.

11  I found an e-mail to myself.

12      Q.   So on September 7, 2012 you wrote this e-mail

13  to yourself?

14      A.   Yeah.

15      Q.   Okay.  It says -- I want to look at the

16  first -- it says remember calling 9-1-1 from guard

17  house immediately woke.  That whole first segment

18  there.  What was that all about?  When did all that

19  happen?

20      A.   So this is my memories of immediately after

21  being struck by Mr. Chang.

22      Q.   Good enough, okay.  Let me go down to the

23  next sentence.  Actually, let me go down two

 1   sentences.  It says Lane, now, is that the Lane you

 2   referred to as your supervisor?

 3        **A.    That's right.**

 4        Q.    It says, "Lane fired me from Cairnwood, said

 5   you're floundering with a tear in his eye."  And I

 6   just want to confirm.  This is your e-mail to

 7   yourself.

 8        **A.    Right.**

 9        Q.    You were apparently fired from Cairnwood?

10        **A.    Well, I was actually never employed there, I**

11   **don't think.**

12        Q.    You said here --

13        **A.    This is a kind of train of -- train of**

14   **thought saying it's not testimony.  It's Lane did tell**

15   **me he was moving to Singapore, that I was floundering,**

16   **and that my work there was probably coming to an end.**

17   **But he wanted me to continue on with some of the**

18   **start-ups I worked with.  And I don't believe -- you**

19   **know, I was never, you know, -- I think had testified**

20   **before I wasn't officially -- he paid for an apartment**

21   **there, but I didn't have compensation that I could**

22   **have been fired from.**

23        Q.    Okay.

1       A.    I wasn't -- I didn't have a salary.

2       Q.    Let's look at the --

3       A.    So I don't know how you fire someone who is

4   not salary.

5       Q.    You wrote to yourself that you were fired,

6   correct?

7       A.    I did.  And I just want to clarify that fired

8   was just a brief word that he asked me to leave.  And

9   it was --

10      Q.    Fine.  It says Merrill, would that be Merrill

11  Lynch, next line?

12      A.    Yeah.

13      Q.    Made fun of, quote, French workweek, close

14  quote.  Concentration difficulties.  What is that all

15  about?

16      A.    That's the objection I stated earlier.  It's

17  been, you know, a resolved issue.  I'm just -- you

18  know.

19      Q.    What is that all about, sir, about your

20  connection with Merrill and your departure there?

21      A.    Well, Merrill made fun of French workweek, so

22  that's a true -- that's a true statement.  Again, I

23  did settle.  I'm going to give limited answers there.

1   **And they -- there was discussion of concentration**

2   **difficulties that I had there.**

3       Q.   And ultimately, as I understand it, you filed

4   a claim against Merrill for the -- whatever basis was

5   that you separated?

6       **A.   I filed a claim for whatever basis ...**

7       Q.   You filed a claim against Merrill that thus

8   far you've been refusing to inform me about, right?

9       **A.   Right.**

10      Q.   And I'm going to just tell you right now that

11  we'll come back and get those questions answered if

12  the court let's us, but your position --

13      **A.   That will be after Dr. Torrey's questions he**

14  **didn't even know about.  So that'll be a long way from**

15  **that.**

16      Q.   So your position is that you don't need to

17  tell me about how you separated from Merrill Lynch?

18      **A.   I mean, it's actually, to my advantage here**

19  **to disclose what happened in Arizona -- or Merrill,**

20  **but I signed an agreement, I won, and I believe it's**

21  **privileged.  Like I said, they raised the possibility**

22  **of concentration difficulties there.  Which for**

23  **someone with undiagnosed frontal brain impairment**

1    secondary to a TBI, they may have been on to something

2    or maybe not.  You're not going to -- that's not

3    anything that that lawsuit ever -- or that claim ever

4    really dug into.  So I don't think there's too much

5    relevance for this lawsuit.  If you have a specific

6    question about Merrill that's relevant to this case

7    I'll try to answer it.

8         Q.   I'm just trying to move through this stuff

9    because I want to give the other folks a chance to ask

10   questions.  Hold on.

11        A.   So I just want to be clear.  I'm not refusing

12   to answer questions if you have specific questions

13   relevant to case about my time at Merrill Lynch.

14             (Isaacs Exhibit 28 was

15             marked for identification.)

16        Q.   BY MR. KAPLAN:  All right.  I assume you

17   recognize the document in front of you?

18        A.   Sure.

19        Q.   It's your notice of -- I think you called it

20   something like notice of intent to sue?  You see that?

21        A.   I would think of it as my e-mail to Dr. Kim,

22   Dr. Jim Yong Kim.  That's what I think of it.

23        Q.   What's the Baker Isaac Capital Group?

1    A.    That's a company I founded with a Dartmouth

2    roommate.   Or Dartmouth friend of mine.

3    Q.    What is it?   What does it do?

4    A.    It doesn't exist anymore.

5    Q.    What was it?   What did it do?

6    A.    Well, it's -- I mean, it was supposed to be a

7    private equity company.

8    Q.    Okay.   I wanted to -- in this particular

9    document, which you submitted and is dated January 15,

10   2012, who did you send this to?

11   A.    Like I said, this is my e-mail to Dr. Jim

12   Yong Kim.   I think I cc'd it to, I don't know, one of

13   the general counsel members.

14   Q.    Did you copy it to Dartmouth Medical School

15   and to the Dartmouth-Hitchcock Medical Center?

16   A.    I think their counsel.   Like not -- their

17   in-house counsel, their general counsel.

18   Q.    So is the answer to my question yes, you

19   forwarded it to Dartmouth Medical School,

20   Dartmouth-Hitchcock Medical Center?

21   A.    I can just say I typed to Jim Yong Kim and to

22   I think Ronin -- don't -- someone in -- two names in

23   the general counsel.   I don't recall at this time.

1      Q.   General counsel where?

2      **A.   Well, Hitchcock and the college both have**

3   **general counsel.**

4      Q.   That's fine.  So you sent it to both, or

5   intended.  You indicate here that -- your reference is

6   United States Court for the State of Vermont.

7      **A.   That's right.**

8      Q.   All right?  So ultimately you filed your

9   action in the United States District Court for the

10  court -- District of New Hampshire?

11     **A.   That's right.**

12     Q.   Okay.  And was this your first notification,

13  as far as you know, your first notification to the

14  defendants of any intent to sue on their behalf?  Or

15  on your behalf?  Excuse me.

16     **A.   No, it was not.  The first notification would**

17  **have been to Jeffrey, Dr. Jeffery Simon around**

18  **Thanksgiving that I probably was left with no choice**

19  **other than to sue.  I think I said that in a voice**

20  **mail to him.  Maybe an e-mail as well.**

21     Q.   Jeffrey Simon was at the time a resident?

22     **A.   My supervisor.  He was a fellow working with**

23  **Dr. Donald West who was the main person I worked with**

1  **at Dartmouth.**

2      Q.    And you told Dr. Simon that you were going to

3  sue the institution?

4      **A.    Or that I felt that I was being left with no**

5  **choice.**

6      Q.    Okay.    All right.    I may -- oh.    Hold on.

7  Hold on.    Dr. Isaacs, are you currently, currently

8  suffering from any medical conditions that are being

9  treated by physicians?

10     **A.    Yes.**

11     Q.    What medical condition or conditions are you

12 currently suffering from that you are under treatment

13 for?

14     **A.    That's difficult to answer.    I think some of**

15 **the -- the condition, diagnoses are like eight lines**

16 **long like rule out this, rule out this, rule out this,**

17 **rule out this.**

18     Q.    My question is what conditions are you

19 diagnosed with that you are currently being treated

20 for?    You either know or you don't.    And if there's a

21 current diagnosis, tell me what it is.

22     **A.    So I think I was answering that without**

23 **meaning -- I think in medical terms is that there's a**

1    question as to the diagnosis.  And a lengthy rule-out

2    list.  So I'm not sure who could testify as to my

3    exact diagnosis under oath with absolute certainty.

4        Q.   My question is do you currently hold any

5    specific diagnosis that you are aware of, regardless

6    of what is being ruled out, and that any physician has

7    informed you about?  That's all.  Yes or no?  And if

8    you are, just tell me what it is.

9        A.   Well, it's a -- like I said, that's a

10   complicated question.  Definitive diagnosis with no

11   rule-out possibilities?

12       Q.   Mm-hmm.

13       A.   I don't know that there is -- well, I mean,

14   I've -- fatty liver, hepatic steatosis.  I have -- I

15   was diagnosed with a sleep disorder that

16   Dartmouth-Hitchcock actually said was moderate/severe

17   sleep apnea, but I believe that includes rule-outs in

18   this as well.  I don't believe there's a definitive

19   knowledge that obstructive sleep pathology is the only

20   cause of my fatigue and impairment.

21       Q.   Are you currently under the care of any

22   physician?

23       A.   Sure.

1        Q.    Who is your physician?

2        **A.    Well, there's a list of them.**

3        Q.    What's the list?

4        **A.    I don't think -- I don't think you can ask**

5   **questions like lists.**

6        Q.    Who are the physicians whose care you're

7   under?

8        **A.    Well, I can tell you some of them.   But I**

9   **think you'll have to rephrase it to get whatever**

10  **you're going with.   But I would say Dr. Richard**

11  **Cornfield.**

12       Q.    Where is he?

13       **A.    Philadelphia.**

14       Q.    Okay.

15       **A.    Dr. Richard Schwab also Philadelphia.**

16       Q.    Okay.

17       **A.    Doctor -- I'm drawing a blank on his name**

18  **now.   An internist in Philadelphia who I've disclosed**

19  **to you before.   I thought I was under care of the**

20  **Dartmouth Sleep Center, but they abandoned me as a**

21  **patient.   Against my will.   Who else am I under care**

22  **of?   I've had numerous consults.   I'm not sure if you**

23  **consider them under care.   I think you'd have to**

1    narrow down your question beyond that answer.

2        Q.   My question was which physicians are

3    currently treating you, currently treating you for

4    anything?  Which physicians?  And I think you've given

5    me a list.

6        A.   I've given you the main ones, but you know

7    what?  There's probably a lot more, you know, I think.

8        Q.   In my interrogatory I asked you to sign

9    authorizations which you have not done.

10       A.   That's right.

11       Q.   Despite the court order that you do so.

12       A.   That's -- I disagree with that.

13       Q.   Well, you haven't signed the authorizations,

14   correct?

15       A.   I have notified you that the authorizations

16   are in violation of the court's protective order.  You

17   asked me to waive my HIPAA rights and allow you to

18   disclose to third parties, my medical knowledge to

19   insurance companies, to institutions, to other third

20   parties.  That is not in the court -- in fact, that's

21   against the court order.  I also told you that if you

22   want to rewrite those -- can I finish my answer?

23       Q.   Yeah.  Yeah.

A.   If you want to rewrite those waivers, I'd consider signing them even after these deadlines to not include those breaches of HIPAA.  I think I also offered to write up those waivers myself, ones that would -- you know, I'd feel comfortable with that were in the spirit of the protective order.  And I think I also told you I wouldn't oppose subpoenas, even though I think they are objectionable.  For instance, that you could subpoena UCLA and California, even though California has strict psychotherapy notes that I am almost positive would not be produced by any judge in California.  I think I even said I would waive that if you wanted to subpoena them.  So I think I gave you three options to get my medical records even though I don't think you have a right to them.

Q.   You haven't signed the authorizations, right?

A.   I believe the authorizations are not in the spirit of the protective order and they would violate my HIPAA rights.

Q.   Okay.  Is there something complicated about my question you don't understand?  My question was have you signed the authorizations?

A.   Right.  I said I did not because I felt they

1    were in violation of the protective order.  I gave you

2    three alternatives to get the records you want.

3        Q.   When we pursue the court's direction to have

4    you sign the authorizations, frankly, it may be

5    necessary to come back and ask you questions about

6    that, but I'll wait till that happens later.

7             Will you mark this.  I think it's my last

8    exhibit.

9             (Isaacs Exhibit 29 was

10            marked for identification.)

11       Q.   BY MR. KAPLAN:  Do you recognize what I've

12   placed in front of you, sir?

13       A.   Yeah, I do.

14       Q.   What is it?

15       A.   It was a very rough estimate of damages --

16   damage scenarios in this litigation.

17       Q.   And who put this damage scenario together?

18       A.   I did in conjunction with my three attorneys

19   that I previously retained.

20       Q.   When was this put together?

21       A.   There's a date on it.  It was when I was

22   e-mailing -- it was when it was e-mailed to you.

23       Q.   Which physician -- excuse me, which attorneys

 1   did you discuss this calculation with?

 2       **A.    Keith Matthews, John Skinner and Patrick**

 3   **Rivard.**

 4       Q.    Okay.  And who actually put the numbers on

 5   paper?  Was it you or somebody else?

 6       **A.    Well, they were never put on paper.  They**

 7   **were put into a spreadsheet.**

 8       Q.    Who put them in the spreadsheet?

 9       **A.    Discussions with them modified the numbers.**

10       Q.    I didn't ask you about discussions.

11       **A.    I managed the spreadsheet on my computer, if**

12   **that's what you're asking.**

13       Q.    And so what I'm -- who made the determination

14   as to the amounts in column two where it says 40,000,

15   40, 41, and then goes into these larger numbers?  Who

16   was it who made that determination?

17       **A.    I think I did in conjunction with them.**

18       Q.    Where did you get the information to

19   determine or to use those numbers in this document?

20       **A.    Not waiving my communications with them, I**

21   **will say I think there was deliberation as to what**

22   **someone with an MD, MBA with a top board score would**

23   **make nationally.  And it starts around a brain surgeon**

```
 1   making 700,000 a clear.  And that might with inflation

 2   go up to 1.6 million.  And throw in the MBA you might

 3   be -- for instance, Dartmouth-Hitchcock's CEO is a

 4   brain surgeon who is also CEO, and he probably makes

 5   well over 1.6 million.  And so this is kind of an

 6   estimate of a high-achieving, like top-achieving

 7   doctor such as your CEO.

 8        Q.   So --

 9        A.   James Weinstein I believe his name is.

10        Q.   I'm trying -- I just want to make sure I

11   understand the assumption.  So the assumption in this

12   document is that you -- this is a document displaying

13   your damages, your alleged damages, right?

14        A.   Damage scenarios.

15        Q.   Right.  And --

16        A.   So one would be a high-achieving doctor, one

17   would be someone disabled, one would be someone in the

18   business world in a private equity fund with their

19   friend.  I think -- although I don't see that here.

20        Q.   It's not here.  So let me just ask you about

21   the second --

22        A.   Is that not -- is this not the full document,

23   then?
```

1          Q.    It's the only document I ever got from you.

2          **A.    Maybe they modified it, I don't know.**

3          Q.    So the second column that begins with the

4    numbers 40, 41, 43, do I correctly assume those would

5    have been numbers attached to your residency?

6          **A.    Yeah.**

7          Q.    And then thereafter these are numbers that

8    would have reflected somebody -- yourself or somebody

9    in your capacity who had completed residencies,

10   probably completed board certifications as well,

11   correct?

12         **A.    That's right.  And, you know, again, I just**

13   **want to look at this.  I'm not sure if it was modified**

14   **by my attorneys.  When you said who put in the**

15   **numbers.  I seem to think there was a third column, I**

16   **seem to think there were three scenarios.  I don't**

17   **know why it appears there are only two scenarios.**

18         Q.    Let me ask you about the second one real

19   quick.  The second one there's a scenario that ends

20   with 2046, 1 million 685, and then one that's 2046

21   145.  What's the seconds column reflecting?

22         **A.    Sorry, which column?**

23         Q.    This one, second one.

1      **A.    The one that ends 145935?**

2      Q.    Correct.

3      **A.    So that's my current projected income on**

4   **disability.**

5      Q.    Okay.  So the first column is what you're

6   projecting based on a neurosurgeon in practice after

7   completing residencies and the like, and the second

8   one is what you're actually receiving on disability?

9      **A.    So I'm looking at this.  I think they**

10  **simplified it down to two scenarios.  One being fully**

11  **disabled and the other being high-achieving Ivy league**

12  **doctor with an MD, MBA and top scores.**

13     Q.    And are you aware where that high-achieving

14  Ivy league doctors numbers came from?

15     **A.    Like I said, I think they're well below James**

16  **Weinstein, your CEO.  I think these numbers are well**

17  **below his.**

18     Q.    Do you know where they came from?

19     **A.    I think they're conservative estimates based**

20  **on CEO's like yours, Dr. James Weinstein.**

21     Q.    Do you know where they came from?  Do you

22  know what documents were looked at?  Do you know where

23  they came from?

1      **A.   Well, I mean, I worked, you know, in**

2   **investment banking, I have an MBA, I worked in the**

3   **medical world, I worked at Dartmouth, I saw James**

4   **Weinstein's figures in the Valley News.  So it came**

5   **from my recollection -- conservative estimates based**

6   **on my recollection of facts in the world.**

7           MR. KAPLAN:  I'm done.  Thank you very much.

8   I'll let you guys ask questions.  I want to make sure

9   you have time.

10                       EXAMINATION

11  BY MS. PEAHL:

12      Q.   Doctor, you all set?

13      **A.   Yeah, I'm just checking the time.  I have**

14  **3:10 I would start examination.  So I guess that**

15  **leaves about almost an hour I think for you.  Anyway.**

16      Q.   One of the claims that you made in this

17  lawsuit is that you were wrongfully denied

18  participation in research opportunities at Dartmouth

19  College.

20      **A.   Right.**

21      Q.   Is that one of your allegations?

22      **A.   Yes.**

23      Q.   Who was that research opportunity with?

1      A.    I think I was denied two types of research

2  opportunities.   One being the LPMR program, which is

3  medical research, that's what the acronym is for.

4  Leadership preventive medicine research.   And the

5  other one would have been research projects such as

6  Dr. Holtzheimer's.   I'm not sure if there are any

7  others, but I think those two things, the LPMR

8  research program and Dr. Holtzheimer.

9      Q.    When did you talk to Dr. Holtzheimer about

10  participating in a research project with him?

11      A.    Maybe October or November.   September.   I

12  don't remember the exact month.   But it was towards

13  the middle.

14      Q.    Did you put any request to participate in a

15  research project with him into writing?   Did you

16  complete an application of some sort?

17      A.    No.   We had discussed a formal application

18  process for a grant.   I think there was a $10,000

19  grant actually at Hitchcock.   So this was both with

20  him as a Dartmouth professor but actually a grant at

21  Hitchcock.   And I was considering doing functional MRI

22  assessment of depression in residents.   So I spoke

23  about that with him, and they were kind of I would say

1    intellectual conversations.  He's a very well-regarded

2    researcher.  So we had kind of intellectual

3    conversations about where the research could go.  And

4    he kind of left it that the next step would be, you

5    know, start to formulate an application for a

6    proposal.

7         Q.   Did you start to formulate an application or

8    a proposal?

9         A.   No.  Because Dr. Finn within a few days asked

10   to meet with me about that proposal.

11        Q.   Did you start to put an application for

12   proposal together?

13        A.   She told me not to.

14        Q.   So your answer is no?

15        A.   No.

16        Q.   Do you have any written communications with

17   Dr. Holtzheimer about participating in this research

18   with him?

19        A.   Maybe just a schedule.  Informal time to

20   chat.  Letting him know by e-mail or I may have called

21   him.  I don't remember.  Probably I e-mailed because

22   he's a pretty busy person.

23        Q.   Have you produced that e-mail?

1        A.   No.   It was probably deleted.   It was part of

2   my e-mails that were deleted improperly.

3        Q.   How many hours on average were you working as

4   a resident in the September, October, November time

5   frame?

6        A.   I think it was a good deal below the 80 cut-

7   off.  80 a week.  So maybe 70 hours a week.

8        Q.   And this research that you would have been

9   interested in doing with Dr. Holtzheimer, were you

10  going to be paid for that?

11       A.   I don't think so.  There was a stipend to

12  conduct your research.  I don't know if that included

13  some minimal expenses.  I don't think so.

14       Q.   And was it your expectation that you would do

15  that during your free time?

16       A.   Yeah.  Or I guess if it grew into a bigger

17  project they may set aside time for the project.

18  Initially it would have been in my free time.

19       Q.   Because you understood you had to complete

20  all of your required tasks as a resident?

21       A.   Yeah.

22       Q.   Did you have a conversation with Dr. Finn

23  about your desire to participate in research with Dr.

1  Holtzheimer?

2       A.   Yes.

3       Q.   And when was that?

4       A.   Like I said, I think it was a few days after

5  I left the meeting with him talking about the next

6  step in formulating a proposal.

7       Q.   So what did you say to Dr. Finn?

8       A.   I just remember the gist of the meeting that

9  it was basically she was saying like come on,

10 you're -- you're struggling, and typically first-year

11 interns don't do research.  Do you really think you

12 can do this?  And I was kind of steered into saying

13 maybe you're right, maybe I'll informally do research

14 but I'll skip the proposal.  So I think I was kind of

15 steered into not applying.

16      Q.   Did Dr. Finn do anything other than

17 discourage you from pursuing that opportunity?

18      A.   Well, it was -- I would say yes.  It was

19 weird to me, like, how quickly after I spoke with

20 Holtzheimer there was an e-mail or a concern from her.

21 Like I said, it was this game of gotcha.  That's what

22 I remember.  It was kind of just no, you can't be with

23 our leading researcher, and now I'm thinking because

```
 1    we're going to fire you.  Something seemed odd about

 2    it to me.  But basically she just steered me away from

 3    it.  And what I perceived as an odd manner at the

 4    time, and now I perceive as this -- perhaps part of

 5    this larger game of gotcha.

 6        Q.   She never told you you could not participate;

 7    is that correct?

 8        A.   I felt that I would have been disagreeing

 9    with her, and I had been frequently, frequently told

10    not to disagree with her.  So I would say I was

11    effectively told not to.  But not in those words.  I

12    would have been disagreeing with her if I said no,

13    actually -- if I said this is what excites me, this is

14    why I chose a residency at Dartmouth to do this kind

15    of research and this might give me more energy and

16    motivation and turn people's thoughts on me into

17    positive, I think if I had said that to her I don't

18    know what would have happened.  She wouldn't have

19    liked it.

20        Q.   Doctor, my question was did she tell you that

21    you could not participate?

22        A.   I don't know whether constructively she did

23    or not.  Literally her words were not forbidding.
```

1        Q.    Is it your contention that if you had

2   participated in that research with Dr. Holtzheimer

3   that ultimately you would not have been dismissed from

4   the residency program?

5        **A.    You know, sometimes if a hospital has a**

6   **really great researcher who has maybe not the bedside**

7   **manner they stay on.  They're just -- their duties are**

8   **switched.  I mean, that's really asking me to**

9   **speculate like what -- where that research that was**

10  **stopped in a very early stage may have gone.  It's**

11  **possible.  I just gave you an example.  I mean, I**

12  **think any hospital a doctor can mention an example of**

13  **maybe a researcher with Asperger's who, you know,**

14  **brilliant researcher but not the best working with**

15  **other doctors.  So maybe.**

16       Q.    But you were not -- you were hired to be a

17  resident in the psychiatry residency program, correct?

18       **A.    Well, the -- all the literature for that**

19  **program really touts the Ivy league research**

20  **opportunities.  I was hired for the entire offering.**

21  **Not just to care for Mary Hitchcock patients.**

22       Q.    You were in your first year of residency,

23  correct?

1      **A.    There are first-year residents who do, you**
2  **know, globally changing research.    World-renowned**
3  **research that changes the international health system.**
4      Q.    Did you submit an application to the
5  leadership in preventive medicine program?
6      **A.    I requested an application.    A requirement**
7  **for that is to have the backing of your program**
8  **director, and I was told that I did not have the**
9  **backing of neither Dr. Finn nor Dr. Ronald Green.    So**
10  **I was under the impression I was ineligible to apply.**
11      Q.    Did you discuss your potential application
12  with Dr. Finn?
13      **A.    Yes, I think so.**
14      Q.    Did you have any written communications with
15  Dr. Finn regarding your potential application to that
16  program?
17      **A.    I think there is an e-mail saying to her I**
18  **wanted to check in on my -- the status of this.    I**
19  **just met with Dr. Green.    If I remember correctly,**
20  **there was an e-mail I was going to meet with her about**
21  **it.    And then we talked about the application.**
22      Q.    Would you agree that Dr. Finn doesn't make
23  decisions about who is ultimately accepted into the

1  program?

2      A.    Like I said, my understanding is she is a

3  prerequisite.  Her evaluation is a prerequisite.  So I

4  think she's effectively deciding -- by not offering to

5  support my application, I think she is making a

6  decision that I can't apply.

7      Q.    And who told you you needed an evaluation

8  from her?

9      A.    That was either in the application packet

10  they sent me or on the Internet or Finn had verbally

11  told it to me.  But there was definitely some -- some

12  source that made me believe I needed a -- my program

13  director's statement and support or backing was

14  required.  And I tried to find out recently, actually,

15  and I don't know if they changed the documentation on

16  the web, because a lot of documentation on the web has

17  changed over the last two years.  So I did actually

18  try to locate that recently, and I couldn't locate it.

19  I don't know.  But it was in the physical papers they

20  gave me.  I'd have to try to find them.  But -- I

21  don't usually imagine things like that.  If I -- that

22  would be pretty odd.  So I -- I seem to remember being

23  told that she -- she was part of the application

1  process.  Or her backing was.

2      Q.    Your program director?

3      A.    Yeah.

4      Q.    You needed a recommendation, essentially,

5  from the program director?

6      A.    I don't know if they used the word

7  recommendation or sign-off, something like that.

8      Q.    And did you talk with Dr. Finn after you were

9  told that?

10     A.    Well, she may have been the one that told

11 that to me, or Dr. Green may have, Dr. Ronald Green.

12 But that's when I spoke with her about that.  She said

13 that I wasn't competitive and that she couldn't

14 support me joining the program.  So there was

15 definitely -- I mean, setting that aside, there was

16 definitely the follow-up discussion that I couldn't do

17 it because she didn't think I was competitive.

18     Q.    Okay.  And when was this?

19     A.    That would have been after Thanksgiving so

20 late November or very early December 2011.

21     Q.    Did Dr. Finn tell you you could not submit an

22 application to the LPMR?

23     A.    I think she said it wasn't possible because

1    she wouldn't support me.  I don't remember her choice

2    of words literally.  You know, I don't remember those.

3        Q.   And in the end you never submitted any

4    application to the program?

5        A.   No.  You know, actually, I was still thinking

6    about it, like I mean, that's -- I don't remember

7    exactly, but I remember almost thinking do I contact

8    them to verify what she said?

9        Q.   And did you do that?

10       A.   That's when I was fired so -- it was like,

11   you know, just a matter of a month and I thought well,

12   let's wait till internal medicine before I research

13   and dig into this more.  So I wasn't in a huge rush

14   for that -- the next few weeks after I had that

15   impression.  But I do seem to remember thinking to dig

16   into that matter a little more.

17       Q.   But you didn't?

18       A.   No.  I was fired.  Or, you know, ...

19       Q.   You were asked some questions and shown some

20   documents by Attorney Kaplan related to the paperwork

21   that you completed when you began at Dartmouth-

22   Hitchcock.

23       A.   Mm-hmm.

1      Q.   And one of the questions you were asked

2  whether you had any disabilities and whether you

3  required any accommodations.  Do you remember that?

4      **A.   Yeah, I do.  I remember that.  And the**

5  **testimony as well.**

6      Q.   And you testified that you answered the

7  question no?

8      **A.   Right.**

9      Q.   You did not have any disability.

10     **A.   Right.**

11     Q.   And did not require any accommodation?

12     **A.   Right.  I think I only just added that my**

13 **actual belief as to my disability is probably more**

14 **complicated than a yes/no question.**

15     Q.   When did you first inform anybody at

16 Dartmouth College or Dartmouth-Hitchcock Medical

17 Center that you had a disability and required an

18 accommodation?

19     **A.   It was around Labor Day weekend, I think.  I**

20 **don't know if it was the week before or the week**

21 **after.  Again, I prompted a phone call with my family**

22 **and I told them I was going in asking for medical**

23 **leave.  My parents were -- they remember, I think**

1    they'd written an affidavit very upset that I was

2    doing that.  So I went into Dr. Finn's office and I

3    remember being teary eyed because I remember I brought

4    up, had the same memories of, you know, what is now

5    known to be these issues for 12 years, and I remember

6    saying to her, I remember almost exact literally the

7    words.  Something like if my performance problems are

8    this serious, then there's a lot of reasons why I

9    should get medical evaluation, and I think I said

10   including a head injury I had.  But I don't remember

11   that.  But I definitely referred, alluded to medical

12   history.  And I mean, I remember that distinctly.  And

13   she knew what I was saying.  Because she kind of

14   paused.  I mean, this -- you know, you don't every day

15   kind of -- I mean, my parents said I offered my

16   resignation there.  So, you know, I have a good memory

17   of that kind of event.  And I remember her just kind

18   of pausing and changing her gesture and then saying

19   oh, no, no, no.  There's nothing that serious.

20   Nothing we can't work around.  I wasn't thinking --

21   this is almost the literal quote, I wasn't thinking

22   anything that drastic.

23        Q.   So let me ask you this question:  What

1    disability did you disclose to Dr. Finn in that

2    conversation?

3        A.    Well, as I've testified, this is a

4    complicated disability case.  And Finn is a Harvard-

5    trained neuroscientist.  And I was I thought speaking

6    to her at that level, not in a form of check box yes

7    or no.  I thought I was being sincere and --

8        Q.    Dr. Isaacs, what condition did you disclose

9    to Dr. Finn?

10       A.    So I'm saying I thought I was being sincere

11   in saying I need to get evaluation to see why I have

12   concentration and tiredness issues.  And I think I

13   probably used those words to her like concentration

14   and fatigue.  You know, I don't remember those words.

15   But I think that I was clear that I thought I have the

16   medical history that warranted investigation, and that

17   this was really the first job that I had that was

18   really demanding, that I wanted to do, because, you

19   know, with the investment banker, the question, I'd

20   always wanted to be a doctor, whether I really want to

21   do that.  So I kind felt like I had -- I remember this

22   kind of heart to heart is the wrong word with Dr.

23   Finn, but I thought I was being very sincere and

offering her basically to fire me.  I mean, I also

thought if they don't like me, this is -- you know, I

was at my limit there.  I thought I could break.  And

sure enough -- well, I won't get into that with this

question.  I was giving her an out.  Or a chance to

get me a medical workup.  And she just backtracked on

all of this and said I wasn't thinking anything that

drastic.  Not --

Q.    You told her you had fatigue and

concentration problems?

A.    I think that's what we were speaking of.

Q.    Those were the words you used?

A.    That's what these conversations in general

were about.  And at some point I said to her around

that Labor Day, you know, I have a medical history.

Something should be worked up if this is so

drastically -- or so severely impacting my

performance.  In which case she said oh, it's nothing

that drastic.  I thought I was asking her as a

Harvard-trained neuroscientist expert to pursue this

more.

Q.    Okay.

A.    And all she did was put it under the table.

1      Q.   Did she tell you not to get a medical

2   evaluation if that's what you thought you needed?

3      **A.   You know, she wrote up what I kind of thought**

4   **was a little bit insincere.  Like three days later she**

5   **ignored the meeting, she didn't take any notes that**

6   **I've seen in this litigation of my request.  She**

7   **denied my request, and she put in a request -- to**

8   **answer your question, she put in a request or a**

9   **suggestion that I get therapy.**

10     Q.   Okay.  Doctor --

11     **A.   Now, for a Harvard-trained neuroscientist to**

12  **just kind of pass this off as being therapy, I mean,**

13  **you can say therapy is appropriate for all situations,**

14  **you could make that argument.  I found it a little**

15  **insincere.**

16     Q.   Dr. Finn was your supervisor at this point,

17  correct?

18     **A.   Yeah.  Yeah.**

19     Q.   She was not your medical provider, correct?

20     **A.   No, I never asked her for medical care.**

21     Q.   You weren't asking her to evaluate you?

22     **A.   I was asking her to make the provisions for**

23  **me to get evaluation.**

1      Q.    Well, what -- what provisions did she have --

2      **A.    A leave of absence.**

3      Q.    Did you ask her for a leave of absence?

4      **A.    Yes.  Yes.**

5      Q.    Did you put that in writing?

6      **A.    No.  I wish I had.**

7      Q.    How long of a leave of absence were you

8  requesting?

9      **A.    We didn't even get to that.  Again, I kind of**

10  **thought that that was a chance for her to ask me just**

11  **to resign.  And I had the suspicion, a bit of a**

12  **suspicion there that other things were being held**

13  **against me.  And if she asked me to resign I probably**

14  **would have done so at that point.**

15      Q.    Had you asked for any other accommodations

16  from Dr. Finn either at that meeting or prior to that

17  meeting?

18      **A.    Prior to, no, not that I remember.  After**

19  **quite frequently just in the sleep -- you know, I was**

20  **getting sleep workup at that time.  So that means I**

21  **think of in terms of my mentality I was asking her**

22  **about the head injury workup.  I didn't know I had a**

23  **sleep diagnosis.  Soon after that meeting I had a**

```
 1   sleep diagnosis and then I frequently, meaning four to
 2   five times, asked her about flexibility or, you
 3   know, --
 4        Q.   My question was prior to that meeting.
 5        A.   No.  I think I said before that, none that
 6   I'm aware of.
 7        Q.   Okay.  And at that meeting what you said to
 8   Dr. Finn was if I've got these issues with tiredness
 9   or concentration, maybe I should get a medical
10   evaluation; that's what you asked her?
11        A.   Yeah, I think I probably used stronger words
12   than maybe, but something of that nature like I think
13   maybe, you know, the next step should be medical
14   workup.
15        Q.   Okay.  And your testimony here is that that
16   statement was a request for a medical leave of
17   absence?
18        A.   I believe I used the words medical leave.
19   Because she said not that drastic.  She wasn't just
20   talking about a maybe there.  She replied not that
21   drastic.  And again, when I told my father I asked for
22   medical leave, he said oh, you might as well resign.
23   Don't do that.  This was -- I wasn't using soft words
```

1    there.  I wish I had a tape recording or a written

2    record of it, but it was -- I think it's pretty clear

3    to her I was basically offering her -- I was offering

4    to get out of her -- her hair, so to speak, and I

5    thought this is -- this will kind of kill two birds

6    with one stone.  Like if I have a medical problem and

7    she really wants to help that out she'll suggest a

8    workup.  If she wants to fire me, you know, this is a

9    good chance for her to suggest I just resign.  Or

10   maybe take long-term leave that I wouldn't come back

11   from.  So I really thought of it as like putting the

12   ball in her court, so to speak, and that was my goal.

13   I mean, I did -- you know, I have some business

14   background.  I came into that meeting with a goal.

15   And I'm pretty sure that I used words like medical

16   leave and, you know, an evaluation of my past medical

17   history and why I'm underperforming.

18        Q.   Did she take you up on your offer to resign?

19        A.   Well, it wasn't an offer to resign.  I was

20   hoping that it would be medical leave.

21        Q.   You were hoping that she would give you that

22   offer, you said?

23        A.   No, I was hoping for medical leave.  But I

1    was hoping that -- look, I said this before.  Maybe it

2    was unclear.  I felt like I was at the point of

3    breaking.

4        Q.   Did she ask you to resign during that

5    meeting?

6        A.   I want to finish the question.  I was not so

7    naive as to not think it was a possibility they knew

8    about USC or were angry about Arizona.  And I thought

9    I don't want to -- for a psychiatry program that I

10   really don't think I'm going to stay in beyond a year

11   or two, I'm going to transfer, I'm not going to

12   subject myself to this.  So --

13       Q.   Did you ask if you should resign?

14       A.   No, I asked for medical leave.

15       Q.   All right.  And she didn't -- she didn't

16   suggest you should resign, did she?

17       A.   No.  Which makes me think she wanted to keep

18   her schedule and the Medicare reimbursement.  You

19   know, now that I look back at it differently.  At the

20   time I thought she really wanted to keep me on as an

21   employee.  I was relieved.  I thought oh, if she

22   really had something against me she would have just

23   gone to the medical leave thing.

1        Q.   Okay.

2        A.   But she's not, so maybe she really wants me

3    there.   But now I think well, they just had to hire

4    someone else and get their hundred-thousand-dollar

5    training stipend.

6        Q.   Did you have a later conversation with Dr.

7    Finn regarding part-time work?

8        A.   Yeah, yeah.

9        Q.   When was that?

10       A.   I think that was November.   There were

11   several small conversations about my lateness, and I

12   said I'm working on -- you know, there was some small

13   ones in the hallway.   Then there was the one where I

14   really asked for part-time accommodation.   And that

15   was December, maybe.

16       Q.   And on what basis do you believe that working

17   part-time would have allowed you to improve your

18   performance as a medical resident?

19       A.   My main complaint really as I described to

20   Dr. Green at the sleep department, I felt half asleep

21   in rounds.   I felt like I would get in a car accident

22   driving to work, which I did.   And then, you know, I

23   would take naps at lunch and be okay.   I'd write I

1    think pretty good notes in the afternoon.  I'd be for

2    the most part pretty engaging with the patients and

3    doing a good job in the afternoons.  So I really

4    thought that, you know, I could always be in maybe a

5    better light and better doctor if somehow we could fix

6    or get rid of that issue in the morning where I was,

7    you know, somewhat like a zombie or, you know,

8    something not fully awake.

9        Q.   Were you treating with any physician during

10   the fall of 2011 for this condition?

11       A.   Well, I think that's when I started to get

12   treatment from the sleep medicine department.

13       Q.   Did any doctor recommend to you that a

14   part-time work schedule would help with your

15   performance issues?

16       A.   When I asked the sleep medicine to evaluate

17   my work they abandoned me as a patient.

18       Q.   And when was that?

19       A.   I mean, well after I was there.

20       Q.   I'm talking about in the fall.

21       A.   No, when I said I was falling asleep on

22   rounds, I believe they committed malpractice by not

23   investigating the matter further.

1    Q.    The question --

2    **A.    I'm disappointed --**

3    Q.    Dr. Isaacs, the question was did any

4    physician recommend to you that part-time work would

5    help with the performance problems you were having?

6    **A.    No.  And I have to wonder why they didn't and**

7    **if they were in on the rest of the hospital viewing me**

8    **as someone to get rid of it.**

9    Q.    Did you speak with anyone other than Dr. Finn

10   about a medical leave of absence?

11   **A.    I think Dr. Simon I mentioned on**

12   **Thanksgiving, Dr. Rogge, Dr. West.  Not in a leave of**

13   **absence term but just that I had a sleep disorder and**

14   **I was trying to figure out like what I could do to,**

15   **you know, do -- be more awake at work.**

16   Q.    You claim that you requested a leave of

17   absence from anybody else?

18   **A.    Dr. Simon and Dr. Frew I -- I used the word**

19   **demanded medical leave.**

20   Q.    Are you talking about the shift you wanted to

21   leave?

22   **A.    On Thanksgiving.**

23   Q.    And anything else other than leaving that

1   shift after Thanksgiving and the medical leave you say

2   you asked for from Dr. Finn in September --

3        **A.   No, to me --**

4        Q.   Let me finish the question.  Any other

5   request for accommodations that you claim you made?

6        **A.   No.  Those were two pretty big requests in my**

7   **book, in my life as things -- I think after January**

8   **13th I started asking DHMC HR and things got confused**

9   **there, I don't know what happened, but when I was**

10  **actually there, I think it was limited to those few**

11  **conversations I've just described.**

12       Q.   Okay.  You were transferred from the internal

13  medicine rotation in the summer of 2011 shortly after

14  you began the program, correct?

15       **A.   Yeah, mm-hmm.**

16       Q.   And what was the reason for that?

17       **A.   Well, that's something I'm trying to discover**

18  **in this lawsuit.**

19       Q.   Let me ask the question a different way.  The

20  purpose was to give you some time to build your

21  skills --

22       **A.   The purported purpose was.  I'm very**

23  **skeptical of that at this point in time.**

1    Q.   You admit you were having problems on the
2  medicine rotation in the summer?
3    **A.   Well, I admit I was having medical problems,**
4  **and in a rant all the words I used to Behrang on**
5  **Facebook I certainly agree with.  And that I was on**
6  **the verge of a nervous breakdown according to three**
7  **people there, yeah.**
8    Q.   And Dr. Finn arranged for you to come back
9  onto the psychiatry rotation --
10    **A.   Yeah.**
11    Q.   -- in the summer, complete that and then try
12  internal medicine again, correct?
13    **A.   Yes, that's right.**
14    Q.   And do you agree that Dr. Finn worked with
15  you during the period of time that you were on the
16  psychiatry rotation, met with you to go over your
17  performance?
18    **A.   She met with me to go over purported**
19  **performance issues which turned into admitted**
20  **performance issues.**
21         MS. PEAHL:  Okay.  Can we pass this down.
22         (Isaacs Exhibit 30 was
23         marked for identification.)

1    Q.   BY MS. PEAHL:  Dr. Isaacs, what we just
2    marked as Exhibit 30, --
3        **A.   Yes.**
4    Q.   -- do you recognize that e-mail?
5        **A.   Yes.**
6    Q.   It's an e-mail exchange between you and Dr.
7    Finn in September of 2011?
8        **A.   Yeah, mm-hmm.**
9    Q.   Would you agree with me that Dr. Finn was
10   giving you an improvement plan that included ten items
11   she wanted you to work on?
12       **A.   I'd agree she gave me something entitled**
13   **improvement plan.  Whether or not she actually wanted**
14   **me to work on these I do have skepticism about.**
15   Q.   Well, you agree she gave you these --
16   identified these items for you, correct?
17       **A.   Yes, yes.**
18   Q.   And you agree that you expressed gratitude to
19   Dr. Finn for working with you?
20       **A.   I was being polite.  I appreciate the update.**
21   **I thought it was a little odd that I asked for medical**
22   **leave and, like I said, she kind of put it under the**
23   **table and sent what seemed to be kind of building a**

1    paper trail kind of thing.  So I don't really have

2    gratitude, to be honest, but I did write politely

3    appreciate the update.

4        Q.    You don't raise your concern about disability

5    or medical leave in your response to Dr. Finn, though,

6    do you?

7        A.    Well, I said it to her and started crying.

8        Q.    In your e-mail --

9        A.    No.  I mean, --

10       Q.    -- September --

11       A.    No, that's what I was surprised about she

12   kind of brushed it under the table so I'd feel stupid

13   saying it again.

14       Q.    When you obtained the sleep consult, did that

15   appointment yield any information with respect to how

16   a medical leave of absence would assist you with your

17   performance on the residency?

18       A.    The sleep consult showed 12 minutes of REM

19   sleep or something like that.  An unacceptable number

20   for a doctor to have.  So yes, I think any

21   legitimately qualified doctor doing his job would have

22   been concerned having someone treat patients

23   consistent with that kind of sleep schedule.  If it

 1    was a one-off thing, maybe not.  But if it was a

 2    consistent problem, I don't think there would be any

 3    expert witness that would, you know, testify to the

 4    contrary.  So I believe medical malpractice occurred

 5    at the sleep center, and unfortunately the New

 6    Hampshire Board of Medicine last week let them off.

 7        Q.   The medical leave of absence would have

 8    assisted you with difficulties you were having in

 9    properly documenting patient records?

10        A.   Sure.  I think most of the stuff was

11    executive functioning.  That's what the

12    neuropsychologist has described.  Not so much lack of

13    knowledge.  My memory is apparently pretty intact.  So

14    work tasks like you just described would probably be

15    the most impacted by anything that could improve

16    frontal brain performance.

17        Q.   And did you provide any opinion from any

18    physician to Dr. Finn or anyone at Dartmouth

19    indicating that that was an accommodation you needed?

20        A.   Well, after the fact I think they've seen my

21    neuropsych --

22        Q.   I'm not talking about after the fact.  When

23    you asked --

1      **A.   At the time I was only seeing Dartmouth Sleep**

2  **Center, and I think this wasn't taken seriously by**

3  **them.   Or seriously enough.**

4      Q.   Were you allowed the opportunity to complete

5  your patient notes off of the unit?

6      **A.   Yeah.   Dr. West informally accommodated my I**

7  **guess disability request you call them now.   I didn't**

8  **phrase it to him as a disability request so much as**

9  **just things that would help my concentration.**

10      Q.   Did you also discuss with Dr. Finn the

11  possibility of working a rotation of one month on/one

12  month off?

13      **A.   No.   She -- I've seen that in a lot of the**

14  **notes.   I don't recall hearing that verbally.   There's**

15  **a chance I missed it verbally, or I think there's the**

16  **chance she never really said it.   I think I would have**

17  **taken her up on that offer for what it's worth.   So if**

18  **she said it, I didn't hear it.**

19      Q.   When you were on the internal medicine

20  rotation, you were given a reduced patient load for a

21  number of days to help you with issues you were having

22  on that rotation, correct?

23      **A.   Yeah, I think so.**

1          Q.   If you would look again at the large

2    spreadsheet that Attorney Kaplan gave you.  I'm not

3    sure --

4               MR. KAPLAN:   Exhibit 29.

5          **A.   Yeah, mm-hmm.**

6          Q.   Are you assuming in this calculation that the

7    only income you will have for the remainder of your

8    working life is disability income?

9          **A.   That is the scenario there.  Like a total**

10   **disability scenario.  I guess it wasn't labeled like**

11   **that.**

12         Q.   But that's what the column --

13         **A.   Yeah.  Also to clarify before, you know,**

14   **these numbers that I had said were well below**

15   **doctor -- the CEO of Hitchcock's salary.  Also I just**

16   **want to --**

17         Q.   That's not my question.

18         **A.   There's inflation built into here, and I**

19   **think everyone agrees the economy 30 years from now --**

20   **you know, a dollar today is maybe, you know, going to**

21   **be 20 cents.  So these numbers of 1.6 million, you**

22   **know, might actually only be 500,000.**

23         Q.   We'll get --

1        **A.    Okay.**

2        Q.    We'll get to those questions in a minute.

3        **A.    Yeah, I was just clarifying the testimony.**

4        Q.    Well, I don't need -- I need you to answer my

5    question.  The question was this document is based on

6    the assumption that your income, which is reflected in

7    the second column of numbers, --

8        **A.    Right.**

9        Q.    -- includes only disability income, correct?

10        **A.    That's right.  And it's 145 because The**

11    **Hartford actually specified inflation at 4 percent a**

12    **year.  So that goes up to the final number there of**

13    **145.  So rough -- roughly a dollar today is 30 cents**

14    **in 25 years, according to The Hartford.  So I used the**

15    **same numbers on this whole spreadsheet.**

16        Q.    Okay.  So what I want you to tell me is what

17    basis do you have for assuming that you're never going

18    to make any income other than the disability income?

19        **A.    Well, what I was thinking at the time I wrote**

20    **this is based on my own assessment of myself.  And**

21    **again, these were just scenarios.  I wasn't actually**

22    **making a declaration.  I was just giving a rough**

23    **scenario list of if Dartmouth traumatized me or caused**

1    **actual physical damage from the stress, what the**
2    **comparison would be between someone totally disabled**
3    **and someone a high-achieving doctor from an Ivy league**
4    **hospital.  So it was really just a comparison, a rough**
5    **comparison of those two.  I wasn't declaring that I'd**
6    **be one or the other.  I was saying maybe I'm going to**
7    **be this one, maybe I would have been that one.  And if**
8    **the evidence is discovered that really what I went**
9    **through would reasonably cause someone to break down**
10   **and never be able to work again, well, then these**
11   **would be verifiable numbers.**

12        Q.   Have you given any consideration to the
13   salary of clinical research professionals when
14   estimating these potential incomes?

15        **A.   At the time I wrote this and I think still**
16   **generally it would be impossible to imagine me doing**
17   **that.  I spend most --**

18        Q.   That's not my -- the question isn't whether
19   we can imagine it.

20        **A.   Right.**

21        Q.   The question was have you given in this
22   document any consideration to the salary potential of
23   clinical research professionals?

1    **A.    No.    No.    These are just two scenarios of**

2    **many possible scenarios.**

3    Q.    How about investment banking and finance

4    professionals?

5    **A.    Again, I made a third column with that**

6    **scenario, and I think my attorneys removed it.  Or**

7    **they asked me to remove it.  I don't remember.**

8    Q.    And the salary that you've reflected in the

9    first column, you told Dr. Kaplan that that was based

10   on your assessment of salaries for a high-functioning

11   neurosurgeon; is that correct?

12   **A.    Dr. Kaplan and I'm Attorney Isaacs.**

13   Q.    I'm sorry.  Did I say doctor?  I'm sorry.

14        MR. KAPLAN:  Perfectly okay.

15   **A.    Sorry, I got lost on the question there**

16   **because I was kind of laughing.**

17        MR. KAPLAN:  A reference to my brother is

18   perfectly okay.

19   Q.    The question is you told Attorney Kaplan that

20   the numbers in the first column were based on your

21   assumption of the salary of I think you said a high-

22   functioning neurosurgeon or just a physician with an

23   MBA?

 1      A.   Or an MBA.  And then I also just added that

 2   inflation, that 1.6 million is really, you know, 800

 3   or 600,000 in today's numbers.

 4      Q.   And in what particular geographic region did

 5   you look to come up with these numbers?

 6      A.   I've done searches on, like, salary dot com

 7   the average neurosurgeon nationally is, like, 474,000,

 8   but a lot of them are part-time.  So a full-time one

 9   might be around five, 600,000.  Anecdotally there

10   aren't too many MD MBA's with those backgrounds, but a

11   lot of them make -- it's definitely not unheard of.

12   In fact, it's more often than not they make between

13   four and 700,000.

14      Q.   So you didn't look at any particular

15   geographic region; is that what you're saying?

16      A.   No.  I was thinking more just kind of the

17   tier, like an academic medical center like Dartmouth.

18      Q.   And what discount rate did you use --

19      A.   It's on here.  You know, I think I factor in

20   The Hartford's 4 percent and probably added on like a

21   real number to that.  So I think I put 7 percent.  But

22   I'd have to go back and check.  It might be 9 percent.

23   It might be -- I really don't know.  I think it was,

1    you know, a midrange number.  It was discount rates --

2    you know, my training and finance was all before the

3    crash eight years ago.  So those discount rates don't

4    mean much anymore, the ones I was taught, because it's

5    now -- you know, it's almost a negative interest rate.

6        Q.   So your answer is you don't know what rate

7    you used?

8        A.   The answer is I am not an expert to determine

9    an interest rate on this.  I used some number like 6

10   or 8 percent which traditionally before the Fed

11   printed a lot of money it was an appropriate number.

12       Q.   But you can't tell me today what number you

13   used?

14       A.   I'd have to go back and look, but I think 6

15   to 8 percent.

16       Q.   And did you apply that to each year or to the

17   total number?

18       A.   I think it was done correctly, you know,

19   what's the word, you know, compounding.

20       Q.   You think?

21       A.   It was an Excel N -- NPV function.  I think I

22   put minimum -- I wouldn't have done much changes on my

23   own to it.  I think it is correct.

1    Q.   Okay.  And can you tell me -- I don't want to

2    ask you for each line on this document.  But looking

3    at the first column, the numbers are going up by a

4    significant numbers every year.

5        **A.   Right.**

6        Q.   And then in 2029 you jump to a million

7    something, and then it goes back down and then back

8    up.  Can you explain to me your basis for choosing the

9    numbers --

10       **A.   Again, I didn't document this all that well,**

11   **but I think -- I think I'm saying there would be**

12   **career transitions where you take a step back in your**

13   **salary and then it would start growing interest rate**

14   **again -- or inflation again.  So I think I did a few**

15   **resets in it.  I mean that's -- you know, the**

16   **assumptions here I think of this as it's a basic thing**

17   **based on 6 percent interest rate for a high-achieving**

18   **doctor salary.  I don't think -- you know, the**

19   **assumptions are kind of -- kind of immaterial.  I**

20   **don't think I -- you know, I just may drop the numbers**

21   **of being totally disabled or be a high-achieving**

22   **doctor.  And they could be off 20 or 30 percent.  I**

23   **mean, I'd be the first to admit that.**

1        Q.    You admit that you had several neurological

2   and psychiatric issues beginning as early as 2001?

3        **A.    Well, I'm not sure how you define issues.**

4   **But neurologically I had a history, a neurologic**

5   **history back to '97.**

6        Q.    Attorney Kaplan asked you what the Baker

7   Isaacs Capital Group was, and you said it was a

8   capital venture company?

9        **A.    Yeah, we were talking -- trying -- I mean,**

10  **there was a website, you can probably still get it,**

11  **but it mentioned like a sustainable kind of a -- an**

12  **investment fund focused on sustainable triple bottom**

13  **line investments.  Triple bottom line just meaning**

14  **that they -- not only were they profitable for a**

15  **venture capital firm but they would be ecologically,**

16  **have no negative -- negative costs in terms of the**

17  **workers socially, no negative repercussions socially.**

18  **So it was kind of what we thought was going to be a**

19  **progressive investment fund that, you know, would**

20  **follow up -- I thought it was kind of following up**

21  **with the work I did in France with Cairnwood.**

22       Q.    Okay.  You were partners with George Baker?

23       **A.    Yeah, I was.**

1          Q.    Was it just the two of you?

2          A.    It was.  We were both 50 percent owners.

3          Q.    Did you have any active role in the running

4    of the company?

5          A.    Well, I was titled CEO of it.  I think that's

6    a bit -- given that it hadn't really gotten off the

7    ground, I'm not sure what titles really mean.  There

8    was no revenue at any point to consider that we were

9    actively managing.  Again, the time -- you didn't

10   specify a time frame so I can't really answer beyond

11   that.

12         Q.    When was the group formed?

13         A.    November, December 2010.

14         Q.    And you said it's no longer in existence?

15         A.    No.  I think Mr. Baker dissolved it in June

16   of this year.

17         Q.    And were you active from November 2010 until

18   June of 2013?

19         A.    Again, I don't know what the word active

20   means.  I mean, we created this corporation.  We

21   hadn't really done anything material for most of the

22   time of its existence.  We had met with a few people

23   to kind of brainstorm and met with Mr. Baker to

1    brainstorm quite a bit in December, January of 2010,

2    '11.  Other than brainstorming, it was more -- I only

3    use the word shell company because it was intended to

4    be more than that, but there wasn't much activity

5    beyond brainstorming.  Now, after I was terminated I

6    did try to work on it with Mr. Baker for several

7    months.  Maybe even six months.  And that -- you know,

8    with some minor successes it didn't really work out.

9        Q.   From January 2011 through January 2012, --

10       A.   Yeah.

11       Q.   -- how much time would you say per week you

12   spent doing --

13       A.   Very little.

14       Q.   Let me finish the question.

15       A.   Okay.  I thought it was done.

16       Q.   -- any work related to Baker Isaac Capital

17   Group?

18       A.   I think I had taken an educational leave from

19   Dartmouth for a week to go to a conference in D.C.,

20   and coming back from that I actually met with a group

21   of people doing a real estate project in India.  So

22   that maybe was about a day in New York.  I had a few

23   phone calls with Mr. Baker maybe half an hour here and

1    there.  But all in all, I mean, I can count on -- you

2    know, count on my fingers the number of instances I

3    worked on that company.

4        Q.    Did you invest money in the company?

5        A.    I have to think about it more.  I mean, I can

6    tell you generally, you know, it cost maybe a thousand

7    dollars to incorporate it.  And I think I put in some

8    of that.  I paid -- you know, to go to that meeting in

9    New York probably cost me a few hundred dollars.  So I

10   invested some time and effort.  But not anything I

11   would call material.

12       Q.    I didn't ask about time and effort.  I asked

13   financially.  Did you invest money in the company?

14       A.    Those examples of a few hundred dollars here

15   and there.  Nothing more than that.

16       Q.    And did you ever receive any salary?

17       A.    No.

18       Q.    Did you ever receive any distributions?

19       A.    No.  There was never any revenue.

20       Q.    Did the company file any tax returns?

21       A.    I actually filed, so I did a few hours of

22   work filing the tax returns for two years for them.

23   Which I never really knew corporate tax returns, but

1  it seemed simple enough because there was a year of

2  revenue, year of salaries, put a few zeros and

3  submitted it.  I think I did it correctly, but one

4  thing I don't have training in is much accounting

5  other than what I did in finance.

6          If you want to take a break for ten minutes.

7  I just have to go to the bathroom.  If this would be a

8  good time for a break?

9      Q.   Sure.

10     A.   Okay.

11     Q.   I just have a couple more questions.  It

12 won't be long.

13          (Recess taken.)

14     Q.   BY MS. PEAHL:  We're just going to -- I just

15 have a few more questions.

16          If we could get that marked.

17          (Isaacs Exhibit 31 was

18          marked for identification.)

19     Q.   BY MS. PEAHL:  Dr. Isaacs, would you take a

20 look at what we just marked as Exhibit 31.  Do you

21 remember these as answers that you provided to

22 interrogatories that were submitted to you on behalf

23 of Dartmouth College and Dr. Finn?

1          **A.     Yeah, I think so.**

2          Q.     And are these answers true and accurate to

3     the best of your belief?

4          **A.     I believe so.**

5          Q.     If you would, it's hard because the pages are

6     not numbered, but if you thumb through not quite

7     halfway till you find question number 7.

8          **A.     Okay.**

9          Q.     You see that question?

10         **A.     Yeah, mm-hmm.**

11         Q.     You want to just take a minute and look at

12     your answer.

13         **A.     (Peruses document.)  Okay.**

14         Q.     Is your answer complete to the best of your

15     knowledge?

16         **A.     You mean sections 1 through 8 of the answer?**

17     **Or 1 through 10?**

18         Q.     Yes.

19         **A.     I mean, this -- it took a lot of time.  I**

20     **wouldn't be able to scrutinize it here, but I don't**

21     **know of any reason why it wouldn't be complete.**

22         Q.     Well, let me ask this:  Since you submitted

23     this, have you thought of anything else that Dr. Finn

```
 1   has done or that you claim to be a supplement to your
 2   answer to this question?
 3        A.   Yes.  I think -- I mean, there will be
 4   supplements to this.  I thought about that recently.
 5   I'm not exactly familiar with the timing procedure of
 6   that.  So I don't want to testify that this is an
 7   exhaustive list now.  I mean, just scanning through
 8   it, I don't think it says that I -- that I believe she
 9   perjured herself in the NHES hearing, that she
10   perjured herself effectively throughout this lawsuit
11   which has delayed my justice or redress.  So that's
12   one example that I don't think is in here.  I mean, I
13   would need a lot of time to really -- you know, to be
14   honest, I think in this lawsuit there's so many things
15   that I'm probably not going to be able to list
16   everything.  And this is probably the core of it.
17   There would probably be a few more I'd add such as the
18   perjury one I mentioned.  You know, or even -- even
19   her e-mailing INSEAD to see if I had a diploma.
20   Again, I really suspect she thought she was in some
21   episode of Homeland or gotcha or whatever and was
22   having fun about this with coworkers.  I mean, that's
23   what Dr. Simon told me.  He agreed with me, my
```

1  suspicion back in Thanksgiving that she and some of

2  her friends were kind of on my case improperly.  So I

3  think there is more.  I mean, whether it's materially

4  different than what I list in here, I don't know.

5      Q.   Other than perjury that you just

6  identified --

7      A.   Perjury and maybe having fun with this

8  detective game at my expense.  But really, I don't

9  think -- I don't think that -- that's why I said

10 before to Attorney Kaplan, I don't think I can be

11 asked to be bound to a list here.

12     Q.   Well, I'm going to disagree with you.  You

13 were asked to provide answers to these

14 interrogatories.

15     A.   Right.

16     Q.   And we can ask you to identify every item.

17     A.   I understand that.  At the point the

18 supplements are due that's the final word.  I

19 understand that.

20     Q.   And I'm asking you today whether you have any

21 other information that you didn't include here.  And

22 you've identified two things that you don't think

23 are --

1     A.   I've given a few examples.  I'm a bit tired

2  now.  It's hard to think of them.  There's nothing

3  that I'm knowingly concealing at this point, if that's

4  what you're asking.  I don't have any surprises.  But

5  I may supplement it at a later date.  But I don't

6  think there will be any shocking new surprises there.

7     Q.   You testified earlier that you have submitted

8  a recent residency application to Dartmouth-Hitchcock

9  Medical Center, correct?

10     A.   Right.

11     Q.   Have you submitted similar residency

12  applications to any other programs?

13     A.   Well, I certified one ERAS application that I

14  then assigned to Dartmouth, maybe 15 other programs.

15  So it would be the same application that is in

16  Dartmouth's possession.

17     Q.   And have you been selected for an interview

18  at any of those?

19     A.   No.  For three years I haven't had any

20  interviews.

21     Q.   Have you submitted an application every year?

22     A.   Yeah.  I don't know if it was -- I don't know

23  if I seriously thought even if I got the job, which

1    seems to be a stretch, that I would be able to do it,

2    but like I said, a lot can change in nine months.  So

3    I guess wishful thinking each year I apply.  Also if I

4    don't apply all my credentials go off the system.

5    Which took years to build.  So part of the reason I

6    reapply is just, you know, an optimistic scenario that

7    two or three years from now, you know, something will

8    work out, I want to keep my credentials in the system.

9              MS. PEAHL:  Can we hand these down.  There's

10   two documents.

11             (Isaacs Exhibits 32-33 were

12             marked for identification.)

13        Q.   BY MS. PEAHL:  Before we get to those

14   documents, Dr. Isaacs, you've got an application, an

15   ERAS application pending.  Is it your belief that you

16   could work anywhere else other than Dartmouth-

17   Hitchcock right now, that you're capable of working as

18   a resident?

19        A.   Today?

20        Q.   Today.

21        A.   Probably not.  But I have some -- more

22   optimism than maybe I had a year ago that that is a

23   possibility in the somewhat foreseeable future.  But

1    it's hard to say with, you know, neuropsych studies

2    that point one way, I can't -- I can't definitely say.

3    I don't think anyone can, unfortunately.  But I think

4    that maybe I would -- how do I say it, maybe there

5    would be ways to reattempt trials.  Trials with

6    accommodations.  Something like that.  So I think that

7    there is a legitimate possibility of structuring some

8    possible medical career.  But I don't know.  And I'm

9    not sure anyone knows.

10       Q.   Have any of the physicians that you're

11    currently treating with indicated that they believe

12    you're capable of working as a physician right now?

13       A.   You know, again, you'd have to ask them, but

14    my impression they are a little bit on the fence.

15    Sometimes they say that's a stretch that you'll ever

16    be a doctor, other times they kind of think well,

17    maybe it could be worth a try.  But I can't answer for

18    them.  At this point and for the last year and a half

19    certainly I don't think any of them could have

20    imagined me caring for patients.  And that's probably

21    why they filed disability paperwork.

22       Q.   The device that you're carrying with you and

23    used today during the deposition, is that prescribed

1  for you by one of the physicians that you're currently

2  treating with?

3      **A.   No.   This is not a prescribable FDA-certified**

4  **device.   It is a working EKG unit.   I -- you know, I**

5  **guess you'd have to call it a hobbyist level thing.**

6  **It's my interest to check my EKG due to the**

7  **irregularities that have been found on me and that**

8  **I've sensed.   It's kind of an abundance of caution**

9  **thing from my point of view.   I've mentioned it to**

10 **physicians.   I don't think they objected.   Maybe they**

11 **told me not to spend too much time obsessed ruminating**

12 **over it, but no one objected to it.   But no one**

13 **prescribed it.**

14     Q.   If you would now look at what you've been

15 given, document 32, I think.

16     **A.   Okay.**

17     Q.   Do you recognize this letter?

18     **A.   32?   Yes.**

19     Q.   That's the January 2002 letter?

20     **A.   Yes.   I recognize it.**

21     Q.   And it's true that this document was

22 submitted either by you or on your behalf to the Keck

23 School of Medicine in connection with your appeal of

1    your dismissal?

2         A.    Yeah.    So I mean, I do have to object to

3    introducing this as evidence because it's from that

4    lawsuit.    But that said, yes, that's true.

5         Q.    And do you also have the next document which

6    is a letter from April of 2006 from Dr. Sandler?

7         A.    Yes.

8         Q.    And same question.    Is this a document that

9    was submitted on your -- by you or on your behalf to

10   the Keck School of Medicine in connection with your

11   appeal?

12        A.    Yes.    The same objection and the same answer.

13             MS. PEAHL:    That's all I've got.

14                    FURTHER EXAMINATION

15   BY MR. KAPLAN:

16        Q.    Dr. Isaacs, I wanted to follow up on one

17   question and one question only.

18        A.    Sure.

19        Q.    Because it has to do with something I asked

20   you.    We marked as Exhibit 1 the court order that then

21   Magistrate McCafferty issued.    And in that order I'm

22   going to specifically refer you, I have it right here,

23   to paragraph 9 that says, "The motion" -- this is the

1    motion to compel the Medical Center filed.  "The

2    defendants have demonstrated the relevance of the

3    requested information.  Plaintiff is directed to

4    respond to interrogatories numbered 11, 17, 18, 21 on

5    or before November 14."

6        **A.    Okay.**

7        Q.    Interrogatory No. 21, which I have in front

8    of me, our interrogatories, was our request that you

9    sign the attached authorizations.

10       **A.    Right.  That's what we've discussed.**

11       Q.    All right.  Now, I understand your position

12   that those authorizations are not in whatever way you

13   believe appropriate.  But I also know that the court

14   has ordered that you sign them.  Now, so my only

15   question to you on this issue is you have not signed

16   them since November 14 when you were ordered to do so.

17   Are you going to sign the authorizations that were

18   submitted to you in compliance with the court's order?

19       **A.    So I have to object to the characterization**

20   **of that question.  The court ordered me to respond to**

21   **the interrogatories.  I have responded in e-mail to**

22   **you that I don't believe the waivers are appropriate.**

23   **That a subpoena or a less intrusive waiver would be**

1    more appropriate given the protective order, and that

2    I'm willing to do those to avoid future motions on the

3    matter.

4         Q.   So is your answer to my question that despite

5    the court order granting the motion to compel, you are

6    unwilling to comply with the request that we made in

7    Interrogatory No. 21 that you sign the authorizations

8    as I provided them to you and as the court has

9    indicated you should sign them?

10        A.   No.   I mentioned to Magistrate McCafferty

11   this issue at the hearing that I was concerned about

12   the protective order, and I believe she said we'll

13   raise that issue if it becomes an issue.   Which is

14   what I'm doing now, or what I've done before by

15   e-mailing you.   So I believe I'm following the more

16   exhaustive order of Magistrate McCafferty and raising

17   the issue that your protective -- or your waivers are

18   what I understand from litigation far more obtrusive

19   than the typical subpoena you could do, and I'm

20   asking -- I'm offering to provide that information to

21   you in the more typical means.

22        Q.   So again, as we sit here now, you are -- have

23   not signed the authorizations, correct?   Correct?   You

1  haven't signed the authorizations?

2      **A.    I have not signed the authorizations.**

3      Q.    And you are not going to sign the

4  authorizations, correct?

5      **A.    I would sign --**

6      Q.    And you --

7      **A.    -- similar authorizations but not those**

8  **authorizations.**

9      Q.    Okay.  Thank you.  Oh, I have one -- I'm

10  sorry, last question.  Maybe.  Lawyers are funny.

11          When you were --

12      **A.    I'm sorry, I also have to -- because the way**

13  **you phrased it and I'm tired, I just have to object on**

14  **the Fifth Amendment there.  It seems that you're**

15  **trying to, you know, pin me down.  I've offered to get**

16  **this information to you.  I understand the order of**

17  **the court on the relevance of them.  I'm just trying**

18  **to make sure the vehicle that is done is done**

19  **correctly.  But I'm going to object to anything under**

20  **the Fifth Amendment on terms of, you know, my**

21  **mentality or why that would be, you know, whatever**

22  **you're suggesting.**

23      Q.    Dr. Isaacs, when you were at the Medical

1    Center as a -- as an intern/resident for that period

2    of time, you had an e-mail account; did you not?

3        A.    Sorry, e-mail account where?

4        Q.    At Dartmouth-Hitchcock Medical Center.  Mary

5    Hitchcock Memorial Hospital.

6        A.    Sure.

7        Q.    And your e-mail account was probably J dot

8    Isaacs dot Hitchcock dot org?

9        A.    Something like that, yeah.

10       Q.    Okay.  And did you maintain, while you were

11   at the Medical Center, did you maintain any private

12   e-mail accounts, e-mail accounts other than Jeffrey

13   dot Isaacs at Hitchcock dot org?

14       A.    I think basically the ones Defendant

15   Bertrand, the e-mails, those four.  Those are the four

16   I used.

17       Q.    All right.  And you had those four e-mail

18   accounts, you maintained them while you were at

19   Dartmouth?  While you were at the Medical Center?

20       A.    Well, I didn't maintain them but I used them.

21       Q.    Okay.  Now, did you ever forward any of the

22   e-mails that you received at your Hitchcock dot org

23   address to any of the e-mail accounts that you've

1  referenced Dr. Bertrand used?

2      **A.    Generally, no.  Did I ever?  I seem to think**

3  **there were, like, two or three.**

4      Q.    Okay.

5      **A.    I don't know the exact number.  A few at**

6  **most.**

7      Q.    All right.  And what would have been the

8  reason that you forwarded some of the e-mails you

9  received on your Hitchcock dot org account to your

10  personal e-mail account?

11      **A.    I can't remember.  I mean, I was -- I was**

12  **transitioning from the sleep department to a doctor in**

13  **Philadelphia, so I think one document I sent to him.**

14  **I don't remember that.  If -- but an example of what I**

15  **would have done, or maybe I think one I forwarded to**

16  **my parents that first week when I was talking about**

17  **resigning.  And other than that, there could be some**

18  **random, miscellaneous reasons I don't remember.**

19      Q.    As somebody who is knowledgeable about

20  computers, and I assume you would take the position

21  that you are knowledgeable about computers and the use

22  of them?

23      **A.    Compared to today's younger generation I'd**

1    say no, but I do have good -- Dartmouth did give me a

2    good theoretical understanding of computer science.  I

3    will say that.

4         Q.   Are you aware of a procedure that you could

5    have put in place that would have automatically

6    forwarded your Hitchcock dot org e-mail accounts to

7    any of your private accounts?

8         A.   Doesn't surprise me that Outlook has that

9    function.  I don't know.  Sometimes I would think it's

10   disabled, sometimes not.  I don't know if it was at

11   Hitchcock, I never looked.

12        Q.   So was there ever an occasion over any period

13   of time you put in place a process to automatically

14   forward your Hitchcock dot org e-mails to any of your

15   private e-mail accounts?

16        A.   I don't think so.  But, you know, maybe after

17   I was fired.  I mean, there are some gaps in my memory

18   when I really wasn't sleeping at all, but I don't

19   think so.

20        Q.   Okay.  Are those e-mail accounts that Dr.

21   Bertrand referenced still in existence?

22        A.   The Baker Isaacs one might not be because --

23   it's, like, phased down if it is.

1          Q.    Those e-mail accounts -- do I correctly --

2    strike that.  Could you go to those e-mail accounts

3    and retract from them any current information on them?

4          **A.    So these four e-mail accounts are the Gmail,**

5    **for the Gmail, yes.  I'm very careful never to delete**

6    **anything from Gmail or Skype or any of that.  You**

7    **know, I basically have every record I've written since**

8    **kindergarten on the computer.  So generally the answer**

9    **is yes.  There were some changeovers in the Baker**

10   **Isaacs server.  I think I have all of them.  But, you**

11   **know, there might be a few exceptions.  But generally**

12   **yes, I'd say.**

13              MR. KAPLAN:  Okay.  That's all I have.

14   Thanks.

15         **A.    Okay.  I guess I just want to add some**

16   **clarification points.  I'll be asking myself the**

17   **questions, so I guess I'll phrase it, ask the question**

18   **and then say response and then say my response.**

19              MR. KAPLAN:  If you want to just make a

20   statement, go right ahead.

21         **A.    Well, because of what we've been doing it's**

22   **easier to think of it in terms of question and answer.**

23   **And I'll probably keep it to a minimum and file an**

1    affidavit if I have to for others.

2              So the first question is when Attorney Kaplan

3    asked you if your head injury resulted in any

4    treatment in the emergency room, do you think that was

5    a fair question or misleading question?  And the

6    answer is I think for an Ivy league hospital that's a

7    leader in head injuries to try to construe a head

8    injury as insignificant based on an initial emergency

9    room doctor's opinion is dishonest at minimum.  It's

10   well known now, maybe when this injury happened it was

11   not well known, that head injuries are very difficult

12   to prognose or diagnose.  Especially in the emergency

13   room setting.

14             So question, did you have further treatment

15   on or around the time of that emergency room

16   assessment?  And the response, yes, I went home, I

17   stopped my internship in Florida.  It was abrupt and

18   surprising to everyone my level of dysfunction after

19   that head injury.  I was then assessed by two, three,

20   maybe four doctors in Philadelphia and neuropsych --

21   neuropsychiatrists or neurologists with

22   neuropsychiatry training who I forget the name of

23   diagnosed me with postconcussive disorder.  He was the

1    first that I'm aware of who diagnosed me with that.

2    He treated me with Inderal, Propranolol, a beta

3    blocker which at the time was one of the theories of

4    ways to help head injuries, although there's now some

5    evidence that can actually hurt recovery from a head

6    injury.  I was then treated by a psychiatrist who

7    assessed the situation, agreed with the

8    postconcussive, from what I recall, and thought a

9    trial of Prozac Fluoxetine might show some success.

10   Which she started.  And I also consulted a family

11   friend neurologist who agreed with all the treatment

12   options.

13           Question, did you believe your injury was far

14   more severe at the time than others observed?  And the

15   answer would be yes.  Given the nature of

16   understanding the head injuries at the time, the fact

17   that I looked and appeared in some ways to be myself

18   visually with no focal deficits, no MRI known

19   injuries, people were in disbelief at what I was

20   claiming at the time.  But not so much disbelief as to

21   not diagnose me with postconcussive disorder.  So it

22   was a surprise is what I'm saying, but still something

23   that was caught on by a neurologist at a hospital I

1 | don't even remember.

2 |       Next question, was that your only neurologic

3 | injury that you're aware of?  And the response, no.  I

4 | suffered another head injury during medical school in

5 | London which I went to their accident and emergency

6 | ER.  Again, it was assessed, they checked out my

7 | pupils and sent me home.  I had some symptoms

8 | reminiscent of 12 years earlier, but nothing of that

9 | magnitude.  Although I did notice some changes in

10 | thought process disturbance that I hadn't noticed

11 | before.  So those would be the two known head injuries

12 | that I'm aware of.

13 |       Next question, with regards to the exhibit

14 | from the USC case where the judge ruled on the

15 | settlement agreement, on the second settlement

16 | agreement, was the judge ever asked to rule on the

17 | first settlement agreement and had the judge even seen

18 | the first settlement agreement?  And my answer, I

19 | don't know if the first settlement agreement was ever

20 | entered into the docket.  I don't recall that it was.

21 | But certainly the judge was never asked to rule on

22 | that matter, on what it meant to seal the records.

23 | And certainly that would be the primary document that

1   I relied upon for the disciplinary records sealing and

2   further treatment in disclosure and nondisclosure.

3   And I --

4           The next question.  Did you ever object to

5   executing the first settlement agreement after you

6   agreed to it in principle?  And the answer, no.  I was

7   happy to sign the first settlement agreement.

8           Question, so if that first settlement

9   agreement was not visibly obvious or perhaps never in

10   the USC lawsuit, is it possible that Dartmouth

11   researched you and formed a conclusion that you were

12   some sort of fraud because they didn't have the most

13   important settlement agreement, the first one, which

14   sealed your records?

15           MR. KAPLAN:  This is kind of a weird thing to

16   do, but I object to the form of your question.  Go

17   ahead.  You can answer it.

18       A.    Response --

19           MR. KAPLAN:  But I object to it.

20       A.    -- yes, it seems to me that both Dartmouth

21   and the New Hampshire Board are very caught up on one

22   of 30 pleadings -- one of 300 pleadings regarding the

23   second settlement agreement, and I do believe that

1    they made numerous legal mistakes.  One of them being

2    their ignorance to the first settlement agreement

3    which they now are in a position of covering up with a

4    larger issue.

5         Question, what do you describe to your

6    friends if they ask you what type of medical problems

7    you have?  The answer, concentration problems and

8    severe fatigue problems that I never really had until

9    about the time I started at Dartmouth.

10        Just for the record, there are a few smirks

11   and papers being passed as the plaintiff asks what is

12   the unusual format of pro se self-cross-examination.

13        You said -- question, you said the sleep

14   problems were not there and were not so serious prior

15   to starting at Dartmouth.  Could you explain what

16   other symptoms, if any, started when you were at

17   Dartmouth?  And the response, yes.  I distinctly

18   recall being in my apartment I sublet from a Tuck

19   student in Hanover who was on his break being awakened

20   by unusual palpitations sustained that I'd never felt

21   before.  And this occurred after what I considered to

22   be the insult and trauma of being wrongly removed from

23   M2 and being ordered possibly to conduct improper

rectal exams by Dr. Khagi.  I had never had any kind

of sustained palpitation like that in my life.  And

then they became almost a nightly issue, which is when

my sleep problems commenced.  At Dartmouth -- at

Arizona I was able to work 30-hour shifts for the most

part.  I was tired at the end of them, but I did have

these issues.  I did recall one quick nervous

palpitation at Arizona, but nothing like -- nothing

like what happened at the first week in Dartmouth.  So

in general I'm someone who works 30-hour shifts, you

know, investment banks, at Arizona, maybe was made fun

of for a French workweek but never had to take naps

during the day and deal with palpitations at night.

And these palpitations have now -- some of them have

been reported as ventricular tachycardia or

bradycardia.  And/or bradycardia.  And although it's

difficult to discover information in this case, if I

am able to discover that additional evidence to

irrefutably prove beyond a reasonable doubt that Finn

and/or Friedman and/or Bertrand knew about Arizona

and/or USC and subjected me to anything that may have

triggered a medical condition such as that, I will be

seeking charges on a state or federal basis.

1          Question, have you already sought charges on

2     a federal and state basis, and what has been the

3     outcome?  Yes, -- response, yes, I and my family

4     complained to the FBI, to the New Hampshire Board of

5     Medicine, and to the State of New Hampshire Police

6     generally regarding the allegations of this lawsuit

7     and surrounding my employment at Dartmouth.  I do not

8     know the state of the FBI investigation, if any.  I

9     believe they may have been deferring to this lawsuit's

10    discovery process because that's what they mentioned

11    typically happens.  The State of New Hampshire refused

12    to investigate and referred me to the Grafton County

13    police.  And I believe the Board of Medicine has

14    refused to investigate most of the serious allegations

15    pertaining to fraud by Bertrand and Finn and improper

16    rectal exams ordered by Dr. Simon Khagi.

17         Question, could you explain why you believe

18    Dr. Khagi ordered you improperly to conduct a rectal

19    exam that was not necessary on a patient?  Response, I

20    researched both anecdotally and by research in medical

21    literature the typical number of rectal exams done,

22    and I had conducted maybe three to five in medical

23    school, which would be about typical.  And every time

1    the doctor person instructed me to do that was very

2    serious and very professional about it.  But Dr. Khagi

3    would be the exception to that.  He smirked the day

4    after, a visible obvious smirk, and he said well, this

5    patient actually needs a rectal exam, which to me

6    meant that the patient the day before did not and it

7    was humorous to him.  And it was very different from

8    the other experiences I've had, and I do think that

9    Dr. Khagi knew that I was a surgery resident at the

10   time he ordered me to do those exams.

11            Do you -- question, do you believe you have a

12   disability?  And the response, my understanding of

13   disability is anything that impacts your day-to-day

14   life.  And the answer to that is yes.  Whether or not

15   it had improved after the head injury and then was

16   worsened by Dartmouth or whether it was always

17   undiagnosed from the head injury is the primary reason

18   that I am pursuing this lawsuit to help me and my

19   caregivers or my medical providers and family

20   understand whether or not I was truly underperforming

21   or whether I was a victim of fraud that caused

22   performance issues, cardiac arrhythmias, sleep

23   disorders and ultimately adjustment disorder and

1    informally mental breakdown.

2              Question, did you offer Dartmouth to settle

3    this case for one dollar in exchange for readmitting

4    you and reassessing -- reassessing accommodation

5    possibilities for your newly discovered frontal brain

6    impairment?

7              MS. PEAHL:  We're going to object to that

8    question.

9              MR. KAPLAN:  Object.  I think both parties

10   object to that.

11        A.   And the response is Dartmouth rejected to

12   settle this case for one dollar and to readmit me,

13   although they did offer $20,000 with no reassessment

14   of the medical conditions, which I refused.

15             That's the end of my questioning.

16             MR. CHABOT:  Same objection to that last --

17   that last answer on the basis of that objection is

18   that those are settlement negotiations and they're not

19   admissible.

20                  <u>FURTHER EXAMINATION</u>

21   BY MR. KAPLAN:

22        Q.   Dr. Isaacs, due to your unusual exam leads me

23   to have a follow-up questions.

1      **A.    I don't know if that's permitted.  Do the**

2  **rules permit that?  I mean, I never --**

3      Q.    I'm sorry, it's not my job to give you legal

4  advice.  I'm asking you questions.

5      **A.    I guess I'm going to object to it.  I'll let**

6  **you go ahead with the questions.**

7      Q.    So you have referred I don't know how many

8  times to one of two settlement agreements with the

9  University of Southern California in connection with

10  your litigation.  We have looked at -- one of those

11  agreements is referenced in the court order that we've

12  marked and we've talked about.  What is the other

13  settlement agreement that you are referring to?

14      **A.    So I actually have to go back, since we're**

15  **allowing questions, I have to go back and ask a**

16  **question which might answer your question.  If you let**

17  **me do that, then I'll answer if you have any more**

18  **questions.  I left a question I thought of after out.**

19  **So --**

20          **MR. KAPLAN:  Fine.  Ask your --**

21      **A.    So we're going to defer to Attorney Kaplan's**

22  **question.  I will ask a self-exam question.  I think**

23  **that will answer Attorney Kaplan.**

1          MR. KAPLAN:   Thank you.

2       A.   So the question is did you take a leave of

3  absence from the American University of the Caribbean

4  after approximately six to eight months as a student

5  there?  And the answer is yes, I did.  I took a leave

6  partially because I felt uncomfortable being in the

7  pending litigation and not fully understanding or

8  being fully comfortable with the -- my legal standing

9  there having not disclosed the current legal situation

10  to AUC, the American University of the Caribbean.  I

11  took that leave and negotiated a settlement agreement

12  with USC that I was happy about.  This was a partial

13  settlement agreement to dismiss the individual

14  defendants from that lawsuit in exchange for sealing

15  my disciplinary records.  And only -- only upon

16  signing that agreement which dis -- sorry, which

17  sealed my disciplinary records did I decide to proceed

18  with enrollment again at the University of the

19  Caribbean, American University of the Caribbean.

20          So next question, if you had not obtained

21  that settlement agreement, the first settlement

22  agreement, the individual defendant settlement

23  agreement, would you have proceeded with your medical

```
 1   diploma?  And the answer is absolutely not.

 2              And now I'll let Attorney Kaplan if he has

 3   questions go on.

 4                      FURTHER EXAMINATION

 5   BY MR. KAPLAN:

 6       Q.   This first settlement agreement, was it in

 7   writing?

 8       A.   Yes.  I think I provided it to you.

 9       Q.   No, you didn't.

10       A.   No, you have been provided with it.  USC

11   provided it to us when you subpoenaed USC.  It's like

12   the first page of my student record.

13       Q.   And the agreement, if I understand you

14   correctly, was an agreement to seal your records,

15   those would be your academic records at USC?

16       A.   Yes.

17       Q.   And in return for the sealing of your

18   agreement, --

19       A.   Yes.

20       Q.   -- you released whoever the individual

21   defendants were?

22       A.   Yes.  So the only consideration for myself --

23   no, I'm answering the question.  The only
```

1    consideration for myself in that was sealing my

2    disciplinary records.  The only consideration I think

3    for them was dropping the charges against their Deans

4    and the NIH employee, Dr. Bachman.

5        Q.  And did anybody -- no, that's all.  So that's

6    all.  If the agreement is in the USC record, I have

7    it, I haven't seen it.  If it's not, I'll make a

8    request of you to get it.  I assume you have it?

9        A.  Interestingly, -- I assume that's a question.

10   I'll answer it.

11       Q.  Do you have it?

12       A.  So I think I lost it.  I had their -- my

13   signed copy but not the fully executed one that they

14   executed.  I had signed it, I think, and e-mailed it

15   back to them so it was lost, but now that you've

16   subpoenaed it, it is in my possession again.

17           MR. KAPLAN:  Okay, good.

18           MS. PEAHL:  Dr. Isaacs has referred to some

19   notes during the course of his deposition.  I'd like

20   to have those marked, if we could.

21       A.  Sure, let me just describe what these notes

22   are.  When I checked into the hotel in Concord last

23   night, I printed out a -- it's actually a California

1    list of deposition objections.  The first page of

2    Google results.  So I printed that out just to help me

3    remember privileges, if they may be relevant here

4    since I'm not -- never done -- never been deposed

5    before in my life.  So that's one.

6         And then another one was again on the first

7    page of Google results and it's on the Rules of

8    Evidence cheat sheet.  And I thought I may have to

9    make some objection on rules.  It's just a quick

10   summary of the Federal Rules of Evidence and, you

11   know, they call it cheat sheet like an exam review

12   sheet.  I haven't actually referred to it.  I mean, we

13   can enter it.  But I have not looked at the Federal

14   Rules of Evidence as I've never made any objections on

15   the Federal Rules in this proceeding.  And I think I

16   briefly looked at this.

17        And then I made handwritten notes of

18   questions to myself for self-deposition questions that

19   I've asked.  Those are the markings on the sheet.

20        And my computation of time periods, 10:00,

21   2:30, 3:30, which has now expired.  The time is

22   finished for this deposition.

23             MR. CHABOT:  Exhibit 34; is that right?

1              (Isaacs Exhibit 34 was

2          marked for identification.)

3          (Deposition concluded at 4:35 p.m.)

1                    CERTIFICATE OF WITNESS

2

3           I, Jeffrey D. Isaacs, M.D., have read the

4    foregoing transcript of deposition taken on Thursday,

5    December 19, 2013, at the US District Court, Concord,

6    New Hampshire, and do hereby swear/affirm it is an

7    accurate and complete record of my testimony given

8    under oath in the matter of Isaacs V. Dartmouth,

9    including any and all corrections that may appear on

10   those pages so denoted as "Corrections."

11

12           _____

13           Jeffrey D. Isaacs, M.D.

14   STATE OF _____

15   COUNTY OF _____

16

17           Subscribed and sworn to before me this _____

18   day of _____ , 20 _____ .

19

20           _____

21           Notary Public _____ J.P. _____

22           My Commission Expires: _____

23

1                C E R T I F I C A T E

2

3           I, Andrew E. Vangjel, a Licensed Court

4    Reporter and Notary Public of the State of New

5    Hampshire, do hereby certify that the foregoing is a

6    true and accurate transcript of my stenographic notes

7    of the deposition of Jeffrey D. Isaacs, M.D., who was

8    first duly sworn, taken at the place and on the date

9    hereinbefore set forth.

10           I further certify that I am neither

11   attorney nor counsel for, nor related to or employed

12   by any of the parties to the action in which this

13   deposition was taken, and further that I am not a

14   relative or employee of any attorney or counsel

15   employed in this case, nor am I financially interested

16   in this action.

17           THE FOREGOING CERTIFICATION OF THIS

18   TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE

19   SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL

20   AND/OR DIRECTION OF THE CERTIFYING REPORTER.

21           _____

22           ANDREW E. VANGJEL, NH LCR 23

23

**$**

**$10,000** [1] - 282:18
**$20,000** [1] - 345:13
**$3,000** [2] - 16:16, 16:21
**$5,000** [4] - 15:20, 15:21, 17:8, 17:18
**$600** [2] - 15:11, 15:19

**'**

**'11** [2] - 172:13, 319:2
**'12** [1] - 172:13
**'95** [2] - 18:12, 18:21
**'96** [1] - 20:7
**'97** [5] - 23:4, 23:13, 185:6, 317:5
**'98** [1] - 23:4
**'99** [1] - 35:5, 35:9, 38:5
**'bilateral** [1] - 56:2
**'empty** [1] - 56:4

**0**

**00040-JL** [1] - 1:9
**03101** [1] - 5:11
**03302-1256** [1] - 5:6

**1**

**1** [15] - 2:18, 12:20, 77:21, 136:3, 136:10, 136:11, 136:15, 137:2, 156:5, 195:18, 199:20, 279:20, 322:16, 322:17, 329:20
**1.6** [4] - 278:2, 278:5, 310:21, 314:2
**1/15/12** [1] - 4:11
**1/25/02** [1] - 4:15
**10** [8] - 3:9, 117:13, 118:5, 118:18, 135:22, 136:8, 263:6, 322:17
**10,000** [2] - 66:5, 67:18
**10/6/10** [1] - 3:4
**10:00** [1] - 350:20
**10th** [3] - 78:18, 117:10, 174:12
**11** [6] - 3:10, 87:8, 140:15, 140:18, 177:5, 330:4

**11/4/13** [1] - 2:18
**11th** [1] - 108:1
**12** [17] - 2:18, 3:11, 3:13, 12:2, 31:19, 55:13, 92:17, 155:8, 168:8, 168:18, 175:4, 178:10, 178:11, 178:12, 293:5, 307:18, 339:8
**12/16/10** [1] - 4:3
**1256** [1] - 5:6
**129** [1] - 3:7
**12th** [1] - 133:4
**13** [7] - 3:13, 136:17, 137:1, 163:21, 164:1, 168:8, 227:12
**130** [1] - 247:9
**133** [1] - 3:8
**135** [1] - 3:9
**13th** [5] - 19:12, 136:20, 174:17, 181:21, 304:8
**14** [4] - 3:14, 175:8, 330:5, 330:16
**140** [1] - 3:10
**145** [3] - 279:21, 311:10, 311:13
**145935** [1] - 280:1
**14th** [1] - 212:6
**15** [10] - 3:16, 21:13, 88:20, 183:9, 183:12, 192:10, 192:13, 214:20, 269:9, 325:14
**155** [1] - 3:12
**15th** [1] - 204:21
**16** [6] - 3:17, 185:15, 185:17, 247:23, 260:6, 260:8
**163** [1] - 3:13
**17** [4] - 3:18, 87:7, 190:15, 330:4
**175** [1] - 3:15
**177** [1] - 10:11
**18** [9] - 3:19, 194:2, 194:5, 222:20, 222:22, 227:12, 258:15, 262:14, 330:4
**180** [1] - 179:11
**183** [1] - 3:16
**185** [1] - 3:17
**19** [9] - 1:17, 3:21, 203:20, 204:16, 218:3, 218:7, 218:18, 230:14, 352:5
**190** [1] - 3:18
**19073** [1] - 10:12
**194** [1] - 3:20

**1999** [1] - 23:19
**1:05** [1] - 214:16
**1:12-cv** [1] - 1:8
**1st** [3] - 137:18, 146:1, 179:8

**2**

**2** [9] - 2:19, 48:14, 78:3, 129:22, 154:1, 156:6, 156:9, 241:18, 259:13
**20** [19] - 3:22, 94:17, 97:8, 135:2, 136:7, 167:8, 167:14, 186:5, 191:7, 191:9, 193:17, 210:17, 210:19, 211:22, 214:20, 217:16, 310:21, 316:22, 352:18
**200** [3] - 145:17, 179:11, 179:12
**2000** [3] - 38:5, 38:19, 172:12
**2001** [1] - 317:2
**2002** [1] - 38:19, 328:19
**2003** [1] - 42:17, 42:18, 42:21
**2004** [2] - 44:9, 44:22
**2005** [1] - 45:6
**2005-6** [2] - 188:21, 189:2
**2006** [4] - 12:2, 12:4, 189:16, 329:6
**2008** [8] - 58:17, 61:1, 70:9, 75:2, 75:3, 76:6, 76:7, 76:8
**2009** [2] - 76:8, 77:21
**2010** [20] - 72:20, 76:3, 76:10, 78:18, 93:10, 95:7, 103:23, 118:5, 126:12, 126:18, 129:11, 131:1, 133:4, 136:3, 197:23, 201:2, 247:23, 318:13, 318:17, 319:1
**2011** [24] - 11:10, 151:7, 151:9, 165:10, 168:18, 172:13, 175:23, 176:16, 177:1, 177:21, 178:23, 182:20, 184:16, 191:7, 193:17, 194:19, 199:2, 199:20, 202:2,

**290:20, 302:10,**
304:13, 306:7, 319:9
**2012** [10] - 153:19, 178:13, 217:16, 218:7, 230:14, 232:10, 260:7, 264:12, 269:10, 319:9
**2013** [5] - 1:17, 15:14, 318:18, 352:5
**202** [1] - 20:14
**2029** [1] - 316:6
**203** [1] - 3:21
**2046** [2] - 279:20
**21** [13] - 4:1, 106:13, 107:3, 114:8, 129:10, 130:23, 149:10, 214:12, 215:11, 330:4, 330:7, 331:7
**210** [1] - 3:23
**214** [1] - 4:1
**22** [4] - 4:2, 223:15, 223:21, 235:17
**23** [11] - 4:3, 5:14, 111:1, 178:23, 198:19, 199:2, 211:2, 224:14, 246:22, 247:2, 353:22
**235** [1] - 4:2
**23rd** [5] - 178:13, 182:16, 182:19, 182:20, 211:20
**24** [10] - 4:4, 175:23, 176:16, 177:1, 177:21, 226:7, 238:4, 250:7, 250:10
**246** [1] - 4:3
**24th** [2] - 179:5, 179:13
**25** [8] - 4:6, 211:3, 211:8, 226:22, 255:1, 261:18, 261:23, 311:14
**250** [2] - 4:5, 39:20
**255** [1] - 4:7
**25th** [2] - 182:22, 183:4
**26** [4] - 4:8, 262:8, 262:12, 262:18
**262** [1] - 4:8
**264** [1] - 4:10
**268** [1] - 4:11
**27** [6] - 4:9, 223:11, 255:4, 255:10, 257:15, 264:5
**276** [1] - 4:12
**27th** [2] - 255:23, 257:16, 257:18

**28** [3] - 4:11, 184:16, 268:14
**281** [1] - 2:8
**29** [4] - 4:12, 194:19, 276:9, 310:4
**2:30** [1] - 350:21

**3**

**3** [17] - 2:20, 13:9, 49:11, 51:3, 55:9, 55:12, 66:19, 103:17, 103:18, 103:22, 139:17, 154:1, 158:16, 161:10, 223:18, 224:9, 226:11
**3/28/11** [1] - 3:19
**30** [12] - 4:13, 6:3, 114:8, 237:2, 237:7, 238:8, 305:22, 306:2, 310:19, 311:13, 316:22, 340:22
**30-hour** [2] - 342:5, 342:10
**300** [2] - 57:3, 340:22
**305** [1] - 4:13
**30th** [1] - 238:2
**31** [4] - 4:14, 232:10, 321:17, 321:20
**31st** [1] - 230:12
**32** [6] - 4:15, 227:10, 227:11, 328:15, 328:18
**32-33** [1] - 326:11
**321** [1] - 4:14
**326** [2] - 4:15, 4:17
**329** [1] - 2:9
**33** [2] - 4:16, 227:17
**336** [1] - 2:10
**34** [3] - 4:18, 350:23, 351:1
**345** [1] - 2:11
**346** [1] - 2:12
**348** [1] - 2:13
**35** [1] - 230:10
**351** [1] - 4:19
**3553** [1] - 10:11
**36** [4] - 111:19, 238:4, 239:5, 240:11
**3:10** [1] - 281:14
**3:30** [1] - 350:21

**4**

**4** [12] - 2:22, 13:9, 50:1, 64:8, 64:9,

64:16, 65:13,
160:10, 184:9,
194:17, 311:11,
314:20
**4,000** [1] - 17:14
**4/15/11** [1] - 3:21
**4/25/11** [1] - 212:18
**4/7/06** [1] - 4:16
**40** [4] - 214:18,
214:19, 277:15,
279:4
**40,000** [1] - 277:14
**41** [2] - 277:15, 279:4
**43** [1] - 279:4
**474,000** [1] - 314:7
**48** [1] - 2:19
**49** [1] - 2:21
**4:35** [1] - 351:3
**4th** [3] - 11:10, 19:11,
240:15

# 5

**5** [15] - 3:1, 51:5, 51:9,
57:17, 57:20, 58:3,
64:17, 65:12, 65:13,
65:14, 66:18,
106:17, 194:17,
217:11, 217:14
**5,000** [3] - 96:7, 96:11,
96:18
**5/20/11** [1] - 3:17
**50** [2] - 2:23, 318:2
**500,000** [1] - 310:22
**51** [2] - 3:2, 236:19
**53** [2] - 239:12, 239:13
**54** [1] - 240:18
**55** [1] - 1:16
**58** [2] - 237:5, 239:12
**5:06** [1] - 186:5
**5:30** [1] - 206:2

# 6

**6** [12] - 2:7, 3:3, 66:17,
66:18, 77:8, 93:10,
114:9, 201:2, 242:3,
315:9, 315:14,
316:17
**6-CV-338** [1] - 49:4
**600** [2] - 17:11, 17:15
**600,000** [2] - 314:3,
314:9
**685** [1] - 279:20
**6:14** [1] - 206:2
**6th** [5] - 19:11, 103:23,
104:14, 104:15,
105:15

# 7

**7** [11] - 3:4, 93:7, 93:9,
95:7, 103:13, 201:1,
224:15, 264:12,
314:21, 322:7
**7/21/10** [1] - 3:6
**70** [1] - 284:7
**700,000** [2] - 278:1,
314:13
**77** [1] - 3:3
**7th** [1] - 217:8

# 8

**8** [8] - 3:6, 70:9, 123:1,
129:2, 129:5,
315:10, 315:15,
322:16
**8/12/10** [1] - 3:8
**80** [2] - 284:6, 284:7
**800** [1] - 314:2
**8th** [1] - 75:1

# 9

**9** [7] - 3:8, 5:5, 133:1,
133:3, 263:5,
314:22, 329:23
**9-1-1** [6] - 29:19,
30:23, 31:2, 31:4,
31:6, 264:16
**9/1/09** [1] - 3:3
**9/1/10** [1] - 3:9
**9/11** [1] - 40:23
**9/21/11** [1] - 4:13
**9/26/11** [1] - 4:13
**90** [1] - 113:11
**93** [1] - 3:5
**95** [1] - 5:10
**99** [2] - 62:14, 147:8
**9:14** [1] - 1:18
**9:15** [1] - 214:16

# A

**A-d-M-o-b** [1] - 14:21
**a.m** [2] - 1:18, 174:12
**AAMC** [4] - 86:15,
149:8, 228:3
**AB** [1] - 35:8
**abandoned** [2] -
273:20, 302:17
**ability** [6] - 11:21,
12:6, 12:11, 115:6,
115:14, 115:20
**able** [9] - 110:9,

110:20, 242:1,
312:10, 322:20,
323:15, 326:1,
342:5, 342:18
**above-named** [1] -
158:20
**abrupt** [1] - 337:17
**absence** [10] - 297:2,
297:3, 297:7,
298:17, 303:10,
303:13, 303:17,
307:16, 308:7, 347:3
**absent** [1] - 217:8
**absolute** [1] - 272:3
**absolutely** [2] -
114:17, 348:1
**absurd** [1] - 128:23
**abundance** [1] - 328:8
**academic** [13] - 44:13,
44:22, 65:1, 65:17,
65:22, 66:23, 80:6,
80:22, 83:19,
218:23, 220:1,
314:17, 348:15
**Academy** [6] - 18:6,
18:10, 18:13, 18:14,
18:18, 72:7
**accept** [2] - 229:6,
229:12
**accepted** [4] - 41:1,
41:3, 213:20, 288:23
**access** [1] - 102:14
**accident** [10] - 107:5,
109:6, 109:8,
109:14, 109:16,
110:1, 193:4, 195:9,
301:21, 339:5
**accommodated** [1] -
309:6
**accommodation** [10] -
184:10, 184:19,
191:11, 192:2,
193:12, 292:11,
292:18, 301:14,
308:19, 345:4
**accommodations** [7] -
190:12, 191:6,
193:19, 292:3,
297:15, 304:5, 327:6
**according** [5] - 75:2,
82:15, 82:17, 305:6,
311:14
**account** [8] - 16:22,
262:23, 333:2,
333:3, 333:7, 334:9,
334:10
**accounting** [1] - 321:4
**accounts** [11] -
333:12, 333:18,
333:23, 335:6,

335:7, 335:15,
335:20, 336:1,
336:2, 336:4
**accreditation** [2] -
202:3, 202:8
**accredited** [1] -
229:22
**accurate** [6] - 21:20,
85:12, 85:16, 322:2,
352:7, 353:6
**accurately** [1] - 52:11
**accused** [1] - 128:6
**ACGME** [36] - 93:19,
95:8, 95:13, 96:2,
98:18, 99:8, 152:8,
197:7, 197:19,
197:20, 198:10,
198:23, 199:1,
199:7, 199:8,
199:11, 200:1,
200:4, 200:12,
200:16, 200:17,
200:21, 201:3,
201:4, 201:13,
201:20, 202:15,
202:19, 203:3,
204:3, 204:11,
207:11, 209:10,
209:21, 225:21,
226:4
**ACGME's** [1] - 202:11
**ACH** [1] - 16:20
**achieve** [2] - 52:14,
52:15
**achieving** [8] - 278:6,
278:16, 280:11,
280:13, 312:3,
316:17, 316:21
**acquittal** [1] - 61:20
**acquitted** [6] - 62:3,
62:4, 69:3, 69:14,
162:17, 162:21
**acronym** [1] - 282:3
**act** [1] - 82:12
**acted** [1] - 94:16
**action** [9] - 55:7, 55:8,
63:20, 98:16, 199:2,
233:3, 270:9,
353:12, 353:16
**actions** [5] - 67:2,
74:9, 99:12, 233:4,
235:8
**active** [3] - 318:3,
318:17, 318:19
**actively** [1] - 318:9
**activities** [3] - 129:20,
161:1, 161:15
**activity** [1] - 319:4
**actor** [1] - 189:23
**acts** [1] - 230:9

**actual** [3] - 47:13,
292:13, 312:1
**ADA** [1] - 132:7
**add** [3] - 203:23,
323:17, 336:15
**added** [4] - 19:22,
292:12, 314:1,
314:20
**addition** [5] - 17:1,
17:7, 64:3, 82:8,
234:10
**additional** [1] - 342:18
**address** [12] - 8:21,
9:7, 10:5, 10:10,
10:15, 10:17, 11:7,
58:20, 69:14,
217:23, 228:1,
333:23
**addressed** [2] - 62:1,
153:12
**addresses** [4] - 10:2,
10:3, 223:10, 228:2
**addressing** [1] -
217:18
**adequately** [1] -
114:20
**adjustment** [2] -
181:21, 344:23
**administrative** [3] -
134:20, 211:23,
222:1
**administrator** [1] -
212:9
**admissible** [1] -
345:19
**admission** [1] - 258:1
**admissions** [2] - 67:1,
257:13
**admit** [5] - 57:11,
305:1, 305:3,
316:23, 317:1
**admitted** [3] - 33:1,
187:17, 305:19
**AdMob** [3] - 14:19,
14:21, 15:12
**adult** [1] - 218:17
**advantage** [2] -
218:20, 267:18
**adverse** [1] - 68:23
**advice** [7] - 75:9,
75:10, 76:13, 76:16,
144:20, 144:23,
346:4
**advise** [1] - 128:9
**advised** [3] - 77:3,
118:2, 128:13
**advisor** [1] - 21:5
**affected** [1] - 233:5
**affects** [1] - 11:21
**affidavit** [4] - 75:2,

75:5, 293:1, 337:1
**affidavits** [1] - 74:22
**affiliation** [1] - 38:8, 41:6, 42:12
**affirmatively** [1] - 47:16
**afford** [1] - 225:5
**afraid** [1] - 228:23
**afternoon** [2] - 204:19, 302:1
**afternoons** [1] - 302:3
**aggressive** [1] - 98:23
**ago** [10] - 21:14, 57:15, 89:8, 92:17, 207:7, 217:5, 224:19, 261:18, 315:3, 326:22
**agree** [31] - 13:4, 53:4, 56:14, 74:1, 84:4, 84:8, 115:11, 120:2, 120:4, 132:11, 142:10, 143:7, 143:15, 177:20, 182:14, 193:14, 215:1, 215:20, 218:9, 218:12, 221:20, 236:16, 252:3, 254:7, 288:22, 305:5, 305:14, 306:9, 306:12, 306:15, 306:18
**agreed** [8] - 5:17, 6:2, 127:9, 149:7, 323:23, 338:7, 338:11, 340:6
**agreeing** [1] - 84:20
**Agreement** [1] - 3:22
**agreement** [51] - 13:9, 52:7, 53:15, 58:11, 60:13, 60:22, 61:3, 63:2, 67:16, 69:3, 69:23, 70:16, 70:21, 71:22, 72:2, 72:3, 155:15, 161:12, 162:22, 163:4, 210:20, 212:2, 213:2, 248:22, 248:23, 249:1, 267:20, 339:15, 339:16, 339:17, 339:18, 339:19, 340:5, 340:7, 340:9, 340:13, 340:23, 341:2, 346:13, 347:11, 347:13, 347:16, 347:21, 347:22, 347:23, 348:6, 348:13, 348:14, 348:18,

349:6
**agreement'** [1] - 56:2
**agreements** [6] - 52:5, 53:8, 55:1, 61:4, 346:8, 346:11
**agrees** [1] - 310:19
**ahead** [8] - 116:8, 130:14, 147:4, 184:21, 229:20, 336:20, 340:17, 346:6
**air** [1] - 233:11
**al** [1] - 1:10
**Alamo** [1] - 170:11
**alcohol** [1] - 89:13
**alcoholic** [1] - 87:17
**alert** [1] - 159:19
**alerted** [1] - 131:1
**alias** [1] - 8:18
**Alison** [3] - 5:12, 6:23
**allegation** [6] - 100:6, 100:8, 111:20, 112:13, 147:10, 263:23
**allegations** [13] - 63:10, 100:11, 100:14, 102:10, 112:14, 131:8, 145:18, 221:2, 230:22, 262:6, 281:21, 343:6, 343:14
**alleged** [6] - 22:21, 102:7, 133:14, 181:20, 220:16, 278:13
**alleging** [2] - 95:8, 243:17
**Alliance** [1] - 38:2
**allow** [2] - 165:11, 274:17
**allowed** [13] - 80:14, 92:22, 92:23, 97:16, 99:20, 100:5, 115:15, 130:17, 132:17, 245:3, 245:21, 301:17, 309:4
**allowing** [1] - 346:15
**alluded** [1] - 293:11
**alluding** [1] - 171:18
**almost** [18] - 29:7, 29:9, 40:6, 44:13, 149:22, 166:7, 217:7, 241:10, 251:11, 253:15, 275:11, 281:15, 291:7, 293:6, 293:21, 315:5, 342:3
**alone** [7] - 26:1, 26:4,

27:5, 27:7, 28:2, 61:23, 226:1
**altercations** [1] - 88:2
**alternative** [1] - 116:11
**alternatives** [1] - 276:2
**Amendment** [2] - 332:14, 332:20
**America** [1] - 36:13
**American** [7] - 36:12, 72:7, 142:22, 249:11, 347:3, 347:10, 347:19
**amount** [1] - 15:9
**amounts** [2] - 17:23, 277:14
**Amy** [2] - 94:1, 133:17
**analysis** [2] - 84:3, 84:6
**analyst** [2] - 39:18, 40:4
**anatomy** [1] - 116:18
**AND/OR** [1] - 353:20
**Andrew** [2] - 5:14, 353:3
**ANDREW** [1] - 353:22
**Andy** [16] - 12:18, 44:20, 54:4, 88:5, 93:6, 106:17, 127:3, 132:23, 155:7, 184:21, 210:16, 214:10, 243:20, 246:20, 254:23, 262:7
**andy@ braganreporting. com** [1] - 5:15
**anecdotally** [2] - 314:9, 343:20
**Angeles** [1] - 47:15
**anger** [2] - 25:9, 34:14
**angry** [3] - 228:8, 228:9, 300:8
**annulled** [16] - 53:7, 53:15, 58:23, 61:4, 61:13, 69:11, 69:12, 70:16, 81:17, 82:1, 82:3, 82:6, 83:3, 83:10, 162:14
**annulment** [2] - 67:16, 82:10
**answer** [168] - 8:23, 11:22, 12:3, 12:6, 12:16, 12:17, 21:21, 22:3, 24:4, 29:2, 30:4, 31:4, 31:17, 48:11, 54:6, 54:10, 60:15, 61:15, 62:21, 64:5, 66:11, 66:12,

66:23, 67:22, 68:10, 68:21, 71:6, 72:9, 73:13, 73:15, 73:20, 73:22, 74:4, 75:16, 76:1, 77:2, 79:15, 80:10, 80:15, 80:16, 81:1, 81:13, 82:7, 83:17, 84:23, 86:19, 88:13, 90:5, 92:5, 92:22, 93:2, 100:23, 101:8, 101:14, 105:9, 107:8, 108:12, 108:18, 109:19, 112:21, 112:23, 115:15, 115:17, 116:7, 117:7, 120:11, 120:12, 122:5, 125:16, 126:23, 130:9, 135:3, 137:10, 138:23, 139:12, 139:22, 139:23, 140:1, 140:2, 141:7, 145:12, 146:13, 149:3, 150:6, 150:8, 150:23, 151:12, 154:17, 156:4, 156:16, 158:11, 159:15, 161:10, 163:2, 163:11, 163:18, 163:19, 164:20, 170:22, 171:20, 172:1, 172:8, 173:9, 174:10, 179:4, 181:19, 183:15, 183:16, 184:23, 186:2, 187:2, 187:22, 188:15, 188:16, 189:19, 192:16, 219:2, 221:6, 222:4, 225:13, 229:7, 229:19, 232:15, 234:20, 239:10, 243:22, 252:16, 262:2, 263:7, 263:9, 263:10, 268:7, 268:12, 269:18, 271:14, 274:1, 274:22, 283:14, 296:8, 311:4, 315:6, 315:8, 318:10, 322:12, 322:14, 322:16, 323:2, 327:17, 329:12, 331:4, 336:8, 336:22, 337:6, 338:15, 339:18, 340:6, 340:17,

341:7, 344:14, 345:17, 346:16, 346:17, 346:23, 347:5, 348:1, 349:10
**answered** [27] - 14:11, 73:19, 76:4, 76:22, 78:7, 126:21, 126:23, 144:6, 154:7, 160:12, 162:19, 164:7, 184:7, 185:10, 190:10, 192:6, 192:9, 192:14, 192:15, 194:23, 195:11, 219:17, 219:18, 235:22, 252:15, 267:11, 292:6
**answering** [11] - 17:5, 64:6, 67:7, 100:2, 112:11, 120:16, 233:7, 245:8, 252:18, 271:22, 348:23
**answers** [7] - 147:18, 193:6, 246:18, 266:23, 321:21, 322:2, 324:13
**Anthony** [1] - 11:19
**anticipates** [1] - 227:1
**anticipating** [1] - 45:20
**ANY** [2] - 353:18, 353:19
**anyplace** [2] - 11:5, 261:1
**anyway** [5] - 76:19, 205:18, 207:8, 207:19, 281:15
**apart** [1] - 245:5
**apartment** [7] - 9:10, 35:21, 36:11, 36:18, 36:19, 265:20, 341:18
**apnea** [1] - 272:17
**apologize** [2] - 76:17, 223:23
**app** [1] - 178:9
**appeal** [2] - 328:23, 329:11
**appear** [3] - 97:14, 237:21, 352:9
**appearance** [1] - 59:13
**APPEARANCES** [1] - 5:1
**appeared** [6] - 39:12, 135:8, 135:17, 179:10, 246:15, 338:17

**appearing** [1] - 109:21
**appended** [1] - 4:21
**appendixes** [1] -
166:20
**applicable** [2] -
184:13, 193:13
**applicant** [1] - 158:20
**applicants** [1] -
138:10
**application** [119] - 3:3,
3:9, 3:11, 72:14,
72:16, 72:19, 73:3,
73:23, 74:9, 76:3,
76:10, 76:21, 77:17,
77:20, 79:17, 79:20,
80:8, 85:12, 87:3,
119:18, 120:2,
120:5, 120:8,
120:21, 121:2,
121:17, 124:18,
124:20, 125:2,
125:8, 125:9,
125:20, 126:4,
126:7, 126:11,
126:14, 126:17,
126:18, 127:6,
134:6, 136:2, 137:3,
137:5, 137:7,
137:17, 138:6,
138:11, 138:13,
138:21, 139:4,
141:3, 144:8,
144:14, 144:17,
145:3, 145:5,
145:22, 146:1,
147:19, 148:10,
150:10, 152:18,
153:23, 154:22,
159:23, 160:4,
163:7, 168:14,
170:21, 176:9,
176:10, 177:5,
178:7, 178:11,
178:17, 180:16,
182:2, 182:16,
195:21, 195:22,
195:23, 196:7,
196:10, 196:21,
196:22, 196:23,
197:17, 202:13,
206:6, 209:1, 211:2,
220:5, 220:14,
221:3, 229:18,
261:4, 282:16,
282:17, 283:5,
283:7, 283:11,
288:4, 288:6,
288:11, 288:15,
288:21, 289:5,
289:9, 289:23,

290:22, 291:4,
325:8, 325:13,
325:15, 325:21,
326:14, 326:15
**applications** [11] -
53:20, 66:23, 67:1,
70:6, 72:18, 79:4,
80:21, 86:16,
144:10, 145:23,
325:12
**applied** [9] - 19:7,
41:1, 46:22, 47:1,
125:19, 126:2,
127:10, 179:7,
180:14
**applies** [1] - 101:14
**APPLY** [1] - 353:18
**apply** [13] - 76:16,
145:10, 179:14,
180:5, 229:3, 229:8,
229:21, 288:10,
289:6, 315:16,
326:3, 326:4
**applying** [1] - 285:15
**Appointment** [3] -
3:14, 3:23, 175:12
**appointment** [4] -
210:21, 212:10,
230:23, 307:15
**appreciate** [2] -
306:20, 307:3
**approach** [1] - 208:18
**appropriate** [12] -
41:19, 60:10, 71:9,
71:12, 71:15,
226:17, 237:22,
296:13, 315:11,
330:13, 330:22,
331:1
**April** [21] - 153:16,
153:18, 177:5,
178:13, 178:23,
182:16, 182:19,
182:20, 198:19,
199:1, 199:20,
204:21, 211:2,
211:3, 211:8,
211:20, 223:18,
224:9, 226:11,
229:22, 329:6
**area** [7] - 30:14, 30:16,
30:17, 31:15, 47:10,
47:11, 182:13
**areas** [1] - 167:17
**argument** [1] - 296:14
**arguments** [3] - 61:9,
67:4, 67:5
**Arizona** [180] - 3:10,
77:6, 77:10, 93:5,
93:11, 94:11, 95:17,

95:23, 96:5, 96:14,
97:2, 97:20, 98:8,
98:14, 98:22, 99:3,
99:11, 100:20,
101:12, 101:23,
102:4, 102:17,
108:6, 113:1, 113:7,
113:21, 115:6,
116:15, 116:23,
117:15, 118:18,
120:1, 120:4, 120:7,
120:21, 121:7,
121:18, 122:3,
122:13, 125:3,
125:6, 125:18,
126:13, 126:15,
126:20, 127:7,
127:9, 127:16,
130:11, 130:14,
131:4, 131:22,
132:2, 136:12,
136:13, 136:16,
140:19, 141:9,
141:10, 141:12,
141:23, 142:1,
142:3, 145:7,
145:18, 146:10,
146:17, 146:18,
147:6, 148:14,
148:21, 149:8,
151:17, 152:6,
155:4, 157:18,
159:7, 159:10,
159:15, 159:20,
160:16, 160:19,
161:15, 162:5,
164:13, 165:18,
166:18, 167:20,
168:2, 168:4, 168:5,
168:15, 169:1,
169:19, 170:3,
170:7, 170:13,
171:3, 171:11,
171:19, 171:22,
172:5, 173:4, 173:8,
174:1, 174:6, 174:9,
174:14, 174:19,
176:7, 177:3, 178:2,
178:16, 179:1,
179:6, 179:9,
179:12, 179:20,
179:22, 180:14,
180:16, 181:4,
181:9, 181:18,
182:15, 195:7,
197:4, 197:21,
198:8, 198:11,
199:3, 199:14,
199:21, 200:2,
200:5, 200:11,
200:19, 201:3,

202:13, 202:22,
203:2, 203:4,
205:19, 206:8,
209:2, 209:8,
209:12, 209:19,
211:7, 211:13,
211:17, 213:5,
221:8, 235:5,
241:22, 242:7,
242:16, 242:18,
244:12, 244:15,
245:5, 246:9,
249:14, 253:8,
253:11, 253:16,
253:21, 254:3,
254:9, 254:10,
256:11, 256:16,
257:1, 267:19,
300:8, 342:5, 342:8,
342:11, 342:20
**Arizona's** [1] - 131:1
**arose** [2] - 185:22,
186:3
**arrange** [1] - 8:3
**arranged** [2] - 24:13,
305:8
**arrhythmias** [1] -
344:22
**arts** [2] - 20:1, 20:2
**aside** [2] - 284:17,
290:15
**asleep** [4] - 110:12,
110:18, 301:20,
302:21
**aspect** [1] - 99:9
**aspects** [1] - 59:10
**Asperger's** [2] - 67:12,
287:13
**assault** [2] - 26:9,
27:23
**assaulted** [1] - 33:16
**assaults** [1] - 29:12
**assert** [1] - 91:21
**asserted** [2] - 91:14,
92:8
**assess** [2] - 33:9,
259:19
**assessed** [4] - 97:7,
337:19, 338:7, 339:6
**assessment** [6] -
33:12, 260:1,
282:22, 311:20,
313:10, 337:16
**asshole** [1] - 255:11
**assigned** [5] - 104:4,
129:21, 130:1,
130:21, 325:14
**assignments** [2] -
114:19, 114:22
**assist** [2] - 238:17,

307:16
**assistance** [1] - 17:9
**assisted** [1] - 308:8
**associate** [2] - 7:4, 7:7
**associated** [1] -
129:22
**assume** [12] - 67:10,
67:13, 184:13,
225:6, 226:17,
254:7, 263:2,
268:16, 279:4,
334:20, 349:8, 349:9
**assuming** [9] - 8:7,
29:3, 43:9, 67:15,
181:15, 200:8,
202:22, 310:6,
311:17
**assumption** [7] -
181:6, 181:10,
182:11, 278:11,
311:6, 313:21
**assumptions** [2] -
316:16, 316:19
**assurance** [1] -
236:14
**assured** [3] - 122:21,
124:2, 124:11
**athlete** [1] - 170:16
**atmosphere** [1] -
169:8
**attach** [1] - 222:10
**attached** [13] - 164:9,
164:11, 194:7,
217:17, 218:2,
222:2, 222:9,
222:12, 222:15,
222:16, 222:22,
279:5, 330:9
**attachments** [2] -
4:17, 221:18
**attempted** [3] - 31:1,
51:21, 52:18
**attempts** [1] - 107:9
**attend** [6] - 45:1, 45:4,
45:8, 45:10, 47:2,
47:5
**attendance** [15] -
53:23, 54:18, 56:16,
72:21, 80:6, 81:23,
82:5, 119:19,
159:20, 160:16,
167:20, 202:22,
203:7, 209:8, 211:12
**attended** [14] - 18:5,
18:10, 46:23, 74:7,
78:23, 127:10,
146:20, 151:15,
151:16, 171:10,
171:18, 172:16,
177:23, 181:17

**attending** [3] - 44:21, 108:8, 173:7
**attendings** [2] - 104:19, 106:4
**attention** [1] - 246:14
**attestation** [1] - 154:9
**attesting** [1] - 154:21
**attitude** [1] - 245:6
**Attorney** [25] - 57:6, 67:3, 75:18, 76:9, 84:5, 92:10, 130:3, 196:16, 199:10, 203:23, 208:12, 222:4, 230:4, 232:15, 241:21, 291:20, 310:2, 313:12, 313:19, 317:6, 324:10, 337:2, 346:21, 346:23, 348:2
**attorney** [6] - 55:2, 90:14, 90:17, 91:23, 353:11, 353:14
**attorney/client** [10] - 48:6, 55:1, 90:1, 90:16, 90:18, 91:10, 91:13, 250:17, 251:5, 252:20
**attorneys** [17] - 48:7, 55:5, 59:11, 61:22, 62:16, 70:12, 97:14, 101:20, 220:18, 224:17, 250:18, 251:21, 252:2, 276:18, 276:23, 279:14, 313:6
**attorneys'** [1] - 72:8
**attribute** [1] - 180:17
**AUC** [2] - 249:11, 347:10
**audit** [1] - 46:16
**augment** [1] - 235:20
**August** [1] - 42:18, 42:21, 117:10, 117:13, 118:5, 118:18, 133:4, 136:17, 136:20, 137:1, 197:23
**authorizations** [17] - 274:9, 274:13, 274:15, 275:16, 275:17, 275:22, 276:4, 330:9, 330:12, 330:17, 331:7, 331:23, 332:1, 332:2, 332:4, 332:7, 332:8
**automatically** [2] - 335:5, 335:13
**available** [2] - 181:7,

215:17
**average** [5] - 14:12, 167:14, 230:6, 284:3, 314:7
**avoid** [3] - 69:8, 118:20, 331:2
**avoiding** [1] - 68:16
**awake** [2] - 302:8, 303:15
**awakened** [1] - 341:19
**aware** [28] - 8:6, 34:4, 53:20, 58:9, 97:2, 99:11, 112:2, 112:14, 112:17, 112:22, 115:4, 126:6, 133:20, 152:6, 157:15, 161:15, 165:21, 199:22, 202:5, 215:15, 272:5, 280:13, 298:6, 335:4, 338:1, 339:3, 339:12
**awareness** [1] - 112:23
**AWB** [2] - 263:2, 263:4

## B

**baby** [1] - 92:16
**bachelor** [1] - 20:2
**Bachman** [1] - 349:4
**background** [3] - 18:4, 68:13, 299:14
**backgrounds** [1] - 314:10
**backing** [4] - 288:7, 288:9, 289:13, 290:1
**backtracked** [1] - 295:6
**bad** [7] - 96:15, 111:6, 111:8, 127:17, 134:9, 166:9, 189:22
**badger** [2] - 130:10, 130:14
**badgering** [1] - 130:6
**Baker** [5] - 268:23, 317:6, 317:22, 319:16, 335:22, 336:9
**baker** [4] - 318:15, 318:23, 319:6, 319:23
**ball** [1] - 299:12
**ballpark** [2] - 15:18, 215:8
**bandage** [3] - 104:20, 105:2, 105:3
**bandwagon** [1] -

113:4
**bank** [1] - 149:20
**banker** [1] - 294:19
**banking** [2] - 281:2, 313:3
**banks** [1] - 342:11
**bar** [2] - 88:6, 88:7
**barrel** [2] - 165:22, 180:22
**base** [1] - 77:4
**based** [33] - 13:6, 36:16, 36:22, 39:19, 48:7, 52:2, 76:4, 129:19, 138:10, 138:12, 147:18, 163:5, 163:6, 164:14, 165:14, 189:19, 219:23, 220:13, 226:11, 226:16, 232:5, 236:5, 252:13, 260:1, 280:6, 280:19, 281:5, 311:5, 311:20, 313:9, 313:20, 316:17, 337:8
**basic** [1] - 316:16
**basis** [12] - 6:14, 99:17, 204:2, 250:15, 267:4, 267:6, 301:16, 311:17, 316:8, 342:23, 343:2, 345:17
**Bates** [2] - 149:10, 217:12
**bathroom** [1] - 321:7
**Beach** [1] - 10:6
**bears** [1] - 158:2
**beat** [3] - 167:13, 167:14, 167:15
**beaten** [1] - 167:8
**beautiful** [4] - 170:10, 170:12, 170:18, 171:5
**became** [2] - 99:11, 342:3
**become** [3] - 110:1, 165:18, 224:21
**becomes** [1] - 331:13
**bedside** [1] - 287:6
**began** [11] - 40:8, 41:18, 41:19, 41:22, 41:23, 43:4, 73:4, 105:23, 106:1, 291:21, 304:14
**begin** [9] - 6:11, 7:18, 41:7, 42:20, 43:6, 56:18, 156:12, 176:2, 255:4

**beginning** [6] - 54:1, 64:18, 133:8, 136:22, 218:15, 317:2
**begins** [3] - 108:2, 111:2, 279:3
**begun** [1] - 45:5
**behalf** [12] - 7:10, 7:13, 9:15, 84:20, 91:15, 92:9, 98:16, 270:14, 270:15, 321:22, 328:22, 329:9
**behavior** [1] - 220:1
**behind** [2] - 239:3, 239:5
**Behrang** [12] - 4:7, 255:6, 255:7, 255:8, 255:12, 257:5, 258:7, 259:17, 260:13, 260:18, 263:15, 305:4
**belief** [7] - 174:2, 185:4, 185:6, 263:20, 292:13, 322:3, 326:15
**beliefs** [2] - 185:13, 192:5
**belittle** [1] - 19:6
**below** [6] - 114:23, 184:1, 280:15, 280:17, 284:6, 310:14
**Ben** [5] - 247:15, 247:17, 248:7, 248:9, 252:23
**Berg** [1] - 20:15
**Bertrand** [55] - 102:14, 112:19, 152:19, 152:21, 153:1, 153:20, 154:14, 154:20, 155:2, 158:3, 158:6, 158:9, 158:14, 160:1, 160:8, 163:15, 164:7, 164:11, 168:23, 173:6, 173:12, 173:13, 173:15, 173:17, 182:2, 217:16, 221:19, 222:22, 223:18, 224:1, 224:10, 224:16, 226:9, 230:1, 230:7, 230:12, 231:7, 231:11, 231:12, 231:15, 232:6, 232:16, 233:12, 233:22, 234:6, 234:22, 235:1,

235:2, 235:12, 333:15, 334:1, 335:21, 342:20, 343:15
**Berwyn** [1] - 10:7
**best** [24] - 26:7, 28:6, 29:9, 48:12, 53:17, 53:18, 56:23, 61:2, 62:8, 71:3, 71:6, 72:23, 79:14, 85:13, 85:17, 147:1, 157:6, 161:11, 174:13, 204:15, 260:18, 287:14, 322:3, 322:14
**beta** [1] - 338:2
**betrayal** [1] - 29:11
**better** [13] - 19:9, 53:14, 73:1, 79:23, 84:6, 119:13, 130:22, 169:9, 184:12, 210:13, 257:8, 302:5
**between** [12] - 9:21, 13:15, 13:16, 25:19, 29:21, 102:15, 168:22, 209:10, 255:5, 306:6, 312:2, 314:12
**beyond** [9] - 40:17, 56:20, 96:21, 221:3, 274:1, 300:10, 318:10, 319:5, 342:19
**big** [4] - 55:12, 143:14, 193:3, 304:6
**bigger** [2] - 208:2, 284:16
**biggest** [3] - 53:8, 53:11, 53:13
**binding** [3] - 83:21, 196:20, 196:23
**binge** [2] - 87:19, 88:18
**biochem** [1] - 79:22
**birds** [1] - 299:5
**birth** [1] - 8:13
**bit** [17] - 18:4, 47:13, 72:18, 74:20, 80:10, 119:20, 123:23, 145:20, 146:2, 179:16, 233:20, 296:4, 297:11, 318:6, 319:1, 325:1, 327:14
**blackmail** [4] - 174:8, 174:17, 219:10, 219:21
**blank** [2] - 169:14, 273:17

**blanked** [2] - 55:23
**blatantly** [1] - 171:7
**blocker** [1] - 338:3
**blunt** [1] - 239:3
**blur** [1] - 183:14
**board** [11] - 57:8, 128:7, 128:8, 133:14, 176:9, 176:10, 209:9, 212:12, 212:21, 277:22, 279:10
**Board** [14] - 163:16, 164:6, 178:8, 178:10, 178:12, 206:8, 220:6, 234:8, 234:11, 234:14, 308:6, 340:21, 343:4, 343:13
**boards** [3] - 62:14, 167:8, 167:14
**body** [1] - 103:1
**bones** [1] - 88:2
**book** [3] - 220:19, 221:4, 304:7
**booth** [5] - 29:18, 29:22, 30:15, 30:22
**Boswell** [5] - 4:5, 247:15, 247:17, 248:7, 253:1
**bottom** [12] - 55:16, 141:16, 142:19, 149:10, 156:7, 165:22, 180:22, 204:18, 262:13, 263:1, 317:12, 317:13
**bound** [1] - 324:11
**box** [4] - 143:10, 143:11, 154:2, 294:6
**Box** [1] - 5:6
**boxes** [1] - 143:11
**bradycardia** [2] - 342:16
**brain** [7] - 28:23, 167:9, 267:23, 277:23, 278:4, 308:16, 345:5
**brainstorm** [2] - 318:23, 319:1
**brainstorming** [2] - 319:2, 319:5
**breach** [5] - 230:13, 232:20, 232:21, 233:4, 233:5
**breached** [3] - 232:9, 233:1, 233:10
**breaches** [1] - 275:3
**break** [21] - 13:15, 13:16, 13:23, 68:2, 68:3, 77:10, 77:12,

87:7, 175:3, 204:9, 213:23, 214:15, 214:16, 214:17, 240:6, 247:5, 295:3, 312:9, 321:6, 321:8, 341:19
**breakdown** [3] - 244:18, 305:6, 345:1
**breaking** [4] - 88:1, 240:8, 300:3
**breath** [1] - 14:1
**brief** [2] - 101:14, 266:8
**Brief** [1] - 247:7
**briefly** [3] - 93:16, 95:21, 350:16
**brilliant** [1] - 287:14
**bring** [12] - 89:21, 90:3, 90:6, 90:12, 92:20, 99:9, 154:10, 154:18, 210:4, 210:5, 210:6
**bringing** [2] - 92:17, 150:21
**brings** [2] - 71:16, 98:9
**Brittany** [1] - 116:19
**broke** [1] - 87:14
**broken** [1] - 88:2
**brother** [1] - 313:17
**brought** [4] - 12:15, 71:1, 90:23, 293:3
**brushed** [1] - 307:12
**BS** [2] - 119:14, 130:22
**build** [2] - 304:20, 326:5
**building** [2] - 170:12, 306:23
**built** [2] - 113:1, 310:18
**bummer** [1] - 248:2
**bunch** [2] - 27:16, 206:4
**business** [2] - 278:18, 299:13
**busy** [1] - 283:22
**BY** [46] - 6:10, 12:22, 48:16, 49:13, 50:3, 51:7, 54:8, 77:12, 87:11, 93:9, 127:8, 129:4, 133:3, 136:1, 140:17, 155:10, 163:23, 175:10, 183:11, 185:3, 185:17, 190:20, 194:4, 203:22, 210:19, 214:3, 215:3, 236:7, 244:7, 247:1, 247:11,

250:9, 255:3, 262:10, 264:7, 268:16, 276:11, 281:11, 306:1, 321:14, 321:19, 326:13, 329:15, 345:21, 348:5, 353:19
**bystanders** [1] - 114:6

# C

**C-h-a-n-g** [1] - 23:21
**cadaver** [1] - 116:20
**Cairnwood** [10] - 36:4, 36:8, 36:9, 39:3, 39:4, 150:17, 265:4, 265:9, 317:21
**CAIRNWOOD** [1] - 36:4
**calculating** [1] - 214:15
**calculation** [3] - 215:4, 277:1, 310:6
**California** [29] - 46:19, 47:8, 47:18, 48:3, 48:18, 49:6, 49:15, 50:4, 50:19, 51:1, 51:21, 53:3, 62:17, 77:6, 101:6, 101:9, 101:18, 101:21, 102:22, 139:14, 221:8, 242:16, 248:10, 248:20, 275:9, 275:10, 275:12, 346:9, 349:23
**campus** [2] - 19:15, 41:16
**canceled** [2] - 65:6, 247:20
**canceling** [1] - 253:3
**capabilities** [1] - 161:22
**capable** [3] - 110:11, 326:17, 327:12
**capacity** [3] - 7:20, 225:12, 279:9
**capital** [4] - 35:15, 35:17, 317:8, 317:15
**Capital** [7] - 36:5, 36:7, 36:8, 36:9, 268:23, 317:7, 319:16
**Capitol** [1] - 5:5
**caption** [1] - 5:22
**captioned** [1] - 6:21
**car** [13] - 22:5, 107:5, 108:11, 109:5,

109:7, 109:14, 109:15, 110:1, 195:9, 241:9, 241:14, 257:20, 301:21
**cardiac** [1] - 344:22
**care** [18] - 31:15, 31:18, 31:19, 31:22, 32:1, 32:3, 47:21, 115:21, 159:16, 182:6, 240:2, 272:21, 273:6, 273:19, 273:21, 273:23, 287:21, 296:20
**career** [13] - 64:23, 65:16, 165:8, 165:17, 189:6, 189:11, 190:7, 248:4, 249:19, 250:2, 316:12, 327:8
**careful** [2] - 156:15, 336:5
**caregivers** [1] - 344:19
**Caribbean** [8] - 116:18, 139:16, 142:23, 249:12, 347:3, 347:10, 347:19
**caring** [1] - 327:20
**Carinoid** [1] - 36:7
**carrying** [1] - 327:22
**Carter** [1] - 186:5
**Cartier** [7] - 3:18, 186:7, 186:8, 189:22, 191:20, 193:1
**Cartier's** [1] - 191:14
**case** [30] - 2:19, 2:20, 2:22, 3:1, 22:19, 49:4, 52:22, 61:21, 71:2, 72:4, 84:5, 101:7, 132:8, 133:17, 195:17, 196:21, 204:12, 225:22, 226:4, 244:1, 268:6, 268:13, 294:4, 295:18, 324:2, 339:14, 342:17, 345:3, 345:12, 353:15
**cases** [3] - 59:4, 72:6, 103:5
**catch** [1] - 14:1
**categorical** [2] - 165:10, 166:3
**Catholic** [1] - 32:22
**caught** [3] - 170:1,

338:23, 340:21
**caused** [14] - 23:16, 39:5, 40:3, 60:20, 60:21, 70:12, 79:7, 111:11, 189:2, 205:22, 225:18, 244:21, 311:23, 344:21
**caution** [2] - 202:4, 328:8
**cautioned** [2] - 242:18, 242:22
**cc'd** [1] - 269:12
**CENTER** [1] - 1:10
**Center** [33] - 7:3, 125:19, 125:22, 126:3, 126:13, 151:2, 151:9, 151:14, 153:7, 153:11, 167:22, 173:5, 178:23, 191:10, 193:21, 211:7, 217:19, 236:14, 238:18, 242:23, 261:1, 269:15, 269:20, 273:20, 292:17, 309:2, 325:9, 330:1, 333:1, 333:4, 333:11, 333:19
**center** [2] - 308:5, 314:17
**centered** [1] - 190:7
**centers'** [1] - 216:18
**Central** [1] - 48:18
**cents** [2] - 310:21, 311:13
**CEO** [6] - 278:3, 278:4, 278:7, 280:16, 310:15, 318:5
**CEO's** [1] - 280:20
**certain** [2] - 188:17, 237:18
**certainly** [14] - 13:14, 20:23, 57:12, 165:9, 165:11, 166:9, 167:7, 188:3, 196:17, 238:4, 305:5, 327:19, 339:21, 339:23
**certainty** [1] - 272:3
**certificate** [1] - 8:14
**CERTIFICATE** [1] - 352:1
**Certification** [1] - 78:3
**CERTIFICATION** [1] - 353:17
**certification** [3] - 78:12, 78:13, 85:8

**certifications** [1] - 279:10
**certified** [4] - 78:8, 78:19, 325:13, 328:3
**certify** [4] - 85:11, 137:17, 353:5, 353:10
**CERTIFYING** [1] - 353:20
**CFO** [1] - 34:23
**Chabot** [2] - 5:10, 7:9
**CHABOT** [4] - 7:9, 178:10, 345:16, 350:23
**chain** [1] - 56:5
**challenge** [1] - 19:9
**chance** [13] - 94:21, 146:15, 203:5, 203:8, 216:6, 221:10, 246:12, 268:9, 295:5, 297:10, 299:9, 309:15, 309:16
**Chang** [21] - 23:19, 23:21, 24:20, 25:8, 25:14, 25:18, 27:3, 27:8, 27:12, 27:14, 27:20, 28:5, 29:16, 30:13, 33:14, 34:10, 34:21, 35:2, 87:16, 89:10, 264:21
**Chang's** [1] - 34:19
**change** [5] - 8:19, 80:14, 197:14, 224:14, 326:2
**changed** [7] - 73:10, 97:8, 169:22, 171:7, 172:19, 289:15, 289:17
**changeovers** [1] - 336:9
**changes** [3] - 288:3, 315:22, 339:9
**changing** [2] - 288:2, 293:18
**characterization** [10] - 52:16, 58:14, 60:16, 65:5, 66:2, 121:6, 191:13, 193:10, 239:21, 330:19
**characterize** [9] - 219:10, 219:12, 219:14, 219:20, 219:21, 221:22, 228:10, 236:15, 254:18
**characterized** [1] - 220:12
**charge** [3] - 233:22, 234:6, 236:1

**charged** [1] - 97:13
**charges** [3] - 342:23, 343:1, 349:3
**chat** [1] - 283:20
**cheat** [2] - 350:8, 350:11
**cheated** [1] - 102:8
**check** [5] - 247:10, 288:18, 294:6, 314:22, 328:6
**checked** [4] - 38:3, 240:16, 339:6, 349:22
**checking** [3] - 212:23, 247:6, 281:13
**checks** [4] - 15:3, 16:17, 16:18, 126:16
**chemicals** [1] - 12:8
**chemistry** [2] - 34:8, 81:18
**Chen** [1] - 151:21
**Chester** [1] - 10:11
**choice** [9] - 62:19, 119:15, 220:19, 244:3, 256:4, 259:18, 270:18, 271:5, 291:1
**choose** [3] - 130:13, 150:6, 221:17
**choosing** [1] - 316:8
**chose** [14] - 74:11, 74:12, 109:15, 119:22, 141:2, 141:4, 141:5, 145:7, 145:8, 148:13, 148:17, 149:21, 220:21, 286:14
**chosen** [1] - 52:2
**Chris** [7] - 7:15, 168:23, 173:6, 173:22, 174:14, 181:15, 240:20
**Christine** [19] - 7:14, 71:14, 102:10, 111:18, 134:19, 151:21, 158:3, 158:6, 158:14, 159:21, 169:3, 171:5, 171:8, 171:16, 171:17, 172:20, 219:10, 219:13, 230:1
**Christopher** [3] - 5:5, 23:19, 23:20
**circles** [1] - 119:5
**circling** [1] - 119:12
**circumstance** [1] - 25:13
**circumstances** [4] - 23:22, 24:2, 25:1,

229:11
**Cirulnick** [3] - 20:15, 20:18, 21:9
**city** [2] - 9:9, 32:19
**City** [8] - 10:6, 11:6, 24:10, 25:21, 26:2, 26:18, 26:19, 88:8
**civil** [1] - 48:18
**Civil** [1] - 5:21
**claim** [10] - 86:23, 150:12, 202:9, 267:4, 267:6, 267:7, 268:3, 303:16, 304:5, 323:1
**claiming** [1] - 338:20
**claims** [20] - 22:14, 33:13, 33:17, 35:2, 56:3, 89:21, 90:4, 90:6, 90:7, 90:8, 90:9, 90:12, 90:23, 91:5, 91:6, 91:14, 92:7, 93:12, 202:6, 281:16
**clarification** [2] - 69:16, 336:16
**clarify** [5] - 13:17, 135:4, 251:14, 266:7, 310:13
**clarifying** [4] - 69:19, 186:23, 231:14, 311:3
**class** [6] - 19:8, 23:18, 24:14, 42:15, 44:2, 232:18
**classes** [4] - 44:21, 45:1, 45:4, 47:5
**classmate** [1] - 64:1
**clause** [1] - 63:20
**clauses** [2] - 72:1, 163:4
**clean** [1] - 134:3
**clear** [16] - 51:18, 51:21, 52:19, 61:11, 61:12, 154:18, 168:12, 174:5, 174:16, 199:18, 201:19, 261:16, 268:11, 278:1, 294:15, 299:2
**cleared** [7] - 52:4, 52:8, 52:10, 53:6, 62:5, 198:11, 198:14
**clearly** [1] - 31:13
**clinic** [3] - 106:5, 106:6, 106:7
**Clinic** [3] - 136:19, 136:22, 198:1
**clinical** [2] - 312:13, 312:23
**close** [5] - 123:4,

208:21, 241:9, 241:14, 266:13
**closed** [2] - 225:22, 226:4
**closely** [1] - 114:11
**closure** [1] - 99:10
**code** [1] - 97:8
**coerced** [1] - 128:11
**coincidence** [2] - 170:15, 171:1
**colleague** [1] - 29:8
**colleagues** [1] - 246:14
**collect** [1] - 174:23
**collectively** [1] - 196:22
**College** [8] - 5:8, 7:5, 7:8, 7:11, 7:14, 281:19, 292:16, 321:23
**college** [3] - 18:16, 23:10, 270:2
**College's** [1] - 72:8
**colluded** [2] - 235:4, 242:9
**colonial** [1] - 170:11
**color** [1] - 92:15
**column** [12] - 277:14, 279:3, 279:15, 279:21, 279:22, 280:5, 310:12, 311:7, 313:5, 313:9, 313:20, 316:3
**com** [2] - 55:18, 314:6
**Coma** [2] - 28:18, 30:5
**comfortable** [3] - 47:4, 275:5, 347:8
**coming** [4] - 169:6, 238:17, 265:16, 319:20
**commenced** [1] - 342:4
**commencing** [1] - 1:17
**comment** [1] - 39:13
**commented** [1] - 112:20
**comments** [5] - 21:8, 21:10, 33:4, 250:23, 251:1
**Commission** [4] - 78:2, 78:15, 184:1, 352:22
**committed** [1] - 302:22
**committee** [5] - 117:16, 117:21, 133:10, 201:23, 226:14
**committee's** [1] -

133:18
**common** [3] - 158:10, 163:17, 163:19
**commonly** [1] - 180:10
**communicate** [1] - 209:6
**communicated** [1] - 111:21
**communicating** [1] - 257:4
**communication** [1] - 91:2
**communications** [4] - 56:10, 277:20, 283:16, 288:14
**community** [4] - 63:17, 216:3, 216:11, 217:2
**companies** [2] - 37:4, 274:19
**company** [19] - 16:7, 16:8, 34:23, 36:13, 36:15, 36:22, 37:19, 38:4, 38:9, 39:1, 269:1, 269:7, 317:8, 318:4, 319:3, 320:3, 320:4, 320:13, 320:20
**compare** [1] - 216:10
**compared** [6] - 108:5, 180:18, 215:23, 216:2, 217:3, 334:23
**comparison** [3] - 312:2, 312:4, 312:5
**compel** [2] - 330:1, 331:5
**compensation** [1] - 265:21
**competency** [1] - 220:8
**competent** [3] - 5:20, 225:23, 226:6
**competitive** [3] - 180:21, 290:13, 290:17
**competitiveness** [2] - 180:23, 181:1
**complained** [2] - 109:11, 343:4
**complaint** [13] - 95:8, 95:10, 95:13, 95:15, 99:8, 199:3, 200:1, 200:15, 201:3, 202:11, 229:23, 301:19
**complaints** [2] - 117:18, 227:22
**complete** [15] - 43:23, 53:21, 79:16, 85:12,

85:16, 137:5, 164:8, 240:21, 282:16, 284:19, 305:11, 309:4, 322:14, 322:21, 352:7
**completed** [19] - 44:1, 76:10, 77:20, 80:20, 120:7, 125:2, 126:17, 136:8, 137:2, 137:8, 145:3, 155:11, 155:15, 155:16, 157:4, 163:8, 279:9, 279:10, 291:21
**completely** [3] - 238:11, 240:5, 251:2
**completing** [3] - 72:13, 152:16, 280:7
**complex** [1] - 190:7
**complexity** [1] - 19:22
**compliance** [2] - 254:19, 330:18
**complicated** [10] - 36:17, 37:1, 48:13, 81:9, 185:13, 192:19, 272:10, 275:20, 292:14, 294:4
**comply** [3] - 207:20, 208:23, 331:6
**complying** [1] - 169:20
**compose** [1] - 257:17
**compound** [1] - 68:20
**compounding** [1] - 315:19
**computation** [1] - 350:20
**computer** [18] - 19:20, 20:1, 20:11, 68:1, 166:15, 169:12, 169:14, 173:1, 174:4, 178:2, 179:5, 180:2, 180:6, 181:7, 277:11, 335:2, 336:8
**computers** [3] - 213:1, 334:20, 334:21
**concealing** [1] - 325:3
**concentration** [9] - 266:14, 267:1, 267:22, 294:12, 294:13, 295:10, 298:9, 309:9, 341:7
**concept** [1] - 231:18
**concepts** [2] - 231:20, 231:22
**concern** [10] - 53:8, 53:11, 53:13, 61:7, 65:7, 66:16, 117:8, 188:4, 285:20, 307:4

**concerned** [9] - 53:8, 61:3, 64:22, 65:15, 66:13, 134:22, 188:2, 307:22, 331:11
**concerning** [21] - 21:12, 25:1, 33:5, 50:12, 51:9, 51:10, 70:4, 70:10, 76:2, 95:16, 111:11, 133:5, 144:9, 169:1, 200:5, 213:5, 215:16, 221:2, 232:1, 237:2, 249:11
**concerns** [13] - 61:8, 70:19, 99:1, 109:1, 115:6, 115:9, 115:14, 115:20, 196:18, 220:9, 231:18, 231:20, 236:23
**conclude** [1] - 208:22
**concluded** [4] - 131:13, 189:20, 233:14, 351:3
**conclusion** [16] - 74:16, 83:2, 83:10, 83:12, 97:2, 113:5, 193:18, 202:10, 232:2, 232:5, 232:7, 232:8, 233:20, 234:13, 340:11
**Concord** [6] - 1:16, 5:6, 9:1, 9:5, 349:22, 352:5
**concurrent** [1] - 109:7
**concussion** [2] - 4:10, 187:19
**condition** [7] - 68:5, 89:12, 271:11, 271:15, 294:8, 302:10, 342:22
**conditional** [5] - 67:8, 67:14, 67:23, 68:22, 69:5
**conditions** [6] - 68:1, 68:2, 271:8, 271:11, 271:18, 345:14
**condominium** [1] - 10:13
**conduct** [4] - 129:23, 284:12, 341:23, 343:18
**conducted** [2] - 13:11, 343:22
**conducting** [1] - 234:12
**conference** [1] - 319:19
**confidential** [3] -

54:19, 54:23, 56:9
**Confidential** [2] - 3:16, 183:13
**confidentiality** [1] - 58:10
**confirm** [7] - 47:19, 77:19, 97:20, 100:16, 100:19, 102:21, 265:6
**confirmed** [1] - 211:1
**confirms** [1] - 99:18
**conflict** [2] - 58:21
**conflicting** [1] - 59:1
**confronted** [1] - 245:11
**confused** [5] - 43:2, 59:7, 75:13, 183:5, 304:8
**confuses** [1] - 200:14
**confusing** [3] - 70:12, 76:17, 215:22
**conjunction** [2] - 276:18, 277:17
**connected** [5] - 22:8, 53:21, 97:3, 243:1, 243:4
**connection** [10] - 56:15, 87:15, 92:8, 149:11, 152:15, 251:16, 266:20, 328:23, 329:10, 346:9
**conscious** [2] - 28:21, 122:10
**consciously** [5] - 74:11, 74:12, 74:13, 157:14, 157:16
**consciousness** [5] - 28:19, 29:1, 30:4, 30:6, 236:5
**consequence** [2] - 28:16, 34:10
**consequences** [1] - 33:6
**conservative** [2] - 280:19, 281:5
**consider** [30] - 9:11, 14:11, 44:12, 85:17, 86:1, 86:8, 117:5, 123:8, 126:14, 128:5, 128:23, 138:9, 138:12, 141:21, 148:1, 148:6, 152:23, 162:3, 162:11, 168:10, 173:19, 184:11, 196:6, 198:19, 227:18, 227:20, 236:2, 273:23, 275:2, 318:8

**consideration** [13] - 61:11, 83:13, 83:18, 83:19, 83:22, 84:10, 84:21, 85:22, 312:12, 312:22, 348:22, 349:1, 349:2
**considered** [13] - 125:10, 126:3, 126:7, 126:9, 126:10, 126:19, 135:6, 146:16, 147:19, 165:22, 180:21, 256:14, 341:21
**considering** [7] - 126:16, 135:8, 162:8, 165:4, 221:23, 238:9, 282:21
**consistent** [4] - 215:4, 227:15, 307:23, 308:2
**consistently** [1] - 12:1
**conspiracy** [1] - 244:10
**constitute** [3] - 86:9, 86:13, 102:20
**constituted** [1] - 162:5
**constructive** [8] - 105:12, 112:15, 117:6, 130:4, 131:8, 241:23, 242:10, 242:15
**constructively** [7] - 105:8, 108:14, 130:15, 132:6, 134:22, 195:16, 286:22
**construe** [2] - 53:1, 337:7
**construed** [3] - 68:12, 68:22, 69:1
**consult** [3] - 76:2, 307:14, 307:18
**consulted** [3] - 75:18, 76:19, 338:10
**consults** [1] - 273:22
**consumption** [1] - 89:13
**contact** [10] - 94:10, 144:15, 145:2, 231:5, 231:7, 231:9, 231:17, 233:13, 234:21, 291:7
**contacted** [2] - 144:9, 245:13
**contain** [1] - 153:14
**contained** [2] - 85:11, 96:20
**contemporaneously**

[2] - 87:16, 128:15
**contention** [2] - 113:22, 287:1
**contents** [1] - 252:10
**context** [4] - 67:4, 185:19, 207:16, 263:11
**contingency** [1] - 204:2
**continue** [11] - 42:5, 45:4, 45:22, 107:15, 116:7, 196:15, 198:18, 232:13, 233:17, 250:2, 265:17
**continues** [1] - 107:22
**continuity** [1] - 92:21
**contract** [12] - 71:22, 82:2, 82:9, 82:10, 83:14, 83:18, 83:21, 212:1, 212:10, 230:13, 232:17, 233:10
**contracts** [1] - 206:5
**contractual** [1] - 84:21
**contradict** [1] - 62:4
**contradictory** [1] - 242:2
**contrary** [2] - 193:21, 308:4
**CONTROL** [1] - 353:19
**control** [1] - 238:15
**controversies** [1] - 63:13
**controversy** [3] - 59:11, 63:10, 162:21
**conversation** [19] - 101:17, 128:10, 128:14, 135:16, 165:15, 171:17, 172:11, 181:23, 182:1, 255:15, 257:23, 263:5, 263:7, 263:8, 263:12, 263:13, 284:22, 294:2, 301:6
**conversations** [9] - 21:1, 90:17, 90:19, 169:2, 283:1, 283:3, 295:13, 301:11, 304:11
**converted** [1] - 139:20
**convictions** [1] - 150:8
**coordinated** [1] - 112:15
**coordinating** [3] - 234:23, 235:13, 235:14

**copied** [3] - 121:16, 143:18, 145:14
**copies** [1] - 4:21
**copy** [6] - 121:13, 212:12, 217:20, 221:16, 269:14, 349:13
**copying** [1] - 140:7
**core** [3] - 263:21, 263:22, 323:16
**Cornfield** [1] - 273:11
**corporate** [1] - 320:23
**corporation** [1] - 318:20
**correct** [85] - 6:16, 12:13, 13:16, 13:17, 16:10, 18:6, 23:5, 23:7, 23:10, 25:15, 26:19, 26:22, 26:23, 30:17, 46:21, 49:7, 49:20, 51:20, 52:19, 64:10, 64:20, 65:19, 68:15, 69:16, 71:11, 94:22, 102:1, 102:17, 105:10, 106:19, 109:2, 109:4, 120:1, 127:11, 127:17, 133:21, 136:17, 141:14, 144:22, 147:14, 153:16, 154:8, 154:10, 154:14, 155:12, 160:13, 172:21, 178:17, 178:20, 178:21, 184:19, 192:2, 200:2, 205:8, 212:13, 223:7, 224:3, 224:7, 225:8, 232:8, 237:8, 253:13, 255:6, 262:1, 263:3, 266:6, 274:14, 279:11, 280:2, 286:7, 287:17, 287:23, 296:17, 296:19, 304:14, 305:12, 306:16, 309:22, 311:9, 313:11, 315:23, 325:9, 331:23, 332:4
**corrected** [3] - 125:4, 125:7, 254:21
**corrections** [1] - 352:9
**Corrections** [1] - 352:10
**correctly** [20] - 18:5, 26:16, 35:1, 41:23, 65:1, 65:4, 65:8, 78:7, 147:20, 181:6,

184:5, 222:1, 222:5, 279:4, 288:19, 315:18, 321:3, 332:19, 336:1, 348:14
**correctness** [1] - 154:22
**cost** [2] - 320:6, 320:9
**costs** [1] - 317:16
**counsel** [16] - 4:22, 6:4, 7:5, 90:20, 251:12, 252:4, 252:13, 269:13, 269:16, 269:17, 269:23, 270:1, 270:3, 353:11, 353:14
**counseling** [2] - 186:16, 188:23
**count** [5] - 113:3, 166:16, 166:18, 320:1, 320:2
**counter** [1] - 189:14
**country** [5] - 122:2, 145:17, 170:12, 177:9, 211:10
**County** [1] - 343:12
**COUNTY** [1] - 352:15
**couple** [16] - 64:12, 74:22, 77:23, 87:13, 97:18, 117:11, 133:6, 175:6, 183:22, 217:2, 227:3, 227:12, 238:8, 255:23, 262:4, 321:11
**course** [12] - 6:12, 6:14, 17:1, 60:14, 77:1, 81:18, 87:5, 99:16, 139:17, 188:9, 195:4, 349:19
**courses** [6] - 44:5, 44:8, 46:6, 46:11, 46:15, 79:11
**court** [30] - 12:23, 13:4, 33:18, 51:16, 57:3, 58:10, 60:7, 60:12, 64:10, 68:15, 68:17, 71:2, 73:20, 73:21, 91:3, 209:13, 233:2, 267:12, 270:10, 274:11, 274:20, 274:21, 299:12, 329:20, 330:13, 330:20, 331:5, 331:8, 332:17, 346:11
**COURT** [1] - 1:1
**Court** [7] - 1:16, 5:14, 48:17, 270:6, 270:9,

352:5, 353:3
**court's** [7] - 52:17, 59:17, 60:5, 70:8, 274:16, 276:3, 330:18
**cover** [4] - 103:6, 194:6, 194:20, 196:17
**cover-up** [1] - 103:6
**covering** [1] - 341:3
**coworkers** [1] - 323:22
**crash** [1] - 315:3
**created** [1] - 318:20
**credentials** [5] - 102:12, 125:14, 125:17, 326:4, 326:8
**credibly** [2] - 146:10, 146:14
**credit** [1] - 46:17
**credits** [1] - 43:16
**criminal** [2] - 227:22, 236:1
**criteria** [2] - 63:14, 128:10
**critical** [1] - 130:9
**criticism** [2] - 103:3, 116:12
**criticisms** [6] - 98:21, 112:7, 112:8, 128:16, 130:16, 244:8
**criticized** [1] - 105:13
**cross** [2] - 214:21, 341:12
**cross-examination** [1] - 214:21
**crossed** [1] - 182:4
**crude** [1] - 256:7
**cruel** [1] - 63:19
**crushed** [1] - 257:1
**Cruz** [2] - 34:3, 34:5
**crying** [1] - 307:7
**cup** [1] - 167:10
**curiosity** [1] - 136:9
**curious** [1] - 225:14
**current** [7] - 8:20, 14:7, 142:15, 271:21, 280:3, 336:3, 347:9
**current/prior** [1] - 143:23
**curriculum** [1] - 20:5
**cut** [1] - 284:6
**CV** [7] - 138:18, 138:19, 147:21, 148:3, 148:4, 195:21

**D**

**D.C** [1] - 319:19
**dad** [2] - 176:6, 207:13
**daily** [1] - 204:1
**damage** [4] - 276:16, 276:17, 278:14, 312:1
**damages** [3] - 276:15, 278:13
**dangerous** [1] - 97:14
**dangerously** [2] - 87:22
**DARTMOUTH** [1] - 1:9
**Dartmouth** [77] - 7:3, 7:5, 7:7, 7:11, 7:13, 9:23, 19:7, 19:11, 19:16, 19:17, 19:22, 20:6, 20:8, 20:13, 20:17, 21:18, 22:13, 22:15, 22:22, 23:7, 23:9, 23:11, 23:19, 24:12, 24:15, 24:17, 33:21, 34:10, 34:11, 34:20, 35:4, 35:10, 67:20, 87:20, 88:3, 101:2, 101:16, 101:22, 102:3, 102:16, 104:23, 105:4, 105:6, 105:10, 113:4, 113:12, 124:20, 125:11, 125:14, 125:16, 126:14, 126:19, 131:5, 138:4, 138:6, 151:2, 152:10, 168:1, 168:6, 176:2, 198:16, 198:20, 199:6, 203:9, 204:1, 204:20, 209:23, 214:23, 216:4, 217:19, 234:1, 242:22, 244:10, 257:19, 260:23, 264:10, 269:1, 269:2, 269:14, 269:15, 269:19, 269:20, 271:1, 272:16, 273:20, 278:3, 281:3, 281:18, 282:20, 286:14, 291:21, 292:16, 308:18, 309:1, 311:23, 314:17, 319:19, 321:23, 325:8, 325:14, 326:16, 333:4, 333:19, 335:1, 340:10,

340:20, 341:9, 341:15, 341:17, 342:4, 342:9, 343:7, 344:16, 345:2, 345:11, 352:8
**Dartmouth's** [7] - 34:16, 216:2, 216:10, 217:3, 217:7, 220:18, 325:16
**Dartmouth-endorsed** [1] - 24:17
**Dartmouth-Hitchcock** [11] - 7:3, 204:20, 217:19, 242:22, 260:23, 269:15, 269:20, 272:16, 292:16, 325:8, 333:4
**DARTMOUTH-HITCHCOCK** [1] - 1:9
**Dartmouth-Hitchcock's** [1] - 278:3
**Dartmouth-owned** [1] - 257:19
**Data** [2] - 3:16, 183:13
**date** [21] - 46:8, 117:20, 129:11, 156:12, 156:13, 177:4, 177:15, 179:15, 183:5, 184:15, 194:20, 212:16, 228:18, 230:15, 237:7, 240:17, 262:14, 276:21, 325:5, 353:8
**dated** [10] - 95:6, 129:10, 175:23, 191:7, 194:19, 194:20, 201:2, 217:15, 223:18, 269:9
**dates** [2] - 191:16, 227:12
**Dave** [1] - 7:6
**David** [3] - 5:13, 8:13, 49:14
**day-to-day** [1] - 344:13
**days** [15] - 6:3, 12:5, 94:17, 97:9, 101:4, 107:12, 230:23, 238:3, 238:9, 256:1, 260:8, 283:9, 285:4, 296:4, 309:21
**dazed** [1] - 195:9
**deadlines** [2] - 208:19, 275:2

**deal** [5] - 60:2, 93:3, 122:5, 284:6, 342:13
**Dean** [5] - 20:19, 34:3, 102:13, 155:6
**Deans** [4] - 21:1, 33:22, 33:23, 349:3
**debate** [1] - 209:12
**December** [7] - 44:3, 247:23, 290:20, 301:15, 318:13, 319:1, 352:5
**decide** [9] - 12:12, 73:21, 80:5, 80:8, 80:22, 86:5, 120:20, 203:13, 347:17
**decided** [12] - 75:17, 99:4, 149:15, 152:6, 157:16, 193:8, 209:22, 209:23, 238:6, 247:22, 252:13
**deciding** [2] - 120:23, 289:4
**decision** [15] - 76:2, 121:9, 122:7, 122:9, 145:15, 148:17, 203:4, 204:14, 219:22, 223:1, 223:12, 251:22, 251:23, 252:5, 289:6
**decisions** [5] - 121:10, 150:18, 259:12, 259:13, 288:23
**declaration** [2] - 154:20, 311:22
**declare** [1] - 69:10
**declared** [1] - 20:9
**declaring** [1] - 312:5
**defendant** [3] - 2:20, 234:14, 347:22
**Defendant** [1] - 333:14
**Defendants** [1] - 1:11
**defendants** [9] - 5:3, 5:8, 7:16, 214:22, 264:10, 270:14, 330:2, 347:14, 348:21
**defer** [2] - 43:12, 346:21
**deferral** [1] - 223:9
**deferred** [3] - 41:3, 43:8, 43:23
**deferring** [1] - 343:9
**deficiencies** [4] - 129:18, 131:2, 202:3, 220:1
**deficiency** [1] - 129:19
**deficits** [1] - 338:18
**define** [4] - 28:18, 28:20, 168:11, 317:3

**defined** [1] - 227:1
**defining** [1] - 29:1
**definitely** [9] - 120:18, 171:5, 260:19, 289:11, 290:15, 290:16, 293:11, 314:11, 327:2
**definitions** [1] - 52:23
**definitive** [2] - 272:10, 272:18
**definitively** [1] - 155:23
**defrauded** [2] - 235:1, 235:5
**defrauding** [2] - 235:15, 245:1
**degree** [6] - 35:6, 41:19, 41:20, 78:17, 78:18, 80:2
**delay** [3] - 224:10, 224:19, 225:3
**delayed** [1] - 42:9
**delays** [1] - 42:9
**delete** [1] - 336:5
**deleted** [3] - 251:13, 284:1, 284:2
**deliberation** [3] - 155:22, 157:18, 277:21
**demand** [1] - 56:6
**demanded** [1] - 303:19
**demanding** [1] - 294:18
**demonstrate** [1] - 17:22
**demonstrated** [3] - 114:20, 129:20, 330:2
**denied** [5] - 69:17, 69:20, 281:17, 282:1, 296:7
**denoted** [1] - 352:10
**deny** [3] - 54:8, 69:19, 71:18
**department** [7] - 152:14, 153:6, 171:22, 198:8, 301:20, 302:12, 334:12
**departure** [2] - 164:12, 266:20
**depo** [1] - 4:18
**deponent** [1] - 6:4
**depose** [1] - 13:14
**deposed** [2] - 6:8, 350:4
**deposing** [1] - 244:20
**deposit** [2] - 16:20, 16:22

**deposition** [27] - 5:17, 6:1, 6:2, 6:13, 6:15, 7:23, 8:9, 13:11, 21:23, 22:9, 22:11, 92:14, 92:20, 97:17, 98:4, 139:14, 145:10, 146:9, 244:13, 327:23, 349:19, 350:1, 350:18, 350:22, 352:4, 353:7, 353:13
**DEPOSITION** [1] - 1:14
**Deposition** [2] - 1:15, 351:3
**depositions** [1] - 5:20
**depression** [13] - 186:15, 187:10, 187:19, 188:4, 188:6, 188:8, 188:20, 189:2, 190:2, 190:6, 191:17, 193:4, 282:22
**describe** [5] - 29:10, 104:9, 184:10, 341:5, 349:21
**described** [9] - 104:8, 133:13, 171:23, 221:18, 301:19, 304:11, 308:12, 308:14
**description** [3] - 164:8, 164:9, 168:9
**Description** [1] - 2:17
**designation** [1] - 132:11
**desire** [2] - 232:12, 284:23
**despite** [4] - 107:9, 221:21, 274:11, 331:4
**destroy** [7] - 54:18, 54:21, 56:1, 56:6, 56:11, 56:15, 250:2
**destroyed** [3] - 56:19, 57:14
**destroying** [1] - 57:1
**detail** [4] - 29:3, 139:5, 192:4, 192:19
**detailed** [1] - 192:16
**details** [2] - 25:22, 241:23
**detective** [1] - 324:8
**determination** [3] - 204:6, 277:13, 277:16
**determinative** [1] - 202:12
**determine** [2] -

**determined** [1] - 70:17
**determining** [1] - 192:22
**developed** [1] - 244:9
**developments** [3] - 224:22, 225:15, 225:17
**deviations** [1] - 167:16
**device** [2] - 327:22, 328:4
**DHL** [1] - 44:4
**DHMC** [23] - 4:2, 126:19, 151:13, 165:12, 170:8, 174:21, 185:21, 186:6, 190:13, 196:21, 200:9, 212:12, 225:5, 227:19, 227:21, 228:20, 230:3, 230:6, 233:1, 256:15, 260:17, 261:3, 304:8
**DHMC's** [1] - 230:13
**DI** [1] - 55:18
**diagnose** [2] - 337:12, 338:21
**diagnosed** [4] - 271:19, 272:15, 337:23, 338:1
**diagnoses** [1] - 271:15
**diagnosis** [8] - 33:4, 271:21, 272:1, 272:3, 272:5, 272:10, 297:23, 298:1
**Dick** [2] - 5:12, 6:23
**didactic** [1] - 245:22
**difference** [1] - 183:3
**different** [33] - 9:20, 9:22, 19:19, 28:19, 37:2, 37:4, 39:7, 46:13, 66:16, 70:12, 72:8, 79:11, 87:1, 101:12, 105:4, 105:11, 112:14, 118:12, 144:1, 152:13, 162:10, 163:4, 169:8, 169:11, 169:23, 191:22, 193:6, 216:1, 220:20, 245:2, 304:19, 324:4, 344:7
**differently** [4] - 44:20, 70:13, 86:11, 300:19
**difficult** [7] - 61:22,

**277:19, 315:8
**determined** [1] - 70:17 —** (continued into last column)
184:23, 185:5, 256:15, 271:14, 337:11, 342:17
**difficulties** [4] - 266:14, 267:2, 267:22, 308:8
**dig** [2] - 291:13, 291:15
**diploma** [6] - 44:3, 45:8, 45:9, 78:14, 323:19, 348:1
**diplomas** [5] - 102:8, 111:13, 111:16, 112:8, 133:15
**direct** [9] - 16:20, 16:21, 75:8, 92:6, 94:10, 152:23, 154:20, 236:5, 243:15
**DIRECT** [1] - 353:19
**directed** [2] - 75:6, 330:3
**direction** [5] - 24:5, 231:7, 237:17, 237:22, 276:3
**DIRECTION** [1] - 353:20
**director** [18] - 7:7, 94:12, 112:6, 154:2, 155:4, 155:5, 155:6, 164:23, 179:23, 180:1, 211:10, 212:1, 231:13, 253:15, 288:8, 290:2, 290:5
**director's** [1] - 289:13
**directors** [15] - 101:19, 112:16, 114:1, 178:1, 179:11, 179:14, 180:5, 180:13, 180:15, 181:8, 253:18, 254:2, 254:6, 259:10, 259:14
**dis** [1] - 347:16
**disabilities** [1] - 292:2
**disability** [32] - 16:9, 136:23, 184:3, 185:2, 185:6, 185:7, 185:12, 186:3, 187:2, 192:1, 192:14, 192:17, 192:18, 192:23, 193:23, 280:4, 280:8, 292:9, 292:13, 292:17, 294:1, 294:4, 307:4, 309:7, 309:8, 310:8, 310:10, 311:9,

311:18, 327:21, 344:12, 344:13

**disabled** [5] - 278:17, 280:11, 312:2, 316:21, 335:10

**disagree** [10] - 52:16, 52:17, 66:2, 132:16, 132:20, 141:4, 254:13, 274:12, 286:10, 324:12

**disagreed** [1] - 52:1

**disagreeing** [2] - 286:8, 286:12

**disappointed** [4] - 167:4, 206:15, 206:17, 303:2

**disaster** [1] - 240:21

**disavow** [2] - 84:1, 163:1

**disbelief** [2] - 338:19, 338:20

**discharge** [3] - 71:21, 82:2, 82:9

**discharged** [5] - 69:4, 69:14, 83:6, 162:15, 162:22

**disciplinary** [6] - 67:2, 162:23, 340:1, 347:15, 347:17, 349:2

**discipline** [2] - 162:6, 162:12

**disciplined** [1] - 160:23

**disclosable** [3] - 74:14, 75:4, 149:5

**disclose** [59] - 53:22, 54:12, 54:14, 65:7, 65:22, 70:5, 71:9, 71:19, 72:4, 72:21, 73:2, 73:7, 74:5, 74:6, 74:12, 78:22, 78:23, 79:7, 79:10, 80:8, 80:23, 99:7, 120:2, 122:13, 122:20, 134:11, 140:10, 141:2, 144:19, 152:12, 160:19, 160:20, 174:9, 176:7, 181:11, 182:15, 190:2, 193:6, 193:8, 197:4, 197:6, 197:7, 202:13, 202:22, 203:14, 207:2, 207:8, 207:15, 207:19, 208:11, 209:2, 209:8, 209:19, 221:7, 228:4, 267:19,

274:18, 294:1, 294:8

**disclosed** [17] - 60:6, 79:3, 149:8, 152:10, 152:15, 160:16, 178:16, 180:9, 180:12, 181:8, 193:22, 199:13, 199:15, 199:21, 199:22, 273:18, 347:9

**disclosing** [4] - 151:18, 157:19, 187:18, 203:4

**disclosure** [14] - 64:23, 65:17, 67:1, 70:10, 73:11, 190:17, 191:17, 212:11, 213:5, 213:14, 213:19, 213:21, 254:19, 340:2

**disclosures** [1] - 58:12

**discount** [3] - 314:18, 315:1, 315:3

**discourage** [1] - 285:17

**discover** [3] - 304:17, 342:17, 342:18

**discovered** [2] - 312:8, 345:5

**discovery** [3] - 175:19, 177:18, 343:10

**discuss** [7] - 48:4, 54:19, 117:17, 170:20, 277:1, 288:11, 309:10

**discussed** [8] - 122:19, 168:15, 171:20, 192:4, 252:9, 254:3, 282:17, 330:10

**discussing** [1] - 252:21

**discussion** [12] - 108:7, 124:9, 124:11, 167:21, 168:21, 168:22, 184:18, 191:15, 191:22, 237:11, 267:1, 290:16

**Discussion** [2] - 175:5, 214:1

**discussions** [7] - 54:20, 76:5, 167:1, 171:4, 190:18, 277:9, 277:10

**dishonest** [4] - 68:12, 69:1, 69:4, 337:9

**dismiss** [2] - 219:23, 347:13

**dismissal** [3] - 73:8, 218:17, 329:1

**dismissed** [2] - 94:22, 287:3

**disorder** [6] - 181:21, 272:15, 303:13, 337:23, 338:21, 344:23

**disorders** [1] - 344:23

**displaying** [1] - 278:12

**dispute** [3] - 121:5, 145:6, 233:2

**disputed** [1] - 249:18

**disqualify** [1] - 85:21

**dissolved** [1] - 318:15

**distinctly** [2] - 293:12, 341:17

**distressed** [1] - 228:10

**distributions** [1] - 320:18

**DISTRICT** [2] - 1:1, 1:3

**District** [6] - 1:15, 48:17, 48:18, 270:9, 270:10, 352:5

**disturbance** [1] - 339:10

**divorced** [1] - 9:21

**divulging** [1] - 68:10

**doc** [1] - 33:8

**docket** [7] - 2:19, 48:19, 49:3, 49:5, 49:18, 96:19, 339:20

**doctor** [24] - 32:11, 123:21, 223:16, 273:17, 278:7, 278:16, 280:12, 281:12, 286:20, 287:12, 294:20, 296:10, 302:5, 302:13, 307:20, 307:21, 310:15, 312:3, 313:13, 316:18, 316:22, 327:16, 334:12, 344:1

**doctor's** [1] - 337:9

**doctors** [5] - 139:11, 139:13, 280:14, 287:15, 337:20

**document** [74] - 13:12, 48:16, 48:19, 49:9, 49:14, 49:16, 49:20, 50:4, 50:5, 50:7, 50:8, 57:16, 58:2, 58:6, 61:17, 64:9, 68:3, 82:4, 82:12,

93:16, 103:2, 103:16, 108:10, 123:18, 126:10, 129:6, 138:16, 154:21, 155:3, 157:1, 158:11, 160:16, 163:15, 173:18, 173:20, 175:11, 183:4, 183:7, 190:21, 191:2, 192:10, 194:8, 194:9, 196:14, 210:16, 211:13, 222:2, 222:8, 222:10, 222:12, 222:13, 222:15, 236:8, 262:12, 268:17, 269:9, 277:19, 278:12, 278:22, 279:1, 311:5, 312:22, 316:2, 316:10, 322:13, 328:15, 328:21, 329:5, 329:8, 334:13, 339:23

**documentation** [4] - 3:8, 133:4, 289:15, 289:16

**documenting** [1] - 308:9

**documents** [34] - 3:19, 17:21, 21:19, 22:7, 34:3, 49:17, 50:14, 52:3, 57:9, 62:6, 66:6, 78:17, 93:20, 95:1, 96:8, 96:12, 96:13, 112:1, 125:18, 130:7, 138:14, 182:2, 192:1, 194:11, 194:13, 195:22, 196:8, 196:13, 217:11, 280:22, 291:20, 326:10, 326:14

**DOES** [1] - 353:18

**dollar** [5] - 301:4, 310:20, 311:13, 345:3, 345:12

**dollars** [5] - 9:18, 14:23, 320:7, 320:9, 320:14

**Donald** [1] - 270:23

**done** [40] - 9:4, 14:11, 34:9, 43:14, 44:15, 73:7, 94:5, 103:4, 104:20, 116:21, 135:12, 153:15, 153:18, 155:17,

155:19, 156:10, 174:22, 191:9, 228:18, 241:7, 241:9, 241:14, 252:12, 264:4, 274:9, 281:7, 297:14, 314:6, 315:18, 315:22, 318:21, 319:15, 323:1, 331:14, 332:18, 334:15, 343:21, 350:4

**door** [2] - 27:12, 97:8

**doors** [4] - 97:12, 97:15, 102:13, 135:14

**dot** [11] - 55:18, 314:6, 333:7, 333:8, 333:13, 333:22, 334:9, 335:6, 335:14

**doubt** [1] - 342:19

**doubting** [1] - 102:6

**Doug** [4] - 170:22, 171:8, 171:9, 171:10

**down** [25] - 30:18, 70:13, 78:22, 117:11, 130:7, 141:6, 146:18, 149:21, 156:6, 240:6, 240:8, 243:15, 245:14, 246:4, 253:4, 264:22, 264:23, 274:1, 280:10, 305:21, 312:9, 316:7, 326:9, 332:15, 335:23

**dozen** [1] - 231:22

**Dr** [213] - 3:4, 3:6, 3:7, 3:19, 4:2, 4:3, 4:4, 4:6, 4:8, 4:9, 4:11, 4:16, 4:18, 6:11, 6:15, 6:17, 6:21, 11:20, 12:22, 18:3, 26:10, 28:20, 66:9, 80:12, 87:11, 94:1, 94:2, 94:11, 98:4, 98:8, 100:8, 102:5, 104:1, 104:2, 104:3, 106:15, 106:21, 107:16, 108:2, 109:12, 111:2, 111:3, 111:10, 111:23, 112:11, 112:12, 112:18, 112:19, 113:11, 114:11, 116:19, 117:17, 117:19, 117:20, 117:22, 118:9, 122:16,

123:2, 123:6, 123:7,
123:11, 123:20,
123:21, 129:5,
133:8, 133:9,
133:17, 135:5,
135:6, 135:8,
135:16, 135:20,
136:1, 151:21,
153:1, 153:2,
153:20, 154:8,
154:14, 162:7,
165:14, 170:6,
172:9, 174:20,
175:10, 176:23,
214:7, 215:9,
217:16, 219:18,
221:18, 222:21,
223:18, 224:1,
224:10, 224:16,
226:9, 226:22,
231:7, 231:11,
231:12, 231:15,
232:6, 232:16,
233:12, 236:23,
237:1, 237:6,
237:10, 238:22,
239:22, 243:9,
245:14, 245:15,
245:16, 246:17,
255:16, 255:18,
267:13, 268:21,
268:22, 269:11,
270:17, 270:23,
271:2, 271:7,
273:10, 273:15,
280:20, 282:6,
282:8, 282:9, 283:9,
283:17, 284:9,
284:22, 284:23,
285:7, 285:16,
287:2, 288:9,
288:12, 288:15,
288:19, 288:22,
290:8, 290:11,
290:21, 293:2,
294:1, 294:9,
294:22, 296:16,
297:16, 298:8,
301:6, 301:20,
303:3, 303:9,
303:11, 303:12,
303:18, 304:2,
305:8, 305:14,
306:1, 306:6, 306:9,
306:19, 307:5,
308:18, 309:6,
309:10, 313:9,
313:12, 321:19,
321:23, 322:23,
323:23, 326:14,
329:6, 329:16,

332:23, 334:1,
335:20, 342:1,
343:16, 343:18,
344:2, 344:9,
345:22, 349:4,
349:18
**dr** [1] - 294:8
**drag** [1] - 261:15
**drastic** [5] - 293:22,
295:8, 295:19,
298:19, 298:21
**drastically** [1] -
295:17
**draw** [1] - 101:22
**drawing** [2] - 169:13,
273:17
**drinking** [5] - 87:18,
87:20, 88:18, 88:21,
88:23
**drive** [1] - 32:6
**driving** [3] - 122:15,
145:13, 301:22
**drop** [4] - 62:19,
235:9, 316:20
**dropping** [1] - 349:3
**drove** [3] - 22:5, 32:7
**drug** [3] - 21:3, 191:3,
191:14
**drunk** [2] - 89:7, 89:15
**dude** [1] - 256:10
**due** [6] - 109:8,
117:23, 194:22,
324:18, 328:6,
345:22
**dug** [1] - 268:4
**Duke** [10] - 79:1,
80:10, 80:12, 80:13,
81:2, 81:10, 141:21,
142:1, 142:22
**duly** [2] - 6:7, 353:8
**duration** [1] - 7:19
**duress** [8] - 62:11,
62:18, 62:20, 63:6,
64:11, 121:20,
122:6, 128:11
**during** [28] - 6:12,
6:14, 15:14, 20:3,
22:13, 22:16, 22:22,
28:4, 39:23, 57:7,
61:1, 87:17, 94:13,
167:23, 169:2,
197:23, 214:15,
225:17, 257:16,
284:15, 300:4,
302:9, 305:15,
327:23, 339:4,
342:13, 349:19
**duties** [3] - 129:21,
130:1, 287:7
**duty** [2] - 98:20,

232:23
**dysfunction** [1] -
337:18

## E

**e-mail** [106] - 3:17,
3:21, 4:3, 4:4, 55:17,
55:22, 56:5, 104:2,
176:6, 177:10,
185:18, 186:4,
186:10, 186:18,
186:19, 187:7,
187:9, 187:13,
187:15, 190:21,
204:4, 205:23,
207:17, 207:23,
208:4, 208:21,
208:22, 209:7,
217:15, 217:23,
218:5, 222:21,
223:10, 223:18,
225:13, 225:20,
227:6, 228:1,
228:13, 230:11,
231:18, 232:1,
232:3, 232:6,
232:10, 232:11,
232:13, 232:16,
233:8, 233:18,
234:2, 236:22,
237:6, 237:14,
237:16, 237:20,
238:16, 238:17,
238:21, 239:17,
240:1, 240:19,
242:4, 243:2, 247:1,
247:14, 249:10,
250:10, 252:23,
255:10, 257:7,
263:14, 264:7,
264:8, 264:11,
264:12, 265:6,
268:21, 269:11,
270:20, 283:20,
283:23, 285:20,
288:17, 288:20,
306:4, 306:6, 307:8,
330:21, 333:2,
333:3, 333:7,
333:12, 333:17,
333:23, 334:10,
335:6, 335:15,
335:20, 336:1,
336:2, 336:4
**E-mail** [1] - 4:1
**e-mailed** [11] - 194:14,
198:11, 205:1,
205:2, 205:4, 206:3,
206:4, 253:16,

276:22, 283:21,
349:14
**e-mailing** [4] - 102:11,
276:22, 323:19,
331:15
**e-mails** [26] - 4:13,
57:13, 179:8,
180:10, 180:11,
180:13, 194:15,
215:12, 228:1,
228:2, 231:6,
231:12, 238:4,
238:19, 250:15,
254:4, 254:5, 255:3,
262:1, 262:14,
262:15, 284:2,
333:15, 333:22,
334:8, 335:14
**ear** [1] - 28:11
**earliest** [2] - 211:5,
211:6
**early** [7] - 31:10, 38:5,
259:5, 259:21,
287:10, 290:20,
317:2
**earn** [1] - 14:8
**earned** [3] - 15:10,
15:15, 17:7
**earning** [1] - 15:6
**easier** [6] - 64:18,
111:9, 162:2,
256:11, 256:21,
336:22
**easiest** [1] - 256:20
**easy** [2] - 253:8,
253:21
**ECFMG** [2] - 78:15,
78:20
**ecologically** [1] -
317:15
**economic** [1] - 62:18
**economy** [1] - 310:19
**ED** [4] - 257:12, 258:1,
258:2, 258:3
**education** [14] - 35:11,
38:10, 78:23, 79:18,
141:6, 141:7,
141:13, 142:13,
142:14, 142:19,
143:5, 143:10,
160:11, 161:1
**Education** [1] - 221:19
**education/training** [2]
- 141:17, 143:6
**Educational** [2] - 78:2,
78:15
**educational** [5] - 18:4,
18:8, 18:15, 61:21,
319:18
**Edward** [1] - 5:4

**effective** [2] - 218:18,
230:13
**effectively** [3] -
286:11, 289:4,
323:10
**effectuates** [1] - 51:19
**effort** [4] - 238:22,
249:21, 320:10,
320:12
**efforts** [1] - 59:16
**eight** [16] - 10:18,
42:3, 57:14, 61:8,
62:16, 63:18, 63:23,
67:18, 69:9, 108:1,
196:13, 208:12,
271:15, 315:3, 347:4
**either** [15] - 35:10,
38:10, 62:19, 107:8,
113:6, 148:14,
153:15, 153:20,
168:23, 173:6,
211:14, 271:20,
289:9, 297:16,
328:22
**ekaplan@sulloway.
com** [1] - 5:7
**EKG** [3] - 247:9,
328:4, 328:6
**elective** [1] - 166:22
**electives** [1] - 169:4
**electronic** [2] - 220:4,
220:7
**elementary** [1] - 246:6
**elements** [3] - 95:16,
220:16, 220:17
**embarrassing** [2] -
96:8, 96:20
**emergency** [17] -
31:14, 31:18, 31:19,
32:1, 32:4, 32:6,
32:9, 32:13, 32:15,
33:8, 33:11, 117:16,
337:4, 337:8,
337:12, 337:15,
339:5
**employed** [8] - 14:5,
35:18, 124:21,
164:17, 164:21,
265:10, 353:11,
353:15
**employee** [4] - 230:6,
300:21, 349:4,
353:14
**employment** [13] -
35:11, 35:13,
148:11, 195:14,
195:21, 196:1,
196:7, 196:20,
196:22, 196:23,
212:2, 343:7

**Employment** [1] - 183:23
**enabling** [1] - 184:11
**end** [22] - 15:14, 23:14, 31:7, 43:15, 46:20, 64:4, 73:20, 92:20, 111:1, 156:13, 199:14, 199:15, 202:15, 217:22, 224:5, 224:6, 231:4, 257:7, 265:16, 291:3, 342:6, 345:15
**ended** [2] - 46:19, 153:4
**endorsed** [1] - 24:17
**ends** [2] - 279:19, 280:1
**energy** [1] - 286:15
**enforce** [7] - 2:21, 2:23, 3:2, 50:6, 51:1, 51:9, 51:11
**enforced** [1] - 69:18
**enforcement** [1] - 231:2
**engage** [1] - 56:7
**engaging** [1] - 302:2
**engineer** [1] - 19:21
**engineering** [2] - 19:19, 19:23
**enrolled** [3] - 45:11, 47:7, 47:17
**enrollment** [8] - 22:16, 41:3, 43:8, 43:23, 72:11, 81:16, 162:21, 347:18
**enter** [1] - 350:13
**entered** [6] - 55:11, 58:11, 60:22, 165:18, 248:22, 339:20
**entering** [3] - 48:20, 262:3, 262:18
**entire** [7] - 45:13, 45:16, 68:11, 154:22, 160:6, 287:20
**entirely** [1] - 81:21
**entities** [2] - 22:15, 39:7
**entitled** [4] - 13:15, 100:1, 175:11, 306:12
**entity** [7] - 9:15, 9:18, 35:18, 36:3, 74:14, 75:4, 149:5
**entry** [3] - 103:23, 110:23, 117:15
**envelope** [2] - 213:7, 213:14

**episode** [1] - 323:21
**Equal** [1] - 183:23
**equity** [2] - 269:7, 278:18
**equivalent** [2] - 101:10, 102:23
**ER** [1] - 339:6
**ERAS** [63] - 3:3, 3:9, 72:13, 72:14, 72:18, 72:19, 73:23, 76:3, 76:10, 76:14, 76:21, 77:1, 77:2, 77:16, 77:19, 79:4, 79:17, 79:20, 80:8, 80:21, 85:12, 86:14, 86:15, 86:20, 87:3, 119:18, 120:4, 120:7, 120:21, 121:1, 121:12, 125:2, 125:20, 126:7, 127:5, 136:2, 137:3, 137:10, 138:18, 144:4, 144:9, 144:15, 144:18, 145:4, 145:9, 147:10, 147:19, 150:21, 151:4, 168:14, 196:9, 196:10, 196:11, 196:12, 196:16, 196:20, 197:17, 220:14, 325:13, 326:15
**Erin** [3] - 186:5, 186:20, 189:22
**erroneous** [1] - 56:13
**erroneously** [2] - 56:11, 233:14
**error** [1] - 56:12
**errors** [2] - 57:5, 57:12
**especially** [3] - 166:13, 231:5, 337:12
**Esq** [5] - 5:4, 5:5, 5:9, 5:10, 5:13
**essential** [1] - 130:20
**essentially** [2] - 227:7, 290:4
**est** [2] - 61:16, 61:17
**establishments** [1] - 88:9
**estate** [1] - 319:21
**estimate** [2] - 276:15, 278:6
**estimates** [2] - 280:19, 281:5
**estimating** [1] - 312:14
**et** [1] - 1:10
**evaluate** [2] - 296:21,

302:16
**evaluation** [9] - 116:10, 289:3, 289:7, 293:9, 294:11, 296:2, 296:23, 298:10, 299:16
**evaluations** [7] - 113:13, 117:19, 117:20, 117:21, 119:4, 260:2, 260:4
**evening** [5] - 31:9, 87:17, 88:4, 88:16, 88:17
**event** [1] - 293:17
**events** [2] - 87:15, 87:17
**evidence** [16] - 55:11, 56:11, 99:17, 101:19, 111:21, 124:4, 154:19, 187:17, 211:12, 226:1, 228:13, 262:18, 312:8, 329:3, 338:5, 342:18
**Evidence** [3] - 350:8, 350:10, 350:14
**evolved** [1] - 21:7
**Ex** [3] - 153:4, 213:7, 213:14
**exact** [7] - 209:18, 209:20, 240:17, 272:3, 282:12, 293:6, 334:5
**exactly** [8] - 9:9, 17:5, 36:10, 43:13, 107:6, 242:13, 291:7, 323:5
**exam** [5] - 343:19, 344:5, 345:22, 346:22, 350:11
**Exam** [1] - 258:21
**examination** [3] - 214:21, 281:14, 341:12
**EXAMINATION** [6] - 2:6, 6:9, 281:10, 329:14, 345:20, 348:4
**examinations** [1] - 104:4
**examine** [1] - 32:12
**examined** [1] - 105:6
**example** [18] - 53:18, 54:17, 62:8, 81:19, 97:16, 102:2, 102:5, 113:11, 115:16, 116:11, 119:6, 193:3, 231:16, 245:22, 287:11, 287:12, 323:12,

334:14
**examples** [5] - 101:14, 103:10, 130:7, 320:14, 325:1
**exams** [8] - 44:15, 57:7, 61:2, 112:9, 342:1, 343:16, 343:21, 344:10
**Excel** [1] - 315:21
**except** [3] - 111:17, 191:16, 248:1
**exception** [1] - 344:3
**exceptions** [2] - 232:22, 336:11
**excessive** [1] - 87:21
**exchange** [6] - 234:10, 255:5, 257:14, 306:6, 345:3, 347:14
**excites** [1] - 286:13
**excluding** [2] - 22:19, 76:21
**excuse** [18] - 27:22, 31:8, 51:10, 74:5, 93:10, 93:23, 99:18, 99:23, 108:8, 111:3, 112:19, 123:21, 126:19, 151:3, 190:21, 206:2, 270:15, 276:23
**execute** [1] - 69:22
**executed** [3] - 135:11, 349:13, 349:14
**executing** [1] - 340:5
**execution** [1] - 225:3
**executive** [3] - 117:16, 133:9, 308:11
**exert** [1] - 91:17
**exerted** [1] - 89:23
**exhaustive** [2] - 323:7, 331:16
**exhibit** [22] - 51:7, 64:7, 64:13, 85:4, 103:11, 103:12, 155:10, 155:11, 168:8, 175:7, 177:6, 178:8, 204:18, 210:15, 214:10, 215:9, 222:6, 222:20, 223:16, 247:12, 276:8, 339:13
**Exhibit** [65] - 3:13, 12:20, 48:14, 49:11, 50:1, 51:3, 51:5, 51:8, 55:9, 55:12, 57:17, 57:20, 64:8, 64:9, 77:8, 93:7, 93:9, 129:2, 129:5, 133:1, 133:3, 135:22, 140:15,

155:8, 163:21, 164:1, 175:8, 178:12, 183:9, 183:12, 185:15, 190:15, 192:10, 192:13, 194:2, 194:5, 201:1, 203:20, 204:16, 210:17, 210:19, 211:22, 214:12, 215:11, 235:17, 246:22, 247:2, 250:7, 250:10, 255:1, 262:8, 262:12, 262:18, 264:5, 268:14, 276:9, 305:22, 306:2, 310:4, 321:17, 321:20, 329:20, 350:23, 351:1
**exhibits** [5] - 4:21, 55:10, 174:22, 175:7, 246:20
**EXHIBITS** [1] - 2:16
**Exhibits** [1] - 326:11
**exist** [4] - 37:19, 82:13, 101:10, 269:4
**existed** [1] - 185:7
**existence** [4] - 163:1, 318:14, 318:22, 335:21
**exists** [4] - 38:3, 38:12, 263:2, 263:4
**exonerated** [1] - 86:21
**exonerates** [1] - 86:23
**expect** [1] - 10:10
**expectation** [1] - 284:14
**expected** [4] - 100:7, 101:5, 237:17, 243:6
**expelled** [6] - 54:7, 54:13, 162:11, 162:13, 162:18, 163:2
**expense** [1] - 324:8
**expenses** [2] - 35:21, 284:13
**experience** [11] - 22:22, 39:9, 108:22, 119:23, 120:22, 170:14, 179:20, 179:23, 206:17, 221:8, 238:14
**experiences** [1] - 344:8
**expert** [4] - 30:5, 295:20, 308:3, 315:8
**expired** [1] - 350:21
**Expires** [1] - 352:22

**explain** [7] - 164:5, 165:20, 186:14, 186:16, 316:8, 341:15, 343:17
**explains** [1] - 244:17
**explanation** [3] - 162:20, 164:12, 164:14
**explore** [2] - 108:17, 179:16
**expressed** [1] - 306:18
**expressly** [1] - 39:14
**expulsion** [1] - 86:14
**expunged** [1] - 225:21
**extended** [3] - 40:16, 141:17, 143:6
**extent** [6] - 58:12, 113:17, 113:20, 132:22, 144:1, 254:9
**eye** [1] - 265:5
**eyed** [1] - 293:3

## F

**face** [3] - 110:3, 248:2
**Facebook** [2] - 257:12, 305:5
**facility** [2] - 194:22, 195:13
**fact** [52] - 39:14, 47:13, 47:20, 48:1, 57:6, 58:9, 59:4, 71:10, 75:11, 78:23, 87:21, 88:20, 96:17, 103:1, 103:9, 126:6, 134:6, 143:12, 145:18, 148:22, 152:6, 154:9, 161:15, 166:9, 166:10, 167:7, 167:15, 179:7, 184:16, 186:21, 187:15, 188:16, 192:5, 192:16, 195:19, 202:5, 206:23, 208:10, 223:10, 234:11, 236:9, 249:18, 253:14, 254:8, 258:5, 260:15, 274:20, 308:20, 308:22, 314:12, 338:16
**factor** [1] - 314:19
**factors** [1] - 72:1
**facts** [15] - 47:12, 95:22, 98:19, 100:13, 100:16, 100:19, 101:1, 101:4, 101:6, 102:20, 153:13, 248:3, 249:11, 281:6
**factum** [2] - 61:16, 61:17
**faculty** [2] - 104:2, 114:12
**fail** [4] - 71:9, 74:10, 259:7, 259:22
**failed** [8] - 104:3, 105:18, 107:3, 109:2, 116:13, 120:2, 127:13, 259:7
**failing** [1] - 249:14
**failure** [4] - 73:6, 74:5, 130:19
**fair** [27] - 197:14, 215:17, 215:21, 216:1, 217:3, 221:21, 224:2, 224:7, 224:10, 224:19, 225:3, 225:5, 225:7, 226:8, 227:13, 228:13, 230:17, 230:21, 231:18, 232:4, 232:14, 233:17, 234:7, 234:23, 235:13, 235:14, 337:5
**fairness** [2] - 111:23, 159:16
**fall** [5] - 24:16, 44:9, 63:19, 302:10, 302:20
**fallen** [1] - 110:12
**falling** [2] - 245:5, 302:21
**falls** [1] - 35:17
**false** [8] - 85:21, 115:9, 115:10, 115:16, 116:12, 125:13, 130:16, 220:7
**falsely** [2] - 115:12, 123:14
**falsification** [1] - 220:5
**falsified** [2] - 128:8, 133:14
**falsifying** [2] - 112:8, 128:7
**familiar** [3] - 13:5, 237:23, 323:5
**familiarize** [1] - 238:23
**Family** [1] - 38:2
**family** [12] - 16:1, 16:4, 16:7, 17:9, 189:8, 248:1, 253:6, 257:8, 292:21, 338:10, 343:3, 344:19
**family's** [1] - 235:6
**far** [13] - 39:22, 134:21, 137:8, 140:8, 216:2, 216:4, 239:3, 239:5, 242:3, 267:8, 270:13, 331:18, 338:13
**farfetched** [1] - 243:16
**fast** [1] - 246:3
**father** [8] - 11:11, 205:23, 206:3, 206:20, 207:14, 207:18, 210:2, 298:21
**father/son** [1] - 208:13
**fatigue** [4] - 272:20, 294:14, 295:9, 341:8
**fatty** [1] - 272:14
**fax** [1] - 194:6
**FBI** [6] - 230:1, 233:22, 234:4, 234:10, 343:4, 343:8
**FDA** [1] - 328:3
**FDA-certified** [1] - 328:3
**feared** [1] - 204:5
**February** [7] - 44:14, 45:16, 45:17, 75:1, 101:16, 152:9, 199:14
**Fed** [4] - 153:4, 213:7, 213:14, 315:10
**Federal** [4] - 5:20, 350:10, 350:13, 350:15
**federal** [11] - 57:3, 59:11, 62:12, 64:10, 66:7, 67:19, 101:9, 102:23, 230:2, 342:23, 343:2
**Feess** [1] - 49:4
**Felipe** [1] - 106:16
**fellow** [2] - 163:8, 270:22
**fellows** [1] - 118:1
**fellowship** [1] - 176:17
**felonies** [1] - 230:2
**felony** [1] - 150:8
**felt** [28] - 31:23, 72:12, 110:9, 121:2, 165:7, 221:4, 226:17, 229:8, 232:23, 233:11, 244:13, 244:19, 254:19, 256:1, 256:7, 256:9, 260:20, 271:4, 275:23, 286:8,
257:8, 292:21, 294:21, 300:2, 301:20, 301:21, 341:20, 347:6
**female** [1] - 262:1
**fence** [1] - 327:14
**Fenner** [1] - 38:11
**few** [35] - 14:18, 22:6, 39:22, 67:17, 130:9, 180:20, 186:13, 187:16, 198:9, 207:7, 215:5, 217:1, 231:20, 241:9, 248:1, 253:5, 264:4, 283:9, 285:4, 291:14, 304:10, 316:14, 318:22, 319:22, 320:9, 320:14, 320:21, 321:2, 321:15, 323:17, 325:1, 334:5, 336:11, 341:10
**field** [1] - 166:5
**fifth** [1] - 106:18
**Fifth** [2] - 332:14, 332:20
**fight** [4] - 108:16, 108:19, 109:20, 235:8
**fighting** [2] - 108:19, 108:20
**figure** [8] - 79:7, 109:18, 111:9, 123:22, 149:1, 181:22, 261:2, 303:14
**figures** [1] - 281:4
**file** [14] - 4:2, 22:14, 60:21, 109:17, 118:23, 124:12, 135:12, 148:10, 206:9, 211:12, 211:17, 236:14, 320:20, 336:23
**filed** [20] - 49:6, 53:19, 54:6, 54:11, 59:13, 64:10, 66:6, 66:13, 70:22, 103:5, 150:12, 235:23, 267:3, 267:6, 267:7, 270:8, 320:21, 327:21, 330:1
**filing** [5] - 5:22, 53:9, 227:22, 320:22
**fill** [8] - 73:4, 138:15, 156:12, 176:21, 177:13, 177:14, 205:16, 207:5
**filled** [27] - 72:19, 72:20, 74:21, 75:5,
119:17, 120:22, 124:18, 144:7, 144:8, 144:14, 144:17, 145:22, 156:17, 156:21, 157:15, 176:19, 176:20, 176:23, 177:1, 177:7, 177:21, 178:5, 178:7, 178:11, 187:18, 205:13, 205:19
**filling** [4] - 72:15, 121:1, 155:20, 156:2
**final** [2] - 311:12, 324:18
**finally** [2] - 49:22, 176:7
**finance** [3] - 313:3, 315:2, 321:5
**financial** [1] - 9:17
**financially** [2] - 320:13, 353:15
**fine** [15] - 13:22, 22:3, 23:16, 30:3, 35:9, 55:12, 78:21, 88:12, 210:15, 251:22, 256:8, 258:16, 266:10, 270:4, 346:20
**fingers** [1] - 320:2
**finish** [18] - 60:8, 72:17, 82:7, 99:22, 100:18, 144:12, 146:17, 147:3, 187:22, 187:23, 241:13, 261:12, 261:13, 274:22, 300:6, 304:4, 319:14
**finished** [4] - 65:8, 80:13, 101:8, 350:22
**Finn** [89] - 7:14, 71:14, 102:10, 111:18, 112:19, 113:2, 134:19, 151:21, 152:14, 152:19, 152:21, 153:2, 153:20, 154:8, 154:20, 155:2, 156:18, 158:3, 158:6, 158:15, 159:21, 160:1, 160:5, 160:7, 163:15, 164:6, 164:11, 168:23, 170:5, 171:5, 171:8, 171:16, 171:17, 172:18, 172:20, 173:6, 173:22, 174:14, 176:19,

176:21, 176:23,
178:1, 178:3, 179:4,
181:16, 181:22,
211:9, 219:11,
219:13, 230:1,
233:22, 234:6,
240:20, 245:14,
246:3, 260:2, 283:9,
284:22, 285:7,
285:16, 288:9,
288:12, 288:15,
288:22, 289:10,
290:8, 290:21,
294:1, 294:4, 294:9,
294:23, 296:16,
297:16, 298:8,
301:7, 303:9, 304:2,
305:8, 305:14,
306:7, 306:9,
306:19, 307:5,
308:18, 309:10,
321:23, 322:23,
342:19, 343:15
**Finn's** [3] - 169:3,
179:13, 293:2
**fire** [5] - 246:11, 266:3,
286:1, 295:1, 299:8
**fired** [9] - 230:22,
265:4, 265:9,
265:22, 266:5,
266:7, 291:10,
291:18, 335:17
**firm** [3] - 121:9,
135:11, 317:15
**first** [115] - 5:18, 11:2,
22:11, 23:2, 29:5,
33:18, 44:16, 52:7,
53:5, 57:11, 59:7,
64:18, 69:6, 70:15,
72:3, 72:19, 87:14,
95:5, 97:4, 104:22,
115:17, 116:18,
123:10, 128:18,
146:23, 151:22,
155:14, 156:6,
156:21, 157:9,
158:21, 158:23,
159:4, 159:5, 159:6,
159:8, 159:9,
159:10, 159:11,
159:18, 160:3,
160:15, 164:21,
167:19, 168:4,
168:21, 170:8,
170:21, 173:3,
173:11, 173:23,
174:3, 174:10,
174:13, 175:12,
175:13, 177:16,
178:15, 181:7,

182:14, 185:18,
186:21, 188:16,
194:5, 194:9, 196:5,
198:16, 199:10,
205:11, 212:6,
232:9, 232:22,
233:9, 236:19,
240:10, 240:11,
244:18, 250:9,
250:14, 255:10,
263:1, 264:16,
264:17, 270:12,
270:13, 270:16,
280:5, 285:10,
287:22, 288:1,
292:15, 294:17,
313:9, 313:20,
316:3, 316:23,
334:16, 337:2,
338:1, 339:17,
339:18, 339:19,
340:5, 340:7, 340:8,
340:13, 341:2,
342:9, 347:21,
348:6, 348:12,
350:1, 350:6, 353:8
**first-year** [2] - 285:10,
288:1
**Fisher** [1] - 152:2
**fishy** [1] - 238:5
**fit** [6] - 128:2, 134:9,
165:8, 165:17,
166:9, 199:5
**five** [14] - 14:2, 107:23,
119:6, 119:13,
128:20, 182:23,
213:15, 214:21,
215:1, 224:18,
226:5, 298:2, 314:9,
343:22
**five-minute** [1] - 226:5
**fix** [1] - 302:5
**flagrant** [1] - 57:5
**flexibility** [1] - 298:2
**Florida** [7] - 10:7,
24:11, 24:12, 24:13,
26:19, 30:19, 337:17
**floundering** [3] -
39:12, 265:5, 265:15
**flu** [3] - 190:4, 190:5,
193:3
**Fluoxetine** [1] - 338:9
**flying** [1] - 139:14
**focal** [1] - 338:18
**focus** [2] - 183:22,
259:12
**focused** [2] - 190:9,
317:12
**folks** [2] - 117:15,
268:9

**follow** [13] - 58:20,
59:5, 60:14, 60:15,
60:18, 80:5, 87:13,
89:17, 233:4,
290:16, 317:20,
329:16, 345:23
**follow-up** [2] - 290:16,
345:23
**followed** [2] - 191:20,
191:21
**following** [9] - 13:20,
92:6, 133:9, 227:17,
232:2, 233:8,
233:17, 317:20,
331:15
**follows** [1] - 6:8
**FOR** [2] - 1:2, 2:16
**forbidding** [1] -
286:23
**forego** [1] - 131:18
**foregoing** [2] - 352:4,
353:5
**FOREGOING** [1] -
353:17
**Foreign** [2] - 78:3,
78:15
**foreign** [3] - 78:17,
238:12, 238:13
**foreseeable** [1] -
326:23
**forever** [1] - 241:6
**forged** [1] - 111:13
**forget** [3] - 141:23,
152:3, 337:22
**forgive** [2] - 38:23,
43:2
**forgot** [4] - 21:22,
121:11, 127:19,
232:18
**forgotten** [3] - 131:3,
131:4, 173:2
**Form** [4] - 3:15, 3:16,
15:12, 183:13
**form** [31] - 3:18, 16:19,
22:2, 24:1, 38:13,
50:15, 68:21, 73:9,
76:12, 99:19, 100:3,
100:17, 155:11,
156:10, 161:7,
161:8, 172:3,
175:15, 175:23,
187:18, 187:20,
192:7, 193:11,
196:17, 196:23,
197:12, 205:13,
207:5, 294:6, 340:16
**formal** [2] - 33:17,
282:17
**formalities** [1] - 5:23
**formally** [1] - 120:10

**format** [1] - 341:12
**formation** [1] - 226:14
**formed** [2] - 318:12,
340:11
**former** [2] - 108:4,
187:14
**forms** [1] - 183:14
**formulate** [2] - 283:5,
283:7
**formulating** [1] -
285:6
**Fort** [1] - 10:7
**forth** [4] - 13:10,
114:22, 226:12,
353:9
**forums** [1] - 84:1
**forward** [7] - 70:2,
70:7, 70:8, 204:14,
227:7, 333:21,
335:14
**forwarded** [6] -
212:10, 223:6,
269:19, 334:8,
334:15, 335:6
**FOSTER** [1] - 7:6
**Foster** [2] - 5:13, 7:6
**fought** [1] - 109:21
**founded** [1] - 269:1
**four** [22] - 9:22, 42:7,
46:13, 72:8, 107:23,
116:21, 125:3,
158:11, 167:16,
193:11, 201:18,
201:21, 228:1,
231:5, 298:1,
314:13, 333:15,
333:17, 336:4,
337:20
**four-page** [1] - 158:11
**fours** [1] - 215:1
**fourth** [2] - 160:8,
253:4
**frame** [3] - 30:1,
284:5, 318:10
**France** [5] - 38:17,
42:5, 42:6, 44:4,
317:21
**frankly** [5] - 52:23,
67:19, 103:5,
130:17, 276:4
**fraud** [4] - 132:7,
340:12, 343:15,
344:21
**fraudulent** [1] - 174:17
**fraudulently** [1] -
150:2
**free** [5] - 50:11, 52:12,
68:8, 284:15, 284:18
**French** [5] - 41:4,
41:5, 266:13,

266:21, 342:12
**frequently** [4] - 286:9,
297:19, 298:1
**freshman** [1] - 19:2
**Frew** [1] - 303:18
**Friday** [1] - 186:5
**Friedman** [12] -
102:10, 111:18,
112:12, 113:2,
237:2, 237:6,
237:11, 238:22,
240:19, 255:16,
260:2, 342:20
**Friedman's** [2] -
236:23, 238:19
**friend** [12] - 21:9, 32:7,
248:12, 248:19,
250:4, 252:23,
255:9, 260:13,
260:18, 269:2,
278:19, 338:11
**friendly** [2] - 135:15
**friends** [6] - 25:20,
108:4, 108:23,
139:15, 324:2, 341:6
**front** [23] - 17:19,
57:16, 57:17, 73:20,
85:4, 85:7, 103:12,
116:22, 158:15,
158:18, 159:18,
160:3, 183:12,
192:11, 215:9,
215:11, 222:20,
223:17, 238:22,
247:2, 268:17,
276:12, 330:7
**frontal** [3] - 267:23,
308:16, 345:5
**fuck** [1] - 261:19
**fucking** [1] - 255:21
**fulfillment** [2] -
129:21, 130:1
**full** [17] - 6:18, 40:1,
41:2, 44:13, 56:5,
61:15, 61:18, 62:15,
62:16, 62:22, 66:12,
67:8, 139:20,
146:14, 278:22,
314:8
**full-time** [4] - 62:15,
62:16, 314:8
**fully** [9] - 134:16,
210:7, 219:19,
242:1, 280:10,
302:8, 347:7, 347:8,
349:13
**fun** [5] - 266:13,
266:21, 323:22,
324:7, 342:11
**function** [2] - 315:21,

335:9
**functional** [1] - 282:21
**functioning** [3] - 308:11, 313:10, 313:22
**functions** [1] - 130:20
**fund** [3] - 278:18, 317:12, 317:19
**fundamentals** [1] - 217:8
**funny** [4] - 34:22, 228:5, 246:13, 332:10
**FURTHER** [3] - 329:14, 345:20, 348:4
**furthermore** [1] - 181:15
**future** [9] - 53:20, 54:13, 64:23, 65:16, 66:23, 69:8, 70:5, 326:23, 331:2

## G

**Gabby** [1] - 200:23
**gain** [2] - 74:17, 155:11
**gained** [1] - 78:11
**game** [4] - 246:16, 285:21, 286:5, 324:8
**games** [1] - 27:17
**gaps** [1] - 335:17
**Gary** [1] - 49:4
**general** [19] - 7:5, 18:8, 30:16, 75:3, 82:12, 95:9, 104:2, 106:23, 114:12, 167:10, 254:12, 254:14, 269:13, 269:17, 269:23, 270:1, 270:3, 295:13, 342:10
**General** [1] - 216:21
**generally** [15] - 13:21, 48:22, 115:8, 180:21, 188:4, 209:20, 236:2, 245:8, 250:20, 312:16, 320:6, 334:2, 336:8, 336:11, 343:6
**generation** [1] - 334:23
**geographic** [2] - 314:4, 314:15
**George** [1] - 317:22
**Germantown** [5] - 18:6, 18:10, 18:13,

18:14, 18:18
**gesture** [1] - 293:18
**GI** [1] - 166:19
**Gifford** [1] - 200:23
**gist** [1] - 285:8
**Given** [1] - 218:19
**given** [22] - 48:16, 89:12, 94:21, 103:10, 114:18, 171:3, 203:8, 218:21, 219:4, 222:4, 274:4, 274:6, 309:20, 312:12, 312:21, 318:6, 325:1, 328:15, 331:1, 338:15, 352:7
**Glasgow** [2] - 28:18, 30:5
**Global** [1] - 38:2
**globally** [1] - 288:2
**glossed** [2] - 58:18, 59:2
**Gmail** [4] - 55:18, 336:4, 336:5, 336:6
**GME** [13] - 3:16, 3:20, 154:2, 155:4, 155:6, 183:13, 212:1, 212:9, 217:20, 221:16, 222:23, 223:12, 231:13
**goal** [4] - 51:20, 68:16, 299:12, 299:14
**Goldman** [1] - 4:15
**Google** [10] - 14:19, 14:20, 15:2, 15:4, 15:12, 17:12, 17:15, 22:12, 350:2, 350:7
**gotcha** [6] - 246:7, 246:8, 246:16, 285:21, 286:5, 323:21
**gotta** [3] - 113:14, 207:14, 248:2
**government** [1] - 63:20
**graduate** [2] - 35:4, 166:2
**Graduate** [2] - 79:1, 221:19
**graduated** [1] - 18:11
**Graduated** [1] - 78:3
**Graduates** [1] - 78:16
**graduating** [1] - 35:9
**Grafton** [1] - 343:12
**grant** [3] - 282:18, 282:19, 282:20
**granting** [1] - 331:5
**gratitude** [2] - 306:18, 307:2
**great** [2] - 191:18,

287:6
**greater** [1] - 114:15
**Green** [5] - 288:9, 288:19, 290:11, 301:20
**grew** [2] - 247:18, 284:16
**grievance** [3] - 217:20, 221:16, 221:17
**grips** [1] - 238:17
**ground** [2] - 30:9, 318:7
**grounds** [4] - 13:18, 73:7, 74:7, 74:10
**group** [11] - 25:20, 26:16, 27:18, 39:18, 51:8, 88:6, 88:8, 185:21, 197:17, 318:12, 319:20
**Group** [4] - 150:17, 268:23, 317:7, 319:17
**growing** [1] - 316:13
**Gruessner** [6] - 135:5, 135:6, 135:8, 135:16, 162:7, 165:3
**Gruessner's** [1] - 165:15
**guard** [2] - 170:1, 264:16
**guess** [33] - 8:23, 9:11, 10:22, 19:6, 22:1, 30:6, 45:7, 50:15, 79:5, 81:19, 89:14, 96:11, 108:15, 120:10, 122:4, 144:23, 147:1, 155:1, 206:7, 211:3, 212:6, 252:2, 259:17, 281:14, 284:16, 309:7, 310:10, 326:3, 328:5, 336:15, 336:17, 346:5
**guessing** [1] - 156:20
**guidelines** [1] - 117:23
**guy** [5] - 74:21, 111:6, 239:23, 247:18
**guys** [3] - 111:7, 111:8, 281:8

## H

**hair** [1] - 299:4
**half** [6] - 215:6, 217:5, 301:20, 319:23, 327:18

**halfway** [1] - 322:7
**hall** [1] - 243:15
**Halloween** [1] - 23:15
**hallway** [1] - 301:13
**halos** [1] - 29:23
**HAMPSHIRE** [1] - 1:3
**Hampshire** [22] - 1:16, 163:16, 164:6, 205:12, 205:14, 205:16, 206:5, 206:9, 209:9, 220:6, 234:8, 234:9, 234:11, 234:14, 270:10, 308:6, 340:21, 343:4, 343:5, 343:11, 352:6, 353:5
**hand** [5] - 58:22, 62:2, 119:3, 147:22, 326:9
**handed** [6] - 49:13, 77:16, 128:19, 133:3, 134:12, 236:7
**handicap** [3] - 184:3, 185:1, 192:13
**handing** [1] - 163:23
**hands** [3] - 62:23, 82:5, 153:4
**handwriting** [1] - 212:16
**handwritten** [3] - 55:13, 157:8, 350:17
**Hanover** [3] - 120:20, 125:22, 341:19
**happy** [4] - 26:3, 70:14, 340:7, 347:12
**harass** [1] - 228:5
**harassing** [1] - 233:12
**hard** [15] - 19:5, 20:22, 21:1, 28:14, 29:9, 53:1, 88:19, 103:5, 164:10, 175:1, 195:8, 253:19, 322:5, 325:2, 327:1
**harder** [3] - 257:3, 257:6
**Harley** [4] - 102:10, 111:18, 238:19, 240:19
**harm** [2] - 230:6, 243:3
**harshest** [1] - 256:18
**Hartford** [5] - 16:13, 16:14, 18:1, 311:11, 311:14
**Hartford's** [1] - 314:20
**Harvard** [6] - 19:7, 216:15, 216:16, 294:4, 295:20, 296:11
**Harvard-trained** [2] -

295:20, 296:11
**haunt** [1] - 121:8
**Hawaii** [1] - 247:21
**HD** [4] - 4:7, 255:6, 255:8, 258:7
**head** [26] - 22:22, 23:2, 23:17, 30:14, 46:9, 47:14, 61:19, 166:14, 185:5, 208:15, 234:3, 243:18, 293:10, 297:22, 337:3, 337:7, 337:11, 337:19, 338:4, 338:5, 338:16, 339:4, 339:11, 344:15, 344:17
**heading** [1] - 258:1
**health** [5] - 185:20, 186:11, 187:18, 235:5, 288:3
**Health** [1] - 216:22
**hear** [7] - 198:6, 198:12, 204:3, 204:10, 209:6, 244:8, 309:18
**heard** [1] - 200:21
**hearing** [40] - 13:1, 13:20, 215:17, 215:21, 216:1, 217:4, 221:21, 222:11, 224:2, 224:7, 224:11, 224:19, 225:3, 225:7, 225:23, 226:5, 226:9, 226:12, 227:2, 227:13, 227:20, 228:2, 228:14, 230:15, 230:17, 230:21, 231:19, 232:4, 232:14, 233:18, 233:23, 234:7, 234:12, 234:23, 235:13, 235:15, 235:23, 309:14, 323:9, 331:11
**heart** [2] - 294:22
**heightened** [1] - 112:12
**held** [3] - 148:22, 253:23, 297:12
**help** [17] - 96:12, 183:20, 185:23, 197:2, 206:14, 206:18, 249:19, 251:14, 259:19, 299:7, 302:14, 303:5, 309:9,

309:21, 338:4, 344:18, 350:2
**helped** [1] - 74:16
**helping** [2] - 248:4, 249:17
**hemorrhoids** [1] - 166:20
**hence** [1] - 68:10
**hepatic** [1] - 272:14
**hereby** [4] - 224:6, 225:2, 352:6, 353:5
**hereinbefore** [1] - 353:9
**heroes** [1] - 198:9
**herself** [3] - 246:14, 323:9, 323:10
**hesitate** [1] - 146:13
**Hi** [1] - 186:11
**hi** [1] - 186:20
**hidden** [1] - 53:11
**hiding** [1] - 254:8
**high** [10] - 15:12, 278:6, 278:16, 280:11, 280:13, 312:3, 313:10, 313:21, 316:17, 316:21
**high-achieving** [7] - 278:6, 278:16, 280:11, 280:13, 312:3, 316:17, 316:21
**high-functioning** [1] - 313:10
**HIPAA** [3] - 274:17, 275:3, 275:19
**hire** [5] - 183:18, 183:19, 196:19, 204:20, 301:3
**hired** [4] - 40:15, 195:23, 287:16, 287:20
**history** [12] - 12:14, 25:7, 25:10, 34:14, 34:18, 211:17, 293:12, 294:16, 295:15, 299:17, 317:4, 317:5
**hit** [3] - 29:9, 29:16, 30:14
**Hitchcock** [30] - 5:3, 7:2, 7:3, 7:16, 113:7, 113:21, 204:20, 217:19, 242:22, 260:23, 269:15, 269:20, 270:2, 272:16, 282:19, 282:21, 287:21, 291:22, 292:16, 325:8, 326:17,

333:4, 333:5, 333:8, 333:13, 333:22, 334:9, 335:6, 335:11, 335:14
**HITCHCOCK** [1] - 1:9
**Hitchcock's** [2] - 278:3, 310:15
**hmm** [25] - 119:21, 123:5, 137:19, 138:8, 151:8, 151:23, 156:11, 160:21, 176:12, 191:8, 199:19, 200:6, 206:10, 206:12, 206:16, 225:1, 226:19, 239:16, 240:23, 272:12, 291:23, 304:15, 306:8, 310:5, 322:10
**hobbyist** [2] - 14:11, 328:5
**hold** [8] - 46:8, 96:21, 253:9, 253:21, 268:10, 271:6, 271:7, 272:4
**holding** [3] - 119:14, 167:5, 167:7
**Holiday** [1] - 9:1
**HOLLIS** [1] - 5:3
**Holtzheimer** [7] - 282:8, 282:9, 283:17, 284:9, 285:1, 285:20, 287:2
**Holtzheimer's** [1] - 282:6
**home** [9] - 9:3, 25:23, 29:22, 36:22, 108:3, 122:15, 170:19, 337:16, 339:7
**Homeland** [1] - 323:21
**homicidal** [1] - 222:11
**homicide** [1] - 222:11
**honest** [6] - 36:15, 79:14, 169:17, 243:16, 307:2, 323:14
**honestly** [7] - 72:12, 72:13, 121:21, 140:6, 162:8, 234:2, 251:1
**honeymoon** [1] - 177:11
**hope** [4] - 182:12, 228:6, 235:6, 236:4
**hoped** [2] - 52:15, 233:21
**hopes** [1] - 69:19
**hoping** [8] - 69:7, 69:13, 69:15, 96:2,

299:20, 299:21, 299:23, 300:1
**hospital** [16] - 32:17, 32:19, 33:2, 184:11, 194:22, 195:12, 196:15, 196:19, 216:11, 216:16, 287:5, 287:12, 303:7, 312:4, 337:6, 338:23
**Hospital** [6] - 7:3, 113:7, 113:22, 174:19, 216:21, 333:5
**hospital's** [1] - 196:17
**hospitals** [7] - 32:22, 104:18, 216:1, 216:3, 216:9, 216:14, 217:2
**hotel** [1] - 349:22
**hour** [6] - 13:16, 14:12, 98:20, 242:11, 281:15, 319:23
**hours** [19] - 13:14, 30:2, 31:20, 109:11, 110:12, 214:17, 214:18, 214:19, 214:20, 214:21, 215:7, 238:4, 239:5, 240:11, 258:15, 284:3, 284:7, 320:21
**house** [2] - 264:17, 269:17
**House** [2] - 3:14, 175:11
**HR** [9] - 152:13, 152:19, 153:6, 153:10, 173:20, 196:18, 212:12, 304:8
**huge** [1] - 291:13
**human** [1] - 182:7
**humorous** [1] - 344:7
**hundred** [6] - 138:3, 146:14, 146:20, 301:4, 320:9, 320:14
**hundred-thousand-dollar** [1] - 301:4
**hurt** [1] - 338:5
**husband's** [1] - 11:18

**I**

**Ianina** [1] - 10:23
**IANINA** [1] - 11:2
**idea** [7] - 19:5, 19:13, 19:14, 162:8, 183:1, 215:3, 241:15

**ideas** [1] - 258:2
**identification** [33] - 12:21, 48:15, 49:12, 50:2, 51:6, 77:9, 93:8, 129:3, 133:2, 135:23, 140:16, 155:9, 163:22, 175:9, 183:10, 185:16, 190:16, 194:3, 203:21, 210:18, 214:13, 235:18, 246:23, 250:8, 255:2, 262:9, 264:6, 268:15, 276:10, 305:23, 321:18, 326:12, 351:2
**IDENTIFICATION** [1] - 2:16
**identified** [4] - 112:4, 306:16, 324:6, 324:22
**identify** [2] - 6:20, 324:16
**ignorance** [1] - 341:2
**ignored** [1] - 296:5
**IIED** [1] - 132:7
**illegal** [1] - 230:19
**illegality** [3] - 58:1, 62:2, 66:19
**illogical** [1] - 62:7
**IM** [2] - 240:22, 256:9
**IM/neuro** [1] - 257:10
**imagine** [7] - 25:5, 106:10, 229:13, 230:4, 289:21, 312:16, 312:19
**imagined** [1] - 327:20
**immaterial** [4] - 71:4, 81:20, 316:19
**immature** [3] - 21:8, 21:10, 256:5
**immediate** [4] - 73:7, 74:7, 225:2, 225:7
**immediately** [9] - 25:17, 29:5, 119:7, 132:19, 152:9, 240:21, 254:20, 264:17, 264:20
**imminently** [1] - 228:23
**immunizations** [1] - 186:12
**impact** [3] - 12:6, 12:11, 203:9
**impacted** [1] - 308:15
**impacting** [1] - 295:17
**impacts** [1] - 344:13
**impairment** [3] - 267:23, 272:20,

345:6
**impairs** [1] - 129:23
**impermissible** [1] - 123:7
**implication** [1] - 65:6
**implied** [2] - 110:4, 111:13
**implies** [1] - 143:3
**implying** [1] - 108:21
**important** [4] - 61:5, 76:18, 199:17, 340:13
**impossible** [3] - 256:12, 256:22, 312:16
**impracticality** [2] - 58:1, 66:20
**impression** [8] - 211:6, 217:6, 217:7, 236:4, 288:10, 291:15, 327:14
**improper** [8] - 74:9, 86:5, 101:3, 131:21, 134:21, 134:23, 341:23, 343:15
**improperly** [9] - 73:7, 74:6, 86:3, 87:2, 132:5, 263:21, 284:2, 324:2, 343:18
**improve** [2] - 301:17, 308:15
**improved** [1] - 344:15
**improvement** [2] - 306:10, 306:13
**in-house** [1] - 269:17
**inability** [1] - 114:20
**Inability** [1] - 130:19
**inappropriate** [4] - 189:21, 234:12, 241:3, 245:17
**incarceration** [1] - 63:17
**incidences** [1] - 103:16
**incident** [6] - 31:18, 33:20, 104:7, 104:9, 104:15, 105:15
**incidents** [1] - 100:21
**include** [23] - 75:11, 75:18, 76:2, 76:11, 81:16, 119:22, 120:21, 122:7, 125:5, 126:12, 126:20, 141:9, 141:10, 141:12, 141:14, 148:14, 148:21, 157:10, 157:12, 157:14, 172:5, 275:3, 324:21
**included** [8] - 125:18,

126:15, 168:10,
187:9, 217:19,
254:11, 284:12,
306:10
**Included** [1] - 221:15
**includes** [3] - 159:23,
272:17, 311:9
**including** [5] - 17:9,
26:17, 196:11,
293:10, 352:9
**income** [16] - 14:8,
14:22, 15:7, 15:9,
15:15, 15:22, 16:5,
17:22, 35:19, 280:3,
310:7, 310:8, 311:6,
311:9, 311:18
**incomes** [1] - 312:14
**incompatible** [1] -
220:1
**incompetence** [9] -
112:2, 112:5,
112:20, 113:9,
113:18, 129:20,
194:23, 195:7,
259:17
**incompetent** [3] -
94:21, 257:9, 259:23
**inconsistencies** [2] -
62:7, 97:19
**incorporate** [1] -
320:7
**independent** [1] -
240:2
**Inderal** [1] - 338:2
**India** [1] - 319:21
**indicate** [5] - 39:15,
149:16, 150:16,
190:11, 270:5
**indicated** [4] - 150:16,
191:23, 327:11,
331:9
**indicates** [1] - 191:5
**Indicates** [1] - 28:9
**indicating** [2] -
249:10, 308:19
**indicative** [1] - 207:18
**indirect** [1] - 152:23
**individual** [6] - 37:6,
207:1, 247:15,
347:13, 347:22,
348:20
**individuals** [4] - 89:5,
100:20, 126:8,
227:23
**ineligible** [1] - 288:10
**infarction** [1] - 81:20
**infer** [4] - 101:23,
154:23, 160:6, 160:7
**inference** [2] - 102:1,
155:2

**inferred** [2] - 94:18,
102:16
**inflation** [5] - 278:1,
310:18, 311:11,
314:2, 316:14
**influence** [1] - 63:5
**influenced** [1] - 19:12
**inform** [6] - 151:9,
151:14, 218:16,
233:1, 267:8, 292:15
**informal** [3] - 57:13,
120:10, 283:19
**informally** [6] - 63:22,
120:12, 120:15,
285:13, 309:6, 345:1
**information** [34] -
15:17, 85:11, 85:21,
85:23, 86:2, 86:3,
86:8, 86:9, 87:3,
96:20, 138:10,
156:9, 187:10,
193:20, 195:20,
198:4, 207:2,
207:19, 213:1,
213:11, 220:4,
220:6, 227:20,
250:15, 252:1,
252:5, 277:18,
307:15, 324:21,
330:3, 331:20,
332:16, 336:3,
342:17
**informed** [8] - 115:11,
118:17, 123:6,
133:17, 134:4,
199:7, 226:23, 272:7
**initial** [2] - 32:11,
337:8
**initiated** [2] - 221:23,
222:5
**injuries** [6] - 337:7,
337:11, 338:4,
338:16, 338:19,
339:11
**injuring** [1] - 88:1
**injury** [24] - 22:23,
23:3, 23:17, 23:23,
24:7, 25:1, 25:13,
46:9, 166:14, 185:5,
208:16, 293:10,
297:22, 337:3,
337:8, 337:10,
337:19, 338:6,
338:13, 339:3,
339:4, 344:15,
344:17
**Inn** [1] - 9:1
**innocent** [1] - 114:6
**insane** [1] - 255:20
**INSEAD** [6] - 41:4,

41:5, 41:8, 41:16,
43:4, 323:19
**insight** [1] - 39:13
**insignificant** [1] -
337:8
**insincere** [2] - 296:4,
296:15
**insinuating** [1] -
144:16
**insofar** [1] - 85:17
**instance** [7] - 5:18,
116:12, 139:13,
170:21, 229:17,
275:8, 278:3
**instances** [1] - 320:2
**institution** [13] -
18:15, 18:17, 19:9,
66:4, 74:6, 79:18,
80:6, 81:15, 140:23,
142:20, 147:7,
225:7, 271:3
**institutions** [6] -
71:10, 80:22, 81:16,
103:7, 146:20,
274:19
**instructed** [2] -
241:19, 344:1
**instructions** [6] - 74:1,
74:3, 81:14, 158:19,
158:20
**insult** [2] - 29:12,
341:22
**insurance** [5] - 16:7,
16:8, 17:4, 109:17,
274:19
**intact** [1] - 308:13
**integrity** [1] - 220:9
**intellectual** [2] -
283:1, 283:2
**intend** [1] - 233:17
**intended** [7] - 64:22,
65:16, 197:6,
246:11, 246:12,
270:5, 319:3
**intending** [2] - 200:7,
207:2
**intent** [5] - 8:7, 9:12,
148:8, 268:20,
270:14
**intention** [1] - 197:3
**intentionally** [3] -
53:12, 128:22, 244:2
**interest** [8] - 19:19,
165:11, 166:14,
315:5, 315:9,
316:13, 316:17,
328:6
**interested** [5] -
166:12, 232:4,
250:9, 284:9, 353:15

**interesting** [5] -
167:17, 193:2,
198:7, 219:2, 220:18
**interestingly** [1] -
349:9
**intern** [7] - 119:19,
119:23, 120:7,
140:22, 143:17,
171:23, 191:12
**intern/resident** [1] -
333:1
**internal** [6] - 93:19,
240:22, 291:12,
304:12, 305:12,
309:19
**International** [1] - 36:5
**international** [1] -
288:3
**internet** [1] - 4:19
**Internet** [4] - 14:12,
14:15, 38:7, 289:10
**internist** [1] - 273:18
**interns** [4] - 114:16,
115:1, 125:17,
285:11
**internship** [10] -
24:13, 24:17, 24:21,
120:21, 181:3,
238:9, 253:12,
256:1, 258:12,
337:17
**interpret** [2] - 69:2,
85:16
**interpretation** [1] -
58:18
**interrogatories** [5] -
321:22, 324:14,
330:4, 330:8, 330:21
**Interrogatories** [1] -
4:14
**interrogatory** [1] -
274:8
**Interrogatory** [2] -
330:7, 331:7
**interrupted** [3] -
141:18, 143:6,
233:20
**interruption** [1] -
142:11
**intervene** [2] - 50:21,
50:23
**interview** [16] - 127:5,
127:6, 138:13,
138:20, 146:5,
147:20, 147:23,
148:2, 148:6, 148:8,
148:13, 149:2,
151:2, 168:1,
200:10, 325:17
**interviewed** [7] -

151:6, 151:8,
151:13, 151:20,
152:4, 168:13, 253:6
**interviewing** [1] -
168:3
**interviews** [9] -
168:17, 179:10,
180:17, 180:19,
181:2, 247:21,
248:1, 253:4, 325:20
**intoxicated** [1] - 89:7
**introduced** [1] -
263:21
**introducing** [1] -
329:3
**intrusive** [1] - 330:23
**invest** [2] - 320:4,
320:13
**invested** [1] - 320:10
**investigate** [5] -
202:5, 231:2, 234:5,
343:12, 343:14
**investigated** [4] -
86:20, 144:5,
225:21, 234:5
**investigating** [1] -
302:23
**investigation** [8] -
86:14, 96:3, 197:8,
197:10, 225:22,
230:8, 294:16, 343:8
**investment** [7] -
149:19, 281:2,
294:19, 313:3,
317:12, 317:19,
342:11
**investments** [1] -
317:13
**involve** [1] - 38:15
**involved** [5] - 43:3,
43:7, 57:3, 96:13,
109:6
**involving** [2] - 87:15,
161:1
**Ira** [1] - 104:2
**ironically** [1] - 167:15
**irrefutably** [1] - 342:19
**irregularities** [1] -
328:7
**irrelevance** [1] -
250:21
**Isaac** [3] - 4:18,
268:23, 319:16
**ISAACS** [3] - 1:6, 1:14,
6:6
**Isaacs** [109] - 2:3,
2:10, 2:12, 2:17, 3:7,
3:19, 4:2, 4:3, 4:4,
4:6, 4:8, 4:9, 4:11,
6:11, 6:15, 6:17,

6:22, 8:13, 11:11, 11:13, 11:15, 11:20, 12:20, 12:22, 18:3, 26:10, 28:20, 48:14, 49:11, 49:14, 50:1, 51:5, 51:17, 66:9, 77:8, 80:12, 87:11, 93:7, 95:7, 100:8, 104:3, 106:21, 107:16, 108:2, 111:23, 112:19, 114:11, 117:17, 117:22, 123:2, 123:6, 123:7, 129:2, 129:5, 133:1, 133:17, 135:22, 136:1, 140:15, 155:8, 163:21, 172:9, 174:20, 175:8, 175:10, 183:9, 185:15, 190:15, 194:2, 203:20, 210:17, 214:7, 214:12, 215:9, 219:19, 226:22, 235:17, 246:17, 246:22, 250:7, 255:1, 262:8, 264:5, 268:14, 271:7, 276:9, 294:8, 303:3, 305:22, 306:1, 313:12, 317:7, 321:17, 321:19, 326:11, 326:14, 329:16, 332:23, 333:8, 333:13, 335:22, 336:10, 345:22, 349:18, 351:1, 352:3, 352:8, 352:13, 353:7

**Isaacs'** [1] - 117:17

**Isaacs-Salvo** [1] - 11:13

**issue** [47] - 28:4, 47:3, 50:13, 50:16, 58:19, 59:17, 67:22, 68:15, 68:17, 75:3, 75:19, 76:19, 76:20, 77:15, 104:21, 104:23, 105:4, 105:11, 121:8, 122:2, 135:21, 147:14, 149:7, 167:20, 171:16, 186:15, 188:6, 188:8, 188:21, 192:19, 208:3, 208:15, 209:12, 241:16, 242:8, 244:5, 266:17, 302:6,

330:15, 331:11, 331:13, 331:17, 341:4, 342:3

**issued** [4] - 13:1, 70:9, 70:18, 329:21

**issues** [24] - 25:9, 48:13, 60:19, 71:16, 98:6, 126:1, 184:17, 189:8, 201:9, 208:15, 215:16, 237:3, 237:12, 293:5, 294:12, 298:8, 302:15, 305:19, 305:20, 309:21, 317:2, 317:3, 342:7, 344:22

**item** [2] - 205:11, 324:16

**items** [8] - 95:16, 97:17, 99:20, 100:1, 150:22, 186:13, 306:10, 306:16

**itself** [5] - 59:12, 62:15, 84:11, 166:8, 258:17

**Ivy** [5] - 280:11, 280:14, 287:19, 312:3, 337:6

**J**

**J.D** [1] - 6:22

**J.P** [1] - 352:21

**jail** [2] - 228:6, 230:1, 235:7

**James** [4] - 278:9, 280:15, 280:20, 281:3

**Jan** [1] - 211:23

**January** [18] - 44:3, 45:5, 151:7, 151:8, 151:14, 152:5, 168:18, 174:12, 174:17, 181:21, 202:2, 269:9, 304:7, 319:1, 319:9, 328:19

**Jasper** [1] - 151:21

**JD** [1] - 41:1

**Jeez** [2] - 256:9, 256:23

**Jeff** [2] - 240:1, 240:20

**Jeffery** [1] - 270:17

**JEFFREY** [2] - 1:14, 6:6

**Jeffrey** [13] - 2:3, 8:13, 49:14, 55:18, 95:7, 186:11, 270:17, 270:21, 333:12, 352:3, 352:13, 353:7

**Jersey** [2] - 10:6, 11:6

**Jim** [5] - 230:23, 231:22, 268:22, 269:11, 269:21

**job** [18] - 62:15, 62:16, 66:23, 78:16, 117:7, 119:12, 121:18, 130:20, 137:6, 149:11, 184:12, 238:3, 246:5, 294:17, 302:3, 307:21, 325:23, 346:3

**John** [3] - 212:8, 277:2

**joined** [1] - 206:13

**joining** [1] - 290:14

**joint** [1] - 24:15

**judge** [24] - 50:21, 50:22, 50:23, 51:23, 52:9, 58:17, 58:18, 59:1, 59:4, 60:17, 62:1, 62:20, 67:13, 69:7, 69:13, 69:16, 69:17, 70:18, 70:23, 275:11, 339:14, 339:16, 339:17, 339:21

**judging** [1] - 244:20

**judgment** [1] - 259:21

**July** [14] - 103:22, 104:13, 104:15, 105:15, 106:13, 107:3, 110:23, 114:8, 129:10, 130:23, 170:8, 240:15, 241:18, 259:13

**jump** [2] - 113:4, 316:6

**jumped** [1] - 239:12

**June** [20] - 35:5, 35:9, 38:4, 191:7, 191:9, 193:17, 227:12, 237:2, 237:7, 238:2, 238:8, 255:4, 255:10, 255:23, 257:15, 257:16, 257:18, 318:15, 318:18

**junior** [3] - 23:8, 23:10, 88:3

**juniors** [1] - 87:20

**jurisdictional** [1] - 125:23

**jury** [1] - 231:1

**justice** [1] - 323:11

**justifiable** [2] - 71:19, 72:4

**justify** [1] - 244:16

**Justin** [2] - 239:17, 239:18

**K**

**K-r-a-w-i-t-t** [1] - 239:17

**Kansas** [1] - 216:12

**KAPLAN** [73] - 6:10, 6:23, 12:18, 12:22, 48:16, 49:13, 49:22, 50:3, 51:4, 51:7, 54:3, 54:8, 77:12, 87:6, 87:11, 93:9, 127:2, 127:8, 129:1, 129:4, 132:23, 133:3, 136:1, 140:14, 140:17, 155:7, 155:10, 163:20, 163:23, 175:6, 175:10, 183:11, 184:21, 185:3, 185:14, 185:17, 190:20, 194:4, 203:22, 210:15, 210:19, 213:22, 214:3, 214:10, 215:3, 236:7, 243:19, 244:7, 247:1, 247:11, 250:9, 254:22, 255:3, 262:7, 262:10, 264:7, 268:16, 276:11, 281:7, 310:4, 313:14, 313:17, 329:15, 336:13, 336:19, 340:15, 340:19, 345:9, 345:21, 346:20, 347:1, 348:5, 349:17

**Kaplan** [29] - 2:7, 2:9, 2:11, 2:13, 5:4, 6:7, 57:6, 67:3, 84:6, 92:10, 130:3, 196:16, 199:10, 204:1, 208:12, 222:4, 230:4, 232:15, 241:21, 291:20, 310:2, 313:9, 313:12, 313:19, 317:6, 324:10, 337:2, 346:23, 348:2

**Kaplan's** [1] - 346:21

**Kathleen** [2] - 5:9, 7:12

**Keck** [3] - 47:8, 328:22, 329:10

**keep** [12] - 56:19, 160:9, 196:14, 222:19, 224:13,

249:21, 250:1, 252:22, 300:17, 300:20, 326:8, 336:23

**keeping** [3] - 149:9, 165:4, 240:2

**Keith** [1] - 277:2

**Kelleher** [2] - 212:8, 212:9

**Kelliher** [1] - 211:23

**kept** [1] - 261:7

**Kevin** [2] - 5:13, 7:4

**key** [1] - 63:9

**Khagi** [8] - 243:9, 255:18, 260:3, 342:1, 343:16, 343:18, 344:2, 344:9

**kill** [2] - 29:9, 299:5

**Kim** [5] - 231:22, 268:21, 268:22, 269:12, 269:21

**Kim's** [1] - 230:23

**Kincaid** [1] - 101:7

**kind** [76] - 27:16, 29:7, 39:8, 39:12, 44:16, 58:17, 58:18, 90:7, 90:8, 94:16, 94:17, 94:18, 95:22, 102:16, 106:6, 106:7, 109:9, 111:20, 112:6, 113:4, 114:4, 122:2, 134:20, 148:8, 152:10, 166:8, 169:10, 169:16, 191:11, 210:9, 213:16, 215:22, 220:19, 226:4, 238:3, 238:6, 240:16, 248:2, 258:2, 265:13, 278:5, 282:23, 283:2, 283:4, 285:12, 285:14, 285:22, 286:14, 293:13, 293:15, 293:17, 294:21, 294:22, 296:3, 296:12, 297:9, 299:5, 306:22, 306:23, 307:1, 307:12, 307:23, 313:16, 314:16, 316:19, 317:11, 317:18, 317:20, 318:23, 324:2, 327:16, 328:8, 340:15, 342:1

**kindergarten** [1] - 336:8

**kinds** [4] - 154:4, 193:7, 213:1, 232:21
**knocked** [2] - 28:16, 30:9
**knowing** [2] - 61:20, 244:15
**knowingly** [1] - 325:3
**knowledge** [21] - 39:14, 56:21, 61:18, 66:16, 76:5, 77:4, 84:1, 85:13, 85:17, 101:18, 161:11, 177:8, 179:13, 242:4, 242:5, 242:15, 243:4, 272:19, 274:18, 308:13, 322:15
**knowledgeable** [2] - 334:19, 334:21
**known** [18] - 8:15, 25:9, 71:23, 75:3, 97:10, 180:10, 180:15, 181:17, 211:7, 211:19, 245:4, 256:18, 256:19, 293:5, 337:10, 337:11, 338:18, 339:11
**knows** [7] - 102:16, 111:14, 208:9, 208:14, 251:1, 327:9
**kpeahl@ wadleighlaw.com** [1] - 5:11
**Krawitt** [2] - 239:18, 239:22

## L

**lab** [1] - 116:19
**labeled** [2] - 121:4, 310:10
**Labor** [2] - 292:19, 295:15
**lack** [5] - 61:10, 73:1, 119:13, 130:22, 308:12
**lane** [3] - 37:9, 37:10, 37:13
**Lane** [4] - 265:1, 265:4, 265:14
**language** [3] - 73:3, 82:3, 103:1
**Lanka** [1] - 45:19
**LAPD** [2] - 63:12, 63:13
**laptop** [1] - 257:19
**large** [4] - 57:4, 125:17, 179:10,

310:1
**larger** [3] - 277:15, 286:5, 341:4
**LaRusso** [2] - 245:15, 246:4
**last** [44] - 9:7, 10:17, 11:3, 12:5, 14:13, 14:18, 15:11, 15:13, 17:8, 25:3, 29:13, 29:17, 34:22, 38:3, 44:2, 51:7, 85:3, 85:4, 104:23, 106:16, 116:22, 129:12, 139:14, 177:5, 180:18, 202:1, 235:9, 257:11, 258:13, 258:15, 258:17, 260:8, 263:2, 263:4, 263:13, 276:7, 289:17, 308:6, 327:18, 332:10, 345:16, 345:17, 349:22
**late** [4] - 24:9, 42:17, 66:7, 290:20
**lateness** [1] - 301:11
**Latin** [1] - 35:7
**latitude** [1] - 80:2
**laughing** [1] - 313:16
**Law** [3] - 41:2, 42:11, 42:19
**law** [26] - 43:14, 43:16, 44:16, 47:10, 47:11, 53:18, 58:13, 58:20, 59:5, 60:14, 60:15, 60:18, 61:21, 62:8, 72:4, 81:21, 82:18, 82:20, 84:5, 101:7, 226:2, 231:1, 232:17, 232:22, 233:9, 246:9
**lawful** [1] - 60:10
**laws** [1] - 207:20
**lawsuit** [43] - 34:3, 34:13, 48:21, 49:5, 49:20, 50:5, 50:13, 51:18, 51:20, 52:18, 53:2, 53:3, 53:19, 54:7, 57:7, 59:11, 62:12, 62:15, 62:19, 68:11, 97:13, 101:2, 101:13, 135:14, 180:12, 234:15, 234:16, 243:17, 250:21, 261:11, 261:14, 262:3, 268:3, 268:5, 281:17, 304:18, 323:10, 323:14,

329:4, 340:10, 343:6, 344:18, 347:14
**lawsuit's** [1] - 343:9
**lawsuits** [3] - 22:14, 53:9, 66:7
**lawyer** [4] - 52:22, 75:8, 91:11, 92:11
**lawyers** [2] - 57:13, 332:10
**LCR** [2] - 5:14, 353:22
**leader** [1] - 337:7
**leadership** [2] - 282:4, 288:5
**leading** [1] - 285:23
**leads** [3] - 21:21, 97:1, 345:22
**league** [5] - 280:11, 280:14, 287:19, 312:3, 337:6
**leaning** [1] - 203:11
**learned** [1] - 101:21
**least** [9] - 69:10, 92:11, 97:10, 117:14, 160:7, 166:22, 177:21, 180:21, 182:13
**leave** [49] - 7:20, 9:12, 19:3, 39:5, 40:3, 94:18, 94:19, 94:20, 94:22, 114:2, 130:17, 134:20, 174:23, 218:23, 222:1, 242:17, 243:5, 243:10, 243:22, 244:2, 259:8, 266:8, 292:23, 297:2, 297:3, 297:7, 298:16, 298:18, 298:22, 299:10, 299:16, 299:20, 299:23, 300:14, 300:23, 303:10, 303:12, 303:16, 303:19, 303:21, 304:1, 306:22, 307:5, 307:16, 308:7, 319:18, 347:2, 347:5, 347:11
**leaves** [3] - 214:19, 214:21, 281:15
**leaving** [8] - 26:4, 38:9, 128:15, 149:14, 149:16, 149:17, 150:17, 303:23
**led** [1] - 25:5
**left** [41] - 19:13, 25:21, 26:1, 26:21, 27:1,

27:3, 27:5, 27:7, 27:8, 28:2, 38:17, 40:19, 40:22, 41:7, 42:23, 44:14, 44:17, 44:19, 112:13, 125:3, 136:12, 136:13, 136:14, 142:23, 143:3, 150:1, 150:11, 206:8, 214:16, 241:8, 241:10, 241:18, 242:12, 244:4, 270:18, 271:4, 283:4, 285:5, 346:18
**legal** [12] - 47:12, 56:20, 68:3, 76:5, 77:5, 190:7, 341:1, 346:3, 347:8, 347:9
**legally** [6] - 8:18, 71:16, 71:18, 83:21, 120:17
**legitimate** [2] - 117:8, 327:7
**legitimately** [1] - 307:21
**length** [2] - 142:2
**lengthy** [1] - 272:1
**less** [4] - 67:12, 146:5, 216:4, 330:23
**lethal** [3] - 25:6, 25:12, 26:5
**letter** [44] - 3:4, 3:6, 4:15, 4:16, 10:9, 81:5, 86:22, 93:10, 93:22, 94:5, 95:4, 95:5, 95:6, 121:20, 129:10, 129:17, 131:13, 164:11, 201:10, 202:7, 217:17, 217:20, 217:22, 218:3, 218:7, 218:10, 218:11, 218:14, 218:16, 220:9, 221:10, 221:14, 222:9, 222:16, 222:21, 223:22, 223:23, 224:5, 224:21, 230:12, 234:20, 328:17, 328:19, 329:6
**Letter** [1] - 224:16
**letting** [1] - 283:20
**level** [14] - 63:11, 112:2, 112:8, 112:12, 112:14, 113:8, 114:14, 120:10, 167:21, 193:23, 259:22,

294:6, 328:5, 337:18
**levels** [4] - 28:19, 97:6, 113:8, 181:1
**Levine** [1] - 104:2
**liar** [1] - 235:4
**license** [30] - 3:12, 139:9, 139:10, 139:17, 139:18, 139:20, 139:21, 139:23, 140:1, 140:10, 140:18, 140:21, 143:15, 143:16, 148:22, 149:6, 152:16, 155:12, 163:8, 166:5, 205:7, 205:12, 205:14, 205:16, 206:6, 208:11, 209:3
**licensed** [2] - 194:22, 195:13
**Licensed** [1] - 353:3
**licenses** [2] - 139:7, 140:4, 143:20, 206:6
**Licensing** [1] - 258:21
**licensing** [4] - 209:1, 209:9, 211:2, 212:12
**lied** [2] - 118:14, 131:16
**lieu** [2] - 134:14, 134:16
**life** [14] - 12:2, 25:8, 33:10, 63:23, 97:11, 111:8, 111:17, 121:3, 190:8, 304:7, 310:8, 342:2, 344:14, 350:5
**lifetime** [1] - 111:19
**lifting** [1] - 225:8
**light** [2] - 224:22, 302:5
**likely** [6] - 64:23, 65:16, 65:22, 71:2, 71:3, 134:10
**limit** [1] - 295:3
**limitations** [1] - 235:8
**limited** [3] - 161:21, 266:23, 304:10
**limits** [1] - 92:16
**line** [11] - 108:1, 108:11, 164:17, 240:20, 253:4, 257:11, 266:11, 316:2, 317:13
**lines** [1] - 271:15
**link** [2] - 143:12, 143:19
**list** [21] - 61:8, 75:7, 81:14, 97:17, 99:20, 100:1, 100:6, 101:6,

103:1, 127:7, 272:2, 273:2, 273:3, 274:5, 311:23, 323:7, 323:15, 324:4, 324:11, 350:1
**listed** [5] - 64:4, 92:10, 98:19, 127:7, 187:19
**listen** [2] - 113:14, 252:9
**lists** [2] - 22:6, 273:5
**literal** [1] - 293:21
**literally** [3] - 286:23, 291:2, 293:6
**literature** [2] - 287:18, 343:21
**litigate** [1] - 62:12
**litigation** [20] - 22:8, 37:2, 67:19, 69:9, 97:23, 98:2, 98:5, 98:6, 98:9, 131:17, 236:10, 249:2, 249:7, 251:17, 262:19, 276:16, 296:6, 331:18, 346:10, 347:7
**live** [2] - 16:5, 39:21
**lived** [2] - 10:6, 29:19
**liver** [1] - 272:14
**lives** [1] - 198:10
**living** [1] - 36:11
**load** [2] - 162:2, 309:20
**loans** [1] - 17:9
**locate** [1] - 289:18
**located** [2] - 36:23, 41:10
**location** [2] - 79:18, 142:20
**locations** [4] - 9:21, 9:22, 10:2, 31:3
**locked** [3] - 97:8, 102:13, 135:14
**locking** [2] - 97:12, 97:15
**log** [1] - 180:6
**logic** [4] - 53:1, 53:16, 53:18, 204:9
**London** [1] - 339:5
**long-term** [2] - 39:15, 299:10
**look** [64] - 12:23, 13:7, 22:4, 57:21, 58:4, 62:21, 63:9, 68:8, 78:21, 93:13, 93:23, 95:4, 95:5, 103:11, 103:22, 110:23, 123:17, 129:4, 136:5, 139:4, 155:14, 156:15, 157:9, 158:12,

181:3, 185:17, 186:4, 188:15, 190:23, 197:17, 197:21, 200:11, 203:22, 204:4, 204:7, 204:16, 211:22, 212:15, 213:8, 213:9, 216:7, 217:9, 218:14, 236:8, 236:19, 237:20, 247:11, 250:5, 252:22, 262:13, 263:1, 263:4, 264:15, 266:2, 279:13, 300:1, 300:19, 310:1, 314:5, 314:14, 315:14, 321:20, 322:11, 328:14
**looked** [17] - 21:22, 119:7, 129:13, 157:1, 157:2, 165:23, 181:16, 185:20, 198:3, 215:23, 216:10, 280:22, 335:11, 338:17, 346:10, 350:13, 350:16
**looking** [14] - 58:2, 65:14, 66:18, 107:23, 131:20, 142:12, 156:5, 156:9, 222:8, 226:7, 238:20, 256:3, 280:9, 316:2
**looks** [3] - 93:19, 170:10, 191:3
**Los** [1] - 47:14
**lose** [1] - 242:21
**losses** [1] - 4:12
**lost** [7] - 233:19, 240:3, 242:13, 313:15, 349:12, 349:15
**low** [1] - 181:1
**LPMR** [3] - 282:2, 282:7, 290:22
**Lunch** [1] - 214:2
**lunch** [4] - 243:10, 243:11, 261:8, 301:23
**lying** [1] - 244:23
**Lynch** [20] - 38:11, 38:15, 39:17, 40:8, 41:7, 41:13, 41:14, 89:18, 89:22, 90:4, 90:6, 92:8, 149:11, 149:12, 150:2, 150:9, 150:11,

266:11, 267:17, 268:13
**Lynch's** [2] - 91:20, 91:22
**Lynn** [2] - 11:13, 11:16

# M

**M.D** [6] - 1:14, 2:3, 6:6, 352:3, 352:13, 353:7
**M1** [1] - 169:7
**M2** [3] - 169:7, 257:23, 341:23
**MAEGAWA** [1] - 106:17
**magistrate** [1] - 13:19
**Magistrate** [3] - 329:21, 331:10, 331:16
**magnitude** [1] - 339:9
**mail** [113] - 3:17, 3:21, 4:1, 4:3, 4:4, 10:9, 16:17, 55:17, 55:22, 56:5, 104:2, 147:23, 176:6, 177:10, 185:18, 186:4, 186:10, 186:18, 186:19, 187:7, 187:9, 187:13, 187:15, 190:21, 204:4, 205:3, 205:23, 207:17, 207:23, 208:4, 208:21, 208:22, 209:7, 217:15, 217:23, 218:5, 222:21, 223:10, 223:18, 225:13, 225:20, 227:6, 228:1, 228:13, 230:11, 231:18, 232:1, 232:3, 232:6, 232:10, 232:11, 232:13, 232:16, 233:8, 233:18, 234:2, 236:22, 237:6, 237:14, 237:16, 237:20, 238:16, 238:17, 238:21, 239:17, 240:1, 240:19, 242:4, 243:2, 247:1, 247:14, 249:10, 250:10, 252:23, 255:10, 257:7, 263:14, 264:7, 264:8, 264:11, 264:12, 265:6, 268:21, 269:11, 270:20, 283:20,

283:23, 285:20, 288:17, 288:20, 306:4, 306:6, 307:8, 330:21, 333:2, 333:3, 333:7, 333:12, 333:17, 333:23, 334:10, 335:6, 335:15, 335:20, 336:1, 336:2, 336:4
**mailed** [15] - 194:14, 198:11, 204:21, 205:1, 205:2, 205:4, 206:3, 206:4, 253:16, 276:22, 283:21, 349:14
**mailing** [6] - 10:5, 10:15, 102:11, 276:22, 323:19, 331:15
**mails** [26] - 4:13, 57:13, 179:8, 180:10, 180:11, 180:13, 194:15, 215:12, 228:1, 228:2, 231:6, 231:12, 238:4, 238:19, 250:15, 254:4, 254:5, 255:3, 262:1, 262:14, 262:15, 284:2, 333:15, 333:22, 334:8, 335:14
**main** [7] - 32:21, 61:2, 61:7, 61:8, 270:23, 274:6, 301:19
**maintain** [8] - 9:9, 9:18, 16:22, 114:20, 245:12, 333:10, 333:11, 333:20
**maintained** [3] - 38:7, 83:8, 333:18
**maintaining** [1] - 13:18
**major** [2] - 20:9, 68:1
**majority** [2] - 57:4, 179:10
**malpractice** [2] - 302:22, 308:4
**managed** [1] - 277:11
**management** [3] - 7:7, 25:9, 34:14
**managing** [1] - 318:9
**Manchester** [1] - 5:11
**manner** [4] - 68:23, 184:12, 286:3, 287:7
**marc** [1] - 235:1
**Marc** [17] - 158:3, 158:5, 158:8, 158:14, 168:23,

173:6, 173:12, 173:13, 173:17, 230:1, 230:7, 230:12, 234:21, 234:22, 235:2, 235:3, 235:12
**March** [19] - 11:10, 175:23, 176:16, 177:1, 177:21, 179:5, 179:13, 184:16, 194:19, 199:15, 217:15, 218:3, 218:7, 218:18, 223:11, 224:9, 230:14, 260:6, 260:8
**Margate** [2] - 10:6, 11:6
**Marina** [1] - 55:4
**Marino** [1] - 4:17
**mark** [23] - 12:18, 48:10, 49:10, 49:23, 51:4, 123:4, 129:1, 132:23, 140:14, 155:7, 163:20, 175:6, 183:8, 185:14, 197:1, 203:18, 210:15, 214:10, 246:20, 254:22, 262:7, 276:7
**marked** [48] - 12:21, 48:15, 49:12, 50:2, 51:6, 51:8, 77:9, 93:8, 93:9, 129:3, 133:2, 135:23, 140:16, 140:17, 155:9, 163:22, 164:1, 175:9, 178:8, 178:12, 183:10, 185:16, 190:16, 192:1, 194:3, 201:1, 203:21, 210:18, 214:13, 217:12, 235:18, 246:23, 250:8, 255:2, 262:9, 264:6, 268:15, 276:10, 305:23, 306:2, 321:16, 321:18, 321:20, 326:12, 329:20, 346:12, 349:20, 351:2
**Market** [1] - 5:10
**marking** [1] - 155:10
**markings** [1] - 350:19
**married** [2] - 10:19, 11:9
**Mary** [5] - 7:2, 113:7, 113:21, 287:21, 333:4

**Mass** [1] - 216:21
**master** [1] - 100:8
**match** [5] - 148:9,
177:9, 194:9, 253:7,
253:19
**matched** [2] - 182:5,
229:22
**material** [1] - 21:4,
79:10, 79:14, 79:19,
80:3, 80:7, 80:22,
80:23, 85:18, 86:1,
86:8, 86:10, 195:20,
205:22, 220:3,
224:22, 226:11,
318:21, 320:11
**materially** [1] - 324:3
**materials** [3] - 22:7,
175:19, 176:2
**matriculated** [6] -
80:11, 81:3, 81:4,
81:7, 81:10
**matriculation** [1] -
141:22
**Matt** [1] - 21:9
**matter** [24] - 29:2,
48:21, 50:12, 56:8,
69:8, 70:12, 71:5,
76:23, 77:2, 84:10,
100:22, 135:9,
189:4, 202:8,
219:14, 226:5,
231:1, 246:9,
291:11, 291:16,
302:23, 331:3,
339:22, 352:8
**matters** [2] - 20:5,
72:5
**Matthew** [2] - 20:15,
20:18
**Matthews** [1] - 277:2
**Mayo** [3] - 136:18,
136:22, 198:1
**MBA** [16] - 41:1, 41:4,
41:5, 41:8, 41:22,
42:15, 44:1, 102:11,
149:18, 277:22,
278:2, 280:12,
281:2, 313:23, 314:1
**MBA's** [1] - 314:10
**McAllister** [2] -
151:21, 151:22
**McCafferty** [3] -
329:21, 331:10,
331:16
**MD** [4] - 95:7, 277:22,
280:12, 314:10
**mean** [113] - 8:17, 9:1,
20:23, 21:13, 21:17,
22:4, 24:2, 27:22,
33:9, 33:15, 43:9,

50:16, 56:2, 62:11,
70:21, 71:13, 72:15,
73:9, 85:16, 94:16,
95:21, 98:3, 98:5,
98:10, 99:21, 99:23,
101:23, 102:6,
106:12, 109:15,
116:9, 122:15,
124:13, 127:23,
128:2, 128:21,
129:8, 130:9, 131:5,
137:10, 137:14,
139:3, 145:11,
146:4, 149:23,
150:15, 155:3,
159:14, 162:1,
167:15, 168:1,
169:12, 170:20,
170:22, 172:2,
172:7, 173:16,
182:7, 190:3,
196:21, 197:19,
198:11, 199:22,
200:21, 201:17,
202:14, 213:6,
222:10, 229:10,
238:19, 243:13,
243:17, 249:23,
251:11, 254:10,
260:15, 267:18,
269:6, 272:13,
281:1, 287:8,
287:11, 290:15,
291:6, 293:12,
293:14, 293:15,
295:1, 296:12,
299:13, 302:19,
307:9, 315:4,
316:15, 316:23,
317:9, 318:7,
318:20, 320:1,
320:5, 322:16,
322:19, 323:3,
323:7, 323:12,
323:22, 324:3,
329:2, 334:11,
335:17, 346:2,
350:12
**meaning** [5] - 61:18,
67:9, 271:23, 298:1,
317:13
**MEANS** [1] - 353:19
**means** [7] - 59:6,
61:20, 85:2, 166:3,
297:20, 318:20,
331:21
**meant** [11] - 25:16,
57:13, 57:14, 83:23,
84:2, 84:4, 261:2,
339:22, 344:6

**measles** [1] - 186:13
**med** [8] - 57:8, 62:12,
62:13, 64:1, 149:18,
248:1, 253:6, 257:8
**Medical** [40] - 7:3,
72:7, 78:3, 78:15,
79:1, 125:19,
125:22, 126:3,
126:13, 151:2,
151:9, 151:13,
153:7, 153:10,
167:21, 173:5,
178:23, 191:10,
193:21, 206:8,
211:7, 217:19,
221:19, 236:14,
238:18, 242:22,
258:20, 261:1,
269:14, 269:15,
269:19, 269:20,
292:16, 325:9,
330:1, 332:23,
333:4, 333:11,
333:19
**medical** [106] - 12:14,
13:18, 31:7, 31:14,
31:22, 45:19, 45:21,
46:23, 47:17, 53:21,
53:22, 54:18, 66:8,
78:14, 78:17, 78:18,
78:22, 79:17, 108:4,
137:14, 139:7,
139:9, 139:16,
140:4, 141:6, 141:7,
141:13, 141:17,
142:12, 142:14,
142:19, 143:4,
143:5, 143:10,
143:19, 144:21,
151:10, 152:16,
157:10, 160:11,
160:12, 161:1,
166:2, 166:4, 166:5,
184:17, 185:21,
216:18, 220:8,
223:8, 236:23,
237:18, 239:6,
242:4, 242:5, 248:4,
263:22, 271:8,
271:11, 271:23,
274:18, 275:14,
281:3, 282:3,
292:22, 293:9,
293:11, 294:16,
295:6, 295:15,
296:1, 296:19,
296:20, 298:9,
298:13, 298:16,
298:18, 298:22,
299:6, 299:15,
299:16, 299:20,

299:23, 300:14,
300:23, 301:18,
303:10, 303:19,
304:1, 305:3,
306:21, 307:5,
307:16, 308:4,
308:7, 314:17,
327:8, 339:4, 341:6,
342:22, 343:20,
343:22, 344:19,
345:14, 347:23
**MEDICAL** [1] - 1:9
**Medicare** [1] - 300:18
**medication** [3] -
11:21, 12:1, 186:16
**medications** [6] -
11:23, 12:5, 12:8,
12:10, 12:17, 189:13
**medicine** [12] -
140:22, 186:6,
240:22, 282:4,
288:5, 291:12,
302:12, 302:16,
304:13, 305:2,
305:12, 309:19
**Medicine** [10] - 47:8,
178:9, 178:10,
178:12, 220:7,
308:6, 328:23,
329:10, 343:5,
343:13
**meet** [3] - 133:8,
283:10, 288:20
**meeting** [26] - 3:8,
63:14, 102:5,
117:17, 118:8,
118:14, 128:3,
133:4, 133:11,
133:13, 135:4,
135:6, 202:1,
237:10, 285:5,
285:8, 296:5,
297:16, 297:17,
297:23, 298:4,
298:7, 299:14,
300:5, 320:8
**meetings** [3] - 20:19,
21:6, 134:21
**meets** [1] - 128:10
**member** [1] - 104:3
**members** [1] - 269:13
**membership** [3] -
226:23, 227:1, 227:4
**Memorial** [4] - 7:2,
113:7, 113:21, 333:5
**memories** [3] - 31:2,
264:20, 293:4
**memory** [18] - 13:6,
23:5, 28:2, 29:21,
30:15, 56:23, 57:1,

61:1, 61:16, 133:23,
150:21, 204:15,
217:6, 245:7,
251:21, 293:16,
308:13, 335:17
**mental** [2] - 62:18,
345:1
**mentality** [5] - 96:16,
96:17, 246:15,
297:21, 332:21
**mention** [10] - 39:11,
101:17, 118:6,
134:1, 145:7,
168:10, 172:4,
173:19, 190:3,
287:12
**mentioned** [23] - 11:7,
33:22, 34:1, 61:2,
116:10, 168:2,
168:4, 168:5,
168:11, 170:4,
170:6, 170:7, 172:6,
172:21, 173:8,
189:3, 216:11,
303:11, 317:11,
323:18, 328:9,
331:10, 343:10
**mentioning** [4] -
71:21, 101:20,
173:12, 173:17
**mentions** [2] - 108:11,
135:4
**merely** [1] - 84:8
**Merrill** [29] - 38:11,
38:15, 39:17, 40:8,
41:7, 41:13, 41:14,
89:18, 89:21, 90:4,
90:6, 91:20, 91:21,
92:8, 149:11,
149:12, 150:2,
150:9, 150:11,
266:10, 266:20,
266:21, 267:4,
267:7, 267:17,
267:19, 268:6,
268:13
**mess** [2] - 73:1,
208:18
**message** [2] - 116:2
**messages** [4] - 4:8,
262:5, 262:20,
262:22
**met** [9] - 30:13, 110:3,
259:10, 288:19,
305:16, 305:18,
318:22, 318:23,
319:20
**method** [2] - 109:20,
109:23
**Meuiner** [5] - 3:18,

156:18, 164:10, 194:14, 231:16
**Michael** [9] - 55:3, 74:20, 74:21, 75:5, 75:6, 76:5, 76:15, 76:23, 77:1
**microscope** [1] - 242:14
**Microsoft** [1] - 156:23
**middle** [4] - 11:14, 107:21, 122:23, 282:13
**midrange** [1] - 315:1
**might** [28] - 92:19, 97:14, 118:19, 121:21, 146:2, 146:6, 146:21, 210:6, 213:23, 225:18, 229:13, 233:23, 234:9, 248:1, 255:16, 257:21, 278:1, 278:2, 286:15, 298:22, 310:22, 314:9, 314:22, 314:23, 335:22, 336:11, 338:9, 346:16
**miles** [1] - 39:22
**Miller** [1] - 3:5
**million** [6] - 278:2, 278:5, 279:20, 310:21, 314:2, 316:6
**mind** [5] - 54:9, 119:11, 130:18, 182:5, 193:2
**mine** [2] - 84:7, 269:2
**minimal** [2] - 114:18, 284:13
**minimum** [3] - 315:22, 336:23, 337:9
**minor** [2] - 244:5, 319:8
**minute** [21] - 77:7, 87:7, 111:1, 114:14, 124:23, 154:11, 158:2, 167:2, 176:16, 183:7, 190:13, 214:17, 218:14, 226:5, 227:11, 239:13, 247:5, 250:6, 259:13, 311:2, 322:11
**minutes** [17] - 14:2, 30:2, 87:7, 87:8, 213:15, 214:17, 214:18, 214:19, 214:20, 214:22, 215:1, 215:5,

242:11, 257:12, 307:18, 321:6
**miscellaneous** [1] - 334:18
**mischaracterizing** [1] - 154:15
**misconduct** [2] - 194:23, 195:6
**misconstrue** [1] - 76:13
**misdemeanor** [3] - 63:11, 63:14, 63:15
**misinformed** [1] - 20:3
**misleading** [2] - 58:15, 337:5
**Misrepresentation** [1] - 195:20
**missed** [2] - 54:1, 309:15
**missing** [5] - 85:21, 85:23, 86:1, 86:3, 86:9
**misstated** [2] - 87:2, 213:11
**misstatements** [1] - 220:13
**misstating** [1] - 86:16
**mistake** [1] - 256:10
**mistakes** [1] - 341:1
**mistreated** [1] - 203:7
**misunderstood** [1] - 199:4
**MLB** [1] - 217:12
**Mobile** [2] - 262:23
**mock** [1] - 235:23
**moderate/severe** [1] - 272:16
**modified** [3] - 277:9, 279:2, 279:13
**Moldova** [2] - 187:13, 187:14
**moment** [9] - 13:8, 18:5, 51:15, 64:16, 66:17, 117:11, 120:20, 142:1, 245:8
**moments** [1] - 207:7
**money** [5] - 14:23, 16:18, 315:11, 320:4, 320:13
**monitored** [1] - 114:12
**monitoring** [1] - 114:15
**month** [19] - 15:11, 15:19, 16:16, 16:21, 17:15, 42:23, 43:21, 79:13, 198:17, 199:12, 199:13, 209:10, 210:13, 224:18, 282:12, 291:11, 309:11,

309:12
**months** [20] - 14:18, 15:8, 24:14, 42:3, 42:7, 45:23, 67:20, 189:1, 201:18, 201:21, 229:22, 230:3, 230:18, 244:14, 257:9, 261:7, 319:7, 326:2, 347:4
**moot** [3] - 147:15, 224:22, 226:3
**moral** [1] - 71:16
**morally** [1] - 120:15
**moreover** [4] - 56:1, 82:8, 232:9
**morning** [4] - 31:10, 107:9, 245:19, 302:6
**most** [33] - 10:17, 21:19, 57:7, 63:21, 67:4, 70:14, 82:17, 82:19, 84:1, 103:12, 130:6, 139:11, 139:13, 166:1, 167:8, 170:12, 178:1, 179:7, 179:13, 180:10, 196:22, 245:1, 245:3, 302:2, 308:10, 308:15, 312:17, 318:21, 334:6, 340:12, 342:5, 343:14
**mostly** [2] - 39:6, 74:18
**mother** [1] - 11:13
**mother's** [1] - 11:18
**motion** [10] - 2:20, 3:1, 50:6, 51:9, 51:10, 52:6, 70:17, 329:23, 330:1, 331:5
**motions** [5] - 53:2, 53:10, 53:16, 57:3, 331:2
**motivate** [1] - 96:14
**motivated** [2] - 98:16, 99:12
**motivation** [1] - 286:16
**motive** [1] - 182:8
**move** [12] - 77:6, 78:1, 84:15, 89:16, 93:5, 162:9, 235:16, 239:8, 239:11, 248:20, 268:8
**moved** [3] - 40:23, 51:1, 248:9
**moving** [4] - 39:6, 39:16, 227:7, 265:15
**MR** [78] - 6:10, 6:23,

7:4, 7:6, 7:9, 7:15, 12:18, 12:22, 48:16, 49:13, 49:22, 50:3, 51:4, 51:7, 54:3, 54:8, 77:12, 87:6, 87:11, 93:9, 127:2, 127:8, 129:1, 129:4, 132:23, 133:3, 136:1, 140:14, 140:17, 155:7, 155:10, 163:20, 163:23, 175:6, 175:10, 178:10, 183:11, 185:3, 185:14, 185:17, 190:20, 194:4, 203:22, 210:15, 210:19, 213:22, 214:3, 214:10, 215:3, 236:7, 244:7, 247:1, 247:11, 250:9, 254:22, 255:3, 262:7, 262:10, 264:7, 268:16, 276:11, 281:7, 310:4, 313:14, 313:17, 329:15, 336:13, 336:19, 340:15, 340:19, 345:9, 345:16, 345:21, 346:20, 347:1, 348:5, 349:17, 350:23
**MRI** [2] - 282:21, 338:18
**MS** [13] - 7:12, 184:21, 215:5, 281:11, 305:21, 306:1, 321:14, 321:19, 326:9, 326:13, 329:13, 345:7, 349:18
**multiple** [4] - 20:19, 107:9, 226:2, 259:18
**must** [1] - 221:18
**mutual** [1] - 56:3

## N

**NA** [2] - 184:12, 193:14
**naive** [1] - 300:7
**naively** [1] - 96:2
**name** [24] - 6:18, 8:12, 8:13, 8:19, 10:21, 11:2, 11:3, 11:14, 11:18, 32:17, 32:22, 36:1, 36:3, 39:1, 106:17, 151:22,

152:2, 152:3, 169:13, 173:2, 232:18, 273:17, 278:9, 337:22
**named** [5] - 23:19, 158:20, 169:14, 247:15, 255:6
**names** [5] - 8:16, 34:2, 37:3, 216:14, 269:22
**naps** [3] - 261:8, 301:23, 342:12
**narrow** [1] - 274:1
**Nashville** [1] - 41:1
**national** [1] - 198:8
**nationally** [2] - 277:23, 314:7
**nature** [9] - 20:20, 71:23, 90:11, 90:23, 91:6, 91:14, 99:1, 298:12, 338:15
**necessarily** [2] - 37:3, 53:10
**necessary** [4] - 8:9, 73:11, 276:5, 343:19
**need** [32] - 6:14, 13:23, 14:1, 14:3, 16:5, 54:15, 70:5, 80:3, 174:9, 185:23, 186:12, 186:22, 188:13, 190:12, 191:11, 193:18, 206:7, 209:23, 214:23, 228:13, 229:19, 232:19, 243:11, 259:4, 264:2, 267:16, 294:11, 311:4, 323:13
**needed** [11] - 19:9, 105:3, 105:6, 106:2, 202:12, 259:3, 289:7, 289:12, 290:4, 296:2, 308:19
**needs** [2] - 205:13, 344:5
**nefarious** [1] - 189:20
**negative** [13] - 113:17, 117:19, 118:10, 118:22, 122:20, 122:21, 124:12, 127:20, 131:12, 315:5, 317:16, 317:17
**negligence** [4] - 34:16, 194:23, 195:7, 195:10
**negotiated** [2] - 50:18, 347:11
**negotiations** [1] - 345:18

nerve [1] - 111:16
nervous [3] - 244:17, 305:6, 342:7
nervousness [1] - 244:21
neurologic [2] - 317:4, 339:2
neurological [1] - 317:1
neurologically [1] - 317:4
neurologist [2] - 338:11, 338:23
neurologists [1] - 337:21
neurology [1] - 166:15
neuropsych [5] - 167:16, 195:5, 308:21, 327:1, 337:20
neuropsychiatrists [1] - 337:21
neuropsychiatry [1] - 337:22
neuropsychologist [2] - 152:1, 308:12
neurosciences [1] - 166:13
neuroscientist [3] - 294:5, 295:20, 296:11
neurosurgeon [5] - 167:4, 280:6, 313:11, 313:22, 314:7
neurosurgery [8] - 166:13, 166:17, 166:21, 166:23, 180:19, 206:14, 206:19
never [64] - 8:18, 8:19, 9:12, 25:7, 39:8, 54:9, 59:21, 60:13, 70:16, 75:6, 75:10, 80:1, 81:6, 81:8, 91:3, 96:1, 105:21, 106:6, 106:7, 118:14, 123:4, 123:12, 134:12, 134:19, 139:9, 144:23, 178:22, 180:2, 183:18, 191:20, 195:16, 200:21, 203:8, 207:12, 218:23, 221:23, 222:5, 235:22, 235:23, 254:4, 255:20, 265:10, 265:19, 277:6, 286:6, 291:3,

296:20, 309:16, 311:17, 312:10, 320:19, 320:23, 335:11, 336:5, 339:21, 340:9, 341:8, 341:20, 342:1, 342:12, 346:2, 350:4, 350:14
NEW [1] - 1:3
new [7] - 42:12, 183:17, 183:19, 196:19, 204:20, 229:4, 325:6
New [30] - 1:16, 3:14, 10:6, 11:6, 39:20, 40:22, 163:16, 164:6, 175:11, 205:12, 205:14, 205:16, 206:5, 206:9, 209:9, 220:6, 234:8, 234:11, 234:14, 270:10, 308:5, 319:22, 320:9, 340:21, 343:4, 343:5, 343:11, 352:6, 353:4
newly [1] - 345:5
news [1] - 198:13
News [2] - 19:11, 281:4
Newtown [4] - 10:4, 10:12, 217:22, 223:6
next [55] - 18:17, 27:12, 30:15, 31:21, 38:10, 38:16, 41:12, 68:7, 106:13, 107:22, 108:11, 110:23, 114:9, 119:18, 122:23, 124:1, 124:18, 135:5, 137:2, 139:5, 143:21, 145:19, 165:6, 170:23, 180:20, 195:12, 195:18, 196:5, 196:14, 204:6, 210:15, 210:16, 218:2, 218:19, 223:15, 224:14, 226:7, 227:2, 254:22, 256:23, 258:17, 259:11, 264:23, 266:11, 283:4, 285:5, 291:14, 298:13, 329:5, 339:2, 339:13, 340:4, 347:20
NH [5] - 3:11, 5:6, 5:11, 5:14, 353:22

NHES [1] - 323:9
nice [2] - 239:23, 261:6
night [6] - 24:9, 31:8, 66:8, 258:15, 342:13, 349:23
nightly [1] - 342:3
nightmare [4] - 208:14, 210:3, 254:11, 254:17
NIH [1] - 349:4
Nina [1] - 55:3
nine [4] - 108:1, 229:22, 230:3, 326:2
nobody [2] - 59:13, 144:17
noise [1] - 21:6
non [3] - 52:21, 61:16, 61:17
nondisclosure [3] - 71:4, 73:12, 340:2
none [8] - 72:6, 108:23, 139:8, 144:1, 145:4, 191:6, 235:22, 298:5
nonetheless [2] - 224:21, 232:13
nonlawyer [1] - 52:21
nonrenewal [1] - 213:8
nonstop [2] - 255:19, 255:21
nonurban [1] - 19:15
Noordsy [6] - 170:6, 170:23, 171:8, 171:9, 171:10
Noordsy's [1] - 182:1
normal [1] - 233:4
normally [3] - 8:7, 92:13, 248:19
NOS [2] - 121:4, 145:14
NOT [1] - 353:18
notary [1] - 57:10
Notary [2] - 352:21, 353:4
note [1] - 241:13
notes [20] - 4:9, 4:18, 105:19, 105:21, 106:3, 106:5, 106:9, 106:11, 121:13, 128:22, 210:9, 275:10, 296:5, 302:1, 309:5, 309:14, 349:19, 349:21, 350:17, 353:6
nothing [20] - 12:9, 84:22, 97:9, 118:9, 127:17, 127:19,

127:21, 161:18, 165:2, 166:21, 177:2, 191:16, 293:19, 293:20, 295:18, 320:15, 325:2, 339:8, 342:8
Notice [1] - 5:22
notice [15] - 4:11, 7:23, 98:4, 106:16, 129:18, 129:19, 146:19, 148:8, 198:19, 218:4, 221:15, 230:13, 268:19, 268:20, 339:9
noticed [4] - 7:22, 103:2, 114:3, 339:10
notification [3] - 270:12, 270:13, 270:16
notified [3] - 31:16, 260:9, 274:15
notify [2] - 221:18, 232:19
notorious [1] - 256:21
notwithstanding [6] - 10:22, 49:3, 56:10, 90:10, 223:13, 263:23
November [11] - 23:4, 23:13, 262:14, 282:11, 284:4, 290:20, 301:10, 318:13, 318:17, 330:5, 330:16
NPV [1] - 315:21
number [30] - 17:18, 17:19, 49:15, 55:14, 114:22, 115:4, 117:18, 125:17, 149:10, 178:8, 184:2, 184:9, 195:18, 217:12, 241:5, 242:3, 307:19, 309:21, 311:12, 314:21, 315:1, 315:9, 315:11, 315:12, 315:17, 320:2, 322:7, 334:5, 343:21
numbered [2] - 322:6, 330:4
numbers [23] - 156:6, 277:4, 277:9, 277:15, 277:19, 279:4, 279:5, 279:7, 279:15, 280:14, 280:16, 310:14, 310:21, 311:7, 311:15, 312:11,

313:20, 314:3, 314:5, 316:3, 316:4, 316:9, 316:20
numerous [4] - 112:17, 262:14, 273:22, 341:1
nurse [1] - 230:6
NUS [1] - 79:1

## O

O'Leary [2] - 5:13, 7:4
O'LEARY [1] - 7:4
oath [3] - 214:8, 272:3, 352:8
object [48] - 7:19, 7:22, 12:14, 14:9, 17:4, 18:7, 22:1, 24:1, 48:6, 48:20, 50:15, 54:23, 55:10, 58:14, 60:16, 65:5, 67:3, 68:20, 73:9, 76:12, 86:18, 92:3, 99:19, 100:10, 100:17, 131:23, 148:15, 151:11, 154:16, 161:7, 191:13, 193:10, 197:11, 213:13, 239:21, 262:3, 262:18, 329:2, 330:19, 332:13, 332:19, 340:4, 340:16, 340:19, 345:7, 345:9, 345:10, 346:5
objected [3] - 172:2, 328:10, 328:12
objecting [2] - 100:2, 161:8
objection [15] - 10:22, 13:18, 13:21, 14:10, 56:10, 90:10, 101:13, 102:22, 223:13, 241:22, 266:16, 329:12, 345:16, 345:17, 350:9
objectionable [1] - 275:8
objections [8] - 5:23, 6:12, 6:13, 7:17, 49:3, 92:11, 350:1, 350:14
obligation [3] - 84:22, 198:15, 228:4
obliged [1] - 43:9
observe [2] - 88:16, 89:4
observed [6] - 87:21,

87:23, 88:18, 113:6,
338:14
**observing** [1] - 114:4
**obsessed** [1] - 328:11
**obsessive** [1] - 87:22
**obstructive** [1] -
272:19
**obtain** [1] - 205:14
**obtained** [2] - 307:14,
347:20
**obtrusive** [1] - 331:18
**obvious** [2] - 340:9,
344:4
**obviously** [12] - 47:2,
67:8, 78:6, 101:12,
123:13, 153:8,
182:3, 188:13,
190:7, 203:9, 238:7,
253:12
**occasion** [4] - 114:3,
242:19, 242:23,
335:12
**occasions** [1] - 245:10
**occupational** [1] -
186:6
**occur** [2] - 24:8,
174:11
**occurred** [11] - 23:3,
31:18, 33:6, 102:3,
162:5, 168:18,
168:22, 172:12,
257:15, 308:4,
341:21
**occurring** [1] - 186:1
**occurs** [1] - 232:20
**October** [14] - 23:14,
93:10, 170:4, 171:1,
171:6, 171:9,
172:12, 172:13,
174:18, 201:2,
282:11, 284:4
**odd** [16] - 29:14,
29:23, 98:19, 98:20,
103:2, 128:5, 128:9,
189:23, 190:5,
190:6, 190:8, 286:1,
286:3, 289:22,
306:21
**OF** [8] - 1:3, 1:14,
352:1, 352:14,
352:15, 353:17,
353:18, 353:20
**offer** [8] - 219:8,
219:21, 299:18,
299:19, 299:22,
309:17, 345:2,
345:13
**offered** [6] - 134:14,
213:3, 213:18,
275:4, 293:15,

332:15
**offering** [7] - 84:19,
287:20, 289:4,
295:1, 299:3, 331:20
**offers** [1] - 56:4
**office** [6] - 36:22,
110:13, 169:3,
212:1, 221:19, 293:2
**official** [8] - 10:5,
41:12, 118:9,
118:10, 134:17,
161:18, 162:1, 165:3
**officially** [2] - 127:21,
265:20
**offshore** [1] - 36:14
**often** [3] - 185:7,
220:12, 314:12
**omission** [1] - 195:20,
220:3, 225:21
**omissions** [1] -
220:14
**omit** [1] - 72:10
**omitted** [1] - 87:2
**on/one** [1] - 309:11
**once** [7] - 116:21,
134:5, 197:7,
198:23, 199:6,
204:5, 204:11
**one** [157] - 7:18, 10:9,
19:15, 21:2, 21:18,
24:20, 28:14, 31:16,
32:21, 39:9, 39:15,
49:23, 51:4, 53:6,
53:7, 53:12, 53:13,
55:3, 55:13, 57:7,
57:22, 59:9, 61:8,
61:14, 62:2, 63:3,
63:9, 67:18, 68:22,
71:17, 72:19, 80:1,
81:4, 81:17, 92:11,
94:16, 97:15, 98:6,
101:16, 102:2,
105:13, 107:12,
107:23, 111:12,
111:17, 116:9,
116:10, 116:13,
116:14, 116:23,
117:3, 119:4, 119:5,
119:8, 119:13,
120:14, 125:8,
125:9, 128:19,
128:20, 129:19,
138:4, 138:6, 142:5,
142:8, 142:11,
149:21, 150:15,
155:21, 157:15,
157:17, 161:12,
162:2, 165:14,
166:1, 169:2, 184:2,
194:13, 194:16,

196:16, 196:20,
198:13, 205:19,
210:13, 213:7,
213:15, 220:2,
220:21, 221:13,
223:2, 224:17,
224:18, 235:12,
238:5, 241:7, 245:2,
250:5, 251:19,
254:22, 256:18,
256:19, 260:18,
269:12, 278:16,
278:17, 279:18,
279:19, 279:20,
279:23, 280:1,
280:8, 280:10,
281:16, 281:21,
282:2, 282:5,
290:10, 292:1,
299:6, 301:13,
308:1, 309:11,
312:6, 312:7, 314:8,
321:3, 323:12,
323:18, 325:13,
327:2, 328:1,
328:12, 329:16,
329:17, 332:9,
334:13, 334:15,
335:22, 338:3,
340:13, 340:21,
340:22, 341:1,
342:7, 345:3,
345:12, 346:8,
346:10, 349:13,
350:5, 350:6
**one-month** [1] -
210:13
**one-off** [1] - 308:1
**one-year** [2] - 142:11,
166:1
**ones** [6] - 42:16,
274:6, 275:4,
301:13, 315:4,
333:14
**onward** [1] - 208:15
**opened** [1] - 146:1
**operating** [2] - 114:19,
181:5
**opinion** [3] - 76:11,
308:17, 337:9
**opportune** [1] - 134:2
**opportunities** [4] -
215:17, 281:18,
282:2, 287:20
**opportunity** [14] -
80:21, 123:7,
190:11, 198:16,
219:4, 219:6, 219:9,
219:11, 219:13,
219:15, 230:8,

281:23, 285:17,
309:4
**Opportunity** [1] -
183:23
**oppose** [1] - 275:7
**opposed** [1] - 261:1
**opposition** [2] - 2:22,
50:6
**optimism** [1] - 326:22
**optimistic** [3] - 54:12,
253:7, 326:6
**option** [3] - 146:5,
218:21, 221:17
**optional** [2] - 149:23,
150:1
**options** [5] - 118:20,
218:20, 227:3,
275:14, 338:12
**order** [37] - 2:18, 3:1,
12:23, 13:4, 13:10,
22:9, 51:9, 51:15,
51:16, 52:2, 56:7,
58:10, 59:17, 60:5,
60:7, 68:15, 68:17,
70:8, 70:18, 205:13,
243:9, 274:11,
274:16, 274:21,
275:6, 275:18,
276:1, 329:20,
329:21, 330:18,
331:1, 331:5,
331:12, 331:16,
332:16, 346:10
**ordered** [12] - 69:17,
69:18, 102:14,
243:23, 244:3,
330:14, 330:16,
330:20, 341:23,
343:16, 343:18,
344:10
**org** [6] - 333:8,
333:13, 333:22,
334:9, 335:6, 335:14
**organic** [1] - 81:18
**organize** [1] - 101:5
**original** [2] - 217:22,
223:5
**Original** [1] - 4:21
**OTC** [2] - 189:13,
189:14
**otherwise** [2] - 58:12,
232:20
**outcome** [1] - 343:3
**Outlook** [1] - 335:8
**outrageous** [1] - 260:2
**outs** [1] - 272:17
**outstanding** [1] -
111:15
**over-the-counter** [1] -
189:14

**overall** [4] - 148:10,
165:8, 165:17
**overlap** [1] - 52:23
**own** [12] - 60:20,
60:23, 73:15, 76:5,
77:4, 93:2, 196:19,
259:21, 260:3,
311:20, 315:23
**owned** [1] - 257:19
**owners** [1] - 318:2

---

## P

**p.m** [1] - 351:3
**P.O** [1] - 5:6
**PA** [2] - 10:12, 257:8
**package** [3] - 4:1,
176:11, 194:13
**packet** [6] - 164:6,
183:18, 183:19,
196:19, 205:6, 289:9
**packets** [1] - 204:20
**page** [100] - 13:9,
22:12, 55:9, 55:13,
55:14, 55:17, 64:16,
64:17, 65:12, 65:13,
65:14, 66:17, 66:18,
68:8, 78:3, 85:3,
85:5, 103:15,
103:17, 103:22,
106:13, 107:22,
111:1, 114:9,
122:23, 123:1,
136:7, 139:5,
143:21, 149:9,
154:1, 155:14,
156:5, 156:6, 156:9,
156:21, 157:5,
157:10, 158:1,
158:2, 158:11,
158:16, 158:21,
158:23, 159:1,
159:4, 159:5, 159:6,
159:8, 159:9,
159:10, 159:11,
159:18, 160:3,
160:8, 160:10,
195:18, 217:11,
217:14, 218:3,
221:14, 222:6,
222:20, 223:15,
223:20, 224:14,
226:7, 226:22,
227:11, 227:17,
230:10, 236:19,
237:5, 239:12,
239:13, 240:18,
256:23, 258:4,
258:13, 258:17,
260:5, 260:8, 263:2,

263:5, 263:6, 263:20, 348:12, 350:1, 350:7
**Page** [2] - 2:6, 2:17
**pager** [29] - 107:8, 107:10, 107:11, 107:17, 112:13, 114:2, 195:8, 240:3, 241:10, 241:16, 241:19, 242:1, 242:8, 242:13, 242:17, 242:21, 243:5, 243:7, 243:14, 244:1, 245:4, 245:7, 245:12, 245:19, 245:22, 245:23, 246:2, 246:4
**pagers** [2] - 107:18, 243:2
**pages** [10] - 22:11, 66:5, 67:18, 96:7, 96:11, 96:18, 119:5, 194:6, 322:5, 352:10
**paging** [1] - 245:18
**paid** [8] - 35:18, 35:21, 36:18, 40:5, 81:8, 265:20, 284:10, 320:8
**Palm** [1] - 10:6
**palpitation** [2] - 342:2, 342:8
**palpitations** [3] - 341:20, 342:13, 342:14
**paper** [5] - 80:4, 113:1, 277:5, 277:6, 307:1
**papers** [4] - 134:12, 152:13, 289:19, 341:11
**paperwork** [3] - 134:20, 291:20, 327:21
**paragraph** [18] - 13:9, 51:15, 51:17, 57:20, 57:23, 64:19, 65:15, 95:5, 104:13, 107:21, 123:1, 133:7, 184:1, 186:21, 188:16, 220:10, 221:1, 329:23
**paragraphs** [1] - 262:5
**parallel** [1] - 101:22
**paranoid** [1] - 243:13
**paraphernalia** [1] - 21:3
**parent/child** [1] - 208:13

**parents** [9] - 11:7, 11:8, 122:15, 170:19, 239:4, 240:13, 292:23, 293:15, 334:16
**parents'** [3] - 9:20, 10:3, 238:6
**Paris** [7] - 35:21, 36:11, 36:18, 36:19, 37:16, 37:17, 39:2
**part** [35] - 19:13, 21:19, 34:16, 95:19, 98:3, 98:5, 120:13, 143:16, 148:10, 152:18, 156:19, 163:14, 167:1, 176:10, 183:17, 183:19, 194:10, 207:23, 255:15, 258:14, 260:14, 264:9, 284:1, 286:4, 289:23, 301:7, 301:14, 301:17, 302:2, 302:14, 303:4, 314:8, 326:5, 342:6
**part-time** [6] - 301:7, 301:14, 301:17, 302:14, 303:4, 314:8
**partial** [1] - 347:12
**partially** [1] - 347:6
**participate** [8] - 114:23, 133:11, 142:3, 239:1, 282:14, 284:23, 286:6, 286:21
**participated** [11] - 13:1, 120:6, 120:11, 120:13, 120:18, 148:23, 151:10, 151:11, 151:15, 235:23, 287:2
**participating** [2] - 282:10, 283:17
**participation** [7] - 83:11, 120:10, 120:17, 157:13, 181:9, 181:12, 281:18
**particular** [10] - 37:6, 59:4, 88:17, 96:13, 184:15, 223:10, 249:15, 269:8, 314:4, 314:14
**parties** [5] - 250:22, 274:18, 274:20, 345:9, 353:12
**partners** [1] - 317:22
**parts** [8] - 37:22, 38:1, 38:2, 55:8, 68:21,

150:19, 156:17, 236:12
**party** [4] - 100:6, 101:12, 152:22, 251:3
**pass** [4] - 259:3, 259:4, 296:12, 305:21
**passed** [1] - 341:11
**past** [9] - 67:2, 157:21, 180:8, 181:3, 207:4, 224:22, 225:15, 260:5, 299:16
**path** [3] - 64:23, 65:16, 233:4
**pathology** [1] - 272:19
**patient** [20] - 105:1, 106:2, 114:19, 114:21, 115:21, 117:8, 121:13, 162:2, 220:7, 240:2, 240:5, 243:3, 273:21, 302:17, 308:9, 309:5, 309:20, 343:19, 344:5, 344:6
**patients** [13] - 104:4, 104:6, 105:19, 106:22, 110:11, 114:22, 115:5, 115:13, 245:16, 287:21, 302:2, 307:22, 327:20
**Patrick** [1] - 277:2
**pause** [1] - 247:7
**paused** [1] - 293:14
**pausing** [1] - 293:18
**pay** [2] - 16:15, 83:14
**paying** [2] - 9:15, 9:17
**payments** [4] - 14:15, 14:18, 16:9, 16:12
**Payne** [11] - 55:3, 74:20, 74:21, 75:5, 75:6, 75:18, 76:5, 76:9, 76:15, 76:23, 77:1
**PDF** [2] - 217:17, 222:23
**PEAHL** [12] - 7:12, 215:5, 281:11, 305:21, 306:1, 321:14, 321:19, 326:9, 326:13, 329:13, 345:7, 349:18
**Peahl** [3] - 2:8, 5:9, 7:12
**Peggy** [3] - 156:18, 194:14, 231:16
**Pelton** [3] - 20:19,

34:3, 34:5
**penalties** [1] - 146:4
**penalty** [1] - 57:10
**pending** [6] - 54:5, 127:4, 184:22, 243:21, 326:15, 347:7
**Pendleton** [5] - 37:9, 37:10, 37:13, 37:14, 39:6
**Penn** [4] - 19:8, 19:11, 19:18, 46:14
**Pennsylvania** [11] - 9:8, 9:11, 9:13, 10:5, 10:7, 10:8, 18:19, 19:1, 19:4, 216:15, 216:22
**people** [49] - 24:14, 24:20, 26:17, 26:21, 27:3, 27:16, 31:14, 47:3, 49:16, 59:5, 60:17, 63:21, 67:10, 67:13, 67:21, 81:17, 82:17, 82:19, 88:1, 88:13, 88:14, 111:19, 112:1, 113:8, 122:12, 139:11, 147:6, 147:9, 152:5, 166:2, 167:23, 168:2, 169:9, 173:9, 179:7, 180:10, 181:2, 185:8, 185:21, 187:16, 212:23, 254:12, 256:5, 261:7, 305:7, 318:22, 319:21, 338:19
**people's** [2] - 198:9, 286:16
**per** [2] - 9:16, 319:11
**perceive** [1] - 286:4
**perceived** [1] - 286:3
**percent** [13] - 57:8, 113:12, 146:14, 147:8, 311:11, 314:20, 314:21, 314:22, 315:10, 315:15, 316:17, 316:22, 318:2
**perfect** [1] - 244:11
**perfectly** [2] - 313:14, 313:18
**perform** [3] - 130:20, 184:11, 191:12
**performance** [16] - 117:18, 237:12, 239:3, 239:5, 244:16, 293:7, 295:18, 301:18,

302:15, 303:5, 305:17, 305:19, 305:20, 307:17, 308:16, 344:22
**performing** [1] - 97:5
**perhaps** [4] - 81:20, 132:10, 286:4, 340:9
**peril** [2] - 73:15, 93:2
**period** [11] - 38:15, 70:4, 79:12, 136:21, 142:11, 197:23, 210:13, 240:8, 305:15, 333:1, 335:12
**periods** [1] - 350:20
**perjured** [2] - 323:9, 323:10
**perjury** [4] - 57:10, 323:18, 324:5, 324:7
**permanent** [2] - 10:17, 166:5
**permissible** [3] - 71:5, 72:10, 72:21
**permission** [2] - 164:23, 165:2
**permit** [2] - 3:10, 346:2
**permits** [1] - 140:21
**permitted** [2] - 13:14, 346:1
**person** [10] - 23:18, 61:23, 63:15, 105:14, 182:4, 234:22, 235:1, 270:23, 283:22, 344:1
**personal** [7] - 107:17, 129:23, 144:20, 159:22, 202:6, 334:10
**personally** [5] - 184:17, 211:19, 213:4, 227:22, 259:21
**pertained** [2] - 76:14, 189:3
**pertaining** [1] - 343:15
**Peruses** [8] - 13:12, 50:8, 58:6, 129:6, 183:4, 191:2, 194:8, 322:13
**PETERS** [1] - 5:8
**Peters** [2] - 7:10, 7:13
**Petrea** [2] - 10:23, 11:4
**PETREA** [1] - 11:2
**PGY** [2] - 106:17, 139:17
**phased** [1] - 335:23
**Philadelphia** [7] -

42:9, 247:18,
273:13, 273:15,
273:18, 334:13,
337:20
**phone** [13] - 29:17,
29:18, 29:22, 30:15,
30:22, 31:5, 101:17,
109:10, 187:16,
239:4, 252:7,
292:21, 319:23
**phrase** [4] - 67:18,
142:19, 309:8,
336:17
**phrased** [3] - 115:23,
116:1, 332:13
**physical** [3] - 104:4,
289:19, 312:1
**physically** [6] - 44:19,
45:10, 45:11, 46:20,
47:5, 47:14
**physician** [14] - 33:5,
112:5, 112:20,
189:1, 220:2, 272:6,
272:22, 273:1,
276:23, 302:9,
303:4, 308:18,
313:22, 327:12
**physicians** [13] - 33:7,
112:3, 112:18,
113:1, 113:6,
113:23, 271:9,
273:6, 274:2, 274:4,
327:10, 328:1,
328:10
**pick** [5] - 43:15,
137:20, 137:22,
138:2
**picked** [1] - 138:7
**pictured** [2] - 233:21,
234:3
**Pierce** [1] - 38:11
**Pierre** [2] - 5:10, 7:9
**Pike** [1] - 10:11
**pile** [1] - 215:12
**pin** [1] - 332:15
**place** [11] - 9:3, 24:10,
41:12, 117:22,
118:4, 120:4,
133:18, 143:1,
335:5, 335:13, 353:8
**placed** [11] - 103:11,
118:3, 118:19,
123:9, 124:4,
132:13, 133:21,
134:5, 134:14,
215:8, 276:12
**places** [2] - 46:13,
242:8
**placing** [2] - 119:2,
183:11

**plagued** [1] - 188:2
**plaintiff** [8] - 2:22,
6:21, 62:2, 64:19,
64:22, 65:15, 330:3,
341:11
**Plaintiff** [3] - 1:7, 5:2,
66:22
**plaintiff's** [1] - 7:20
**plan** [3] - 24:15,
306:10, 306:13
**planned** [2] - 165:9,
199:6
**planning** [2] - 207:19,
207:20
**plans** [3] - 165:9,
165:17, 165:18
**plate** [1] - 39:8
**plausible** [1] - 244:4
**play** [1] - 98:10
**playground** [1] - 246:7
**playing** [3] - 27:17,
246:7, 246:8
**pleading** [2] - 68:16,
70:20
**pleadings** [6] - 52:10,
53:10, 57:12, 61:7,
340:22
**Pleasant** [1] - 1:16
**PLLC** [2] - 5:3, 5:8
**plus** [1] - 214:17
**PMB** [1] - 10:11
**point** [56] - 9:13, 21:2,
22:21, 27:19, 31:21,
45:21, 46:18, 61:17,
65:10, 70:2, 70:7,
78:6, 78:10, 81:4,
92:21, 118:8,
119:10, 127:22,
131:18, 133:20,
138:15, 143:14,
147:15, 152:9,
157:21, 162:23,
170:9, 177:10,
182:4, 198:15,
207:21, 210:6,
223:11, 229:11,
233:8, 235:19,
238:2, 238:5, 239:3,
240:13, 244:13,
246:2, 249:20,
250:3, 259:20,
295:14, 296:16,
297:14, 300:2,
304:23, 318:8,
324:17, 325:3,
327:2, 327:18, 328:9
**pointed** [3] - 57:5,
58:21, 58:22
**pointing** [1] - 28:10
**points** [6] - 63:3,

70:21, 167:8,
167:14, 207:21,
336:16
**police** [2] - 109:17,
343:13
**Police** [2] - 234:9,
343:5
**policies** [2] - 196:18,
216:18
**polite** [1] - 306:20
**politely** [1] - 307:2
**poor** [4] - 96:17,
147:2, 236:2, 244:16
**poorly** [2] - 67:17,
240:1
**portacath** [1] - 116:15
**position** [20] - 38:21,
38:23, 39:4, 39:15,
39:23, 40:9, 40:14,
40:15, 52:13, 85:22,
129:22, 151:5,
160:12, 213:18,
213:20, 267:12,
267:16, 330:11,
334:20, 341:3
**positive** [6] - 127:16,
156:20, 156:21,
251:11, 275:11,
286:17
**possession** [2] -
325:16, 349:16
**possibilities** [3] -
169:6, 272:11, 345:5
**possibility** [6] -
240:13, 267:21,
300:7, 309:11,
326:23, 327:7
**possible** [13] - 29:3,
82:9, 121:12,
140:13, 175:4,
187:10, 227:12,
244:6, 287:11,
290:23, 313:2,
327:8, 340:10
**possibly** [3] - 37:4,
63:17, 341:23
**post** [2] - 135:12,
135:13
**postconcussive** [3] -
337:23, 338:8,
338:21
**postgraduate** [1] -
140:18
**potential** [4] - 288:11,
288:15, 312:14,
312:22
**potentially** [3] - 25:12,
26:5, 61:13
**Potter** [2] - 94:1, 94:8
**practice** [4] - 140:22,

160:12, 161:1, 280:6
**practiced** [1] - 116:21
**pre** [1] - 156:17
**pre-filled** [1] - 156:17
**precluded** [1] - 26:9
**preemployment** [1] -
126:16
**prefer** [1] - 106:4
**preference** [1] -
169:10
**prelim** [1] - 180:22
**preliminary** [6] -
165:21, 166:6,
166:10, 166:11,
256:17
**prematurely** [1] -
25:21
**premed** [9] - 19:20,
19:21, 44:4, 44:8,
46:6, 46:10, 46:11,
79:10, 79:22
**preparation** [1] -
235:21
**prepare** [5] - 21:23,
22:9, 22:10, 175:15,
228:13
**prepared** [5] - 6:12,
56:14, 64:9, 185:20,
252:16
**prerequisite** [1] -
289:3
**prescribable** [1] -
328:3
**prescribed** [2] -
327:23, 328:13
**prescription** [1] -
189:13
**present** [6] - 5:12,
6:21, 8:8, 40:22,
104:5, 240:4
**presentation** [1] -
104:6
**presented** [1] - 110:13
**preserved** [1] - 226:11
**pretend** [1] - 106:11
**pretty** [32] - 24:9,
62:13, 87:20, 88:2,
92:5, 92:6, 96:8,
96:17, 113:12,
131:4, 177:14,
181:1, 182:4,
186:19, 188:17,
192:9, 209:21,
209:22, 220:22,
228:8, 236:2,
239:23, 243:1,
260:2, 283:22,
289:22, 299:2,
299:15, 302:1,
302:2, 304:6, 308:13

**preventable** [1] -
34:15
**prevented** [1] - 60:13
**preventive** [2] - 282:4,
288:5
**previous** [6] - 121:14,
121:17, 140:7,
145:15, 176:17,
191:15
**previously** [1] -
276:19
**primarily** [1] - 77:4
**primary** [3] - 233:8,
339:23, 344:17
**principle** [1] - 340:6
**printed** [6] - 22:6,
211:15, 211:16,
315:11, 349:23,
350:2
**printouts** [1] - 4:19
**priorities** [2] - 246:1
**privacy** [6] - 14:10,
48:8, 90:2, 91:16,
91:19, 250:22
**private** [5] - 269:7,
278:18, 333:11,
335:7, 335:15
**privilege** [14] - 17:4,
48:6, 54:23, 55:1,
89:23, 90:1, 90:16,
90:18, 91:10, 91:13,
91:17, 250:17,
251:5, 252:20
**privileged** [10] - 10:4,
18:8, 22:6, 48:22,
251:6, 252:6, 252:7,
252:19, 267:21
**privileges** [3] - 92:18,
195:14, 350:3
**privy** [1] - 48:21
**Pro** [1] - 5:2
**pro** [6] - 59:3, 59:9,
59:12, 61:23, 92:2,
341:12
**probation** [29] - 98:21,
98:22, 99:3, 99:6,
99:7, 117:22, 118:3,
118:4, 118:7,
118:13, 118:15,
118:17, 118:19,
119:2, 123:9, 124:4,
124:5, 127:10,
127:13, 132:14,
132:17, 133:19,
133:21, 134:5,
134:10, 134:15,
135:11, 165:7, 166:7
**problem** [6] - 52:20,
56:3, 109:16, 242:5,
299:6, 308:2

**problems** [18] - 20:16, 20:20, 108:11, 109:14, 117:14, 118:23, 119:8, 165:10, 293:7, 295:10, 303:5, 305:1, 305:3, 341:6, 341:7, 341:8, 341:14, 342:4
**Procedure** [1] - 5:21
**procedure** [5] - 116:14, 117:1, 132:18, 323:5, 335:4
**procedures** [8] - 104:19, 196:18, 217:4, 217:21, 221:16, 238:18, 238:23
**proceed** [5] - 92:19, 223:14, 226:8, 226:13, 347:17
**proceeded** [1] - 347:23
**proceeding** [2] - 228:2, 350:15
**proceeds** [1] - 263:5
**process** [48] - 13:23, 14:3, 15:7, 117:23, 121:9, 134:6, 137:13, 137:16, 145:5, 145:15, 146:1, 147:2, 148:9, 156:1, 168:1, 176:2, 178:16, 181:7, 188:11, 188:12, 188:14, 196:23, 203:16, 204:8, 209:18, 209:20, 215:21, 217:20, 221:16, 221:21, 224:15, 225:3, 225:7, 227:21, 232:4, 232:14, 233:18, 234:7, 234:23, 235:13, 260:4, 261:4, 261:5, 282:18, 290:1, 335:13, 339:10, 343:10
**processes** [2] - 96:23, 216:1
**produced** [9] - 21:18, 21:19, 236:10, 250:16, 251:7, 251:15, 251:16, 275:11, 283:23
**product** [8] - 14:10, 90:1, 91:16, 91:18, 91:20, 91:22, 92:3
**profession** [1] - 53:22

**professional** [5] - 129:20, 159:22, 194:22, 195:14, 344:2
**professionals** [3] - 312:13, 312:23, 313:4
**professor** [4] - 34:8, 232:18, 232:19, 282:20
**professors** [1] - 47:15
**profitable** [1] - 317:14
**prognose** [1] - 337:12
**program** [122] - 20:1, 20:2, 24:21, 40:5, 41:2, 41:4, 41:5, 41:8, 41:10, 41:19, 41:20, 41:22, 42:5, 42:16, 43:4, 43:7, 68:2, 74:8, 86:13, 86:17, 87:4, 94:12, 95:9, 95:17, 98:15, 100:20, 101:19, 102:11, 106:2, 106:19, 112:6, 112:16, 114:1, 119:13, 119:19, 120:7, 123:9, 128:2, 132:14, 136:12, 136:14, 142:4, 143:8, 143:17, 146:20, 147:12, 148:23, 149:18, 151:3, 151:4, 151:15, 151:16, 154:2, 154:10, 155:4, 155:5, 160:11, 162:10, 164:22, 164:23, 165:7, 165:8, 165:12, 165:16, 165:22, 166:1, 166:3, 166:6, 166:16, 166:19, 171:11, 171:18, 172:5, 172:16, 172:18, 173:5, 174:1, 176:18, 178:1, 179:11, 179:14, 179:23, 180:1, 180:5, 180:13, 180:15, 181:8, 181:18, 206:13, 211:10, 213:12, 218:18, 219:5, 219:8, 253:15, 253:18, 254:2, 254:5, 256:2, 256:21, 257:3, 257:5, 259:10,

259:14, 260:10, 282:2, 282:8, 287:4, 287:17, 287:19, 288:5, 288:7, 288:16, 289:1, 289:12, 290:2, 290:5, 290:14, 291:4, 300:9, 304:14
**programs** [11] - 108:5, 137:20, 137:22, 138:7, 145:17, 180:8, 193:9, 253:6, 325:12, 325:14
**progressive** [1] - 317:19
**prohibit** [1] - 58:12
**project** [5] - 282:10, 282:15, 284:17, 319:21
**projected** [1] - 280:3
**projecting** [1] - 280:6
**projects** [3] - 35:13, 38:6, 282:5
**promised** [1] - 39:8
**promoted** [1] - 40:17
**prompted** [8] - 26:8, 27:23, 29:15, 43:6, 96:23, 176:6, 187:16, 292:21
**prong** [2] - 69:6, 69:7
**proper** [4] - 86:5, 86:10, 93:1, 132:18
**properly** [4] - 115:7, 130:1, 218:12, 308:9
**property** [1] - 88:1
**proposal** [6] - 283:6, 283:8, 283:10, 283:12, 285:6, 285:14
**Propranolol** [1] - 338:2
**prose** [2] - 256:4, 256:5
**protective** [9] - 72:1, 274:16, 275:6, 275:18, 276:1, 331:1, 331:12, 331:17
**protocols** [2] - 238:18, 238:23
**prove** [2] - 98:2, 342:19
**proved** [1] - 195:16
**provide** [9] - 31:15, 115:21, 144:20, 164:7, 201:20, 227:2, 308:17, 324:13, 331:20
**provided** [11] - 15:22, 82:5, 193:20, 212:9,

220:6, 221:20, 321:21, 331:8, 348:8, 348:10, 348:11
**provider** [1] - 296:19
**providers** [1] - 344:19
**providing** [1] - 16:4
**provisions** [2] - 296:22, 297:1
**provoked** [1] - 30:13
**Prozac** [1] - 338:9
**psych** [6] - 121:3, 247:20, 247:22, 253:3, 253:5, 257:5
**psychiatric** [1] - 317:2
**psychiatrist** [2] - 25:2, 338:6
**psychiatry** [11] - 151:3, 180:20, 180:23, 218:17, 219:5, 256:19, 257:2, 287:17, 300:9, 305:9, 305:16
**psychologist** [1] - 152:1
**psychosis** [2] - 121:4, 145:14
**psychotherapy** [1] - 275:10
**Public** [2] - 352:21, 353:4
**pull** [3] - 109:16, 112:7, 254:4
**pulled** [1] - 169:3
**punch** [3] - 25:7, 25:12, 26:5
**punched** [2] - 25:14, 25:18
**punishment** [2] - 63:18, 63:19
**punishments** [1] - 63:16
**pupils** [2] - 32:12, 339:7
**purported** [2] - 304:22, 305:18
**purpose** [5] - 230:17, 230:21, 231:21, 304:20, 304:22
**purposes** [3] - 5:19, 131:8, 184:18
**pursuant** [1] - 117:22
**pursue** [5] - 165:11, 221:17, 232:4, 276:3, 295:20
**pursuing** [2] - 285:17, 344:18
**put** [50] - 46:8, 57:17, 62:17, 80:4, 81:17, 85:4, 96:18, 98:18,

124:20, 128:21, 131:17, 134:10, 134:19, 137:7, 146:17, 146:18, 149:21, 153:3, 157:16, 167:1, 170:21, 180:11, 182:14, 185:18, 192:11, 211:17, 218:23, 243:3, 258:2, 263:11, 276:17, 276:20, 277:4, 277:6, 277:7, 277:8, 279:14, 282:14, 283:11, 295:23, 296:7, 296:8, 297:5, 306:22, 314:21, 315:22, 320:7, 321:2, 335:5, 335:13
**putting** [5] - 31:3, 131:19, 135:7, 247:1, 299:11
**PYLES** [1] - 7:15
**Pyles** [2] - 5:5, 7:15

## Q

**QA** [1] - 4:2
**qualification** [1] - 45:7
**qualifications** [1] - 159:22
**qualified** [1] - 307:21
**qualifies** [1] - 35:16
**quality** [1] - 236:13
**quarter** [1] - 87:7
**questionable** [1] - 120:17
**questioned** [1] - 93:1
**questioning** [5] - 87:14, 99:10, 214:23, 215:16, 345:15
**questionnaire** [2] - 185:20, 186:12
**questions** [49] - 7:18, 11:22, 12:6, 12:11, 26:12, 48:11, 57:22, 64:13, 92:19, 93:14, 130:10, 130:12, 133:7, 142:17, 145:1, 150:19, 155:19, 156:16, 172:10, 174:21, 194:17, 236:17, 242:11, 245:2, 252:18, 263:7, 263:9, 267:11, 267:13, 268:10, 268:12, 273:5,

276:5, 281:8,
291:19, 292:1,
311:2, 321:11,
321:15, 336:17,
345:23, 346:4,
346:6, 346:15,
346:18, 348:3,
350:18
**quibble** [1] - 64:1
**quick** [4] - 236:8,
279:19, 342:7, 350:9
**quickly** [4] - 131:20,
209:21, 209:22,
285:19
**quit** [1] - 105:14
**quite** [4] - 198:9,
297:19, 319:1, 322:6
**quote** [10] - 65:15,
123:2, 123:4, 241:8,
241:9, 241:14,
241:15, 266:13,
266:14, 293:21
**quotes** [1] - 123:3

## R

**R-i-f-k-i-n-d** [1] - 101:8
**RA** [1] - 21:5
**radiologist** [2] - 128:9,
234:1
**radiology** [1] - 128:5
**raise** [6] - 102:2,
147:14, 167:18,
254:12, 307:4,
331:13
**raised** [4] - 76:23,
104:23, 201:10,
267:21
**raising** [1] - 331:16
**ramifications** [1] -
124:10
**ran** [1] - 246:4
**random** [1] - 334:18
**rank** [2] - 248:2, 253:5
**ranked** [3] - 19:11,
19:12, 239:6
**ranking** [2] - 19:9,
19:12
**rant** [1] - 305:4
**rare** [1] - 106:5
**rate** [6] - 314:18,
315:5, 315:6, 315:9,
316:13, 316:17
**rates** [2] - 315:1, 315:3
**rather** [1] - 175:4
**re** [3] - 3:1, 4:9, 4:12
**reach** [2] - 107:9,
107:16
**reachable** [2] -

107:11, 107:13
**reached** [4] - 193:18,
202:10, 232:3, 232:5
**react** [1] - 252:5
**read** [47] - 34:2, 44:16,
54:3, 54:5, 57:21,
58:7, 58:17, 65:1,
65:4, 65:8, 68:4,
73:3, 73:23, 91:9,
93:15, 97:12,
103:19, 103:21,
103:23, 104:1,
123:1, 123:19,
127:2, 127:4, 133:6,
155:3, 164:16,
164:19, 184:5,
184:20, 184:22,
187:4, 193:1,
209:14, 212:15,
220:10, 221:11,
223:2, 238:16,
238:21, 239:2,
243:19, 243:21,
352:3
**reading** [6] - 44:15,
95:21, 154:21,
208:22, 221:1,
257:14
**readmit** [1] - 345:12
**readmitting** [1] - 345:3
**ready** [2] - 87:11,
214:3
**real** [9] - 84:5, 120:9,
146:15, 195:10,
203:8, 258:5,
279:18, 314:21,
319:21
**realize** [1] - 200:15
**realized** [4] - 79:23,
110:6, 198:15,
206:18
**really** [86] - 8:22, 12:1,
12:15, 15:19, 17:19,
19:14, 21:1, 21:17,
24:5, 26:6, 27:18,
29:10, 32:18, 36:17,
37:1, 58:20, 63:1,
71:13, 79:5, 81:10,
82:14, 93:1, 94:15,
97:16, 120:12,
120:14, 120:16,
121:16, 121:23,
127:5, 128:18,
128:21, 130:6,
131:3, 159:16,
162:8, 166:11,
170:9, 171:2,
173:14, 187:15,
198:5, 207:12,
225:23, 233:2,

236:5, 244:2,
248:16, 260:16,
260:17, 260:22,
260:23, 268:4,
285:11, 287:6,
287:8, 287:19,
294:17, 294:18,
294:20, 299:7,
299:11, 300:10,
300:20, 300:22,
301:2, 301:14,
301:19, 302:3,
307:1, 309:16,
312:4, 312:8, 314:2,
314:23, 318:6,
318:7, 318:10,
318:21, 319:8,
320:23, 323:13,
323:20, 324:8,
335:18, 341:8
**reapply** [2] - 165:10,
326:6
**reason** [27] - 19:18,
52:4, 66:13, 105:14,
108:2, 115:12,
115:19, 120:19,
130:5, 132:4,
134:23, 146:16,
146:18, 149:14,
149:16, 149:17,
150:11, 150:17,
150:19, 155:18,
192:2, 263:21,
304:16, 322:21,
326:5, 334:8, 344:17
**reasonable** [5] -
154:23, 155:2,
184:10, 193:12,
342:19
**reasonably** [6] -
160:6, 160:7,
163:13, 163:17,
208:22, 312:9
**reasons** [11] - 19:16,
64:4, 99:5, 99:7,
119:1, 127:13,
149:20, 150:15,
226:2, 293:8, 334:18
**reassessing** [2] -
345:4
**reassessment** [1] -
345:13
**reattempt** [1] - 327:5
**Rebecca** [2] - 94:1,
94:8
**recalled** [1] - 123:14
**receipt** [1] - 205:22
**receive** [12] - 10:10,
14:15, 14:22, 16:18,
16:21, 31:17,

221:10, 222:2,
232:11, 232:13,
320:16, 320:18
**received** [19] - 14:17,
31:19, 104:1,
106:15, 107:17,
117:19, 117:20,
131:13, 143:15,
159:21, 176:1,
176:11, 177:10,
188:23, 222:16,
224:20, 226:8,
333:22, 334:9
**receiving** [9] - 16:9,
16:12, 31:7, 186:17,
187:7, 223:19,
237:7, 237:22, 280:8
**recent** [3] - 34:2,
103:12, 325:8
**recently** [5] - 157:3,
177:18, 289:14,
289:18, 323:4
**recess** [1] - 214:2
**Recess** [2] - 87:10,
321:13
**recognize** [16] - 37:3,
48:19, 48:23, 49:16,
49:19, 50:7, 50:9,
164:1, 210:20,
236:11, 236:12,
268:17, 276:11,
306:4, 328:17,
328:20
**recognized** [1] - 49:1
**recollect** [1] - 28:6
**recollection** [15] -
26:7, 30:10, 44:17,
53:13, 61:6, 94:23,
109:12, 123:18,
174:13, 198:2,
245:9, 248:13,
248:14, 281:5, 281:6
**recommend** [2] -
302:13, 303:4
**recommendation** [3] -
133:18, 290:4, 290:7
**reconsider** [2] - 92:19,
109:9
**reconsidering** [1] -
135:9
**reconstruct** [1] -
210:13
**record** [31] - 6:20,
34:19, 51:18, 51:22,
52:19, 53:6, 118:10,
122:21, 122:22,
124:15, 124:17,
124:19, 127:17,
127:18, 127:21,
131:11, 131:12,

131:17, 131:19,
134:3, 175:5, 214:1,
220:8, 247:8,
262:19, 299:2,
336:7, 341:10,
348:12, 349:6, 352:7
**recorded** [1] - 105:16
**recording** [1] - 299:1
**records** [50] - 18:8,
34:13, 52:7, 54:18,
54:22, 56:2, 56:7,
56:15, 56:17, 57:1,
58:22, 58:23, 59:22,
60:2, 60:5, 61:6,
61:22, 62:5, 65:1,
65:17, 65:22, 65:23,
66:1, 66:3, 66:9,
66:14, 69:10, 71:3,
71:17, 71:22, 83:3,
83:7, 83:19, 83:22,
84:1, 84:9, 84:20,
162:23, 168:21,
275:14, 276:2,
308:9, 339:22,
340:1, 340:14,
347:15, 347:17,
348:14, 348:15,
349:2
**recovery** [1] - 338:5
**rectal** [5] - 342:1,
343:16, 343:18,
343:21, 344:5
**redact** [2] - 250:15,
252:1
**redacted** [1] - 252:21
**redaction** [2] - 252:11,
252:12
**redactions** [1] -
250:11
**redress** [1] - 323:11
**reduced** [7] - 30:6,
114:23, 115:5,
115:13, 115:19,
129:12, 309:20
**refer** [3] - 218:11,
255:11, 329:22
**reference** [11] -
110:16, 168:11,
172:15, 172:17,
190:18, 208:4,
208:7, 248:7, 262:4,
270:5, 313:17
**referenced** [5] -
133:10, 178:23,
334:1, 335:21,
346:11
**references** [6] - 207:1,
207:4, 207:5,
236:18, 241:6, 241:7
**referencing** [3] -

47:11, 56:9, 208:2
**referred** [8] - 172:11, 262:21, 265:2, 293:11, 343:12, 346:7, 349:18, 350:12
**referring** [20] - 50:10, 59:19, 64:7, 65:23, 66:4, 66:9, 67:8, 96:19, 139:2, 139:11, 142:16, 210:7, 253:12, 253:14, 255:16, 260:17, 260:22, 261:23, 263:13, 346:13
**refers** [4] - 59:6, 104:22, 142:13, 210:3
**reflected** [3] - 279:8, 311:6, 313:8
**reflecting** [1] - 279:21
**reflects** [2] - 209:7, 254:8
**refunding** [1] - 81:6
**refuse** [3] - 50:17, 60:21, 93:2
**refused** [5] - 50:20, 63:13, 343:11, 343:14, 345:14
**refusing** [4] - 90:4, 92:5, 267:8, 268:11
**regard** [4] - 70:13, 74:11, 144:9, 250:10
**regarded** [1] - 283:1
**regarding** [13] - 48:1, 50:14, 95:7, 115:6, 115:14, 115:20, 144:19, 144:21, 144:22, 288:15, 301:7, 340:22, 343:6
**regardless** [2] - 225:11, 272:5
**regards** [2] - 224:2, 339:13
**region** [2] - 314:4, 314:15
**register** [1] - 46:15
**registration** [1] - 3:10
**regress** [1] - 256:5
**regularly** [1] - 14:17
**rehire** [1] - 230:18
**reimbursement** [1] - 300:18
**reinstate** [1] - 152:7
**rejected** [1] - 345:11
**rejection** [1] - 195:23
**rejoined** [1] - 27:18
**related** [15] - 22:15, 37:4, 52:10, 52:11,

77:14, 107:5, 129:21, 152:22, 188:9, 189:6, 195:22, 224:3, 291:20, 319:16, 353:11
**relationship** [1] - 17:4
**relative** [1] - 353:14
**relatively** [2] - 135:15, 216:3
**release** [1] - 56:3
**released** [1] - 348:20
**relevance** [4] - 10:23, 268:5, 330:2, 332:17
**relevant** [6] - 12:15, 92:14, 213:11, 268:6, 268:13, 350:3
**relied** [1] - 340:1
**relieved** [3] - 70:17, 70:19, 300:21
**relive** [1] - 130:10
**reluctance** [1] - 102:2
**rely** [1] - 84:3
**REM** [1] - 307:18
**remain** [5] - 42:2, 42:6, 42:22, 44:10, 68:11
**remainder** [1] - 310:7
**remember** [173] - 9:9, 20:12, 20:22, 20:23, 21:2, 21:15, 21:16, 21:17, 23:16, 25:22, 27:15, 27:18, 29:4, 29:5, 29:13, 29:17, 29:23, 32:4, 32:15, 32:17, 32:22, 33:23, 34:9, 35:20, 43:19, 58:16, 59:14, 79:5, 83:1, 88:11, 89:8, 89:12, 91:9, 104:9, 104:15, 104:16, 104:17, 107:4, 107:10, 111:3, 111:6, 111:10, 116:1, 116:17, 117:1, 117:4, 120:23, 121:23, 122:4, 122:10, 122:11, 122:12, 122:16, 124:7, 124:16, 129:8, 129:9, 129:12, 130:6, 131:5, 133:10, 133:22, 134:7, 135:6, 136:11, 138:3, 140:8, 141:5, 145:15, 145:16, 147:16, 151:18, 151:20, 154:1,

155:20, 155:21, 156:1, 156:2, 157:2, 157:17, 157:18, 170:1, 173:16, 173:23, 174:3, 174:6, 176:8, 183:17, 185:19, 185:23, 186:1, 186:17, 186:19, 187:6, 187:9, 187:11, 187:12, 188:4, 188:13, 188:14, 191:4, 198:12, 200:17, 201:1, 201:10, 204:8, 204:23, 205:1, 205:5, 209:17, 209:19, 216:12, 216:13, 217:7, 217:23, 218:5, 220:17, 220:22, 223:19, 228:18, 237:9, 237:10, 240:6, 240:7, 240:17, 241:1, 242:12, 242:20, 244:6, 245:14, 245:18, 248:12, 249:5, 249:9, 257:22, 258:3, 264:16, 282:12, 283:21, 285:8, 285:22, 288:19, 289:22, 291:1, 291:2, 291:6, 291:7, 291:15, 292:3, 292:4, 292:23, 293:3, 293:5, 293:6, 293:10, 293:12, 293:17, 294:14, 294:21, 297:18, 313:7, 321:21, 334:11, 334:14, 334:18, 339:1, 350:3
**remembering** [3] - 121:16, 145:11, 210:14
**remembers** [1] - 248:14
**remind** [1] - 214:7
**reminded** [2] - 145:13, 241:11
**reminiscent** [1] - 339:8
**remove** [2] - 105:1, 313:7
**removed** [4] - 105:3, 241:1, 313:6, 341:22
**removing** [1] - 240:21

**renowned** [1] - 288:2
**rent** [2] - 9:15, 9:16
**repeat** [2] - 84:17, 209:4
**repeated** [1] - 84:16
**repercussions** [2] - 238:7, 317:17
**rephrase** [2] - 54:16, 273:9
**replied** [1] - 298:20
**replying** [1] - 72:13
**report** [13] - 33:20, 37:6, 37:15, 106:21, 107:3, 108:3, 109:3, 109:4, 109:17, 110:16, 134:5, 192:7, 192:8
**reported** [10] - 34:7, 34:8, 37:15, 63:12, 110:8, 110:20, 192:5, 192:16, 342:15
**Reporter** [2] - 5:14, 353:4
**REPORTER** [1] - 353:20
**reporting** [9] - 113:8, 114:5, 184:1, 184:16, 185:1, 185:4, 185:6, 185:11, 220:7
**reports** [3] - 113:17, 113:20, 113:22
**representations** [1] - 221:3
**representative** [1] - 7:2
**represented** [3] - 59:9, 59:10, 251:8
**representing** [1] - 75:1
**reprimanded** [1] - 160:22
**REPRODUCTION** [1] - 353:18
**republic** [1] - 187:14
**request** [42] - 7:23, 60:11, 69:17, 84:9, 147:20, 148:1, 148:6, 148:7, 148:12, 152:17, 187:10, 189:21, 197:8, 197:9, 197:16, 206:8, 209:3, 223:7, 224:3, 224:6, 224:21, 225:2, 225:8, 226:8, 226:12, 227:15, 228:16, 238:6, 251:18, 251:20,

282:14, 296:6, 296:7, 296:8, 298:16, 304:5, 309:7, 309:8, 330:8, 331:6, 349:8
**requested** [11] - 94:20, 222:23, 223:11, 224:11, 227:8, 227:20, 264:10, 288:6, 303:16, 330:3
**requesting** [3] - 214:20, 224:19, 297:8
**requests** [4] - 69:20, 228:12, 251:19, 304:6
**require** [6] - 53:22, 64:23, 65:17, 67:1, 86:4, 292:11
**required** [12] - 58:12, 150:20, 150:22, 150:23, 184:18, 205:15, 209:9, 259:20, 284:20, 289:14, 292:3, 292:17
**requirement** [2] - 205:7, 288:6
**requirements** [3] - 95:8, 208:23, 254:20
**research** [27] - 226:2, 281:18, 281:23, 282:1, 282:3, 282:4, 282:5, 282:8, 282:10, 282:15, 283:3, 283:17, 284:8, 284:12, 284:23, 285:11, 285:13, 286:15, 287:2, 287:9, 287:19, 288:2, 288:3, 291:12, 312:13, 312:23, 343:20
**researched** [2] - 340:11, 343:20
**researcher** [5] - 283:2, 285:23, 287:6, 287:13, 287:14
**reservation** [1] - 229:10
**reservations** [1] - 229:1
**resets** [1] - 316:15
**reside** [1] - 11:4
**residence** [5] - 8:22, 9:19, 11:7, 27:14, 29:18
**residencies** [3] - 256:19, 279:9, 280:7

residency [42] - 95:9, 98:14, 98:15, 100:20, 106:1, 106:19, 108:5, 117:16, 142:13, 143:7, 151:15, 151:16, 166:18, 171:11, 171:18, 172:5, 172:15, 172:18, 173:5, 174:1, 176:3, 176:17, 177:22, 179:7, 179:14, 201:23, 206:19, 218:17, 220:4, 229:3, 229:4, 229:8, 229:18, 253:12, 279:5, 286:14, 287:4, 287:17, 287:22, 307:17, 325:8, 325:11
resident [19] - 9:12, 106:18, 133:9, 140:22, 143:17, 163:8, 164:18, 191:12, 210:20, 217:18, 244:11, 258:10, 270:21, 284:4, 284:20, 287:17, 301:18, 326:18, 344:9
Resident [1] - 3:22
residential [3] - 8:20, 30:17, 31:14
residents [8] - 98:23, 114:13, 114:16, 117:23, 205:15, 216:19, 282:22, 288:1
residing [3] - 9:23, 27:11, 32:20
resign [27] - 119:11, 119:16, 123:3, 123:8, 123:12, 132:12, 134:3, 134:9, 134:11, 174:9, 218:22, 219:4, 219:7, 219:9, 219:12, 219:14, 219:16, 238:6, 297:11, 297:13, 298:22, 299:9, 299:18, 299:19, 300:4, 300:13, 300:16
resignation [15] - 121:19, 122:6, 128:1, 128:11, 128:12, 132:10, 134:13, 136:16,

137:2, 161:19, 218:20, 219:21, 293:16
resigned [16] - 118:7, 118:22, 124:3, 124:9, 124:12, 127:22, 142:9, 160:11, 161:17, 164:22, 165:3, 194:21, 195:17, 200:13, 219:1, 253:17
resigning [4] - 238:1, 238:10, 240:14, 334:17
resolve [4] - 20:4, 56:7, 59:2, 84:9
resolved [2] - 50:12, 266:17
resolves [1] - 125:23
resort [1] - 259:18
resources [1] - 216:4
respect [1] - 307:15
respectfully [1] - 84:3
respond [3] - 150:19, 330:4, 330:20
responded [5] - 108:2, 186:20, 188:11, 256:10, 330:21
responds [1] - 201:9
response [37] - 55:21, 68:12, 69:1, 69:5, 93:12, 95:6, 107:18, 172:19, 172:21, 200:4, 200:8, 200:16, 200:17, 200:18, 201:2, 201:13, 201:16, 201:20, 201:22, 202:11, 202:18, 202:23, 222:23, 224:20, 226:16, 226:18, 307:5, 336:18, 337:16, 339:3, 340:18, 341:17, 343:3, 343:19, 344:12, 345:11
responses [1] - 200:20
responsibilities [6] - 115:19, 129:12, 129:22, 130:2, 169:5, 171:21
responsibility [4] - 8:3, 115:5, 160:5, 245:12
rest [1] - 303:7
restate [1] - 148:18
restricted [5] - 160:23,

161:16, 161:23, 162:3, 195:13
restriction [1] - 193:19
restrictions [1] - 191:5
result [16] - 14:14, 28:15, 35:2, 50:22, 59:16, 60:5, 60:10, 60:19, 68:14, 86:14, 151:3, 151:4, 168:14, 195:22, 232:3, 233:3
resulted [1] - 337:3
results [2] - 350:2, 350:7
retain [1] - 251:20
retained [1] - 276:19
rethinking [1] - 135:17
retract [1] - 336:3
retrospect [1] - 35:15
return [4] - 43:22, 44:6, 46:1, 348:17
returned [6] - 25:23, 27:10, 44:9, 46:1, 46:4, 46:12
returns [3] - 320:20, 320:22, 320:23
revenue [3] - 318:8, 320:19, 321:2
reverse [1] - 164:8
review [15] - 22:7, 52:12, 74:20, 93:20, 152:8, 160:5, 180:1, 201:23, 216:7, 217:21, 223:1, 223:7, 223:12, 223:14, 350:11
reviewed [2] - 74:15, 74:16, 75:11, 117:21, 125:10, 153:19, 154:3, 158:23, 159:5, 159:8, 159:9, 202:1
reviewing [2] - 154:21, 186:11
revise [4] - 80:9, 80:15, 80:16, 81:2
revoked [1] - 102:14
rewrite [2] - 274:22, 275:1
Richard [2] - 273:10, 273:15
Richardson [1] - 20:14
rid [3] - 244:10, 302:6, 303:8
ridiculous [2] - 203:15, 213:16
rife [2] - 62:6, 62:7
Rifkind [2] - 101:8, 102:22

rights [3] - 91:16, 274:17, 275:19
rise [4] - 25:1, 86:16, 149:1, 193:16
risk [1] - 7:7
Rivard [1] - 277:3
Rogge [1] - 303:12
role [3] - 98:11, 220:2, 318:3
Ronald [2] - 288:9, 290:11
Ronin [1] - 269:22
room [6] - 6:20, 7:1, 21:3, 21:4, 21:5, 32:5, 32:6, 32:9, 32:13, 32:15, 33:8, 114:19, 243:10, 257:23, 337:4, 337:9, 337:13, 337:15
roommate [2] - 20:18, 269:2
roommates [2] - 20:13, 20:16
rose [1] - 193:23
rotation [8] - 237:1, 304:13, 305:2, 305:9, 305:16, 309:11, 309:20, 309:22
rotations [1] - 169:5
rough [4] - 276:15, 311:13, 311:22, 312:4
roughly [8] - 16:21, 17:7, 17:18, 18:20, 38:4, 38:18, 38:19, 311:13
rounding [3] - 245:16, 246:1, 246:5
rounds [5] - 104:5, 106:22, 245:19, 301:21, 302:22
routinely [1] - 112:4
RRC [1] - 201:23
rubber [1] - 230:18
rubbish [2] - 242:6, 244:5
ruined [1] - 235:5
rule [1] - 70:23, 101:6, 271:16, 271:17, 272:1, 272:11, 272:17, 339:16, 339:21
rule-out [2] - 272:1, 272:11
rule-outs [1] - 272:17
ruled [6] - 1:7, 197:7, 226:4, 228:4, 272:6, 339:14

rules [5] - 13:21, 245:20, 346:2, 350:9
Rules [5] - 5:20, 350:7, 350:10, 350:14, 350:15
ruling [2] - 209:11, 209:21
ruminating [1] - 328:11
run [1] - 243:17
running [2] - 245:14, 318:3
rush [1] - 291:13

## S

S/O [2] - 240:3
safe [2] - 229:13, 229:15
safer [3] - 184:12, 230:3, 230:5
safest [1] - 228:21
safety [2] - 114:21, 117:9
saint [2] - 32:23
salaries [2] - 313:10, 321:2
salary [12] - 35:22, 266:1, 266:4, 310:15, 312:13, 312:22, 313:8, 313:21, 314:6, 316:13, 316:18, 320:16
Salvo [3] - 11:13, 11:16, 11:19
SAME [1] - 353:19
sanctioned [1] - 160:23
Sandler [2] - 4:16, 329:6
sat [1] - 252:4
satisfaction [1] - 53:6
saved [1] - 198:9
saw [16] - 25:22, 27:14, 91:9, 105:19, 155:3, 155:4, 158:6, 160:8, 175:17, 175:18, 177:18, 178:1, 179:12, 183:21, 198:13, 281:3
Scale [2] - 28:18, 30:6
scanned [1] - 4:22
scanning [1] - 323:7
scattered [2] - 21:4, 231:23
scenario [9] - 234:3, 234:4, 276:17,

279:19, 310:9,
310:10, 311:23,
313:6, 326:6
**scenarios** [1] -
229:13, 230:4,
243:18, 276:16,
278:14, 279:16,
279:17, 280:10,
311:21, 313:1, 313:2
**schedule** [6] - 79:23,
115:12, 283:19,
300:18, 302:14,
307:23
**scheduled** [2] - 109:3,
109:22
**scheduling** [3] - 20:4,
43:10, 227:3
**scholarship** [1] - 41:2
**School** [6] - 47:8,
79:1, 269:14,
269:19, 328:23,
329:10
**school** [23] - 19:23,
43:14, 44:16, 45:21,
46:23, 47:17, 53:21,
57:8, 62:12, 62:14,
64:2, 66:8, 149:19,
162:12, 166:2,
216:17, 232:17,
232:23, 233:10,
246:7, 263:22,
339:4, 343:23
**schools** [4] - 19:19,
157:10, 193:8, 217:1
**Schwab** [1] - 273:15
**science** [7] - 19:20,
20:1, 20:11, 68:1,
68:2, 166:15, 335:2
**score** [2] - 57:8,
277:22
**scores** [5] - 111:13,
128:7, 128:8,
133:14, 280:12
**Scott** [1] - 20:15
**screen** [4] - 179:6,
180:3, 180:6, 191:14
**screw** [1] - 39:1
**scrutinize** [1] - 322:20
**scrutiny** [1] - 52:3
**se** [7] - 9:16, 59:4,
59:9, 59:12, 61:23,
92:2, 341:12
**Se** [1] - 5:2
**seal** [3] - 84:20,
339:22, 348:14
**sealed** [16] - 52:7,
56:17, 56:20, 58:22,
59:22, 61:6, 69:10,
83:4, 83:6, 83:7,
83:18, 83:22,

162:14, 162:22,
340:14, 347:17
**sealing** [20] - 58:23,
60:2, 61:13, 61:20,
61:21, 65:6, 67:9,
71:3, 71:17, 82:10,
82:11, 82:22, 83:20,
84:9, 84:22, 85:2,
340:1, 347:14,
348:17, 349:1
**search** [2] - 4:19,
264:9
**searches** [1] - 314:6
**second** [35] - 23:7,
23:9, 23:10, 51:15,
51:16, 51:17, 52:6,
53:6, 53:7, 53:15,
64:18, 65:15, 69:7,
72:2, 102:5, 133:7,
158:1, 158:2, 160:8,
170:8, 170:16,
170:23, 171:16,
221:14, 234:17,
240:20, 278:21,
279:3, 279:18,
279:19, 279:23,
280:7, 311:7,
339:15, 340:23
**secondary** [1] - 268:1
**seconds** [2] - 214:4,
279:21
**secret** [2] - 249:21,
250:1
**section** [2] - 58:11,
208:21
**sections** [1] - 322:16
**secure** [2] - 151:1,
151:5
**secured** [1] - 151:19
**security** [1] - 29:18
**see** [57] - 13:10, 15:13,
55:16, 55:21, 65:11,
66:20, 77:17, 78:4,
91:5, 91:6, 91:7,
91:8, 93:18, 101:18,
108:4, 108:10,
114:9, 136:5,
149:11, 155:6,
156:6, 158:2,
159:15, 161:2,
164:11, 165:5,
177:4, 182:20,
184:2, 185:19,
196:1, 196:5,
206:11, 206:23,
207:23, 208:1,
208:12, 208:16,
209:6, 210:2,
210:10, 215:11,
217:11, 218:7,

228:6, 235:6, 235:9,
248:4, 250:11,
253:9, 258:6,
268:20, 278:19,
294:11, 322:9,
323:19
**seeing** [4] - 29:23,
106:2, 194:5, 309:1
**seek** [3] - 31:22, 32:3,
205:7
**seeking** [1] - 342:23
**seem** [13] - 32:22,
123:23, 124:8,
133:22, 145:16,
171:2, 199:17,
257:22, 279:15,
279:16, 289:22,
291:15, 334:2
**segment** [2] - 215:16,
264:17
**segments** [1] - 13:16
**selected** [1] - 325:17
**selectively** [1] -
148:13
**self** [3] - 341:12,
346:22, 350:18
**self-cross-**
**examination** [1] -
341:12
**self-deposition** [1] -
350:18
**self-exam** [1] - 346:22
**semester** [6] - 24:16,
45:2, 45:5, 116:18,
232:22, 233:9
**semesters** [1] - 46:10
**send** [12] - 138:19,
146:19, 152:20,
152:23, 153:1,
153:10, 158:11,
190:1, 206:9,
224:17, 243:15,
269:10
**sending** [2] - 196:8,
263:3
**sends** [1] - 227:19
**senior** [1] - 114:12
**sensation** [2] - 29:14
**sense** [8] - 131:2,
158:10, 163:17,
163:19, 232:11,
232:20, 244:22,
245:6
**sensed** [1] - 328:8
**sent** [39] - 14:23, 18:1,
44:3, 81:5, 93:12,
93:17, 98:3, 121:19,
152:13, 152:18,
153:5, 153:6,
173:18, 173:20,

186:10, 196:13,
212:7, 212:19,
212:21, 213:7,
213:13, 224:16,
224:21, 232:10,
233:18, 234:2,
234:20, 237:6,
247:14, 261:18,
262:1, 262:5,
262:22, 263:19,
270:4, 289:10,
306:23, 334:13,
339:7
**sentence** [13] - 51:17,
55:17, 108:1, 111:2,
124:1, 164:21,
165:6, 165:13,
218:19, 261:13,
261:17, 261:20,
264:23
**sentences** [2] - 210:8,
265:1
**separate** [2] - 67:21,
143:10
**separated** [2] - 267:5,
267:17
**separately** [1] - 92:12
**September** [20] -
18:21, 20:7, 77:20,
95:7, 126:18, 136:3,
136:8, 136:10,
136:11, 136:15,
137:2, 137:18,
179:8, 229:21,
264:12, 282:11,
284:4, 304:2, 306:7,
307:10
**series** [3] - 194:11,
194:12, 255:3
**serious** [7] - 117:14,
190:3, 293:8,
293:19, 341:14,
343:14, 344:2
**seriously** [4] - 229:5,
309:2, 309:3, 325:23
**served** [2] - 94:7,
106:6
**server** [1] - 336:10
**serves** [1] - 230:12
**service** [9] - 63:17,
107:17, 114:13,
237:18, 240:22,
241:2, 241:20, 243:6
**session** [1] - 245:23
**set** [7] - 42:12, 43:11,
214:3, 237:14,
281:12, 284:17,
353:9
**sets** [1] - 13:10
**setting** [3] - 106:8,

290:15, 337:13
**settle** [4] - 55:22,
266:23, 345:2,
345:12
**settlement** [66] - 2:21,
2:23, 3:2, 48:5, 50:6,
50:14, 50:18, 51:2,
51:10, 51:11, 51:19,
52:5, 52:6, 52:7,
52:14, 53:5, 53:14,
54:19, 55:1, 56:4,
58:23, 59:17, 59:18,
59:19, 59:21, 59:23,
60:1, 60:13, 60:22,
61:5, 63:2, 67:16,
68:17, 68:18, 69:3,
69:18, 69:21, 69:23,
70:15, 70:21, 72:2,
72:3, 83:15, 161:12,
163:4, 339:15,
339:17, 339:18,
339:19, 340:5,
340:7, 340:8,
340:13, 340:23,
341:2, 345:18,
346:8, 346:13,
347:11, 347:13,
347:21, 347:22,
348:6
**settlements** [1] -
53:17
**seven** [5] - 107:23,
116:18, 166:17,
235:7, 261:18
**seven-year** [2] -
166:17, 235:7
**several** [7] - 15:8,
150:15, 194:15,
245:10, 301:11,
317:1, 319:6
**severe** [3] - 88:2,
338:14, 341:8
**severely** [1] - 295:17
**shall** [2] - 5:17, 225:5
**sham** [1] - 117:5
**sheet** [6] - 194:6,
194:20, 350:8,
350:11, 350:12,
350:19
**shell** [1] - 319:3
**shift** [2] - 303:20,
304:1
**shifts** [2] - 342:5,
342:10
**shit** [1] - 258:5
**shock** [4] - 29:7,
29:11, 174:7, 181:20
**shocking** [1] - 325:6
**shooting** [2] - 198:7,
200:23

**short** [7] - 68:10, 79:12, 121:16, 157:8, 171:3, 214:17
**shorten** [1] - 132:10
**shortly** [2] - 78:19, 304:13
**show** [12] - 49:9, 109:6, 119:19, 120:1, 179:6, 179:20, 179:23, 180:11, 183:6, 255:21, 262:11, 338:9
**showed** [3] - 109:11, 247:9, 307:18
**showing** [2] - 175:11, 194:4
**shown** [4] - 50:3, 51:8, 110:12, 291:19
**shows** [1] - 180:8
**sic** [1] - 211:23
**sick** [1] - 110:1
**sickness** [1] - 109:5
**side** [1] - 164:8
**sign** [17] - 60:21, 68:18, 69:23, 155:23, 158:12, 212:17, 274:8, 276:4, 290:7, 330:9, 330:14, 330:17, 331:7, 331:9, 332:3, 332:5, 340:7
**sign-off** [1] - 290:7
**signature** [5] - 6:4, 155:20, 158:9, 163:14, 182:21
**signatures** [1] - 158:3
**signed** [33] - 6:3, 50:14, 57:10, 61:17, 77:20, 93:23, 136:3, 136:6, 152:14, 152:19, 158:15, 163:14, 173:21, 177:12, 178:13, 212:3, 212:6, 212:20, 213:2, 213:4, 213:15, 217:21, 223:5, 267:20, 274:13, 275:16, 275:22, 330:15, 331:23, 332:1, 332:2, 349:13, 349:14
**significant** [1] - 316:4
**signing** [5] - 68:16, 86:15, 154:23, 275:2, 347:16
**signs** [2] - 154:8, 154:14
**similar** [5] - 77:14,

116:2, 121:13, 325:11, 332:7
**similarities** [2] - 102:13, 102:15
**similarly** [1] - 12:10
**Simon** [7] - 270:17, 270:21, 271:2, 303:11, 303:18, 323:23, 343:16
**simple** [7] - 92:6, 128:12, 159:17, 193:16, 234:19, 251:23, 321:1
**simplified** [1] - 280:10
**simplify** [1] - 69:8
**simply** [1] - 46:16, 57:15, 59:16, 60:12, 84:8, 84:19, 87:1, 92:6, 112:18, 193:17, 220:23
**simultaneous** [1] - 231:6
**sincere** [3] - 294:7, 294:10, 294:23
**Singapore** [10] - 39:7, 39:16, 41:11, 41:13, 41:15, 41:17, 41:23, 42:2, 79:1, 265:15
**sinus** [1] - 247:9
**sit** [3] - 47:14, 103:4, 331:22
**sitting** [3] - 7:1, 199:20, 241:10
**situation** [8] - 105:5, 114:5, 186:15, 197:18, 197:21, 228:22, 338:7, 347:9
**situations** [2] - 144:21, 296:13
**six** [21] - 12:2, 13:14, 24:13, 46:9, 67:20, 79:11, 88:13, 88:14, 89:6, 107:23, 113:1, 142:9, 142:10, 189:1, 214:19, 235:7, 244:14, 257:9, 261:7, 319:7, 347:4
**six-year** [1] - 235:7
**skeptical** [1] - 304:23
**skepticism** [1] - 306:14
**skills** [3] - 116:13, 128:20, 304:21
**Skinner** [1] - 277:2
**skip** [2] - 43:16, 285:14
**skipping** [1] - 258:14
**Skype** [1] - 336:6
**slander** [3] - 147:5,

147:13
**Sleep** [2] - 273:20, 309:1
**sleep** [21] - 110:9, 272:15, 272:17, 272:19, 297:19, 297:20, 297:23, 298:1, 301:20, 302:12, 302:16, 303:13, 307:14, 307:18, 307:19, 307:23, 308:5, 334:12, 341:13, 342:4, 344:22
**sleeping** [1] - 335:18
**slew** [1] - 111:23
**small** [3] - 64:1, 301:11, 301:12
**smart** [1] - 67:12
**smarter** [2] - 67:12, 167:12
**Smashburger** [1] - 34:23
**smirk** [1] - 344:4
**smirked** [1] - 344:3
**smirks** [1] - 341:10
**Smith** [1] - 38:12
**SMS** [4] - 261:18, 261:23, 262:5, 263:13
**socially** [2] - 317:17
**socks** [1] - 92:15
**soft** [1] - 298:23
**solely** [1] - 220:13
**someone** [34] - 21:2, 25:6, 25:11, 29:7, 29:11, 34:17, 34:22, 78:17, 114:3, 128:7, 132:21, 134:22, 147:22, 158:11, 167:3, 190:4, 219:8, 233:13, 243:1, 244:23, 266:3, 267:23, 269:22, 277:22, 278:17, 301:4, 303:8, 307:22, 312:2, 312:3, 312:9, 342:10
**someplace** [2] - 9:4, 26:17
**sometime** [2] - 38:5, 211:8
**sometimes** [7] - 53:11, 123:16, 123:17, 287:5, 327:15, 335:9, 335:10
**somewhat** [5] - 24:16, 43:9, 70:19, 302:7, 326:23

**somewhere** [3] - 9:8, 63:16, 175:20
**soon** [6] - 106:8, 110:8, 110:20, 200:7, 207:8, 297:23
**sorry** [25] - 14:20, 19:5, 23:20, 84:18, 136:11, 178:6, 186:23, 187:23, 193:16, 197:20, 209:16, 214:18, 223:20, 223:23, 249:23, 258:18, 279:22, 313:13, 313:15, 332:10, 332:12, 333:3, 346:3, 347:16
**Sorry** [1] - 216:18
**sort** [11] - 9:10, 9:17, 9:18, 15:7, 33:13, 162:5, 176:2, 185:23, 198:4, 282:16, 340:12
**sought** [3] - 32:1, 51:17, 343:1
**sound** [1] - 203:15
**sounds** [2] - 203:17, 243:13
**source** [7] - 14:15, 14:23, 15:15, 15:22, 82:18, 82:20, 289:12
**sources** [1] - 82:22
**Southern** [14] - 46:19, 47:8, 47:18, 48:3, 49:6, 49:15, 50:4, 50:19, 51:1, 51:21, 346:9
**Soviet** [1] - 187:14
**span** [1] - 111:19
**Spanish** [1] - 170:11
**speaker** [1] - 236:2
**speaking** [2] - 294:5, 295:11
**speaks** [1] - 258:16
**specialty** [1] - 166:4
**specific** [7] - 75:19, 171:4, 237:17, 241:7, 268:5, 268:12, 272:5
**specifically** [25] - 9:6, 21:23, 22:10, 40:15, 61:5, 64:14, 74:4, 76:20, 76:23, 89:9, 103:17, 117:4, 148:16, 172:15, 172:17, 173:17, 173:23, 174:15, 174:21, 192:8, 192:9, 240:7, 245:11, 262:13,

329:22
**specified** [1] - 311:11
**specify** [1] - 318:10
**speculate** [10] - 25:11, 26:3, 26:6, 27:22, 76:15, 89:14, 96:16, 233:14, 246:15, 287:9
**speculating** [1] - 146:23
**speculation** [2] - 26:6, 96:22
**speech** [1] - 233:15
**spell** [2] - 11:1, 106:16
**spend** [4] - 47:3, 262:10, 312:17, 328:11
**spent** [7] - 70:4, 71:10, 97:22, 113:11, 136:2, 238:20, 319:12
**spin** [2] - 172:8, 172:9
**spirit** [2] - 275:6, 275:18
**spontaneously** [1] - 236:3
**spreadsheet** [5] - 277:7, 277:8, 277:11, 310:2, 311:15
**Spreadsheet** [1] - 4:12
**sprinklers** [2] - 30:19, 30:20
**spun** [1] - 97:13
**spurred** [1] - 123:18
**Square** [4] - 10:4, 10:12, 217:23, 223:6
**Sri** [1] - 45:19
**Staff** [3] - 3:14, 175:11
**stage** [1] - 287:10
**stairs** [1] - 245:15
**Stam** [2] - 116:19
**stamp** [1] - 230:19
**stamped** [1] - 149:10, 217:12
**stand** [4] - 106:18, 144:4, 145:11, 261:10
**standard** [2] - 167:16, 202:7
**standardized** [4] - 196:16, 259:18, 260:1, 260:4
**standing** [3] - 164:22, 165:4, 347:8
**stands** [3] - 184:13, 189:14, 240:3
**star** [2] - 150:20, 150:22
**STARR** [1] - 5:8

**Starr** [2] - 7:10, 7:13
**start** [16] - 18:20, 38:7, 52:23, 92:14, 136:7, 139:1, 183:14, 243:12, 243:13, 259:23, 265:18, 281:14, 283:5, 283:7, 283:11, 316:13
**start-ups** [2] - 38:7, 265:18
**started** [21] - 20:6, 20:8, 20:13, 20:17, 21:6, 42:10, 102:10, 108:13, 108:15, 109:23, 169:8, 181:21, 185:8, 214:15, 243:8, 302:11, 304:8, 307:7, 338:10, 341:9, 341:16
**starting** [8] - 51:16, 108:9, 109:20, 169:18, 258:11, 341:15
**startled** [2] - 172:19, 172:20
**starts** [3] - 258:5, 258:12, 277:23
**state** [14] - 7:18, 121:1, 135:3, 139:7, 143:19, 145:13, 189:5, 205:20, 207:10, 225:10, 225:11, 342:23, 343:2, 343:8
**State** [6] - 206:5, 234:9, 270:6, 343:5, 343:11, 353:4
**STATE** [1] - 352:14
**statement** [16] - 99:22, 100:10, 103:3, 131:7, 144:4, 145:9, 170:2, 210:1, 211:14, 241:22, 261:10, 261:12, 266:22, 289:13, 298:16, 336:20
**statements** [3] - 118:10, 239:2, 242:3
**states** [4] - 68:7, 110:16, 186:14, 206:7
**STATES** [1] - 1:1
**States** [8] - 1:15, 46:2, 46:5, 46:12, 48:17, 258:20, 270:6, 270:9
**stating** [1] - 104:3
**station** [1] - 257:21
**status** [3] - 217:18,

228:11, 288:18
**statute** [1] - 235:7
**stay** [13] - 18:23, 19:1, 39:23, 43:20, 121:3, 162:9, 166:1, 224:6, 224:10, 225:8, 226:3, 287:7, 300:10
**stayed** [3] - 9:20, 136:18, 238:7
**staying** [1] - 27:5
**steal** [1] - 248:13
**steatosis** [1] - 272:14
**steered** [3] - 285:12, 285:15, 286:2
**stenographic** [1] - 353:6
**stenotype** [1] - 5:18
**step** [9] - 57:2, 248:3, 249:14, 258:18, 283:4, 285:6, 298:13, 316:12
**steps** [1] - 207:12
**still** [22] - 13:17, 13:21, 27:17, 37:19, 38:3, 38:7, 43:3, 43:7, 70:20, 70:22, 71:1, 99:14, 202:8, 214:8, 228:19, 229:1, 234:19, 291:5, 312:15, 317:10, 335:21, 338:22
**stipend** [1] - 35:22, 284:11, 301:5
**stipulated** [2] - 69:12, 70:15
**STIPULATIONS** [1] - 5:16
**stole** [1] - 150:9
**stolen** [1] - 150:2
**stone** [3] - 42:13, 43:11, 299:6
**stop** [8] - 14:2, 85:15, 107:2, 114:13, 133:19, 158:22, 214:23, 218:21
**stopped** [5] - 75:1, 82:7, 139:15, 287:10, 337:17
**store** [1] - 10:14
**story** [1] - 264:1
**straight** [1] - 92:4
**strange** [4] - 94:16, 110:4, 145:20, 246:3
**strategies** [1] - 220:20
**stream** [1] - 236:5
**Street** [4] - 1:16, 5:5, 5:10, 39:20
**stress** [4] - 109:8, 256:6, 312:1
**stressed** [2] - 110:10,

114:5
**stretch** [3] - 161:23, 326:1, 327:15
**strict** [1] - 275:10
**strike** [17] - 28:8, 28:13, 44:20, 60:19, 69:21, 78:10, 88:5, 90:12, 128:13, 151:19, 158:6, 158:7, 177:16, 179:21, 189:18, 219:4, 336:2
**striking** [1] - 34:10
**string** [4] - 3:17, 3:21, 4:4, 4:6
**stronger** [3] - 61:9, 63:3, 298:11
**struck** [7] - 28:5, 28:7, 29:4, 29:6, 30:16, 87:16, 264:21
**structure** [1] - 36:14
**structured** [1] - 36:13
**structuring** [1] - 327:7
**struggling** [4] - 192:22, 240:2, 241:15, 285:10
**student** [11] - 34:19, 42:19, 108:4, 137:14, 151:10, 154:9, 239:6, 263:19, 341:19, 347:4, 348:12
**studied** [1] - 91:8
**studies** [3] - 62:19, 195:5, 327:1
**study** [1] - 248:20
**studying** [2] - 57:6, 66:8
**stuff** [6] - 156:22, 206:4, 217:9, 250:20, 268:8, 308:10
**stupid** [1] - 307:12
**subcuticular** [5] - 116:16, 116:20, 116:22, 117:2, 119:12
**subject** [8] - 73:10, 168:14, 168:15, 169:22, 171:7, 171:15, 172:19, 300:12
**subjected** [1] - 342:21
**subjects** [1] - 262:6
**sublet** [1] - 341:18
**submission** [1] - 6:3
**submit** [3] - 144:5, 288:4, 290:21
**submitted** [20] - 126:11, 126:12,

132:11, 136:16, 136:20, 137:1, 145:9, 178:22, 211:2, 269:9, 291:3, 321:3, 321:22, 322:22, 325:7, 325:11, 325:21, 328:22, 329:9, 330:18
**submitting** [1] - 148:12
**subpoena** [4] - 275:9, 275:13, 330:23, 331:19
**subpoenaed** [2] - 348:11, 349:16
**subpoenas** [1] - 275:7
**Subscribed** [1] - 352:17
**subsequent** [2] - 79:4, 120:22
**substance** [1] - 263:23
**substantial** [1] - 220:8
**substantially** [1] - 129:23
**subtlety** [2] - 94:18, 94:20
**success** [1] - 338:9
**successes** [1] - 319:8
**sue** [9] - 131:22, 132:2, 147:7, 204:13, 209:22, 268:20, 270:14, 270:19, 271:3
**sued** [6] - 48:2, 91:3, 94:4, 94:6, 98:8, 202:14
**suffered** [1] - 339:4
**suffering** [2] - 271:8, 271:12
**sufficient** [2] - 84:10, 84:21
**suggest** [4] - 134:1, 299:7, 299:9, 300:16
**suggested** [4] - 94:18, 128:3, 128:4, 128:6
**suggesting** [1] - 332:22
**suggestion** [2] - 154:19, 296:9
**suing** [1] - 209:11
**Sulloway** [1] - 7:15
**SULLOWAY** [1] - 5:3
**summarize** [2] - 13:13, 182:13
**summarized** [1] - 150:12
**summary** [4] - 2:19, 95:3, 191:14, 350:10

**summer** [6] - 43:12, 171:8, 171:10, 304:13, 305:2, 305:11
**superior** [1] - 113:13
**supervising** [1] - 173:7
**supervisor** [4] - 135:17, 265:2, 270:22, 296:16
**supplement** [5] - 17:3, 159:23, 163:7, 323:1, 325:5
**Supplement** [1] - 3:13
**supplements** [4] - 12:8, 196:20, 323:4, 324:18
**support** [4] - 289:5, 289:13, 290:14, 291:1
**supporting** [1] - 101:1
**supposed** [8] - 48:4, 81:14, 127:12, 142:1, 142:3, 245:21, 245:23, 269:6
**supposing** [1] - 150:1
**surely** [1] - 254:11
**surgeon** [5] - 29:1, 165:19, 167:9, 277:23, 278:4
**surgeons** [1] - 147:8
**surgery** [24] - 95:9, 95:16, 104:2, 106:2, 106:23, 114:12, 116:13, 116:15, 117:15, 164:17, 165:21, 166:6, 167:10, 169:16, 170:2, 171:21, 171:23, 180:22, 181:3, 198:8, 256:18, 257:3, 257:6, 344:9
**surgical** [6] - 98:14, 100:20, 128:20, 130:8, 142:3, 143:7
**surprise** [5] - 29:6, 257:2, 335:8, 338:22
**surprised** [10] - 117:1, 187:12, 187:15, 188:1, 220:21, 256:17, 256:20, 257:4, 307:11
**surprises** [2] - 325:4, 325:6
**surprising** [1] - 337:18
**surrounding** [3] - 23:23, 25:13, 343:7
**suspect** [7] - 26:2,

30:11, 97:9, 169:18,
245:1, 245:3, 323:20
**suspected** [1] - 95:23
**suspicion** [10] - 98:19,
99:13, 99:14, 99:18,
100:19, 102:17,
102:21, 297:11,
297:12, 324:1
**suspicions** [1] -
111:11
**suspicious** [4] -
98:17, 108:14,
110:22, 111:17
**sustainable** [2] -
317:11, 317:12
**sustained** [2] -
341:20, 342:2
**sustains** [1] - 99:18
**suture** [2] - 116:16,
119:8
**sutures** [1] - 119:12
**suturing** [1] - 116:15
**swear/affirm** [1] -
352:6
**switched** [1] - 287:8
**sworn** [3] - 6:7,
352:17, 353:8
**symptoms** [2] - 339:7,
341:16
**synonym** [2] - 82:3,
82:9
**system** [8] - 33:18,
169:12, 169:14,
173:1, 178:2, 288:3,
326:4, 326:8
**System** [1] - 216:22
**systems** [1] - 180:2

# T

**T-Mobile** [2] - 262:23
**table** [3] - 295:23,
306:23, 307:12
**tachycardia** [2] -
247:9, 342:15
**tail** [1] - 43:15
**taker** [1] - 111:15
**talented** [1] - 170:16
**talks** [6] - 188:16,
195:19, 208:10,
217:21, 224:2, 253:3
**Tampa** [6] - 24:10,
24:11, 24:12, 24:13,
24:19, 30:20
**tape** [1] - 299:1
**task** [1] - 244:3
**tasks** [3] - 130:20,
284:20, 308:14
**taught** [5] - 47:15,

116:20, 232:23,
233:9, 315:4
**tax** [3] - 320:20,
320:22, 320:23
**TBI** [12] - 187:19,
188:3, 188:7, 190:1,
190:17, 191:17,
191:20, 193:5,
193:22, 268:1
**tea** [1] - 167:10
**team** [2] - 106:23,
120:13
**tear** [1] - 265:5
**teary** [1] - 293:3
**technical** [6] - 116:12,
116:14, 117:3,
119:4, 119:7, 119:9
**technically** [1] - 35:16
**technology** [1] - 39:18
**temple** [4] - 28:10,
28:11, 28:12, 30:14
**Temple** [3] - 46:14,
79:12, 79:23
**temporarily** [1] - 9:23
**ten** [14] - 14:2, 37:4,
87:8, 88:15, 108:1,
174:12, 214:4,
214:16, 214:17,
215:23, 230:2,
242:11, 306:10,
321:6
**ten-minute** [1] -
214:17
**tend** [1] - 111:20
**tense** [4] - 67:9, 67:15,
67:23, 69:6
**tenure** [3] - 22:13,
40:1
**term** [8] - 30:7, 39:15,
52:17, 149:4, 174:1,
202:3, 299:10,
303:13
**terminate** [4] - 74:10,
132:19, 134:22,
228:3
**terminated** [16] - 10:1,
87:4, 108:15,
130:16, 132:6,
132:13, 132:14,
132:18, 195:13,
195:17, 213:12,
218:12, 230:14,
260:9, 263:22, 319:5
**terminating** [3] - 96:1,
105:9, 230:22
**termination** [20] -
74:7, 86:13, 86:17,
105:12, 112:15,
117:6, 130:4, 131:9,
135:11, 196:1,

218:10, 218:11,
220:12, 221:2,
221:15, 230:19,
241:23, 242:10,
242:15, 261:5
**terms** [20] - 7:19,
13:10, 13:13, 25:6,
35:10, 45:8, 47:12,
48:5, 52:14, 115:13,
141:13, 141:16,
162:23, 180:23,
213:8, 271:23,
297:21, 317:16,
332:20, 336:22
**terrorist** [1] - 96:21
**test** [7] - 111:13,
111:15, 167:16,
191:3, 249:15,
258:19, 258:20
**testified** [14] - 6:8,
80:15, 82:10, 89:18,
123:13, 127:15,
131:11, 131:15,
161:14, 164:14,
265:19, 292:6,
294:3, 325:7
**testify** [16] - 47:20,
47:21, 48:1, 67:22,
86:19, 88:19, 99:13,
101:5, 102:18,
103:9, 123:14,
178:3, 179:13,
272:2, 308:3, 323:6
**testifying** [2] - 75:19,
135:10
**testimony** [11] - 80:14,
144:5, 148:16,
157:4, 162:13,
214:14, 265:14,
292:5, 298:15,
311:3, 352:7
**testing** [1] - 169:17
**tests** [5] - 102:8,
136:18, 136:21,
259:18, 259:19
**text** [5] - 4:6, 4:8,
262:5, 262:20,
262:22
**texts** [2] - 262:15,
263:18
**Thanksgiving** [6] -
270:18, 290:19,
303:12, 303:22,
304:1, 324:1
**that'll** [1] - 267:14
**THE** [5] - 1:2, 353:17,
353:18, 353:19,
353:20
**theirs** [1] - 180:4
**themselves** [3] - 6:20,

53:17, 88:2
**theoretical** [1] - 335:2
**theories** [1] - 338:3
**therapy** [2] - 296:9,
296:12, 296:13
**thereafter** [4] - 78:19,
209:22, 209:23,
279:7
**therefore** [1] - 181:16
**they've** [2] - 200:10,
308:20
**Thi's** [1] - 129:18
**thinking** [41] - 19:10,
28:1, 43:13, 58:16,
63:2, 63:6, 63:7,
64:3, 67:10, 67:14,
122:1, 145:16,
147:1, 147:2,
147:10, 147:15,
156:20, 204:1,
206:14, 209:11,
210:9, 220:18,
231:14, 231:15,
231:16, 234:9,
238:1, 243:12,
246:10, 260:3,
285:23, 291:5,
291:7, 291:15,
293:20, 293:21,
295:7, 311:19,
314:16, 326:3
**third** [12] - 19:18,
40:16, 104:18,
104:22, 130:19,
152:22, 250:22,
251:3, 274:18,
274:19, 279:15,
313:5
**thirty** [1] - 6:3
**THIS** [1] - 353:17
**Thomas** [1] - 151:22
**thoughts** [3] - 207:4,
232:15, 286:16
**thousand** [2] - 301:4,
320:6
**threaten** [1] - 132:2
**threatened** [3] -
131:17, 131:22,
135:14
**threatening** [1] - 33:11
**three** [53] - 9:22,
13:16, 24:14, 30:1,
45:23, 46:7, 46:9,
76:14, 82:11, 92:10,
92:12, 92:18, 97:22,
101:4, 103:10,
105:19, 107:23,
109:11, 112:2,
112:3, 125:3,
143:11, 146:6,

148:9, 152:13,
163:3, 182:22,
214:17, 214:18,
215:6, 230:18,
245:10, 251:20,
257:11, 258:18,
258:19, 258:20,
259:1, 259:2,
259:20, 260:8,
275:14, 276:2,
276:18, 279:16,
296:4, 305:6,
325:19, 326:7,
334:3, 337:19,
343:22
**three-and-a-half** [1] -
215:6
**three-hour** [1] - 13:16
**threw** [1] - 21:3
**throughout** [2] - 45:1,
323:10
**throw** [4] - 25:11,
26:5, 220:19, 278:2
**thrown** [1] - 221:4
**thumb** [1] - 322:6
**Thursday** [1] - 352:4
**Thursday,December**
[1] - 1:17
**tier** [1] - 314:17
**timing** [2] - 54:15,
323:5
**tired** [3] - 325:1,
332:13, 342:6
**tiredness** [2] - 294:12,
298:8
**titled** [4] - 48:17,
66:19, 129:17, 318:5
**titles** [1] - 318:7
**TO** [1] - 353:18
**today** [17] - 82:11,
98:9, 101:2, 148:16,
162:19, 163:3,
204:21, 206:4,
206:5, 210:11,
310:20, 311:13,
315:12, 324:20,
326:19, 326:20,
327:23
**today's** [3] - 21:23,
314:3, 334:23
**together** [9] - 26:17,
112:7, 174:14,
183:14, 213:7,
258:2, 276:17,
276:20, 283:12
**tolerated** [1] - 227:23
**tomorrow** [2] - 122:3,
147:12
**tone** [1] - 29:7
**tonight** [1] - 9:2

**took** [18] - 12:5, 12:10, 26:4, 29:11, 42:15, 44:4, 46:6, 101:16, 102:7, 109:9, 191:3, 259:4, 259:21, 261:8, 322:19, 326:5, 347:5, 347:11
**top** [13] - 19:8, 19:21, 42:15, 57:7, 147:2, 166:10, 239:6, 250:11, 252:23, 277:22, 278:6, 280:12
**top-achieving** [1] - 278:6
**top-ranked** [1] - 239:6
**topic** [2] - 66:19, 220:2
**Torrey's** [1] - 267:13
**torts** [1] - 202:6
**total** [5] - 15:15, 188:23, 214:19, 310:9, 315:17
**totally** [5] - 169:23, 250:20, 257:9, 312:2, 316:21
**touts** [1] - 287:19
**towards** [7] - 15:14, 45:8, 99:12, 166:16, 245:6, 262:13, 282:12
**traced** [1] - 181:23
**track** [1] - 175:1
**tracking** [2] - 218:4, 218:6
**traditionally** [1] - 315:10
**tragedy** [1] - 200:23
**trail** [2] - 113:2, 307:1
**train** [4] - 122:10, 233:19, 265:13
**trained** [3] - 294:5, 295:20, 296:11
**training** [45] - 3:11, 139:10, 139:18, 139:20, 139:21, 139:22, 140:1, 140:5, 140:10, 140:18, 142:16, 143:8, 143:11, 143:15, 143:16, 143:17, 143:23, 144:22, 148:23, 149:5, 152:16, 155:12, 156:12, 156:13, 160:20, 163:7, 176:17, 178:16, 180:8, 182:2, 193:8, 195:14, 205:7, 205:12, 205:14,

205:16, 206:5, 206:6, 206:17, 208:11, 236:6, 301:5, 315:2, 321:4, 337:22
**transcribed** [1] - 5:19
**transcript** [3] - 4:21, 352:4, 353:6
**TRANSCRIPT** [1] - 353:18
**transfer** [4] - 19:7, 20:3, 43:16, 300:11
**transferred** [4] - 19:17, 41:15, 81:19, 304:12
**transferring** [1] - 20:5
**transition** [3] - 189:6, 189:11, 190:8
**transitional** [1] - 135:7
**transitioning** [1] - 334:12
**transitions** [1] - 316:12
**transmit** [3] - 122:2, 137:20, 145:17
**transmitted** [2] - 31:5, 137:23
**transmitting** [1] - 232:16
**trauma** [2] - 208:13, 341:22
**traumatic** [1] - 241:4
**traumatized** [1] - 311:23
**treat** [4] - 32:10, 115:7, 115:14, 307:22
**treated** [6] - 32:9, 108:23, 271:9, 271:19, 338:2, 338:6
**treating** [6] - 110:11, 274:3, 302:9, 327:11, 328:2
**treatment** [7] - 31:8, 271:12, 302:12, 337:4, 337:14, 338:11, 340:2
**trial** [4] - 6:1, 8:8, 152:11, 338:9
**trials** [2] - 327:5
**triathlon** [1] - 170:7
**triathlons** [1] - 170:15
**tried** [5] - 50:13, 50:20, 82:22, 107:16, 289:14
**triggered** [1] - 342:22
**triple** [2] - 317:12, 317:13
**trivial** [1] - 29:1
**trouble** [2] - 31:3, 97:4

**true** [35] - 30:21, 115:21, 118:23, 124:22, 139:8, 141:20, 144:3, 153:2, 161:6, 161:8, 161:9, 161:10, 161:13, 164:21, 165:1, 165:5, 165:6, 165:9, 165:11, 165:13, 165:14, 166:23, 182:12, 197:5, 211:14, 244:16, 261:10, 266:22, 322:2, 328:21, 329:4, 353:6
**truly** [1] - 344:20
**trustees** [2] - 7:10, 7:13
**truthful** [6] - 149:2, 164:15, 176:18, 195:3, 195:15, 208:19
**truthfully** [4] - 11:22, 12:7, 141:7, 195:11
**try** [19] - 29:2, 29:10, 76:18, 113:15, 121:23, 131:5, 172:8, 181:22, 204:8, 204:9, 211:18, 250:1, 268:7, 289:18, 289:20, 305:11, 319:6, 327:17, 337:7
**trying** [38] - 26:10, 27:21, 29:19, 31:2, 33:9, 48:11, 50:23, 62:11, 62:16, 67:17, 68:14, 76:12, 79:6, 86:18, 97:23, 98:2, 107:4, 109:18, 123:22, 131:12, 147:22, 148:23, 169:19, 172:9, 172:10, 209:5, 209:18, 238:17, 240:4, 249:21, 261:2, 268:8, 278:10, 303:14, 304:17, 317:9, 332:15, 332:17
**tsunami** [1] - 45:19
**Tuck** [1] - 341:18
**tucked** [1] - 53:12
**Tucson** [7] - 136:14, 170:9, 198:7, 198:13, 200:22
**Tuesday** [3] - 258:6, 258:12
**tuition** [2] - 81:6, 81:8
**turn** [30] - 55:9, 55:13,

64:16, 66:17, 85:3, 96:3, 103:15, 106:13, 114:8, 117:10, 122:23, 139:5, 158:1, 182:6, 217:10, 218:2, 222:6, 222:20, 223:15, 230:10, 236:19, 237:5, 240:18, 245:21, 245:23, 258:4, 258:13, 260:5, 286:16
**turned** [3] - 21:7, 246:2, 305:19
**turns** [3] - 41:6, 69:11, 166:19
**tutor** [1] - 116:19
**TV** [1] - 255:21
**twice** [1] - 76:22
**two** [79] - 7:17, 12:5, 14:13, 22:11, 24:14, 25:19, 30:2, 38:16, 40:4, 40:6, 40:9, 40:15, 40:17, 40:19, 40:20, 40:23, 45:23, 52:5, 53:4, 59:11, 66:7, 97:7, 98:22, 101:14, 102:15, 103:6, 103:10, 105:19, 107:18, 107:23, 110:12, 111:19, 112:16, 119:4, 119:5, 139:15, 146:6, 148:7, 161:13, 166:22, 194:6, 198:14, 200:22, 214:18, 214:20, 214:21, 215:1, 230:23, 238:3, 247:20, 248:3, 249:14, 258:2, 259:10, 259:14, 264:23, 269:22, 277:14, 279:17, 280:10, 282:1, 282:7, 289:17, 299:5, 300:11, 304:6, 312:5, 313:1, 318:1, 320:22, 324:22, 326:7, 326:10, 334:3, 337:19, 339:11, 346:8
**two-year** [3] - 40:4, 40:9, 40:15
**type** [4] - 39:9, 102:9, 140:3, 341:6
**typed** [3] - 156:23,

164:9, 269:21
**types** [2] - 97:18, 282:1
**typewritten** [2] - 156:10, 156:22
**typical** [12] - 30:7, 40:10, 40:11, 63:15, 87:19, 88:3, 99:2, 256:4, 331:19, 331:21, 343:21, 343:23
**typically** [7] - 40:17, 87:21, 87:23, 128:8, 171:15, 285:10, 343:11

---

## U

**U.S** [1] - 19:11
**UC** [1] - 217:1
**UCLA** [3] - 121:3, 217:1, 275:9
**ultimately** [10] - 46:18, 50:12, 69:22, 78:11, 132:14, 267:3, 270:8, 287:3, 288:23, 344:23
**unable** [4] - 47:16, 47:18, 66:22, 104:5
**unacceptable** [1] - 307:19
**unanimously** [1] - 117:22
**unattended** [1] - 243:6
**unclean** [1] - 62:23
**unclear** [3] - 68:12, 80:11, 300:2
**uncomfortable** [2] - 101:20, 347:6
**unconscionability** [2] - 63:8, 64:2
**unconscionable** [2] - 63:21, 63:22
**unconscious** [3] - 28:16, 28:22, 30:7
**unconsciousness** [1] - 28:17
**UNDER** [1] - 353:19
**under** [40] - 5:20, 13:10, 35:17, 45:9, 48:5, 57:10, 63:19, 64:11, 66:19, 92:17, 121:19, 122:6, 128:11, 140:3, 143:4, 143:10, 150:7, 152:8, 157:10, 165:7, 211:5, 214:8, 230:8, 242:14, 244:13,

256:6, 271:12, 272:3, 272:21, 273:7, 273:19, 273:21, 273:23, 288:10, 295:23, 306:22, 307:12, 332:19, 352:8

**undergrad** [1] - 22:16

**underperforming** [1] - 299:17, 344:20

**understood** [12] - 34:13, 44:1, 44:18, 65:21, 74:2, 74:4, 138:5, 220:15, 221:1, 235:12, 259:14, 284:19

**undertake** [1] - 249:20

**undesirable** [2] - 165:23, 181:2

**undiagnosed** [2] - 267:23, 344:17

**undue** [1] - 63:5

**unequivocal** [1] - 61:14

**unequivocally** [1] - 61:12

**unethical** [1] - 182:4

**unfair** [1] - 95:2

**unfortunately** [2] - 308:5, 327:3

**unhappiness** [1] - 26:4

**unheard** [1] - 314:11

**unit** [3] - 245:15, 309:5, 328:4

**UNITED** [1] - 1:1

**United** [8] - 1:15, 46:2, 46:5, 46:12, 48:17, 258:20, 270:6, 270:9

**universities** [1] - 101:19

**University** [43] - 18:19, 18:23, 19:1, 19:3, 46:19, 47:7, 47:17, 48:2, 49:6, 49:15, 50:4, 50:18, 50:23, 93:11, 94:11, 95:17, 108:5, 119:22, 119:23, 125:5, 126:12, 126:20, 127:16, 142:22, 151:17, 164:13, 171:11, 171:19, 177:2, 179:20, 179:22, 181:17, 197:4, 216:15, 216:21, 221:8, 249:12, 346:9, 347:3, 347:10, 347:18,

347:19

**unknown** [2] - 71:23, 130:5

**UNLESS** [1] - 353:19

**unless** [1] - 20:10

**unlikely** [1] - 167:6

**unreasonable** [1] - 232:6

**unrelated** [2] - 250:20, 251:2

**unsafe** [5] - 227:18, 227:21, 228:19, 229:4, 229:9

**untruthful** [2] - 138:21, 139:3

**unusual** [6] - 63:19, 96:20, 108:22, 341:12, 341:20, 345:22

**unwilling** [1] - 331:6

**up** [67] - 22:5, 31:7, 31:23, 39:1, 43:15, 46:19, 46:20, 57:17, 71:2, 71:16, 73:20, 80:5, 87:13, 89:17, 92:17, 92:20, 96:3, 97:13, 103:6, 109:7, 109:11, 109:16, 110:12, 119:10, 132:6, 146:1, 153:4, 154:11, 154:18, 164:9, 167:20, 179:20, 179:23, 191:20, 191:21, 209:21, 210:4, 210:5, 210:6, 215:23, 216:5, 217:22, 233:2, 233:11, 238:7, 247:19, 254:4, 275:4, 278:2, 290:16, 293:4, 295:16, 296:3, 299:18, 309:17, 311:12, 314:5, 316:3, 316:8, 317:20, 329:16, 340:21, 341:3, 345:23

**upcoming** [3] - 169:4, 169:5

**update** [4] - 198:15, 199:6, 306:20, 307:3

**upper** [1] - 28:11

**UPS** [1] - 10:14

**ups** [2] - 38:7, 265:18

**urine** [1] - 191:3

**US** [3] - 98:14, 258:20, 352:5

**USC** [112] - 2:19, 2:20, 2:22, 3:1, 46:20, 46:23, 47:5, 47:15, 52:5, 53:19, 53:23, 54:7, 54:17, 54:21, 55:22, 56:1, 56:4, 56:6, 56:14, 62:17, 63:1, 63:11, 66:14, 69:11, 70:5, 70:10, 70:15, 70:20, 71:11, 72:4, 72:11, 72:22, 74:12, 74:13, 75:7, 75:11, 75:18, 76:3, 76:11, 76:21, 81:23, 82:6, 83:7, 83:18, 95:23, 96:6, 96:14, 97:3, 97:21, 98:15, 99:12, 100:21, 100:22, 102:2, 102:16, 102:18, 119:14, 121:7, 130:4, 141:10, 141:12, 141:14, 142:23, 143:1, 148:14, 148:21, 149:4, 151:10, 157:10, 157:14, 157:20, 159:3, 161:12, 162:11, 162:18, 167:5, 168:15, 181:12, 188:8, 188:9, 189:4, 189:10, 189:11, 195:9, 203:7, 208:2, 208:4, 208:15, 225:21, 228:4, 248:7, 248:8, 248:18, 248:22, 249:11, 254:11, 262:1, 262:5, 262:18, 263:19, 300:8, 339:14, 340:10, 342:21, 347:12, 348:10, 348:11, 348:15, 349:6

**USC's** [2] - 51:10, 84:20

**USC/AUC/Arizona/ failed** [2] - 248:3

**useless** [1] - 166:8

**uses** [1] - 218:4

**USMLE** [3] - 102:7, 258:23, 259:20

**V**

**VA** [23] - 104:3, 106:6, 106:22, 114:12, 169:7, 169:9,

169:15, 169:22, 170:3, 170:10, 170:12, 170:13, 170:17, 171:3, 171:21, 171:23, 172:21, 172:22, 172:23, 174:4, 174:5, 174:18, 182:1

**vaccinations** [3] - 186:14, 186:22, 188:18

**vague** [3] - 71:12, 125:13, 139:3

**vaguely** [1] - 49:17

**valid** [3] - 70:22, 83:21, 92:12

**Valley** [1] - 281:4

**Vanderbilt** [12] - 41:2, 42:11, 42:19, 42:20, 43:4, 43:6, 43:20, 44:7, 44:9, 44:11, 44:19, 44:21

**Vangjel** [2] - 5:14, 353:3

**VANGJEL** [1] - 353:22

**various** [6] - 31:2, 103:5, 113:5, 188:17, 201:9, 244:8

**vary** [2] - 104:18, 104:19

**Veazey** [1] - 39:20

**vehicle** [1] - 332:18

**ventricular** [1] - 342:15

**venture** [4] - 35:15, 35:16, 317:8, 317:15

**venue** [1] - 130:11

**verb** [4] - 67:9, 67:14, 67:23, 69:5

**verbally** [5] - 33:15, 173:15, 289:10, 309:14, 309:15

**verge** [2] - 240:8, 305:6

**verifiable** [1] - 312:11

**verification** [1] - 158:16

**verify** [2] - 78:16, 291:8

**verifying** [1] - 158:9

**Vermont** [1] - 270:6

**version** [2] - 217:17, 222:23

**versus** [4] - 35:13, 47:12, 47:13, 49:14

**victim** [1] - 344:21

**video** [6] - 7:23, 8:1, 8:2, 8:3, 8:8

**videoconference** [2] - 228:12, 228:17

**view** [10] - 28:21, 83:4, 89:7, 96:14, 98:13, 99:10, 117:14, 232:7, 250:3, 328:9

**viewing** [1] - 303:7

**Villanova** [4] - 46:14, 79:11, 79:22, 80:1

**vindicated** [1] - 233:23

**violate** [1] - 275:18

**violation** [3] - 95:8, 274:16, 276:1

**violations** [1] - 98:20

**violence** [4] - 25:7, 25:10, 34:14, 34:18

**visible** [1] - 344:4

**visibly** [1] - 340:9

**visited** [1] - 139:15

**visual** [1] - 29:23

**visually** [1] - 338:18

**voice** [1] - 270:19

**void** [4] - 59:16, 59:18, 59:21, 131:7

**voluntarily** [19] - 123:8, 124:3, 128:12, 191:16, 194:21, 195:17, 198:22, 198:23, 199:6, 200:13, 202:21, 207:2, 209:1, 209:7, 218:22, 219:1, 219:7, 219:11, 253:17

**voluntary** [4] - 122:5, 128:1, 218:20, 219:20

**volunteer** [2] - 45:18, 45:20

**vote** [2] - 118:3, 118:12

**voted** [4] - 117:21, 118:15, 118:16, 124:5

**W**

**W-a-e-r** [1] - 94:2

**Wadleigh** [2] - 7:9, 7:12

**WADLEIGH** [1] - 5:8

**Waer** [26] - 3:4, 3:6, 94:1, 94:2, 94:11, 98:4, 98:8, 102:6, 104:1, 106:15, 107:16, 109:12, 117:19, 117:20, 118:9, 122:16, 123:2, 123:6,

123:11, 123:20,
123:21, 133:9,
133:17, 135:20,
167:1
**Waer's** [1] - 135:16
**wait** [9] - 145:21,
146:3, 146:5,
156:14, 183:7,
223:16, 259:11,
276:6, 291:12
**waiting** [12] - 136:21,
200:4, 201:12,
201:13, 201:15,
201:16, 201:17,
202:18, 203:11,
204:2, 204:10,
207:10
**waive** [4] - 6:12,
68:23, 274:17,
275:12
**waived** [4] - 5:23, 6:4,
81:8, 232:21
**waiver** [1] - 330:23
**waivers** [4] - 275:1,
275:4, 330:22,
331:17
**waiving** [1] - 277:20
**walk** [2] - 14:1, 130:17
**wants** [4] - 230:6,
299:7, 299:8, 301:2
**ward** [1] - 121:3
**warranted** [1] - 294:16
**warrants** [1] - 97:12
**Washington** [1] - 10:7
**waste** [1] - 80:4
**watched** [1] - 67:21
**water** [1] - 77:11
**wavelength** [2] -
67:11, 67:14
**wavered** [1] - 79:13
**Wayne** [1] - 111:2
**ways** [5] - 53:5, 166:8,
327:5, 338:4, 338:17
**weaker** [1] - 61:9
**web** [2] - 289:16
**website** [1] - 317:10
**Wednesday** [1] -
258:18
**week** [30] - 25:3,
34:22, 139:15,
146:2, 146:3, 162:2,
170:8, 170:17,
170:23, 177:8,
180:13, 198:10,
198:13, 224:23,
225:15, 225:18,
240:9, 240:10,
244:18, 259:11,
284:7, 292:20,
308:6, 319:11,

319:19, 334:16,
342:9
**weekend** [2] - 240:16,
292:19
**weeks** [10] - 12:2,
103:4, 125:3, 142:9,
142:10, 146:6,
198:14, 200:22,
291:14
**weigh** [1] - 70:13
**weighed** [2] - 13:19,
19:14
**weight** [1] - 128:21
**Weinstein** [3] - 278:9,
280:16, 280:20
**Weinstein's** [1] -
281:4
**weird** [6] - 170:16,
188:5, 212:4, 212:5,
285:19, 340:15
**welcome** [1] - 204:19
**well-being** [3] -
228:23, 235:6
**well-regarded** [1] -
283:1
**well-written** [1] - 67:5
**West** [7] - 10:6, 10:11,
113:11, 245:16,
270:23, 303:12,
309:6
**West's** [1] - 116:10
**Wharton** [13] - 38:2,
41:5, 42:9, 42:11,
42:12, 42:16, 43:1,
43:3, 43:4, 43:10,
43:15, 43:16, 44:2
**whatsoever** [5] -
14:16, 15:16, 71:23,
203:3, 235:22
**whereas** [2] - 19:22,
21:18
**whole** [22] - 67:15,
69:8, 97:11, 103:19,
111:23, 122:2,
135:9, 135:17,
135:21, 158:12,
163:15, 169:11,
210:3, 246:11,
261:17, 261:20,
263:5, 263:6, 263:8,
264:1, 264:17,
311:15
**wife** [1] - 250:23
**wife's** [1] - 10:21
**Wikipedia** [5] - 82:15,
82:18, 82:21, 82:23,
83:1
**William** [1] - 11:11
**willing** [3] - 131:18,
181:3, 331:2

**windows** [1] - 88:1
**wipe** [3] - 124:15,
124:17, 124:19
**wish** [3] - 61:23,
297:6, 299:1
**wishes** [2] - 6:13,
169:21
**wishful** [1] - 326:3
**withdrawn** [1] -
194:21
**WITNESS** [2] - 2:3,
352:1
**witness** [2] - 101:5,
308:3
**witnesses** [1] - 224:18
**woke** [2] - 31:23,
264:17
**woman** [1] - 263:3
**won** [1] - 267:20
**wonder** [8] - 34:15,
243:8, 243:12,
243:13, 243:23,
257:8, 259:23, 303:6
**wondered** [2] - 182:9,
182:12
**wondering** [1] - 188:7
**Word** [2] - 156:23,
157:1
**word** [38] - 26:8, 47:2,
47:4, 47:23, 52:4,
52:8, 52:9, 52:22,
61:11, 71:12, 71:15,
73:1, 96:18, 118:17,
119:14, 120:17,
127:20, 130:22,
135:13, 141:4,
145:8, 147:13,
148:17, 151:11,
171:22, 174:5,
174:6, 242:7, 244:5,
254:18, 266:8,
290:6, 294:22,
303:18, 315:19,
318:19, 319:3,
324:18
**wording** [1] - 124:1
**words** [26] - 52:2,
60:20, 60:23, 67:17,
69:3, 69:14, 82:1,
168:22, 172:4,
172:7, 173:4, 174:4,
174:14, 256:7,
286:11, 286:23,
291:2, 293:7,
294:13, 294:14,
295:12, 298:11,
298:18, 298:23,
299:15, 305:4
**wore** [1] - 92:15
**workday** [1] - 257:16

**workers** [1] - 317:17
**works** [4] - 105:13,
137:13, 163:9,
342:10
**workup** [5] - 295:6,
297:20, 297:22,
298:14, 299:8
**workweek** [3] -
266:13, 266:21,
342:12
**world** [7] - 53:18,
228:22, 243:2,
278:18, 281:3,
281:6, 288:2
**world-renowned** [1] -
288:2
**worried** [1] - 188:2
**worry** [1] - 203:17
**worse** [1] - 257:1
**worsened** [2] -
136:23, 344:16
**worst** [1] - 216:2
**worth** [2] - 309:17,
327:17
**wound** [5] - 104:20,
105:1, 105:2, 105:6,
130:8
**wrangling** [1] - 53:4
**write** [24] - 67:6,
105:18, 105:21,
106:3, 106:4, 106:8,
106:10, 106:11,
109:15, 128:22,
140:5, 144:1,
193:14, 206:7,
208:8, 208:9,
208:18, 225:18,
257:12, 257:23,
260:12, 275:4,
301:23, 307:2
**writes** [1] - 256:23
**writing** [11] - 91:6,
98:18, 182:15,
188:6, 231:12,
257:13, 257:15,
260:19, 282:15,
297:5, 348:7
**written** [24] - 57:2,
66:7, 67:5, 67:18,
93:10, 93:11, 93:23,
128:19, 145:9,
168:9, 168:10,
211:12, 215:22,
216:2, 216:4, 238:3,
255:5, 260:6,
260:12, 283:16,
288:14, 293:1,
299:1, 336:7
**wrongdoing** [4] -
199:7, 199:9,

199:11, 200:8
**wrongfully** [1] -
281:17
**wrongly** [1] - 341:22
**wrote** [43] - 20:10,
64:19, 65:2, 65:4,
65:9, 65:19, 65:20,
65:21, 66:22, 67:7,
67:14, 68:4, 68:5,
106:9, 117:3, 132:6,
142:22, 145:4,
155:4, 178:16,
184:12, 190:10,
192:3, 206:19,
207:18, 223:22,
224:1, 224:18,
256:9, 256:12,
258:8, 259:8, 259:9,
259:17, 261:21,
261:22, 264:12,
266:5, 296:3,
311:19, 312:15
**Wynne** [12] - 111:3,
111:4, 111:10,
112:11, 112:18,
118:9, 122:16,
123:2, 123:11,
123:21, 133:9
**Wynne's** [1] - 135:21

## Y

**Ybor** [6] - 24:10,
25:21, 26:1, 26:18,
26:19, 88:8
**year** [68] - 14:13,
15:13, 15:14, 17:8,
18:11, 19:2, 23:2,
23:7, 23:8, 23:9,
23:10, 35:23, 36:1,
36:7, 36:9, 36:10,
39:9, 40:4, 40:9,
40:15, 40:16, 43:14,
44:13, 44:16, 44:22,
45:13, 45:16, 63:17,
71:10, 83:11,
106:18, 121:14,
121:17, 135:7,
140:7, 142:5, 142:8,
142:11, 145:15,
166:1, 166:7,
166:16, 166:17,
166:19, 180:18,
180:19, 180:20,
217:5, 235:7, 259:5,
259:21, 285:10,
287:22, 288:1,
300:10, 311:12,
315:16, 316:4,
318:16, 321:1,

321:2, 325:21, 326:3, 326:22, 327:18

**years** [39] - 10:18, 21:13, 38:16, 40:6, 40:18, 40:19, 40:20, 40:23, 46:7, 46:9, 53:4, 57:14, 63:18, 63:23, 67:19, 69:9, 76:14, 88:20, 92:17, 97:22, 98:22, 111:19, 116:18, 188:2, 208:12, 230:2, 261:18, 289:17, 293:5, 310:19, 311:14, 315:3, 320:22, 325:19, 326:5, 326:7, 339:8

**yelled** [1] - 246:4

**yes/no** [1] - 292:14

**yesterday** [2] - 22:4, 22:5

**yield** [1] - 307:15

**Yong** [5] - 230:23, 231:22, 268:22, 269:12, 269:21

**York** [4] - 39:20, 40:23, 319:22, 320:9

**younger** [1] - 334:23

**yourself** [7] - 26:17, 164:19, 264:8, 264:13, 265:7, 266:5, 279:8

**yous** [1] - 238:22

## Z

**zero** [1] - 242:4

**zeros** [1] - 321:2

**zombie** [1] - 302:7