UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEW HAMPSHIRE

*******************************************

| | |
|---|---|
| Dr. J.D. Isaacs | * |
| | * |
|    Plaintiff, | * |
| | * |
|       -v- | *   Case No. 1:12-cv-00040-LM |
| | * |
| Dartmouth-Hitchcock Medical Center, | * |
| Mary Hitchcock Memorial Hospital, | * |
| Dr. Christine T. Finn, and the | * |
| Trustees of Dartmouth College, | * |
| | * |
|    Defendants. | * |
| | * |

*******************************************

**DEFENDANTS CHRISTINE T. FINN, MD, and TRUSTEES OF DARTMOUTH COLLEGE'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1(a), Dr. Christine T. Finn, M.D., and the Trustees of Dartmouth College ("the College") hereby submit their memorandum in support of their Motion for Summary Judgment, filed concurrently herewith.

*Brief Statement of Material Facts Pursuant to Local Rule 56.1(a)*

The plaintiff in this matter, Dr. J.D. Isaacs, began his medical education at the University of Southern California's Keck School of Medicine, which he attended briefly in 2005. See Deposition Transcript of Jeffrey D. Isaacs, MD, at 46:18-47:5 (hereinafter "Plaintiff's Depo."). He ultimately graduated from the American University of the Carribean medical school in 2010. See plaintiff's Electronic Residency Application Service application, Exh. 10 to his deposition at

1

Isaacs GME/Training 020, annexed as Exh. A to the Declaration of Pierre A. Chabot (hereinafter "ERAS application").

Following his graduation from medical school, plaintiff matched at a surgical residency with the University of Arizona. See Plaintiff's Response to Interrogatory No. 4, propounded by the Trustees of Dartmouth College and Christine T. Finn, M.D., annexed hereto as Exh. B to the Chabot Declaration. He lasted approximately 6 weeks, and resigned from that program in lieu of being placed on probation for poor performance. See Plaintiff's Depo. at 132:9-134:17.

Shortly thereafter, plaintiff completed an ERAS application,[1] which he knew would be submitted to, and relied upon, by residency programs to which he was applying following his resignation from Arizona. Plaintiff's Depo. at 136:1-138:14. Plaintiff did not list either his enrollment at Keck School of Medicine, or his prior residency experience with the University of Arizona, on that application. Id. at 141:6-143:1. The application, which is included as Exhibit A to the annexed attorney declaration, contains the following language:

> I certify that the information contained within my ERAS application is complete and accurate to the best of my knowledge. I understand that any false or missing information may disqualify me from consideration for a position; …or, if employed, may constitute cause for termination from the program."

ERAS Application at Isaacs GME/Training 000023.

Plaintiff interviewed for the psychiatry residency program at Dartmouth-Hitchcock Medical Center's ("DHMC")[2] Graduate Medical Education ("GME") program, in January of 2011. Plaintiff's Depo. at 151:1-:7; Deposition Transcript of Christine T. Finn, M.D. at 43:1-:10

---

[1] The Electronic Residency Application Service, or "ERAS" application is a standard application filled out by medical graduates, and used by medical residency programs to evaluate a candidate's qualifications and fit for their program. In Dr. Isaacs' case, the application was completed and electronically signed on September 1, 2010, and submitted to DHMC and Dr. Finn in early 2011. This ERAS application is the primary tool used to evaluate potential residents, and is supplemented by an interview prior to extending an offer of employment.

[2] The residency program is actually run at the Mary Hitchcock Memorial Hospital. Dartmouth Hitchcock Medical Center is the trade name by which the entity is commonly known. Both Mary Hitchcock Memorial Hospital and Dartmouth Hitchcock Medical Center have been named as defendants in this case. We will refer to both jointly as "DHMC" throughout this Memorandum.

(hereinafter "Finn Depo."). He was offered a position in the psychiatry residency program on April 14, 2011. Exh. 20 to Plaintiff's deposition; Plaintiff's Depo. at 211:18-212:14. The residency program is run by DHMC, and Dr. Finn takes her direction on how to operate the residency program from DHMC, though she is paid by the Trustees of Dartmouth College. Finn Depo. at 60:5-:12. The College is reimbursed for the portion of Dr. Finn's salary relating to her work as the Program Director for the Psychiatry Residency program at DHMC. See id.

Before beginning the residency program in late June, plaintiff was required to complete DHMC's "new hire" process, which included applying for a trainee medical license from the New Hampshire Board of Medicine. He prepared this application on April 23, 2011. Application for New Hampshire Trainee Medical License of Jeffrey D. Isaacs, Exh. 12 to Plaintiff's Depo. at Isaacs GME/Training 002-003, Exh. C to Chabot Declaration (hereinafter "N.H. Board of Medicine Application"). In that application, he listed his experience at the University of Arizona residency program.[3] Id. at Isaacs GME/Training 004-005.

Although Dr. Finn certified some of the information on that form, her certification was, by its plain language, only of the information on the pages preceding Dr. Isaacs' disclosure of his prior residency experience. Id. at Isaacs GME/Training 003 (certifying that "all of the above information concerning the applicant is correct") (emphasis added); see also id. at 004 (plaintiff's disclosure concerning the University of Arizona Residency). Despite this post-offer disclosure, neither Dr. Finn, nor anyone else to her knowledge, was aware of the omissions on plaintiff's ERAS application until January, 2012. Finn Depo at 61:3-62:8; 103:9-:12; 148:12-149:6.

---

[3] Indeed, at that point plaintiff "[didn't] see any way around" disclosing his prior residency, and determined to tell the New Hampshire Board of Medicine that he "joined the [Arizona residency] program thinking it would help [him] get neurosurgery and was disappointed in the training experience and realized it would not in any way help [him] do a neuroscience related residency[.]" Plaintiff's Depo. at 204:16-206:21.

3

Plaintiff's time in the DHMC psychiatry residency program[4] did not go smoothly. He was removed from his very first rotation, on internal medicine, within a week. Isaacs Depo. at 304:12-305:20. He was notified of several performance deficiencies at that time, and was transferred to the general psychiatry rotation, in hopes of building up his skills in an environment where more support could be provided by his program director, Dr. Finn. Finn Depo. at 186:9-:20. Throughout his residency, plaintiff was the recipient of numerous oral and written criticisms. Every witness to these criticisms has essentially testified that the criticisms were warranted under the circumstances. E.g., Finn Depo. at 208:21-209:5; Deposition Transcript of Dr. Ghislaine Guez at 75:10-76:24; Deposition Transcript of Harley Friedman, M.D. at 121:18-:122:8 (hereinafter "Friedman Depo."); Deposition of Dr. Simon Khagi at 107:19-110:8. Indeed, after he was moved to the general psychiatry rotation, he was placed on a written performance improvement plan. See Sept. 26, 2011 Email Exchange Between Dr. Finn and Dr. Isaacs, Isaacs Depo. Exhibit 30, Exh. D to the Chabot Declaration; see also Plaintiff's Depo. at 306:9-:17. Plaintiff never met the expectations of that plan. Finn Depo. at 81:3-:19; 94:16-95:2.

Although his performance on the general psychiatry rotation was not sufficient to advance him to his second year of residency, he was again allowed to attempt the internal medicine rotation, a required component of the first year program, in January, 2012. Finn Depo. at 94:16-95:2. Within the first week, it was clear that his performance was still not sufficient, and, for the second time, he was removed from the internal medicine rotation. Friedman Depo. at 121:4-122:8.

---

[4] The psychiatry residency program is a four-year program. The first year involves a 6-7 "block" rotation in the general psychiatry program, a four-block rotation in internal medicine, and a two-block rotation in neurology, each block being about one month long. Residents are assigned to these blocks according to their own personal schedules and the staffing needs of the various DHMC departments involved in supervising the residents for each block. The goals of the first year are for residents to develop skills and proficiency in basic patient management, diagnosis, interview, and evidence based practice. A resident needs to demonstrate the ability to work with decreasing supervision in order to progress past the first year of residency. See annexed Affidavit of Christine T. Finn, M.D.

4

Given plaintiff's poor performance the second time he attempted his "internal medicine" rotation, Dr. Finn and others undertook to review his ERAS application. This review alerted them to discrepancies on the application that, in turn, lead them to review other external sources, including the Association of American Medical College's National Resident Matching Program website. Finn Depo. at 123:5-124:13. Dr. Finn ran a National Residency Matching Program "match history" report, which revealed that plaintiff had previously matched at the University of Arizona surgical residency and had omitted that experience from his ERAS application. Id. at 122:8-124:13. Further investigation by DHMC's counsel also turned up the fact that Dr. Isaacs had attended the Keck School of Medicine, and had not disclosed that fact either on his ERAS application, nor his license application with the New Hampshire Board of Medicine. Id. at 90:4-91:18; N.H. Board of Medicine Application at Isaacs GME/Training 002. Neither Dr. Finn, nor anyone else affiliated with Dartmouth College, was aware of these omissions, or the true extent of plaintiff's prior educational and training experience, until that time. Finn Depo. at 61:3-62:8; 103:9-:12; 148:13-149:6; Deposition of William Torrey, Dartmouth College's 30(b)(6) designee, at 126:22-128:15 (hereinafter "Torrey Depo.").[5]

During his residency, plaintiff inquired about, but did not apply to, a degree-granting "Leadership in Preventive Medicine Residency" ("LPMR") program. Plaintiff's Depo. at 288:4-291:8. The LPMR program is a competitive program that requires 2nd year or later residents in good standing with their residency program to take on extra responsibilities. Dartmouth College is responsible for the portion of this program that awards a Masters in Public Health degree. Torrey Depo. at 155:17-157:17. Plaintiff never applied for the Masters in Public Health Degree

---

[5] Dr. Torrey stated at his 30(b)(6) deposition that Dr. Finn had noticed plaintiff's prior residency experience when examining a "form." As Dr. Finn made clear at her deposition, this "form" was the National Resident Matching Program "Match History Report." Finn Depo at 123:18-124:13. Although Dr. Isaacs apparently makes much of Dr. Torrey's use of the word "form," Finn Depo. at 146:1-147:15, there is nothing in the record that renders either deponent's testimony inconsistent with the other.

5

Program, which, unlike the LPMR Program, does not require that a person be in good standing as a medical resident at DHMC. Id. It is undisputed that Dr. Finn told plaintiff that he was not, in her view, qualified for the LPMR Program, though she did not prevent plaintiff from applying. Plaintiff's Depo. at 290:8-291:8.

Plaintiff also inquired about a research project being performed by Paul Holtzheimer, M.D. Again, Dr. Finn informed plaintiff that performing research with Dr. Holtzheimer was inadvisable, given his struggles handling his existing responsibilities and work load as a resident, but did not prevent him from formally applying for that research project. Plaintiff's Depo. 282:14-286:23.

During his residency, plaintiff disclosed to Dr. Finn that he was feeling overwhelmed and fatigued. Finn Depo. at 26:4-:11. He also disclosed that he sought a sleep study at DHMC, and would be using a CPAP machine to ameliorate his fatigue issues. Id. at 79:5-:13. He did not otherwise make Dr. Finn aware of any disability. Plaintiff was offered the option of working a "one-month-on, one-month-off" schedule when he requested to work part-time, ostensibly as a result of his sleep problems. Finn Depo. at 79:14-80:11. Dr. Finn advised him at the same time that the structure of the residency program and his current rotation did not allow for other part time schedules. Id.

Plaintiff was ultimately terminated from the residency program by letter dated March 19, 2012. Plaintiff's poor performance and omissions from his ERAS and Board of Medicine Applications were the stated reasons for his termination. See March 19, 2012 Letter, Exhibit A to Finn Deposition (hereinafter "Termination Letter"), annexed as Exh. E to the Chabot Declaration.[6]

---

[6] This "exhibit" comprises 18 "tabs" produced in a single booklet by plaintiff at many depositions. Defendants are reproducing only the portion of that exhibit containing the Termination Letter.

By that point, the present case had already been filed. See Doc. 1. After filing this lawsuit, and after his termination, plaintiff made his first administrative complaint to the Equal Employment Opportunity Commission, alleging ADA violations. See Plaintiff's Response and Document Production to Defendants' First Request For Production No. 9, Exh. F to Chabot Declaration.[7] Neither of the two complaints filed by Plaintiff with the EEOC named the Trustees of Dartmouth College as the organization alleged to be responsible for the conduct alleged by plaintiff. Id. Nor were the Trustees of Dartmouth College ever served with any such Administrative Complaint. See Affidavit of Kevin D. O'Leary, Esquire, at ¶ 4.

The case has proceeded through numerous procedural twists and turns since then, but ultimately discovery was requested of and provided by defendants, and ten (10) depositions, including the plaintiff's, have been taken.[8] Plaintiff has, to a much lesser extent, provided discovery requested by the Defendants, including responding to contention interrogatories enumerating the bases of his fraud and misrepresentation claims. See Plaintiff's Response to Interrogatory 9 of Defendants' First Set of Interrogatories, Annexed hereto as Exh. B to the Chabot Declaration.

Finally, it is undisputed that plaintiff has not disclosed any expert or expert testimony in support of any of his claims, despite the discovery he has received and the depositions he has taken. Although the deadline to disclose expert testimony has passed twice, see Doc. 61 (setting October 4, 2013 deadline for expert disclosure) and Doc. 106 at p. 8 (setting December 13, 2013 deadline), plaintiff has disclosed no expert opinions, either from physicians, other healthcare

---

[7] Defendants have Bates-stamped Plaintiff's document production and are including the pages Bates-stamped 43-81, which comprises plaintiff's entire production responsive to this Request. Defendants are also annexing the pages of the Request containing Request 9, and plaintiff's response thereto, as a single Exhibit—Exhibit F to the annexed Declaration of Pierre A. Chabot.

[8] Plaintiff has repeatedly sought to take the deposition of Dr. Kim, Dartmouth's former president, and this Court recently issued a Protective Order requiring plaintiff to withdraw his subpoena for Dr. Kim's deposition in the District of Columbia. As Dr. Finn never communicated with Dr. Kim, about plaintiff's employment or otherwise, defendants are confident that his deposition would not add to the analysis of this motion. Finn depo. at 137:13-:19.

7

providers, economists, or occupational/vocational experts. He has not requested an extension of time to obtain such opinions, nor has he filed any motion to that effect.

*Applicable Standard*

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A "genuine" issue is one that could reasonably be resolved in either party's favor at trial. Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003). A "material" issue is one that could sway the outcome under applicable law. Id. In determining whether any genuine and material fact issue requires resolution by a fact-finder, the "court must scrutinize the record in the light most flattering to the party opposing the motion, indulging all reasonable inferences in that party's favor." Id.

*Argument*

A—Plaintiff's Failure to Exhaust Administrative Remedies Dooms His ADA and RSA 354-A Claims Against the College as a Matter of Law.

On February 3, 2012, plaintiff filed this lawsuit, separately naming Dartmouth-Hitchcock Medical Center and the Trustees of Dartmouth College. Doc. 1 at 1. More than five months later, for the first time, he filed an administrative action with the Equal Employment Opportunity Commission. Plaintiff's Response to Defendant's Request for Production 9, Ex. F to Chabot Declaration. Plaintiff did not name the Trustees of Dartmouth College in that complaint, nor were the Trustees ever served with such a complaint. Id.; Affidavit of Kevin D. O'Leary,

8

Esquire at ¶ 4. Under binding First Circuit and New Hampshire law, plaintiff's unexcused failure to name the Trustees of Dartmouth College in his administrative complaint requires that his claims under the ADA and New Hampshire Law Against Discrimination be dismissed.[9]

Administrative exhaustion, in the form of filing an administrative complaint and either participating in the investigation or obtaining a right-to-sue letter, is a prerequisite to bringing ADA claims to this Court. Bonilla v. Muebles J.J. Alvarez, Inc., 194 F.3d 275, 277 (1st Cir. 1999). The same is true under the New Hampshire Law Against Discrimination, which is the basis of plaintiff's disability and retaliation claims against the College. See Munroe v. Compaq Computer Corp., 229 F. Supp. 2d 52, 67 (D.N.H. 2002) (Muirhead, Magistrate J.) (citing N.H. Rev. Stat. Ann. 354-A:21). Although there are some equitable exceptions, they do not save plaintiff's claims against the college. See Bonilla, 194 F.3d at 278 (despite the "wiggle room" afforded for peculiar circumstances where equitable tolling might save a claim, failure to timely file an administrative complaint "if unexcused, bars the courthouse door.").

Plaintiff initially brought his Title I ADA claims against both DHMC and the College, and was expressly informed, at least as of February 27, 2012, that he needed to separately serve the two different entities. See Doc. 7 (the College's Joinder to DHMC's Motion to Quash Service). Yet, when he finally attempted to fulfill his obligation to exhaust administrative remedies, he neither named nor served the Trustees of Dartmouth College. There can be no equitable exception to the administrative exhaustion requirement in this case—plaintiff was fully aware of the need to separately name and serve the Trustees of Dartmouth College when he filed his May 31, 2012 EEOC complaint. He never did so, and so has failed to satisfy a necessary prerequisite to maintaining his ADA and RSA354-A claims. Accordingly, Counts I and III of

---

[9] The College also adopts and incorporates the additional arguments concerning administrative exhaustion, to the extent they are applicable.

9

Plaintiff's Amended Complaint, Doc. 54, must be dismissed as against the Trustees of Dartmouth College.

      B—Plaintiff Was Not an Employee of the Trustees of Dartmouth College, and His ADA and New Hampshire Law Against Discrimination Claims Fail for This Separate Reason

      Plaintiff was, at all times relevant to this case, employed by DHMC or Mary Hitchcock Memorial Hospital.  See Plaintiff's "Resident Agreement of Appointment," Exh. 20 to his deposition transcript, annexed as Exh. F to the Chabot Declaration; Isaacs Depo at 210:19-:22. Although his program director, Dr. Christine Finn, is paid by the Trustees of Dartmouth College, her work on behalf of the residency program is directed and controlled by DHMC, not the College.  Finn Depo. at 60:5-:12; Torrey Depo. at 31:19-33:16.  Under these circumstances, there is no genuine dispute that DHMC, rather than the College, was plaintiff's employer.  See e.g., Connors v. Dartmouth-Hitchcock Medical Center et al, Nos. 2:10-cv-94 & 2:12-cv-51, 2013 WL 3560946 at * 5 (D. Vt. July 11, 2013) (granting summary judgment in favor of Dartmouth Trustees on psychiatry resident's employment-related claims).  Accordingly, there is no basis to hold the College liable under Title I of the ADA, nor under R.S.A. 354-A, the New Hampshire Law Against Discrimination.

      The Americans with Disabilities Act only forbids discrimination by a "covered entity," which can only include "an employer, employment agency, labor organization or joint labor-management committee." 42 USC § 12111(2)). See Lopez v. Massachusetts, 588 F.3d 69, 88 (1st Cir. 2009) (entity cannot be "employer" within meaning of ADA unless it employs Plaintiff or "exercises control over an important aspect of [a] plaintiff's employment."). Likewise, the New Hampshire Law Against Discrimination prohibits discrimination and retaliation by an *employer* on the basis of disability.  RSA 354-A:7, I.

10

Plaintiff's employment contract and the deposition testimony taken in this case demonstrate that DHMC, and not the College, was plaintiff's employer. Thus, Counts I and III must be dismissed as to Dartmouth College.

### C—Plaintiff Cannot Point to Any False Statement by Dartmouth College or Dr. Finn; Even Could he do so, he Could Not Prove Reasonable Reliance, so His Fraud and Negligent Misrepresentation Claims Fail as a Matter of Law.

Plaintiff asserts claims sounding in both fraud and negligent misrepresentation against the College and Dr. Finn. Plaintiff answered contention interrogatories, which sought disclosure of all statements he claimed to have been misrepresentations, and all actions taken in reliance on those statements. A review of his responses, which are attached,[10] demonstrates that plaintiff cannot show that any false statement was directed at him for the purpose of inducing reliance, nor, even indulging all reasonable inferences in his favor, could plaintiff ever demonstrate reasonable reliance to his detriment.

To prevail on a fraud claim, plaintiff must prove (i) That defendant made a representation to him, (ii) with knowledge of its falsity; (iii) with the intention of causing plaintiff to rely on the statement, and (iv) that plaintiff justifiably relied on these statements to his detriment. Tessier v. Rockerfeller, 162 N.H. 324, 332 (2011). In order for reliance to be justified, the fact(s) misrepresented must be material in the sense that a reasonable person would consider the fact(s) important in deciding a course of action or the maker of the representation has reason to know that the recipient will consider the fact(s) important in deciding a course of action. Id. at 333 (citing RESTATEMENT (2D) OF TORTS§ 537). Similarly, to prove up his negligent misrepresentation claim, plaintiff needs to show: (i) that a defendant negligently misstated a material fact to plaintiff, and (ii) that plaintiff reasonably relied on that statement to his

---

[10] See Exh. B to Chabot Decl. at pages Bates-labeled18-27.

11

detriment. Ingaharro v. Blanchette, 122 N.H. 54, 57 (1982). Fraud cannot be alleged in general terms, but rather must be plead specifically. Fed. R. Civ. Pro. 9(b). In a multiple defendant case, this requires pleading sufficient facts to put "each defendant on notice of what role he is alleged to have played in the fraud." Manchester Mfg. Acquisitions, Inc. v. Sears, Roebuck & Co., 802 F. Supp. 595, 600 (D.N.H. 1992) (citing Fed. R. Civ. Pro. 9(b)).

    Defendants dispute that any of the statements plaintiff identifies in his interrogatory response are actually false. That said, plaintiff's fraud and misrepresentation claims fail for the simple reason that he cannot show that any of these statements are in any way material, or that he detrimentally relied on them.

    Plaintiff makes much of the fact that he disclosed his residency at the University of Arizona in his application for a New Hampshire trainee medical license, after admittedly not disclosing it on his ERAS application, and after he had been offered a position in the DHMC psychiatry residency program. He seems to be asserting that because he made a subsequent disclosure, his termination from the DHMC program based in part on his omissions from the ERAS application, was fraudulent.

    He further alleges that his supervisors falsely criticized his performance and competencies and denied him accommodations, all for the purpose of either causing him to resign, or to stay in the residency program. Plaintiff does not identify any action he took in

reliance on these alleged misrepresentations. Nor does he state how any of these representations were material to any action he did take.[11]

The undisputed evidence is that plaintiff applied to and was offered a position in the DHMC psychiatry residency program. He accepted that offer. His performance in the first week on the internal medicine rotation was deficient and resulted in his transfer. His performance continued to be deficient and he was placed on an improvement plan. Finally, he was removed from the internal medicine rotation a second time due to performance issues. He was ultimately terminated for the performance deficiencies and the omissions on his ERAS application and his application to the New Hampshire Board of Medicine.

Plaintiff's actions with respect to the residency program included applying, accepting an offer, and working for approximately six months. Although he claims that he considered resigning early in his residency, he did not do so and was ultimately terminated. Plaintiff's Depo. at 299:21-300:23. There is simply no evidence that plaintiff took any action, other than attempting to improve his performance so that he could successfully complete the residency program. Nor is there any evidence that remaining in the residency program caused him to forego some other opportunity. Thus, plaintiff has not demonstrated any material misrepresentation on which he detrimentally relied. The absence of any genuine issue of material fact regarding these necessary elements of both the fraud and the negligent

---

[11] Plaintiff also claims that he was discouraged from pursuing a research opportunity and applying to the LPMR program based on Dr. Finn's statements about his lack of qualification. Even if true, plaintiff does not demonstrate how those statements were false and under the circumstances, it is undisputed that Dr. Finn did consider his performance to be substandard. Plaintiff makes other allegations, but they are so facially vague and speculative as not to warrant serious examination. The possible exception is plaintiff's contention that his termination letter contained false statements. That contention cannot, however, support a fraud claim as a matter of law, as plaintiff could hardly have changed his position in reliance on the letter. See Maffei v. Allstate Ins. Co., 412 F. Supp. 2d 1049, 1055 (E.D. Cal. 2006) (applying California law); Stafford v. Radford Comm. Hosp., 908 F. Supp. 1369, 1375-76 (W.D. Va. 1995) (applying Virginia law).

13

misrepresentation claims entitle Dartmouth College and Dr. Finn to summary judgment on Counts VI and VIII.

> D—Plaintiff Never Applied to Any Federally-Funded Research or Degree Program at Dartmouth College, and so his Rehabilitation Act Claim Fails.

Plaintiff has asserted claims against the College under the Rehabilitation Act, 29 U.S.C. § 701 *et seq.* Employment claims under the Rehabilitation Act are not available to plaintiff as against either Dr. Finn or the College, as neither was his "employer" for purposes of such claims. See, Plaintiff's Resident Agreement of Appointment, Ex. 20 to Plaintiff's Deposition; see also, Section B, *supra* (arguing that neither Dr. Finn nor the College were plaintiff's "employer"). Plaintiff's Rehabilitation Act claim against these defendants seems, therefore, to assert that he was denied the opportunity to participate in a federally-funded program or activity.

Although the College is involved in the LPMR Program, and arguably receives grant funding for faculty research projects, plaintiff never applied to those programs.[12] Plantiff's Depo. at 282:14-286:23; 290:21-291:8. Moreover, because those programs would require additional work, above and beyond the workload that plaintiff was already incapable of managing, he was never "qualified" to take part in those programs. Torrey Depo. at 155:17-157:17. Thus, Dr. Isaacs cannot establish that he ever applied to participate in or was even qualified to participate in any federally-funded program or activity run by the College and Count VII must be dismissed as against the College.

---

[12] As Dr. Torrey noted, the portion of the LPMR Program overseen by the College is the Master's of Public Health degree program—a program that is open to qualified applicants regardless of whether they are residents at DHMC. There is no genuine dispute that plaintiff never applied to the Master's of Public Health program.

<u>E—There is no Genuine Dispute Concerning Plaintiff's Allegations of Intentional Infliction of Emotional Distress and That Claim Must be Denied as a Matter of Law.</u>

Plaintiff has asserted an intentional infliction of emotional distress against Dr. Finn and the College. There simply is no evidence that either Dr. Finn or the College intentionally engaged in any wrongful behavior, let alone behavior sufficient to constitute intentional infliction of emotional distress.

To make out a claim for intentional infliction of emotional distress under New Hampshire law, a plaintiff must prove conduct "so outrageous and extreme 'as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" <u>Borque v. Bow</u>, 736 F. Supp. 398, 404 (D.N.H. 1990) (citing RESTATEMENT (2D) OF TORTS § 46(1)). Even an "illegal and reprehensible" discharge of an employee, actionable under relevant non-discrimination laws, does not support an intentional infliction of emotional distress claim. <u>See</u> <u>Konefal v. Hollis/Brookline Sch. Dist.</u>, 143 N.H. 256, 260-61 (1998).

Plaintiff claims[13] that Dr. Finn had knowledge of various disabilities, and knowing of those disabilities, intentionally engaged in workplace "tests" for the purpose of forcing him to resign from the DHMC Graduate Medical Education Program. Plaintiff has produced no evidence to establish that Dr. Finn had knowledge of any of the various neuropsychiatric disabilities he claims. In fact, on his pre-employment questionnaire, Plaintiff did not disclose any disability. <u>See</u> Plaintiff's Depo. at 183:9-185:2. At most, Dr. Finn became aware that Plaintiff was undergoing a sleep study, and was diagnosed with sleep apnea. Finn Depo. at 79:5-80:11. Even so, Plaintiff has produced no evidence, other than his own speculation, that Dr. Finn, or anyone else, engaged in "tests" for the purpose of forcing Plaintiff's resignation. <u>J.</u>

---

[13] In addition to the complaints made in the Amended Complaint, plaintiff also responded to the College and Dr. Finns' contention interrogatories, specifically Interrogatory No, 7, Exh. B To Chabot Declaration at 13-16. A review of that response demonstrates that plaintiff's contentions are no more than inadmissible speculation and conjecture insufficient to withstand a Motion for Summary Judgment.

Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc., 76 F.3d 1245, 1251 (1st Cir. 1996) ("neither 'conclusory allegations, improbable inferences, and unsupported speculation,' . . . nor '[b]rash conjecture coupled with earnest hope that something concrete will materialize, is [ ]sufficient to block summary judgment.'") (citations omitted).

The "tests" that plaintiff alleges are that he was required to work 90 hour weeks, was forced to work after undergoing a sleep study, was denied accommodations and was continually criticized. Doc. 54, ¶ 195. These allegations, even if given a generous construction and if proven, constitute the type of workplace behavior that are not actionable under New Hampshire law. Konefal, 143 N.H. at 260-61. It follows that Dr. Finn and the College should be granted judgment as a matter of law on Count IX.

F—Plaintiff's Failure to Disclose any Expert Witness Dooms His Negligent Infliction of Emotional Distress Claim

Plaintiff has also asserted a claim of negligent infliction of emotional distress against the Dartmouth defendants. However, he has not disclosed any expert witness to establish that any defendant's negligence caused emotional distress significant enough to result in physical symptoms. Thus, this claim fails as a matter of law.

To state a claim for negligent infliction of emotional distress, a plaintiff must allege that the causal negligence of a defendant foreseeably caused serious mental and emotional harm, accompanied by objective physical symptoms. Tessier, 162 N.H. at 342. The New Hampshire Supreme Court has "repeatedly held that 'expert testimony is required to prove physical symptoms suffered from alleged negligent infliction of emotional distress.'" O'Donnell v. HCA Health Servs. of New Hampshire, Inc., 152 N.H. 608, 612 (2005); Michovenez v. Blair, LLC, 2012 DNH 114, 2012 WL 2627567 at *9-10 (McAfferty, Magistrate J.).

16

Plaintiff claims that Dr. Finn and Dartmouth College caused him emotional distress by restricting his career advancement, harassing him, denying him accommodations, lying and misrepresenting facts, and subjecting him to work-related scrutiny. Amended Complaint (Doc. 54) ¶ 205. He claims the emotional distress was accompanied by an acute chronic stress reaction needing immediate medical attention.

To date, plaintiff has disclosed no expert witnesses. Absent expert testimony to prove physical symptoms suffered as a result of the alleged emotional distress, his negligent infliction of emotional distress claim fails under binding New Hampshire law. The College and Dr. Finn are therefore entitled to summary judgment on Count X.[14]

G—Plaintiff's Failure to Disclose Any Expert Testimony Bars Various Claims or Portions of Claims

As of today's date, plaintiff has not disclosed any expert reports, nor has he provided any summary disclosures for non-retained experts. See, Fed. R. Civ. Pro. 26 (a)(2)(A-C). Plaintiff has never requested an extension of either of the deadlines he has missed, nor has he filed any motion seeking extra time to obtain expert testimony. Plaintiff presumably cannot now disclose expert reports to ward off summary judgment. See Lohnes v. Level 3 Communications, 272 F.3d 49, 59 (1st Cir. 2001); Insight Technology, Inc. v. SureFire, LLC, No. 04-cv-74-JD, 2007 D.N.H. 135, 2007 WL 3244092 at * 2 (citing Fed. R. Civ. Pro. 37(c)); Poulis-Minot v. Smith, 388 F. 3d 354, 358 (1st Cir. 2004)). Absent any expert opinions, plaintiff will be unable to prove any medical special damages, See Daniel C. Pope, NEW HAMPSHIRE CIVIL JURY INSTRUCTIONS § 9.12 (2012) (citing Peterson v. Gray, 137 N.H. 374 (1993); Rawson v. Bradshaw, 125 N.H. 94

---

[14] Even if Plaintiff did produce expert medical testimony regarding his physical symptoms, the New Hampshire Workers' Compensation statute, RSA 281-A:8, bars negligence claims against a supervisor or co-worker acting on behalf of the employer. LaVallie v. Simplex Wire and Cable Co., 135 N.H. 692 (1992). It is undisputed that Dr. Finn, in her capacity as Program Director, was acting on behalf of Plaintiff's employer, DHMC. See Torrey Depo at 30:15-31:12. Thus, Plaintiff cannot bring a negligence claim against Dr. Finn for actions which she took in her capacity as his supervisor in the residency program and she is entitled to summary judgment on Count X.

17

(1984); Valliere v. Filfat, 110 N.H. 331 (1970); RESTATEMENT (2D) OF TORTS §461); any future lost earnings, Hutton v. Essex Group, Inc., 885 F. Supp. 331, 334-35 (D.N.H. 1995); or, as previously mentioned, any portion of his Negligent Infliction of Emotional Distress claim. O'Donnell, 152 N.H. at 612.

*Conclusion*

For all of the foregoing reasons, the Trustees of Dartmouth College are entitled to Summary Judgment on Counts I, III, VI, VII, VIII, IX and X and Dr. Christine Finn is entitled to Summary Judgment on Counts VI, VII, IX and X.  In addition plaintiff's claims for medical special damages and future lost earnings must be dismissed.

Respectfully submitted,
**TRUSTEES OF DARTMOUTH COLLEGE AND CHRISTINE T. FINN, M.D.**

**By their attorneys,**

WADLEIGH, STARR & PETERS, P.L.L.C.

Dated: February 18, 2014.

/s/Pierre A. Chabot
Kathleen C. Peahl, Esq., No. 6880
Pierre A. Chabot, Esq., No. 17606
Wadleigh, Starr & Peters, P.L.L.C.
95 Market Street, Manchester, NH 03101
(603) 669-4140
kpeahl@wadleighlaw.com