UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


```
* * * * * * * * * * * * * * * * *
                                *
J.D. ISAACS,                    *
          Plaintiff,            *
                                *  12-cv-40-JL
          v.                    *  October 31, 2013
                                *  10:15 a.m.
DARTMOUTH HITCHCOCK MEDICAL     *
CENTER, et al.,                 *
          Defendants.           *
                                *
* * * * * * * * * * * * * * * * *
```


TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE LANDYA B. MCCAFFERTY

Appearances:

For the Plaintiff:   J.D. Isaacs
(Pro se)             3553 West Chester Pike, Unit #177
                     Newton Square, PA  19073

For the Defendant:   Edward M. Kaplan, Esq.
                     Christopher James Pyles, Esq.
                     Sulloway & Hollis
                     9 Capitol Street
                     P.O. Box 1256
                     Concord, NH 03302-1256

                     Kathleen C. Peahl, Esq.
                     Pierre A. Chabot, Esq.
                     Wadleigh, Starr & Peters, PLLC
                     95 Market Street
                     Manchester, NH  03101

Court Reporter:      Diane M. Churas, LCR, CRR
                     Official Court Reporter
                     U.S. District Court
                     55 Pleasant Street
                     Concord, NH   03301
                     (603) 225-1442

```
 1                    BEFORE THE COURT

 2              THE CLERK:  The Court has before it for

 3    consideration a motions hearing in the matter of Isaacs

 4    versus Dartmouth Hitchcock Medical Center, et al., Civil

 5    No. 12-cv-40-JL.

 6              THE COURT:  Okay.  Why don't everybody just

 7    introduce themselves for the record if you would,

 8    starting with Dr. Isaacs.

 9              MR. ISAACS:  I'm Dr. Jeffrey Isaacs, the

10    plaintiff.

11              MR. KAPLAN:  Ed Kaplan, your Honor, from

12    Sulloway & Hollis for Mary Hitchcock and related

13    defendants.

14              MR. PYLES:  Same defendants, your Honor.

15              MS. PEAHL:  Kathleen Peahl from Wadleigh,

16    Starr & Peters for Dartmouth College and Christine Finn.

17              MR. CHABOT:  Attorney Pierre Chabot from

18    Wadleigh, Starr for the same defendants your Honor.

19              THE COURT:  All right.  Just so we are all

20    using the same terminology.  The way I'm dividing the

21    Dartmouth Hitchcock defendants up is the Hitchcock

22    defendants.  Does that work in terms of terminology?

23              MR. KAPLAN:  It does, your Honor.

24              THE COURT:  And Finn is in that group.

25              MR. KAPLAN:  I think given the fact that
```

1    there's Dartmouth College -- the trustees of Dartmouth

2    College and Dartmouth Hitchcock Medical Center and Mary

3    Hitchcock, it's probably just easier to go Hitchcock and

4    Dartmouth.

5            THE COURT:  Or college would be okay?

6            MR. KAPLAN:  Fine.

7            THE COURT:  If I refer to them as college

8    defendants, Hitchcock defendants, is that consistent and

9    okay with you as well?

10           MR. ISAACS:  Yes.

11           THE COURT:  If we can all sort of describe, to

12   the extent you're talking about one group of defendants,

13   it would be easier to just lump them together as

14   Hitchcock defendants.  These acronyms get a little

15   confusing.

16           MS. PEAHL:  Just to be clear, your Honor,

17   Christine Finn is employed by the trustees of Dartmouth

18   College, not by the Hitchcock.

19           THE COURT:  Okay.  So Finn actually would go

20   with the college.

21           All right.  Let me make sure I've got all my

22   paperwork.  Okay.  Now, let me just begin by giving you

23   a sense of the scope of this hearing and how I view it

24   and how I intend to conduct it.  I'm going to issue oral

25   orders on most of the pending motions that have been

1    referred to me by Judge Laplante.  If either party takes

2    issue with a ruling on a particular motion today, file a

3    motion.  I'm not entertaining oral argument on every

4    pending motion.

5             I'm going to issue a new structured discovery

6    schedule today.  I know that's something the parties

7    want, and I will explain that order at the end of the

8    hearing after I hear from you.

9             There are several discreet issues that I want

10   to hear argument on, and I will ask for argument as I

11   need it.

12            Now, I'm going to issue oral rulings on

13   pending motions now from the bench, and these are

14   motions I don't need to hear oral argument on.  I've

15   read them, considered them, thought about them, I'm

16   going to rule on them.  I'm really doing this as a

17   courtesy from the bench so that you have a sense today

18   of what discovery disputes will be outstanding after

19   today.  Okay?  And then I will also, as a courtesy both

20   to the parties and to the Court, keep a written record.

21   I will issue a brief written order that summarizes each

22   oral ruling.  That way you will have a written order

23   that you can look at as well.

24            All right.  But if you object to some ruling

25   that I'm issuing, file a motion because I'm not going to

1   entertain argument on those motions that I'm going to

2   rule on now.  I am going to entertain argument on some,

3   however, and I will tell you those in just a moment.

4          Now, I tend to refer to motions by document

5   numbers.  I just want to make sure, Dr. Isaacs, that

6   that is okay with you.  Do you have a sense of document

7   numbers that go with a particular motion?

8          MR. ISAACS:  Yes, I have the docket right

9   here.

10          THE COURT:  All right.  First and easiest, the

11   defendants' joint motion for a hearing, Document No. 72.

12   Well, that's denied as moot because the hearing's

13   happening today.  I'm giving you that essentially.

14          So plaintiff's motion to strike the motion for

15   hearing, Document No. 75, is also denied.  The hearing

16   is being held now.

17          All right.  Defendants' motion for protective

18   orders to quash seeking to depose doctors in Lebanon.

19   These are Riblet, Friedman, and Green.  These are

20   Document Nos. 79 and 98.  Are you with me?  Are you with

21   me on these?  These motions are granted.  Depositions

22   will be held at a neutral location in Lebanon with an

23   off-duty law enforcement officer present.  The cost

24   associated with obtaining a neutral location and hiring

25   the officer will be borne by defendants.

1          Motion for protective order to prevent the

2     deposition of Dr. Kim I believe is the college

3     defendant's motion, Document No. 76.  That is granted.

4     Once all other depositions are complete, plaintiff may

5     renew requests for Dr. Kim's deposition if he can

6     demonstrate that Dr. Kim possesses information not

7     obtained or obtainable from any other source.

8          All right.  Plaintiff's motion for protective

9     order concerning his deposition.  That's Document No.

10    86.  That's denied as unnecessary because the defendants

11    have agreed that the deposition can be held on one day

12    and will last less than six hours.  The deposition will

13    be conducted in two three-hour sessions in one day with

14    at least one hour in between the sessions.

15         All right.  Defendants' motion for protective

16    order.  This is the confidentiality order, 101, and the

17    proposed confidentiality order at 101-1.  My order on

18    that is as follows:  Because the parties have extreme

19    difficulty agreeing on simple matters of discovery, and

20    because so much of the discovery in this case concerns

21    confidential matters, such as, medical records of

22    plaintiff or any other patient, audit trails, quality

23    assurance information, personnel evaluations, testing,

24    or other personnel records concerning any party or

25    witness to the case, educational records and employment

1    records, the Court believes a broad confidentiality

2    order such as that proposed by defendants at Document

3    101-1 is appropriate.

4         So that's going to be granted.  I'm going to

5    issue an order.  I'm going to study 101-1 more

6    carefully, but I am going to grant this motion.  I'm

7    going to issue a protective order similar to that

8    located at 101-1.

9         MR. KAPLAN:  Your Honor, may I make one

10   comment about that?

11        THE COURT:  Yes.

12        MR. KAPLAN:  Just because you're going to be

13   restructuring an order possibly.  One of our primary

14   concerns is this information being published on the

15   Internet.  Dr. Isaacs, I can show you, but has been

16   publishing things on the Internet.  So I just want to

17   make sure that in your order you include language that

18   would make it impermissible to publish records and

19   documents produced in this litigation on the Internet.

20        THE COURT:  I believe 101-1 contains such

21   language.

22        MR. KAPLAN:  The only reason I'm mentioning it

23   is you said you might restate it or rewrite it in some

24   way and I just wanted to make sure it was still

25   included.  Thank you.

1           THE COURT:  Okay.

2           MR. ISAACS:  Your Honor, can I also note, can

3   I request when you're reviewing that, my concern is that

4   it goes so far as to prevent me from speaking to doctors

5   or family members just generally about how this case is

6   going, how my day is going.  There's some language in

7   there that's so broad that I'm worried I really have to

8   live in a vacuum.  So I'd appreciate any attention.  I

9   understand the ruling on the blog and any dissemination

10  of discovery materials, but if there's a way to just

11  delineate and assist me in carrying on day-to-day life,

12  you know, talking to some reasonable people about this

13  lawsuit, I would appreciate it.

14          THE COURT:  Understood.  I will take those

15  both into consideration as I issue or edit 101-1.

16          All right.  Now, there's specific motions

17  dealing with confidential records.  Let me start with,

18  this is plaintiff's motion to quash subpoenas relative

19  to USC and American University of the Caribbean records.

20  This is Document No. 93.  That is denied.  The relevance

21  of the educational records has been demonstrated by the

22  defendants.  Plaintiff's argument that a confidential

23  settlement concerning the USC records precludes

24  discovery is not accurate.  The settlement agreement

25  exempts from its purview any court-ordered disclosure.

1          All right.  There's I believe the Hitchcock

2     defendants' motion for a protective order concerning

3     depositions of New Jersey and California witnesses, Guez

4     and Simon, Document No. 102.  That's denied as plaintiff

5     has agreed to conduct the depositions within a hundred

6     miles of where the witnesses are located.

7          Now, what we have left is -- let's start with

8     what looks to be probably the simplest motion left.  Let

9     me just summarize what's left in case you lost track.

10          The plaintiff has filed a motion for subpoena

11     for PACER service, Document No. 89.  There's no

12     objection that's been filed to that, and I just want to

13     hear a little bit from plaintiff on that because I'm

14     just not clear on what that is.  I know there's no

15     objection entered, but I just want to hear more details

16     on that.  That's number one.  We'll start with that.

17          There is I think what I would call maybe

18     perhaps the biggest dispute or largest dispute in the

19     case dealing with plaintiff's motion for sanctions, an

20     injunctive order, which is Document No. 71.  I'm going

21     to ask some questions about that.

22          And then the motion to compel -- Hitchcock

23     defendants' motion to compel, which is Document No. 100.

24     I am going to rule on a good portion of that, but I

25     wanted to ask the defendant some questions about one of

1    the interrogatories.

2            So that's the scope of today's hearing.  Those

3    three motions I have not issued rulings on.  I'm going

4    to issue rulings on today for your benefit, and I will

5    issue a scheduling order and give some specific

6    structure time frames to what remains in the calendar

7    for you.

8            I note that discovery in this case closes

9    December 13th.  You've got summary judgment due close

10   thereafter, December 23rd, and then Judge Laplante likes

11   summary judgment to happen 120 days before his final

12   pretrial.  So whatever we reschedule, we have to keep

13   that on track.  And then the jury trial is currently

14   scheduled for May 6th in this case.

15           I think what's going to have to happen is that

16   we're going to bump things a bit forward to give you

17   time to do further discovery and to make the disclosures

18   that I'm ordering today, but we'll talk about that at

19   the end, and I want to hear from you on scheduling

20   before I issue an order, and then I can take it under

21   advisement and piece it together based on what you've

22   told me today.  So I can give you a general sense of

23   what I'm thinking by way of scheduling when we get there

24   and then let you lead me whatever direction you both

25   think makes more sense.

1        All right.  Let's start with the smallest,

2   this subpoena for PACER service.  I'm just not clear on

3   what this is.  So perhaps -- and I read your motion.  It

4   looks like there are documents you want to get from

5   PACER.  PACER's apparently telling you, you need to file

6   a subpoena.  I've never heard of such a thing and I just

7   wanted to get more detail on it before I go issuing a

8   subpoena for something that I have no idea what I'm

9   issuing.  Go ahead and just explain it to me if you

10  would.

11       MR. ISAACS:  Sure.  Your Honor, the idea for

12  this subpoena came to me after awaiting email searches

13  for the keyword of my name "Isaacs" and it appears some

14  or all those emails were deleted.  So I was trying to

15  think of other evidence to prove my assertion in this

16  case that for the six months I worked at Hitchcock, the

17  defendant knew about a prior lawsuit from eight years

18  ago almost, and I was thinking an email search at

19  Hitchcock would reveal that, but that now appears to be

20  jeopardized.  So I believe a PACER search is highly

21  likely to show if the defendants knew during those six

22  months, especially because I worked in Arizona, as you

23  know from the pleadings, before Dartmouth, and I believe

24  there is a high probability Arizona knew about this

25  lawsuit from eight years ago.

1          So to answer your question, what is this PACER

2     information, I believe it falls under the category of

3     metadata, not actual conversation or any kind of

4     documents that the defendants ever produced.  It's

5     metadata that does exist at the Judiciary Data Center in

6     San Antonio, Texas.  And I telephoned them, and just

7     their initial customer support representative was able

8     to confirm that this data does exist, and they've

9     actually seen subpoenas in the past for this data.  Not

10    very frequently, but they have seen them before.  But it

11    is confidential.  They don't release it without a

12    subpoena.  That's what I was told on the telephone.

13         THE COURT:  What kind of metadata would be on

14    PACER that you can't get access to through PACER?

15    Explain that to me.

16         MR. ISAACS:  It's who looked at the documents

17    from a docket from eight years ago from the California

18    case.  So if someone leaked this lawsuit information as

19    against FERPA to the defendants or Arizona, I believe

20    there's a good chance they got it off of PACER.  So that

21    metadata would exist, that someone paid ten cents a page

22    to pull up this lawsuit from eight years ago.

23         THE COURT:  How is that relevant to this

24    lawsuit?

25         MR. ISAACS:  It's relevant because it may lead

1    to discoverable information of who leaked sealed

2    educational information about my past to the defendants.

3            THE COURT:  And what claim in the case does

4    that relate to?

5            MR. ISAACS:  The intentional emotional

6    distress claim that I was effectively punished and tried

7    to be constructively terminated because of being a

8    litigious person eight years ago.

9            THE COURT:  And you're telling me that PACER

10   actually gives out to the public with a subpoena

11   metadata showing who paid for PACER documents related to

12   a case.

13           MR. ISAACS:  Yes.  They keep at least three

14   years of archives.  I believe that's a rule that they

15   have to follow.  They have to maintain a three-year

16   record of who accessed each individual document from any

17   federal court record, and they can be searched

18   backwards, like by metadata.  That's why -- I wasn't

19   sure.  That's why I keep telephoning them.

20           So of course anyone can look at their receipts

21   for the last three years of what they've purchased on

22   PACER, but you can actually reverse search and look at

23   who's looked at an individual lawsuit, and that's what

24   I'm looking for.  I believe it is likely to lead to

25   discoverable information of who leaked sealed

1   educational records to my former employers.  I mean, I

2   can't say it's a hundred percent.

3           THE COURT:  And who leaked the information to

4   your former employers.

5           MR. ISAACS:  Right, being Arizona and

6   Dartmouth.

7           THE COURT:  Okay.  But you're suing Dartmouth

8   in this case.  So you're alleging that who would have

9   leaked this information?

10          MR. ISAACS:  You know, I mean, I guess you've

11  given me liberty to speculate, but I'm not sure if

12  someone from six years ago that I sued was angry.  I'm

13  not sure if someone somehow, gossip or grapevine, got to

14  my employers and then they looked it up on PACER through

15  their general counsel.

16          What I lived through for six months at

17  Dartmouth, I have a strong belief that they knew about

18  this lawsuit from six years ago well before they said

19  they did.  I mentioned some of those points in the

20  lawsuit, but I do have a strong belief in that, and I

21  would hope that it would show on PACER.  I was hoping it

22  would show on a search of their computer system for the

23  word "Isaacs."  I don't think the PACER search would be

24  necessary if there was a forensics search done for

25  Isaacs.

1          THE COURT:  Let's hold this because we're

2    going to get to that forensics search.

3          All right.  So let's put Document No. 89 on

4    hold for the moment, and let's move on to Document No.

5    71.  All right.  Let me just at the outset of Document

6    No. 71, which is the motion for sanctions, and what I'm

7    -- let me tell you at the outset that I'm interested in

8    a narrow portion of this.

9          First of all, with respect to Document No. 71,

10   the request for sanctions is denied.  The defendants

11   have not violated any court order to compel discovery.

12   Sanctions are inappropriate at this time.

13         The request to have any fact deemed admitted

14   by any defendant is denied at this time, given the

15   scheduling order we're going to issue shortly.

16         And with respect to the deletion of the

17   Outlook email account -- this would be with respect to

18   Hitchcock defendants.  Am I correct on that?

19         MR. KAPLAN:  Yes, your Honor.

20         THE COURT:  The Court finds that the

21   defendants were on notice of the need to preserve the

22   plaintiff's email account and failed to do so.  The

23   Court need not decide at this time whether the

24   spoliation of evidence was willful or negligent.  That's

25   something for Judge Laplante to decide.

1          But based on the general duty to preserve

2    relevant evidence, and there's an email from Dr. Isaacs

3    to Hitchcock essentially saying don't delete my account

4    and the account got deleted, and I think that's all

5    admitted.  You're admitting that there was a mistake,

6    but why shouldn't I order a forensic analysis of the

7    email accounts and computers to determine whether or not

8    the information can be located?

9          The idea that you can just go back to

10   individuals and get emails of people who you think were

11   cc'd on things, that doesn't seem to me to address the

12   problem, and it seems to me this is -- you know, a

13   computer forensic expert goes in and sees if he or she

14   can recover those emails that were deleted.  To me at

15   this point you're going to have to talk me out of

16   ordering that at this point because I feel like he's

17   entitled to that based on what I've read.  Tell me why

18   that shouldn't be ordered in the first instance just to

19   recover the emails.  And then he might need less

20   discovery on the other end.

21         MR. KAPLAN:  The direct answer to your

22   question is because we've already tried that and it's

23   not possible.  Now, I'm not in a position to prove that

24   unless we have a hearing on it and I put the appropriate

25   witnesses on.  But I will tell you that the scenario of

1   what occurred here is the following, and I don't want to

2   be redundant to what we already wrote but just for

3   purposes of background.

4          THE COURT:  I'm happy to have you be redundant

5   for purposes of the limited issues that I'm going to

6   talk about, but go ahead.

7          MR. KAPLAN:  I will address those, your Honor.

8   When the hospital received Dr. Isaacs' letter, an email,

9   general counsel from the hospital directed the

10  appropriate individuals at the institution to put a

11  litigation hold on Dr. Isaacs' Outlook file, and that

12  was directed to an individual who in turn contacted the

13  IT group.  That occurred sometime -- I don't have the

14  materials right in front of me, but basically in late

15  January, contemporaneous with the materials we received

16  from Dr. Isaacs.

17         THE COURT:  That would have been at the same

18  time of the email that's attached to his motion.

19         MR. KAPLAN:  Essentially it would have been

20  when he requested we do so; right.  I was alerted to Dr.

21  Isaacs' letter and the possibility of this lawsuit maybe

22  eight or nine days later by my client.  I reiterated the

23  request for a litigation hold, as I am required to do,

24  and in fact received confirmation from my client that a

25  litigation hold had been requested of the IT folks.

1   That was in January, might have been very early

2   February, but I believe that was all in January.

3        Fast forward now until roughly June, because

4   that's the next time an issue of Dr. Isaacs' Outlook

5   arises, and I think it was contemporaneous with one of

6   the earlier requests in the case.

7        THE COURT:  You said June?

8        MR. KAPLAN:  June, it might have been July,

9   Judge, I'd have to look, but in that time frame.

10        At that point in time I am alerted to the fact

11   that the litigation hold as I've indicated in my papers

12   did not occur.  I contact -- I deal directly with the

13   folks in the IT group there.  I asked a series of

14   questions, not the least of which was if there was

15   absolutely no limitation on the amount of money that I

16   could give you or expend in order to secure those

17   records, how could we do it?  And their IT group came

18   back and told me that they could not, that there was a

19   write-over, that's the way the system works, that there

20   is no way that on their system, their hard drives, their

21   servers that those documents or those emails still

22   exist.

23        Now, I took that, and I take that at face

24   value.  I did not go out and independently hire an

25   expert to reconfirm that.  If the Court orders me to do

1  so, I will do so.  But I was satisfied with the

2  information I was receiving.  I am still not absolutely

3  clear, other than the explanations I've received from

4  four people, as to why and how that litigation hold

5  didn't take place other than the fact that when it was

6  requested, the individual who was responsible for

7  putting it in place just did not do so.  And it was a

8  mistake.  It was that simple.  If it was nothing else,

9  it was a bad mistake, but it was a mistake.

10          I can try and confirm all of this so that the

11  intentional issues and all that is put aside through two

12  ways.  Obviously if you wanted to conduct a hearing, I

13  can bring in the witnesses to testify to everything I've

14  just said, because that is exactly what happened, or if

15  the Court would be more satisfied and orders some

16  external review of this issue, we will obviously comply.

17  But that's the entire story, your Honor.

18          Now, let me just follow up by saying we have

19  tried to do the next best thing.  And I realize it's not

20  absolute.  What we have tried to do is we have tried to

21  go through each of the individuals within the

22  institution, and even to some extent outside, who might

23  have had any contact with Dr. Isaacs, because their

24  Outlook accounts are still there, and we have searched

25  those records and we have -- I even brought with me.  We

1  have many, many emails.  They fall into two categories.

2  One are the emails that come off the individual Outlook

3  accounts for these various people, and I think there

4  were eight or nine or ten in the search, and the second

5  group of emails are all of the quality assurance --

6  otherwise quality assurance protected emails within the

7  evaluation files.  We have all those and we would have

8  provided them --

9        THE COURT:  With confidentiality.

10       MR. KAPLAN:  With confidentiality.  And this

11  case would have moved along.  I'm not absolutely certain

12  to what extent there are any large holes in this

13  process.  I mean, it's just one of the things I'm not

14  going to know.  But that is the sum and substance of how

15  we tried to correct it.  We let Dr. Isaacs know as soon

16  as we learned.  It was a mistake.

17       THE COURT:  All right.  Let me hear from Dr.

18  Isaacs on that.  You heard what Attorney Kaplan just

19  suggested.  He made an offer of proof describing his

20  role in it, his understanding of what's occurred.  He's

21  relying essentially on IT experts, if you will, IT

22  employees of Dartmouth, I assume.

23       MR. KAPLAN:  Yes, sir.

24       THE COURT:  Who said this is what happened.

25  It was a mistake.  The litigation hold that our general

1    counsel ordered us to do and that our lawyer ordered

2    separately and subsequently, we didn't abide by that

3    litigation hold, and there's nothing we can do.  It's

4    gone.

5            And at this point what would you like to see

6    happen?  Would you like to see an evidentiary hearing on

7    those questions, or do you think it makes more sense for

8    me to simply order an independent forensic at

9    defendants' expense, not an IT employee within

10   Dartmouth, to examine the Outlook account and the

11   computer system and find out if that can be somehow

12   restored.

13           MR. CHABOT:  Your Honor, respectfully, an

14   employee at Hitchcock.  It wouldn't be a Dartmouth

15   employee.  Thank you, your Honor.

16           THE COURT:  I'm sorry, I'm using that in

17   violation of my earlier agreement.  So what do you

18   think?

19           MR. ISAACS:  Just to clarify a few points

20   before that.  First, on Attorney Chabot's assertion, at

21   a deposition last week it was clear a college employee

22   ordered the deletion of the account.  So it is unclear

23   which defendant or both played a role in this just to

24   make that point from the depositions so far.

25           A second point is my concern -- well, first, I

1   don't believe deletion of an entire doctor's account at

2   the hospital is appropriate, but my bigger concern is

3   that other emails were deleted.  I of course saw my

4   Outlook account every day.  Looking back it might add

5   circumstantial evidence to my claims, but there was

6   probably no smoking gun in my Outlook account.  If there

7   was I would have noticed it and then we wouldn't have a

8   fraud claim here because I would have been informed.  So

9   my bigger concern is that there was a retaliatory

10  deletion of other emails, and that's where I said that

11  PACER wouldn't be necessary.  If we had a CD with every

12  email containing the word "Isaacs," I'd be pretty

13  certain that my claims would be supported to a jury.

14          THE COURT:  All right.  So with respect to the

15  search for emails containing his name, where are we on

16  that?  You have done that?  You just haven't turned it

17  over for confidentiality reasons?

18          MR. KAPLAN:  We have not performed a search

19  institution-wide for Dr. Isaacs' name.  In fairness, I

20  stand here -- I'm not certain we are even capable of

21  doing that without going to each individual Outlook

22  account within the entire institution.  What we have

23  typically done in other cases and I would have done here

24  if Dr. Isaacs' file still existed is we identify any of

25  the individuals with whom Dr. Isaacs might have had any

1  contact or might have been involved with Dr. Isaacs and

2  go to those eight or ten or twelve or fifteen or twenty

3  Outlook accounts, we freeze them, we save them, and we

4  search them.

5       So what we have done in the first instance is

6  simply requested all of the emails from both our own

7  representatives and from the college's representatives

8  to the extent -- Dr. Finn, for example, and we have

9  those emails, any that relate to Dr. Isaacs, and that's

10 what we've done.

11      Now, I do want to add one thing though that I

12 should have said before.  Nobody ordered the deletion of

13 anything here.  The system at Dartmouth, good, bad, or

14 indifferent -- excuse me, the system at Hitchcock, good,

15 bad, or indifferent, was the following.  When an

16 individual separated from the institution and when there

17 was a human resource notation of that fact, 30 days

18 thereafter their Outlook account was -- I don't know the

19 right word.  It was gone.  They deleted the entire

20 account.  And they didn't just do that for Dr. Isaacs.

21 They do that for anybody.  And that's exactly how it

22 happened.  It was an automatic process.  It wasn't that

23 somebody directed it occur.  The direction occurred

24 several years before when that process was put in place.

25 Now, that may be a good process or a bad process, but

1   that's what was in place and that's exactly how it

2   happened.

3       So the other emails we have have been

4   responsive to that.  Could we do an Isaacs search on

5   those individuals?  We probably could.  But I think we

6   already have those emails, your Honor.

7       THE COURT:  Okay.  Now, Dr. Isaacs wasn't

8   terminated until the end of March.  Is that right?

9       MR. KAPLAN:  That's correct.  That's correct.

10  So the litigation hold was requested --

11      THE COURT:  Prior to March.

12      MR. KAPLAN:  -- prior to March, but it wasn't

13  put in place.  His records -- Dr. Isaacs' emails were in

14  place.  Nothing had happened to them until 30 days after

15  he was terminated, which occurred probably in April or

16  early May, and it wasn't until June when we made the

17  requests -- by the way, that happened without any human

18  input, if you will, other than the human resource group

19  identified him as being terminated.  A process, I

20  believe it's called PeopleSoft, went into place and

21  30 days thereafter his Outlook account was deleted.  And

22  it was probably a month thereafter or maybe six weeks

23  thereafter that I made a request for the records

24  thinking they were there.

25      THE COURT:  Because you asked for a litigation

1    hold.

2          MR. KAPLAN:  Because we had asked for a

3    litigation hold to be in place.

4          THE COURT:  Well, there is a real problem with

5    trusting the IT department of Hitchcock in light of the

6    fact that they didn't put in place something to abide by

7    their own attorney's requests, orders really, to hold

8    his email account.  So the IT account at Hitchcock is

9    not high on my list in terms of reliability at this

10   point.  So my instinct would be that a computer forensic

11   expert be involved.  I'm not exactly sure how and on

12   what time frame.  I may take that issue under

13   advisement, but I want to let you know I am inclined to

14   think that a computer forensic expert ought to take a

15   look at what's happened, and that person should be added

16   to any sort of -- to the extent there is an evidentiary

17   hearing on this, that person should testify as an

18   independent expert to say here's what happened, here's

19   how the email got deleted, here's why I can't restore

20   the account.

21         Now, the other side to this, the other point

22   here is that Dr. Isaacs is saying I may be able to live

23   without that if there can be a search for his name.

24         MR. KAPLAN:  Well, your Honor, if I might

25   propose something.

1          THE COURT:  I'm totally open to that.  Go

2    ahead.

3          MR. KAPLAN:  This isn't the first time that

4    I've been involved in computer issues.  How about -- if

5    the Court is inclined to have us have an independent

6    individual look at it, I need to ask a preliminary

7    question, which is, is the independence of an

8    independent person destroyed by, if I can identify

9    somebody for the Court.  I mean, because we've used

10   computer experts before in other litigation.  I mean, I

11   can certainly find an independent person, but I'm not

12   sure if it's a person that I locate that I've

13   automatically killed his or her independence.  But if

14   that's okay, if that's what the Court wants --

15         THE COURT:  Let me just say my feeling on

16   that -- I want to give Dr. Isaacs an opportunity to talk

17   me out of this.  My feeling on that is I would order the

18   defendant to bear that cost, and I trust this particular

19   attorney with respect to his integrity, and I do not in

20   any way question that he would secure some expert that

21   would not be independent of the college or the Hitchcock

22   defendants.

23         MR. KAPLAN:  I appreciate that.  Thank you.

24         THE COURT:  So that's my inclination, even

25   though I'm not at all comfortable trusting, if you will,

1    the expertise of the IT department at Hitchcock.

2    There's a difference between those two things.

3         So my inclination would be, they're bearing

4    the cost via a court order and they can pick.  And in

5    fact, perhaps you could supply two or three names to Dr.

6    Isaacs and let him choose among the three that you know

7    of in this area who you could hire, you could pay to do

8    this work.  Let him pick from that list of two or three.

9    What do you think of that, Dr. Isaacs?

10         MR. ISAACS:  I want to clarify.  Is that for a

11   search of all emails with my name, or is that just for

12   my account?

13         THE COURT:  It would be twofold.  And to the

14   extent we can resolve this here today, that's good for

15   the parties because that means the case stays on track

16   and you have a sense of what in the world is happening

17   in your case.  So if we can come up with an agreement

18   and a time frame that you're all -- both parties are

19   okay with, I'm happy to go ahead and issue an order from

20   the bench today on this, and it would be inclined to be

21   twofold.  One, determine whether or not the email

22   account, your account, your Outlook account can be

23   recovered.  So that's one thing.  I would also like that

24   computer forensic individual to explain why it can't be

25   recovered, what happened in the deletion process.  So

 1   that's really subparts of one issue, your Outlook

 2   account.

 3          And then the second thing is can the Hitchcock

 4   defendant -- and it may involve the Dartmouth College

 5   defendant -- to clarify that for me, but a search of the

 6   defendant's computer using his name, which seems to me a

 7   very reasonable scope.

 8          MR. KAPLAN:  Your Honor, I have a proposal.  I

 9   can make a proposal on that as well, your Honor.  I can

10   only tell you what we've done in other cases and maybe

11   it will work.  And that is that I would identify all of

12   the individuals that in our view have any potential

13   relationship in any way to Dr. Isaacs, and having

14   identified those individuals, we could do whatever

15   target or search words you want as long as I can

16   identify the individuals.  Isaacs is easy enough.  And

17   if Dr. Isaacs has reason to add to that list because he

18   thinks some other people need to be included within the

19   institution, in a matter of a quick motion by Monday,

20   it's not going to take that long, or Tuesday, I can get

21   that to the Court, to Dr. Isaacs.  Maybe we can give him

22   two days or three to look at it and to let me know

23   whether or not, or the Court, if he needs any additional

24   names, and we will agree to do a defined search for

25   those individuals.  I mean, there's 5,000, 6,000 people

1   up there.  It would be an unnecessarily, unbelievably

2   expensive process to search everybody up there, and

3   obviously I don't think we should be required to do

4   that.  But we can do a defined search for sure.  I've

5   done that before, and frankly, plaintiffs have said, no,

6   I want you to add these two or three names, and that's

7   worked pretty well, and I would propose that here as

8   well.

9          THE COURT:  All right.  So you're saying the

10  computer forensic would not be needed for that portion

11  of this.  That's something your IT department can do.

12         MR. KAPLAN:  I would simply say -- thank you,

13  Chris.  My proposal would include a date limitation, and

14  the date limitation would probably be, I don't know,

15  30 days before he started there or something like that.

16  I guess that would be what I would do.  I could even do

17  it as of the date of his application when he became

18  known to us.  But that would limit the search within

19  reasonable frames and we could get that done and get it

20  done quickly I'm sure.

21         THE COURT:  All right.  Let me ask Dr. Isaacs

22  about that.  That's something that's been I think

23  proposed in writing as well.  What are your thoughts

24  with respect to naming individuals with whom you had

25  contact and searching through their email accounts for

1   using the keyword "Isaacs"?

2          MR. ISAACS:  Right.  Your Honor, we had a bit

3   of -- last week there was a 30(b)(6) deposition on the

4   college, and that process did not work.  They identified

5   four individuals to search for the word "Isaacs."  None

6   of those four were the people I thought would have been

7   -- who leaked information or who would have been in the

8   know.  So initially with four, that did not work last

9   week for a 30(b)(6) hearing.  In fact, we may have to

10  repeat that deposition because of that.

11         My concern is, back to the characterization

12  that Attorney Kaplan gave that this was an automatic

13  deletion, I know the law is quite different on automatic

14  software processes versus intentional ones that are not

15  routine.  I just want to be clear.  I did put this

16  somewhere in the pleadings, but when I telephoned

17  Hitchcock IT around January 20th, they told me a

18  Dartmouth College employee ordered the deletion.

19         Now, on January 20th I hadn't even been given

20  papers for administrative leave, and of course I

21  wouldn't be fired for three more months.  So it's very

22  hard to characterize this as an automatic process.  I

23  believe the law would shift to an unusual or an

24  intentional process.

25         THE COURT:  And who told you that?

1          MR. ISAACS:  It was a telephone call I made to

2   the DHMC IT department, the help desk that would help

3   any doctor or any employee with IT problems.  And he

4   looked it up.  He was methodical on the phone.

5          THE COURT:  What date was that?

6          MR. ISAACS:  Around January 20, 2012.  And he

7   was definitely giving me specific information.  He said,

8   oh, no, this is scheduled to be deleted in 30 days.  I

9   even warned Dartmouth.  I said this is scheduled to be

10  deleted.

11         So this was an I would say ongoing

12  non-automatic process as best as I could tell.  So my

13  concern here -- I respect that you've worked with

14  Attorney Kaplan.  He has a great repetition nationally

15  with the Federation of Defense Counsel, but my belief of

16  a felony is that -- I don't know if it's classified as a

17  felony, but there was some kind of obstruction of the

18  process here.  And I've been told it's one of my

19  stronger claims that something -- they want to hide

20  something.  I don't know.  I mean, I can't really

21  speculate beyond that, but this is possibly all I have

22  to hang on for getting firm evidence other than a jury

23  deciding who's believable on circumstantial evidence.

24  He may be making the more likely than not threshold.  I

25  think I can go forward with the case without a smoking

1  gun, like I said, but I really feel like the smoking gun

2  is possibly deleted here.

3       THE COURT:  And you actually spoke to somebody

4  what would have been two months prior to your

5  termination?

6       MR. ISAACS:  Yes, your Honor.

7       THE COURT:  And they're telling you that a

8  Dartmouth College employee ordered the deletion.

9       MR. ISAACS:  Yes.  The only Dartmouth College

10  employee I emailed ever about this at that time was Jim

11  Yong Kim.  So there's a problem that three days after

12  that email to Dr. Kim, a non-automatic process occurred.

13  And, you know, I really feel -- from what I've seen of

14  the civil procedure and civil discovery process, I mean,

15  it's an honor code at a lot of levels, and it appears to

16  me that honor code was violated.

17       THE COURT:  Let me ask you this.  You just

18  said earlier to the Court that there really wasn't

19  anything in there, because you've got all of it.  You

20  saw it all.  You basically remember it.  You wish you

21  had your email account, that's understandable.  But if

22  there were a smoking gun in there, you would have seen

23  it.  So what would motivate somebody at Dartmouth to

24  delete something that doesn't contain any damning

25  evidence against them?

1   MR. ISAACS:  I also wanted to correct what I

2   said before.  You asked what claims this all applied to

3   and I said the IIED claims.  It also applies to the

4   fraud claim.  I think there would be circumstantial

5   evidence in those emails that there was IIED.  For sure

6   they were emailing me every day off.  I don't recall all

7   of them, but there would be a pattern of -- that I was a

8   persona non grata there.  I don't think it would show --

9   prove a fraud claim unless there's something I didn't

10  see.  There may be something I didn't notice when I

11  worked there that looking back with 20/20 hindsight, I

12  might say, oh, wow.  But I don't know that at this

13  point.  So I would say I don't believe the fraud claim

14  would be proven by those emails, but I can't say for

15  sure.  I just don't know.

16      THE COURT:  Okay.  I'm going to hear from you

17  before I issue anything, but just give me a second.  I

18  am inclined to put on hold the issue of a computer

19  forensic expert for just a moment and allow the type of

20  search that Attorney Kaplan has described, which would

21  be -- and the reason I'm inclined to focus on that is

22  because you may find all kinds of things that you're

23  looking for.  You haven't seen anything yet because they

24  haven't turned it over yet.  Right?

25      MR. ISAACS:  Sure.

1        THE COURT:  So it may be that what he's

2   thinking may in fact satisfy you.  Let me just finish.

3   So what I'm thinking is he has a list he says of nine to

4   twelve names that are people with whom you dealt.  Now,

5   have you seen the list of nine to twelve names?  No.

6        What I would suggest then is that he has an

7   opportunity to look at your nine to twelve names that

8   you would propose searching.  You're indicating,

9   Attorney Kaplan, to me that your IT department can do a

10  full-on search for the keyword "Isaacs" in those

11  separate email accounts.

12       MR. KAPLAN:  That's what I mean by it.

13       THE COURT:  And that then you could disclose

14  that information under a confidentiality -- you could

15  disclose it all fairly quickly if you knew it was all

16  covered by a confidentiality agreement, and this will

17  help get you information, because he can put it all

18  together for you and get it to you knowing that it's all

19  deemed confidential, at least at the start.  Okay?  You

20  get an opportunity to look at that information and study

21  it and indicate who else -- what other email accounts

22  that you believe should be searched.  And my sense is

23  that Attorney Kaplan can do this fairly quickly, a quick

24  turnaround on this what I will call Isaacs' keyword

25  email searching.  Why isn't that a good starting point,

1    Dr. Isaacs?

2            MR. ISAACS:  Your Honor, I agree that we could

3    defer to other matters.  I think some of the pressing

4    cases I submitted to the court, sometimes they went on

5    for three years in iteration.  So let's hope that isn't

6    the case here.

7            But one point I just want to make with the

8    keyword search, given that everything will now be under

9    confidentiality, first I believe the college should also

10   do a search, and my second point would be my

11   understanding of these Microsoft Outlook systems is that

12   it's not much more difficult, in fact it may be easier,

13   to just do a search for everyone and turn over a CD to

14   me.  And since it's now under a confidentiality order,

15   the burden and the time is on me to look through and

16   pick out the nine people, if there are nine people.

17           So I don't believe it would impose a great

18   cost burden on the defendant to just turn over a CD for

19   the year 2011 of all keyword Isaacs.  I believe that

20   could probably be done probably in a day's work for both

21   defendants, the college and Hitchcock, and I would be

22   very happy with that as I think a good possible source

23   of discoverable evidence.

24           So I believe we could defer to other matters

25   if we put in a strong search, cast a fairly wide net

1   that can be done technically I believe in a day's work.

2          THE COURT:  I believe he was up and I made him

3   sit down, so I'm going to let him go.

4          MR. KAPLAN:  They forced me to sit in front

5   and I figured I'd be the one to talk.

6          MR. CHABOT:  Your Honor, that search has

7   already been done.  That search has already been

8   performed for the professor who supervises the

9   psychiatry residency program, Dr. Finn; Dr. Ronald

10  Green, one of the other doctors that was involved in Dr.

11  Isaacs' termination; Dr. Holtzheimer who Dr. Isaacs has

12  alleged had a research opportunity that he was denied;

13  Dr. Noordsy who was involved in supervising the

14  residency; and Dr. Harley Friedman, who was not really a

15  college employee, but he does have a college email

16  address, who was the internal medicine doctor on the

17  rotation that Dr. Isaacs had the most trouble with.

18          We've done the search.  We've turned over -- I

19  believe it's only two emails that reference Dr. Isaacs

20  at all.  I believe -- and I'm shooting from the hip a

21  little, but I think there are probably between 80 and a

22  140 emails total in the set.  I personally reviewed

23  them, and I made the determination that -- the rest of

24  them mention somebody else that has Isaacs or Isaacson

25  in the name.

1        We also did a search for a gentleman named

2    Baughman whom frankly we don't think is relevant to the

3    case, but it was easier to just do the search and turn

4    over, I don't believe there were any results there, than

5    it was to fight over.  So we've done that search, and I

6    don't believe that we need to cast any further -- you

7    know, cast out a wider net at all.

8        THE COURT:  All right.  Now, let's just deal

9    with the college defendants for just a second.  It was

10   Dr. Finn, Green, Noordsy, Friedman and there was one

11   other.

12       MR. CHABOT:  Finn, Noordsy, Holtzheimer,

13   Ronald Green.  Holtzheimer, H-O-L-T-Z-H-E-I-M-E-R.

14       THE COURT:  Noordsy and Friedman.  Let me just

15   ask you while I have you up.  So what you did with those

16   five individuals is you did a search of their Outlook

17   accounts for the word "Isaacs," and the sum total of

18   emails was in the forties.

19       MR. CHABOT:  The sum total was probably

20   closer -- it was over 60 and it may have been as many as

21   140.  I'm trying to remember.  There was 80 in one set.

22   I can't remember if that was the total set or there

23   was -- the Baughman set might have had 60 in it, but

24   there were no responsive emails.

25       THE COURT:  And basically as you culled them

1  and you read them to see if in fact Dr. Isaacs was

2  referred by name, you found two such emails.

3      MR. CHABOT:  I believe so, your Honor.  In

4  fact I'm certain of that.

5      THE COURT:  And have you turned over those two

6  emails to Dr. Isaacs?

7      MR. CHABOT:  Yes, to his counsel when he was

8  represented.

9      THE COURT:  So just dealing with the college

10  defendants, why should we require anything further from

11  them?

12      MR. ISAACS:  Your Honor, that's actually what

13  I referred to from the 30(b)(6) last week.  Those were

14  the four or five individuals that I was aware of.  So

15  off the top of my head the two most important ones that

16  worked at Harvard with the person I sued six years ago

17  were not in that list.  The one who was staring at me

18  for 30 minutes my first day of work, Dr. Alan Green, he

19  was not on that list.  So just people I'm aware of are

20  not on that list.  I don't even know that I know, again,

21  who leaked this information.

22      Another point would be that the general

23  counsel appears to have been involved in this case well

24  before I was even asked to leave work on January 13th.

25  Now, were they acting -- I didn't even want to get into

1   whether they were acting as attorneys or administrators

2   there, but general counsel seems to know what happened

3   here.  I mean, in fact they told me on the phone, I'm

4   sure you'd like to know what happened.

5          Now, I understand, they may be privileged to

6   counsel.  I'm not aware of it.  I don't know whether

7   they're acting as administrators or attorneys in that

8   position.

9          So I've just listed three people that were not

10  on that list, and there could very well be more.  Again,

11  my understanding of the technicalities of this searching

12  for their entire administration of probably 240

13  employees, it might take less time than pinpointing

14  individuals.

15         THE COURT:  Yes.  But asking them to cast a

16  wide net doesn't make sense when it can be determined

17  that there were specific individuals.

18         Let me deal with the privilege issue first.

19  The two emails, Attorney Chabot, were there any emails

20  that you were claiming privilege with respect?

21         MR. CHABOT:  Not from this set, your Honor.

22  Dr. Finn has an email account from Dartmouth Hitchcock

23  Medical Center.

24         THE COURT:  We're not worried about that right

25  now.

1          MR. CHABOT:  Okay.  We did cull some of those

2     for privilege.  On the .edu accounts there are none that

3     we were claiming privilege on.  Frankly I think the two

4     emails with the college just mentioned Dr. Isaacs by

5     name.  One was sort of an auto check notice, somebody

6     had entered duty hours for him for a certain length of

7     time, and it was an auto prompt.  I don't remember what

8     the other one was frankly.

9          THE COURT:  Okay.  There weren't any emails

10     that you weren't turning over on grounds of privilege.

11          MR. CHABOT:  No.

12          THE COURT:  So what are the other names of the

13     individuals at Dartmouth College that you would like

14     email searching done with your name?  What are their

15     names?

16          MR. ISAACS:  Dr. Alan Green.  Again, he is

17     really the one I was suspicious after my first day of

18     working for him.  And then Dr. Jim Yong Kim, and then

19     Attorney O'Leary, who's present today.  I don't know

20     whether he was an administrator or attorney at that

21     point, but those are the three names that I'm aware of

22     today.  There might be more I can think of later and

23     there may be more that I'm not aware of.

24          THE COURT:  What basis for Dr. Kim?  I thought

25     there was an assertion at least somewhere in the myriad

1  of pleadings that he had nothing to do with --

2       MR. ISAACS:  There is that assertion that he

3  had nothing to do with my termination.  It's agreed he

4  didn't sign my termination letter.  I believe it's a

5  small community there.  Dr. Kim is one of the two people

6  who have worked with the person I sued six years ago.

7       THE COURT:  All right.  Let me shortcut this.

8  Any reason why you couldn't do an Isaacs search on those

9  three individuals, and if there's nothing, there's

10  nothing.  If there's one or two emails you turn them

11  over to him.  I mean, Dr. Kim, if you're correct, there

12  won't be any.  If there's one or two because he's copied

13  on something, then he should see them.

14       MR. CHABOT:  The one issue that I certainly

15  would have, your Honor, is we certainly haven't

16  subjected any of these folks to a litigation hold.  So I

17  couldn't make any representation that their accounts

18  were or were not preserved at this point.

19       THE COURT:  I think he's asking simply for a

20  search of their Outlook accounts for his name and then

21  you would review it similarly as you did for the five

22  names you've already identified.

23       MR. Chapot:  I could do that, your Honor, but

24  for example, Dr. Kim left the college.  I don't know

25  what happened in terms of preservation of his account or

1    if any emails were preserved.

2         MR. ISAACS:  He was a defendant in this case,

3    so that would be another situation where the litigation

4    hold didn't work, just for the record.

5         THE COURT:  All right.  Let's at least give

6    them an opportunity to see what they're able to come up

7    with.  And I'm guessing that there will be a privilege

8    log with Attorney O'Leary's email account because --

9    Attorney O'Leary is general counsel?

10        MR. CHABOT:  Attorney O'Leary is in the

11   courtroom today.  He is general counsel.

12        THE COURT:  So he certainly would be emailed

13   on discussions, email correspondence with respect to

14   some termination that's happening in the college.

15        MR. CHABOT:  Your Honor, other than the

16   communications with Dr. Isaacs, they probably all would

17   be subject to a claim of privilege, and without having

18   seen it, that may be very burdensome for us to have to

19   go through and review all of that.  I think that there

20   was probably a lot of email involved at the outset in

21   this case.  I know there was a lot of emails with us,

22   and I frankly -- the emails were from Dr. Isaacs, not

23   from the Hitchcock account.  They're largely afterwards.

24        THE COURT:  Just a moment.  Please don't speak

25   over him and certainly don't interrupt me.

 1          MR. CHABOT:  He should have those documents

 2     already.  That wouldn't be subject to a claim of

 3     privilege, and likely without having seen them, there

 4     would be a large volume of emails, all of which, other

 5     than those communications he already has, would be

 6     subject to a claim of privilege.  So it would be a

 7     futile exercise and we would argue it would impose an

 8     undue burden.  But if you order us to look at them, we

 9     will.

10          THE COURT:  I think I would be inclined to

11     order you to look at them.  There's just one individual.

12     There probably are a significant number of emails.  But

13     to the extent they're privileged, you can do a privilege

14     log.  To the extent he disputes any claims of privilege,

15     he can look at the privilege log and that log needs to

16     give him enough information so that he can tell what it

17     is you are claiming privilege on, and anticipating that

18     a good portion of Attorney O'Leary's emails will not be

19     turned over because he is counsel and there is a

20     privilege that attaches to his legal advice.

21          I do think in general the claim of privilege

22     isn't going to cloak everything.  There could be emails

23     that he's copied on that do not seek legal advice that

24     involve Dr. Isaacs.  So I think it's fair enough to

25     request that and turn over those things that contain

1    references to his name.  If you're correct, there won't

2    be that many from Dr. Kim.  And Dr. Green, I'm not sure

3    of a facial expression that you didn't like really

4    warrants searching, but for purposes of this hearing I'm

5    going to ask you to go ahead and search his account, and

6    that would cover all individuals that Dr. Isaacs is

7    concerned with with respect to the college defendants.

8    Okay?  And I will give you a time frame in a written

9    order after today.  But those three names run a keyword

10   search with "Isaacs" and then do exactly what you did in

11   terms of culling the emails.

12          The only difference is you will have a

13   privilege log this time, and it's going to need to be a

14   meaningful privilege log so he can see what it is you

15   are claiming is privileged, and then to the extent

16   there's an objection, you try to work that out.  If you

17   can't work it out, then it may be that I review those

18   documents in camera, assuming Judge Laplante refers the

19   dispute to me.  But hopefully there won't be any

20   disputes.  Hopefully it will be clear to you.

21   Attorney-client privilege does protect confidential

22   discussions between an attorney and their client.  So

23   just as they can't get emails between you and the

24   various attorneys you've had, you're not going to be

25   able to look at Attorney O'Leary's confidential

1    attorney-client privileged emails.  So just so you're

2    aware, a privilege log will be coming your way with

3    whatever they disclose from that.

4          And what time frame, Attorney Chabot, would

5    you be able to do this in, knowing that you've already

6    done it for five.  Is this something you can do --

7          MR. CHABOT:  Your Honor, as to Kim and Alan

8    Green, I suspect, provided that the IT professional at

9    the college is available to help me out, I could do both

10   of those in the space of a day or two.  As to Attorney

11   O'Leary, just thinking of the volume of email he and I

12   have had back and forth, it could be several days to

13   create the privilege log.  I might suggest that we --

14         THE COURT:  Certainly any emails between the

15   two of you would be --

16         MR. CHABOT:  Just as a way to short circuit

17   this.  I don't think anything after the filing of the

18   lawsuit would be relevant really in any way to the

19   claims that are being made right now.  So we could maybe

20   put a date limitation from the first of the year that he

21   started his residency up to the date of filing, and that

22   might decrease the burden of the privilege log.

23         THE COURT:  With respect to Attorney O'Leary?

24         MR. CHABOT:  I'm just thinking about the

25   volume of communications we've had with Attorney

1    O'Leary, which would be him acting as a client and us

2    the attorneys, all for the purpose of legal advice or to

3    assist the preparation of the case.  I think that date

4    limitation would be reasonable and it would reduce the

5    burden.

6         And also we would want the protective order to

7    be finalized before we turned anything over.  So that

8    would be a second consideration.

9         THE COURT:  That's going to be finalized by

10   the Court, me, very quickly.

11        MR. CHABOT:  Yeah.  With that limitation, your

12   Honor, I suspect I can do it within a week.

13        THE COURT:  Okay.  What do you think about the

14   date limitation that he's proposing?  He's proposing a

15   quick turnaround for you so you can get this information

16   he's saying within a week.  What do you think about the

17   date limitation?

18        MR. ISAACS:  Yes, your Honor.  I apologize for

19   interrupting.  That's actually what I was going to

20   suggest was I'm not looking to go into their attorney

21   communications for this whole past year and a half.  My

22   concern is when they received notice of this lawsuit

23   from eight years ago, it quickly went to counsel that

24   acted as an administrative, because Defendant Finn has

25   acknowledged she basically was given all information and

1    interpretation of that lawsuit by her attorneys.

2         So my concern is I was terminated from

3    Dartmouth through a decision-making process that was

4    done by an attorney interpreting that lawsuit, and

5    whether there was a leak of that lawsuit that was

6    improper, that may have also gone to the attorney.  So

7    it's fairly specific where I'm questioning the

8    attorney/client privilege.  I agree with Attorney

9    Chabot.  It's really unlikely to be an issue after,

10   let's say, February 15th of 2012.  I believe anything

11   that I'm alleging happened prior to February 15th, prior

12   to my termination, let's say March 5th, 2012.

13        MR. CHABOT:  Your Honor, we'll perform the

14   search as you ordered.  But I would just encourage you

15   to take a look at the amended complaint, which is Docket

16   54 in this matter.  I don't think that there were really

17   any colorable claims made about his prior time at the

18   University of Arizona.  This case morphed a little bit.

19   This is a disability discrimination lawsuit.  There are

20   claims for intentional infliction for emotional

21   distress, but I don't think that they're reasonably

22   noticed up in the complaint.

23        We'll abide by the order and have it done

24   within that time.  Thank you, your Honor.

25        THE COURT:  All right.  I appreciate that.

1   Okay.  So with respect to the Dartmouth College

2   defendants and the keyword searching, what will happen

3   then is that within 14 days of today's date -- and if

4   you can get them to him in seven, that's great.  But

5   within 14 days of today's date, you will do a keyword

6   search of the three names, the three additional names,

7   Dr. Alan Green, Dr. Kim, and Attorney O'Leary, and

8   produce those emails that include his name or refer to

9   him and the time -- the relevant time frame for the

10  search.  It will be limited to the time of Dr. Isaacs'

11  admission to the college through the date his lawsuit

12  was filed.

13          MR. CHABOT:  Just to be clear, your Honor, he

14  was hired as a resident at Dartmouth Hitchcock in I

15  believe June of 2011.  He was a student at Dartmouth

16  College back in the early 1990s.  So we would be going

17  probably from the first of the year in 2011 through

18  until March I believe 19 of 2012 was the date of the --

19          THE COURT:  Entirely fair if that works, and

20  I'm sure it works for Dr. Isaacs as well.

21          MR. ISAACS:  Yeah.  I think it probably should

22  be up to my termination date, which is only six weeks

23  after lawsuit was noticed.  Because Defendant Finn has

24  said that she basically based her information off the

25  attorneys to terminate me.

1          THE COURT:  When was the lawsuit filed as

2   opposed to noticed?

3          MR. ISAACS:  February 8th.

4          MR. CHABOT:  February 8th, 2012.

5          THE COURT:  All right.  Make it his date of

6   termination.  March 19th, I think that's fair.

7          Okay?  Is that clear?  I just want to make

8   sure that everybody's clear before we go to the

9   Hitchcock defendants.

10          MR. CHABOT:  Yes, your Honor.  Thank you.

11          MR. ISAACS:  Yes, it is, your Honor.  Thank

12   you.

13          THE COURT:  Okay.  Now, with respect to the

14   Hitchcock defendants, I am inclined to allow the keyword

15   searching that you described.  Now, there may be

16   individuals that are on your list -- that are not on

17   your list that Dr. Isaacs would want their accounts

18   searched.

19          MR. KAPLAN:  I can identify the people that we

20   would recommend right now, your Honor.

21          THE COURT:  Would that be helpful or would you

22   rather have that via a letter?

23          MR. ISAACS:  I don't know if it's a good use

24   of time.  I mean, I worked with about 30 individuals.

25   I'm sure they didn't know everything about this

1    incident, but probably they may have some discoverable

2    evidence.  I don't want to try to list 30 now.

3         THE COURT:  Before you do your keyword search

4    of twelve, just send him by fax or some other way the

5    list and --

6         MR. KAPLAN:  It's going to be three, your

7    Honor, not twelve.  I don't mean to interrupt.  Because

8    when we started looking at this again and came into it,

9    we realized who was actually involved.  The extension on

10   that list had to do with these allegations about

11   virtually any attending he ever came in contact with.

12   And the reason I was standing up before was I wanted to

13   make sure we understand the community in which we are

14   working here.  If I was to do a search of these email

15   accounts, I don't know what will come up with Isaacs,

16   but these are people whose email accounts are complete

17   with innumerable references to patients.  It's not a

18   typical search that can be done quickly.  The search can

19   be done, but then the examination of these various

20   emails needs to be done with a significant amount of

21   detail because of what we often find in them.

22        I will tell you -- and I didn't realize it

23   when we were speaking.  We've already done the search.

24        THE COURT:  Of the three individuals?

25        MR. KAPLAN:  The Isaacs search.  I didn't

1   realize we had.

2        THE COURT:  All right.  And there are three

3   individuals you deemed relevant.  Can you tell Dr.

4   Isaacs the three people.

5        MR. KAPLAN:  I can.  You heard about Christine

6   Finn.  Christine Finn is actually an employee of

7   Dartmouth, but she runs the psychiatry residency program

8   for the hospital, Mary Hitchcock Memorial Hospital.  We

9   did an email search -- we did an "Isaacs" search of

10  Chris Finn's records.  They had very few of them.  We

11  have the rest of them and here they are.  And they would

12  have been produced had the protective order been issued.

13       We did a search of Marc Bertrand, M-A-R-C

14  B-E-R-T-R-A-N-D.  Marc is the head -- I think he's the

15  director of the graduate medical education area and is

16  the program director for all of the graduate medical

17  education at Dartmouth.  He and Chris Finn were the two

18  individuals who actually signed the termination letter.

19       We did a search of Harley, H-A-R-L-E-Y,

20  Friedman, F-R-I-E-D-M-A-N.  Dr. Friedman is the program

21  director for internal medicine at the hospital, and the

22  reason he is relevant is because there have been some

23  claims made during the first portion of Dr. Isaacs'

24  residency, and his first rotation was an internal

25  medicine rotation, and so Dr. Friedman was involved.

1        Now, he deposed somebody last week who was his

2    first supervisor, and he's asked to depose two other

3    people who were supervisors in internal medicine, one in

4    California, one in New Jersey.  If he wants to do that,

5    we'll do that.

6        We did not do an email search for them because

7    frankly we didn't know they were involved, still don't

8    think they are.  So we didn't do an email search of

9    their accounts.  I hope they still exist.  None of them

10   are still there.  They have been gone for a long time.

11        And just so the Court understands, I need to

12   explain to you that the allegations against the

13   physician he deposed last week were allegations that

14   because he was asked to do a physical exam for

15   individuals who came in, probably with internal

16   bleeding, and was told in connection with that that he

17   had to do a digital rectal exam, he's alleging that he

18   was sexually assaulted.  Now, that issue aside that was

19   not --

20        THE COURT:  Who's alleging that he was

21   sexually assaulted?

22        MR. KAPLAN:  Dr. Isaacs, as a result of being

23   compelled to do a digital rectal exam during his

24   training as a resident.

25        I did not ever conclude that that physician

1   was somebody who was involved in the case until those

2   allegations were made.  I still don't think he is, but

3   by then he was long gone.  I did produce him for a

4   deposition and will do the same.

5        So it's hard for me to figure out who he

6   really thinks is involved and whose records we ought to

7   be examining.  These are the people that I've suggested

8   and I think they're the ones that cover firm ground.  If

9   he wants some others, I'm happy to hear about who they

10  are, recognizing the fact that it might take a bit of

11  time to go through their email accounts.

12       THE COURT:  What was your time frame of that

13  search?

14       MR. KAPLAN:  Depending on how many people

15  there are I would guess.

16       THE COURT:  No, the time frame for the search

17  that you already have done.  Was it similar to --

18       MR. KAPLAN:  Yeah.  I'm looking here -- the

19  first email I see in Bertrand was January 16, 2012.

20  Maybe that's not the first.  Hold on.  Here's a June 30,

21  2011.  The first one I see from Chris Finn's is in

22  April 2011, that's the year before he started.  There

23  are -- Marc Bertrand's, the earliest date I see is -- I

24  think the earliest is May of -- may be May of 2011.

25  Excuse me, 2012.  Because I don't think Dr. Bertrand was

1  involved in his hiring.  And with Dr. Friedman the

2  earliest one I see is April 25, 2011.  His rotation

3  actually started in late June, early July 2012.  So it

4  would have predated that by several months.  So those

5  three have already been completed, your Honor.

6         THE COURT:  He was hired --

7         MR. KAPLAN:  Excuse me, 2011.  I'm sorry.

8         THE COURT:  That's all right.  Well, certainly

9  a good place to start is what you've already done, and

10  then from there you can indicate those individuals that

11  you would like an "Isaacs" keyword search done.  You

12  will have to obviously explain why you think the keyword

13  search is necessary, but certainly as soon as the

14  confidentiality order is issued, Attorney Kaplan is

15  going to hand over emails to you.

16         Now, was there a privilege log?  For

17  instance, Dr. Finn's emails, were they claiming

18  privilege or are you withholding anything for privilege

19  reasons?

20         MR. KAPLAN:  When Dr. Isaacs refused to sign a

21  protective order, the work on these emails frankly

22  stopped because he was not willing to sign a protective

23  order.  So I don't have in hand a privilege log at the

24  moment.  It would not take long to create a privilege

25  log.

1          THE COURT:  Okay.  So there are some documents

2     that you're not including in the pile.  And you can

3     provide that shortly after the confidentiality order.

4          MR. KAPLAN:  Right.  And there are others that

5     I can produce as long as we can remove any personal

6     health information from individuals who are identified.

7     So there are -- I mean, we have to go through the

8     process of either creating a privilege log or redacting

9     information from them if they're not otherwise

10     privileged and then producing them.  So we'll go through

11     that process and do that.

12          THE COURT:  All right.  So for the moment

13     we're going to put on hold the computer forensic expert

14     issue, for the moment, and I will simply take that under

15     advisement for now and decide how that should be

16     handled.  And frankly, based upon your assertion

17     earlier, Dr. Isaacs, that it's this information that

18     you're more concerned with -- and by this information,

19     just so the record's clear, what you're really concerned

20     with is keyword searching Hitchcock defendants' and

21     college defendants' email accounts for references to

22     you, and you're less concerned with the -- your own

23     account because you've seen it.  You saw those emails,

24     and had you seen something obviously of a smoking gun

25     nature, you would remember it, and you did not see any

1   such email.  However, that doesn't ameliorate or

2   alleviate your concerns with the fact that your account

3   was deleted, but I think we can put that issue on hold

4   because this is more important to you.

5         So let's get the keyword searching done and

6   get information disclosed and produced to you with a

7   confidentiality agreement in place, and then you're

8   going to have discovery to look at to decide, you know,

9   what further you need, what further you need to do in

10  your case.

11        So what will happen is I will issue the

12  confidentiality order today or tomorrow, sometime soon,

13  to get this running.  In the meantime, Attorney Chabot

14  has agreed to do a broader search than he feels is

15  warranted, but he's willing to do a search that we just

16  described, a keyword search and supply you with the

17  discovery that comes from that.  And then Attorney

18  Kaplan is going to go back and put together the

19  discovery of emails from Dr. Finn, Marc Bertrand, and

20  Harley Friedman, and put together any privilege logs so

21  that you're aware of anything that they're claiming is

22  privileged and that you can't really see.  And the

23  privilege log again, if it can be meaningful enough so

24  that he can see what it is, what type of document it is

25  or communication that requires the cloak of privilege,

1    and if it's self-explanatory, he can see it and

2    understand that it's confidential.  But if he takes

3    issue with it, it will give him enough information to

4    ask you why can't you disclose that to me.

5              MR. KAPLAN:  Fine.

6              THE COURT:  And if he disagrees, then he'd

7    have enough information to file a motion.

8              Okay.  So that is a starting point, and to the

9    extent other keyword searches need to be done on other

10   Hitchcock defendants, that's something you will have a

11   better handle on I think once you get this first set of

12   production of documents, Dr. Isaacs.

13             And so I think that takes care of what I

14   wanted to handle with respect to Document No. 71 for the

15   moment.

16             Now let's go to the last document, motion to

17   compel.  This is the Hitchcock defendants' motion to

18   compel, Document No. 100, and let me indicate at the

19   outset I'm inclined to grant this in full with respect

20   to Interrogatories 17, 18, and 21.  The one that I'm

21   curious about is the Read Notify, the email tracking,

22   and that's Interrogatory No. 11.  If you don't mind,

23   Attorney Kaplan, could you just explain the relevance of

24   that and explain it to me.  Read Notify.

25             MR. KAPLAN:  Well, actually there are several

1   aspects to it, your Honor.  One of the most troubling to

2   us is that we were not aware, perhaps it was my own

3   system and my own people being naive about this, but we

4   were not aware that we were being tracked because

5   there's no -- nothing indicates that.  And so for a

6   period of time until we learned that Dr. Isaacs used the

7   Read Notify system -- which, by the way, we learned from

8   his California litigation.  Until we learned that, we

9   didn't know that anytime anyone from my office opened

10  one of his emails, he not only knew that we opened it,

11  but he knew if we forwarded it.

12          Now, this has caused some amount of

13  frustration in the sense that we can no longer forward

14  emails, which would be a typical way we deal with them.

15  We now have to scan them and send them that way or Dr.

16  Isaacs will know what we're doing.

17          THE COURT:  He knows through this software

18  that he's purchased, he knows who you're forwarding it

19  to as well?

20          MR. KAPLAN:  I believe he does.  I will let

21  him respond to that.  He knows they're being forwarded

22  to an address is what I'm saying.  Now, my concern about

23  this is that many of the emails early in this litigation

24  were exchanged with my clients, and I forwarded things

25  to my client without knowing that he was tracking what I

1    was doing.  And I am very concerned about that and I

2    would like to know what he knows about what I was doing

3    internally, which has a great deal of concern, because I

4    may have to take some action.  And I can't tell you what

5    yet because I don't know to what extent he has that

6    knowledge or what was going on with that.

7            THE COURT:  Let me stop you there because I

8    don't want to get too off track.  Read Notify software,

9    have you looked it up?  Have you studied it?

10           MR. KAPLAN:  I have discussed it with my own

11   IT folks in my office, yes.  And by the way, there's a

12   point in time -- and I can't remember when it was that

13   we actually put our own system in to block it, and now

14   we have that system in place.

15           THE COURT:  I've just never heard of this.

16           MR. KAPLAN:  Neither had I.

17           THE COURT:  I'm wondering how a company can

18   essentially sell software that allows somebody to know

19   who an individual might be forwarding email to.

20           MR. KAPLAN:  Perhaps Dr. Isaacs can explain

21   it.

22           THE COURT:  All right.  Before we move to your

23   second, your subset of argument, let me just get that

24   clear.  Can you explain that, the Read Notify?  Because

25   maybe we can shortcut this if in fact all it is is sort

1    of a receipt notification, doesn't give you metadata.

2    What does it tell you?

3         MR. ISAACS:  Yeah, I think it is important.  I

4    can try to explain it to you.  For your information,

5    Read Notify is an Australian company that does not

6    disclose exactly how they operate.  So that doesn't

7    help.  But as far as my understanding --

8         THE COURT:  So Read Notify is a company.

9         MR. ISAACS:  It's a company, yes.

10        THE COURT:  And they sell software which

11   you've used before.

12        MR. ISAACS:  Yes.

13        THE COURT:  And they don't disclose what they

14   do.

15        MR. ISAACS:  No.  They don't have to.  I don't

16   know -- Australian laws, they don't have to disclose it.

17   But I can tell you my understanding of it.  It's

18   metadata again.  The way Internet email transmission

19   protocols work, emails can contain links in general,

20   links to photos and links to other websites, and when

21   there's a link to a photo, when someone opens up their

22   email, that photo is retrieved from a server, and if

23   someone has access to that server they can see who is

24   retrieving the photo.  I'm not sure if I'm stating this

25   clearly.  Anytime parts of the email are retrieved,

1    there are metadata showing the location of the request

2    for that photo or the email.

3        So I guess what I'm trying to say is the core

4    of the way an Internet transmission protocol works is

5    that things are tracked to metadata.  It's not

6    actually -- as far as I understand from Read Notify,

7    it's not something additional built into their system.

8    It's using standard protocols.

9        THE COURT:  When you send an email to Attorney

10   Kaplan, --

11       MR. ISAACS:  Yes.

12       THE COURT:  -- what do you get back?  What,

13   for example, do you get back from Read Notify?

14       MR. ISAACS:  So if the email would be opened,

15   you would see the IP address, and usually the region,

16   what part of New Hampshire in this case, opened up that

17   email, because it's retrieving things from servers to

18   open up the email.  So I'm saying the way it opens it,

19   leaves a record.  It leaves a metadata record.

20       THE COURT:  All right.  So you know where

21   Attorney Kaplan is when he's opening your email.

22       MR. ISAACS:  You may know an IP address

23   from -- let's say it's Verizon providers.  Verizon has a

24   data center in Manchester.  You may know that, that his

25   computer retrieved parts of your email from a data

1    center in Manchester.  And if he forwarded it to

2    somebody, which is what his concern was, and let's say

3    they were in Boston, you would see metadata showing that

4    email retrieving from a server in Boston.  So there can

5    be kind of a trail of forwarding, but you don't see the

6    communication.

7         And I think the case law is very sparse on

8    this, but, again, it's basically I guess you could say

9    exploiting the nature of the Internet protocol itself.

10        THE COURT:  Okay.  So essentially if you were

11   to comply and produce discovery responses to

12   Interrogatory 11, what would that look like and how easy

13   would that be for you to gather?

14        MR. ISAACS:  I could print out my Read Notify

15   account.  My concern with this interrogatory was that it

16   was -- my concern is why were they concerned that I may

17   have known they opened an email.  So I thought it looked

18   like evidence of some kind of guilt that they were

19   wondering how I knew something was forwarded.

20        But, your Honor, I'd like to make this easier

21   for the Court.

22        THE COURT:  I'm happy to have that.  Go ahead.

23        MR. ISAACS:  I hadn't wanted to volunteer this

24   information to them, because I don't think I had to, but

25   I didn't use Read Notify or anything like Read Notify

1   with them.  So it's very interesting to me that they

2   have applied some kind of guilt for something I did six

3   years ago, which is exactly what this whole case is

4   about.

5          THE COURT:  Wasn't that one of the questions

6   in the interrogatory, did you use Read Notify, blah,

7   blah, blah.  Why not just answer no?

8          MR. KAPLAN:  Your Honor, just so you know, our

9   concern about this does come -- maybe I ought to take

10  one second and explain to you how this whole University

11  of California thing came about.  It might enlighten the

12  process somewhat.  When Dr. Isaacs filed his letter --

13         THE COURT:  Let me cut you off because I don't

14  want to get into something that we don't need to.  Let

15  me just find Interrogatory No. 11 and make sure I'm

16  clear on --

17         MR. CHABOT:  Page three, your Honor.

18         THE COURT:  I've got it.  Thank you.  Why

19  can't you, Dr. Isaacs, just answer the question with a

20  no?  If in fact what you just said is true, you're

21  helping the Court, why couldn't you just answer that

22  with no?  Why did you have to object to the extent that

23  it's overbroad, unduly burdensome, blah, blah, blah.

24         MR. ISAACS:  Yeah.  Those were the three

25  attorneys prior that wrote that objection I believe, and

1    my recollection of the phone calls with them, if I

2    believe what they said --

3            THE COURT:  Don't reveal attorney-client

4    privileges here, okay?  What I need you to do -- because

5    I'm going to issue an order on Document No. 100 right

6    now, okay?  And I don't need to hear anything further

7    about this.  It's granted.  The defendants have

8    demonstrated the relevance of the requested information.

9    The information requested in interrogatories numbered

10   11, 17, 18, and 21 shall be provided on or before

11   November 14th, 2013.  So that is done.

12           Okay.  Now, scheduling order is the only thing

13   remaining, and here's what I have in mind.  This could

14   be, you know, a decade trying to come up with a

15   scheduling order that would meet everybody's needs, but

16   this is simple.  This is very simple, and let me just

17   see if it makes some sense.  I'm going to just read the

18   draft essentially of a discovery order I have in mind, a

19   scheduling order, and what I want to do is hear from you

20   on what piece of it makes sense, what doesn't, and then

21   I will take whatever I need upstairs and figure out a

22   scheduling order that will seem to answer some or most

23   of your concerns hopefully.  Because we can even do it

24   today right here and now.

25           We're going to get to a point where my

1    stenographer needs a break, and so hopefully we can do

2    this in short order.  Let me give you a sense of what

3    I'm thinking, and this is fairly simple.

4         All right.  Each party will have 30 days from

5    today's date.  That would be until December 2nd of this

6    year.  Now, I've counted 30.  If it lands on a weekend

7    I've bumped it to a weekday.  So you have 30 days from

8    today's date to submit a request to any other party to

9    produce any interrogatory response, document, or other

10   item in discovery, or notice any deposition yet to be

11   taken.  Thirty days.

12        The parties will then have an additional

13   30 days -- that would make until January 2nd of 2014 --

14   to either produce the discovery requested, produce

15   privilege logs, or submit, the requesting party, any

16   objection in writing to providing the requested items.

17        These objections need to be specific so that

18   we can move the case forward, not just some sort of

19   macro that you press on your computer.  They need to be

20   specific at this point.

21        All right.  If any discovery matter cannot be

22   resolved by the January 2nd date, all right, then after

23   that date any party may, within 14 days of that date --

24   and that would be by January 16, 2014, file motions to

25   compel or other motions to resolve any other outstanding

1  discovery dispute.  These motions must be in compliance

2  with the Federal Rules of Civil Procedure and the

3  Court's local rules.

4        Now, the Court reminds Dr. Isaacs that pro se

5  parties must follow the rules of court and the Federal

6  Rules of Civil Procedure.  So just by way of one

7  example, if you were to file a motion to compel, the

8  local rules require you to put what it is you requested

9  so I can see the specific verbatim request, what their

10  objection is and I see their verbatim objection, and

11  then from that you then make your argument that I should

12  compel them to provide more.  Does that make sense?  You

13  have to attach it to whatever motion.

14        MR. ISAACS:  Yes.

15        THE COURT:  All right.  That's one example,

16  but make sure you check the Court's local rules and the

17  Federal Rules of Civil Procedure because failure to

18  abide by rules of the court may result in sanctions such

19  as the Court denying the motion to compel because it

20  doesn't follow the local rules.  Okay?

21        MR. ISAACS:  Yeah.

22        THE COURT:  All right.  First of all,

23  discovery shall close on February 3rd, 2014.  And I will

24  issue a new scheduling order in this matter that extends

25  the expert disclosures accordingly, summary judgment

1    deadlines comply with Judge Laplante's 120 days, and I

2    will continue the trial date to accommodate this

3    scheduling order.

4            So this is very much a draft of something that

5    I thought might work and simplify things, keep you

6    somewhat on track.  It's not way off track.  It moves

7    you a couple of months into the future.  But that's

8    something that I would envision ordering if the parties

9    are in agreement.

10           Let me just hear from -- I will give you the

11   benefit of listening to the attorneys who have a little

12   more experience with discovery and scheduling and trials

13   and allow you to respond after.

14           So let's start, Attorney Kaplan, do you have

15   any immediate reaction, Attorney Peahl, Attorney Chabot.

16   I don't mean to ignore Attorney Pyles, but I can see the

17   two of you are conferring.

18           MR. KAPLAN:  Your Honor, I have one concern.

19   I'm not at all concerned with the written discovery

20   issues.  We'll work those out.  The concern I have about

21   the deposition scheduling is that I'm in trial all of

22   November in federal district court in Vermont.  I know

23   Chris can handle a lot of it.  I mean, he can handle all

24   of it, but he's got stuff going on, too.  And so I would

25   appreciate perhaps a slightly longer window to complete

1   the depositions, particularly if Dr. Isaacs is planning

2   to go out to California and planning to go to New Jersey

3   and all of these places. Other than that I have no

4   concern with it at all.

5           THE COURT: Okay. I have the discovery

6   closing on February 3rd. And then I have a deadline for

7   each of you to submit, you know, requests. That would

8   include a request to depose somebody, but it doesn't

9   mean you have to do the deposition in 30 days. The

10  discovery closes February 3rd.

11          MR. KAPLAN: I misunderstood. If we have

12  until February 3rd to complete discovery, I'm fine.

13  We'll work that out.

14          THE COURT: Okay. And this is why I wanted to

15  make sure we go through this so we can clarify. I'm

16  giving you a 30-day time frame to decide what it is you

17  don't have that you still need essentially.

18          MR. KAPLAN: If I can just stand up one more

19  time and make a suggestion that perhaps would help here.

20          THE COURT: Of course you can.

21          MR. KAPLAN: Dr. Isaacs has sort of a

22  propensity to file subpoenas and sometimes he doesn't

23  like the fact that we don't respond in a day or two, and

24  sometimes we can't. If he simply tells me who he wants

25  to depose from my clients, from the clients I represent,

1    I have and will cooperate on producing those witnesses.

2    He can still issue subpoenas if he wants to, but we

3    could really simplify this if he lets me know and gives

4    me a window and I will try and produce these witnesses.

5    It's up to him of course, but it would make life a

6    little easier.

7              THE COURT:  All right.  Well, that's an issue

8    between you and -- you listened to Attorney Kaplan in

9    terms of his preference, and hopefully the two of you

10   can work that out.  It's nothing that I'm going to deal

11   with right now.  Attorney Peahl.

12             MS. PEAHL:  Thank you, your Honor.  Your

13   proposed schedule is fine with us.  The only other

14   suggestion we would make is we would like to see a

15   deadline in your order for the plaintiff's deposition to

16   be completed.  That was supposed to happen back in

17   September and it was delayed as a result of the

18   plaintiff's motion, and we'd like to get that scheduled

19   earlier than February.  For instance, by the first of

20   the year.

21             THE COURT:  All right.  That's fair enough.

22   So now let me hear from you, Dr. Isaacs.  In terms of

23   the scheduling order that I just explained, do you have

24   any concerns or issues with respect to that?

25             MR. ISAACS:  No, I don't have any issues with

1  that.  I just have three kind of logistic questions at

2  some point.

3          THE COURT:  Let's put those aside for the

4  moment.  Now, with respect to your deposition, fair to

5  say that deposition shall occur prior to December 14th?

6          MR. ISAACS:  All depositions?

7          THE COURT:  Yours.

8          MR. ISAACS:  Mine?  It's fair, yes.

9          THE COURT:  I threw that date out.  Does that

10  work for you, Attorney Peahl?  I threw out December 14th

11  because that gives you time to schedule it.  And I'm

12  thinking about November being out for Attorney Kaplan.

13          MR. KAPLAN:  That's fine.

14          THE COURT:  December 14th works for Dr.

15  Isaacs.  That's a Saturday.  So let's say December 16th.

16          MR. ISAACS:  We had listed a recommended date

17  of December 19th.  I don't know if -- that was one of

18  the first available mutual dates we had.  So if that

19  would be fairer.

20          THE COURT:  Let's say it shall happen on or

21  before December 19th.  On or before December 19th, does

22  that work?

23          MS. PEAHL:  Thank you.

24          THE COURT:  All right.  Now, three additional

25  issues.  Are these issues that are related to rulings

1   I've already made?

2          MR. ISAACS:  Yeah, just brief clarification.

3          THE COURT:  Perfect.  Go ahead.

4          MR. ISAACS:  One would be the motion to

5   compel.  You granted -- I just wondered if that applied

6   to psychotherapy notes.  They asked for medical records

7   and 15 years of psychotherapy notes.

8          THE COURT:  This is Document No. 100.

9          MR. ISAACS:  Yes, that's right.  I don't have

10  that in front of me.  That's going to be very hard to

11  produce and very messy in terms of admissible evidence.

12         THE COURT:  Which interrogatory number is it?

13         MR. ISAACS:  It's the one for medical records.

14  Interrogatory 21.

15         THE COURT:  These are just authorizations for

16  release.

17         MR. ISAACS:  Those authorizations void the

18  confidentiality agreement they propose.  They allow them

19  to distribute my psychotherapy notes to third parties

20  for 15 years total.

21         THE COURT:  Let's not get into that.  If you

22  have an issue with that, you file a motion.  If you have

23  a problem with the confidentiality order, file a motion.

24  We'd be here all day if we debate every order that I've

25  issued.

1          But for clarification, Interrogatory No. 21

2    deals with authorizations for certain records, and I'm

3    ordering you to provide those authorizations.  So what's

4    your next issue?

5          MR. ISAACS:  Okay.  I wasn't sure if we were

6    going to come back to the PACER motion, the 89.  Because

7    the San Antonio office has already archived those

8    records.  I don't believe it would burden them any more

9    to send them.  Given the level of full disclosure I made

10   and the defendants haven't objected to it, it seems like

11   it may be a small issue that may provide good evidence.

12         THE COURT:  I'm going to take that one under

13   advisement.  I appreciate that you have pointed that

14   out, but I am going to issue an order on that.  Hold on.

15         (Pause.)

16         THE COURT:  And let me ask you this.  In the

17   next 30 days where you have to ask for information --

18   obviously you're going to be provided -- information is

19   going to be produced to you as well in this 30-day time

20   period that we just talked about.  But why couldn't you

21   also ask in discovery for -- concerning knowledge and

22   source of knowledge regarding that USC case?  Why

23   couldn't you ask that?  Why wouldn't that take care of

24   this?

25         MR. ISAACS:  I have asked that.  The way I've

1    asked it, they basically pointed it all back to they've

2    learned from Attorney Kaplan, which I, first, find hard

3    to believe, and second, it's privileged in that

4    administrative decisions were made under privilege.  So

5    it's already created a bit of a problem, and I thought

6    the PACER information would just simplify everything.

7            THE COURT:  Okay.  What was your next issue?

8            MR. ISAACS:  That's the last issue.  Just a

9    clarification.  I made an addendum to the motion for

10   sanctions which was seeking to compel the patient

11   records.  I dispute -- Attorney Kaplan has characterized

12   this as an anemic blood loss patient.  I have a very

13   different characterization of it.

14           THE COURT:  You're going to have to help me

15   out.  Is this the patient he was talking about who had a

16   rectal exam?

17           MR. ISAACS:  Yes, it's that patient.  It was a

18   subject of the deposition last week.  I requested those

19   records about two months ago and then put them in that

20   addendum to motion for sanctions.  I told him I'd be

21   okay with the HIPAA redactions, if the patient's name is

22   even there.

23           THE COURT:  And why do you need that

24   information?  This would be a patient that came in and

25   had a rectal exam.

1          MR. ISAACS:  Right.

2          THE COURT:  And why do you need those records?

3          MR. ISAACS:  I believe it was an inappropriate

4    exam.  My testimony on that was actually filed in this

5    court a month after the lawsuit was filed.  There's a

6    paragraph where I wrote how -- had a very bizarre

7    rationalization of trying to assess the patient's

8    cancer.  That's not medically normal.

9          THE COURT:  You could take issue with a

10   patient's exam, but how does that relate to your claim?

11         MR. ISAACS:  So I believe -- that was the

12   first week when people at the hospital were reporting I

13   was on the verge of a nervous breakdown.  I believe they

14   had known information about California and Arizona at

15   that time and that they were subjecting me to additional

16   bizarre tests.

17         THE COURT:  But this is a patient who

18   underwent a rectal exam, a patient, not you.

19         MR. ISAACS:  Yes.

20         THE COURT:  You're asking for that patient's

21   redacted records.

22         MR. ISAACS:  Just to get an expert opinion --

23   I actually don't want the Court to listen to my word.  I

24   want to get an expert opinion on whether that was an

25   appropriate exam.  So I am just looking at it for an

1   expert opinion.

2           THE COURT:  Okay.  I am going to rule, based

3   on your proffer and your description, that that

4   information is not relevant to any parties' claim or

5   defense.  Also, to the extent you might be seeking

6   broader discovery, discovery of any matter relevant to

7   the case, I find that you haven't shown good cause for

8   that.  So I am going to deny your request to have

9   information related to a patient who underwent a rectal

10  exam, a patient that you were involved with.  That just

11  is not relevant.  So I'm not going to order that that be

12  compelled.

13          So those were the three items that you wanted

14  to bring up.  Is there anything further anyone needs

15  from the Court at this point?

16          MS. PEAHL:  No, your Honor.

17          MR. KAPLAN:  No.

18          THE COURT:  Dr. Isaacs?

19          MR. ISAACS:  Just on that last one, what would

20  be the procedure -- you had mentioned at the beginning

21  to file a motion on it, and that's the only thing I'd

22  take any objection to I believe today.  I believe that I

23  was hazed that first week and there's more to the story

24  than you've probably heard.  Maybe I didn't communicate

25  it well to you.  Is there a way I can clarify the reason

1  and what would be -- I guess I'm asking for

2  clarification what you meant on the motion.  Is that a

3  motion to Judge Laplante?  I don't know what you meant.

4       THE COURT:  Well, to the extent you're asking

5  for records that deal with a patient who had a rectal

6  exam during that week when you feel you were harassed or

7  bullied, you have not shown any nexus between any of

8  your claims or your theories in this case and the need

9  for that patient's records.  You can testify about your

10  knowledge and the way you felt about something, but you

11  haven't shown a need to get that patient's records.

12  That's what I'm saying.  I'm ruling, and to the extent

13  you need any clarification, you take objection to that

14  ruling, file a pleading, file a motion.  Okay?

15       MR. ISAACS:  Okay.  Thank you.

16       THE COURT:  Thank you.

17       ALL:  Thank you, your Honor.

18       (Adjourned at 12 noon.)

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I, Diane M. Churas, do hereby certify that the

4     foregoing transcript is a true and accurate

5     transcription of the within proceedings, to the best of

6     my knowledge, skill, ability and belief.

7

8

9     Submitted: 2/25/14          **DIANE M. CHURAS, LCR, RPR, CRR**

10                                LICENSED COURT REPORTER, NO. 16
                                   STATE OF NEW HAMPSHIRE
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25