UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| J.D. Isaacs,<br>            *Plaintiff*,<br><br>            v.<br><br>Dartmouth Hitchcock Medical Center,<br>et al.<br>            *Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 1:12-cv-00040-LBM |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT

Dartmouth Hitchcock Medical Center ("DHMC") and Mary Hitchcock Memorial Hospital ("MHMH") request summary judgment of all claims against them pursuant to Fed. R. Civ. P. 56, because the Plaintiff was appropriately terminated from a residency program for issues including performance deficiencies, false reporting, and submitting an inaccurate residency (ERAS) application. *See* Ex. 1 and Ex. 2.

## I.  FACTS

The following undisputed facts support the Motion for Summary Judgment, with citations to the record as required by Fed. R. Civ. P. 56, and L.R. 56.1(a).

### A.  The Plaintiff's earlier medical education.

In 2005/2006, the Plaintiff attended the University of Southern California Keck School of Medicine ("USC"), and during his first year he was suspended and dismissed for a matter involving another student. *See* Ex. 3, Order, p.1.

The Plaintiff sued USC, and the case settled two years later. *Id.*  He tried to void the agreement, but USC filed a Motion to Enforce. *See* Ex. 4.  E-mails from the Plaintiff attached to the motion show that he wanted to avoid disclosing his USC enrollment on future applications,

as he wrote "I have no desire to disclose this matter to anyone," and worried that he might have "difficulty answering future applications," or that his enrollment would be revealed. *Id.*, pp. 29, 32. The Plaintiff recognized that "his intended future career path is likely to require disclosure of academic records." *See* Ex. 5, p. 5. The Court enforced the settlement as written. *See* Ex. 3.

In August 2006, the Plaintiff enrolled at the American University of the Caribbean, and graduated in April 2010. *See* Ex. 6. During that time, in July and August 2007, he also briefly attended Duke NUS Graduate Medical School – Singapore ("Duke"). *Id.*

In September 2009, the Plaintiff submitted an Electronic Residency Application Service ("ERAS," or residency application) form to the University of Arizona Department of General Surgery ("AZ"). *Id.* He did not disclose attending USC, but listed Duke and gave an explanation for his departure. *Id.*, p.2.

The Plaintiff started at AZ on July 1, 2010, and immediately demonstrated poor work habits and skills. *See* Ex. 7, pp. 3-9, and Ex. 8. Program Director Amy Waer, M.D., met with him on July 7 and raised concerns that he "was in the habit of arriving late to work, that he was not able to evaluate his patients prior to morning rounds, that he did not perform physical exams on his patients, and that he did not write progress notes on ward patients, or clinic notes on clinic patients. They felt he was substantially underprepared for this internship." *See* Ex. 9. He was reminded of "the importance of punctuality, performing physical exams on the patients, and writing notes." *Id.* A short time later, he breached two sterilization protocols and his conduct was described as "extremely dangerous." *See* Ex. 10.

On July 21, 2010, AZ issued a "Notice of Deficiency" to the Plaintiff, indicating the following performance problems:

1.     Demonstrated incompetence in professional activities related to the fulfillment of the assigned duties and responsibilities associated with your position;

2.     Personal conduct that substantially impairs your fulfillment of properly assigned duties and responsibilities;

3.     Inability or failure to perform the essential functions of the job or tasks assigned.

*See* Ex. 11.  He continued to struggle with completing notes, obtaining critical patient information, and following instructions.  *See* Ex. 12.  On August 12, 2010, Dr. Waer notified the Plaintiff that the Resident Executive Committee had voted to place him on probation.  *See* Ex. 13.  He resigned instead, and filed an administrative complaint.  *See* Ex. 7.  Dr. Waer's response detailed incidents where the Plaintiff had failed to properly document patient files, was tardy or absent, left his pager behind, and otherwise failed to meet the requirements of the job.  *Id*.  She also related a conversation where the Plaintiff asked, "If I resign, can we say I was never here?"  *Id.*, p. 8.  He was told that response was impermissible.  *Id*.

**B.  The Plaintiff's 2010 ERAS residency application.**

On September 1, 2010, the Plaintiff submitted an ERAS application to the Dartmouth Hitchcock Psychiatry Program, pledging:

> I certify that the information contained within my ERAS application is complete and accurate to the best of my knowledge.  I understand that any false or missing information may disqualify me from consideration for a position; may result in an investigation by the AAMC per the *AAMC Policies Regarding the Collection, Use, and Dissemination of Resident, Intern, Fellow and Residency, Internship, and Fellowship Application Data"* may also result in expulsion from ERAS; or if employed, may constitute cause for termination from the program.

*See* Ex.  2*,* emphasis added.  Despite promising to provide "complete and accurate" information, the Plaintiff did not disclose his attendance at USC, Duke, or even the AZ program he had resigned from just weeks before.  *Id*.

That information should have been listed under "Medical Education" on page 2 of the application, but was omitted. *Id*. Additionally, although there is a section for identification of state medical licenses, and even though he had received an Arizona training license in June 2010, the Plaintiff wrote "none." *Id; see* Ex. 14. The ERAS application also required applicants to identify any interruption to their medical education, but although he had been dismissed from USC, left Duke, and resigned from AZ, the Plaintiff did not disclose that information. *See* Ex. 2.

After certifying that his ERAS application was "complete and accurate," the Plaintiff interviewed with the Defendants in January 2011; he admits that he did not disclose any information about his AZ or USC enrollments during those meetings. *See* Ex. 27, p. 151.

The Plaintiff "matched" with the MHMH based on his ERAS application and interviews. *See* Ex. 28, p. 20-21, and Ex. 32. On March 28, the Plaintiff signed a form accepting the MHMH training position. *See* Ex. 15. At the same time, he completed a "Data Form" certifying that he did not have any handicap or disability, or need any reasonable accommodation. *See* Ex. 16. After being hired, he received a new hire packet via e-mail on April 15, with a Resident Agreement executed by the Office of Graduate Medical Education ("GME") on April 14, and a New Hampshire Board of Medicine "Application for Training License." *See* Ex. 17. He immediately e-mailed his father, writing "the NH state training license application asks about prior training licenses in other states .. so i guess I'll need to write that i left arizona, and request that AZ medical board send my file to NH .. i don't see any way around this[.]" *Id.*

On April 25, the Plaintiff signed the MHMH Resident Agreement, agreeing among other things that MHMH could terminate his employment "at any time upon any reasonable basis which shall be deemed to include failure to satisfy the academic requirements of the program… or conduct unbecoming of a physician." *See* Ex. 18. He also completed the New Hampshire

Board of Medicine training license application and listed AZ on page 4, with an explanation on the reverse side; he did not disclose USC.  *See* Ex. 19.  Neither Program Director Christine Finn, M.D., ("Dr. Finn") nor Graduate Medical Education ("GME") Dean Marc Bertrand, M.D., ("Dr. Bertrand") saw the AZ reference on the license application.  *See* Ex. 29, p. 61, and Ex. 32.  They were not aware of the AZ match until January 2012.  *Id.*

### C.  The Plaintiff's unacceptable job performance and termination.

The Plaintiff started his residency on an internal medicine ("M2") rotation in late June 2011, and as at AZ his performance deficiencies were immediately apparent.  *See* Ex. 20 generally.  On June 30, M2 supervisor Harley Friedman, M.D., ("Dr. Friedman") e-mailed the Plaintiff summarizing Dr. Friedman's decision to reduce the Plaintiff's patient load so he could focus on improving his skills.  *Id.*, pp. 58-59.  Dr. Friedman set forth clear expectations about arriving on time, leaving sufficient time to prepare for rounds, answering pager calls, and documenting patient files; and, he bluntly told the Plaintiff that "your performance is far behind what we would expect of interns in our service.  It is your responsibility to improve your performance."  *Id.*  On July 2, Dr. Friedman removed the Plaintiff from the M2 rotation, citing his lack of knowledge, skills and motivation.  *Id.*, pp. 54, 55.  When Dr. Friedman was deposed by the Plaintiff, he testified about those problems in the following way:

> . . . your performance, even in the first several days of your internship was well-below the standard we would set for interns in our program.  And your performance was poor enough that I became involved in your training very, very early to try and sort out those problems and to see if there was something that we could fix or we could alter to help you succeed in our program.

> The issue was around the efficiency of the care that you were delivering.  It was around being able to manage the workload that we expect of new interns at the beginning of the year.  It was around the, again, there were multiple sort of evaluations that occurred.  It was around the accuracy of some of the documentation that you were doing on patients that were on the in-patient service.  There were multiple deficiencies that were noted in your performance.

*See* Ex. 28, pp. 75-77.

Simon Khagi, M.D., made similar observations when deposed by the Plaintiff, and testified that the Plaintiff "[d]idn't finish his notes on time; left his pager in the room and go off to lunch after repeatedly being told not to do so; having his resident answer those pages repeatedly for him on his behalf, despite his responsibilities" and thought the Plaintiff was removed from M2 for "overall incompetence." *See* Ex. 30, pp. 62, 108.

The Plaintiff was moved to a psychiatry rotation, where he showed minor improvement, but still had significant performance issues. *See* Ex. 20. For example, he failed to finish summaries on time, and lacked fundamental interviewing and presentation skills. *Id.*, p. 36. On July 21, Dr. Finn expressed concerns that he was not present for a required sign-out on several occasions, and reminded him it was "an important aspect of patient care." *Id.*, p. 61. He was also reminded to arrive before rounds and to be prepared. *Id.* On August 11 and 30, she expressed concerns over the Plaintiff's late sign-outs, unexplained absences, and inability to be reached by pager. *Id.*, pp. 62-63. The following month, the Plaintiff declined to be involved in a patient consultation, ordered opiate medication on the wrong patient, and displayed poor patient assessment skills. *Id.*, p. 71. There were continued problems contacting the Plaintiff, reported concerns about his failure to complete progress notes or discharge summaries, and an incident where the Plaintiff "cut and pasted" notes instead of submitting his own work. *Id.*, pp. 71-73.

On September 21, Dr. Finn gave the Plaintiff a written performance improvement plan to address short-comings such as "lack of details, gaps in clinical knowledge, repeated lateness, and limited self-direction." *See* Ex. 21. He was reminded to be on time, to write complete and timely notes, to wear his pager, and to be prepared for rounds. *Id.*

On October 7, Dr. Finn acknowledged some improvements but saw on-going issues with "on call work, or understanding what is important, prioritizing work, note writing and following the guidance of senior residents."  *See* Ex. 20, p. 41.  In November, the Plaintiff failed to give a clear or complete presentation, engage in logical analysis, or articulate a working diagnosis.  *Id.*, p. 89.  He prematurely discharged a patient.  *Id.*  These issues and others were addressed during a performance meeting on November 29.  *Id.*, pp. 42-43.

The Plaintiff deposed Dr. Finn, and she testified that his academic and non-academic problems included tardiness and not responding to pages (*See* Ex. 29, p. 81), incomplete physical exams, errors due to cutting and pasting instead of using independent analysis, and misappropriating notes (*Id.*, p. 28).

On December 30, Dr. Finn e-mailed Dr. Bertrand to express concerns about the Plaintiff's performance and identify program options to address those problems, including the possibility of not renewing the Plaintiff's residency contract.  *See* Ex. 22.

The Plaintiff returned to M2 for his next rotation, and it quickly became clear that his skills had not sufficiently improved.  The Plaintiff deposed Ghislaine Guez, M.D., who worked with him on that rotation, and she testified that he struggled with clinic scenarios, obtaining necessary patient data, and with time management.  *See* Ex. 31, p. 12.  She thought his most significant problem was an overall lack of effort.  *Id.*, p. 21.  However, she also "thought there were a lot of facts that were not obtained from patients . . . you struggled to put together a cohesive assessment and plan."  *Id.*, p. 65.  Ultimately, Dr. Guez thought that the Plaintiff was not "competent to perform the duties required as an intern."  *Id.*, p. 76.

On January 11, 2012, Dr. Friedman removed the Plaintiff from the M2 rotation, for late arrivals, poor work, and misrepresenting a patient examination.  *See* Ex. 20, p. 91-92.

Dr. Finn and Dr. Friedman reviewed the Plaintiff's ERAS application, and Dr. Friedman noticed a gap in the education chronology.  *See* Ex. 28, pp. 121-22; Ex. 29, p. 90-92; 140.  They discovered that the Plaintiff had been at AZ, but did not disclose it on his 2010 ERAS application.  *Id*. When Dr. Finn met with the Plaintiff on January 13 to discuss the performance problems and undisclosed AZ match, the Plaintiff:

> … reports purposely leaving this information off, at times stating it was because he did not think it was relevant, and at other times, because it was under dispute and the 'status' had not yet been determined and finally that he did not need to report it because it was his choice to leave.

*See* Ex. 23.  She told him "that the ERAS application is quite specific in asking about prior training experiences, and that the omission of his prior internship experience was a serious issue. I let him know that the application allows for provision of an explanation, and that the correct course of action would have been to enter in the seven weeks of training, and then indicate an explanation[.]"  *Id*.  The Plaintiff had done that when disclosing Duke on his AZ ERAS application (*See* Ex. 6), but did not disclose or explain AZ to the Defendants (*compare*, Ex. 2). He was placed on administrative leave, notified that the options being considered at that time included his dismissal, and given a copy of the grievance policy.  *See* Ex. 23.  Several weeks later, Dr. Finn learned that the Plaintiff had also attended USC.  *See* Ex. 29, p. 61.

### D.  The Plaintiff's refusal to engage in administrative remedies.

On March 19, 2012, the Plaintiff was terminated for performance deficiencies and behavior incompatible with the role of a physician.  *See* Ex. 1.  He was advised of his grievance rights and given materials outlining that process.  *Id*.

On March 20, the Plaintiff asked to participate in the Fair Hearing process.  *See* Ex. 24, p. 13.  On April 3, he requested a stay.  Id., p. 22.  On May 7, he asked that the process move forward.  *Id*., pp. 22-23.  Dr. Bertrand then notified the Plaintiff that a committee had been

formed.  *Id*., p. 25.  On May 30, Dr. Bertrand gave the Plaintiff two June hearing dates to choose

from.  *Id*., p. 32; *see* generally Ex. 32.

The Plaintiff responded by threatening to file criminal complaints against Dr. Bertrand

and others, refusing to appear at DHMC, and demanding a videoconference.  *See* Ex. 24, p. 33.

The next day, he instructed Dr. Bertrand to "not ever contact me again[.]"  *Id*., p. 35.  His request

to terminate the Fair Hearing process was confirmed on June 4, 2012.  *See* Ex. 25.

## II.  **PROCEDURAL HISTORY**

The procedural history is brief.  In May 2012, the Plaintiff filed charges against DHMC

with the Equal Employment Opportunity Commission ("EEOC"), alleging that the date of

purported ADA discrimination was March 19, 2012, when he was discharged.  *See* Ex. 26.

MHMH was not named in the EEOC charges.  *Id.*

On February 6, 2013, the Plaintiff filed an Amended Complaint, containing 10 causes of

action.  *See* Docket Entry #54, 1:12-cv-0040.

On November 4, the Court issued new deadlines, under which the Plaintiff's expert

disclosures were due by December 13, and discovery closed on February 3, 2014.  *See* Docket

Entry #106, 1:12-CV-40, p. 8.  The Plaintiff has not identified any experts.

## III.  **STANDARD OF REVIEW**

"Summary judgment is warranted where 'there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law.'"  *McGair v. Am. Bankers Ins. Co.

of Fla.*, 693 F.3d 94, 99 (1st Cir. 2012).  "The object of summary judgment is to 'pierce the

boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is

actually required.'"  *Dávila v. Corp. de P.R. para la Diffusión Púb.*, 498 F.3d 9, 12 (1st Cir.

2007).  An opposing party may survive summary judgment "by demonstrating, through

submissions of evidentiary quality, that a trial worthy issue persists." *Sánchez-Rodríguez v. AT&T Mobility P.R., Inc.*, 673 F.3d 1, 9 (1st Cir. 2012). "However, 'a conglomeration of conclusory allegations, improbable inferences, and unsupported speculation is insufficient to discharge the nonmovant's burden.'" *Sánchez-Rodríguez*, 673 F.3d at 9 (quoting *DePoutot v. Raffaelly*, 424 F.3d 112, 117 (1st Cir. 2005)).  Bald assertions, unsupported conclusions, and speculation will be ignored. *Serapion v. Martinez*, 119 F.3d 982, 987 (1st Cir. 1997); *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## IV.  LEGAL ARGUMENTS

Summary judgment should be granted for several reasons.  First, the undisputed facts and controlling law are dispositive of the ten counts asserted in the Complaint.  The Defendants fulfilled all of their legal obligations to the Plaintiff, and offer evidence that establishes they acted in a legitimate and non-discriminatory way at all times.  Second, MHMH was the Plaintiff's employer; DHMC does not have any employees.  Any claims against DHMC as an "employer" must therefore fail.  Third, discovery is closed and the expert disclosure deadline has passed, without the Plaintiff identifying any experts who are required if his claims of liability and damages are to move forward.  Finally, the Plaintiff failed to exhaust his administrative remedies, and those available through the Defendants' grievance process, and given the recognized deference institutions like the Defendants are afforded, his claims are barred.

### A.  The undisputed facts mandate judgment for the Defendants.

#### 1.      Count I: ADA Claim (DHMC/MHMH).

For the purposes of summary judgment, the Defendants will assume that a prima facie case may be made, and therefore focus on the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973);  *see also Ruiz Rivera v. Pfizer*

*Pharms., LLC*, 521 F.3d 76,82 (1st Cir. 2008).  The Defendants may defeat a prima facie inference by providing legitimate and non-discriminatory reasons for their actions, thereby shifting the evidentiary burden to the Plaintiff.  *Id.*; *see Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 99 (1st Cir. 2007) (citations omitted) and *Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 105 (1st Cir. 2005).

The undisputed facts cited above amply illustrate the legitimate and non-discriminatory employment decisions MHMH made regarding the Plaintiff's residency.  Throughout his employment, he was late to rounds and sign-outs, unprepared, unavailable by pager, and lacking in basic skills.  *See* Exs. 1, and 20 – 23.  His performance was so bad that he was removed from his first scheduled rotation, but his problems persisted during his second rotation, and led to implementation of a written performance plan. *See.* Ex. 21.  He still failed to meet improvement goals, and engaged in conduct that was inappropriate for a doctor, such as falsely reporting a patient examination and omitting information from his residency application. *See* Exs. 2, 20.

The Plaintiff claims that he was denied employment opportunities, unfairly supervised, and denied requested accommodations, but there is not any factual support for those claims, and the undisputed record shows appropriate reasons for all of the employer's actions.  For example, the Plaintiff did receive close supervision, which was legitimate given his numerous performance problems.  Some of those meetings were part of a performance improvement plan, in which Dr. Finn wrote "During this improvement period, residency staff members will provide additional support and supervision to you[.]"  *See* Ex. 21.  The Plaintiff replied "I think that the plan you wrote makes sense…. [I] am grateful for the teaching and guidance I have received in the first few months of residency."  *Id.*, p. 40.  It is also true that the Plaintiff inquired about transferring into a different program (LPMR), and Dr. Finn "let him know that generally the PGY-1 and 2

years must be successfully completed in order to participate in this additional training." *Id*., p. 43.  He was not denied an opportunity because of disability discrimination; he was simply not qualified, and had not successfully completed required training.

The Plaintiff alleges that he made accommodation requests that were ignored, but once again there are no facts supporting such a charge.  Unless an employer knows, or should know, that an accommodation is necessary, the employee must explicitly request one, in a way that is sufficiently direct and specific, while also showing how the accommodation is linked to plaintiff's disability. *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 89 (1st Cir. 2012).  The only evidence of any discussion about a change in work comes in the performance plan meeting memo of November 29, 2011, when the Plaintiff inquired about part-time work, and Dr. Finn explained to him that "the PGY-1 year is not well suited to part time work, other than alternating months off and on services.  He agrees to remain at a regular shift for now." *See* Ex. 20, p. 42. There is no causal connection to an alleged disability, or even a request for an accommodation.

There are legitimate reasons for the employer's actions.  MHMH did not discriminate or retaliate against the Plaintiff, but acted in an appropriate manner given his significant workplace failures and dishonest conduct as highlighted by his ERAS omissions.  The burden therefore shifts to the Plaintiff, who must produce facts and evidence showing that the stated reasons "were both a sham, and a sham intended to cover up a discriminatory motivation." *Taite v. Shineski*, 2010 WL 745160, at *11 (D.N.H. Mar. 1, 2010); *see also Mesnick v. Gen Elec. Co.*, 950 F.2d 816, 824 (1st Cir. 1991) ("It is not enough for a plaintiff merely to impugn the veracity of the employer's justification; he must elucidate specific facts").  He cannot satisfy that requirement.  Moreover, to the extent the Plaintiff alleges "retaliation" on some basis, it is clear that he must show not only a protected activity, but that such activity was "a but for cause" of

adverse employment action.  *See Univ. of Tex. Sw. Med. Ctr. V. Nassar*, 133 S.Ct. 2517, 2534

(2013).  There are no facts with which he can meet that burden, or rebut the legitimate and non-

discriminatory reasons for discharge as articulated by the Defendants.

The Plaintiff's ADA claims against DHMC must also fail because that entity does not

have any employees.  *See* Ex. 33.  It is not an employer under the ADA.  The ADA claims

against MHMH also fail, because the Plaintiff did not exhaust his administrative remedies.  To

proceed with an ADA claim, he is required to file a charge with the EEOC, or with an

appropriate state or local agency, within the prescribed time limits.  *Hess v. Rochester Sch. Dist.*,

2005 D.N.H. 143 (2005), citing *Bonilla v. Muebles J.J. Alveraz, Inc.*, 194 F.3d 275, 278 (1st Circ.

1999).  Here, he never filed any charge against MHMH.  *See* Ex. 26.  For these reasons, MHMH

and DHMC are entitled to judgment on Count I.

### 2.      Count II: Wrongful Termination (DHMC)

In order to establish a tort claim for wrongful termination, the Plaintiff must show he was

terminated for performing an act which public policy would encourage, or for refusing to

perform an act that public policy would condemn; and, that the termination was motivated by

bad faith, malice, or retaliation.  *MacKenzie v. Linehan*, 158 N.H. 476, 480 (2009).

However, even before those elements are considered against the undisputed facts, it is

clear that this "at-will" claim against DHMC must fail because that entity did not employ him.

*See* Ex. 18, 33.  Moreover, the Plaintiff was a contract employee.  *See* Ex. 18.  New Hampshire

employees fall into two classes: contract employees and at-will employees. *Panto v. Moore

Business Forms, Inc.*, 130 N.H. 730, 547 A.2d 260, 267 (N.H. 1988). Contract employees are

limited in their remedies for breach by the terms of the contract. *Id.*  In contrast, at-will

employees are limited in their remedies to claims for wrongful termination.  *Censullo v. Brenka*

*Video, Inc*., 989 F.2d 40, 41 (1st Cir. 1993), citing *Cloutier v. Great Atlantic & Pacific Tea Co.*, 121 N.H. 915 (1981).  Since the Plaintiff was a contract employee, he cannot assert an "at-will" cause of action; and, his claim against DHMC fails since there was no contract between them.

The claim also fails on the merits, and there is an overwhelming amount of undisputed evidence, from deposition testimony through written records, documenting the Plaintiff's significant performance and professional failings.  Those issues, identified by multiple doctors over the course of months, included being late, being unprepared, failing to obtain critical patient information, not documenting files, not responding to pages, and not following instructions.  *See* Ex. 20-23.  His unprofessional conduct included misrepresenting information on his ERAS application, which, standing alone was appropriate grounds for termination.  *See* Ex. 2.  On January 13, 2012, he was placed on administrative leave while his status was under review.  *See* Ex. 23.  The Plaintiff was informed that one of the options being considered was dismissal.  *Id.*

The "acts" identified by the Plaintiff as supporting his wrongful termination claim did not take place until several days after he was notified of his possible dismissal; his "ethics complaint" came on January 15, and his Office of Civil Rights complaint was made on January 17.  *See* Complaint at Count II.  Both were filed after his dismissal was already being considered.  *See* Ex. 23.  As Dr. Finn wrote several days before those acts, the only other possible outcomes were resignation and remediation.  *Id*.  The Plaintiff did not resign, and the grievance policy clearly states that remediation is not an option when a resident engages in behavior incompatible with the role of a physician.  *See* Ex. 1., p.3.  Misrepresenting application information and engaging in conduct incompatible with the role of a physician barred the remediation option, making dismissal the only appropriate decision.  *Id.; see also* Ex. 18.

There is no evidence of any causal link between the Plaintiff's subsequent complaints and the termination decision that was already under consideration.  *See generally Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality").  Arguing that the events are simply close in time, without any facts showing a causal connection, is speculation and insufficient to defeat summary judgment.  *Mariani-Colon v. Dep't of Homeland Sec.*, 511 F.3d 216, 224 (1st Cir. 2007) ("Appellant offers no additional evidence to show that the reasons the government offered for his termination are pretextual. While appellant engages in much speculation and conjecture, a plaintiff cannot defeat summary judgment by relying on conclusory allegations, or rank speculation"); *see also Horskotte v. Comm'r, New Hampshire Dept. of Corrections*, 2010 WL 1416790, at \*5 (D.N.H, April 2, 2010), relying on *Layne v. Vinzant*, 657 F.2d 468, 476 (1st Cir. 1981) .  No facts support a wrongful termination claim, and DHMC was not even the employer, so summary judgment on Count 2 is appropriate.

### 3.      Count III: NH RSA 354-A (DHMC/MHMH)

The Plaintiff's state discrimination claims are barred because he failed to exhaust his administrative remedies as required by New Hampshire law.  *Hess v. Rochester Sch. Dist.*, 2005 DNH 143 (2005), citing *Bonilla v. Muebles J.J. Alveraz, Inc.*, 194 F.3d 275, 278 (1st Circ. 1999).

RSA 354-A was enacted by the New Hampshire legislature to establish a comprehensive statutory process under which parties could initiate an administrative procedure to address claims of discrimination, harassment and retaliation.  *See* RSA 354-A:1.  The statute clearly requires that the mandatory administrative charge alleging violations of RSA 354-A "must be filed within 180 days after the alleged act of discrimination."  *Id.*, A:21, III.  A party may only pursue a civil

discrimination claim after removing the case from the Commission.  *Id.*, A:21-a, I, II.  In short, to bring a cause of action under 354-A, the Plaintiff was required to file a charge against MHMH with the New Hampshire Commission for Human Rights.  He never did, and he simply failed to follow the required statutory procedure to initiate a state administrative claim.  Therefore, as supported by the legal authority cited above, the Defendants are entitled to judgment.

    **4.**        **Count IV – Breach of Contract (DHMC)**

When interpreting a contract, courts ordinarily "determine the parties' intent from the plain meaning of the language used."  *Sabinson v. Trs. of Dartmouth Coll.,* 160 N.H. 452, 458 (2010).  Here, the Plaintiff has not identified what written instruments form the basis of his claim against DHMC, other than an allegation in his Complaint, at ¶123, that he was owed a "more thorough written record" of some kind.  Significantly, however, he did not have any contract with DHMC.  There is, instead, a MHMH Resident Agreement that allows for termination "at any time upon any reasonable basis which shall be deemed to include failure to satisfy the academic requirements of the program… or conduct unbecoming of a physician."  *See* Ex. 18.

The Plaintiff received all information to which he was entitled, and notice of his termination on March 19, 2012.  *See* Ex. 1.  He also received copies of the grievance policy.  *Id.*  That policy calls for, among other things, a resident being "informed in writing of the documented deficiencies or allegations and of the recommendation for nonrenewal, dismissal or remedial training[.]"  *Id.*, Fair Hearing Policy, §I,D,1.  Clearly, the termination letter provided that notice, as the Plaintiff promptly initiated the grievance process.  *See* Ex. 24.  When he requested a stay, it was given; when he moved to re-open the hearing, Dr. Bertrand appointed a panel and provided hearing dates.  *Id.*; *see also* Ex. 32.  The Plaintiff then abruptly ended the process and instructed Dr. Bertrand not to contact him again.  *Id.; see* Ex. 25.  The Plaintiff

received what he was due under the MHMH Resident Agreement, and since there was neither a breach of that agreement nor any DHMC contract, the Defendants are entitled to judgment as a matter of law on Count IV.

### 5.   Count V - Covenant of Good Faith/Fair Dealing (DHMC)

New Hampshire recognizes an implied duty of good faith and fair dealing in contractual relationships.  *Tessier v. Rockefeller*, 162 N.H. 324 (2011), *Cloutier v. A & P Tea Co., Inc.*, 121 N.H. 915, 920 (1981).  In order to properly allege a good faith and fair dealing claim, a plaintiff must make allegations that are separate and distinct from those underlying a breach of contract claim. *See Balsamo v. Univ. Sys. of N.H.*, 2011 D.N.H. 150, citing *Alt. Sys. Concepts, Inc. v. Synopsys, Inc.*, No. CIV. 00-546-B, 2001 U.S. Dist. LEXIS 12047, 2001 WL 920029, at *3 (D.N.H. Aug. 2, 2001) (the plaintiff's "good faith and fair dealing claim is redundant because it will be addressed in its claim for breach of contract"); *see also Hall v. EarthLink Network, Inc.*, 396 F.3d 500, 508 (2d Cir. 2005) ("If the allegations [underlying a good faith and fair dealing claim] do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated.") (internal quotation marks and citation omitted).

As discussed above, there was not any contract with DHMC so this claim must fail. MHMH has already set forth facts establishing the good-faith reasons for the actions it took regarding the Plaintiff's employment.  Since there are not any new claims in Count V, summary judgment is warranted.

### 6.      Count VI: Negligent Misrepresentation (DHMC/MHMH)

Misrepresentation claims are subject to Fed. R. Civ. P. 9(b), and heightened pleading standards, but the Plaintiff only identifies one statement, purportedly made by Dr. Finn, that "accommodations are difficult to arrange for an intern." *See* Complaint, at ¶141.  He must show that the representation was made with knowledge that it was false, or with conscious indifference to the truth.  *See LeDoux v. J.P. Morgan Chase*, 12-cv-260-JL, 2012 WL 5874314 at *11(D.N.H. Nov. 20, 2012), citing *Tessier v. Rockefeller*, 162 N.H. 324, 332 (2011).  The Plaintiff does not identify whether the statement related to a disability accommodation request, or how it is even untrue.  There is no claim he "relied" on the statement, which is a required legal element of such a claim.  *Snierson v. Scruton*, 145 N.H. 73, 78 (2000).  There is no expert testimony creating an issue of fact that the statement caused his "complete disability" as asserted in ¶147 of the Complaint.  Therefore, the Defendants are entitled to judgment on Count VI.

### 7.      Count VII: Rehabilitation Act (DHMC/MHMH)

As the Plaintiff acknowledges, the standard to review claims under the Rehabilitation Act are the same as those applied under the ADA.  His claims in Count VII mirror those made in Count I, and the Defendants therefore adopt the same discussion here and request that summary judgment be awarded for the reasons set forth above.

### 8.      Count VIII: Fraud (DHMC/MHMH)

The Plaintiff faces a high burden in alleging the elements of fraud with specific allegations of misconduct, together with a showing that the statements were made with knowledge that they were false, or with conscious indifference to the truth, with the intention to cause another to rely upon it.  *See Snierson, supra*.  The alleged "fraud" is that the Defendants

"misrepresented Plaintiff's performance as a resident physician." *See* Complaint, ¶174. The undisputed facts defeat that claim.

The factual record regarding the Plaintiff's academic incompetence and unprofessional conduct is discussed at length above. The Defendants have provided sworn testimony, e-mail documentation, and performance evaluations, all providing facts to show that the Plaintiff did not perform tasks in timely manner, did not properly examine patients, did not sufficiently document patient files, was unacceptably tardy or absent, and was frequently unprepared for rounds. They have also shown that he misrepresented his activities, and omitted information from his ERAS application. Those undisputed facts are sufficient for summary judgment on the fraud claim, as there can be no doubt that his performance as a physician was unacceptable, and since his conduct incompatible with the role of physician would have, standing alone, resulted in his termination.

### 9.    Count XIX: IIED claim (DHMC/MHMH)

In order to make out a claim for intentional infliction of emotional distress ("IIED"), the Plaintiff show that the Defendants "by extreme and outrageous conduct, intentionally or recklessly cause[d] severe emotional distress" to him. *Morancy v. Morancy*, 134 N.H. 493, 496, (1991) (quotation omitted). "In determining whether conduct is extreme and outrageous, it is not enough that a person has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice." *Mikell v. Sch. Admin. Unit #33*, 158 N.H. 723, (2009) (citation and quotations omitted). Rather, there must be a showing that "the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.*

The Defendants have submitted the factual basis for all of their actions leading up to and through termination.  The record establishes that they saw performance problems and discovered dishonest conduct, and that they took appropriate and non-discriminatory actions in response.  The burden is on the Plaintiff to produce evidence that creates a genuine issue of material fact, to show the Defendants engaged in acts that were even more than something illegal or reprehensible.  *See Konefal v. Hollis/Brookline Co-op Sch. Dist.,* 143 N.H. 256, 261 (1998).  Here, there is simply no evidence of any such wrongful conduct.  Additionally, an IIED claim requires a showing of emotional distress with physical manifestations, as established through expert testimony.  *O'Donnell v. HCA Health Services of NH, Inc.,* 152, N.H. 608, 611-612 (2005).  The Plaintiff, however, has not identified any expert witnesses and the disclosure deadline has passed.  Judgment in favor of the Defendants on this Count is therefore appropriate.

### 10.     Count X: Negligent Infliction of Emotional Distress (DHMC/MHMH)

The elements needed to establish a claim for negligent infliction of emotional distress are: "(1) causal negligence of the defendant; (2) foreseeability; and (3) serious mental and emotional harm accompanied by objective physical symptoms." *O'Donnell, supra.*  The *O'Donnell* Court also held, "[t]o ensure that the emotional injury is sufficiently serious to be afforded legal protection as well as to establish causation, we have repeatedly held that "expert testimony is required to prove physical symptoms suffered from alleged negligent infliction of emotional distress."" *Id.*, (citation omitted); *see Michnovez v. Blair*, CV-20-100-LM (summary judgment on emotional distress claim where plaintiff lacked expert).  Since the undisputed facts do not establish any facts constituting causal negligence, and since the Plaintiff has not disclosed any experts, this claim fails.

It is also well-settled that claims for emotional distress damages against an employer based on injuries that occurred during employment are barred by RSA 281-A:8, I, the New Hampshire "Workers' Comp" Statute.  R.S.A. 281-A:8 provides statutory immunity to employers from tort claims brought by employees; under that statutory scheme, the employee "shall be conclusively presumed . . . . to have waived all rights of action whether at common law or by statute" against an employer.  *See* RSA 281-A:8, I.  Courts have consistently interpreted that statutory immunity to include claims for emotional distress.  *See Gilbert v. Essex Group*, 930 F. Supp. 683 (D.N.H. 1993); *Miller v. CBC Cos.*, 908 F. Supp. 1054, 1068 (D.N.H. 1995), citing *Censullo v. Brenk Video*, 989 F. 2nd 40, 43 (1st Cir. 1993) (interpreting New Hampshire law). In *Sefiane v. Walmart Stores, Inc*., 2002 D.N.H. 68, the court analyzed employee claims of intentional and negligent infliction of emotional distress, and granted summary judgment to the employer.

Once again, the Defendants have provided facts establishing the propriety of their actions and employment decisions, and the record is simply devoid of any facts to support the Plaintiff's claims of negligent infliction of emotional distress.

### B.    The Plaintiff lacks necessary expert testimony.

The Plaintiff has not disclosed any expert witnesses, and his disclosure deadline passed months ago.  "Expert testimony is required where the subject presented is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson." *Boynton v. Figueroa*, 154 N.H. 592, 601 (2006).

Without experts on liability or causation, the Plaintiff cannot proceed with his claims of injury, exacerbation, or disability.  Those issues are well beyond the knowledge of an average juror, and compounded in this case by the variety of conditions the Plaintiff's claims to have,

from Asperger's Syndrome (Complaint, ¶11), to head trauma (*Id*., ¶12), to an unidentified pre-existing "neuropsychiatric disability" (*Id.*, ¶13), to a presently alleged "complete disability" (*Id.*, ¶147). As the *O'Donnell* Court held, expert testimony is required show both the significance of the emotional injury claimed, and causation. Since he has failed the provide experts, all claims for physical and emotional injury fail as a matter of law.

The Plaintiff's claim for economic loss fails as a matter of law for similar reasons. First, even if he could identify an injury and establish causation, the complexity of the alleged damages and losses are clearly not within a jury's realm of common knowledge and everyday experience. *Laramie v. Stone*, 160 N.H. 419, 430-431 (2010), citing *Accord Parra v. Atchison, Topeka & Santa Fe Ry. Co.*, 787 F.2d 507, 509 (10th Cir. 1986) ("Where the injury is obscure, … a loss of future earnings capacity must be established by expert medical testimony in order to avoid pure speculation on the part of the jury"). Second, the Plaintiff's claims for future lost earning as a doctor are even more speculative, because they require assumptions about the Plaintiff's successful completion a residency program and future certifications. *Barsoumian v. University at Buffalo*, 2013 U.S. Dist. LEXIS 102808 *9 (W.D.N.Y. July 23, 2013) (assumptions about the successful completion of residency program and qualifying examination for board certification are "too speculative to form an appropriate basis for monetary damages").

C.     **The Plaintiff's failure to exhaust remedies bars claims.**

Under New Hampshire law, the "general rule is that administrative remedies must first be exhausted before a party brings a matter to the courts." *Huard v. Town of Pelham*, 159 N.H. 567 (2009) (affirming dismissal of claims because plaintiff failed to exhaust administrative remedies, notwithstanding his argument that he was "not required to do so 'if it is obvious that it is a waste of time and will more likely than not result in the denial of his requests'"). *See Appeal of Linn*,

145 N.H. 350 (2000) (affirming dismissal of hospital employee's Whistleblowers' Protection Act claim "because she had not attempted to utilize the hospital's internal grievance procedure to restore her rights" as required by the Act). The court "may dismiss [an action] with prejudice" for failure to exhaust administrative remedies "if [the] administrative remedies are no longer available to the plaintiff" because he failed to take the steps necessary to exhaust such remedies within a stated deadline. *Silva v. Warden, New Hampshire State Prison*, 150 N.H. 372 (2003).

Although an issue of first impression in New Hampshire, the same rule should apply to administrative proceedings at a teaching hospital such as MHMH. In this case, the parties entered into an employment contract, under which administrative procedures to resolve disputes were deemed to be "an integral part of this agreement." *See* Ex. 18, ¶5. Courts in other jurisdictions reviewing similar facts have held "a physician in a private hospital whose employment and/or hospital privileges have been terminated must exhaust all internal administrative remedies" before seeking judicial relief. *See Nemazee v. Mt. Sinai Medical Center*, 564 N.E.2d 477, 482 (Ohio 1990). In that case, a medical resident's breach of contract and IIED claims against a teaching hospital, filed after his termination, were dismissed because he did not participate in the administrative process available through his employment contract. *Id.,* 477-78. The court noted that "[t]he majority of courts in other jurisdictions which have considered this issue have found that the exhaustion doctrine is applicable to the administration of private hospitals." *Id.,* 482 (citing *Westlake Community Hospital v. Kaiman*, 551 P.2d 410 (Cal. 1976) (before a doctor may initiate an action against a hospital for damages for an allegedly wrongful denial or withdrawal of privileges, he must exhaust the available internal remedies afforded by the hospital); *Eidelson v. Archer*, 645 P.2d 171 (Ala. 1982) and other cases).

The same analysis applies in this case.  The Plaintiff signed a contract, under which administrative review of decisions was available. He refused to participate in that process, and did not exhaust his remedies.  He should not now be allowed an additional opportunity for review after refusing to avail himself of MHMH grievance process.

**D.  MHMH should be given deference on performance decisions.**

Decisions on academic performance and ethical standards applicable to residents should be accorded deference, as recognized in other jurisdictions.  *See Bhatt v. University of Vermont*, 958 A.2d 637, 642 (2008) (citing *Falcone v. University of Minnesota*, 388 F.3d 656, 659 (8th Cir. 2004) (a university has "virtually unrestricted discretion to evaluate academic performance")); *Regents of the University of Michigan v. Ewing*, 474 U.S. 214, 225 n.11 (1985) ("University faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation").  That deference arises from the unique position of teaching hospitals, which is quite different from a traditional employment environment or relationship.  Allowing a jury to determine whether it believes the Plaintiff performed at an unacceptable level academically, or in a manner incompatible with the role of a physician professionally, would improperly interfere with MHMH's right to make academic and/or disciplinary decisions about its residents.  *See Board of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78, 92 (1978) ("Courts are particularly ill-equipped to evaluate academic performance").  Accordingly, even if the Court determined that the other reasons for granting summary judgment were insufficient, deferring to the judgment of the teaching hospital on matters of academic performance and resident integrity would be appropriate.

## V.  <u>CONCLUSION</u>

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of facts for purposes of ruling on a motion for summary judgment."  *O'Rourke v. Boyne Resorts*, Opinion No. 2014 DNH 024, 12-CV-445-SM, citing *Scott v. Harris*, 550 U.S. 372, 380 (2007). Here, the record cannot be disputed; the Plaintiff omitted required information from his ERAS application, performed his work at an unacceptably poor level, and engaged in conduct that was contrary to the role of a physician.  Against those documented facts tracking his academic and non-academic deficiencies, the Plaintiff offers unsupported theories of collusion and conspiracy insufficient to defeat a dispositive motion.  "Creating a genuine issue of material fact requires hard proof rather than spongy rhetoric."  *Kearny v. Town of Wareham*, 316 F.3d 18, 22 (1st Cir. 2002).

WHEREFORE, for the reasons set forth in the Motion for Summary Judgment and this supporting Memorandum of Law, the Defendants respectfully request that their motion be GRANTED, and that they be awarded judgment on all counts against them.

**DARTMOUTH HITCHCOCK MEDICAL CENTER and MARY HITCHCOCK MEMORIAL HOSPITAL**

By Their Attorneys,
SULLOWAY & HOLLIS, P.L.L.C.


Dated: February 18, 2014        By:    /s/ Christopher J. Pyles
                                       Edward M. Kaplan (#1307)
                                       Christopher J. Pyles, Esq. (#15165)
                                       Sulloway & Hollis, P.L.L.C.
                                       9 Capitol Street
                                       Concord, NH 03301
                                       (603)223-2863

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing pleading was served via e-mail on the following persons on this date:

**Jeffrey David Isaacs**
**3553 West Chester Pike Unit 177**
**Newtown Square, PA 19073**

**Kathleen Peahl, Esq.**
**Wadleigh Starr & Peters, PLLC**
**95 Market Street**
**Manchester, NH 03101**

**Pierre Chabot, Esq.**
**Wadleigh Starr & Peters, PLLC**
**95 Market Street**
**Manchester, NH 03101**

Dated:  February 18, 2014         By:    /s/ Christopher J. Pyles
                                                Christopher J. Pyles